**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br>　　　　　　　　　　Plaintiffs,<br>　　　and<br><br>STATE OF WEST VIRGINIA et al.,<br>　　　　　　　　　　Intervenor-Plaintiffs,<br>　　　v.<br><br>JULIE MOORE et al.,<br>　　　　　　　　　　Defendants,<br>　　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　　　Intervenor-Defendants. | Case No. 2:24-cv-01513 |
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br>　　　　　　　　　　Plaintiffs,<br>　　　v.<br><br>STATE OF VERMONT et al.,<br>　　　　　　　　　　Defendants,<br>　　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　　　Intervenor-Defendants. | Case No. 2:25-cv-00463 |

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ......................................................................................................................1

BACKGROUND .......................................................................................................................3

    A.    Cost Assessment .....................................................................................................3

    B.    Cost Recovery Demands.........................................................................................6

    C.    Adaptation Projects.................................................................................................9

STANDARD OF REVIEW ......................................................................................................11

ARGUMENT ...........................................................................................................................12

I.    The Court should dismiss the Chamber Complaint for lack of subject matter jurisdiction. ...................................................................................................................12

    A.    The Chamber Plaintiffs have not alleged associational standing...........................12

    B.    The Court should dismiss all claims brought under 42 U.S.C. § 1983..................14

        1.    The Chamber Plaintiffs may not bring § 1983 claims on behalf of their members...................................................................................................15

        2.    The Chamber Plaintiffs have not alleged direct § 1983 claims, nor could they.......................................................................................................15

        3.    The Court should dismiss all preemption/preclusion claims brought under § 1983...................................................................................................17

II.    The Court should dismiss the West Virginia Plaintiffs' Vermont constitutional claims for lack of subject matter jurisdiction...................................................................................17

    A.    The West Virginia Plaintiffs lack standing to raise claims under the Vermont Constitution..........................................................................................................17

    B.    This Court may not hear claims against Vermont under the Vermont Constitution..........................................................................................................19

III.    The Court should dismiss all three complaints under Rule 12(b)(6). ...............................21

    A.    Plaintiffs' facial challenges face a high burden. ...................................................21

    B.    Plaintiffs fail to state a claim that Act 122 is federally precluded. (Chamber Count I; W. Va. Count I; U.S. Count II)................................................23

i

1.      Act 122 is not unconstitutionally "extraterritorial." .................................25

2.      Plaintiffs have not stated a preemption claim under the foreign affairs doctrine. ........................................................................................27

3.      Federal common law does not preempt Act 122; *City of New York v. Chevron Corporation* is inapposite.............................................................31

C.     The Clean Air Act does not preempt Act 122. (Chamber Count II; W. Va. Count II; U.S. Count I). .............................................35

1.      The Clean Air Act does not expressly preempt Act 122. ..........................35

2.      The Clean Air Act does not occupy the field. .............................................36

3.      Act 122 does not conflict with the Clean Air Act. .....................................38

D.     Plaintiffs fail to state a claim that Act 122 violates due process. (Chamber Count III; W. Va. Counts IV, V) ..........................................................42

1.      Act 122 does not violate substantive due process......................................42

a.      Act 122 has a legitimate purpose. ...................................................44

b.      Act 122's cost recovery program is rational. ................................44

c.      Act 122 is not unconstitutionally vague.........................................49

2.      Act 122 does not violate procedural due process.......................................51

E.     Plaintiffs fail to state a claim that Act 122 violates the Equal Protection Clause or the Common Benefits Clause. (W. Va. Counts VI, VII) ..........................................................................................51

1.      Act 122 does not violate the Equal Protection Clause..............................51

2.      Act 122 does not violate the Common Benefits Clauses...........................54

F.     Act 122 does not violate the dormant Commerce Clause. (Chamber Count IV; W. Va. Count III; U.S. Count III) ........................................55

1.      There is no freestanding "extraterritoriality" claim under the dormant Commerce Clause. ........................................................................................55

2.      Plaintiffs have not alleged a valid "discrimination" claim. ......................57

3.      Plaintiffs have not plausibly alleged a *Pike* violation...............................59

G.    Plaintiffs fail to state a claim that Act 122 violates the dormant Foreign Commerce Clause.
(Chamber Count IV; W. Va. Count III; U.S. Count IV)..........................................61

H.    Plaintiffs fail to state a claim that Act 122 imposes excessive fines.
(Chamber Count V; W. Va. Count VIII)....................................................................64

    1.    Act 122 is not punitive..............................................................................64

    2.    Plaintiffs' claim that the Act imposes "excessive" fines is not ripe...........65

    3.    Plaintiffs cannot demonstrate that the cost recovery demands are "grossly disproportional." ......................................................................................66

I.    Plaintiffs fail to state a takings claim.
(Chamber Count VI; W. Va. Counts IX, X) ..............................................................68

J.    The West Virginia Plaintiffs fail to state a separation of powers claim.
(W. Va. Count XI) .....................................................................................................73

CONCLUSION..................................................................................................................75

# TABLE OF AUTHORITIES

**Cases**

*A.B. v. S.U.*, 2023 VT 32, 218 Vt. 123, 298 A.3d 573 ...................................................43

*Alden v. Maine*, 527 U.S. 706 (1999)..........................................................................20

*Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017) .................................................58

*Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011)............................................32

*Am. Fed'n of Labor v. Am. Sash & Door Co.*, 335 U.S. 538 (1949) ..............................45

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903 (9th Cir. 2018)...........29, 44

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ........................................28, 29, 30

*Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016).............16

*Anderson v. Edwards*, 514 U.S. 143 (1995).................................................................30

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024).......................................................23

*Arizona v. United States*, 567 U.S. 387 (2012)......................................................23, 36

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ..................................24

*Art & Antique Dealers League of Am., Inc. v. Seggos*, No. 18 Civ. 2504 (LGS),
2019 WL 416330, (S.D.N.Y. Feb. 1, 2019) ...................................................................14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................11

*Athens School Dist. v. Vt. State Bd. of Educ.*, 2020 VT 52, 212 Vt. 455, 237 A.3d 671 .........73, 74

*Austin v. United States*, 509 U.S. 602 (1993) .......................................................64, 65

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59
(2d Cir. 1998)................................................................................................................57

*Badgley v. Walton*, 2010 VT 68, 188 Vt. 367, 10 A.3d 469 ....................................21, 55

*Baker v. State*, 170 Vt. 194, 212, 744 A.2d 864 (1999) ..............................................54

*Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022)........................................69

*Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298 (1994) ...............................................61, 62

*Beaulieu v. Vermont*, 807 F.3d 478 (2d. Cir. 2015) ........................................................................20

*Becker v. Leavitt*, 489 F.2d 1087 (2d Cir. 1973) .............................................................................52

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................................11, 12, 60

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) ......................................................25, 26

*Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) ...................................................................32, 33

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255 (2017)..........................................................................................................25, 26

*Brown v. Daikin Am. Inc.*, 756 F.3d 219 (2d Cir. 2014).................................................................12

*Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003)...............................58

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013)......................30

*Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011).................................................................24

*Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995) .............................................................................66

*Choquette v. Perrault*, 153 Vt. 45, 569 A.2d 455 (1989)...............................................................54

*City and Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173 (Haw. 2023)........................................34

*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981) ...................................................32

*City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021)........................................31, 34, 41

*Clift v. City of Burlington,* 925 F. Supp. 2d 614 (D. Vt. 2013) .....................................................22

*Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33 (E.D.N.Y. 2020)...........................................................................................................68, 70, 71

*Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001) .................44, 47, 48

*Concrete Pipe & Products v. Constr. Laborers Pension Trust for S. Ca.*, 508 U.S. 602 (1993)........................................................................................................................71

*Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021) .......................................16

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986) ...............................................70, 72

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993).............................................................35, 38

*D.C. v. Exxon Mobil Corp.*, 89 F.4th 144 (D.C. Cir. 2023).............................................................34

*Dep't of Revenue of Kentucky. v. Davis*, 553 U.S. 328 (2008).......................................................57

*Do No Harm v. Pfizer, Inc.*, 126 F.4th 109 (2d Cir. 2024) .........................................................13

*E. Enters. v. Apfel*, 524 U.S. 498 (1998)........................................................42, 43, 70, 71, 72

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)...........................................................................32

*Fairbanks v. United States*, 181 U.S. 283 (1901) ..........................................................................21

*Farina v. MTA*, 409 F.Supp.3d 173 (S.D.N.Y. 2019) .................................................................66

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993) .........................................................52

*FCC v. Consumers' Research*, 606 U.S. ---, 145 S. Ct. 2482 (2025)..........................................75

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .........................................................49

*Ferry v. City of Montpelier*, 2023 VT 4, 217 Vt. 450, 296 A.3d 749 ...........................................18

*Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883 (2d Cir. 1998)...................................................20

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351 (2021)................................26

*Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230 (2019) ...........................................................20

*Fuentes v. Shevin*, 407 U.S. 67 (1972)..........................................................................................51

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997)...................................................................58, 59

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989)....................................17

*Greater Chataqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405
(S.D.N.Y. 2022) ............................................................................................................................70

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295
(D. Vt. 2007)................................................................................................................................41

*Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583 (D. Vt. 2015)............................................12

*Hines v. Davidowitz*, 312 U. S. 52 (1941)....................................................................................38

*Hinesburg Sand & Gravel Co., Inc. v. State of Vermont*, 166 Vt. 337, 693 A.2d 1045 (1997)................................................................................................18

*Housing Our Seniors in Vt., Inc. v. Agency of Commerce & Cmty. Dev.*, 2024 VT 12, 219 Vt. 80, 315 A.3d 1000.................................................................17, 18

*Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016)...........................................37

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977)...............................13

*Hunter v. State*, 2004 VT 108, 177 Vt. 339, 865 A.2d 381 .........................................73

*Illinois v. City of Milwaukee, Wisconsin*, 406 U.S. 91 (1972) ......................................32

*In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113 (2d Cir. 2010) ...............................28

*In re B&M Realty, LLC*, 2016 VT 114, 203 Vt. 438, 158 A.3d 754 ................................73

*In re Caterpillar, Inc., C13 & C15 Engine Products Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236 (D.N.J. July 29, 2015)...........................................................37

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Products Liab. Litig.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................................36

*In re: Cnty. Comm'rs of Boulder City. v. Suncor Energy USA, Inc.*, --- P.3d ---, 2025 WL 1363355 (Colo. 2025) .........................................................................34

*In re Gaston & Snow*, 243 F.3d 599 (2d Cir. 2001) .....................................................32

*In re Handy*, 171 Vt. 336, 764 A.2d 1226 (2000) .......................................................75

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 725 F.3d 65 (2d Cir. 2013)....................................................................................38, 39, 40

*In re Montpelier & Barre R.R. Corp.*, 135 Vt. 102, 369 A.2d 1379 (1977)...................21

*In re Mountaintop Inn & Resort*, 2020 VT 57, 212 Vt. 554, 238 A.3d 637...................22

*In re MVP Health Ins. Co.*, 2016 VT 111, 203 Vt. 274, 155 A.3d 1207 .......................75

*In re Property of One Church St.*, 152 Vt. 260, 565 A.2d 1349 (1989)........................55

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Products. Liab. Litig.*, 959 F.3d 1201 (9th Cir. 2020)...........................................................................35

*Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979)................................61

*Kampfer v. Cuomo*, 993 F. Supp. 2d 188, 194 (N.D.N.Y. 2014)..................................................23

*Kansas v. Garcia*, 589 U.S. 191 (2020) ............................................................................36, 38

*Keepers, Inc. v. City of Milford*, 807 F.3d 24 (2d Cir. 2015)............................................16

*Kittay v. Giuliani*, 252 F.3d 645 (2d Cir. 2001) ..................................................................22

*League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155 (2d Cir. 1984) ......................................................................................................................15

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) .....................................................16

*Long Island Oil Products Co. v. Local 553 Pension Fund*, 775 F.2d 24 (2d Cir. 1985).........................................................................................................42, 43

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).................................................11, 13

*Maine v. Taylor*, 477 U.S. 131 (1986)...................................................................................44

*March v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007) ............................................................35

*Mayor & City Council of Baltimore v. BP, P.L.C.*, 31 F.4th 178 (4th Cir. 2022) ............................34

*McCarthy v. City of Cleveland*, 626 F.3d 280 (6th Cir. 2010) ............................................68

*Medtronic, Inc.* v. *Lohr*, 518 U. S. 470 (1996)....................................................................35

*Missouri v. Illinois*, 180 U.S. 208 (1901)............................................................................32

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ..........................................................22, 23

*Murphy v. NCAA*, 584 U.S. 453 (2018) ...............................................................................36

*Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623 F.3d 1 (1st Cir. 2010)............................29

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001)...........................................44

*Nat'l. Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ....................25, 27, 56, 57, 59, 60

*Nat'l Rifle Ass'n v. Cuomo*, 480 F. Supp. 3d 404 (N.D.N.Y. 2020) ...............................15, 16

*Nat'l Shooting Sports Found., Inc. v. James*, 604 F. Supp. 3d 48 (N.D.N.Y. 2022), *aff'd*, 144 F.4th 98 (2d Cir. 2025) .........................................................12

*Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98 (2d Cir. 2025) ................23, 41, 56, 60

*Nassau & Suffolk Cty. Taxi Owners Assoc. v. State*, 336 F. Supp. 3d 50
(E.D.N.Y. 2018) ..................................................................................................12

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ................................................15

*Nordlinger v. Hahn*, 505 U.S. 1 (1992).........................................................52

*North Dakota v. Minnesota*, 263 U.S. 365 (1923) ..................................32, 33

*New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201 (2d Cir. 2006) .................34

*N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79 (2d Cir. 2017)..............58

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010) ....................35

*N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69 (2d Cir. 2019) ...............15

*N.Y. State Dept. of Social Servs. v. Dublino*, 413 U.S. 405 (1973) .................37

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)................21

*Ondovchik Family Ltd. P'ship v. Agency of Transp.*,
2010 VT 35, 187 Vt. 556, 996 A.2d 1179 ......................................................72

*Otter Creek Solar LLC v. State of Vermont*, No. 299-4-18 Cncv, Ruling on Mots. for S.J.
(Vt. Super. Ct. Mar. 4, 2019)........................................................................55

*Paroline v. United States*, 572 U.S. 434 (2014) ...........................................65

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)...............68

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ................20

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984)..............43, 47

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)................................59, 60, 61

*Quarty v. United States*, 170 F.3d 961 (9th Cir. 1999)..................................44

*Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582 (2d Cir. 2024)....................65

*Rest. Law Ctr. v. City of New York*, 90 F.4th 101 (2d Cir. 2024)................39, 41, 57, 59

*R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130 (1986)............36

*Rodriquez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132 (2020) ....................32, 33

*S. Jackson & Son, Inc. v. Coffee, Sugar, & Cocoa Exch. Inc.*, 24 F.3d 427
(2d Cir. 1994) ................................................................................................11

*S. Pac. Co. v. Ariz. Ex rel. Sullivan*, 325 U.S. 761 (1945) ...........................................61

*Sanitation and Recycling Indus., Inc. v. City of New York*, 928 F. Supp. 407
(S.D.N.Y. 1996) ............................................................................................51

*Skiff v. S. Burlington Sch. Dist.*, 2018 VT 117, 208 Vt. 564, 201 A.3d 969 ................18

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)..........................................................12, 13

*State v. Ludlow Supermarkets, Inc.*, 141 Vt. 261, 448 A.2d 791 (1982)....................54, 55

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ...............................25

*State of Vermont v. 3M Co.*, Ruling on Mots. to Dismiss, No. 547-6-19 Cncv
(Vt. Super. Ct. May 28, 2020) ........................................................................19

*State of Vermont v. Clearview AI, Inc.*, Ruling on Def.'s Mot. to Dismiss, No. 226-3-20 Cncv
(Vt. Super. Ct. Sept. 10, 2020) .......................................................................19

*State of Vermont v. Monsanto Co.*, Ruling on Defs.' Mot. to Dismiss, No. 23-CV-2606
(Vermont Super. Ct. May 29, 2024)................................................................19

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)....................................................14

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014) ............................................13

*Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046 (11th Cir. 2008)....................................68

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)...............................12

*Timbs v. Indiana,* 586 U.S. 146 (2019) .....................................................................65

*Town of Southold v. Town of East Hampton*, 477 F.3d 38 (2d Cir. 2007) ...............57, 58

*Trojan Technologies, Inc. v. Commonwealth of Pennsylvania*, 916 F.2d 903
(3d Cir. 1990)..............................................................................................28

*United States v. Alcan Alum. Corp.*, 315 F.3d 179 (2d Cir. 2003) ...............................43

*United States v. Amalfi*, 47 F.4th 114 (2d Cir. 2022)..................................................52

*United States v. Bajakajian*, 524 U.S. 321 (1998) ..........................................64, 65, 66

*United States v. George*, 779 F.3d 113 (2d Cir. 2015) ............................................................66, 67

*United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988) ......................................................48

*United States v. N.E. Pharm. & Chem. Co., Inc.*, 810 F.2d 726 (8th Cir. 1986)...........................48

*United States v. Pink*, 315 U.S. 203 (1942).................................................................................27

*United States v. Raines*, 362 U.S. 17 (1960)...............................................................................22

*United States v. Viloski*, 814 F.3d 104 (2d Cir. 2016) ............................................................64, 65

*USGen New England, Inc. v. Town of Rockingham*, 2003 VT 102, 176 Vt. 104, 838 A.2d 927 .................................................................................................................................55

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)................................21, 42, 43, 45, 47, 72

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ..................................................................39

*Va. Uranium, Inc. v. Warren*, 587 U.S. 761 (2019) .....................................................24, 35, 37, 40

*Vitale v. Bellows Falls Union High Sch.*, 2023 VT 15, 217 Vt. 611, 293 A.3d 309 ...............18, 54

*VIZIO, Inc. v. Klee*, 886 F.3d 249 (2d Cir. 2018) ........................................................................59

*Vt. Home Mortg. Credit Agency v. Montpelier Nat'l Bank*, 128 Vt. 272, 262 A.2d 445, 449 (1970)........................................................................................................................................75

*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005) ........................................................17

*Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1 (1986)...............................................62

*Warth v. Seldin*, 422 U.S. 490 (1975).........................................................................................13

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008).........................21, 23

*W. Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937) ..............................................................42, 43

*West Virginia v. EPA*, 597 U.S. 697 (2022) .................................................................................37

*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955) .....................................................53
*Wool v. Office of Prof'l Regulation*, 2020 VT 44, 212 Vt. 305, 236 A.3d 1250......................................................................................................................18

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)...........................................25, 26

xi

*W. Va. CWP Fund v. Stacy*, 671 F.3d 378 (4th Cir. 2011) ........................................69

*Young v. Masci*, 289 U.S. 253 (1933)........................................................................25

*Zschernig v. Miller*, 389 U.S. 429 (1968) ................................................................28

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3.........................................................................................61

U.S. Const. art. III, § 2 ..............................................................................................20

Vt. Const. ch. I ...........................................................................................................18

Vt. Const. ch. I, art. 7 ................................................................................................54

Vt. Const. ch. II, § 5 ..................................................................................................18

**Statutes**

2024 Vt. Acts & Resolves No. 122 ..................................................................... passim

    Act 122 Sec. 2, § 596(2) ..............................................................9, 44, 72, 74

    Act 122 Sec. 2, § 596(5) ...........................................................................7, 49

    Act 122 Sec. 2, § 596(6) ...................................................................................6

    Act 122 Sec. 2, § 596(7) ....................................................................4, 50, 73

    Act 122 Sec. 2, § 596(8) ...........................................................................4, 73

    Act 122 Sec. 2, § 596(10) .........................................................................4, 73

    Act 122 Sec. 2, § 596(15) .................................................................................6

    Act 122 Sec. 2, § 596(22) ..............................................7, 14, 26, 45, 50, 67

    Act 122 Sec. 2, § 596(23) .................................................................................6

    Act 122 Sec. 2, § 597 .....................................................................................65

    Act 122 Sec. 2, § 597(1) ...................................................3, 8, 9, 40, 44, 64, 67

Act 122 Sec. 2, § 597(5) ...................................................................................9

Act 122 Sec. 2, § 597(6) ...................................................................................9

Act 122 Sec. 2, § 598(a) ..............................................................................8, 67

Act 122 Sec. 2, § 598(a)(1) ..........................................................................8, 65

Act 122 Sec. 2, § 598(a)(2) ..........................................................................7, 49

Act 122 Sec. 2, § 598(b) ...........................................................6, 8, 45, 50, 67

Act 122 Sec. 2, § 598(c) .................................................................................50

Act 122 Sec. 2, § 598(d) .......................................................................8, 46, 50

Act 122 Sec. 2, § 598(e) ......................................................................... 8, 50-51

Act 122 Sec. 2, § 598(f) ..........................................................................8, 9, 45

Act 122 Sec. 2, § 598(g) .................................................................................50

Act 122 Sec. 2, § 598(*i*) ............................................................................9, 51

Act 122, Sec. 2, § 599 .....................................................................................65

Act 122, Sec. 2, § 599(a) ...................................................................................6

Act 122 Sec. 2, § 599(b) ......................................................................... 6, 50-51

Act 122 Sec. 2, § 599a(b) ....................................................................... 50-51

Act 122 Sec. 2, § 599a(b)(1) ...................................................................8, 45, 46

Act 122 Sec. 2, § 599a(b)(2) ...............................................................8, 45, 46, 51

Act 122 Sec. 2, § 599a(c) ...................................................................... 6, 50-51

Act 122 Sec. 2, § 599a(d) .................................................................................6

Act 122 Sec. 2, § 599c .....................................................3, 5, 8, 44, 65, 73, 74

Act 122 Sec. 2, § 599c(1) .................................................................................74

Act 122 Sec. 6 § 8003(a)(33) .........................................................................50

2025 Vt. Act & Resolves No. 47 ........................................................... passim

    Act 47 Sec. 20, § 599a(b) .......................................................... 50-51

    Act 47 Sec. 20, § 599a(c) ...................................................... 6, 50-51

    Act 47 Sec. 20, § 599a(d) ................................................................6

    Act 47 Sec. 21 ...........................................................8, 9, 45, 46

    Act 47 Sec. 22, § 596(7) ..........................................................4, 50, 73

    Act 47 Sec. 22, § 596(22) ........................................7, 14, 26, 45, 50, 67

    Act 47 Sec. 23, § 598(b) ......................................6, 8, 45, 50, 67

    Act 47 Sec. 24, § 599c ....................................3, 5, 8, 44, 65, 73, 74

Vt. Stat. Ann. tit. 3, § 840 ...............................................................50

Vt. Stat. Ann. tit. 10, ch. 24A ..........................................................1

Vt. Stat. Ann. tit. 10, § 591(i) .......................................................... 6-7

Vt. Stat. Ann. tit. 20, § 2 .................................................................6

Vt. Stat. Ann. tit. 20, § 3a ...............................................................6

Vt. Stat. Ann. tit. 20, § 48 ...............................................................7

26 U.S.C. § 52(a) .............................................................................49

26 U.S.C. § 52(b) .............................................................................49

26 U.S.C. § 414(m) ..........................................................................49

26 U.S.C. § 414(o) ...........................................................................49

42 U.S.C. § 1983 .............................................................14, 15, 16, 17

42 U.S.C. § 7401 .............................................................................39

42 U.S.C. § 7401(a)(3) .....................................................................36

42 U.S.C. § 7410 .............................................................................40

42 U.S.C. § 7411(b)(1)(B) .................................................................................39

42 U.S.C. § 7416 ..................................................................................... 36-37, 40

42 U.S.C. § 7521(a)(1) .......................................................................................39

42 U.S.C. § 7543(a) ............................................................................................35

42 U.S.C. § 7543(b) ............................................................................................35

**Rules**

Fed. R. Civ. P. 12(b)(1) ......................................................................................11

Fed. R. Civ. P. 12(b)(6) ......................................................................................11

**Other Authorities**

5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007) ................................12

*Black's Law Dictionary* (12th ed. 2024) ...........................................................65

Michael S. Knoll & Ruth Mason, *The Dormant Foreign Commerce Clause After* Wynne,
39 Va. Tax Rev. 357 (2020).................................................................................61

Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards,
90 Fed. Reg. 36,288 (proposed Aug. 1, 2025) (to be codified at 40 C.F.R. pts. 85, 86, 600,
1036, 1037, 1039) ...............................................................................................38

Repeal of Greenhouse Gas Emissions Standards for Fossil Fuel-Fired Electric Generating
Units, 90 Fed. Reg. 25,752 (proposed June 17, 2025) (to be codified at 40 C.F.R. pt. 60)...........38

**Legislative Record Excerpts**

*2021 Vermont Climate Assessment* (provided to House Environment & Energy
Committee Apr. 17, 2024)................................................................................10, 11

*2023 Vermont State Hazard Mitigation Plan* (provided to House Environment & Energy
Committee Apr. 17, 2024)................................................................................10, 11

Callahan & Mankin, "Carbon Majors and the Scientific Case for Climate Liability"
(provided to Senate Judiciary Committee Feb. 22, 2024) .............................................5

Callahan & Mankin, "Globally Unequal Effect of Extreme Heat on Economic Growth, *Science Advances* (2022) (provided to Senate Judiciary Committee Feb. 22, 2024) .....................5

Complaint, *State of Vermont v. ExxonMobil Corp.*, No. 21-CV-02778 (Sept. 14, 2021) (attached to Written Testimony of Vermont Attorney General's Office, Senate Judiciary Committee (Feb. 28, 2024))............................................................................................7, 48

*Fifth National Climate Assessment: Chapter 21/Northeast* (provided to House Environment & Energy Committee Apr. 17, 2024) ................................................................................10

Richard Heede, "Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854-2010," *Climatic Change* (2013) (provided to House Environment & Energy Committee Apr. 11, 2024) ............................................................7

*Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II/Northeast* (provided to House Environment & Energy Committee Apr. 17, 2024)......10

IPCC Second Assessment Climate Change 1995, https://www.ipcc.ch/site/assets/uploads/2018/05/2nd-assessment-en-1.pdf ...................................4

*NOAA State Climate Summaries 2022/Vermont* (provided to House Environment & Energy Committee Apr. 17, 2024).........................................................................................10

Rebuild by Design, *Vermont Atlas of Disaster* (provided to House Environment & Energy Committee Apr. 17, 2024) (slides)................................................................................10, 11

Testimony for S.259, Dr. Justin Mankin, House Environment & Energy Committee (Apr. 11, 2024) (slides) ...........................................................................................................5

Testimony of Andy Jones (Intervale Community Farm), House Environment & Energy Committee, Apr. 17, 2024 (slides) ................................................................................ 10

WILO Flood Image (provided to House Environment & Energy Committee Apr. 11, 2024).......10

Written Testimony of Richard Heede, House Environment & Energy Committee (Apr. 11, 2024) (slides) ...........................................................................................................7, 8

Written Testimony of Lauren Hierl (Vermont Conservation Voters), House Environment & Energy Committee (Apr. 17, 2024).................................................................................10

Written Testimony of Anthony Iarrapino (Conservation Law Foundation), House Environment & Energy Committee (Apr. 11, 2024).............................................................4, 7, 47

Written Testimony of Dr. Justin Mankin, House Environment & Energy Committee (Apr. 11, 2024).............................................................................................................5

Written Testimony of Ben Edgerly Walsh (Vermont Public Interest Group), House Environment
& Energy Committee (Apr. 17, 2024) ..............................................................................4

# INTRODUCTION

Climate change has transformed Vermont and will continue to do so for years to come. While working on the legislation challenged here, the Vermont Legislature heard testimony confirming what Vermonters know from experience: climate change is leading to increased average temperatures, longer summers, shorter winters, and a range of associated environmental issues such as more frequent and severe flooding, increased droughts, dangerous heat waves, threats to ecosystems, and strains on the state's energy grid.

Vermont is working to adapt to those changes. In recent years, for example, Vermont has repaired, rebuilt, and updated infrastructure in response to major flood events. Efforts like these have been costly but they are critical to mitigating the continued impacts associated with human-caused climate change. They will also need to continue, and the State will continue to incur costs to respond to an increasingly warming climate. Nonetheless, Vermont does not yet have a reliable estimate of the outlays it will need to make to adapt to the changing climate. Nor does it have a mechanism for allocating some of those costs among those who might fairly be expected to bear some of the burden.

In 2024, the Legislature created a framework intended to help bridge those gaps. The Climate Superfund Act[1] helps to fill the knowledge gap by directing the State Treasurer to prepare an estimate of the costs of climate change to Vermont and its residents resulting from certain, "covered" greenhouse gases over the past thirty years. It helps to fill the solutions gap by acknowledging and building on the Agency of Natural Resources' (ANR's) ongoing efforts to create a resiliency strategy to help drive adaptation resources where they are most needed. And it

---

[1] 2024 Vt. Acts & Resolves No. 122, *as amended by* 2025 Vt. Act & Resolves No. 47, Secs. 20-25, codified at Vt. Stat. Ann. tit. 10, ch. 24A (collectively, Act 122 or the Act). A copy of Act 122 is attached as **Exhibit A**. A copy of the relevant parts of Act 47 is attached as **Exhibit B**.

aims to help address resource and allocation issues by developing a rational, science-based framework under which ANR will issue "cost recovery demands" to large fossil fuel companies—some of the highest individual contributors to Vermont's climate change impacts—that have sufficient connections to Vermont.

Recognizing the importance of getting the process right, the Legislature gave the Treasurer and ANR some time to do their work. ANR must submit its climate resilience strategy to the Legislature—the first step in the process—by September 15, 2025. But the work bearing on cost assessment and allocation will not be finished for years. The current deadline for the Treasurer's Office to submit its cost report is January 15, 2027. Rules for allocating costs among responsible parties are due January 1, 2028, with final cost recovery demands to be issued by July 1, 2028.

Nonetheless, almost two years before the Treasurer completes its cost assessment, three years before ANR determines how costs will be allocated, and three-and-a-half years before a single cost recovery demand is issued, the U.S. Chamber of Commerce (the Chamber) and the American Petroleum Institute (API) sued to invalidate the law. Several months later, a group of twenty-four states intervened as Plaintiffs. The United States then filed its own suit on May 1, 2025, characterizing Vermont's measured attempt to define and recover some of its climate-change-related costs as a "transparent monetary-extraction scheme" that "attempts to usurp the power of the federal government by regulating the national and global emissions of greenhouse gases."

The Act does no such thing. It is a valid exercise of Vermont's traditional authority to raise revenue, protect the health, safety, and welfare of its citizens, and mitigate environmental harms inside its borders. It does not conflict with federal law or policy, regulate fossil fuel

emissions, or punish fossil fuel producers. It establishes a reasonable framework for assessing costs and allocating a portion of those costs to those who bear responsibility for them. Plaintiffs' allegations to the contrary are wrong on the law and rest on speculation about how the Act might be implemented. The Act is constitutional on its face. The Court should dismiss all three complaints.[2]

## BACKGROUND

Act 122 is a cost recovery mechanism designed to help provide revenue for climate change adaptation projects in Vermont. Act 122 Sec. 2, § 597(1). Toward that end, the Act establishes a Climate Superfund Cost Recovery Program (Cost Recovery Program) whereby the State will issue cost recovery demands to responsible parties based on their proportional share of the State's climate change adaptation costs. The Cost Recovery Program has three main components: (i) assessment of Vermont's climate change costs, (ii) development of cost recovery demands, and (iii) implementation of climate change adaptation projects. Each component is described below.

### A.    Cost Assessment

Act 122 directs the State Treasurer to assess Vermont's past and future costs from covered greenhouse gas emissions. Act 122 Sec. 2, Act 47 Sec. 24, § 599c. Covered greenhouse gas emissions are those resulting from "the use of fossil fuels extracted or refined" during the

---

[2] This Memorandum of Law is submitted in accordance with the Court's June 30, 2025, scheduling order in the two cases captioned above. It supports Vermont's Motion to Dismiss the three separate complaints filed in the two cases. The Plaintiffs in the case filed by the Chamber and API (Case No. 2:24-cv-01513) are referred to as the **Chamber Plaintiffs** and their Complaint (ECF Doc. No. 1) is referred to as the **Chamber Complaint**. West Virginia and 23 other states who intervened in the Chamber Case are referred to as the **West Virginia Plaintiffs** and their Complaint (ECF Doc. No. 31) is referred to as the **West Virginia Complaint**. The United States' complaint in Case No. 2:25-cv-0463 (ECF Doc. No. 1) is referred to as the **U.S. Complaint**.

"covered period" (January 1, 1995, through December 31, 2024) by an entity with an ownership interest in a fossil fuel business during the period. Act 122 Sec. 2, Act 47 Sec. 22, § 596(7), (8), (10).

The covered period reflects that, by 1995, there was no serious debate that fossil fuels were a primary contributor to anthropogenic global warming, and that fossil fuel companies knew this to be the case. For instance, the Legislature heard testimony about NASA's 1988 testimony before Congress on the expected impacts of climate change, how the Intergovernmental Panel on Climate Change (IPCC) was formed and endorsed by the United Nations General Assembly that same year, and how the IPCC released climate assessment reports in the early 1990s confirming fossil fuels as a "central and growing contributor to climate change."[3] In particular, the IPCC's 1995 Second Assessment Report found there was already "a discernible human influence on global climate" and that fossil fuels were the primary source (accounting for two-thirds of anthropogenic greenhouse gas emissions since 1860).[4] The Legislature also received testimony that fossil fuel companies knew, by the 1990s at the latest, that their products were a leading cause of climate change, which would lead to potentially catastrophic effects including extreme weather events and losses to communities and ecosystems.[5]

---

[3] *E.g.,* Written Testimony of Ben Edgerly Walsh (Vermont Public Interest Group) at 3, House Environment & Energy Committee (Apr. 17, 2024) (attached as **Exhibit C**). The legislative record materials cited herein can be accessed through the Vermont Legislature's website: https://legislature.vermont.gov/bill/status/2024/S.259.

[4] IPCC Second Assessment Climate Change 1995, at 11, 22, https://www.ipcc.ch/site/assets/uploads/2018/05/2nd-assessment-en-1.pdf (referenced in Walsh Written Testimony, *supra* note 3).

[5] *E.g.,* Written Testimony of Anthony Iarrapino (Conservation Law Foundation) at 10-15, House Environment & Energy Committee (Apr. 11, 2024) (collecting examples) (attached as **Exhibit D**).

The Treasurer's cost assessment will include (i) a summary of the "cost-driving effects" of covered greenhouse gas emissions in Vermont, including effects on public health, natural resources, agriculture, biodiversity, and housing; (ii) a calculation of Vermont's past and future costs under each of these effects; and (iii) a calculation of Vermont's past and future costs to abate these effects. Act 122 Sec. 2, Act 47 Sec. 24, § 599c. In developing this assessment, the Treasurer is authorized to consult with any person or entity "for the purpose of obtaining and utilizing credible data or methodologies" that may aid in the assessment. *Id.* The assessment is due to the Legislature by January 15, 2027. *Id.*

The Legislature heard testimony from Dartmouth professor Dr. Justin Mankin regarding the feasibility of linking Vermont's climate change costs to particular emissions.[6] Dr. Mankin explained there are peer-reviewed, consensus scientific methods that scientists can use to quantify the costs of climate change to a region like Vermont and attribute those costs to particular emissions.[7] Among other things, he described approaches to damage attribution work, including one that uses an estimate of damages from a ton of emissions (e.g., the social cost of carbon), and one that isolates and quantifies particular damages attributable to particular emitters ("end to end" attribution).[8]

---

[6] *E.g.,* Written Testimony of Dr. Justin Mankin, House Environment & Energy Committee (Apr. 11, 2024) (attached as **Exhibit E**); Testimony for S.259, Dr. Justin Mankin, House Environment & Energy Committee (Apr. 11, 2024) (slides providing overview of testimony) (attached as **Exhibit F**); Callahan & Mankin, "Carbon Majors and the Scientific Case for Climate Liability" (provided to Senate Judiciary Committee Feb. 22, 2024) (attached as **Exhibit G**); Callahan & Mankin, "Globally Unequal Effect of Extreme Heat on Economic Growth, *Science Advances* (2022) (provided to Senate Judiciary Committee Feb. 22, 2024) (attached as **Exhibit H**).

[7] *See generally* Mankin Written Testimony, *supra* note 6.

[8] *Id.* at 2.

**B.    Cost Recovery Demands**

A cost recovery demand is a charge assessed against a responsible party to make a payment to the State for the Climate Superfund Cost Recovery Program Fund (Fund). Act 122 Sec. 2, § 596(6), (15).

***The Fund.*** Act 122 establishes the Fund to "provide funding for climate change adaptation projects in the State*." Id.* § 599(a). The Fund consists of cost recovery payments, legislative appropriations, and other monies approved by the Secretary of Administration (e.g., gifts and donations). *Id.* The Fund is administered by ANR and can be used for (i) qualified expenditures for climate change adaptation projects identified in the State's Resilience Implementation Strategy, plus reasonable administrative expenses; (ii) climate adaptation actions identified in the State Hazard Mitigation Plan; and (iii) implementation of Vermont's Community Resilience and Disaster Mitigation Grant Program. Act 122 Sec. 2, §§ 596(23), 599(a), (b).

ANR develops the Resilience Implementation Strategy (Strategy), which will include practices for nature-based solutions, adaptive infrastructure, early-warning mechanisms, threat response, and economic and environmental sustainability, as well as "criteria and procedures for prioritizing climate change adaptation projects eligible to receive monies" from the Fund. Act 122 Sec. 2, Act 47 Sec. 20, § 599a(c). The Act requires ANR to take various steps when adopting the Strategy, including consulting with multiple stakeholder groups and experts and identifying potential, proposed, and ongoing climate change adaptation projects throughout the State. *Id.* § 599a(d).

Vermont's Hazard Mitigation Plan is developed by the Department of Public Safety's Emergency Management Division to protect Vermont lives and property from hazards such as natural disasters and health-related emergencies. *See* Vt. Stat. Ann. tit. 20, §§ 2, 3a; *see also id.*

tit. 10, § 591(i) (including hazard mitigation plans in Emergency Management Division's biannual report to Vermont Climate Council). The Community Resilience and Disaster Mitigation Grant Program is a state program administered by the Department of Public Safety and the Department of Environmental Conservation to award grants to municipalities for disaster mitigation, adaptation, and repair, including for flood-impacted areas. *See id.* tit. 20, § 48.

**_Responsible Parties._** A responsible party is an entity (or its successor) (i) that was engaged in "the trade or business of extracting fossil fuel or refining crude oil" during any part of the covered period, (ii) to whom ANR determines more than one billion metric tons of covered greenhouse gas emissions are attributable, and (iii) who has sufficient connection with Vermont to satisfy constitutional nexus requirements. Act 122 Sec. 2, Act 47 Sec. 22, § 596(22).[9] As noted above, the Legislature heard testimony that fossil fuels are the primary contributor to climate change.[10] The one billion metric ton threshold allowed the Legislature to focus on those most responsible for fossil fuels' contributions to climate change. It also helps ensure that a responsible party's emissions are attributable to the responsible party, as supported by the testimony of climate scientist Richard Heede.[11]

---

[9] Entities treated as a single employer under federal law are treated as a single responsible party under Act 122. Act 122 Sec. 2, §§ 596(5), 598(a)(2).

[10] *E.g.,* Iarrapino, *supra* note 5; Complaint, *State of Vermont v. ExxonMobil Corp.*, No. 21-CV-02778, at 3 (Vt. Super. Ct. Sept. 14, 2021) (attached to Written Testimony of Vermont Attorney General's Office, Senate Judiciary Committee (Feb. 28, 2024)) (attached as **Exhibit I**).

[11] *E.g.,* Written Testimony of Richard Heede, House Environment & Energy Committee (Apr. 11, 2024) (slides describing attribution of emissions to major carbon producers and referencing publicly available data on historical contributions of fossil fuel companies) (attached as **Exhibit J**); Richard Heede, "Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854-2010," *Climatic Change* (2013) (presenting quantitative analysis tracing carbon dioxide and methane emissions to 90 "carbon major" entities) (provided to House Environment & Energy Committee Apr. 11, 2024) (attached as **Exhibit K**).

ANR is to adopt rules by January 1, 2028 that include methodologies and requirements for identifying and registering responsible parties. Act 122 Sec. 2, § 599a(b)(1)-(2); Act 47 Sec. 21.

**_Payments._** ANR will issue cost recovery demands to responsible parties. Act 122 Sec. 2, Act 47 Sec. 23, § 598(a), (b), (f). The payment in the cost recovery demand will be based on the responsible party's share of covered greenhouse gas emissions, as applied to the State's climate change adaptation costs to address covered emissions. Act 122 Sec. 2, Act 47 Secs. 23, 24, §§ 597(1), 598(a)(1), (b), 599c.[12] For example, if Company A is responsible for 5% of covered greenhouse gas emissions, then Company A's payment will be 5% of the State's costs to address the covered emissions. In this way, because the Treasurer's cost assessment only includes costs to address the effects of covered greenhouse gas emissions (not all greenhouse gas emissions), and the cost recovery demands allocate only those costs, each responsible party is responsible only for its actual share of emissions.

The Act requires ANR to adopt rules by January 1, 2028, with methodologies and requirements for determining responsible parties' applicable shares and issuing notices of the cost recovery demands. Act 122 Sec. 2, § 599a(b)(1)-(2); Act 47 Sec. 21. When determining the amount of covered greenhouse gas emissions attributable to a particular entity, ANR is to use the United States Environmental Protection Agency's Emissions Factors for Greenhouse Gas Inventories. Act 122 Sec. 2, § 598(d).[13]

---

[12] There are provisions to reduce a refiner's payment if crude oil extracted by another entity was already accounted for. Act 122 Sec. 2, § 598(e).

[13] *See also* Heede, *supra* note 11 (testimony regarding attribution of emissions to particular producers).

ANR is then required to issue the cost recovery demands within six months of the rulemaking (by July 1, 2028). Act 122 Sec. 2, § 598(f); Act 47 Sec. 21. Payments are due within the next six months (by the end of 2028) or through installments. *Id.* There are procedures for contesting the cost recovery demand at ANR and on appeal in the Vermont Superior Court. Act 122 Sec. 2, § 598(*i*).

### C.    Adaptation Projects

As noted above, the primary purpose of Act 122 is to secure revenue for climate change adaptation projects throughout the State. *Id.* §§ 597(1), (5), (6). These projects may be identified in the State's Resilience Implementation Strategy, Hazard Mitigation Plan, or Community Resilience and Disaster Mitigation Grant Program. *See supra* Section B. The projects are "designed to respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change and to assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions." Act 122 Sec. 2, § 596(2). Examples of climate change adaptation projects include:

> implementing nature-based solutions and flood protections; home buyouts; upgrading stormwater drainage systems; making defensive upgrades to roads, bridges, railroads, and transit systems; preparing for and recovering from extreme weather events; undertaking preventive health care programs and providing medical care to treat illness or injury caused by the effects of climate change; relocating, elevating, or retrofitting sewage treatment plants and other infrastructure vulnerable to flooding; installing energy efficient cooling systems and other weatherization and energy efficiency upgrades and retrofits in public and private buildings, including schools and public housing, designed to reduce the public health effects of more frequent heat waves and forest fire smoke; upgrading parts of the electrical grid to increase stability and resilience, including supporting the creation of self-sufficient microgrids; and responding to toxic algae blooms, loss of agricultural topsoil, crop loss, and other climate-driven ecosystem threats to forests, farms, fisheries, and food systems.

*Id.*

These projects will help Vermont adapt to the significant impacts of climate change within the State.[14] The Legislature heard testimony about climate-related impacts to the environment, public health and safety, agriculture, recreation, the economy, and public and private infrastructure like roads, bridges, homes, and business. For example, greater variability in temperature and precipitation, including floods and drought, is expected to increase crop damage and make growing conditions on Vermont farms more challenging. *See 2021 Vermont Climate Assessment-Executive Summary, supra* note 14*.* Seasonal variations are affecting fruit-bearing species like apple trees (which require a long over-wintering period) and threatening the viability of the maple syrup industry. *Id.* The winter ski season is becoming shorter. *Id.* Public health is threatened in multiple ways, including by increases in disease-carrying ticks and mosquitoes, increased natural disasters with resulting illness and loss of life, decreased air quality exacerbating chronic health conditions, and exposure to dangerous extreme heat. *Id. Executive Summary* & 335-39. Power outages are expected to increase as storms become more intense, particularly in winter. *Id. Executive Summary.*

Vermont's water resources also are suffering, with increases in both heavy precipitation events and prolonged dry spells leading alternatively to damaging runoff events and low water availability. *Id.* Wildlife populations are shifting and almost 100 bird species are expected to disappear from the State by 2046, including the common loon and hermit thrush. *Id.* The

---

[14] *See, e.g.,* materials provided to House Environment & Energy Committee (Apr. 11 & 17, 2024): Testimony of Andy Jones (Intervale Community Farm) (slides) (attached as **Exhibit L**); *2021 Vermont Climate Assessment* (attached as **Exhibit M**); *NOAA State Climate Summaries 2022/Vermont* (attached as **Exhibit N**); *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II/Northeast* (attached as **Exhibit O**); *Fifth National Climate Assessment: Chapter 21/Northeast* (attached as **Exhibit P**); Written Testimony of Lauren Hierl (Vermont Conservation Voters) (attached as **Exhibit Q**); Rebuild by Design, *Vermont Atlas of Disaster* (slides) (attached as **Exhibit R**); *2023 Vermont State Hazard Mitigation Plan* (attached as **Exhibit S**); WILO Flood Image (attached as **Exhibit T**).

composition of forests is changing and becoming less favorable for species like sugar maple and balsam fir, while threats from invasive species, insects, and disease increase. *Id.* Seasonal changes are also shortening the window for active forest management, which can impact forest product markets, rural economies, and forest health. *Id.* And of course, as Vermont experienced in Tropical Storm Irene and again in the floods of 2023 and 2024, increased flooding causes massive infrastructure and environmental damage and loss of homes and livelihoods. *See generally 2023 Vermont State Hazard Mitigation Plan, supra* note 14, at 65-93 (describing extensive impacts of inundation flooding and fluvial erosion in Vermont); *Vermont Atlas of Disaster*, *supra* note 14.

## STANDARD OF REVIEW

### Fed. R. Civ. P. 12(b)(1)

Dismissal under Federal Rule of Civil Procedure 12(b)(1) is required when the court lacks subject matter jurisdiction. There is no subject matter jurisdiction when there is no case or controversy. *See S. Jackson & Son, Inc. v. Coffee, Sugar, & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994) ("Because Article III is a limit on judicial power, a court will not have subject matter jurisdiction over an action absent the requisite case or controversy."). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### Fed. R. Civ. P. 12(b)(6)

To survive dismissal under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court takes factual allegations as true, *see id.* at 555-56, but "th[is] tenet . . . is inapplicable to legal conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court does

not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements." *Id.* Nor is the Court "bound to accept as true a legal conclusion couched

as a factual allegation." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting

*Twombly*, 550 U.S. at 555). Additionally, for factual allegations to be plausible, they must have

"sufficient factual heft to show that the pleader is entitled to relief." *Nat'l Shooting Sports*

*Found., Inc. v. James*, 604 F. Supp. 3d 48, 56 (N.D.N.Y. 2022) (quoting *Twombly,* 550 U.S. at

557), *aff'd*, 144 F.4th 98 (2d Cir. 2025). They "must be enough to raise a right to relief above the

speculative level." *Twombly*, 550 U.S. at 555.

   In ruling on a motion to dismiss, courts "consider the complaint in its entirety, as well as

other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)

(citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)). This includes materials in the

legislative record. *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 598 n.5 (D. Vt. 2015);

*Nassau & Suffolk Cty. Taxi Owners Assoc. v. State*, 336 F. Supp. 3d 50, 58 (E.D.N.Y. 2018).

## ARGUMENT

I.    **The Court should dismiss the Chamber Complaint for lack of subject-matter jurisdiction.**

A.    **The Chamber Plaintiffs have not alleged associational standing.**

   "[N]o principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal-court jurisdiction to actual cases or

controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citation omitted). The doctrine

of standing enforces this limitation by identifying the "category of litigants empowered to

maintain a lawsuit in federal court to seek redress for a legal wrong." *Id*. at 338. To establish

standing, a plaintiff must plead (1) an injury in fact, (2) causation, and (3) redressability. *Lujan*, 504 U.S. at 560-61. Where the plaintiff is an organization—like the Chamber Plaintiffs— standing may be established either (1) by a direct injury to the entity (i.e., organizational standing) or (2) by the organization in its representative capacity (i.e., associational standing). *E.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

The Chamber Plaintiffs do not allege organizational standing—i.e., that Act 122 directly harms them as organizations. Instead, they rely on associational standing. *See* Chamber Compl. ¶ 15 ("Plaintiffs have associational standing."). But that claim fails because they have not adequately alleged that at least one of their members has standing in its own right. *See Do No Harm v. Pfizer, Inc.*, 126 F.4th 109, 118 (2d Cir. 2024) (plaintiff seeking to establish associational standing must show, among other things, that "its members would otherwise have standing to sue in their own right" (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977))). Specifically, they do not allege a concrete and particularized and actual or imminent injury to any individual member. *See Spokeo*, 578 U.S. at 338 ("at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of standing (citation omitted)); *Lujan*, 504 U.S. at 560 (injury must be "concrete and particularized" and "actual or imminent") (citation omitted).

The Chamber Plaintiffs have not alleged that any of their members have suffered an actual injury. And while "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur,'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted), they have not alleged that any particular member is suffering any "impending" injury or is at substantial risk of being covered by the Act. While their Complaint mentions ExxonMobil, Shell, BP, and Chevron, it does not

allege that any of those entities will be covered by—and therefore plausibly subject to injury from—the Act.[15] Only responsible parties are subject to the Act, and neither the Chamber nor API have alleged they have any members meeting the definition of responsible party:

> "Responsible party" means any entity or a successor in interest to an entity that during any part of the covered period was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the Agency attributable to for more than one billion metric tons of covered greenhouse gas emissions. The term responsible party does not include any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution.

Act 122 Sec. 2, Act 47 Sec. 22, § 596(22).

A plaintiff asserting associational standing must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "An organizational plaintiff's assertion that there is a 'probability that some members are threatened with concrete injury' will not suffice." *Art & Antique Dealers League of Am., Inc. v. Seggos*, No. 18 Civ. 2504 (LGS), 2019 WL 416330, at *2 (S.D.N.Y. Feb. 1, 2019) (quoting *Summers*, 555 U.S. at 497). Thus, the Chamber Plaintiffs' failure to allege that any specific member will be covered by Act 122 is fatal to their claims. The Court should dismiss the Chamber case in its entirety for lack of standing.

**B.    The Court should dismiss all claims brought under 42 U.S.C. § 1983.**

To the extent the Chamber Plaintiffs assert claims under 42 U.S.C. § 1983, the Court should dismiss those claims. First, the Chamber Plaintiffs may not assert § 1983 claims on behalf of their members. Second, although an organization may assert a § 1983 claim on its own behalf, the Chamber Plaintiffs have not alleged—and could not allege—any plausible basis for their own

---

[15] Plaintiffs allege that Vermont "intends to seek cost recovery demands" from their members and that the Act "targets" several specific member companies, Chamber Compl. ¶ 16, but do not allege the Act actually covers any particular member.

14

§ 1983 claims. Third, preemption and preclusion claims are not cognizable under § 1983.

Therefore, the Court should also dismiss the Chamber Plaintiffs' preemption and preclusion

claims (Chamber Compl. Counts I & II) insofar as they are brought under § 1983.

### 1. The Chamber Plaintiffs may not bring § 1983 claims on behalf of their members.

First, the Chamber Plaintiffs lack standing to bring § 1983 claims on behalf of their

members. The Second Circuit has made clear that "an organization does not have standing to

assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have

'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured.'" *Nnebe v.

Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (alteration in original) (quoting *League of Women Voters

of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)); *see also

N.Y. State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 74-75 (2d Cir. 2019) ("In a string of

opinions, this Court has held that organizations suing under Section 1983 must, without relying

on their members' injuries, assert that their own injuries are sufficient to satisfy Article III's

standing requirements." (citing *Nnebe*, 644 F.3d at 156-58)); *Nat'l Rifle Ass'n v. Cuomo*, 480 F.

Supp. 3d 404, 412 (N.D.N.Y. 2020) ("Because . . . under 42 U.S.C. § 1983, an association cannot

bring an action as the representative of its members, this Court finds that Plaintiff has not pled

associational standing." (citing *Nnebe*, 644 F.3d at 156)). Thus, Plaintiffs may not assert claims

under § 1983 that rely on their members' personal rights, and those claims should be dismissed.

### 2. The Chamber Plaintiffs have not alleged direct § 1983 claims, nor could they.

The Chamber Plaintiffs do not have standing to assert an independent § 1983 claim,

either. For an association to assert a § 1983 claim, it must allege "an injury independent of that

suffered by its members," that it has "a close relation to" injured third parties, and "a hindrance

to those parties' ability to protect their own interests." *N.Y. State Citizens' Coal.*, 922 F.3d at 74 (alteration in original) (quotation marks and citation omitted); *see also Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015) ("One purpose of standing doctrine is to ensure that 'the plaintiff at issue is the appropriate plaintiff to bring a claim.' It matters, in other words, whose rights a plaintiff asserts." (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 126 (2d Cir. 2003), *abrogation on other grounds recognized by Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016))). Plaintiffs have not alleged a valid, direct § 1983 claim.

First, Plaintiffs do not allege an independent injury. "To establish its own injury, an organization must show that it has suffered a 'perceptible impairment' to its activities. This showing can be met by identifying 'some perceptible opportunity cost' that the organization has incurred because of the violation of its members' rights." *N.Y. State Citizens Coal.*, 922 F.3d at 75 (internal citation omitted). Plaintiffs neither assert nor identify any injury to themselves. The injury they allege is the potential imposition of cost recovery liability on one or more of their members. *See, e.g.,* Chamber Compl. ¶¶ 15, 124, 151, 158, 175, 188. They do not allege impairment to their activities or identify any "perceptible opportunity cost" to their organizations. Indeed, Plaintiffs assert that representing the interests of their members in court is "an important function" of the organizations, and they are taking advantage of that opportunity here. *Id.* ¶¶ 13, 17; *see, e.g., Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) (need to pursue litigation was not perceptible impairment where "pursuing litigation" was "integral" to plaintiff organization's mission).

Second, Plaintiffs' members are some of the largest, most profitable businesses on Earth; it is therefore not surprising that Plaintiffs have not even attempted to argue that they are not well-suited to protect their own interests. *See Nat'l Rifle Ass'n*, 480 F. Supp. 3d at 412 n.1 ("To

16

overcome the bar of prudential standing to assert the rights of its members, Plaintiff was required

to show its members would have had difficulty asserting their own interests . . . ; it did not, and

thus, its claims must be dismissed."). Thus, Plaintiffs have not sufficiently pled an independent

§ 1983 claim.

### 3. The Court should dismiss all preemption/preclusion claims brought under § 1983.

Finally, claims of preclusion and preemption—like those in Counts I and II of the

Chamber Complaint—are not properly brought under § 1983 because "the Supremacy Clause, of

its own force, does not create rights enforceable under § 1983." *Golden State Transit Corp. v.*

*City of Los Angeles*, 493 U.S. 103, 107 (1989); *see also Wachovia Bank*, *N.A. v. Burke*, 414 F.3d

305, 321 (2d Cir. 2005) ("A violation of the Supremacy Clause is distinct from, and does not

necessarily give rise to, a violation of federal rights actionable under § 1983."). Plaintiffs do not

point to another source of federal rights enforceable under § 1983 to support their preclusion and

preemption claims. Thus, to the extent those claims are brought under § 1983, the Court should

dismiss them.

## II. The Court should dismiss the West Virginia Plaintiffs' Vermont constitutional claims for lack of subject matter jurisdiction.

### A. The West Virginia Plaintiffs lack standing to raise claims under the Vermont Constitution.

The West Virginia Plaintiffs lack standing to raise claims under the Vermont Constitution.

*See* W. Va. Compl. ¶¶ 13-14, 16-17, 194-200, 207-212, 235-244 (asserting Vermont due process,

common benefits, takings, and separation of powers claims). Vermont generally follows federal

standing requirements—injury-in-fact, causation, redressability. *Housing Our Seniors in Vt., Inc.*

*v. Agency of Commerce & Cmty. Dev.*, 2024 VT 12, ¶ 13, 219 Vt. 80, 315 A.3d 1000. A party's

alleged injury "depends on the nature of the right allegedly intruded upon"—there must be an

"'invasion of a legally protected interest.'" *See Ferry v. City of Montpelier*, 2023 VT 4, ¶ 13, 217 Vt. 450, 296 A.3d 749 (quoting *Hinesburg Sand & Gravel Co., Inc. v. State of Vermont*, 166 Vt. 337, 341, 693 A.2d 1045, 1048 (1997));[16] *Housing Our Seniors*, 2024 VT 12, ¶ 15 ("We conclude that plaintiffs lack standing because they have not alleged an actual injury to any protected legal interest."). As such, standing is determined by the specific claims a party presents, whether statutory, common-law, or constitutional. *See Ferry*, 2023 VT 4, ¶ 13. For claims under the Vermont Constitution, the court looks to the language of the right granted in the Constitution to "discern the interest" (if any) that a plaintiff has therein. *See id.* ¶ 19.

Here, the West Virginia Plaintiffs have not adequately alleged any legally protected interests for their Vermont constitutional claims. Chapter I of Vermont's Constitution—under which Plaintiffs allege due process, Common Benefits, and takings violations—applies to inhabitants of the State. Vt. Const. ch. I ("Chapter I. A Declaration of the Rights of the Inhabitants of the State of Vermont"); *Skiff v. S. Burlington Sch. Dist.*, 2018 VT 117, ¶ 28, 208 Vt. 564, 201 A.3d 969 ("This heading signifies that the rights that follow are personal to Vermont's inhabitants."). Similarly, the Vermont Constitution's separation of powers provision— Vt. Const. ch. II, § 5, under which the West Virginia Plaintiffs bring Count XI of their Complaint—applies within the State of Vermont to the Vermont government. It cannot reasonably be interpreted to extend substantive rights to persons wholly outside the State. *Cf. Ferry*, 2023 VT 4, ¶¶ 19, 21 (looking to language of Chapter II's voting provision to determine that members of Vermont voting pool had legally protected interest); *Vitale v. Bellows Falls*

---

[16] *Hinesburg* included "zone of interest" considerations in its standing analysis. 166 Vt. at 341-42, 693 A.2d at 1048-49. Zone of interest is a prudential standing doctrine that overlaps in some respects with the "injury in fact" requirement of the traditional standing test. *See id.; Wool v. Office of Prof'l Regulation*, 2020 VT 44, ¶ 10 n.1, 212 Vt. 305, 236 A.3d 1250.

*Union High Sch.*, 2023 VT 15, ¶ 11, 217 Vt. 611, 293 A.3d 309 (holding "Vermont children have a fundamental right to education" under Chapter II's Education Clause).

Obviously, West Virginia and the other plaintiff States are not inhabitants of Vermont. They also have not alleged that any of the citizens whose rights they purport to vindicate are inhabitants of Vermont or otherwise subject to the Vermont Constitution's protections. And while they also purport to be vindicating the rights of "energy producers" within their states,[17] they have not identified or alleged that any such producers are "responsible parties" who will be subject to the Act. *See* W. Va. Compl. ¶¶ 19-42. Therefore, even if it were appropriate for these states to represent the private interests of fossil fuel corporations as *parens patriae*,[18] they still would not have standing because they have not alleged an injury cognizable under the Vermont Constitution. *See supra* Section I.A. Claims under the Vermont Constitution should be dismissed.

### B.    This Court may not hear claims against Vermont under the Vermont Constitution.

Moreover, this Court lacks jurisdiction to hear this case because a federal court may not hear a claim against a state under its own state law. As the Supreme Court has observed, "it is

---

[17] *E.g.,* W. Va. Compl. ¶¶ 1 (generally), 13 (Vt. due process), 14 (Vt. Common Benefits (Article 7)), 16 (Vt. takings), 18 (generally), 199 (Vt. due process), 212 (Vt. Common Benefits (Article 7)), 237 (Vt. takings, cross-referencing, e.g., ¶ 228-230), 242 (Vt. separation of powers).

[18] *Parens patriae* provides standing where a State alleges an injury to a quasi-sovereign interest and to a substantial segment of its population. *See State of Vermont v. Clearview AI, Inc.*, Ruling on Def.'s Mot. to Dismiss, No. 226-3-20 Cncv, at 36-38 (Vt. Super. Ct. Sept. 10, 2020) (citing *Alfred L. Snapp & Son, Inc. v. P.R., ex rel., Barez*, 458 U.S. 592, 601 (1982)) (attached as **Exhibit U**). Representing the private interests of fossil fuel companies does not qualify. *Cf., e.g., Clearview* at 36-38 (*parens patriae* standing in consumer fraud action regarding facial recognition technology); *State of Vermont v. 3M Co.*, Ruling on Mots. to Dismiss, No. 547-6-19 Cncv, at 9-10 (Vt. Super. Ct. May 28, 2020) (*parens patriae* standing for contamination in drinking water wells) (attached as **Exhibit V**); *State of Vermont v. Monsanto Co.*, Ruling on Defs.' Mot. to Dismiss, No. 23-CV-2606, at 16-20 (Vermont Super. Ct. May 29, 2024) (*parens patriae* standing for PCBs contamination in schools and natural resources) (attached as **Exhibit W**).

difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Such suits, according to the Court, "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment." *Id*. at 90; *see also Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883, 891 (2d Cir. 1998) ("*Pennhurst* made clear that the Eleventh Amendment prevents a federal court from granting injunctive relief against a state official *on the basis of state law*.").

While the Eleventh Amendment itself does not apply directly here, *see*, *e.g.*, *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d. Cir. 2015) (Eleventh Amendment provides for "immunity of a state's treasury from claims for damages brought by private entities in federal courts" (citation omitted)), the basic principle is the same, *see Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 243 (2019) ("The 'sovereign immunity of the States,' we have said, 'neither derives from, nor is limited by, the terms of the Eleventh Amendment.'" (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999))). Whether a case is brought by a private party or another state, the principles of federalism and sovereignty underlying *Pennhurst* do not allow a federal court to "instruct[] state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106.

To be sure, when they joined the Union, the states consented to federal jurisdiction over "Controversies between two or more States." U.S. Const. art. III, § 2. But Defendants are not aware of any authority extending that jurisdiction to claims like the state constitutional claims at issue here and those described in *Pennhurst*—i.e., claims asking a federal judge to issue an injunction directing a state official on how to comply with state law. Allowing such suits would not vindicate any federal interest and would upset the "proper balance between the supremacy of federal law and the separate sovereignty of the States." *Alden*, 527 U.S. at 757 (citing *Pennhurst*,

465 U.S. at 105). The Court should dismiss the West Virginia Plaintiffs' claims under the Vermont Constitution.

## III.    The Court should dismiss all three complaints under Rule 12(b)(6).

### A.    Plaintiffs' facial challenges face a high burden.

Act 122 is economic legislation that does not infringe on fundamental rights or create suspect classes. It is presumed constitutional under the United States and Vermont constitutions, and Plaintiffs bear the burden to show otherwise. *See, e.g., Fairbanks v. United States*, 181 U.S. 283, 285 (1901) (noting that when addressing a constitutional challenge to a statute, "[t]he presumptions are in favor of constitutionality, and before a court is justified in holding that the legislative power has been exercised beyond the limits granted, or in conflict with restrictions imposed by the fundamental law, the excess or conflict should be clear"). It is "well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). *See also, e.g., Badgley v. Walton*, 2010 VT 68, ¶ 20, 188 Vt. 367, 10 A.3d 469; *In re Montpelier & Barre R.R. Corp.*, 135 Vt. 102, 103, 369 A.2d 1379, 1380 (1977) ("In testing statutes for their compliance with constitutional standards, every presumption is to be made in favor of constitutionality.").

Further, because Act 122 has not yet been implemented or applied to anyone, Plaintiffs' challenge is a facial challenge. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (noting that pre-enforcement challenge, before plaintiff has been "charged with any violation," is facial challenge). They can prevail on such a challenge only by "'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State*

*Republican Party*, 552 U.S. 442, 449 (2008) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (affirming standard and noting "[t]his Court has . . . made facial challenges hard to win");[19] *In re Mountaintop Inn & Resort*, 2020 VT 57, ¶ 22, 212 Vt. 554, 238 A.3d 637. Facial challenges to legislation are "the most difficult challenge[s] to mount successfully." *N.Y. State Rifle*, 804 F.3d at 265 (citation omitted). A facial challenge "that is deficient as a matter of law may be dismissed" for failure to state a claim under Rule 12(b)(6). *Clift v. City of Burlington*, 925 F. Supp. 2d 614, 633 (D. Vt. 2013) (citing *Kittay v. Giuliani*, 252 F.3d 645, 646-47 (2d Cir. 2001)).

For these reasons, the allegations to support a facial challenge cannot rest on speculation. In *Washington State Grange,* the Supreme Court held a Washington voting law was facially constitutional "[b]ecause [the law] does not on its face impose a severe burden on political parties' associational rights, and because respondents' arguments to the contrary rest on factual assumptions about voter confusion that can be evaluated only in the context of an as-applied challenge." 552 U.S. at 444. The Court emphasized that, "[i]n determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449-50; *id.* at 450 ("[t]he delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined" (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960))).

The Court continued:

Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature

---

[19] The *Moody* Court explained that First Amendment facial challenges have a "less demanding though still rigorous standard." 603 U.S. at 723. Plaintiffs do not raise a First Amendment challenge in this case.

interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'"

552 U.S. at 450-51 (internal citations omitted); *see also Nat'l Shooting Sports,* 144 F.4th at 107-08 (in preemption, dormant Commerce Clause, and vagueness challenge, noting that "[s]ince Appellants have brought a facial constitutional challenge . . . they must establish that the law cannot be constitutionally applied against anyone in any situation").[20]

Simply put, a facial challenge to a law only can be decided based on what we know the law does, not speculative allegations about what the law might do. As set forth below, based on what we know Act 122 does, it is constitutional.

### B. Plaintiffs fail to state a claim that Act 122 is federally precluded. (Chamber Count I; W. Va. Count I; U.S. Count II)

Plaintiffs' federal "preclusion" claims appear to hinge on allegations that the Supremacy Clause and disparate structural elements of the Constitution preclude Vermont from imposing the

---

[20] *See also, e.g., Moody*, 603 U.S. at 723 (citing *Wash. State Grange*, 552 U.S. at 450-51, and noting "NetChoice chose to litigate these cases as facial challenges, and that decision comes at a cost."); *Arizona v. United States*, 567 U.S. 387, 415 (2012) (explaining that when a party brings suit to challenge a law before it has gone into effect, "[t]here is basic uncertainty about what the law means and how it will be enforced," and "without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [the law] will be construed" unconstitutionally); *Antonyuk v. James*, 120 F.4th 941, 987 (2d Cir. 2024) (citing *Wash. State Grange*, 552 U.S. at 450-51, and denying facial injunction against concealed carry law provision because "Plaintiffs assume that licensing officers will act in bad faith, but facial challenges require the opposite assumption"); *Kampfer v. Cuomo*, 993 F. Supp. 2d 188, 194, 196 (N.D.N.Y. 2014) (noting general standard that facial challenges are "disfavored" because they rest on speculation and dismissing claim asserting facial challenge to gun control law).

cost recovery demands contemplated by the Act. *See*, *e.g.*, Chamber Compl. ¶ 73 (quoting Supremacy Clause in support of "Federal Preclusion" argument). But the Supremacy Clause "creates a rule of decision" by which courts decline to "give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). The Clause is not "the source of any federal rights." *Id.* (quotation marks and citations omitted). To state a plausible claim of "preclusion" in this sense, plaintiffs must identify *substantive* federal law with which the state law allegedly conflicts—i.e., a statutory or constitutional provision that preempts the Act. *See Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (claim of preemption cannot be based on "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives"); *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., in lead opinion) ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." (citation omitted)).

That is, "brooding" policy arguments like those Plaintiffs make about the need to protect "energy producers" and the world economy from Vermont's efforts to respond to the harms of climate change, *see*, *e.g.*, Chamber Compl. ¶¶ 1, 89, do not make out a valid preemption claim. Plaintiffs must instead identify specific statutory or constitutional texts with which Act 122 conflicts. Apart from their statutory preemption claim under the Clean Air Act—which is addressed *infra* Section III.C—Plaintiffs collectively have identified only three potential candidates. Act 122 is not "precluded" under any of them.

1.    **Act 122 is not unconstitutionally "extraterritorial."**

First, all three complaints rely on what Plaintiffs characterize as a constitutional

prohibition on "extraterritorial" regulation. Chamber Compl. ¶¶ 79-86; W. Va. Compl. ¶¶ 132-

136; U.S. Compl. ¶¶ 60-72. Of course, it has long been recognized that states may apply their

laws to out-of-state actors when their actions have in-state consequences, *see Young v. Masci*,

289 U.S. 253, 258-59 (1933) ("The cases are many in which a person acting outside the state

may be held responsible according to the law of the state for injurious consequences within it."),

and that is what Act 122 does here.

Moreover, the cases Plaintiffs cite do not support that there is a stand-alone

extraterritoriality "preclusion" doctrine. Instead, they are either due process cases, *e.g.*, *BMW of

North America, Inc. v. Gore*, 517 U.S. 559 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*,

538 U.S. 408 (2003); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023); *World-Wide

Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980); *Bristol-Myers Squibb Co. v. Superior Ct. of

California, San Francisco Cnty.*, 582 U.S. 255 (2017), or dormant Commerce Clause analyses,

*e.g. Mallory*, 600 U.S. at 150 (Alito, J., concurring); *Nat'l. Pork Producers Council v. Ross*, 598

U.S. 356 (2023).

None of those cases support Plaintiffs' claim that Act 122 is unconstitutionally

extraterritorial. The *Gore* and *Campbell* cases, for example, suggest the opposite. They held that

state courts could not, through punitive damages awards, seek to punish or alter out-of-state

"conduct that may have been lawful where it occurred," *Campbell*, 538 U.S. at 421, where the

conduct "had no impact on [the forum state] or its residents," *Gore*, 517 U.S. at 572-73.[21] The

---

[21] *See also Campbell*, 538 U.S. at 420 (noting that the defendant "was being condemned for
its nationwide policies rather than for the conduct directed toward" the plaintiffs).

Court distinguished those punitive damage awards from awards "supported by the State's interest in protecting its own consumers and its own economy." *Gore*, 517 U.S. at 572; *Campbell*, 538 U.S. at 422 (noting that punitive damages award punished conduct that "bore no relation to the [in-state plaintiff's] harm"). Unlike the punitive damages awards in *Gore* and *Campbell*, Act 122 does not seek to punish or alter *any* conduct, let alone lawful conduct in other jurisdictions. Its purpose is compensatory, and its cost recovery demands are tied concretely and directly to in-state harms. And even if the Act were punitive (again, it is not), under *Gore* and *Campbell* a state may punish defendants for out-of-state conduct that causes harm within the state—and there is plainly such a nexus here. Thus, to the extent they are relevant at all, the punitive damages cases support the facial constitutionality of Act 122.

Plaintiffs cannot allege a valid due process claim under *Mallory*, *World-Wide Volkswagen*, and *Bristol-Myers-Squibb* either. Those cases address attempts by state courts to exercise personal jurisdiction over out-of-state defendants. None of the Plaintiffs have plausibly alleged that they are likely to be hailed into Vermont court under the Act and therefore lack standing to raise this claim on their own behalf. Moreover, insofar as the Chamber Plaintiffs attempt to assert the rights of their members, the Act on its face does not apply to potential responsible parties that "lack[] sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." Act 122 Sec. 2, Act 47 Sec. 22, § 596(22).

Plaintiffs largely ignore that nexus requirement or argue that because fossil fuels are not typically produced or refined in Vermont, Vermont will not be able to exercise jurisdiction over the responsible parties. *E.g.,* U.S. Compl. ¶¶ 68-70. But the question of constitutional jurisdiction is a highly fact-dependent inquiry, *see generally Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351 (2021), and Plaintiffs have not even identified a specific responsible party

26

under the Act, or how Act 122 will impermissibly violate the Supreme Court's personal jurisdiction tests. At a minimum, Plaintiffs cannot show that Vermont will be unable to exercise jurisdiction over *any* potentially responsible party under the Act. Thus, as a matter of law, Act 122 does not facially violate the principles of due process discussed in *Mallory* and similar cases.

Finally, Chamber Plaintiffs' citations to *Pork Producers* and Justice Alito's concurrence in *Mallory*, Chamber Compl. ¶¶ 82, 83, do not support their extraterritoriality argument. Those are dormant Commerce Clause opinions, and the Supreme Court has recently held that a law does not run afoul of the dormant Commerce Clause simply because it has "extraterritorial effects." *See Pork Producers*, 598 U.S. at 374-75 (rejecting extraterritoriality theory under the dormant Commerce Clause, noting that "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior"). Those opinions do not support plaintiffs' "extraterritoriality" claims here.[22]

## 2. Plaintiffs have not stated a preemption claim under the foreign affairs doctrine.

Next, Act 122 represents a lawful exercise of Vermont's authority to raise revenue to address local public health and environmental harms, protect the safety and welfare of its citizens, and adapt to climate change impacts within its borders. Plaintiffs therefore cannot show that the Act clearly conflicts with any express federal foreign policy. It is not preempted under the foreign affairs doctrine (Chamber Compl. ¶ 87; U.S. Compl. Count V).

The Supreme Court has interpreted the United States Constitution to vest power over foreign affairs exclusively with the federal government. *United States v. Pink*, 315 U.S. 203, 233 (1942). The foreign affairs power may therefore preempt state laws that intrude on the federal

---

[22] Plaintiffs' standalone dormant Commerce Clause claims are analyzed separately *infra* at Section III.F.

government's exclusive power over foreign affairs by "disturb[ing] foreign relations." *Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968); *see Trojan Technologies, Inc. v. Commonwealth of Pennsylvania*, 916 F.2d 903, 913 (3d Cir. 1990) ("[A]ny state law that involves the state in the actual conduct of foreign affairs in unconstitutional."). But where a state law "address[es] a traditional state responsibility," a plaintiff asserting foreign affairs preemption must point to a conflict between the state law and a specific federal policy. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003). Thus, "state law 'must give way' to the foreign policy of the United States" only "where there is 'evidence of clear conflict between the policies adopted by the two.'" *In re Assicurazioni Generali*, *S.P.A.*, 592 F.3d 113, 117-18 (2d Cir. 2010) (quoting *Garamendi*, 539 U.S. at 420-21). Plaintiffs must allege an "express foreign policy and [a] clear conflict raised by the state law" to prevail.

In *Garamendi*, for example, the "express" foreign policy was illustrated by a series of executive agreements designed to promote exclusive use of the International Commission on Holocaust Era Insurance Claims (ICHEIC) to resolve certain international insurance claims. *See Garamendi*, 539 U.S. at 396-408. The Court held that California's Holocaust Victim Insurance Relief Act was preempted by that express policy because it imposed policy disclosure obligations on insurers that would have interfered with the federal policy of encouraging European insurers to work with the ICHEIC to develop acceptable disclosure procedures. *Id*. at 421.

The *Generali* case involved the same foreign policy, which had by the time of that decision also been confirmed by letters from the Secretaries of State through two presidential administrations. *Generali*, 592 F.3d at 117. The Second Circuit held in that case that state-law claims against European insurers arising out of Holocaust-era insurance policies conflicted with

the "consistent Presidential foreign policy," *id.* at 118, that the ICHEIC "should be regarded as the exclusive forum and remedy for claims within its purview," *id*. at 119.

No federal foreign policy prohibits what Act 122 does, which is to secure payments from fossil fuel producers with Vermont impacts to help fund in-state climate adaptation projects. Indeed, the primary concern addressed by the Act—climate change adaptation within Vermont's borders—is a traditional, domestic concern that does not implicate foreign affairs. *See, e.g.*, *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018) ("It is well settled that the states have a legitimate interest in combating the effects of climate change on their residents."); *see Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623 F.3d 1, 13 (1st Cir. 2010) ("The Supreme Court indicated in *Garamendi* that it is appropriate to 'consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted.'" (citation omitted)). The Act does not implicate—and certainly does not interfere or conflict with—any consistent, express foreign policy.

Searching for such a policy, the United States first cites the United Nations Framework Convention on Climate Change. But it admits that the Framework Convention is aimed at the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." U.S. Compl. ¶ 104; *see also* Chamber Compl. ¶ 94 (relying on Framework Convention). Act 122 does not facially conflict with the Framework Convention. The Act does not purport to increase, decrease, or otherwise regulate the production or use of fossil fuels or control fossil fuel emissions. And even if the Act could disincentivize the production or use of such fuels in practice—as all three Complaints speculate—that effect obviously would not *conflict* or interfere with the Framework

Convention's goal of "stabilization of greenhouse gas concentrations" at levels "that would prevent dangerous anthropogenic interference."

The United States also points to (1) the "Kigali Amendment to the Montreal Protocol," which relates to the use of hydrofluorocarbons, not fossil fuels, U.S. Compl. ¶ 41, (2) the Kyoto Protocol, to which the United States is not a party, *id*. ¶ 42, and (3) the Paris Climate Agreement, from which the United States withdrew on January 20, 2025, *id*. ¶ 43. But none of those instruments—or the United States' decision not to join them—reflect a sufficiently strong or coherent federal foreign policy for purposes of foreign affairs preemption analysis. Vague allegations about the United States' decision *not* to enter, or withdraw from, a disparate series of treaties do not have the same preemptive force as the express, clearly articulated foreign policy at issue in both *Garamendi* and *Generali*. Nor does the unexplained decision to enter and withdraw from a series of international government-to-government treaties demonstrate a conflict with the Act, which operates primarily on private entities, not foreign governments. *Garamendi*, 539 U.S. at 419 n.11.

Finally, even if Plaintiffs could show that a cost assessed on fossil fuel companies with a nexus to Vermont could have some effect on foreign policy—say, as Plaintiffs allege, because of the amount of the assessment, *e.g.*, Chamber Compl. ¶ 96; W. Va. Compl. ¶ 145; U.S. Compl. ¶ 5—that is not enough to sustain a facial challenge to the statute. Plaintiffs must plausibly allege there will be more than an "incidental or indirect" effect on foreign countries in all applications of the Act. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613, 617 (9th Cir. 2013) ("To intrude on the federal government's foreign affairs power, a [state's action] must have more than some incidental or indirect effect on foreign affairs." (citation omitted)); *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (in preemption case, noting that "a facial challenge is

'the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [rule] would be valid'" (quoting *Salerno*, 481 U.S. at 745)). They cannot do so because, again, it will be years before Vermont determines through administrative process which companies are covered by the law and how much those companies will be charged.

Act 122 does not regulate foreign governments, upset international agreements, or interfere with diplomatic relations. It addresses a distinctly local problem, and it only applies to companies that have contributed to the problem and have a sufficient constitutional nexus to Vermont. Plaintiffs cannot demonstrate that the statute, in all its applications, will have *any* effect—let alone a non-incidental effect—on a foreign country or the federal government's ability to conduct foreign relations. The Court should reject Plaintiffs' foreign affairs preemption argument.

### 3. Federal common law does not preempt Act 122; *City of New York v. Chevron Corporation* is inapposite.

Finally, the Chamber and West Virginia Plaintiffs invoke federalism principles, arguing that Act 122 "regulates" cross-border air pollution and energy production in an area governed instead by federal common law. *See* Chamber Compl. ¶¶ 76-78; W. Va. Compl. ¶ 138. This argument borrows heavily from the Second Circuit's analysis in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), in which the Court held that (1) the federal common law of interstate pollution supplanted New York City's state tort claims seeking redress for climate change harms, (2) those federal common law claims had been displaced by the Clean Air Act, and (3) given this displacement, the City's claims could not go forward because the Clean Air Act did not specifically authorize them. *Id.* at 91, 96, 99. This claim also fails.

31

It bears noting at the outset that "[t]here is no federal general common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Accordingly, courts "do not possess a general power to develop and apply [federal] rules of decision." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 (1981) (*Milwaukee II*). Instead, it is primarily for Congress to decide whether to "displace state law" by enacting a "federal rule." *Id*. at 312-13. That conclusion flows from the Constitution itself: federal common law "plays a necessarily modest role" in a system that "vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States." *Rodriquez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132, 136 (2020).

Thus, the Supreme Court has constrained the development of federal common law to certain, narrow "limited situations," in which it is necessary to apply a federal rule of decision. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507-08 (1988); *see In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001) ("The ability of the federal courts to create federal common law and displace state created rules is severely limited."). To be sure, the Supreme Court has historically found it necessary to apply federal "common law" to certain claims involving interstate pollution. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) (collecting cases). But the cases through which that body of federal common law developed arose out of a very specific circumstance: an attempt by one state to abate point-source pollution emanating from another state. *See*, *e.g.*, *Illinois v. City of Milwaukee, Wisconsin*, 406 U.S. 91, 93 (1972) (*Milwaukee I*) (nuisance action to abate sewage discharge into Lake Michigan); *North Dakota v. Minnesota*, 263 U.S. 365, 371 (1923) (suit to enjoin alteration of river flow); *Missouri v. Illinois*, 180 U.S. 208, 241-43 (1901) (nuisance action to abate sewage discharge into interstate waters).[23]

---

[23] That body of law was developed out of the recognition that the "jurisdiction and procedure of th[e Supreme Court] in controversies between states of the Union . . . . grows out of the

And even where federal common law exists, it cannot displace state law without a "significant conflict." *Boyle*, 487 U.S. at 507-08.

Here, Plaintiffs cannot get past *City of New York* step one (federal common law supplanting state common law) because (i) federal common law does not supplant state *statutory* law and (ii) even if it did, Act 122 does not directly or indirectly regulate interstate pollution, the operative arena of displaced federal common law. In either case, there is no need to apply *City of New York* steps two and three, which depend on federal common law first supplanting the state law at issue.

First, *City of New York* addressed Clean Air Act displacement of federal common law, and by extension, analogous state common law. It did not address federal displacement of a state statute. And that difference is significant in view of the "necessarily modest role" federal common law plays in our federalist system. *Rodriquez*, 589 U.S. at 136. While it is sometimes appropriate in "limited areas" for federal judges to supplant state common law with a federal "rule of decision," *id.*, that does not extend to state statutes, like Act 122, that do not interfere with any federal rule of decision. Claims regarding conflicting federal and state statutory law are resolved under a traditional Supremacy Clause preemption analysis (and the Clean Air Act does not preempt Act 122, *see infra* Section III.C).

Second, even if federal common law could supplant state statutory law, Act 122 does not conflict with the federal common law of interstate pollution. That body of law was created to give states a remedy—the ability to abate conduct outside their borders—they did not already have, not to create an affirmative rule of interstate immunity (which no court has ever done).

_____

history of the creation of the power, in that it was conferred by the Constitution as a substitute for the diplomatic settlement of controversies between sovereigns and a possible resort to force." *North Dakota*, 263 U.S. at 372-73.

Vermont is not seeking to abate a nuisance originating in another state. The Act imposes a one-time charge rationally founded on a responsible party's contributions to the State's climate-change-related costs over a defined period of time. Unlike the common law claims at issue in *City of New York*, it does not seek abatement of any alleged nuisance (in-state or out-of-state),[24] and it does not impose any ongoing duty requiring a responsible party to change its production, marketing, or consumption practices. Thus, Act 122 does not conflict with the federal interests animating the interstate pollution cases. *See New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 208 (2d Cir. 2006) ("[W]here there is no conflict between federal policy and the application of state law, 'a mere federal interest in uniformity is insufficient to justify displacing state law in favor of federal common law.'" (citation omitted)).

Therefore, this case is not controlled by *City of New York* or the body of federal common law underlying that decision.[25] Act 122 is not preempted by federal common law.

---

[24] *See City of New York*, 993 F.3d at 88 (noting that City's suit sought an "equitable order ascertaining damages and granting an injunction to abate the public nuisance and trespass that would go into effect should the Producers fail to pay the court-ordered damages").

[25] The State reserves the right to argue that *City of New York* was wrongly decided insofar as it relied on federal common law that had been displaced by the Clean Air Act and declined to perform a traditional, statutory preemption analysis. *See, e.g.*, *Mayor & City Council of Baltimore v. BP, P.L.C.*, 31 F.4th 178, 203 (4th Cir. 2022) (pointing out the "legal flaw" in *City of New York's* analysis); *D.C. v. Exxon Mobil Corp.*, 89 F.4th 144, 153 (D.C. Cir. 2023) (noting that *City of New York's* reasoning "cannot be squared" with Supreme Court precedent); *City and Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1200 (Haw. 2023) (finding *City of New York's* reasoning "not persuasive"); *In re: Cnty. Comm'rs of Boulder City. v. Suncor Energy USA, Inc.*, --- P.3d ---, 2025 WL 1363355, at *9-10 (Colo. 2025) (declining to follow *City of New York* and criticizing its preemption analysis); *see also* W. Va. Compl. ¶ 112 (alleging that "the Clean Air Act displaces any claims grounded in federal common law" and "is now the federal standard governing any claims involving interstate greenhouse gas emissions").

### C. The Clean Air Act does not preempt Act 122.
### (Chamber Count II; W. Va. Count II; U. S. Count I)

The preemption of state laws represents "a serious intrusion into state sovereignty." *Medtronic*, *Inc.* v. *Lohr*, 518 U. S. 470, 488 (1996) (Stevens, J., plurality). Therefore, to show that Act 122 is preempted, Plaintiffs must point to "a clear congressional command." *Va. Uranium, Inc.*, 587 U.S. at 773 (Gorsuch, J., in lead opinion); *id.* at 767 (noting it is not enough "to rest on a supposition (or wish) that 'it must be in there somewhere'"). Courts will find state law preempted only where (1) Congress has "expressly preempted" the state law; (2) Congress "'has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'"; or (3) "local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (citation omitted); *March v. Rosenbloom*, 499 F.3d 165, 177 (2d Cir. 2007). The Clean Air Act (CAA) does not preempt Act 122 under any of these doctrines.

### 1. The Clean Air Act does not expressly preempt Act 122.

Plaintiffs do not seem to argue that the CAA expressly preempts Act 122, and it does not. Express preemption is largely a straightforward application of statutory interpretation. "When a federal law contains an express preemption clause, [courts] 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" *Whiting*, 563 U.S. at 594 (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993)). The Clean Air Act contains one express preemption provision and it only pertains to emissions controls for new motor vehicles in certain circumstances. *See* 42 U.S.C. § 7543(a), (b). Act 122 does not establish emissions controls for new motor vehicles. *See generally In re Volkswagen "Clean*

Diesel" Mktg., Sales Practices, & Products. Liab. Litig., 959 F.3d 1201, 1218-19 (9th Cir. 2020)

(discussing express preemption in CAA). Thus, the CAA does not expressly preempt Act 122.

**2.    The Clean Air Act does not occupy the field.**

Act 122 is a revenue-raising statute that does not regulate air pollution, so it does not

operate in the same field as the Clean Air Act. Even if it did, it would not be preempted under a

theory of field preemption. "Field preemption occurs when federal law occupies a 'field' of

regulation 'so comprehensively that it has left no room for supplementary state legislation.'"

*Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (quoting *R.J. Reynolds Tobacco Co. v. Durham*

*County*, 479 U.S. 130, 140 (1986)). "Field preemption reflects a congressional decision to

foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567

U.S. at 401. A typical field preemption analysis looks to the specific provision of the CAA

purported to occupy a particular regulatory field. *See*, *e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 208

(2020) ("In order to determine whether Congress has implicitly ousted the States from regulating

in a particular field, we must first identify the field in which this is said to have occurred."); *In re*

*Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Products Liab. Litig.*, 295 F. Supp. 3d

927, 1001 (N.D. Cal. 2018) ("Congress did not intend to occupy the field to the extent the field is

defined (broadly) as motor vehicle emissions"). Plaintiffs identify no such provision or particular

field, but point to the CAA as a whole. *E.g.,* Chamber Compl. ¶¶ 109-114, W. Va. Compl. ¶¶ 156-

159, U.S. Compl. ¶¶ 48-52.

However, the cooperative approach of the Clean Air Act explicitly leaves room for

supplemental regulation by the states. *See* 42 U.S.C. §§ 7401(a)(3) ("air pollution control at its

source is the primary responsibility of States and local governments"), 7416 ("nothing in this

chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or

36

enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution"). As the Supreme Court has said, where "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." *Hughes v. Talen Energy Mktg.*, *LLC*, 578 U.S. 150, 167 (2016) (Sotomayor, J., concurring) (quoting *N.Y. State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 421 (1973)); *see In re Caterpillar, Inc., C13 & C15 Engine Products Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *14 (D.N.J. July 29, 2015) ("While the Court recognizes the breadth of federal regulation in the area, the savings clause suggests that Congress did not intend to occupy the entire field of motor vehicle regulation.").

Even if Act 122 regulated greenhouse gas emissions, the Supreme Court has made clear the Clean Air Act does not occupy that field. In *West Virginia v. EPA*, the Court determined that the CAA's regulatory authority over power plants is limited and does not extend to the kind of measures EPA deemed "necessary to mitigate the dangers presented by climate change." 597 U.S. 697, 727 (2022). EPA had proposed a system-wide cap that would have required a transition from higher-emitting sources to lower-emitting sources (from coal to natural gas to wind and solar). By the Court's reasoning, importing this kind of regulatory authority into the CAA, beyond on-site emission controls, would amount to a "'fundamental revision of the statute.'" *Id.* at 728 (citation omitted). Ultimately, the Court determined that Congress could not have delegated EPA the authority "to devise carbon emissions caps" at a level that would address climate change. *West Virginia*, 597 U.S. at 732*; see also Va. Uranium*, 587 U.S. at 771 (Gorsuch, J., in lead opinion) (holding state law is not preempted where federal statute does not provide authority to regulate the activity). Now, Plaintiff EPA is stepping away even from on-site

emission controls and has begun the process to end its earlier proposed regulation of carbon emissions from stationary sources.[26] EPA has also just indicated its intention to end its regulation of motor vehicle greenhouse gas emissions, proposing to rescind the greenhouse gas "endangerment finding" that supported its regulation of those emissions. [27]

In sum, the Clean Air Act does not occupy the field of greenhouse gas regulation. As such, even if Act 122 regulated greenhouse gas emissions, it would not be field preempted by the Clean Air Act.

### 3.    Act 122 does not conflict with the Clean Air Act.

Where preemption is not express and where Congress has not occupied the field, a state law is preempted only where "compliance with both federal and state regulations is a physical impossibility," *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 725 F.3d 65, 97 (2d Cir. 2013) (citation omitted), or where the law stands as an "unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Wyeth v. Levine*, 555 U.S. 555, 563 (2009) (quoting *Hines v. Davidowitz*, 312 U. S. 52, 67, 61 (1941)). This type of preemption, "like all preemption arguments, must be grounded 'in the text and structure of the statute at issue.'" *Kansas*, 589 U.S. at 208 (quoting *CSX Transp., Inc.*, 507 U.S. at 664)). "The burden of establishing obstacle preemption . . . is heavy," mere "tension" is not enough, rather obstacle preemption will only be found when "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *In re MTBE*, 725 F.3d at

---

[26] Repeal of Greenhouse Gas Emissions Standards for Fossil Fuel-Fired Electric Generating Units, 90 Fed. Reg. 25,752 (proposed June 17, 2025) (to be codified at 40 C.F.R. pt. 60).

[27] Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36,288 (proposed Aug. 1, 2025) (to be codified at 40 C.F.R. pts. 85, 86, 600, 1036, 1037, 1039).

101-02 (citations and internal quotation marks omitted). Moreover, where "plaintiffs bring a facial preemption challenge to a state law," as here, "they must demonstrate that there is no possible set of conditions under which the challenged state [regime] could be constitutional." *Rest. Law Ctr. v. City of New York*, 90 F.4th 101, 117 (2d Cir. 2024).

First*, it is not physically impossible for responsible parties to comply with both Act 122 and the Clean Air Act. The Clean Air Act "regulates pollution-generating emissions from . . . stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 308 (2014). It does so by imposing limits on emissions of various air pollutants. *See, e.g.*, 42 U.S.C. §§ 7411(b)(1)(B), 7521(a)(1). Act 122 does not impose any emission limits. Even if it did, and even if those limits were very stringent, it only would be "physically impossible" for responsible parties to comply with both Act 122 and the Clean Air Act if the Clean Air Act required entities *to emit* a certain amount of greenhouse gases. *See In re MTBE*, 725 F.3d at 97 (noting that state law may be preempted where "state law penalizes what federal law requires" or "when state law claims directly conflict with federal law"). This plainly is not the case. A responsible party will face no difficulty in complying with both Act 122 and the Clean Air Act, therefore there is no "physical impossibility" preemption.

Next, Act 122 does not pose an obstacle to the structure or purpose of the Clean Air Act. The overriding purpose of the Clean Air Act is to "prevent and control air pollution." *Rest. Law Ctr.*, 90 F.4th at 101. Its text is clear: "The purposes of this subchapter are . . . to *protect and enhance the quality of the Nation's air* resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401 (also listing other purposes to support research to "achieve the *prevention and control of air pollution*," provide assistance to

States and localities in "the development and execution of their *air pollution prevention and control* programs," and support regional "regional *air pollution prevention and control* programs") (emphases added). And the structure of the Clean Air Act likewise does not reveal Congressional concern with reducing air pollution *too much* (again, even if the Act regulated pollution, which it does not). Indeed, the Act reflects a "cooperative federalism" approach to regulation, under which states share responsibility for implementing the law and are free, in most circumstances, to impose more stringent emissions standards. *See, e.g.,* 42 U.S.C. § 7410 (state implementation plans); 42 U.S.C. § 7416 (retention of state authority). Here, the purpose of Act 122 is not to regulate pollution at all, but to recover a portion of Vermont's climate adaptation costs. *See* Act 122 Sec. 2, § 597(1) (describing purpose to "secure compensatory payments" to "provide a source of revenue for climate change adaptation projects within the State"); *In re MTBE*, 725 F.3d at 101 ("A showing that the federal and state laws serve different purposes cuts against a finding of obstacle preemption."). The Act does not stand as an obstacle to the Clean Air Act's pollution reduction regime.

The United States' allegation that Act 122 "obstructs EPA's discretion to balance environment, economic, and energy considerations," U.S. Compl. ¶ 55, is the sort of "simplistic" preemption argument the Court has rejected. *See Va. Uranium*, 587 U.S. at 777 (Gorsuch, J., in lead opinion). The Clean Air Act seeks to reduce air pollution by, in relevant part, imposing baseline emissions standards on pollution sources. Whatever balancing is committed to the EPA in determining specific emissions standards does not amount to a congressional intent to preempt all state laws that theoretically could have some impact on emissions. For obstacle preemption, Plaintiffs would need to show that Act 122 in fact regulates greenhouse gas emissions (it does not) and that the Clean Air Act's purpose, text, and structure evince a congressional intent to

prohibit all state regulation of greenhouse gases. Much as Plaintiffs may wish it, this is not the law Congress enacted.

And even if it were the case that the Clean Air Act preempted all laws that could influence emissions, Plaintiffs' obstacle preemption claim still would fail because their allegations about the Act's impacts on future emissions rely on speculative assumptions about how the Act will be implemented. *See* W. Va. Compl. ¶ 169; U.S. Compl. ¶ 54. The Act has not yet been implemented and the amount and distribution of cost recovery demands is not yet known, nor is any purported effect on fossil fuel production. Such speculative claims (even if they were otherwise relevant) cannot serve as a basis for a facial challenge to a statute. *See, e.g., Rest. Law Ctr.*, 90 F.4th at 117; *Nat'l Shooting Sports*, 144 F.4th at 112 ("In other words, a facial challenge to a state statute involves a claim that the law 'is invalid in toto—and therefore incapable of any valid application.'" (citation omitted)); *supra* Section III.A.

Finally, Plaintiffs' reliance on *City of New York* does not save their preemption argument. *City of New York* did not conduct an obstacle preemption analysis or overrule longstanding statutory preemption standards. Instead, it addressed whether the Clean Air Act displaced federal common law, which is a different analysis. *See City of New York*, 993 F.3d at 95-98; *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007) ("The Supremacy Clause is not implicated when federal laws conflict."); *AEP*, 564 U.S. at 423 (displacement of federal common law by federal statutory law "does not require the 'same sort of evidence of a clear and manifest congressional purpose' demanded for preemption of state law" (citation and alteration omitted)). *City of New York's* further holding that the Clean Air Act does not "authorize" state common law suits likewise does not speak to whether a federal statute preempts a state statute. *See* 993 F.3d at 98-100. Any preemption of Act 122 by the Clean Air Act

would need to follow the classic preemption analysis described above, which *City of New York* did not purport to change. Under that analysis, the Clean Air Act does not preempt Act 122. The overbroad application of *City of New York* that Plaintiffs request here would extend the case far beyond its actual holding and would conflict with settled Supreme Court precedent governing federal preemption.

### D.    Plaintiffs fail to state a claim that Act 122 violates due process. (Chamber Count III; W. Va. Counts IV, V)

Act 122 is economic legislation that rationally allocates economic burdens to serve legitimate state purposes, provides sufficient guidance for its implementation, and gives responsible parties notice and an opportunity to be heard on their cost recovery demands. It is facially constitutional under substantive and procedural due process.

#### 1.    Act 122 does not violate substantive due process.

To state a substantive due process claim, Plaintiffs must plausibly allege that Act 122 lacks any rational basis and is unsupported by a valid legislative purpose. They have not done so.

In the context of economic legislation, Plaintiffs face a high burden: they must "establish that the legislature has acted in an arbitrary and irrational way." *Usery*, 428 U.S. at 15 (upholding black lung benefits statute requiring coal mines to pay benefits to employees who left employment before effective date of statute against facial due process challenge), *cited with approval in E. Enters. v. Apfel*, 524 U.S. 498, 524 (1998) (O'Connor, J., plurality); *Long Island Oil Products Co. v. Local 553 Pension Fund*, 775 F.2d 24, 27 (2d Cir. 1985); *see also W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937) ("[R]egulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.").

The same standard applies for retroactive economic legislation; the key inquiry is whether "the retroactive application of the legislation is itself justified by a rational legislative

purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984); *see also id.* at 733 ("[A]lthough we have noted that retrospective civil legislation may offend due process if it is particularly harsh and oppressive, that standard does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in [*Usery*]." (citations and quotation marks omitted)); *Long Island Oil*, 775 F.2d at 27 (question is whether law's retroactive application "is justified by a legitimate legislative purpose furthered by rational means").[28]

If the protections of the Vermont Constitution applied to West Virginia (they do not, *see supra* Section II), this standard also would apply to West Virigina's claim under the Vermont Constitution. *See* W. Va. Compl. ¶¶ 194-200. The Vermont Supreme Court's cases "have treated claims under Article 4 [due process] similarly to those made under the U.S. Constitution, and we have employed the federal standards to evaluate Article 4 claims." *A.B. v. S.U.,* 2023 VT 32, ¶ 10, 218 Vt. 123, 298 A.3d 573. The Vermont Supreme Court has viewed "the reasoning of the federal decisions regarding federal due process [as] logical, persuasive, and consistent with th[e] Court's past cases involving Article 4." *Id.* ¶ 15.

Under this standard, Act 122 is constitutional on its face.

---

[28] *Eastern Enterprises*, in which a fractured Court struck down part of the Retiree Health Benefit Act of 1992, did not change this standard. *See* 524 U.S. at 524-27. First, there is no controlling opinion in *Eastern Enterprises. See United States v. Alcan Alum. Corp.*, 315 F.3d 179, 189 (2d Cir. 2003) ("Because the substantive due process reasoning presented in Justice Kennedy's concurrence is not a logical subset of the plurality's takings analysis, no 'common denominator' can be said to exist among the Court's opinions. The only binding aspect of such a splintered decision is its specific result, and so the authority of *Eastern Enterprises* is confined to its holding that the Coal Act is unconstitutional as applied to Eastern Enterprises."). Second, the test articulated in Justice Kennedy's due process concurrence is not contrary. *See E. Enters.*, 524 U.S. at 549 (Kennedy, J., concurring) (noting concern with retroactive laws of "great severity" and that Act in question bore "no legitimate relation to the interest which the Government assert[ed] in support of the statute" (citing *Usery*, 428 U.S. at 19)).

### a.    Act 122 has a legitimate purpose.

First, the Act has a legitimate legislative purpose: "to secure compensatory payments from responsible parties . . . to provide a source of revenue for climate change adaptation projects within the State[.]" Act 122 Sec. 2, § 597(1). Protecting the health, safety, and welfare of Vermonters through projects that help the State's communities, households, and businesses respond to and prepare for the negative impacts of climate change is a valid purpose. *Id.* § 596(2) (definition of climate change adaptation projects); *Maine v. Taylor*, 477 U.S. 131, 144, 151-52 (1986) (noting state "retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources"); *Quarty v. United States*, 170 F.3d 961, 967 (9th Cir. 1999) ("There can be no dispute that the purpose of raising government revenue is a legitimate legislative purpose."); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1330 (Fed. Cir. 2001) (holding retroactive act imposing monetary assessments for purpose of remediating contaminated facilities "rationally furthers a legitimate legislative objective"); *Nat'l Elec. Mfrs. Ass'n v. Sorrell,* 272 F.3d 104, 115 (2d Cir. 2001) (holding "Vermont's interest in protecting human health and the environment from mercury poisoning is a legitimate and significant public goal"); *Am. Fuel*, 903 F.3d at 913 ( "legitimate interest" in addressing "adverse effects of climate change").

### b.    Act 122's cost recovery program is rational.

Second, the Act provides a rational, non-arbitrary means of accomplishing this purpose. It assigns payments to responsible parties based on their proportional share of the State's costs to adapt to climate change.

The first step is for the Treasurer to assess Vermont's climate change costs. Act 122 Sec. 2, Act 47 Sec. 24, § 599c. The Treasurer has until January 15, 2027, to conduct this assessment,

and may hire consultants "for the purposes of obtaining and utilizing credible data or methodologies," which will help ensure the accuracy and reliability of the assessment. *Id.* The Legislature's decision to address covered greenhouse gas emissions in this cost assessment (those resulting from fossil fuels extracted or refined from 1995 through 2024) was reasonable. Contrary to Plaintiffs' assertion that the Legislature had "no sound basis" to choose this period,[29] the legislative testimony shows that, by 1995, the link between fossil fuel production and climate change was clear and that fossil fuel producers knew this to be the case. *See supra* Background Section A. Due process does not require the Legislature to address all greenhouse gas emissions from all time periods. *See infra* Section III.D.1.b.

Next, ANR will determine who the responsible parties are and will issue cost recovery demands based on each party's share of covered greenhouse gas emissions, as applied to the State's costs to address covered emissions. Act 122 Sec. 2, Act 47 Sec. 23, §§ 596(22), 598(b), (f), 599c(3). ANR will establish methodologies and requirements for identifying and registering responsible parties through rulemaking, ensuring that responsible parties are those with more than one billion metric tons of covered greenhouse gas emissions and sufficient constitutional nexus requirements, consistent with the statutory definition. *See* Act 122 Sec. 2, Act 47 Sec. 22, §§ 596(22), 599a(b)(1)-(2); Act 47 Sec. 21. And the statutory definition is reasonable. A Legislature need not address all aspects of a problem (e.g., *all* emitters of covered greenhouse gas emissions). *See Am. Fed'n of Labor v. Am. Sash & Door Co.*, 335 U.S. 538, 541-42 (1949) ("[L]egislative authority, exerted within its proper field, need not embrace all the evils within its reach." (citation omitted)); *Usery*, 428 U.S. at 19 ("It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have

---

[29] Chamber Compl. ¶ 129; W. Va. Compl. ¶ 186.

been wiser or more practical under the circumstances is not a question of constitutional dimension."). Further, the one billion metric tons requirement logically focuses on the main contributors of greenhouse gas emissions and helps ensure their emissions are attributable to them. *See supra* Background Section B.

Moreover, to determine each party's applicable share of covered greenhouse gas emissions, the Act requires ANR to adopt rules with methodologies and requirements for making that determination, and to use the EPA's Emissions Factors for Greenhouse Gas Inventories. Act 122 Sec. 2, §§ 598(d), 599a(b)(1)-(2); Act 47 Sec. 21. Again, these measures promote the accuracy and reliability of ANR's cost recovery demands.

Thus, the Act only assigns payments to a responsible party based on greenhouse gas emissions attributable to that party and only for the amount of Vermont's climate change adaptation costs proportional to those emissions.[30] It establishes a process for ANR and the State Treasurer to conduct the work necessary to make these determinations, including through consultation with outside entities and rulemaking. Plaintiffs' allegations that Vermont "cannot" reliably do this work and that it is "impossible"[31] are speculative, not plausible, and cannot support a facial challenge. *See supra* Standard of Review & Section III.A.

Similarly, Plaintiffs' allegation that the Act imposes a "harsh and oppressive retroactive penalty"[32] is both conclusory and speculative, and likewise insufficient to mount a facial challenge. *See id*. Setting aside that a cost recovery demand is not a "penalty" at all, Plaintiffs do

---

[30] Plaintiffs' allegation that the Act attributes "all the purported impacts in Vermont to greenhouse gas emissions solely to fossil fuels (and solely to [a] small handful of energy producers)" is wrong. *See* Chamber Compl. ¶ 134; *also* W. Va. Compl. ¶ 188. *See supra* Background Section B.

[31] Chamber Compl. ¶¶ 131, 132, 133; *see also* W. Va. Compl. ¶ 187.

[32] Chamber Compl. ¶ 128; W. Va. Compl. ¶ 190.

not know what or whether the "penalties" will be. There has been no cost assessment, no allocation rulemaking, no cost recovery demand. More importantly, whether retroactive liability is harsh and oppressive is not a standalone inquiry, but depends on whether the law is rational. *See Pension Benefit Guar. Corp.*, 467 U.S. at 733 (noting that harsh and oppressive standard "does not differ from" arbitrary and irrational standard). For all the reasons described above, Act 122 is rational—the "penalty" about which Plaintiffs complain is attributable and proportional to the costs arising from the responsible parties' conduct. *See Usery*, 428 U.S. at 19 ("[T]he purpose of the [Black Lung Benefits] Act is to satisfy a specific need created by the dangerous conditions under which the former employee labored to allocate to the mine operator an actual, measurable cost of his business.").

Likewise, Plaintiffs' complaint that Act 122 covers "lawful actions taken long ago, with no opportunity to know what the law is before [energy companies] acted,"[33] does not undermine valid retroactive legislation. *See Usery,* 428 U.S. at 15 ("[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts."). To the extent energy companies' prior knowledge or expectations are relevant, they do not help Plaintiffs. The Legislature heard testimony that the fossil fuel industry knew as far back as 1954 that its products contributed to climate change, and by the 1990s at the latest.[34] *See Commonwealth Edison*, 271 F.3d at 1349 ("A number of Supreme Court decisions make clear that company knowledge of the dangers present in their operations is relevant to a determination

---

[33] Chamber Compl. ¶ 128; *see also* W. Va. Compl. ¶¶ 185, 191.

[34] *E.g.,* Iarrapino Written Testimony, *supra* note 5, at 10-15.

of reasonable expectations.");[35] *United States v. Monsanto Co.*, 858 F.2d 160, 174 (4th Cir. 1988) (upholding retroactive application of CERCLA and noting that while activities "may have been technically 'legal' prior to CERCLA's enactment, it was certainly foreseeable at the time that improper disposal could cause enormous damage to the environment"); *United States v. N.E. Pharm. & Chem. Co., Inc.*, 810 F.2d 726, 734 (8th Cir. 1986) ("Congress acted in a rational manner in imposing liability for the cost of cleaning up [hazardous] sites upon those parties who created and profited from the sites and upon the chemical industry as a whole").

The legislative record also reflects that these companies anticipated liability and government action based on their emissions, as captured in a prescient internal report from Shell in 1998:

> In 2010, a series of violent storms causes extensive damage to the eastern coast of the U.S. Although it is not clear whether the storms are caused by climate change, people are not willing to take further chances. The insurance industry refuses to accept liability, setting off a fierce debate over who is liable: the insurance industry or the government. After all, two successive IPCC reports since 1993 have reinforced the human connection to climate change . . . Following the storms, a coalition of environmental NGOs brings a class-action suit against the US government and fossil-fuel companies on the grounds of neglecting what scientists (including their own) have been saying for years: that something must be done. A social reaction to the use of fossil fuels grows, and individuals become 'vigilante environmentalists' in the same way, a generation earlier, they had become fiercely anti-tobacco. Direct-action campaigns against companies escalate. Young consumers, especially, demand action.[36]

---

[35] In upholding a retroactive monetary assessment on uranium facilities, *Commonwealth Edison* considered (i) Congress's assessment that the party benefited from an activity contributing to societal harm and that liability was not disproportionate, and (ii) whether retroactive liability was contrary to a party's reasonable expectations. 271 F.3d at 1345-46. The court explained these factors were sufficient—but not necessary—to uphold retroactive economic legislation. *See id.*

[36] Complaint, *supra* note 10, at 22. *See also, e.g., id.* at 25 (referencing statement from Exxon scientist advocating Exxon adopt "a very aggressive defensive program in . . . atmospheric science and climate because there is a good probability that legislation affecting our business will be passed"), 27 (referencing API publication asserting that facts "don't support . . . restraining oil use'" or "forcing Americans" to change their lifestyles); 29 (referencing API memorandum

Additionally, Plaintiffs' allegations regarding "controlled group" liability also are premature, conclusory, and insufficient to mount a facial challenge. Act 122 provides that entities in a "controlled group" shall be treated by ANR as "a single entity for the purposes of identifying responsible parties," and that the entities are jointly and severally liable for any cost recovery demand within the controlled group. Act 122 Sec. 2, § 598(a)(2). Plaintiffs' conclusory allegations that this is "arbitrary" and beyond the State's "jurisdictional limitations" assume that entities will unfairly be subject to "severe penalties" for a separate entity's emissions over which the State has no jurisdiction, *see* Chamber Compl. ¶ 139—but this is impossible for Plaintiffs to know. ANR still needs to adopt the rule for identifying responsible parties; no "penalties" for any controlled group have been assessed yet (severe or otherwise); and the Act requires that responsible parties have sufficient constitutional nexus to Vermont in any case. Further, the Act reasonably defines "controlled group" by reference to the Internal Revenue Code, which carefully specifies the overlapping ownership and control interests that properly qualify entities as one for purposes of certain tax provisions. Act 122 Sec. 2, § 596(5), *cross-referencing* 26 U.S.C. §§ 52(a), (b), 414(m), (o).

### c.    Act 122 is not unconstitutionally vague.

Plaintiffs' final due process argument—that Act 122 is unconstitutionally vague—is misplaced. *See* Chamber Compl. ¶¶ 140, 141; W. Va. Compl. ¶ 189. Act 122 does not prohibit any conduct; there is no statutory requirement whereby Plaintiffs need to "know what is required of them so they may act accordingly." *Cf. FCC v. Fox Television Stations, Inc.,* 567 U.S. 239,

---

stating: "Climate is at the center of the industry's business interests. Policies limiting carbon emissions reduce petroleum product use. That is why it is API's highest priority issue and defined as strategic."), 29 (referencing industry coalition formed in 1989 to "oppose greenhouse gas emission reduction initiatives").

258 (2012) (striking down Federal Communications Commission enforcement orders where broadcasters did not have fair notice of what was prohibited under indecency provision of Public Telecommunications Act). Similarly, the Act does not give "unfettered discretion to Vermont agencies" that "encourages seriously discriminatory enforcement." Chamber Compl. ¶¶ 140, 141. There is no "enforcement" of any statutory requirement or prohibition. ANR and the Treasurer will *implement* Act 122, resulting in specific cost recovery demands to specific responsible parties, at which point there may be enforcement if responsible parties do not submit the required payments. Act 122 Secs. 2, 6 §§ 598(g), 8003(a)(33).

Additionally, even if vagueness was the proper framework to assess whether the Act gives sufficient guidance to ANR and the Treasurer, it does. The Act is full of requirements and parameters for the Treasurer and ANR to follow in carrying out their duties. For example, the Act defines "responsible parties" and "covered greenhouse gas emissions" and gives ANR the framework for calculating cost recovery demands based on these covered greenhouse gas emissions. Act 122 Sec. 2, Act 47 Secs. 22, 23, §§ 596(7), (22), 598(b). It tells ANR to use EPA's Emissions Factors for Greenhouse Gas Inventories for determining greenhouse gas emissions attributable to responsible parties. Act 122 Sec. 2, § 598(d). Among other things, it provides further guidance on adjusting cost recovery demands based on responsible party ownership, spells out what monies in the Fund can be used for, details what must be in ANR's Resilience Implementation Strategy, and directs ANR to adopt implementing rules (which will be subject to public notice and comment, *see* Vt. Stat. Ann. tit. 3, § 840, and will provide additional information about how ANR will identify responsible parties and calculate cost recovery demands, all consistent with the guidelines in the Act). Act 122 Sec. 2, Act 47 Sec. 20, §§ 598(c),

(e), 599(b), 599a(b), (c); *see also infra* Section III.J (describing guidance to Treasurer). Act 122 is not unconstitutionally vague.

### 2.    Act 122 does not violate procedural due process.

It is not clear whether Plaintiffs attempt to state a procedural due process claim; but if so, that claim also fails. Chamber Compl. ¶¶ 142-143. Assuming a protected property interest exists, procedural due process requires meaningful notice and an opportunity to be heard. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). Act 122 provides both. *See* Act 122 Sec. 2, Act 47 Sec. 20, § 599a(b)(2) (ANR to adopt rules for issuing "notices of cost recovery demands"); Act 122 Sec. 2, § 598(*i*) (procedures for responsible party to request reconsideration of a notice of cost recovery demand at ANR with judicial appeal of a final notice to Superior Court). It is impossible for Plaintiffs to show that cost recovery demands would (or could) always be issued without adequate procedure. *See Sanitation and Recycling Indus., Inc. v. City of New York*, 928 F. Supp. 407, 418-19 (S.D.N.Y. 1996) (rejecting facial procedural due process challenge).

To the extent the Chamber's "procedural safeguard" allegations relate to whether Act 122 has guideposts for implementation, or can be implemented with reliability and accuracy, those are addressed elsewhere. *See supra* at 50-51, *infra* Section III.J (guideposts); *supra* Section III.D.b.1 (reliability and accuracy).

### E.    Plaintiffs fail to state a claim that Act 122 violates the Equal Protection Clause or the Common Benefits Clause. (W. Va. Counts VI, VII)

### 1.    Act 122 does not violate the Equal Protection Clause.

Plaintiffs' equal protection claim is based on the same faulty premise as their due process claim—that Act 122 lacks any reasonableness or sound purpose. But as with due process, Plaintiffs are wrong.

To begin, a statute like Act 122 that "does not implicate suspect or quasi-suspect classifications or burden fundamental rights" is subject to rational basis review, which "demands only that the classification be rationally related to a legitimate governmental interest." *United States v. Amalfi*, 47 F.4th 114, 124 (2d Cir. 2022); *see also Becker v. Leavitt*, 489 F.2d 1087, 1090-91 (2d Cir. 1973) (upholding New York revenue sharing statute against equal protection challenge where there was "a showing of some rational connection" between statute and legitimate purpose). This is an "extremely deferential standard," and Plaintiffs must "negat[e] *every conceivable basis* [that] might support" the legislative classification. *Amalfi*, 47 F.4th at 125 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993)). "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC*, 508 U.S. at 313. Instead, "[t]his standard of review is a paradigm of judicial restraint" that affords challenged statutes a "strong presumption of validity." *Id.* at 314. "Where there are 'plausible reasons'" for the legislative classification, the court's "'inquiry is at an end.'" *Id.* at 313-14 (citation omitted).

Here, there are not only plausible reasons, but also actual reasons for Vermont to focus on entities that extracted fossil fuel or refined crude oil during the covered period: fossil fuels are the single largest contributor to climate change impacts. *See supra* Background Section A. This is more than equal protection requires: the Legislature was not required to "actually articulate at any time the purpose or rationale supporting its classification." *FCC*, 508 U.S. at 315 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992)). Legislative choices are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC*, 508 U.S. at 315. Act 122 easily surpasses this standard.

Plaintiffs essentially argue that Vermont should seek cost recovery from *all* greenhouse gas emitters. They complain that "Vermont has not offered any legitimate purpose for distinguishing between large producers of three specific fuel types (all based outside of Vermont) and all other greenhouse-gas emitters (many of which are based inside Vermont)." W. Va. Compl. ¶ 204. They assert that the *only* way for Act 122 to be rationally related to its purpose is for the Act to "actually [seek] remediation from all the relevant emitters." *Id.* ¶ 205. This is not the law.

Rather, "scope-of-coverage provisions are unavoidable components of most economic or social legislation" and a legislature must "draw the line somewhere." *FCC*, 508 U.S. at 316 (upholding classification between different types of cable television facilities in Cable Communications Policy Act). As such, "the precise coordinates of the resulting legislative judgment [are] virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." *Id.* The precedent is clear:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.

*Williamson v. Lee Optical of Okla.*, *Inc.*, 348 U.S. 483, 489 (1955) (internal citations omitted) (upholding Oklahoma law permitting only licensed optometrists or ophthalmologists (but not opticians) to perform certain functions related to eyeglasses); *see also W. Coast Hotel*, 300 U.S. at 400 ("This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach.").

Vermont's decision to focus on a class of entities responsible for large quantities of greenhouse gas emissions causing climate change impacts is rationally related to Vermont's goal

of recovering costs to address those climate change impacts—especially because the class only is responsible for its actual share of impacts, not *all* impacts. Act 122 satisfies equal protection.

### 2. Act 122 does not violate the Common Benefits Clause.

West Virginia cannot sue Vermont under the Common Benefits Clause of the Vermont Constitution. *See supra* Section II. But even if it could, West Virginia fails to state a common benefits claim. The Common Benefits Clause is "intended to ensure that the benefits and protections conferred by the state are for the common benefit of the community and are not for the advantage of persons 'who are a part only of that community.'" *Baker v. State*, 170 Vt. 194, 212, 744 A.2d 864, 878 (1999) (quoting Vt. Const. ch. I, art. 7). A legislative classification creating an exclusion "from the general benefit and protection of the law" needs to "bear a just and reasonable relation to the legislative goals*." Baker*, 170 Vt. at 204, 744 A.2d at 872. More precisely, "when no fundamental right or suspect class is involved," the question is "whether the law is reasonably related to the promotion of a valid public purpose." *Choquette v. Perrault*, 153 Vt. 45, 52, 569 A.2d 455, 459 (1989). It is "insufficient to assert that there is a law that results in some people having a benefit and others not, accompanied by the legal conclusion that this difference in treatment violates the Vermont Constitution." *Vitale*, 2023 VT 15, ¶ 24.

Here, West Virginia is not being excluded from any benefit. *Cf. Baker*, 170 Vt. at 215, 744 A.2d at 880 (exclusion of same-sex couples from benefits and protections of marriage); *State v. Ludlow Supermarkets, Inc.*, 141 Vt. 261, 264, 448 A.2d 791, 793 (1982) (allowing small but not large stores to stay open on Sunday); *Choquette*, 153 Vt. at 54, 569 A.2d at 460 (conferring benefit on livestock owners to detriment of non-livestock owners). Instead, West Virginia's Common Benefits argument appears to be the same as its equal protection argument: that Vermont improperly distinguished between different types and sizes of greenhouse gas emitters.

W. Va. Compl. ¶¶ 210-211. This does not raise a Common Benefits issue. *See USGen New England, Inc. v. Town of Rockingham*, 2003 VT 102, ¶¶ 27, 30, 176 Vt. 104, 838 A.2d 927 (holding Common Benefits did not apply where tax classification did not create "preferential benefit to any class of persons" (citing *In re Property of One Church St.*, 152 Vt. 260, 264, 565 A.2d 1349, 1351 (1989) (explaining that "emphasis in the Common Benefits Clause" is "what is required to protect the polity from the granting of privilege to the few")).

Assuming this distinction could support a Common Benefits claim, the distinction is constitutional. As explained above, it was reasonable for the Legislature to focus on parties responsible for more than one billion metric tons of greenhouse gas emissions, and the Legislature does not need to tackle all aspects of a problem (or all greenhouse gas emitters) at once. *See supra* at 53-54. In other words, unlike in *Ludlow,* the distinction is not based on size *only,* but size *because. See Otter Creek Solar LLC v. State of Vermont*, No. 299-4-18 Cncv, Ruling on Mots. for S.J., at 13-14 (Vt. Super. Ct. Mar. 4, 2019) (upholding setback requirements where "not intended to penalize larger facilities solely to give a benefit to smaller ones") (attached as **Exhibit X**); *Badgley*, 2010 VT 68, ¶¶ 38-41 (describing deference to legislative policy decisions in common benefits analysis).

Act 122 is reasonably related to promoting valid public purposes, *see supra* Sections III.D.1.b & Section III.E.1, and it does not violate Vermont's Common Benefits Clause.

**F.    Act 122 does not violate the dormant Commerce Clause. (Chamber Count IV; W. Va. Count III; U.S. Count III)**

**1.    There is no freestanding "extraterritoriality" claim under the dormant Commerce Clause.**

Plaintiffs ground their dormant Commerce Clause claims primarily in the purported extraterritorial effects of the Act. *See*, *e.g.*, Chamber Compl. ¶ 151; W. Va. Compl. ¶¶ 164; U.S.

Compl. ¶ 76. But in *National Pork Producers*, the Supreme Court rejected the existence of a freestanding rule on extraterritorial impacts of state laws. Specifically, the Court rejected the concept—advanced by the plaintiffs in that case—that a state law could run afoul of the dormant Commerce Clause simply because it has "the practical effect of controlling commerce outside the State." *Pork Producers*, 598 U.S. at 371; *see id.* at 374 (noting that "many (maybe most) state laws have the practical effect of controlling extraterritorial behavior," without raising constitutional concerns—for example, "libel laws, securities requirements, charitable registration requirements, franchise laws, [and] tort laws"). Thus, insofar as Plaintiffs' claims are based solely on the purported extraterritorial impacts of the Act, those claims fail as a matter of law.

Moreover, the Act has a nexus requirement, meaning that it would be applied only to potentially responsible parties that have connections to Vermont. It is not yet clear how that provision will be applied—rules on the provision are not due until January 1, 2028. So even if there were still an extraterritoriality claim under the dormant Commerce Clause, Plaintiffs cannot make out a facial claim that the Act offends the clause here. *See Nat'l Shooting Sports*, 144 F.4th at 116 ("Because a facial constitutional challenge seeks to strike down a statute in its entirety, [plaintiffs] must show that [the statute] regulates wholly extraterritorial conduct *in every application of the statute* in order to succeed on their extraterritoriality claim."); *see also Pork Producers*, 598 U.S. at 390 ("[E]xtreme caution is warranted before a court deploys this implied authority [to find a state law preempted in the absence of congressional preemption]. Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of extreme delicacy, something courts should do only where the infraction is clear." (citations and quotation marks omitted)).

### 2.    Plaintiffs have not alleged a valid "discrimination" claim.

As the *Pork Producers* Court recognized, the "very core of . . . dormant Commerce

Clause jurisprudence" is its "antidiscrimination principle"—the prohibition against "state laws

driven [] by economic protectionism." *Pork Producers*, 598 U.S. at 369 (citations and quotation

marks omitted). A "clearly discriminatory law may operate in three ways: (1) by discriminating

against interstate commerce on its face . . . (2) by harboring a discriminatory purpose . . . or (3)

by discriminating in its effect." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 48 (2d

Cir. 2007). In the context of the dormant Commerce Clause, "discrimination" means "differential

treatment of in-state and out-of-state economic interests that benefits the former and burdens the

latter." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 74 (2d

Cir. 1998); *see Rest. Law Ctr.*, 90 F.4th at 120 (dormant Commerce Clause "doctrine is animated

by 'concern about economic protectionism' or those measures 'designed to benefit in-state

economic interests by burdening out-of-state competitors'—not laws that primarily operate

across state lines" (quoting *Dep't of Revenue of Kentucky. v. Davis*, 553 U.S. 328, 337-38

(2008)).

Plaintiffs do not seem to argue—nor could they—that Act 122 is facially discriminatory.

The statute makes no facial distinction between in-state and out-of-state responsible parties.

Moreover, the *purpose* of the statute is not to discriminate against interstate commerce. The

purpose of the law is to raise money for climate change adaptation in Vermont, drawing from the

producers of the fuels that the Legislature rationally found contributed significantly to the

problem. Nonetheless, Plaintiffs argue that Act 122 discriminates against interstate commerce

because all potentially responsible parties are located outside of Vermont. Thus, they allege that

Act 122 effectively "targets" out of state interests for adverse economic treatment as compared to

forms of energy production "Vermont may prefer like wind or solar or other renewable energy sources." Chamber Compl. ¶ 151; *see also* U.S. Compl. ¶ 76; W. Va. Compl. ¶ 166.

But "laws that draw distinctions between entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce Clause." *Town of Southold*, 477 F.3d at 49; *see also Allco Finance Ltd. v. Klee*, 861 F.3d 82, 103 (2d Cir. 2017) ("Conceptually . . . any notion of discrimination assumes a comparison of substantially similar entities." (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298-99 (1997))). "[I]n order to show a discriminatory effect on interstate commerce, the Plaintiffs must demonstrate that the Statute confers on their in-state *counterparts* a competitive advantage." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 216 (2d Cir. 2003) (emphasis added); *see N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 91 (2d Cir. 2017) ("The Supreme Court has considered and rejected the argument that a statute is discriminatory because it will apply most often to out-of-state entities in a market that has more out-of-state than in-state participants.").

Act 122 may, as Plaintiffs allege, distinguish between fossil fuel producers and, for instance, clean energy producers (for obvious reasons). But it does not distinguish between out-of-state fossil fuel producers and their relevant counterparts: in-state fossil fuel producers. All fossil fuel producers—in-state and out-of-state—are equally subject to (or exempt from) Act 122's requirements. The same goes for clean energy producers. A large fossil fuel producer to whom the Act otherwise applies would not be able to escape a cost recovery demand were it located in Vermont; and a clean energy producer would not become liable for a cost recovery payment were it located outside the state. The Act therefore does not discriminate, in purpose or effect, for purposes of the dormant Commerce Clause.

58

### 3.    Plaintiffs have not plausibly alleged a *Pike* violation.

Plaintiffs[37] also fail to allege a violation of the dormant Commerce Clause under the *Pike* test, which holds that a law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see Rest. Law Ctr.*, 90 F.4th at 118 ("[A] non-discriminatory law that only incidentally burdens interstate commerce is subject to a more permissive balancing test . . . and will only be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains." (citations and quotations omitted)). They have not alleged, and cannot allege, the "critical requirement" for a *Pike* claim: that the application of the Act imposes a "substantial burden on interstate commerce."

A burden on interstate commerce is cognizable under *Pike* when the nature of the burden suggests protectionism—i.e., where the effects of the challenged law "may . . . disclose the presence of a discriminatory purpose." *Pork Producers*, 598 U.S. at 377. In fact, many *Pike* cases have "turned in whole or in part on the discriminatory character of the challenged state regulations." *Id.* (citation omitted). Thus, "the *Pike* line [of cases] serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose," and "'no clear line' separates the *Pike* line of cases from [the] core antidiscrimination precedents." *Id.* (quoting *Gen. Motors*, 519 U.S. 278); *see also VIZIO, Inc. v. Klee*, 886 F.3d 249, 259 (2d Cir. 2018) ("The *Pike* test is often directed at differentiating protectionist measures from those that can fairly be viewed as directed to legitimate local concerns, with effects on interstate commerce that are only incidental.").

---

[37] The United States and the West Virginia Plaintiffs have expressly alleged *Pike* claims. U.S. Compl. ¶ 21; W. Va. Compl. ¶ 172. The Chamber Plaintiffs do not appear raise this claim.

Plaintiffs have not plausibly alleged that Act 122 substantially burdens interstate commerce in a manner so disproportionate to its in-state benefits as to "disclose the presence of a discriminatory purpose." *Pork Producers*, 598 U.S. at 377. The in-state benefits of the Act are manifest: it seeks to recover adaptation costs to protect Vermont's human and natural communities from the severe, ongoing impacts of climate change. It does so through a mechanism tied directly to those costs that is agnostic as to whether the source of the funds is in-state or out-of-state. As for burden, Plaintiffs rely on speculation as to the Act's interstate burdens: that the Act will impose "massive" (but currently unknown) fines on some subset of companies that may (in some vague way) "encumber domestic energy production" with costs that "*could* harm the entire nation" (again, in some undefined and nonspecific way). Chamber Compl. ¶ 151; *see also* W. Va. Compl. ¶ 172; U.S. Compl. ¶ 82.

At a minimum, those allegations do not suffice to establish that the Act is facially unconstitutional. Indeed, the Second Circuit has cautioned against even attempting to weigh the benefits and burdens of economic legislation before the legislation has been implemented:

> Courts are generally "ill qualified to develop Commerce Clause doctrine dependent on . . . predictive judgments" and should not "project[] the effect of applying the Commerce Clause" where the economic burdens and benefits of a regulation are not clear. Here, in the absence of any evidence or specific findings regarding the economic benefits and burdens of Section 898, we find no undue burden under *Pike*.

*Nat'l Shooting Sports*, 144 F.4th at 115-16 (internal citation omitted); *see also Pork Producers*, 598 U.S. at 385 (Gorsuch, J., plurality) ("Petitioners must plead facts 'plausibly' suggesting a substantial harm to interstate commerce; facts that render an outcome a 'speculative' possibility are not enough" (quoting *Twombly*, 550 U.S. at 555)).

Regardless of the ultimate magnitude of the cost recovery demand, however, Plaintiffs have not—and cannot—plausibly allege that *any* interstate burden resulting from the Act so

"clearly exceeds" the in-state benefits as to suggest economic protectionism. Their *Pike* claim fails.

G.    **Plaintiffs fail to state a claim that Act 122 violates the dormant Foreign Commerce Clause.**
**(Chamber Count IV; W. Va. Count III; U.S. Count IV)**

Act 122 does not discriminate between domestic and foreign responsible parties, or between foreign and domestic fossil fuel production, but treats all entities with a nexus to Vermont equally. Nonetheless, Plaintiffs have also alleged that the Act violates the dormant Foreign Commerce Clause. Chamber Compl. ¶ 152; U.S. Compl. ¶¶ 86-93; W. Va. Compl. ¶¶ 173-79. It does not.

The Foreign Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The clause "has long been understood, as well, to provide 'protection from state legislation inimical to the national commerce.'" *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 310 (1994) (quoting *S. Pac. Co. v. Ariz. Ex rel. Sullivan*, 325 U.S. 761, 769 (1945)). Few Supreme Court cases have dealt with the dormant Foreign Commerce Clause, and all of those addressed claims involving state taxes. *See, e.g.*, Michael S. Knoll & Ruth Mason, *The Dormant Foreign Commerce Clause After* Wynne, 39 Va. Tax Rev. 357, 371 (2020) (collecting cases). Here, Plaintiffs do not seem to allege that Act 122 violates the dormant Foreign Commerce Clause as an unconstitutional tax but rather because it undermines the "federal government's exclusive authority to regulate international trade and . . . speak[] with one voice to foreign countries." W. Va. Compl. ¶ 173 (citing *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979)); *accord* U.S. Compl. ¶¶ 86-93; Chamber Compl. ¶¶ 152-154.

61

This claim fails for much the same reason Plaintiffs have not alleged a viable foreign affairs preemption claim: they have not alleged a clear congressional foreign policy (i.e., the federal "one voice") with which Act 122 allegedly conflicts. They have not identified a federal statute or ratified treaty, for example, that prohibits states from imposing charges on fossil fuel producers. And it is not the courts'—or even the President's—role to supply such a foreign trade policy. *See Barclays*, 512 U.S. at 329-30 (plaintiffs could not sustain dormant Foreign Commerce Clause claim where Congress had not weighed in with a federal policy bearing on the statute); *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 10 (1986) (same). Plaintiffs' failure to allege a specific congressional policy with which Act 122 conflict is fatal to their dormant Foreign Commerce Clause claims.

Moreover, like many of the theories Plaintiffs raise, the rationale for all three complaints is based on multiple layers of implausible speculation about how the Act will be implemented and the resulting economic effects. Fundamentally, they assume that (1) there will be foreign entities with sufficient contacts with Vermont to satisfy the statute's "nexus" requirement, (2) they will be subject to cost recovery demands large enough to influence their prices or behavior, and (3) there will be enough of those entities to influence foreign countries' policy positions on greenhouse gases, or raise global oil or gas prices. West Virginia, for example, argues that notwithstanding the Act's nexus limitation and limited scope (it seeks to recover only a portion of Vermont's climate change costs in shares proportional to a company's contribution to those costs), Act 122 will impose a large enough cost on a large enough share of entities in the "86 different countries" who "import close to 9 million petroleum barrels daily" that it will "antagonize" foreign governments and lead to global price spikes that will, according to West

Virginia, undermine United States sanctions against Iran. W. Va. Compl. ¶ 174. The United States does not make this argument.

The Chamber Plaintiffs' reasoning also relies on economic speculation though they acknowledge, at least, that the outcomes they have conjured are only "potential." *See* Chamber Compl. ¶¶ 153-54 (arguing that the Act "potentially" increases costs for the United States' key trade partners, "*risks* disrupting international trade in the energy industry by *potentially* increasing costs for" consumers, and "*potentially* negatively affect[s] energy policy with foreign trade partners" (emphases added)).  And the United States is even more circumspect, relying simply on a conclusory allegation that the "Act harms the federal government's capacity to speak with one voice when conducting commercial relations with foreign governments," U.S. Compl. ¶ 91, without explaining how. The United States also relies implicitly on a series of assumptions about how the Act will be implemented, and how responsible parties will respond.

Thus, even if Plaintiffs had alleged a congressional foreign policy with which the Act *could* conflict (they have not), all plaintiffs can plausibly allege right now is that Act 122 may—to some extent—apply in some way to foreign entities or domestic entities that operate overseas. That is not enough to sustain a facial challenge under the dormant Foreign Commerce Clause. If it were enough to speculate about worst-case economic scenarios, any state legislation that could impose costs on foreign companies could be found to facially run afoul of the dormant Foreign Commerce Clause. The Court should dismiss Plaintiffs' dormant Foreign Commerce Clause claims because they have neither alleged an express foreign trade policy nor a plausible theory as to how the Act facially conflicts with that policy.

### H.   Plaintiffs fail to state a claim that Act 122 imposes excessive fines. (Chamber Count V; W. Va. Count VIII)

Plaintiffs cannot come close to demonstrating the essential elements of an excessive fines claim: that the Act's cost recovery program is punitive and grossly disproportional. It is neither. The Act creates a compensatory cost recovery program to accomplish remedial purposes. Moreover, the disproportional element of the claim is not ripe and, even if it were, the program's cost recovery demands are explicitly proportional to responsible parties' contributions to the problem Act 122 seeks to address.

### 1.   Act 122 is not punitive.

To state an excessive fines claim, Plaintiffs must first establish the Act is punitive. *See Austin v. United States*, 509 U.S. 602, 609 (1993) ("The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.'" (citation omitted)); *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016) ("[excessive fines] clause applies only to those forfeitures that may be characterized, at least in part, as 'punitive'—*i.e.,* forfeitures for which a defendant is personally liable"). Payments to "compensate the Government for a loss" are not punitive. *Viloski*, 814 F.3d at 109; *see also United States v. Bajakajian*, 524 U.S. 321, 329 (1998) (holding forfeiture of currency was punitive where deterrence was a goal and forfeiture did not "serve the remedial purpose of compensating the Government for a loss").

Act 122's cost recovery program is not punitive. It is explicitly compensatory: "The purposes of the Program [include] to secure compensatory payments from responsible parties based on a standard of strict liability to provide a source of revenue for climate change adaptation projects within the State." Act 122 Sec. 2, § 597(1). The payments will be used for the

64

remedial purpose of implementing climate change adaptation projects in the State. *See*, *e.g.*, Act 122 Sec. 2, Act 47 Sec. 24, §§ 597, 598(a)(1), 599, 599c; *supra* Background.

Additionally, because the cost recovery payments do not arise from any violation of law, they cannot be punitive. *See Punishment, Black's Law Dictionary* (12th ed. 2024) (defining "punishment" as "[a] sanction — such as a fine, penalty, confinement, or loss of property, right, or privilege — assessed against a person who has violated the law"); *Punitive, Black's Law Dictionary* (12th ed. 2024) (defining "punitive" as "[i]nvolving or inflicting punishment"). No doubt, this is why excessive fines cases arise in the context of underlying offenses. *See*, *e.g.*, *Bajakajian*, 524 U.S. at 324 (forfeiture of funds arising from criminal currency export violation); *Austin*, 509 U.S. at 604 (civil forfeiture arising from criminal drug offense); *Timbs v. Indiana,* 586 U.S. 146, 148-49 (2019) (civil vehicle forfeiture arising from controlled substance and conspiracy crimes); *Paroline v. United States*, 572 U.S. 434, 439 (2014) (criminal restitution arising from child pornography crime); *Viloski*, 814 F.3d at 107-08 (civil and criminal forfeiture of funds arising from multiple conspiracy/money laundering/mail fraud crimes); *Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 587 (2d Cir. 2024) (fines arising from multiple violations of failure to pay tolls). As such, Plaintiffs' allegations that the Act is punitive because it applies to lawful activities actually demonstrate that it is not. Chamber Compl. ¶¶ 163 (alleging punishment where companies were "lawfully operating"), 164 (alleging "strict liability" for "lawful businesses" is punitive). Because the Act is not punitive, the Excessive Fines Clause does not apply. *Viloski*, 814 F.3d at 108-09 (clause only applies to punitive fines).

### 2.    Plaintiffs' claim that the Act imposes "excessive" fines is not ripe.

Even if the Act's cost recovery demands were punitive, Plaintiffs would fail on the second element of excessive fines because that element is not ripe. A fine only is

unconstitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 110 (quoting *Bajakajian*, 524 U.S. at 334). The Supreme Court has established four factors to guide the inquiry: (i) the "essence of the crime . . . and its relation to other criminal activity," (ii) whether the person upon whom the fine is assessed "fits into the class of persons for whom the statute was principally designed," (iii) the "maximum sentence and fine that could have been imposed," and (iv) "the nature of the harm caused by the defendant's conduct." *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015). Here, there is no cost recovery demand to assess against these factors. As such, this element of the claim is not ripe. *See Farina v. MTA*, 409 F. Supp. 3d 173, 196 (S.D.N.Y. 2019) (holding certain claims related to toll violations not ripe where "'no fine has been imposed, and no enforcement proceedings have been commenced'") citation omitted)); *see also id.* ("[C]hallenges under the Excessive Fines Clause are ... generally not ripe until the actual, or impending, imposition of the challenged fine." (citing *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995))).

### 3. Plaintiffs cannot demonstrate that the cost recovery demands are "grossly disproportional."

Even if the Court were to credit Plaintiffs' speculative predictions that cost recovery demands will be millions or billions of dollars,[38] there is no gross disproportionality. Though the four factors are not a neat fit because the Act's cost recovery program is not punitive, the Act does not create liability that would be "grossly disproportional" to the gravity of the conduct giving rise to the demands.

The "essence" of the conduct here is a responsible party's contribution to greenhouse gas emissions through fossil fuel extracting and refining activities, and the "nature of the harm" is

---

[38] Chamber Compl. ¶ 170; W. Va. Compl. ¶ 221.

the impact of those emissions in Vermont. Act 122 Sec. 2, Act 47 Secs. 22, 23, §§ 596(22), 598(b). Unlike excessive fines cases which are based on *fines* (not compensatory payments), these two factors are purposefully proportional in the Act: cost recovery demands are tailored to match responsible parties' share of Vermont's climate change adaptation costs based on the costs attributable to their conduct. *See supra* Section III.D.1.b. Further, the Act only applies to conduct that occurred with enough frequency and magnitude to contribute more than one billion metric tons of greenhouse gas emissions during the covered period. Act 122 Sec. 2, Act 47 Sec. 22, § 596(22); *see George*, 779 F.3d at 123 (noting conduct at issue was "no one-time failure" but occurred "for more than five years"). And the nature of the harm is devastating. *See supra* Background Section C. These factors demonstrate the "fine" is not grossly disproportional.

Additionally, Plaintiffs' allegation the Act requires responsible parties to pay for all Vermont's climate change adaptation costs from all emissions is simply wrong. Chamber Compl. ¶ 169. The Act only assigns payments to a responsible party based on greenhouse gas emissions attributable to that party and only for the amount of Vermont's costs proportional to those emissions. *See supra* Background Part B; Section III.D.1.b. Plaintiffs' allegations that it will be "impossible" to do this and that Vermont risks "overestimation" in its cost recovery demands are speculative and cannot be credited in this facial challenge. Chamber Compl. ¶ 169; W.Va. Compl. ¶ 220. *See supra* Section III.A.

On the "class of persons" factor, there is no question that cost recovery demands apply to persons the Act designed them to apply to—responsible parties. *See* Act 122 Sec. 2, §§ 597(1), 598(a). The remaining factor (maximum fine or sentence that could have been imposed) again highlights that the Excessive Fines Clause is the wrong vehicle for Plaintiffs' complaints. Unlike a maximum sentence or a maximum penalty, there is not a "maximum" cost recovery demand

67

against which to assess all other cost recovery demands for disproportionality. It is what it is: a responsible party's fair share of Vermont's climate change adaptation costs.

In sum, cost recovery demands are not punitive fines, so the Excessive Fines Clause does not apply. Even if it did, the claim should still be dismissed because the "grossly disproportional" element is not ripe. Even if it were, the Act's purposefully designed program makes cost recovery demands proportional to the conduct from which they arise. The Act does not violate the Eighth Amendment.

## I.    Plaintiffs fail to state a takings claim.
## (Chamber Count VI; W. Va. Counts IX, X)

To state a valid takings claim, Plaintiffs must make plausible, "broadly applicable allegations" that satisfy the takings test in every circumstance in which Act 122 will be applied. *See, e.g.*, *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 45, 47 (E.D.N.Y. 2020) (dismissing facial regulatory takings challenge). They face a high burden because regulatory takings claims depend upon the "particular circumstances" of a case and are "essentially ad hoc, factual inquiries." *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978) (citation omitted). Plaintiffs cannot meet this burden. Their takings claims should be dismissed.

First, Plaintiffs have not alleged a property interest to invoke the Takings Clause at all. Numerous circuits have held that where a takings claim is based on a requirement to pay money, the alleged taking needs to affect a specific property interest. *See*, *e.g.*, *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1056 (11th Cir. 2008) ("the takings analysis is not an appropriate vehicle to challenge . . . a mere monetary obligation without regard to an identifiable property interest"); *McCarthy v. City of Cleveland*, 626 F.3d 280, 285-86 (6th Cir. 2010) ("[A]ll circuits that have addressed the issue have uniformly found that a taking does not occur when the statute

in question imposes a monetary assessment that does not affect a specific interest in property.")
(collecting cases); *Ballinger v. City of Oakland*, 24 F.4th 1287, 1295 (9th Cir. 2022) ("the City's
Ordinance imposes a general obligation to pay money and does not identify any specific fund of
money; therefore, it does not effectuate an unconstitutional physical taking"); *Commonwealth
Edison*, 271 F.3d at 1340 (upholding special assessment for uranium clean-up costs because
"while a taking may occur when a specific fund of money is involved, the mere imposition of an
obligation to pay money" does not effectuate a taking). *W. Va. CWP Fund v. Stacy*, 671 F.3d
378, 387 (4th Cir. 2011) (upholding Black Lung Benefits Act because "in light of *Eastern*…the
mere imposition of an obligation to pay money does not give rise to a claim under the Takings
Clause").

Though it does not appear the Second Circuit has addressed the issue, it has made clear
that *Eastern Enterprise's* plurality opinion (in which takings was applied to a mere obligation to
pay money) provides no rule of law that needs to be followed. *See supra* note 28. Therefore, this
Court should follow the weight of authority and hold that Plaintiffs have not identified any
property interest protected by the Takings Clause. Plaintiffs generally allege they will have to
"hand over funds,"[39] but they have not identified a specific property interest—such as a specific
fund—that will be affected. For this reason, their takings claim fails.

Second, even if the requirement to pay a cost recovery demand qualified as a property
interest, Plaintiffs still have not alleged a valid takings claim. Three primary factors in assessing
whether there has been a regulatory taking (facial or otherwise) are: (1) "the economic impact of
the regulation on the claimant," (2) "the extent to which the regulation has interfered with

---

[39] Chamber Compl. ¶ 178; W. Va. Compl. ¶ 224.

distinct investment-backed expectations," and (3) "the character of the governmental action."
*Cmty. Hous.*, 59 F.4th at 553 (quoting *Penn Cent.*, 438 U.S. at 124).

  Here, despite Plaintiffs' conclusory allegation that the Act imposes a "substantial and
disproportionate penalty" on responsible parties, the economic impact of Act 122 is not known—
which Plaintiffs acknowledge in the very same sentence. *See* Chamber Compl. ¶ 181 (opining
that cost assessments may be "*potentially* in the hundreds of millions or billions of dollars")
(emphasis added); *see also* W. Va. Compl. ¶ 228 ("energy producers are forced to pay *what will
likely be* billions of dollars" (emphasis added)). A court cannot strike down a statute based on
"potential." *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 226 (1986) (holding that
federal statute requiring employers withdrawing from pension plans to contribute their share of
unfunded benefits was not a taking and noting: "[t]here is nothing to show that the withdrawal
liability actually imposed on an employer will always be out of proportion to its experience with
the plan"); *cf. E. Enters.*, 524 U.S. at 529 (O'Connor, J., plurality) (reasoning in as-applied
challenge that there was "no doubt that the [Act] has forced a considerable financial burden"
with specific estimated amounts provided by the parties); *Greater Chataqua Fed. Credit Union v.
Marks,* 600 F. Supp. 3d 405, 416-17, 430 (S.D.N.Y. 2022) (crediting plaintiffs' argument they
"will lose hundreds of thousands of dollars" where law reduced judgment interest rates from 9%
to 2%). Further, even if the amounts of the cost assessments were known, this factor would
weigh in favor of the State because the costs assessments will not be "made in a vacuum," but
will be proportional to a responsible party's share of greenhouse gas emissions impacting
Vermont. *See supra* Background Sections A & B; *Connolly*, 475 U.S. at 225 (economic impact
mitigated where "[t]he assessment of withdrawal liability is not made in a vacuum, however, but

directly depends on the relationship between the employer and the plan to which it had made contributions").

Similar to the Act's economic impact, the extent of any "interference" with distinct investment-backed expectations is not known and cannot support a facial challenge. *See supra* Section III.A; *Penn Cent.*, 438 U.S. at 124 (explaining regulatory takings claims are fact-specific); *Cmty. Hous.*, 59 F.4th at 554 (holding that plaintiffs "failed to establish that the [program] interferes with *every* property owner's investment-backed expectations, which is required on a facial challenge, because such expectations can be assessed only on a case-by-case basis"). And even if the impacts were severe, this would not amount to a taking. Plaintiffs' "investment-backed" arguments rely on the retroactivity of Act 122,[40] but as shown above, the Act's retroactive application is a rational means to accomplish a legitimate state purpose. *See supra* Section III.D.1. "Given that [Plaintiffs'] due process arguments are unavailing, 'it would be surprising indeed to discover' the challenged statute nonetheless violat[es] the Takings Clause." *Concrete Pipe & Products v. Constr. Laborers Pension Trust for S. Ca.*, 508 U.S. 602, 641 (1993) (citation omitted). Even under the plurality opinion in *Eastern Enterprises* (upon which Plaintiffs rely and which is not controlling, *see supra* note 28), Act 122 does not unlawfully interfere with any investment-backed expectations. Unlike the statute at issue there, Act 122 is "calibrated" to responsible parties' "past actions." *See E. Enters.*, 524 U.S. at 536 (O'Connor, J., plurality) (assessing investment-backed expectations factor); *supra* Section III.D.1.b. Further, the Act applies to a period when the fossil fuel industry knew its products were contributing to climate change harms, so there could not be a reasonable expectation of avoiding responsibility for those harms. *See supra* Background Section A. In any case, the Supreme

---

[40] Chamber Compl. ¶ 182; W. Va. Compl. ¶ 229.

Court's cases "are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery*, 428 U.S. at 16 (collecting cases).

The character of governmental action in Act 122 also weighs against a taking. The Act does not "physically invade" or "permanently appropriate" assets, but rather "adjusts the benefits and burdens of economic life to promote the common good." *See Connolly*, 475 U.S. at 225. It is designed to serve a very important public interest—the ability to "respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change and to assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions." Act 122 Sec. 2, § 596(2). As with New York's rent stabilization law designed "to prevent 'serious threats to the public health, safety, and general welfare,'" "[n]o one can seriously contend that these are not important public interests and courts are not in the business of second-guessing legislative determinations such as this one." *Cmty. Housing*, 59 F.4th at 555 (citation omitted). And though they cite it,[41] *Eastern Enterprises* does not help Plaintiffs here either: Act 122 is *not* "unrelated to . . . any injury" responsible parties have caused. *Cf. E. Enters.*, 524 U.S. at 537 (O'Connor, J., plurality). Quite the opposite: responsible parties' liabilities will be proportional to their impacts in Vermont. *See supra* Section III.D.1.b. Act 122 is not a taking under either the federal or the Vermont constitution. *See Ondovchik Family Ltd. P'ship v. Agency of Transp.*, 2010 VT 35, ¶ 14, 187 Vt. 556, 996 A.2d 1179 (applying same takings analysis under both constitutions).

---

[41] Chamber Compl. ¶ 183; W. Va. Compl. ¶ 230.

J.    **The West Virginia Plaintiffs fail to state a separation of powers claim.
(W. Va. Count XI)**

Act 122 does not violate separation of powers. Under Vermont's unlawful delegation doctrine, one branch of government cannot "virtually 'usurp[]' from another its constitutionally defined function." *Hunter v. State*, 2004 VT 108, ¶ 21, 177 Vt. 339, 865 A.2d 381 (citation omitted). It is a "relatively forgiving standard . . . tolerant of … overlapping institutional arrangements." *Id.* There is no unconstitutional delegation of legislative power so long as a statute "establish[es] reasonable standards to govern the achievement of its purpose and the execution of the power which it confers." *In re B&M Realty, LLC*, 2016 VT 114, ¶ 28, 203 Vt. 438, 158 A.3d 754 (alteration in original) (citation omitted). Where the Legislature has not delegated "the power to make the law" but has conferred "discretion to its execution . . . no valid objection can be made." *Athens School Dist. v. Vt. State Bd. of Educ.*, 2020 VT 52, ¶ 39, 212 Vt. 455, 237 A.3d 671 (citations and quotation marks omitted); *id.* ¶¶ 38-40 (providing overview of non-delegation doctrine).

Plaintiffs claim that Act 122 gives the State Treasurer "unfettered discretion" to determine Vermont's costs to adapt to climate change with "no guidance whatsoever" on how to assess those costs. W. Va. Compl. ¶¶ 241-243. This is incorrect. The statute contains multiple provisions that guide the Treasurer's discretion. First, the cost assessment applies to "covered greenhouse gas emissions," which are those resulting from "the use of fossil fuels extracted or refined" during the covered period (January 1, 1995, through December 31, 2024). Act 122 Sec. 2, Act 47 Secs. 22, 24 §§ 596(7), (8), (10), 599c. Second, there are three specific categories of information to be included in the assessment. *See supra* Background Section A. While Plaintiffs complain that the Treasurer may consider "any other effect" he "determines is relevant" under the first category (cost-driving effects), W. Va. Compl. ¶ 243, Plaintiffs ignore that (i) a

considered effect must still be a "cost-driving effect[] of covered greenhouse gas emissions," (ii) the Treasurer must consult with the Climate Action Office on such "other" effects, and (iii) the statute provides additional guidance through the examples already listed (e.g., public health, natural resources, flood safety). *See* Act 122 Sec. 2, § 599c(1).

Third, the Treasurer's assessment of costs will be informed by the types of projects Vermont will need to implement to respond to climate change. Act 122 provides a descriptive and detailed definition of "climate change adaptation projects" with multiple examples. *See* Act 122 Sec. 2, § 596(2); *supra* Background Section C. The Treasurer also will have information about specific projects to be funded in ANR's Resilience Strategy, the State Hazard Mitigation Plan, and Vermont's Community Resilience and Disaster Mitigation Grant Program. *See supra* Background Section B. Each of these has its own set of guidelines, and Act 122 lays out particular guidance on both the content and process for developing the Strategy. *Id.* Fourth, the statute directs the Treasurer to consult with the Interagency Advisory Board to the Climate Action Office and authorizes the Treasurer to consult with others to "obtain[] and utilize[e] credible data or methodologies" to make the assessment. Act 122 Sec. 2, Act 47 Sec. 24, § 599c.

Thus, it is not true that Act 122 gives "no guidance whatsoever" on how to assess the costs of climate change impacts. That Plaintiffs do not like the guidance in the statute does not make it unconstitutional. Courts "must construe the constitutional command consistent with efficient and effective governmental structures that are able to respond to the complex challenges and problems faced by today's state government." *Athens*, 2020 VT 52, ¶ 38 (citation omitted). Absolute specificity is not required—the Legislature "may confide a broad grant of authority to a subordinate agency in intricate matters affecting the general welfare in natural resources, health,

education and economics." *Vt. Home Mortg. Credit Agency v. Montpelier Nat'l Bank*, 128 Vt. 272, 278, 262 A.2d 445, 449-50 (1970).

The statute provides more than a guiding standard, and this is more than sufficient. *See In re MVP Health Ins. Co.*, 2016 VT 111, ¶ 13, 203 Vt. 274, 155 A.3d 1207 (identifying key difference between permissible and impermissible schemes as "whether there are 'any standards' for the exercise of discretion" (citation omitted)); *cf. In re Handy*, 171 Vt. 336, 349, 764 A.2d 1226, 1238 (2000) (holding impermissible delegation where statute provided "absolutely no standard or guidance"); *accord FCC v. Consumers' Research*, 145 S. Ct. 2482, 2497-501 (2025) (upholding "intelligible principle" nondelegation test for revenue-raising statutes).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss all three complaints in their entirety.

[Signature Block on Next Page]

DATED August 15, 2025

Respectfully submitted,

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By:    /s/ Jonathan T. Rose
JONATHAN T. ROSE
*Solicitor General*
LAURA B. MURPHY
*Director, Environmental Protection Unit*
HANNAH W. YINDRA
PATRICK T. GAUDET
*Assistant Attorneys General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
jonathan.rose@vermont.gov
laura.murphy@vermont.gov
hannah.yindra@vermont.gov
patrick.gaudet@vermont.gov

*With contributions from legal interns Jane
O'Connell and Emily Karwacki*