State MTD Ex. C



April 17, 2024

### VPIRG Testimony to House Environment & Energy on S.259, the Climate Superfund Act
Ben Edgerly Walsh, VPIRG Climate & Energy Program Director

VPIRG strongly supports S.259, the Climate Superfund Act, for the simple reason that the costs of climate change are staggering, and Vermonters should not have to shoulder those costs alone. The parties responsible for the climate crisis should be required to pay their fair share for the cost to Vermont to adapt to, become more resilient to, and respond to the climate crisis.

Historically, in the climate space VPIRG has primarily advocated for actions specifically designed to reduce climate pollution. That's not what this bill is about – it's about ensuring that Vermont has the resources necessary (in particular over the medium to long term) to deal with the effects of the climate crisis.

The largest fossil fuel companies in the world made more than $200 billion in profits in 2022, and again in 2023. Meanwhile, Vermonters have gotten stuck with the costs of climate change cleanup in our communities. That shouldn't be the case. These same fossil fuel companies knowingly made a mess of the climate. As you heard in detail in your joint hearing with House Judiciary, they knew about the dangers of carbon pollution decades ago. They should be required to help pay to address the costs of this crisis to Vermont.

This "polluter pays" principle is well-established in state and federal law, and has been repeatedly upheld in our nation's courts.

The key question is, who do we think should pay for the costs caused by the climate crisis? In our view the answer is clear: Vermont should do everything it can to ensure the world's largest fossil fuel companies pay their fair share, rather than accepting that Vermont and Vermonters have to shoulder this burden on our own.

**Process as laid out in S.259:**

ANR adopts Resilience Implementation Strategy (10 V.S.A § 599a(b)(3))

↓

State Treasurer Report on the Cost to Vermont of Covered Greenhouse Gas Emissions, informed by the Resilience Implementation Strategy (10 V.S.A § 599c)

↓

ANR rules adopting methodologies to identify responsible parties, determine share of covered GHG emissions, register responsible parties, and issue notices of cost recovery demands (10 V.S.A. § 599a(b)(1))

↓

ANR issues cost recovery demands to responsible parties, with payments due six months after demands issued (10 V.S.A. § 598(f) and § 598(g))

↓

Funds deposited in Climate Superfund Cost Recovery Program Fund established in 10 V.S.A. § 599 (10 V.S.A. § 598(h))

↓

Funds used as laid out in 10 V.S.A. § 599 – generally, for "climate change adaptation projects" in the Resilience Implementation Strategy and State Hazard Mitigation Plan, along with reasonable administrative expenses

**What investments are included?**

"Climate change adaptation projects" defined in 10 V.S.A § 596: "means a project designed to respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change and to assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions." The definition also includes a non-exhaustive list of eligible projects.

As you can see, the definition of climate change adaptation projects is very broad – essentially any action the state may want to take to prepare for or respond to the negative effects of the climate crisis. Ultimately, these investments would be guided by the Resilience Implementation Strategy.

**How are total costs to Vermont calculated?**

10 V.S.A. § 599c (Treasurer's report):
- "an assessment of the cost to the State of Vermont and its residents of the emission of covered greenhouse gases for the period that began on January 1, 1995 and ended on December 31, 2024" including
    o "a categorized calculation of the costs that have been incurred and are projected to be incurred in the future within the State of Vermont" from those emissions
    o "a categorized calculation of the costs that have been incurred and are projected to be incurred in the future within the State of Vermont to abate the effects" of those emissions

**How are cost recovery demands determined?**

Cost recovery demand formula ANR would implement (laid out in 10 V.S.A. § 598(b)):

$$(X/Y) * Z = \text{Cost Recovery Demand}$$

- $X$ = Covered emissions during covered period from a responsible party, expressed in metric tons CO2e
- $Y$ = All covered emissions during covered period, expressed in metric tons CO2e
- $Z$ = Total costs of covered GHG emissions from the covered period per the Treasurer's report

**Testimony on Attribution Science**

In regards to the Treasurer's report, as Prof Justin Mankin of Dartmouth College (an expert in attribution science) testified, "Using peer-reviewed, consensus scientific methods, scientists can *quantify* the economic losses a region like Vermont has endured from the impacts of global

warming to date, trace those losses back to particular emitters, and provide estimates of future losses." (testimony before Senate Natural Resources & Energy, March 21, 2024)

And as it relates to the responsibility of ANR to determine proportional liability of responsible parties, Richard Heede of the Climate Accountability Institute, who has done extensive research into emissions from historic fossil fuel extraction, made clear in testimony that data from the SEC and other publicly available filings make the analysis required of ANR entirely feasible.

**Covered Period**

I also wanted to describe some of the events leading up to 1995, the beginning of the covered period in the bill. ANR These events make abundantly clear that the major fossil fuel companies classified as responsible parties under S.259 had a reasonable basis to anticipate the possibility of future regulation of their products and activities.

As you have heard, these companies were well aware of the damage their products and activities had caused and were causing to the world's climate, the impacts that global warming would have, and the costs to third parties it would create. When coupled with the national and international attention to and activity around climate change throughout the late 80s and early 90s, by at least as early as 1995 these corporations could have reasonably anticipated future regulation of their products and activities, including potential liability for the damage resulting from their products and activities.

I wanted to very briefly summarize a far from exhaustive list of the national and international work being undertaken on climate change over that period.

- In 1988, NASA's James Hansen (among others) testified before the US Senate Energy and Natural Resources Committee about the expected impacts of climate change.
- Also in 1988, the Intergovernmental Panel on Climate Change (IPCC) was formed, held its first session, and was endorsed by the UN General Assembly.
- In 1989, the EPA published a report titled "Policy Options for Stabilizing Global Climate," which had been requested by Congress earlier in the 1980s, alongside a second report, "The Potential Effects of Global Climate Change on the United States," which was published in 1990.
- Also in 1990, the IPCC issued its First Assessment Report, and then in 1992 it issued "Climate Change 1992, Supplemental Report to the IPCC Scientific Assessment," which confirmed fossil fuels as a central and growing contributor to climate change.
- In 1992, the United Nations Framework Convention on Climate Change (UNFCCC) was adopted, and by June 1993 it had 166 signatories. The US Senate ratified it on Oct 10, 1992.
- And in 1995, the first Conference of the Parties (COP) to the UNFCCC was held in Berlin, followed by the IPCC's publication of its Second Assessment Report.

**Climate Science and Expected Impacts on Vermont from Climate Change**

Lastly, I wanted to briefly delve into what climate science indicates is coming at Vermont in the years and decades to come. I've submitted to your committee a number of documents that assess the impacts Vermont and the region are likely to see due to the climate crisis, including

the Northeast chapters of the Fourth and Fifth National Climate Assessments, NOAA's National Center for Environmental Information's Vermont State Climate Summary, and the Vermont Climate Assessment.

Each of these documents summarizes aspects of an incredible body of work that has been done by scientists to determine the scale, scope, and nature of those impacts, and each warrants your consideration in the context of this bill. To give you a sense of the impacts they outline, I also wanted to quote briefly from each. Obviously these quotes represent a very small slice of each document, but I thought it would be helpful to give you a sense of their contents.

Northeast Chapter of the Fourth Climate Assessment (2018)
> "Projected increases in temperature are expected to lead to substantially more premature deaths, hospital admissions, and emergency department visits due to heat across the Northeast"

Northeast Chapter of the Fifth Climate Assessment (2023)
> "Precipitation in the Northeast has increased in all seasons, and extreme precipitation events (defined as events with the top 1% of daily precipitation accumulations) have increased by about 60% in the region–the largest increase in the US"

NOAA National Centers for Environmental Information, Vermont State Climate Summary
> "Extreme weather events, particularly floods and severe storms, are having a stronger impact on Vermont. At the same time, multiyear meteorological and hydrological droughts continue to pose challenges for water dependent sectors. Extreme rainfall events are projected to become more frequent and intense in the future." (Key Finding 3)

Vermont Climate Assessment
> - "Vermont's climate is projected to warm faster than the global average."
> - "As ice and snow melt earlier in the spring, longer and warmer summers could lead to more evaporation, which could favor more frequent summer droughts" (Betts 2017)."
> - "The Northeast is also expected to experience more frequent and powerful storms (Dupigny-Giroux et al. 2018)."
> - "Factors like wetter winters and springs, a faster spring thaw, and more intense rainfall could contribute to increased flooding across Vermont."

**Language Suggestions**

In addition to my testimony in support of S.259, I also wanted to briefly note two potential changes to one piece of the bill presented to House Judiciary last Thursday in the afternoon, after that morning's joint hearing with this committee.

In 10 V.S.A. § 598(j) (page 10, lines 6-8 of S.259 as passed the Senate), the "savings clause," Geoff Hand of SRH Law (who VPIRG has consulted with on this policy) suggested a change that expanded on a potential change you heard about from your legislative council last Thursday morning:

> (j) Nothing in this section shall be construed to supersede or diminish in any way existing any other remedies available to a person of the State Person, as defined at 1 V.S.A. § 128, at common law or under statute.

During the joint hearing, your legislative counsel suggested replacing the phrase "person of the state" just with the word "person" (which is defined in 1 V.S.A. § 128). That afternoon, Mr. Hand expanded on that suggestion by suggesting adding an explicit cross reference to 1 V.S.A. § 128, and by replacing the phrase "existing remedies" with the phrase "any other remedies." VPIRG supports those two edits, as in our view they result in an appropriately broad, clearer savings clause.

For reference, the definition of "person" in 1 V.S.A. § 128 is:
> "Person" shall include any natural person, corporation, municipality, the State of Vermont or any department, agency, or subdivision of the State, and any partnership, unincorporated association, or other legal entity."