

**For a thriving New England**

CLF Vermont    15 East State Street, Suite 4
Montpelier, VT 05602
P: 802.223.5992
F: 802.223.0060
www.clf.org

April 11, 2024

TESTIMONY OF ANTHONY IARRAPINO, ESQ.[1] TO THE VERMONT HOUSE COMMITTEE ON ENVIRONMENT AND ENERGY AND THE HOUSE COMMITTEE ON JUDICIARY IN CONNECTION WITH THEIR REVIEW OF S.259

Climate change is an existential threat to Vermont as we know it.  The burning of fossil fuels extracted and refined by some of the largest and most profitable corporations in the world has overheated our planet.  The consequences of this overheating have been and will be disastrous and costly for a state like Vermont and its residents. I have seen these consequences in my community and my own home firsthand.

We are not fully prepared for what lies ahead. We don't have a clear strategy for adaptation and resilience. We have not forecasted the costs of ongoing, fossil-fuel-driven climate disruption. And even without such a cost calculation at the ready, we know we don't have the money to pay the full costs of the projects and programs necessary to help keep us safe and help us recover from the worst of the unfolding climate crisis. Those are the problems that S.259 will address.

S.259 builds on and complements parallel state efforts to "respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change and to assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions."

Our communities, critical infrastructure, and iconic industries have all evolved to occupy a once-stable climactic niche that fossil fuel combustion is rapidly destroying.  The global fossil fuel extracting and refining industry has contributed to making a mess in Vermont.

---

[1] Attorney Iarrapino is a partner at Montpelier's Wilschek Iarrapino Law Office, PLLC and a registered lobbyist for the Conservation Law Foundation, Inc.



S.259 is an urgently needed, lawful, scientific means of holding them accountable to pay their fair share of addressing the consequences of that mess in a systematic, stepwise way with four major components.

Step 1—ANR, with help from the Treasurer devise and adopts the Resilience Implementation Strategy to identify the scope and scale of projects needed to accelerate resilience, adaptation, and recovery, and set forth a methodology for funding those projects wisely and efficiently over time.

Step 2—the Treasurer's office tallies the cost of past, current, and likely climate effects attributable to the activities of the major fossil fuel corporations. The Treasurer receives help in this endeavor from experts from throughout state government, contracted actuaries, and others, like Professor Mankin, whom the Treasurer may turn to for credible data and analysis.

Step 3—ANR uses the Treasurer's bottom line cost calculations to determine the fair share each major fossil fuel polluter pays in proportion to the amount of global overheating pollution attributable to their enormously profitable extraction and refinement activities.  ANR then exercises its judicially-enforceable authority to assess payment demands for fair share cost recovery to those Big Oil companies subject to Vermont's jurisdiction.

Step 4—ANR distributes fair-share payments collected from Big Oil to pay for the critical climate adaptation projects consistent with the Resilience Implementation Strategy.

These steps are rational, fair, and necessary in the face of the climate crisis.

When it comes to Step 3, as you have heard and will hear from other witnesses, we have both the scientific and legal tools to get the job done:

- This bill establishes strict liability based on the massive amounts of greenhouse gas pollution attributable to the products and activities of the fossil fuel extracting and refining corporations at the root cause of the climate crisis.

- Polluter-pays strict liability is a well-established concept in Vermont and federal law.



- Strict liability laws do not require proof of wrongdoing, negligence, or mental state; they just require proof that the liable party engaged in the polluting activities to which strict liability attaches—in this case extracting and refining fossil fuels that resulted in at least 1 billion metric tons of $CO_2$ equivalent emissions from 1995 to 2024.

  - There is no disputing that the companies who would be held accountable under this bill engaged in such activities—it is proven in publicly reported data from the companies themselves. **That reliable data is publicly available to Vermont and has been carefully analyzed using peer reviewed methods such as those reflected in the widely-cited Carbon Majors report published by Ric Heede and others.  That report demonstrates how you take the detailed dataset of fossil fuels extracted and refined and translate that into the total greenhouse gas emissions fueling the climate crisis on a corporation by corporation basis.  You will hear more about that work today.**

  - Federal courts have upheld statutes imposing strict liability without an evidentiary trial of facts where there is no doubt that the responsible parties engaged in the activities that caused the pollution problem for which the law holds them strictly liable.  E.g., *Commonwealth Edison Co. v. U.S.*, 271 F.3d 1327, 1341-42 (Fed. Cir. 2001)

- The focus of the bill is not about exacting retribution on large fossil fuel companies because of intentional wrongdoing. Rather, it is about acknowledging that large fossil fuel extracting and refining companies have imposed an economic burden on Vermont while reaping economic benefits for themselves.

- The U.S. Supreme Court has stated that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality" *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)

Like other major polluters whose profit-making activities have imposed substantial public health, infrastructure and natural resource damage costs on Vermont communities, we know that Big Oil and other fossil fuel interests will resist the State's efforts to recover the costs attributable to their climate-polluting products and activities.  In other states considering legislation similar to S.259 and in a written memo to your Senate Colleagues, the American Petroleum Institute—Big Oil's trade association—has made numerous claims that legislation like S.259 would be unconstitutional.



Despite self-serving industry claims to the contrary, the Climate Superfund bill has been carefully crafted with fundamentally sound and constitutional legal concepts from the hazardous waste cleanup and cost-recovery context coupled with cutting-edge, peer-reviewed climate science like that being conducted by Professor Mankin, Ric Heede, and their colleagues in the field of attribution science.

The result is a bill firmly rooted in the State's police power, reserved for Vermont and its fellow states by the 10th Amendment to the United States Constitution.  As the U.S. Supreme Court has observed, "[a]ny attempt to define [state police power's] reach or trace its outer limits is fruitless."   So long as the state's exercise of the police power has not been preempted by Congress and does not otherwise conflict with the Constitution it can be exercised broadly to protect the welfare of Vermont and its citizens. The testimony CLF will give and that you will hear from other legal experts and scholars affirms that the exercise of Vermont's police power to make the major contributors to fossil-fuel driven climate change pay their fair share through S.259's cost-recovery mechanisms is consistent with the Constitution.

<u>S.259 is not pre-empted by federal law</u>

Though Vermont and fellow states enjoy broad police powers within our federal system, in certain policy areas Congress can constitutionally pre-empt state action by crafting a uniform federal solution meant to supplant state efforts. When it comes to recovering the costs of climate damage inflicted on all of the United States by the activities of large fossil fuel extracting and refining companies, CLF would welcome a nationwide federal solution that obviated the need for states like Vermont, Massachusetts, Maryland, New York, or California to set up state-level programs.  Sadly, thanks to the lobbying influence of the fossil fuel industry in the halls of Congress, efforts to enact such a federal solution have failed.

Through the leadership of Senator Sanders, Maryland Senator Van Hollen and others, Congress did consider establishing the "Polluters Pay Climate Fund" as part of the Build Back Better legislation  That proposal was ultimately blocked by West Virginia Senator and fossil fuel magnate Joe Manchin along with the entire Republican Senate caucus.  The federal Polluter Pays Climate Fund would have created a remedial mechanism for climate damage that would be funded by cost recovery from fossil fuel companies responsible for the largest share of fossil fuel-related emissions and in proportion to the share of each such major polluter.  While some of the details differ, the same Polluter Pays legal concepts and key mechanisms of strict liability and administrative cost-assessment and recovery from major fossil fuel companies used in the



federal proposal are reflected in S.259. Had the federal Polluters Pay Climate Fund been enacted, there would be a strong argument that Vermont's efforts to seek recovery for the same climate damage at the state level and from the same major fossil fuel polluters would be constitutionally pre-empted.

Unless the next election breaks Big Oil's grip on Congress, the prospects of Congress enacting federal legislation that would pre-empt S.259 remain bleak. In the absence of such Congressional action, Vermont and other states reeling from the mounting costs of climate change have both the opportunity and the imperative to act without facing a cogent pre-emption argument.

The fossil fuel extracting and refining companies will undoubtedly try to argue that S.259 is pre-empted by the federal Clean Air Act. This argument is flawed—and also deeply hypocritical coming from an industry that has filed or joined dozens of lawsuits seeking to curtail EPA's authority to regulate greenhouse gas emissions under the Clean Air Act.

First and foremost, it is important to recognize that S.259, unlike the federal Clean Air Act, is **not aimed at controlling or curtailing greenhouse gas emissions from any particular source in Vermont or elsewhere**. Rather, S.259 is about recovering costs Vermont is bearing because of past emissions resulting from fossil fuel extraction and refining activities and the climate-related costs they impose on Vermont.

By contrast, the Clean Air Act is precisely focused on imposing certain pollution controls on the amount and type of emissions and emissions-creating activities polluters can engage in. Penalties imposed on polluters under the Clean Air Act by the EPA or states, which share certain authority under the Clean Air Act, are about securing compliance with specific Clean Air Act pollution controls, not recovering the costs of climate damage resulting from fossil fuel pollution. Thus, nothing in S.259 creates a conflict with the Clean Air Act's specific provisions or creates any obstacle to compliance with the Clean Air Act for a polluter fitting the definition of "responsible party" under S.259. Fossil fuel extractors and refiners simply have no basis to argue "conflict" or "obstacle" pre-emption of S.259 by the Clean Air Act.

Similarly, any claim that the Clean Air Act occupies the entire field of allowable state regulation of greenhouse gas emissions, including cost recovery for costs imposed by past pollution, rests on increasingly shaky ground.

No currently-enacted provision of the Clean Air Act empowers EPA to seek recovery of adaptation, resilience, and disaster recovery costs imposed on the U.S. by fossil fuel extracting and refining industry activities and attributable greenhouse emissions in the way that S.259 empowers Vermont ANR to recover those costs for Vermont. If the Clean Air Act already



occupied the field of such climate cost-recovery regulation, there would have been no reason for the U.S. Senate to consider the as-yet unpassed federal Polluter Pays Climate Fund act mentioned above.

Moreover, recognizing and respecting the police powers traditionally enjoyed by states like Vermont in areas of environmental protection and public health, Congress inserted a broad "States' Rights Savings Clause" into the Clean Air Act.  It provides that that the law is not intended to "preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control <u>or abatement</u> of air pollution."[2]

To the extent that Congress did want the Clean Air Act to limit the power of the states it also unambiguously reflected that intention in the statute.  First, it has made clear that a state "may not adopt or enforce any emission standard or limitation which is <u>less stringent</u>" than certain federal standards.[3]  Second, in the interest of creating uniform regulations for the automotive industry, the Clean Air Act says that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines. . . ."[4] although there are certain exceptions for EPA-authorized California regulations.

The point being that Congress has clearly shown it knows how to curtail certain state authority related to air pollution when it wants to. In the case of state recovery of climate disruption costs resulting from fossil-fuel based greenhouse gas emissions attributable to extractors and refiners, Congress has taken no such action.

On this pre-emption point, there is some unfavorable yet readily distinguishable precedent from the U.S. Second Circuit Court of Appeals in the heavily-criticized case of *City of New York v. Chevron*.  As will be explained by other witnesses, that case involved a common law nuisance suit brought by the City of New York against major oil companies seeking to recover climate damages that the City of New York is experiencing and that are attributable to oil company products.  Ultimately, the Court held that the City of New York could not proceed because all

---

[2] 42 U.S.C. § 7416.
[3] <u>Id</u>.
[4] 42 U.S.C. §7543(a).



conceivable regulation of greenhouse gas pollution is covered by the Clean Air Act and thus common law nuisance claims like the one brought by the City are pre-empted.

Since then, numerous other federal circuit courts, including those with reputations as being more conservative than the Second Circuit, have disagreed with the Second Circuit's pre-emption analysis in *Chevron* and reached opposite conclusions. Similarly, the decision has been heavily analyzed and distinguished by legal scholars who conclude it would not apply to state legislation like S.259.

The Second Circuit's *Chevron* decision also omits any discussion of the proposed federal Polluter Pays Climate Fund act, whose consideration by Congress undermines any claim that the Clean Air Act already occupied the field of cost recovery for climate damage caused by greenhouse gas emissions. This is no surprise given that the Second Circuit heard arguments in the *Chevron* case in 2019, two-years before Congress considered the Polluter Pays Climate Fund—the functional federal equivalent of S.259. The omission of analysis on this point undermines the *Chevron* decision as precedent applicable to the question of whether legislation like S.259 is pre-empted by the Clean Air Act.

Moreover, in the year after the Second Circuit's decision, the U.S. Supreme Court issued a decision in the case of *West Va. v. EPA,* 597 U.S. ___ (2022) that struck down the EPA's Clean Power plan, employing the so-called "major questions" doctrine to reject the notion that Congress has delegated broad authority to the EPA when it comes to regulating greenhouse gas emissions from power plants. While the case arose from a different set of facts than the one in the Second Circuit's *Chevron* decision, it is highly instructive on the conservative Supreme Court majority's considerably narrower view of the Clean Air Act's scope when it comes to greenhouse gas emissions regulation at the federal level.

In questioning the scope of the Clean Air Act and the authority bestowed upon EPA thereunder, opinions by members of the Court's conservative majority, cite multiple examples of negative legislative history—instances where Congress introduced legislation aimed at controlling greenhouse gas pollution through cap and trade or carbon taxation for example, but failed to enact it (e.g., slip opinion of Gorsuch concurring at 11-12). To support a narrower reading of EPA authority under the Clean Air Act when it comes to greenhouse gas emissions, the conservative

Supreme Court majority and concurrence opinions both rely, in part, on that negative history as well as concerns about preserving the traditional authority of states in the absence of clear Congressional intention to pre-empt state authority.

Again, the lack of consideration by the Second Circuit's *Chevron* panel of the fact that Congress considered and failed to pass the federal Polluter Pays Climate Fund—the bill on which S.259 is partially modeled— and its failure to respect traditional state authority provides yet another basis to doubt the applicability of the Second Circuit's *Chevron* decision in any future polluter lawsuit claiming federal pre-emption of S.259.[5]

### S.259 respects the due process rights of responsible parties by providing a mechanism to appeal cost recovery assessments demanded from them

The 14th Amendment to the U.S. Constitution's guarantee of Due Process does provide another limitation on certain exercises of state police power.  Legal precedent involving retroactive cost recovery programs like the one envisioned by S.259 provide a strong basis for concluding that S.259 does not run afoul of the 14th Amendment.

In assessing any possible Due Process attacks on S.259, it is important to underscore that S.259 is remedial in nature rather than punitive.  The focus of the bill is not about exacting retribution on large fossil fuel companies because of intentional wrongdoing.  Rather, it is about acknowledging that the activities and products of the world's largest fossil fuel extracting and refining companies have imposed an economic burden on Vermont while reaping economic benefits for themselves.  In this context, the U.S. Supreme Court has stated that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."[6]

---

[5] See also *Preemption and Alteration of EPA and State Authority to Regulate Greenhouse Gases in the Kerry-Lieberman Bill*, McCormick and Chang, Columbia Law School (2010) for examples of draft legislation in which Congress shows it knows how to expressly pre-empt state's pre-existing authority over various means of greenhouse gas and climate change regulation; something it has not done in the current version of the Clean Air Act.
[6] *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)

In other words, in any polluter Due Process challenge to S.259, federal courts would be required to apply a deferential "rational basis" standard of review that starts from the presumption that the state acted within its authority.

A Federal Appeals Court case involving the Constitutionality of a federal statute under which Congress assigned cleanup costs assessments to public utilities who participated in a federally run uranium enrichment program without first requiring the Atty General or the Secretary of the Interior/Energy to sue the Public Utilities in Court provides a helpful example of how this "rational basis" analysis works in Due Process cases.  The Appeals Court explained that:

> In judging the rationality of legislation under the Due Process Clause[7], **an evidentiary trial of facts, such as the relative contributions of weapons processing and utility fuel processing to the total contamination at the government plants, is not required.** Rather, as the Supreme Court has noted in another context: the question is whether the legislative conclusion [to enact the statute] was reasonable and supported by substantial evidence in the record before Congress. In making that determination, we are not to re-weigh the evidence de novo, or to replace Congress' factual predictions with our own. Rather, we are simply to determine if the [rational basis] standard [of review] is satisfied. If it is, summary judgment . . . is appropriate regardless of whether the evidence is in conflict.[8]

When we think of Courts, we think of punishment. Court process is there to protect people from being punished unfairly. S.259 is not about punishment, it is about adjusting the burdens and benefits of economic life in the era of the climate crisis so that those who reap extensive benefits bear proportionally fair burdens.

Moreover, S.259 does provide prospective responsible parties aggrieved by a cost recovery demand with access to due process through both an administrative appeal of cost-recovery demands at the ANR level and through a subsequent appeal to the Vermont Superior Court Civil Division and ultimately the Vermont Supreme Court [page 9-10].

---

[7] Due Process cases against the federal government arise under the 5th Amendment, rather than the 14th Amendment which applies to states.  There is, however, no meaningful difference in the Due Process analysis Courts employ under either amendment.

[8] *Commonwealth Edison Co. v. U.S.*, 271 F.3d 1327, 1341-42 (Fed. Cir. 2001)



**Large fossil fuel companies actually knew or reasonably should have known that their activities and products would cause cost-driving effects of climate change during the S.259 "covered period"**

There is a rational basis for S.259's assessment of statutory cost-recovery demands to large fossil fuel companies based on past conduct.  Again, this is not a new concept in law.  It is reflected partly in the structure of Vermont's Hazardous Waste Management Act, which includes retroactive manufacturer strict liability provisions for products causing harm to human health and the environment, in the federal CERCLA laws, and in the federal law about uranium processing cleanup mentioned above.

Legal precedents involving the laws cited above often turn on a key question to determine the fairness of such retroactivity provisions in statutes like S.259: should responsible parties reasonably have known about the problem their activities might cause in the future at the time they engaged in the activities in the past?  Courts have made clear that this is an "objective test" that looks at all available information about the problem in question rather than a subjective test that requires a polluter-by-polluter showing of specific knowledge.

In the case of the retroactive cost-recovery for the problem S.259 is aimed at, there is overwhelming evidence of historical industry knowledge of the connection between fossil fuel combustion and climate damage of the sort Vermont has experienced and will continue to experience as a result of "covered greenhouse gas emissions." That evidence stretches back well past 1995, the beginning of the "covered period" for strict liability under S.259.

Much of that historical knowledge resulted in large part from science produced internally for and kept secret by some of the same big fossil fuel companies who would likely be "responsible parties" under S. 259.  The Vermont Attorney General's Office has already collected much of that information for the State of Vermont.  It is reflected in the AG's pending consumer fraud case against several Big Oil companies based on their coverup and deceptive practices as it relates to public climate denial and greenwashing.

CLF applauds the AG's effort to hold Big Oil accountable for their lies and climate deception. The AG has a strong case to show that Big Oil engaged in wrongful fraudulent conduct and must be punished for it under the Vermont Consumer Protection Act. **It is important to stress, however,**



**that S.259, unlike the AG's consumer fraud case, is not about punishment based on fraudulent activity**.

There is, nonetheless, important overlap in the evidence supporting the AG's consumer fraud lawsuit and the defensibility of retroactive cost recovery from responsible parties.  In the case of S.259, that evidence speaks to whether it was objectively reasonable for Big Oil to anticipate—at the beginning of the "covered period"—the possibility of future regulation like S.259 based on scientific knowledge of the connection between the large fossil fuel companies' products and the type of cost-driving climate disruptions Vermont and our fellow states are now experiencing.

The AG's complaint succinctly summarizes the state of scientific knowledge possessed by or accessible to the fossil fuel industry:

> "By the 1990s at the latest, Defendants had amassed an overwhelming and irrefutable body of research indicating that the use of their fossil fuel products was a leading cause of climate change and that failure to reduce usage would lead to potentially catastrophic effects to the climate, the environment, and the global economy, including significant changes in sea level, weather and ocean currents, extreme precipitation and drought, and resulting impacts on and loss of ecosystems, communities, and people. Defendants also knew, through their own internal research or information obtained through their participation in industry trade groups, that by the time global warming became detectable it could be too late to take effective measures to mitigate these effects or stabilize the situation to prevent severe adverse consequences for the environment."

The allegations contained in the AG's report are borne out by the investigative reporting and scholarship of a wide range of individuals and organizations who have shared a trove of that information in the public domain. Links to some of that information are contained in this testimony.

Recent reporting in The Guardian newspaper traces fossil fuel industry-funded scientific knowledge of climate danger back as far as 1954.  Primary source excerpts from that industry-funded research may also be found here.



Take Royal Dutch Shell Corporation as one example cited in investigative reporting by L. Michael Buchsbaum.  He reports that

> In 1977, Shell co-funded and helped organize a week-long academic workshop on the carbon cycle staged by the Scientific Committee of Problems of the Environment, or SCOPE, an international research collaboration initiative. Bert Bolin, the Swedish meteorologist who would later become the first chairman of the IPCC, took part in the session.

> The workshop's 491-page report was just one of dozens of Shell-backed academic initiatives and reports published throughout the '70s that spelled out the risks posed by burning fossil fuels in increasingly vivid terms, peppered with warnings of "drastic economic consequences" and "severe stresses on human societies".

And Committee members can read Buchsbaum's other reporting with further links to primary source, industry-funded science here: https://energytransition.org/2023/10/shell-games-unearthed-docs-reveal-companys-deep-awareness-of-fossil-fuels-existential-risks/


Much of that knowledge is reflected in a chilling video produced by Shell and released in 1991 called Climate of Concern.  It is still available on YouTube. https://www.youtube.com/watch?v=0VOWi8oVXmo This video belies the widespread availability of scientific research linking burning of fossil fuels to climate disruption and cost-driving impacts like flooding and crop failure, something documented further by Vatan Hüzeir, a PhD candidate at Erasmus University Rotterdam and publisher of *Dirty pearls: exposing Shell's hidden legacy of climate change accountability, 1970-1990.  Included among that research is a* 1970 industry journal article where Shell appears to accept responsibility for harms caused by its products.


Further, even older evidence proves that Shell was not alone in its awareness of the problem; rather the knowledge was disseminated on an industry-wide basis by the American Petroleum Institute—the very same fossil fuel industry trade association that has filed comments opposing S.259 with this Committee.


Viewers of the popular film *Oppenheimer* may recognize the name of physicist Edward Teller. Aside from his work on the hydrogen bomb, Teller also studied climate change resulting from burning fossil fuels.  In 1959, he gave a cautionary address to the American Petroleum Institute.



In his address, he gave a stark warning of the dangers of global warming to the petroleum industry and human civilization, describing the need to transition to energy sources other than fossil fuels:

> [A] temperature rise corresponding to a 10 per cent increase in carbon dioxide will be sufficient to melt the icecap and submerge New York. All the coastal cities would be covered, and since a considerable percentage of the human race lives in coastal regions, I think that this chemical contamination is more serious than most people tend to believe.[9]

I also call Senators attention to the research of Oxford Senior research fellow Benjamin Franta, who uncovered a document containing the 1965 annual remarks of American Petroleum Institute's ("API") President, Frank Ikard.  His remarks to Big Oil executives include acknowledgement of a Johnson Administration Report of the Environmental Pollution Panel of the President's Science Advisory Committee which warned that fossil fuel combustion could cause significant climactic changes by the end of the 20th century.  In his remarks, he noted that **"[o]ne of the most important predictions of the report [was] that carbon dioxide is being added to the earth's atmosphere by the burning of coal, oil, and natural gas**," which would lead to "marked changes in climate beyond local or even national efforts." [10]  He then warned industry leaders that

> This report unquestionably will fan emotions, raise fears, and bring demands for action. **The substance of the report is that there is still time to save the world's peoples from the catastrophic consequence of pollution, but time is running out**.

These and many more primary sources detailing pre-1990 Big Oil awareness of the harmful nature of their products on the climate may also be found by following the links below:

> Benjamin Franta, Early oil industry knowledge of CO2 and global warming, 8 Nature Climate Change 1024 (Nov. 19, 2018), https://www.nature.com/articles/s41558-018-0349-9

> Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis, Center for International Environmental Law 12 (Nov. 2017), https://www.ciel.org/wpcontent/uploads/2017/11/Smoke-Fumes-FINAL.pdf.

---

[9] Edward Teller, Energy patterns of the future, 38 Energy and Man: A Symposium 53, 58 (1960).
[10] Frank Ikard, Meeting the challenges of 1966, Proceedings of the American Petroleum Institute 12-15 (1965)



Environmental Research, A Status Report, American Petroleum Institute (Jan. 1972), http://files.eric.ed.gov/fulltext/ED066339.pdf

Memo from J.F. Black to F.G. Turpin re The Greenhouse Effect, Exxon Research and Engineering Company 2 (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-ongreenhouse-effect-for-exxon-corporation-management-committee/ .

Memo from R.W. Cohen to W. Glass re possible "catastrophic" effect of CO2, Exxon Corporation 1 (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possibleemission-consequences-of-fossil-fuel-consumption

Memo from M.B. Glaser to Exxon Management re CO2 "Greenhouse" Effect, Exxon Research and Engineering Company 11 (Nov. 12, 1982), https://www.climatefiles.com/exxonmobil/1982-memoto-exxon-management-about-co2-greenhouse-effect/

Between 1983-84, Exxon's researchers published their results in at least three peer-reviewed papers in the Journal of the Atmospheric Sciences and American Geophysical Union. See e.g. Atmospheric Greenhouse Effect: Is Burning of Fossil Fuels Affecting World Climate?, Mobil Oil Corp., Status Report Environmental & Toxicology Issue No. 83-2 (June 1, 1983), https://perma.cc/6A6Y-GQSF

Geoffrey Supran and Naomi Oreskes, *Assessing ExxonMobil's climate change communications* (1977–2014), 12(8) Environmental Research Letters 084019 (Aug. 23, 2017), http://iopscience.iop.org/article/10.1088/1748-9326/aa815f.

Furthermore, as noted by the Union of Concerned Scientists, "[i]n 1988, the issue moved beyond the scientific community and onto the national stage. James Hansen, a leading NASA climate scientist, testified before Congress that scientific data had confirmed that industrial activities were causing climate change. It was also in 1988 that the United Nations formed the Intergovernmental Panel on Climate Change and the U.S. Congress introduced the National Energy Policy Act in an effort to reduce emissions of heat-trapping gases." Based on these events, the Union of Concerned Scientists rightly observe that "[i]t is difficult to imagine that executives, lobbyists, and scientists at major fossil companies were by this time unaware of the robust scientific evidence of the risks associated with the continued burning of their products." Based on the documents referenced above, there is no imagination required.

This growing awareness of the global warming problem had spread to Vermont as well.  In 1989, as reported by the Washington Post, then governor Madeleine Kunin addressed the United



Nation on the need to take action on global warming, something Governor Kunin also carried over into her 1989 inaugural address.

While there is an overlap in the type of evidence relevant to the AG's consumer fraud case and the defensibility of the Climate Superfund Act—there is a critical difference. The AG's consumer fraud complaint makes abundantly clear that it DOES NOT "seek to make Defendants pay for environmental degradation or remediation in Vermont or elsewhere."

By contrast, S.259 is entirely about making the world's largest fossil fuel extractors and refiners pay for their fair share of those and other climate costs that emissions attributable to their products and activities have imposed and will impose on Vermont and its residents.

Numerous of the leading and likely "responsible parties" under S.259 have purposefully availed themselves of Vermont's marketplace in a manner that would support assertion of cost-recover jurisdiction over such parties

The carefully crafted definition of the term "responsible party" (S.259 page 6, lines 10-12) is one of the many ways in which S.259 has been drafted to conservatively respect the Constitutional limits of Vermont's legislative police power. The draft provides that "The term responsible party does not include any person [i.e., corporation] who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." The "nexus" requirement referred to is designed to ensure consistency with 14th Amendment's Due Process Clause.

As will be explained further by Professor Rothschild in her testimony and written materials, under U.S. Supreme Court precedent, Due Process requires that responsible parties have "certain minimum contacts" with Vermont as a prerequisite to Vermont asserting jurisdiction over those companies, particularly those headquartered elsewhere. In this case, all of the fossil fuel companies that likely fit the definition of responsible parties based on the significant amount of greenhouse gas pollution attributable to them are indeed headquartered outside of Vermont.

Under more recent U.S. Supreme Court precedent[11] dealing with jurisdictional due process, Vermont has a clear argument that fossil fuel companies who have marketed and/or sold fossil

---

[11] *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1021 (2021)

fuel products within Vermont and through a nationwide marketplace can be held accountable under Vermont laws like S.259 as a result of their business activities in Vermont and in the national marketplace of which Vermont is a part. The Court's analogous precedent recognizes that if responsible parties expect to benefit from the protection of Vermont laws when they do business here, then they must also expect to bear the economic burdens Vermont laws rightly impose on their business activities too.

The Attorney General's pending consumer fraud lawsuit against several large fossil fuel companies details the myriad ways in which Big Oil companies have established the requisite "minimum contacts" with Vermont by purposefully availing themselves of the benefits of Vermont's marketplace. The evidence already available to the State of Vermont indicates that mega-corporations like Exxon Mobil, Shell, Chevron, Citgo, and others are or have been registered to do business in Vermont, regularly market their products to Vermont consumers, and regularly sell their products to Vermont consumers and businesses through a variety of distribution channels.

When ANR moves to implementation of S.259, it may ultimately determine that there are some polluters who would otherwise qualify as "responsible parties" based on the volume of "covered greenhouse gas emissions" attributable to their activities, but who do not also satisfy the constitutional "nexus" requirement in S.259. The potential for some polluters to avoid paying their fair share due to lack of minimum contacts with Vermont, should not, however, restrain Vermont from pursuing cost recovery from others with the largest share of responsibility who unquestionably would satisfy the constitution's jurisdictional nexus test.

CONCLUSION

Though time is of the essence, your colleagues in the Senate were sensitive to concerns from the Vermont Agency of Natural Resources that its hard-working staff not be asked to do too much too fast. The Committee's amendment takes heed of that and has set an extended timeline for the Treasurer and ANR to complete their work, including an interim report next session that will allow all stakeholders to identify and seize on opportunities to improve the program design or implementation. This approach also phases in Vermont's investment in the necessary steps laid out above so that we can budget to get the job done over several fiscal years.



It is time to adjust the burdens and benefits of the climate crisis so that those who reap extensive financial benefits bear proportionally fair burdens. Those heavy burdens to our physical, mental, and financial wellbeing now rest entirely on the shoulders of federal, state, and local taxpayers, small businesses, farmers, and disproportionately on those historically disadvantage and marginalized populations who can least afford it and who are often most in harm's way.  The major fossil fuel extracting and refining companies must pay their fair share.

S.259 holds fossil fuel extracting and refining companies at the root cause of the climate crisis accountable for the damage their products and activities have inflicted and will inflict on Vermont.  The State's general police power, which has been preserved under the 10th Amendment to the U.S. Constitution, affords state legislators the authority and responsibility to protect and improve the welfare of your constituents by enacting this Climate Superfund law.  I urge you to join your cross-partisan majority of Senate colleagues, who voted 26-3, in supporting passage of this bill.

+++++++++++