# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>     *Plaintiffs*,<br><br>   v.<br><br>STATE OF VERMONT, et al.,<br><br>     *Defendants*,<br><br>  and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT AND CONSERVATION LAW FOUNDATION,<br><br>     *Defendant-Intervenors*. | No. 2:25-cv-00463 |

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ..........................................................................................1

BACKGROUND .............................................................................................2

I.      Federal Law Traditionally Governs Interstate And Global Pollution,
        Balancing Environmental Protection With Other National Interests....................................2

II.     Vermont Enacts A Law Penalizing Out-of-State Energy Producers For
        Global Greenhouse Gas Emissions. ........................................................................6

        A.      The Superfund Act........................................................................6

        B.      Fossil Fuel Production and Greenhouse Gas Emissions in Vermont ....................7

LEGAL STANDARDS .....................................................................................8

ARGUMENT .................................................................................................9

I.      The United States Has Both Standing And Authority To Sue, And The
        Case Presents A Ripe And Justiciable Controversy. ...............................................9

        A.      The United States Has Standing to Seek Redress for Usurpation of
                Federal Authority, Harm to the General Welfare, and Direct
                Financial Loss. ........................................................................10

        B.      The United States Brings a Cause of Action in Equity.........................................18

        C.      This Case Presents a Ripe and Justiciable Controversy........................................20

                1.      This case is constitutionally ripe................................................21

                2.      This case is prudentially ripe. ...................................................22

II.     The United States' Suit Is Not A Pre-Enforcement Challenge, And In Any
        Event, The Superfund Act Is Unlawful In All Its Applications.........................................27

III.    The Clean Air Act Preempts The Superfund Act. ..............................................28

        A.      The Clean Air Act Precludes State-Imposed Liability for Out-of-
                State Greenhouse Gas Emissions..........................................................29

       B.     The Superfund Act Impermissibly Imposes Liability under
Vermont Law for Out-of-State Greenhouse Gas Emissions. ................................32

              1.     The Act impermissibly regulates in the field of interstate
greenhouse gas emissions. .........................................................32

              2.     The Superfund Act conflicts with the Clean Air Act. ...............38

IV.   The Superfund Act Exceeds Constitutional Limits On Extraterritorial
Regulation. .................................................................................................42

       A.     State Law Cannot Govern Out-of-State Greenhouse Gas
Emissions. ...................................................................................42

       B.     The Constitution Broadly Imposes Territorial Limits on the
Exercise of State Power. ...........................................................44

       C.     The Superfund Act Directly Regulates Conduct Outside Vermont
that Bears No Discernible Connection to the State. ................................47

V.    The Foreign Affairs Doctrine Preempts The Superfund Act. ...........................51

       A.     The Superfund Act Clashes with U.S. Foreign Policy. ..........................51

       B.     The Superfund Act Intrudes into the Field of Foreign Affairs
Without Addressing a Traditional State Responsibility. .......................56

VI.   The Superfund Act Violates The Commerce Clause. ........................................58

VII.  The United States Is Entitled To Permanent Injunctive Relief. ........................61

CONCLUSION .................................................................................................61

## TABLE OF AUTHORITIES

**Cases**                                        **Pages(s)**

*Able v. United States,*
88 F.3d 1280 (2d Cir. 1996) ................................................................. 23

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ............................................... 10, 13, 15, 16

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) ............................................... 47, 49

*Am. Elec. Power Co., Inc. (AEP) v. Connecticut,*
564 U.S. 410 (2011) ................................................................. passim

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ............................................... 51, 54, 56, 57

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................... 10, 15, 18, 29

*Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.,*
981 F.2d 1177 (10th Cir. 1993) ................................................... 34

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ............................................................. 19, 20

*Ass'n for Accessible Meds. v. Ellison,*
140 F.4th 957 (8th Cir. 2025) ................................................... 47, 58

*Baldwin v. G.A.F. Seelig, Inc.,*
294 U.S. 511 (1935) ................................................................. 44

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.,*
512 U.S. 298 (1994) ................................................................. 60

*Bell v. Cheswick Generating Station,*
734 F.3d 188 (3d Cir. 2013) ....................................................... 31

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996) ....................................................... 35, 45, 50

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.,*
582 U.S. 255 (2017) ................................................................. 44

iv

*Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*,
    492 F.3d 484 (4th Cir. 2007) ................................................................. 44

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016) ..................................................................... 8

*Cayuga Indian Nation of N.Y. v. Seneca Cnty.*,
    978 F.3d 829 (2d Cir. 2020) ................................................................. 44

*Chamber of Commerce v. Whiting*,
    563 U.S. 582 (2011) ............................................................................. 43

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992) ............................................................................. 34

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) ............................................................ passim

*Container Corp. of Am. v. Franchise Tax Bd.*,
    463 U.S. 159 (1983) ............................................................................. 60

*Cotton v. Noeth*,
    96 F.4th 249 (2d Cir. 2024) ................................................................. 26

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ................................................................. 53, 54, 61

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993) ............................................................................. 34

*Ctr. for Biological Diversity v. EPA*,
    141 F.4th 153 (D.C. Cir. 2025) ........................................................... 39

*Diamond Alt. Energy, LLC v. EPA*,
    145 S. Ct. 2121 (2025) ............................................................. 15, 17, 18

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) ....................................................................... passim

*EPA v. EME Homer City Generation*,
    572 U.S. 489 (2014) ..................................................................... 40, 43

*Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*,
    265 F. Supp. 3d 179 (D. Conn. 2017) ................................................. 11

*Ex parte Young*,
    209 U.S. 123 (1908) ............................................................................ 19

*FEC v. Cruz*,
    596 U.S. 289 (2022) ............................................................................ 12

*Fountain v. Karim*,
    838 F.3d 129 (2d Cir. 2016) ................................................................. 8

*Franchise Tax Bd. v. Hyatt*,
    587 U.S. 230 (2019) ..................................................................... 44, 46

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025) ........................................................................ 44, 49

*Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*,
    93 F.3d 68 (2d Cir. 1996) ................................................................... 23

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
    267 F.3d 1228 (11th Cir. 2001) .................................................... 45, 49

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) ............................................................... 50

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
    988 F.3d 114 (2d Cir. 2021) ...................................................... passim

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989) ........................................................ 44, 45, 47, 58

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ...................................................................... 51, 56

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) ........................................................................... 50

*Illinois v. City of Milwaukee*,
    406 U.S. 91 n.9 (1972) .............................................................. passim

*Illinois v. City of Milwaukee*,
    731 F.2d 403 (7th Cir. 1984) .............................................................. 32

*In re Assicurazioni Generali, S.P.A.*,
    592 F.3d 113 (2d Cir. 2010) ............................................................... 51

*In re Debs*,
    158 U.S. 564 (1895) ........................................................................ 13, 14, 18

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    725 F.3d 65 (2d Cir. 2013) ............................................................ 20, 21, 22

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ............................................................................ passim

*Japan Line, Ltd. v. County of Los Angeles*,
    441 U.S. 434 (1979) ................................................................................ 56, 60

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ...................................................................................... 27

*Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Finance*,
    505 U.S. 71 (1992) .................................................................................... 59, 60

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012) ........................................................................................ 35

*La Union Pueblo Entero (LUPE) v. Abbott*,
    604 F. Supp. 3d 512 (W.D. Tex. 2022) ............................................ 10, 11, 13, 24

*Lab. Council for Latin Am. Advancement v. EPA*,
    12 F.4th 234 (2d Cir. 2021) ............................................................ 20, 21, 22, 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ........................................................................................ 22

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) .............................................................................. 8

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) .................................................................................... 44, 46

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................................ 39

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ........................................................................................ 13

*Merrick v. Diageo Americas Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) .......................................................................... 31

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ................................................................. 56

*Movsesian v. Victoria Versicherung AG*,
  670 F.3d 1067 (9th Cir. 2012) ....................................... 51, 55, 57, 58

*N. Carolina, ex rel. Cooper v. TVA*,
  615 F.3d 291 (4th Cir. 2010) ....................................................... 31

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ........................................................ 61

*N.Y. Pub. Int. Rsch. Grp. v. Whitman*,
  321 F.3d 316 (2d Cir. 2003) .......................................................... 3

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999) ......................................................... 60

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) ........................................................ 24

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ............................................................. passim

*New Energy Co. of Indiana v. Limbach*,
  486 U.S. 269 (1988) ............................................................. 59, 60

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
  (*NOPSI*), 491 U.S. 350 (1989) ................................................. 24, 61

*New York by James v. Niagara-Wheatfield Cent. Sch. Dist.*,
  119 F.4th 270 (2d Cir. 2024) ....................................................... 13

*New York by James v. Pa. Higher Educ. Assistance Agency*,
  2020 WL 2097640 (S.D.N.Y. May 1, 2020) ........................................... 11

*New York Life Ins. Co. v. Head*,
  234 U.S. 149 (1914) ................................................................ 46

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019) .......................................................... 8

*Ray v. Atl. Richfield Co.*,
  435 U.S. 151 (1978) ................................................................ 39

*Revitalizing Auto Communities Envtl. Response Tr. v. Nat'l Grid USA*,
   10 F.4th 87 (2d Cir. 2021) ................................................................. 23

*Sanitary Dist. of Chicago v. United States*,
   266 U.S. 405 (1925) ............................................................. 13, 16, 18

*Simmonds v. INS*,
   326 F.3d 351 (2d Cir. 2003) ............................................................... 23

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ..................................................................... 13, 16

*Sprietsma v. Mercury Marine*,
   537 U.S. 51 (2002) ............................................................................ 53

*State Farm Mut. Auto. Ins. v. Campbell*,
   538 U.S. 408 (2003) .................................................................... 45, 46

*Stauffer v. Brooks Bros., Inc.*,
   619 F.3d 1321 (Fed. Cir. 2010) ......................................................... 11

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .................................................................... 22, 23

*Sys. Application & Techs., Inc. v. United States*,
   691 F.3d 1374 (Fed. Cir. 2012) ......................................................... 25

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981) ................................................................. passim

*Texas v. Becerra*,
   577 F. Supp. 3d 527 (N.D. Tex. 2021) ......................................... 24, 25

*Texas v. United States*,
   523 U.S. 296 (1998) .................................................................... 25, 26

*Texas v. Yellen*,
   105 F.4th 755 (5th Cir. 2024) ............................................................ 24

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025) ..................................................................... 19

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ........................................................ 24, 61

*United States v. Brand Jewelers, Inc.*,
    318 F. Supp. 1293 (S.D.N.Y. 1970) ................................................................. 13

*United States v. California*,
    2020 WL 8183945 (E.D. Cal. Feb. 26, 2020) ....................................................... 11

*United States v. Idaho*,
    623 F. Supp. 3d 1096 (D. Idaho 2022) ........................................................... 11, 13

*United States v. Locke*,
    529 U.S. 89 (2000) ................................................................................. 30, 37

*United States v. Manning*,
    434 F. Supp. 2d 988 (E.D. Wash. 2006) ............................................................... 23

*United States v. Missouri*,
    114 F.4th 980 (8th Cir. 2024) .......................................................................... 18

*United States v. Supreme Ct. of N.M.*,
    839 F.3d 888 (10th Cir. 2016) ...................................................................... 20, 23

*United States v. Texas*,
    557 F. Supp. 3d 810 (W.D. Tex. 2021) ............................................................ 19, 20

*United States v. Texas*,
    566 F. Supp. 3d 605 (W.D. Tex. 2021) ....................................................... 13, 14, 16

*United States v. Texas*,
    719 F. Supp. 3d 640 (W.D. Tex. 2024) ................................................................. 24

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ..................................................................................... 3

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021) .................................................................................... 16

*Va. Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019) .................................................................................... 43

*Variscite NY Four, LLC v. New York State Cannabis Control Bd.*,
    -- F.4th --, 2025 WL 2313142 (2d Cir. Aug. 12, 2025) ...................................... 20, 23, 26

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) ......................................................................... 10, 11, 25, 26

x

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010) ........................................................................ 57

*W. Virginia v. EPA*,
   597 U.S. 697 (2022) ..................................................................................... 37

*W. Virginia v. United States*,
   479 U.S. 305 (1987) ..................................................................................... 20

*Wachovia Bank, N.A. v. Burke*,
   414 F.3d 305 (2d Cir. 2005) ........................................................................ 30

*Washington v. FDA*,
   108 F.4th 1163 (9th Cir. 2024) ............................................................. 12, 16

*Watson v. Emps. Liab. Assurance Corp.*,
   348 U.S. 66 (1954) ....................................................................................... 45

*Whole Woman's Health v. Jackson*,
   2021 WL 5016707 (U.S. Oct. 27, 2021) ...................................................... 19

*Young* v. *Masci*,
   289 U.S. 253 (1933) ................................................................................ 47, 48

*Zschernig v. Miller*,
   389 U.S. 429 (1968) .......................................................................... 51, 56, 57

**Statutes**

Pub. L. No. 100-204, 101 Stat. 1331 (1987) (*reprinted at* 15 U.S.C. § 2901 note) ................ 5, 52

15 U.S.C. § 2901 .................................................................................................... 5, 52

33 U.S.C. § 1370 ......................................................................................................... 31

42 U.S.C. § 7401 *et seq* ............................................................................................. 3

42 U.S.C. § 7401(a)(3) .......................................................................................... 39, 40

42 U.S.C. § 7410 ......................................................................................................... 31

42 U.S.C. § 7410(a)(2)(D)(i) ...................................................................................... 40

42 U.S.C. § 7411 ......................................................................................................... 37

42 U.S.C. § 7411(a)(1) ................................................................................................. 4

42 U.S.C. § 7411(d) ........................................................................................ 31

42 U.S.C. § 7416 ............................................................................................. 32

42 U.S.C. § 7506a(a) ...................................................................................... 41

42 U.S.C. § 7604(e) ........................................................................................ 32

42 U.S.C. § 7545 ............................................................................................. 39

42 U.S.C. § 7546 ............................................................................................. 39

S.259 (Act 122) (2024), *as amended by* H.231 (Act 47) (2025),
     Vt. Stat. Ann. tit. 10, § 596-599c ........................................................ passim

Vt. Stat. Ann. tit. 10, § 596(2) ..................................................................... 17

Vt. Stat. Ann. tit. 10, § 596(7) ...................................... 6, 7, 28, 33, 43, 47, 57

Vt. Stat. Ann. tit. 10, § 596(8) .................................................................. 6, 17

Vt. Stat. Ann. tit. 10, § 596(10) ................................................................ 6, 56

Vt. Stat. Ann. tit. 10, § 596(12) ..................................................................... 7

Vt. Stat. Ann. tit. 10, § 596(22) ..................................................... 6, 17, 27, 49

Vt. Stat. Ann. tit. 10, § 597 .......................................................................... 59

Vt. Stat. Ann. tit. 10, § 597(1) ....................................................................... 6

Vt. Stat. Ann. tit. 10, § 598(a)(1) ................................................................... 6

Vt. Stat. Ann. tit. 10, § 598(b) ....................................................................... 7

Vt. Stat. Ann. tit. 10, § 598(f) ............................................................... 7, 18. 22

Vt. Stat. Ann. tit. 10, § 599a(a) ................................................................... 22

Vt. Stat. Ann. tit. 10, § 599a(b) ................................................................... 21

Vt. Stat. Ann. tit. 10, § 599a(c) ................................................................... 22

Vt. Stat. Ann. tit. 10, § 599c .......................................................................... 48

N.Y. Envtl. Conserv. Law § 76-0101(6) ...................................................... 15

N.Y. Envtl. Conserv. Law § 76-0101(3) ........................................................ 17

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................... 8

**Other Authorities**

*Declaring a National Energy Emergency*,
    Exec. Order No. 14156, 90 Fed. Reg. 8,433 (Jan. 20, 2025) .................... 5

*Establishing the National Energy Dominance Council*,
    Exec. Order No. 14213, 90 Fed. Reg. 9,945 (Feb. 14, 2025) .................... 4

*Putting America First in International Environmental Agreements*,
    Exec. Order No. 14162, 90 Fed. Reg. 8,455 (Jan. 20, 2025) ................. 5, 6

*Protecting American Energy From State Overreach*,
    Exec. Order No. 14260, 90 Fed. Reg. 15,513 (Apr. 8, 2025) ................... 4

*Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to
    Large and Persistent Annual United States Goods Trade Deficits*,
    Exec. Order No. 14257, 90 Fed. Reg. 15,041 (Apr. 2, 2025) ................... 6

United Nations Framework Convention on Climate Change,
    S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 ..................................... 5

Framework Convention, Kyoto Protocol (Dec. 10, 1997),
    37 I.L.M. 22 (1998) ................................................................................ 5

S. Res. 98, 105th Cong., 1st Sess. (July 25, 1997) ................................. 5, 53

*Standing As an Article II Nondelegation Doctrine*,
    11 U. Pa. J. Const. L. 781 (2009) ......................................................... 26

## INTRODUCTION

The U.S. Constitution and a century of precedent require that federal law govern interstate and global air pollution. In flagrant disregard, the State of Vermont recently enacted its so-called Climate Superfund Act (the "Superfund Act" or the "Act"). The Act imposes retroactive strict liability and severe monetary penalties on foreign and domestic energy companies that allegedly contributed to *global* greenhouse gas emissions over the course of nearly three decades. In so doing, the Act seeks to extend Vermont's regulatory reach far beyond the State's borders, purporting to police nationwide airspace and, indeed, the entire world.

But it is beyond cavil that Vermont cannot use its own law to impose liability on energy companies for alleged harm caused by greenhouse gas emissions originating in other states and nations. The Second Circuit recently made this clear when it held that the City of New York could not use "state tort law to hold multinational oil companies liable for the damages caused by global greenhouse gas emissions." *City of New York v. Chevron Corp.*, 993 F.3d 81, 85 (2d Cir. 2021). Undeterred, Vermont tries to evade that holding by swapping out a tort suit with a statute. That makes no difference. Vermont's statute, like the City's tort suit, seeks to "impose strict liability" on global energy producers under state law "for the damages caused by fossil fuel emissions no matter where in the world those emissions were released." *Id.* at 93. That is exactly what the Second Circuit—applying longstanding Supreme Court precedent—said states and localities could not do.

By regulating global greenhouse gas emissions based on conduct outside Vermont—and outside the United States—the Superfund Act flouts federal law and our constitutional structure. First, the Clean Air Act preempts it because it regulates domestic greenhouse gas emissions that originate out of state. Second, the Superfund Act transgresses the Federal Constitution's limits on

1

extraterritorial legislation by nationalizing (and even globalizing) Vermont's legislative power—a problem even more pronounced here because the legislation intrudes into an inherently federal area. Third, the Foreign Affairs Doctrine preempts the Act because it regulates global greenhouse gas emissions that originate in other nations, interfering with U.S. foreign policy. And fourth, the Act violates the Commerce Clause because it directly regulates out-of-state conduct, discriminates against interstate and foreign commerce, and undermines the National government's ability to speak with one voice when conducting commercial relations with foreign nations.

Vermont is usurping federal authority and impairing the United States' sovereign interest in the recognition of its laws and the preservation of our Nation's federal structure. The Court should deny the motions to dismiss, grant the United States' motion for summary judgment, declare the Superfund Act unconstitutional and unenforceable, and permanently enjoin Defendants from taking any actions to implement or enforce it.

## BACKGROUND

## I. Federal Law Traditionally Governs Interstate And Global Pollution, Balancing Environmental Protection With Other National Interests.

**1.** The Supreme Court has long recognized that "our federal system does not permit [certain] controvers[ies] to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). This includes areas in which "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Id.* For these subjects, the "basic scheme of the Constitution . . . demands" a federal rule of decision. *Am. Elec. Power Co., Inc. (AEP) v. Connecticut*, 564 U.S. 410, 421 (2011).

This is why, since the Founding, federal law has applied to disputes involving cross-boundary pollution, which implicate "uniquely federal interests," including "the conflicting rights of states and our relations with foreign nations." *City of New York*, 993 F.3d at 90–92 (cleaned up)

2

(collecting cases).  There is no history or tradition of states regulating interstate, much less global, pollution.  And for good reason:  If each state could apply its own law in this area, the result would be "an irrational system of regulation" that "lead[s] to chaotic confrontation between sovereign states" and "uncertainty" over the governing legal standard, as polluters would have to comply with the laws "of all states potentially affected by" an otherwise "lawful discharge."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496–97 (1987) (quotation marks omitted).  Because the structure of our Constitution requires "a uniform rule of decision" for "controvers[ies]" involving interstate pollution, it "demands . . . applying federal law and not the varying . . . law of the individual States."  *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 107 n.9 (1972).  Until Congress acted, interstate pollution was governed by federal common law.  *See id.* at 103, 105 n.6; *AEP*, 564 U.S. at 421.

In 1963, Congress enacted (and later amended) the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, "the nation's first modern environmental law," *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319 (2d Cir. 2003).  The Clean Air Act creates a comprehensive national program for regulating "pollution-generating emissions from both stationary sources, such as factories and power-plants, and moving sources, such as cars, trucks, and aircraft," subject to various statutory standards for regulation that apply to each type of source.  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014).  Beginning in 1970, Congress vested authority to implement the Clean Air Act in the Environmental Protection Agency ("EPA").  *City of New York*, 993 F.3d at 87.

In determining whether and how to regulate interstate air pollution, EPA must balance other economic and national interests.  *See id.* at 93 (recognizing the "careful balance" that must be struck between environmental protection, on the one hand, and "energy production, economic

3

growth, foreign policy, and national security, on the other"). Chief among these interests is ensuring that the Nation maintains a reliable energy supply—an objective that Congress, the Supreme Court, and the President have all emphasized. *See* 42 U.S.C. § 7411(a)(1) (requiring stationary source emission standards to reflect "the cost of achieving such [emissions] reduction and any nonair quality health and environmental impact and energy requirements"); *AEP*, 564 U.S. at 427 (explaining that "the environmental benefit potentially achievable" through regulation must be weighed against "our Nation's energy needs and the possibility of economic disruption").

The President recently explained that maintaining "[a]n affordable and reliable domestic energy supply" is "essential to the national and economic security of the United States, as well as our foreign policy." *Protecting American Energy From State Overreach*, Exec. Order No. 14260, § 1, 90 Fed. Reg. 15,513 (Apr. 8, 2025). To that end, the President determined that "[i]t shall be the policy of my Administration to make America energy dominant," and in furtherance of this policy, the United States "must expand all forms of reliable and affordable energy production," including fossil fuels. *Establishing the National Energy Dominance Council*, Exec. Order No. 14213, § 1, 90 Fed. Reg. 9,945, 9,945 (Feb. 14, 2025); Declaration of Deputy Secretary of State Christopher Landau ("Landau Decl.") ¶ 13; Statement of Undisputed Material Facts ("SUMF") ¶ 19. The President established the National Energy Dominance Council, which includes the Secretary of State, to provide him with recommendations for increasing affordable energy production, including through elimination of unnecessary regulation and promoting awareness of "the national security concerns with removing reliable and affordable energy sources." 90 Fed. Reg. at 9,946; Landau Decl. ¶ 13; SUMF ¶ 20. Finally, earlier this year, the President declared a national energy emergency, finding that "[t]he United States' insufficient energy production, transportation, refin-

4

ing, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Declaring a National Energy Emergency*, Exec. Order No. 14156, § 1, 90 Fed. Reg. 8,433, 8,434 (Jan. 20, 2025); Landau Decl. ¶ 12; SUMF ¶ 18.

**2.**  Because climate change "is a global problem that the United States cannot confront alone," the federal government "has worked cooperatively with foreign governments through diplomatic channels" to address the issue. *City of New York*, 993 F.3d at 88.  Congress directed the executive branch to develop a "coordinated national policy on global climate change" through the Global Climate Protection Act, Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1407–09 (1987) (reprinted at 15 U.S.C. § 2901 note); Landau Decl. ¶ 4; SUMF ¶ 9–11, and the federal government has been carefully coordinating and refining that policy for decades.  Since 1992, for example, the United States has been party to the Senate-ratified United Nations Framework Convention on Climate Change, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107, which creates a framework for international cooperation and contemplates protocols and other agreements to address greenhouse gas emissions, Landau Decl. ¶ 5; SUMF ¶¶ 12–13.

At the same time, the United States has rejected more restrictive measures, recognizing that more regulation does not always serve national interests.  The United States is not, for example, party to the Kyoto Protocol of 1997, *see* Framework Convention, Kyoto Protocol (Dec. 10, 1997), 37 I.L.M. 22 (1998), which sets binding greenhouse gas emission reduction targets on certain Framework Convention parties, S. Res. 98, 105th Cong., 1st Sess. (July 25, 1997); Landau Decl. ¶ 6; SUMF ¶ 14.  More recently, in January 2025, the President ordered the withdrawal of the United States from the 2015 Paris Climate Agreement—which also seeks to curb greenhouse gas emissions—because of the unfair economic burden the Agreement imposed on American workers, businesses, and taxpayers, especially when the United States has already "reduced air

5

and water pollution, and reduced greenhouse gas emissions." *Putting America First in International Environmental Agreements*, Exec. Order No. 14162, §§ 1–3(a), 90 Fed. Reg. 8,455, 8,455 (Jan. 20, 2025); Landau Decl. ¶ 11; SUMF ¶ 17. And in April 2025, the President specifically exempted "energy and energy products" from the reciprocal tariffs he imposed on imports from U.S. trading partners. *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, Exec. Order No. 14257, § 3(b), 90 Fed. Reg. 15,041, 15,045–46 (Apr. 2, 2025).

## II. Vermont Enacts A Law Penalizing Out-of-State Energy Producers For Global Greenhouse Gas Emissions.

### A. The Superfund Act

In May 2024, Vermont enacted its Superfund Act. *See* S.259 (Act 122) (2024), *as amended by* H.231 (Act 47) (2025), Vt. Stat. Ann. tit. 10, §§ 596-599c. The Act levies retroactive penalties on major energy companies, under a strict liability standard, for what Vermont alleges is each company's pro rata contribution to global greenhouse gas emissions "released into the atmosphere" from 1995 to 2024. *Id.* § 596(7), (8), (22); *id.* § 598(a)(1). It then funnels those penalty dollars into a fund for in-state "adaptation projects" that have supposedly been necessitated by climate change. *Id.* §§ 597(1), 598(a)(1).

Those forced to pay under the Act are called "responsible parties" and include "any entity . . . that, during any part of the covered period [1995 to 2024] was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the [Agency of Natural Resources] attributable to for more than one billion metric tons of covered greenhouse gas emissions." *Id.* § 596(22). Among the entities subject to the Act are "foreign nation[s] . . . that hold[] or held an ownership interest in a fossil fuel business" from 1995 through 2024. *Id.* § 596(10).

6

"Covered greenhouse gas emissions," moreover, means "the total quantity of greenhouse gases released into the atmosphere, expressed in metric tons of carbon dioxide equivalent, resulting from the use of fossil fuels extracted or refined by an entity during the covered period." *Id.* § 596(7); *see also id.* § 596(12) (defining fossil fuels as "coal, petroleum products, and fuel gases").

As its plain text confirms, the Act does not distinguish between greenhouse gases emitted during the extraction or refining of fossil fuels and gases emitted from the end use of those fossil fuels. Instead, the Act declares *producers* responsible for all emissions "resulting from the use of fossil fuels" they extracted or refined from 1995 to 2024. *Id.* § 596(7).

To determine a responsible party's penalty amount, the Superfund Act directs the State Treasurer to calculate the total "cost to the State of Vermont and its residents . . . from covered greenhouse gas emissions." *Id.* § 598(b). The Act then *requires* that the Agency of Natural Resources issue "cost recovery demands," *id.* § 598(f), to responsible parties in "an amount that bears the same ratio to the cost to the State of Vermont and its residents . . . as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions," *id.* § 598(b).

## B.    Fossil Fuel Production and Greenhouse Gas Emissions in Vermont

The facts on the ground confirm that the Superfund Act necessarily applies entirely to out-of-state conduct—and to greenhouse gas emissions that, by and large, also originate out of state. According to a U.S. Government publication,[1] "Vermont has no crude oil reserves or production,

---

[1] "The U.S. Energy Information Administration (EIA) is the statistical and analytical agency within the U.S. Department of Energy. EIA collects, analyzes, and disseminates independent and impartial energy information to promote sound policymaking, efficient markets, and public understanding of energy and its interaction with the economy and the environment." U.S. Energy Info. Admin., About EIA, Mission and Overview, https://perma.cc/WM39-5E4W. EIA's "data, analyses, and forecasts are independent of approval by any other officer or employee of the U.S. government." *Id.*; *see* SUMF at 1 (information on government websites is judicially noticeable).

nor does it have any petroleum refineries." SUMF ¶ 1. The State also "has no natural gas reserves or production" and no "coal mines or coal reserves." SUMF ¶¶ 2–3. Along with its lack of fossil fuel production, Vermont "has the lowest carbon dioxide emissions of any state in the nation," SUMF ¶ 4, which is significant because carbon dioxide emissions account for nearly all greenhouse gas emissions in the United States, *see* SUMF ¶ 5 ("According to EPA, in 2022, $CO_2$ emissions accounted for about 80% of total gross U.S. anthropogenic [greenhouse gas] emissions.").

## LEGAL STANDARDS

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016). When standing is challenged at the motion-to-dismiss stage, a plaintiff need only "allege[] facts that affirmatively and plausibly suggest that [it] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). Courts "may refer to evidence outside the pleadings" when assessing subject matter jurisdiction. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Similarly, on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (cleaned up).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**ARGUMENT**

Vermont touts its Superfund Act as a novel means of combatting climate change, but it is really an attack on the supremacy of federal law that threatens the balance of power between the National government and the states. The Act violates federal law in many ways, but each violation stems from the same dispositive fact: The Act, on its face and by design, imposes liability for emissions and conduct occurring nationwide and globally, thereby exceeding Vermont's authority and intruding on areas that the Constitution reserves exclusively for federal control.

Vermont's nothing-to-see-here response rests on multiple legal errors. Besides echoing many of those errors, the Intervenors go even further afield, asserting that the United States can't even ask the Court to stop Vermont's ongoing violation of federal law and usurpation of federal authority. That makes no sense as a matter of law or logic. Because the Superfund Act is unlawful on its face, the Court should deny the motions to dismiss and grant the United States' motion for summary judgment.

The stakes couldn't be higher. If, as Vermont and the Intervenors insist, laws like this one can stand, energy companies across the globe will be subject not only to billions (or even trillions) of dollars in retroactive liability, but to a patchwork of rules governing their conduct in any given location, as one state (or city) after another seeks to hold the companies strictly liable for fossil-fuel activities that take place around the world. Our federal system does not tolerate such an irrational regulatory regime—one that would also imperil the Nation's energy needs. The Court should end Vermont's lawless experiment.

## I. The United States Has Both Standing And Authority To Sue, And The Case Presents A Ripe And Justiciable Controversy.

The Intervenors open with a trio of threshold objections to the United States' ability to bring this suit. Each is meritless.

9

A.    **The United States Has Standing to Seek Redress for Usurpation of Federal Authority, Harm to the General Welfare, and Direct Financial Loss.**

The United States has standing to seek relief against enforcement of preempted state laws like Vermont's Superfund Act.  *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012) (pre-enforcement preemption challenge to state immigration law).  The Intervenors say the United States has failed to allege an injury.  That is demonstrably incorrect.  The Complaint alleges three types of injury, each independently sufficient for standing.

**Sovereign injury.**  The United States is suffering ongoing injury to its sovereignty because the Superfund Act usurps federal authority to regulate in an area of exclusive federal control.  The federal government, like each state, has cognizable "sovereign interests," not only in its "power to create and enforce a legal code, both civil and criminal," but also in "recognition [of that code] from other sovereigns." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *Arizona*, 567 U.S. at 398 ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.").

The Supreme Court has thus explained:  "It is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).  So "[w]hen state governments enact laws that impugn the United States' sovereignty, a personal injury to the United States arises."  *La Union del Pueblo Entero (LUPE) v. Abbott*, 604 F. Supp. 3d 512, 527 (W.D. Tex. 2022); *see also id.* at 526 ("Undoubtedly, the United States suffers a concrete harm to its sovereignty when its laws are violated" by a state.).

Courts have repeatedly and uniformly applied this principle to hold that "the United States' sovereign interests are harmed when its laws are violated." *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022); *see also, e.g.*, *Stauffer v. Brooks Bros., Inc*., 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("From the government's perspective, a harm arises from an 'injury to its sovereignty arising from violation of its laws.'" (quoting *Vermont Agency*, 529 U.S. at 771)); *United States v. California*, 2020 WL 8183945, at *3 (E.D. Cal. Feb. 26, 2020) ("The United States has plausibly alleged its claimed injury—the usurpation of federal authority to conduct foreign affairs."); *New York by James v. Pa. Higher Educ. Assistance Agency*, 2020 WL 2097640, at *11 (S.D.N.Y. May 1, 2020) ("a sovereign is injured by a violation of its law"); *Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 192 (D. Conn. 2017) (The United States suffers an "injury to its sovereignty . . . from violation of its laws.").

Here, the Superfund Act—which is in full effect and is being implemented, *see infra* at 21–22—injures U.S. sovereignty by violating federal law and usurping authority to regulate interstate commerce and global air pollution, which are areas of exclusive federal control under the Constitution and Clean Air Act. *See, e.g.*, Compl. ¶¶ 6–7, 10, 35–36, 51. And an injunction from this Court will fully redress that harm. That is sufficient for standing.

The Intervenors cite no case rejecting this basis for injury. Indeed, they cite no case denying standing to the United States for lack of injury in any context. They nevertheless argue that the United States must allege an additional "*impairment*" to its sovereign interest, "such as a way in which state law will interfere with enforcement of federal law." Mem. in Support of Intervenor-Defendants' Mot. to Dismiss, Dkt. No. 43-1, at 11–12 ("Int. Mem."). That is incorrect. The usurpation of authority from the United States is itself "a concrete harm to its sovereignty." *LUPE*, 604 F. Supp. 3d at 526. The Intervenors' sole citation (Mem. at 12) is a case involving a state

11

plaintiff that did not allege that the challenged federal regulation usurped or "interfere[d] with the state's *authority*" (unlike the United States here); rather, it alleged that the regulation "affect[ed] state law enforcement indirectly, by making violations of state law more difficult or costly to detect." *Washington v. FDA*, 108 F.4th 1163, 1176 –77 (9th Cir. 2024). Not only is that case inapposite, but it supports the United States. The court recognized a "cognizable interest in the preservation of sovereign authority"; it simply held that the state plaintiff failed to allege that the regulation "encroache[d] on its authority to govern." *Id.* at 1177.

Here, by contrast, the United States alleges that Vermont has violated federal law by directly usurping federal authority to regulate interstate air pollution. Compl. ¶ 10. For example, the Clean Air Act "creates a comprehensive program for regulating air pollution in the United States." *Id.* ¶ 32. The Superfund Act directly interferes with that by "imposing strict liability and substantial financial penalties on fossil fuel businesses for their global greenhouse gas emissions." *Id.* ¶ 51. It "creates a patchwork of state-level penalties that . . . frustrates the Clean Air Act's goal of efficiency and predictability," interferes with its "integrated approach to air pollution control," *id.* ¶ 54, and "obstructs EPA's discretion to balance environmental, economic, and energy considerations in regulating greenhouse gases," *id.* ¶ 55. The Complaint is teeming with other allegations of interference with federal interests, such as interfering with interstate commerce (¶ 82), foreign commerce (¶ 91), and "with the United States foreign policy on greenhouse gas regulation" (¶ 107).

The Intervenors attempt to fight these allegations on the merits by contending that "nothing in the Vermont Act regulates greenhouse gases or sets energy policy." Mem. at 12. But "[f]or standing purposes," courts must "accept as valid the merits of [the plaintiff's] legal claims." *FEC v. Cruz*, 596 U.S. 289, 298 (2022); *see infra* at 35–36 (explaining why the Superfund Act regulates

global greenhouse gas emissions).  And on the merits, the United States has alleged that the Superfund Act usurps the federal government's authority and violates federal law.  That is sufficient for standing.

**General welfare and *parens patriae*.**  Separately, the United States has "standing in court" to sue for "injury to the general welfare." *In re Debs*, 158 U.S. 564, 584 (1895).  This encompasses an array of injuries, such as interference with "interstate and foreign commerce," *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1925), "widespread deprivations . . . of property through 'state action,'" *United States v. Brand Jewelers, Inc.*, 318 F. Supp. 1293, 1299 (S.D.N.Y. 1970), violations of civil rights, *LUPE*, 604 F. Supp. 3d at 523, and any other injury to "the general welfare" or the "public at large," *United States v. Texas*, 566 F. Supp. 3d 605, 640 (W.D. Tex. 2021); *see also United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022) ("As a general principle, the United States may sue to redress widespread injuries to the general welfare.").

Relatedly, "the Federal Government [is] the ultimate parens patriae of every American citizen." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).  With respect to federal law, "the United States . . . represents [the American People] as parens patriae" and has standing to assert injuries on behalf of American citizens. *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923).  The Supreme Court has explained that a *parens patriae* suit asserts "quasi-sovereign" injuries on behalf of the public, such as injury to the "economic" or "physical" "health and well-being" of a "substantial segment" of the population. *Snapp*, 458 U.S. at 607; *see New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 273 (2d Cir. 2024).  Thus, "[t]he same sovereign interests" support the United States' standing as guardian of the "general welfare" under *Debs* and as *parens patriae* under *Mellon*. *Texas*, 566 F. Supp. 3d at 641.

13

The United States alleges injury to the national energy economy and its consumers through unlawful interference with interstate commerce. The President of the United States has declared an energy emergency, concluding that "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." Compl. ¶ 2. The President concluded that "dangerous State and local policies" "in our Nation's Northeast" "jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population." *Id.* ¶ 3. One of those dangerous policies is Vermont's Superfund Act. The Act nakedly purports to extract what will surely be tens of billions of dollars from our Nation's (and the world's) largest fuel producers, none of which reside in Vermont. *Id.* ¶¶ 19–31. And the Act purports to impose this penalty based on national and global greenhouse gas emissions. *Id.* ¶ 24.

The Superfund Act thus injures the general welfare. The certainly impending transfer to Vermont of billions of dollars in penalties from out-of-state energy companies based on out-of-state fossil fuel production and emissions is a disruption of the national energy market. Compl. ¶¶ 56, 82, 84; *see also* Chamber Mot. for Summ. J., Case No. 24-cv-1513, Declaration of Vijay Swarup ("Swarup Decl."), Dkt. No. 100-6, ¶ 22 (Sept. 15, 2025) ("The imposition of the cost recovery demand on ExxonMobil and other companies is poised to significantly affect the U.S. fossil fuel industry."); SUMF ¶ 24. It is also an unlawful obstruction of interstate commerce. *Texas*, 566 F. Supp. 3d at 640 ("*Debs* . . . offers the United States standing when there are obstructions to interstate commerce."). After all, interstate commerce is obstructed if energy producers cannot produce energy for the Nation without bottomless liability to Vermont. This alone is sufficient to support standing.

14

But it is worse than that. If Vermont's "statute were valid, every State could give itself independent authority" to impose the same penalties on the same energy producers, grinding energy producers and energy production to a halt. *Arizona*, 567 U.S. at 402; Compl. ¶ 57. New York has already enacted its own Climate Change Superfund Act, which expressly seeks $75 billion dollars in penalties from out-of-state energy companies. N.Y. Envtl. Conserv. Law § 76-0101(6). California, Maine, New Jersey, and others have proposed similar schemes.[2]

Siphoning billions of dollars from energy companies further harms consumers because raising costs on energy producers tends to "raise energy costs for consumers nationwide." Compl. ¶ 10, 56, 61, 82; *see also* Chamber Mot. for Summ. J., Case No. 24-cv-1513, Declaration of Dustin Meyer ("Meyer Decl."), Dkt. No. 100-5, ¶ 17 (Sept. 15, 2025) ("The Act could negatively affect energy production and could increase energy costs . . . ."); SUMF ¶ 26. As the Supreme Court has explained, "when the government regulates . . . a business, the regulation . . . may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2136 (2025). And here, forcing energy producers to "internalize the costs of climate change . . . would presumably affect the price and production of fossil fuels." *City of New York*, 993 F.3d at 103; *see also Snapp*, 458 U.S. at 593 (for *parens patriae* standing, "the indirect effects of the injury must be considered as well"). Even if the billions of dollars in penalties did not directly affect energy prices for consumers, those penalties plausibly cause "economic injuries to others in the chain," such as "manufacturers, retailers, suppliers," or "competitors." *Diamond Alt.*, 145 S. Ct. at 2136. And those injuries are a disruption to national energy policy and the national energy market, as the President has declared. Compl. ¶¶ 1–3. These allegations are sufficient to

---

[2] *See Polluters Pay: How States are Filling the Federal Climate Funding Gap in 2025*, NCEL (March 3, 2025), https://perma.cc/82CT-482U (last visited September 11, 2025).

support the United States' standing to seek redress for injuries to the general welfare as "the ultimate *parens patriae* of every American citizen." *Katzenbach*, 383 U.S. at 324.

The Intervenors' contrary arguments fail. Their assertion "that *parens patriae* standing is limited to state governments . . . is demonstrably incorrect." *Texas*, 566 F. Supp. 3d at 637. The Intervenors have it backwards: The *states* lack *parens patriae* standing when it comes to suits against the federal government, not the other way around. "[S]tates do not have standing to sue the federal government in a third-party *parens patriae* capacity." *Washington*, 108 F.4th at 1177 (citing *Snapp,* 458 U.S. at 607). "This is because, with respect to the relationship between citizens and federal action, the federal government, not the states, is the sovereign entity that acts as the ultimate 'parent of the country.'" *Id.* at 1177–78. More still, the federal government's interests in the general welfare are even "stronger than those that have established a similar standing for a State, as the interests of the nation are more important than those of any State." *Sanitary Dist. of Chicago*, 266 U.S. at 426. Finally, for the reasons explained above, the United States amply alleges an interest in the general welfare—protection of the national energy economy during a Presidentially declared energy emergency—sufficient for standing.

**Pecuniary interest.** Finally, the United States has plausibly alleged that Vermont's Superfund Act will cause direct financial loss to the United States. The United States purchases fossil fuels. Compl. ¶ 10; Neta C. Crawford, *Pentagon Fuel Use, Climate Change, and the Costs of War*, Brown University (2019) at 4, https://perma.cc/YSZ5-CYL9 (observing that the United States Department of War "is the single largest consumer of energy in the US, and in fact, the world's single largest institutional consumer of petroleum"). Any increase in fuel costs therefore injures the United States' pecuniary interests. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (even "one dollar" lost is an Article III injury). The United States also earns revenue from fossil fuel

leasing on federal lands, which generated over $13.8 billion in 2024. Compl. ¶ 10 & n.1. Any decrease in leasing or oil production on federal lands injures the United States because it will necessarily reduce revenue.

The Superfund Act seeks to extract tens of billions of dollars from the largest fossil fuel producers in the world. Compl. ¶ 20. The Act applies to all producers—worldwide—that Vermont determines are responsible "for more than one billion metric tons of covered greenhouse gas emissions" between 1995 and 2024 (and that meet the statute's nexus requirement). Vt. Stat. Ann. tit. 10, § 596(8), (22). The Act demands payment for comprehensive infrastructure, agriculture, forestry, housing, medical, transportation, and other public health programs for the State of Vermont. *Id.* ¶ 596(2). For comparison, New York's copy-cat statute tallies the costs for its "climate change adaptive infrastructure" projects at $75 billion. N.Y. Envtl. Conserv. Law § 76-0101(3), (6).

Under "commonsense economic realities," *Diamond Alt.*, 145 S. Ct. at 2136, forcing energy producers to "internalize the costs of climate change . . . would presumably affect the price and production of fossil fuels," *City of New York*, 993 F.3d at 103; *see also* Swarup Decl. ¶ 22 (SUMF ¶ 24); Meyer Decl. ¶ 17 (SUMF ¶ 26). "To put it simply, the State of Vermont's significant cost recovery demands would have to be paid, and the funds to make that payment would have to come from somewhere, forcing energy producers like ExxonMobil to make strategic business decisions about capital investments, production volumes, planning, prices, contracts, and personnel." Swarup Decl. ¶ 27; SUMF ¶ 25. It would blink economic reality to assume away such an outcome—along with the resulting pecuniary harm to the United States as a consumer of fossil fuels and recipient of royalties from development on federal lands.

And far from "unfounded speculation," Int. Mem. at 9, it is certain that Vermont will impose these costs. After all, the statute compels the Agency of Natural Resources to "issue the cost

recovery demands" to responsible parties by a date certain. Vt. Stat. Ann. tit. 10, § 598(f); *see infra* at 22. And even if the total amount is half of New York's $75 billion, it is common economic sense that extracting over $35 billion from an industry will affect the market. *Diamond Alt.*, 145 S. Ct. at 2136. This consequence is even more predictable when New York is simultaneously seeking to impose an additional $75 billion on the same industry, and other states may soon follow suit.

*      *      *

For all these reasons, the United States has alleged an Article III injury that is caused by Vermont's Superfund Act and will be redressed by a ruling from this Court declaring the statute unlawful and enjoining its enforcement.

### B.    The United States Brings a Cause of Action in Equity.

Contrary to the Intervenors' misguided argument (Mem. at 15), the United States has an equitable cause of action to challenge preempted state laws that interfere with the federal government's sovereign rights, pecuniary interests, and the general welfare. That was the cause of action the United States asserted in a preemption suit against Arizona's immigration laws, which the Supreme Court affirmed on the merits. *Arizona*, 567 U.S. 387.

And it is the same cause of action the United States has repeatedly asserted and prevailed on in the Supreme Court and elsewhere. *E.g.*, *Sanitary Dist. of Chicago*, 266 U.S. at 426 ("The Attorney General by virtue of his office may bring this proceeding and no statute is necessary to authorize the suit."); *In re Debs*, 158 U.S. at 584, 599 ("Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other[.]"); *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) (holding

18

that the United States could sue in the "equitable tradition of suits to enjoin unconstitutional actions by state actors," and collecting cases); *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021) (listing six preemption cases brought by the United States between 2018 and 2020).

It is also the same cause of action that Vermont itself endorsed in an amicus brief recently filed at the Supreme Court. *See* Brief of Massachusetts et al. as Amici Curiae, *Whole Woman's Health v. Jackson*, 2021 WL 5016707, at *6 (U.S. Oct. 27, 2021) (arguing that "the United States . . . could seek equitable relief to redress [a state statute's] violation" of federal law); *see also id.* at *7 ("[T]he United States has appropriately sought equitable relief to restore the very supremacy of our Constitution.").

Relying on a case about a particular form of *remedy* (universal injunctions), not causes of action, the Intervenors claim (Mem. at 16) that the United States may not assert a cause of action in equity because courts have only such equitable authority as was "traditionally accorded by courts of equity at the time of our founding." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2560 (2025). *CASA* is inapposite because the United States does not seek a universal injunction—or any other remedy that was not "traditionally accorded by courts of equity at our country's inception." *CASA*, 145 S. Ct. at 2551 (quotation marks omitted). Rather, the United States seeks traditional relief perfectly tailored against defendants, who are the State of Vermont and the executive officers responsible for carrying out the unlawful Superfund Act.

This is consistent with "a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing "ability to sue to enjoin unconstitutional actions by state and federal officers" in "equity"); *Ex parte Young*, 209 U.S. 123, 155–56 (1908) (recognizing suit in equity to enjoin enforcement of unconstitutional state law). And it is consistent with a founding principle that "States retain no

19

sovereign immunity as against the Federal Government." *W. Virginia v. United States*, 479 U.S. 305, 312 n.4 (1987). In short, *CASA* is a case about universal injunctions, and *Armstrong* "does not limit the federal government's ability to enforce the supremacy of its laws." *Texas*, 557 F. Supp. 3d at 820. *Armstrong* in fact "counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest." *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016).

### C.      This Case Presents a Ripe and Justiciable Controversy.

Finally, this suit is ripe for judicial review. "Ripeness has both a constitutional and a prudential dimension." *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, -- F.4th --, 2025 WL 2313142, at *6 (2d Cir. Aug. 12, 2025). "The doctrine of constitutional ripeness prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (quotation marks omitted). "This aspect of the ripeness doctrine overlaps with the standing doctrine," so generally a determination "that a plaintiff has Article III standing is enough to render its claim constitutionally ripe." *Id.*

The prudential ripeness doctrine, by contrast, is "a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary." *Id.* "In determining whether a claim is prudentially ripe, [courts] ask whether the claim is fit for judicial resolution and whether and to what extent the parties will endure hardship if decision is withheld." *Id.* "In general, the more the matter to be placed before the court involves a pure issue of law, unaffected by factual considerations, the less the concern

20

that judicial review might" be premature.  *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 253 (2d Cir. 2021).

### 1.    This case is constitutionally ripe.

The United States' claims are constitutionally ripe for the same reasons it has standing to bring this suit.[3]  *MTBE*, 725 F.3d at 110; *see supra* at 10–18.  This dispute is not an "abstract disagreement[]" in which the United States' "injury is merely speculative and may never occur." *MTBE*, 725 F.3d at 110.  Rather, the United States is suffering injury *now* because the Superfund Act usurps federal authority and violates federal law.  The Intervenors are thus wrong to call this suit a "pre-implementation, pre-enforcement challenge[]."  Mem. at 18.  Although the Act builds in deadlines for certain events, the Act is not the dormant statute the Intervenors portray it to be.

To the contrary, the Act has been in full effect since July 2024.  *See* Act 122 Sec. 7 ("This act shall take effect July 1, 2024 . . . .").  And relevant State actors have *already* started implementing it—and are continuing to do so.  Shortly after the law took effect, for example, the Agency of Natural Resources began the process of "adopt[ing] rules necessary to implement the requirements of" the Act, Vt. Stat. Ann. tit. 10, § 599a(b), by seeking "expert opinions and advice to inform which fossil fuel companies must be held accountable under Act 122, including how to determine their relative share of climate-related loss and damage that Vermont has experienced over the past 30 years," SUMF ¶ 6.  This action "mark[ed] the first step in effectuating the historic legislation."  SUMF ¶ 6.

Moreover, in January 2025, the Agency of Natural Resources, in consultation with the State Treasurer, submitted the required "report to the General Assembly detailing the feasibility and

---

[3] The Intervenors appear to argue only that the United States' claims are prudentially unripe.  *See* Int. Mem. at 20–26.

progress of carrying out the requirements of this chapter, including any recommendations for improving the administration of the Program." Vt. Stat. Ann. tit. 10, § 599a(a); *see* SUMF ¶ 7. The report described the State's progress in implementing the Act—including steps taken to craft its climate resilience strategy (which is due to the State Legislature by September 15, 2025, the same day as this filing), Vt. Stat. Ann. tit. 10, § 599a(c)—and requested more time and funding so the State Treasurer could provide a more "robust" assessment of the cost to Vermont from covered greenhouse gas emissions. *See* SUMF ¶ 8. Because the Treasurer's cost assessment requires "significant and consequential work," SUMF ¶ 8, it is now due to the State Legislature by January 2027, Vt. Stat. Ann. tit. 10, § 599c.

More still, for all the Intervenors' emphasis on the cost recovery demands that likely won't be issued until 2028, they gloss over the fact that the cost demands are *certainly impending*—Vermont *will issue* the demands, and it will do so by a *date certain*, because that is what the Act *requires*. *See* Vt. Stat. Ann. tit. 10, § 598(f) (mandating that "[t]he Agency *shall issue* the cost recovery demands required under this section not later than" July 2028 (emphasis added)); Act 47 Sec. 21(b). So even the cost recovery demands cannot be treated as something "merely speculative" that "may never occur." *MTBE*, 725 F.3d at 110.

### 2. This case is prudentially ripe.

Although the Supreme Court has not yet formally discarded the prudential ripeness doctrine, it has "noted 'tension' between exercise of prudential restraint and the Court's 'recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'" *Lab. Council*, 12 F.4th at 253 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). The Supreme Court has thus cast doubt on "the continuing vitality of the prudential ripeness doctrine." *Susan B. Anthony List v.*

*Driehaus*, 573 U.S. 149, 167 (2014); *Revitalizing Auto Communities Envtl. Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021) (recognizing that the prudential ripeness doctrine may no longer be "good law" and that it at most is "a narrow exception to the strong principle of mandatory exercise of jurisdiction"). This "[c]onsideration[]," though not dispositive, "weigh[s] against deferring judicial review." *Lab. Council*, 12 F.4th at 252.

But this case is prudentially ripe anyway. First, the United States' claims are fit for review because they present purely legal questions that will not be clarified through further factual development. *See United States v. Manning*, 434 F. Supp. 2d 988, 1007–08 (E.D. Wash. 2006) (finding "no ripeness issue" in United States' preemption challenge and rejecting request to delay review until the state interpreted and implemented the statute, because "[t]he [statute] says what it says in plain, mandatory language"). "It is a legal question whether" the Superfund Act is unconstitutional and preempted, "the answer to which will not change" based on the future events identified by the Intervenors. *Variscite*, -- F.4th --, 2025 WL 2313142, at *7. Put differently, the claims "would not benefit from any further factual development" and "the court would be in no better position to adjudicate the issues in the future than it is now." *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003); *Variscite*, -- F.4th --, 2025 WL 2313142, at *6–7 (dormant Commerce Claim ripe because it raised "a legal question"); *Supreme Ct. of N.M.*, 839 F.3d at 904 (preemption claim ripe because it was a legal question that "c[ould] be resolved without further factual development"); *Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996) (constitutional claim ripe because it was "purely legal and may be decided without further factual development"); *Able v. United States,* 88 F.3d 1280, 1290 (2d Cir. 1996) (holding that constitutional challenge to statute was "ready for judicial determination" because it presented issues that were "primarily legal, and not factual, in nature").

The Intervenors offer a parade of purported contingences that, in their view, render this matter unfit for review.  *See* Int. Mem. at 19.  But the United States' claims do not turn on those contingencies (the number or identity of responsible parties, the total cost recovery, and the specific methodologies developed for carrying out the Act).  "What future contingencies remain," in other words, "are not determinative of the questions before" the Court.  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013).  Further confirming that the United States' claims are ripe, the Intervenors mostly argue that the "due process claims," the claims under the "Eighth Amendment's excessive fines clause," and the "takings claims" are unfit for review.  Int. Mem. at 21–22.  But the United States has not asserted those claims.  *See* Compl. ¶¶ 45–110.

Second, the United States would suffer hardship if Vermont could continue implementing a preempted law that usurps federal authority.  *Cf. Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024) (finding that "losing sovereign authority" tipped the scales in "balance of hardships" analysis for permanent injunction).  Vermont's ongoing violation of federal law works ongoing "concrete harm" to the United States.  *LUPE*, 604 F. Supp. 3d at 526.  In fact, *irreparable* harm to the United States necessarily results when states violate its laws.  *See, e.g.*, *New Orleans Pub. Serv., Inc. v. Council of New Orleans* (*NOPSI*), 491 U.S. 350, 366–67 (1989) (irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of" federal law (quotation marks omitted)); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds by* 567 U.S. 387 (2012) (finding irreparable harm to the United States based on preempted Arizona immigration law); *United States v. Texas*, 719 F. Supp. 3d 640, 695 (W.D. Tex. 2024) (recognizing "per se irreparable harm" to the United States when an individual state attempts to usurp federal authority and enforce preempted laws); *Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2021) (injury to "sovereign interest is necessarily

irreparable" (cleaned up)). And "the standard for ripeness requires a lesser showing of hardship" than the "irreparable harm" "standard for obtaining injunctive relief." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1385 (Fed. Cir. 2012).

The Intervenors claim that the United States cannot base hardship on the injury to its sovereignty. Int. Mem. at 25. That is incorrect, for the reasons just given. The Intervenors rely on dicta from *Texas v. United States*, 523 U.S. 296 (1998), but the quoted language fails on its own terms to support their position. There, Texas sought a declaration that the Voting Rights Act's preclearance requirement did not apply to the hypothetical future implementation of certain provisions in a state statute. *Id.* at 297. The Court held that the matter was "not fit for adjudication" because Texas's claim relied on multiple contingencies not "currently foreseen or even likely." *Id.* at 300. Alternatively, the Court reasoned that the claim was unfit for review because the issues would be "better grasped when viewed in light of a particular application" of the state statute. *Id.* at 301. As still another alternative basis for its decision, the Court noted that the "threat to federalism," which likewise hinged on contingencies, was too much of an "abstraction" to support hardship, especially when "the hardship to Texas of biding its time" was "insubstantial." *Id.* at 302. This last point—which was doubly removed from the Court's holding—is inapposite here, because Vermont's violation of federal law, which injures U.S. sovereignty, is occurring now and will persist for as long as the Superfund Act remains in effect. *See Vermont Agency*, 529 U.S. at 771.

Indeed, the Intervenors' position proves too much. If the harm to U.S. sovereignty stemming from the violation of federal law were a mere "abstraction," as the Intervenors contend, the United States would lack Article III standing in such cases—despite the mountain of precedent holding otherwise. *See supra* at 10–11. That is also why the Intervenors miss the mark when they liken the United States' sovereign interests to an individual alleging a mere "threat to personal

25

freedom." Int. Mem. at 25 (quoting *Texas*, 523 U.S. at 302). The Supreme Court has held that the former, but not the latter, is a cognizable injury sufficient to support standing (much less the hardship needed for prudential ripeness). *See, e.g.*, *Vermont Agency*, 529 U.S. at 771; *cf. also* Tara Leigh Grove, *Standing As an Article II Nondelegation Doctrine*, 11 U. Pa. J. Const. L. 781, 802 (2009) ("It has been well-established for over a century that the Executive Branch has standing to bring suit in federal court to 'see that federal law is obeyed[,]'" but "[i]t is equally well-established that private plaintiffs may not assert such an abstract grievance.").

On the flipside, "rendering an answer" on the legality of the Superfund Act now "would impose no hardship on" Vermont (or the Intervenors). *Variscite*, -- F.4th --, 2025 WL 2313142, at *7. Just the opposite: Vermont "has an interest in judicial efficiency and clarification of the law." *Cotton v. Noeth*, 96 F.4th 249, 257 (2d Cir. 2024). And even more so here—both Vermont and the Intervenors point to the alleged arduous "multi-year administrative process to implement [the Act's] mandate." Int. Mem. at 18; Mem. in Support of Vermont's Mot. to Dismiss, Dkt. 35-1, at 2 ("Vt. Mem."). As noted above, in their recent report to the State Legislature, the Agency of Natural Resources and State Treasurer requested (and received) additional time and funding for the Treasurer to prepare the cost assessment, given the "significant and consequential work" it requires. *See supra* at 21–22. Vermont thus has a substantial interest in clarifying the Superfund Act's legal validity before it devotes more time and resources (including taxpayer dollars) to the rulemaking process and cost assessment.

For all these reasons, "[p]rudence does not require a delayed adjudication in this case." *Variscite*, -- F.4th --, 2025 WL 2313142, at *7. The Court should exercise its jurisdiction and decide the merits.

**II.    The United States' Suit Is Not A Pre-Enforcement Challenge, And In Any Event, The Superfund Act Is Unlawful In All Its Applications.**

Before turning to the merits, however, Vermont and the Intervenors try to dial up the United States' burden by framing this suit as a pre-enforcement facial challenge.  *See* Vt. Mem. at 21–23; Int. Mem. at 17–18.  But this suit is not a pre-enforcement challenge.  As explained above, the United States has already sustained an injury to its sovereignty and is continuing to do so.  That injury is traceable not merely to the certainly impending cost-recovery demands but to the Superfund Act's *present* intrusion on federal authority and violation of federal law.

In all events, the Act is facially invalid.  In one respect, this suit "has characteristics of both" a facial and an as-applied challenge.  *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010); *see also* Compl. at p.28 (requesting a declaration that the Superfund Act is "unconstitutional and unenforceable . . . both facially and as applied").  The challenge could be labeled "as applied" in that it seeks to invalidate the Act to the extent it reaches beyond Vermont's borders.  If the Act could be applied *solely* to in-state emissions and conduct, Vermont's argument here, at least as to the United States' claims, would have more force.

The problem for Vermont, however, is that there is no world in which the Act's application could be cabined to purely in-state emissions and conduct—and thus it is facially invalid.  For the Act to be applied lawfully, at least two conditions would have to be met:  (1) All fossil fuel extraction and refining activities of all responsible parties would have to occur in Vermont alone; and (2) the fossil fuels extracted or refined by those entities would have to stay in Vermont, such that all emissions from their use originate in the State.  Neither of these conditions will ever hold true.

First, Vermont is not home to *any* fossil fuel extraction or refining, *see supra* at 7–8, so the Act necessarily targets out-of-state conduct, *see* Vt. Stat. Ann. tit. 10, § 596(22) (defining "[r]esponsible party" as an entity in the "business of extracting fossil fuel or refining crude oil," without

27

any requirements that the extraction and refining occur in Vermont).  Second, even if the Act applied solely to in-state extraction and refining (which again doesn't exist), it still imposes liability based on "the total quantity of greenhouse gases released into the atmosphere . . . resulting from the use of [the] fossil fuels [that were] extracted or refined"—no matter *who* uses those fossil fuels or *where* they use them.  Vt. Stat. Ann. tit. 10, § 596(7).  So liability based on out-of-state emissions is baked into the statutory scheme—and (from Vermont's perspective) good reason, as Vermont "has the lowest carbon dioxide emissions of any state in the nation." *Supra* at 8.  If the Act will be applied at all, then, it *must* be applied to emissions primarily originating outside Vermont.

The upshot is that this case "can be decided based on what we know the law does," without relying on "speculative allegations about what the law might do."  Vt. Mem. at 23.  And what we know is that the Act necessarily sweeps in out-of-state conduct and emissions, which (for all the reasons given below) makes it unlawful in every application—or facially invalid.

## III.    The Clean Air Act Preempts The Superfund Act.

Turning to the merits, the Clean Air Act preempts Vermont's attempt to impose liability for greenhouse gas emissions originating in other states.  As explained above, federal law has always occupied the field of interstate air pollution regulation.  Before the Clean Air Act, federal common law governed this area. *Milwaukee*, 406 U.S. at 103, 105 n.6; *AEP*, 564 U.S. at 421; *City of New York*, 993 F.3d at 90–95.  And "resorting to state law on a question previously governed by federal common law is permissible only to the extent authorized by federal statute." *City of New York*, 993 F.3d at 99 (cleaned up).

Far from authorizing the application of state law, the Clean Air Act "is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation" of out-of-state air pollutants. *Ouellette*, 479 U.S. at 491 (quotation marks omitted);

28

*see Arizona*, 567 U.S. at 399. What is more, state efforts to police such pollutants under their own law conflict with the Clean Air Act's text, structure, and purposes by obstructing its comprehensive framework and EPA's carefully bounded regulatory discretion. *See Arizona*, 567 U.S. at 399–400; *City of New York*, 993 F.3d at 99–100. The Clean Air Act therefore preempts the Superfund Act.

A.    **The Clean Air Act Precludes State-Imposed Liability for Out-of-State Greenhouse Gas Emissions.**

"For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91 (collecting cases). That is because "our federal system does not permit . . . controvers[ies]" that "implicat[e] the conflicting rights of States or our relations with foreign nations" (such as interstate pollution) "to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641. Instead, federal law must govern such controversies because they implicate "an overriding federal interest in the need for a uniform rule of decision" as well as "basic interests of federalism." *Milwaukee*, 406 U.S. at 105 n.6; *id.* at 105 n.6, 107 n.9 (emphasizing that the issue "demands . . . applying federal law," not the "vary-ing . . . law of the individual States"). Absent a statutory rule of decision from Congress, federal common law supplied the governing framework. *Id.* at 103, 105 n.6; *AEP*, 564 U.S. at 421; *City of New York*, 993 F.3d at 90–95.

Through the Clean Air Act, Congress supplanted federal common law with a comprehen-sive program for regulating air pollutants in the United States—including greenhouse gases such as carbon dioxide and methane—that generally allows emissions until EPA determines that one or more statutory standards for regulatory controls are satisfied. *See AEP*, 564 U.S. at 424; *City of New York*, 993 F.3d at 95–96. But that displacement of federal common law did not suddenly make state law competent to govern in this field—a field "which the states have traditionally *not* occupied." *City of New York*, 993 F.3d at 98. Instead, because the Clean Air Act operates in a

29

field—interstate air pollution—that state law has "traditionally *not* occupied," Vermont cannot "resort[] to state law" to regulate greenhouse gas emissions unless specifically "authorized by" the Clean Air Act. *City of New York*, 993 F.3d at 98–99 (cleaned up); *Ouellette*, 479 U.S. at 492. After all, the presumption against federal preemption falls away in "fields of regulation that have been substantially occupied by federal authority for an extended period of time," as is true with interstate air pollution. *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005); *United States v. Locke*, 529 U.S. 89, 108 (2000) (recognizing that in some areas "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers").

And under the Clean Air Act, only a "slim reservoir" of state authority exists in this area: State-imposed liability must be based on "the law of the pollution's *source* state." *City of New York*, 993 F.3d at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497); *see also AEP*, 564 U.S. at 429. Or said differently, at the state level, air pollutants are subject only to *source state* law—the Clean Air Act, like the federal common law that preceded it, occupies the field of *interstate* regulation and preempts any effort by a state to police out-of-state emissions under in-state law.

This rule follows from the Supreme Court's decision in *Ouellette*. At issue there was whether the Clean Water Act preempted a tort suit under Vermont law seeking relief for injuries caused by pollution emitted in New York. *Ouellette*, 479 U.S. at 484. Relying on the Clean Water Act's "comprehensive" and "pervasive regulation" of water pollution, and the reality that "control of interstate pollution is primarily a matter of federal law," the Court framed the inquiry as whether the Clean Water Act "specifically preserved" the application of state law to water pollution that originates in another state. *Id.* at 492.

The Court answered no, holding that the Clean Water Act precluded "applying the law of an affected State" to impose liability on "an out-of-state source." 479 U.S. at 494. Instead, the

Court interpreted the statute's savings clause—which permits states to adopt and enforce stricter standards than required by the Clean Water Act, 33 U.S.C. § 1370—to permit liability under state law only if "pursuant to the law of the source [s]tate," *Ouellette*, 479 U.S. at 497. A contrary rule, the Court reasoned, would "undermine" the comprehensive "regulatory structure" created by Congress in the Clean Water Act. *Id.*; *see also id.* at 493 ("if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the 'full purposes and objectives of Congress'").

Relying on *Ouellette*, the Court in *AEP* instructed lower courts to determine "the availability *vel non* of" state law liability for greenhouse gas emissions in light of the Clean Air Act's "preemptive effect." 564 U.S. at 429; *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 692–93 (6th Cir. 2015) ("Clean Water Act precedents are persuasive with respect to the Clean Air Act because many provisions in the Clean Water Act—including the savings clauses—were modeled on the Clean Air Act[.]"); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 196 (3d Cir. 2013) (finding "no meaningful difference between the Clean Water Act and the Clean Air Act for the purposes of [the] preemption analysis"); *N. Carolina, ex rel. Cooper v. TVA*, 615 F.3d 291, 306 (4th Cir. 2010) (*Ouellette*'s "holding is equally applicable to the Clean Air Act").

The Second Circuit followed that instruction in *City of New York*, holding that "the Clean Air Act does not authorize" the City to "recover damages for the harms caused by global greenhouse gas emissions . . . under New York law." 993 F.3d at 91, 99. Rather, as relevant here, the Clean Air Act's "cooperative federalist approach" authorizes application of state law in two "narrowly circumscribed" ways. *Id.* at 99–100.

First, it "permits each state to take the first cut at determining how best to achieve EPA . . . standards *within its domain*." *Id.* at 99 (cleaned up); 42 U.S.C. §§ 7410, 7411(d). Second,

its two savings clauses, which are "nearly identical [to the] savings clauses in the Clean Water Act," "permit states to create and enforce their own emissions standards applicable to *in-state polluters*." *City of New York*, 993 F.3d at 99 (emphasis added); 42 U.S.C. § 7604(e) ("Nothing in this section shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief"); *id.* § 7416 (states may "adopt or enforce" emissions standards so long as they are not "less stringent" than federal standards).

So like the Clean Water Act, the Clean Air Act's savings clauses "permit only [state-imposed liability] under 'the law of the pollution's *source* state.'" *City of New York*, 993 F.3d at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497). And that makes sense, as such regulation would still be *intrastate* in nature—the polluter need only answer to source-state law. Because the City sought to impose "New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world," the court held that the Clean Air Act preempted the claims. *Id.*

### B.    The Superfund Act Impermissibly Imposes Liability under Vermont Law for Out-of-State Greenhouse Gas Emissions.

#### 1.    The Act impermissibly regulates in the field of interstate greenhouse gas emissions.

The same analysis and result follow here. Given the inherently federal nature of the issue and the national concerns it implicates, *see supra* at 2–3, 29–30, the Clean Air Act must affirmatively "authorize" state regulation of interstate air pollution, *City of New York*, 993 F.3d at 99 (cleaned up); *see Ouellette*, 479 U.S. at 492; *Illinois v. City of Milwaukee*, 731 F.2d 403, 411 (7th Cir. 1984). And as with the state tort suit in *City of New York*, the Superfund Act "does not seek

to take advantage of th[e] slim reservoir of state" regulation authorized by that statute in this area. *City of New York*, 993 F.3d at 100.

The Superfund Act instead openly regulates interstate air emissions, which is a field that has always been occupied by federal law, both before and after the Clean Air Act was enacted, because of our constitutional structure and the inherently national (indeed, global) nature of the issue. The Superfund Act's plain text gives away the game by unabashedly targeting "the total quantity of greenhouse gases released into the atmosphere . . . resulting from the use of fossil fuels extracted or refined by an entity during the covered period." Vt. Stat. Ann. tit. 10, § 596(7). Nothing in that definition limits the scope of the Act to emissions originating in Vermont. This is why no one—not Vermont, not the Intervenors—disputes that the Act applies to out-of-state emissions. That ends this case.

Vermont and the Intervenors resist this inescapable conclusion, contending that *City of New York*'s affirmative-authorization rule does not apply here because (1) federal law does not supplant state *statutes* like the Superfund Act in the first place, and (2) the Superfund Act does not intrude on the operative field because it does not *regulate* interstate pollution. *See* Vt. Mem. at 33; Int. Mem. at 34. They are wrong on both scores.

On the first point, neither Vermont nor the Intervenors cite a single case holding—or even suggesting—that the source of state law matters to whether "our federal system . . . permit[s] the controversy to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641. That is no surprise, as the "overriding federal interest in the need for a uniform rule of decision" on interstate pollution does not somehow vanish when dealing with state statutes rather than common-law rules. *Milwaukee*, 406 U.S. at 105 n.6. To the contrary, "varying" state statutory law, no less than "the varying common law of the individual States," would undermine the substantial federal interest in

33

a "uniform standard" in this area. *Id.* at 107 n.9 (quotation marks omitted). This is why the Supreme Court has made clear that when federal common law applies, "*state statutes* or decisions are not conclusive." *Id.* at 105 (emphasis added); *see also City of New York*, 993 F.3d at 89 ("whether the water of an interstate stream must be apportioned between two states is a question of federal common law upon which neither the statutes nor the decisions of either state can be conclusive" (cleaned up)).

If more were needed, the Superfund Act is a carbon copy of the common-law action rejected in *City of New York*. Just like the Superfund Act, the City had "requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property." *City of New York*, 993 F.3d at 88. And just like the Superfund Act, "the goal of [the City's] lawsuit" was to "impose strict liability for the damages caused by fossil fuel emissions." *Id.* at 93. If Vermont could so easily skirt binding precedent by codifying a common-law standard in a statute, this area of law would turn into little more than an exercise in artful pleading. *Cf. id.* at 91.

Traditional preemption principles confirm that the result is the same regardless whether a state imposes liability through a common-law action, as in *City of New York*, or by doing the same thing through a statute, as here, because preemption is based on the *federal* laws in question—the source of the preempted state law is irrelevant unless Congress intended otherwise. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (holding that preemption provision applied to both state statutes and common-law claims); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522 (1992) (same); *Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*, 981 F.2d 1177, 1179 (10th Cir. 1993) (same preemption analysis because "[t]he objectives of the common law duty and a regulatory statute [we]re the same").[4]

---

[4] Vermont and the Intervenors make much of the supposedly "narrow" scope of federal common law. *See* Vt. Mem. at 33; Int. Mem. at 34–36. Even so, absent the Clean Air Act and Clean Water

34

Vermont and the Intervenors fare no better in attempting to sidestep *City of New York* by claiming that the Superfund Act does not intrude on the field of interstate pollution regulation because it does not regulate interstate air emissions or impose pollution control standards. *See* Vt. Mem. at 33–34, 36; Int. Mem. at 32, 37–39. Here again, *City of New York* resolves this question. There, the City made the same argument, namely, that "because it [sought] damages—not abatement or the imposition of pollution standards—its claims d[id] not threaten to regulate emissions at all." *City of New York*, 993 F.3d at 92. The Second Circuit held this argument "ignores economic reality," because "'regulation can be effectively exerted through an award of damages,' and 'the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *Id.* (quoting *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012)); *see also id.* ("[A] substantial *damages award* like the one requested by the City would effectively *regulate* the Producers' behavior far beyond New York's borders." (emphasis added)); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 & n.17 (1996) ("Regulation can be as effectively exerted through an award of damages as through some form of preventive relief." (cleaned up)).[5]

If anything, the Superfund Act is an "even more ambitious" regulatory scheme than "a standard of care or emission restrictions" because it "impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or

---

Act, federal common law would govern interstate air and water pollution under well-settled law. *AEP*, 564 U.S. at 421; *Ouellette*, 479 U.S. at 487; *Milwaukee*, 406 U.S. at 103; *City of New York*, 993 F.3d at 91–92. So the only question is whether federal law treats state statutes differently than state common law. For the reasons stated, it does not.

[5] Thus, it is simply false that the Second Circuit, in holding that the City sought to regulate emissions, relied on the City's request for an injunction. *See* Int. Mem. at 37; Vt. Mem. at 34 & n.24. The entire analysis was about the regulatory effect of a damages award; the requested injunctive relief—which would kick in *only if the defendants failed to pay damages*—played no role in the analysis, which is why the court relegated mention of it to a footnote. *See City of New York*, 993 F.3d at 92–93 & n.5.

who released them),” requiring producers “to cease global production altogether” if they wish “to avoid all liability.” *City of New York*, 993 F.3d at 93 (holding that the City was trying to regulate emissions even though it was “not expressly seeking to impose a standard of care or emission restrictions”). So “regardless of whether the” stated “purpose of” the Act is “compensatory or regulatory,” it still forces fossil fuel businesses “to adopt different or additional means of pollution control from those required by the” Clean Air Act. *Ouellette*, 479 U.S. at 498 n.19; *City of New York*, 993 F.3d at 93, 96 (noting that “an action for damages . . . would have the same practical effect” as “an action for injunctive relief against the Producers to stop them from producing fossil fuels”).

Vermont’s and the Intervenors’ repeated refrain that the Superfund Act is “retroactive” and imposes no “ongoing duty” changes nothing. Vt. Mem. at 34; Int. Mem. at 37–39. The potential damages award in *City of New York* was also retroactive, and the court did not rely on the presence or absence of an ongoing duty. Besides, this argument is too clever by half. If Vermont and the Intervenors are right that the Superfund Act is not regulatory simply because it is retroactive, Vermont would have free rein to extend the covered period in perpetuity, so long as that period always ends before the present day. That reality, along with the prospect of other states enacting similar laws, would force producers to alter their conduct accordingly. *Cf. City of New York*, 993 F.3d at 93 (relying on “common sense and basic economics” in determining that the City could regulate conduct through a retroactive damages award). Although the Intervenors object to considering such “‘hypothetical or imaginary cases’ in deciding a facial preemption challenge,” Int. Mem. at 38 (citation omitted), these considerations go to whether the Act in fact regulates conduct on its face, not to whether a particular application of the statute is lawful or unlawful.

36

For all these reasons, *City of New York* controls this case and requires that the Clean Air Act affirmatively *authorize* the Superfund Act (which it doesn't). 993 F.3d at 99. Because there is no starting assumption that states' historic police powers govern interstate pollution, *City of New York*, 993 F.3d at 98; *Locke*, 529 U.S. at 108, Vermont's and the Intervenors' traditional preemption arguments are beside the point, *see* Vt. Mem. at 35–42; Int. Mem. at 26–33.

At any rate, Vermont and the Intervenors also go wrong by maintaining that the Superfund Act is not field preempted under traditional preemption principles. Both argue that the Clean Air Act's "cooperative federalism" model leaves room for supplemental state regulation. *See* Vt. Mem. at 36 (citing savings clause); Int. Mem. at 33 (same). But again, the Clean Air Act carves out a "narrowly circumscribed" role for state regulation, "permit[ting] states to create and enforce their own emissions standards applicable to *in-state* polluters." *City of New York*, 993 F.3d at 99–100 (emphasis added); *see also supra* at 31–32. As for *out-of-state* polluters—that is, *interstate* regulation—the Clean Air Act occupies the field. *City of New York*, 993 F.3d at 100.

Vermont adds that the Supreme Court's decision in *West Virginia v. EPA* "made clear the Clean Air Act does not occupy that field." Vt. Mem. at 37. That decision said nothing of the sort. It merely held that Section 111 of the Clean Air Act did not authorize EPA to "devise carbon emissions caps based on a generation shifting approach," which would have required transforming electricity generation at power plants from high-emitting sources to lower-emitting sources. *W. Virginia v. EPA*, 597 U.S. 697, 732 (2022). By striking down a particular method of regulating carbon emissions, the Court in no way suggested that the field is open to state regulation (much less that the Clean Air Act *authorizes* such regulation).

In sum, Vermont "intends to hold [businesses] liable, under [Vermont] law, for the effects of emissions made around the globe over the past [three decades]." *City of New York*, 993 F.3d at

92. Because such a "sprawling [scheme] is simply beyond the limits of state law," it is preempted on this basis alone. *Id.*; *see also id.* at 98 (stressing that state law is not "competent to address out-of-state greenhouse gas emissions"); *Ouellette*, 479 U.S. at 492 ("the control of interstate pollution is primarily a matter of federal law").

### 2.    The Superfund Act conflicts with the Clean Air Act.

The Superfund Act also conflicts with the text, structure, and purposes of the Clean Air Act. *Ouellette*, 479 U.S. at 494; *City of New York*, 993 F.3d at 100. As explained, "[t]he Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions.'" *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428). EPA is thus responsible for deciding whether and how to regulate such emissions on a nationwide basis. *AEP*, 564 U.S. at 426. This is no small task, as determining the "appropriate amount of regulation in any particular greenhouse gas-producing sector" requires "informed assessment of competing interests." *Id.* at 427. On the one hand is "the environmental benefit potentially achievable," and on the other is "our Nation's energy needs and the possibility of economic disruption." *Id.* Through the Clean Air Act, Congress "entrust[ed] such complex balancing to EPA in the first instance." *Id.*

The Superfund Act thwarts the discretion Congress gave EPA to balance environmental, economic, and energy concerns in regulating air pollutants. *Id.*; *City of New York*, 993 F.3d at 93. The Clean Air Act grants EPA authority to set nationwide standards, based on its expert judgment, when it determines that emissions meet applicable statutory standards for regulation. And when EPA makes that determination, the Clean Air Act provides detailed instructions on the nature of resulting regulations and relevant considerations. *See, e.g.*, *AEP*, 564 U.S. at 424. Vermont,

through the Superfund Act, wrests that authority from EPA by imposing its own nationwide stand-ard of retroactive strict liability for harms allegedly tied to global emissions, a standard neither Congress nor EPA authorized. *See* 42 U.S.C. § 7401(a)(3) (specifying "air pollution control at its source," not by imposing retroactive liability for out-of-state emissions).

Vermont and the Intervenors suggest that EPA's proposed rescission of certain greenhouse gas emissions standards may alter the preemption analysis. *See* Vt. Mem. at 37–38; Int. Mem. at 32 n.32. Not so. For one, *proposed* rules have no legal force; EPA has yet to take final action on any of the potential changes and rationales set out in the proposals. For another, the Superfund Act purports to regulate fossil-fuel production, and nothing in EPA's proposed rescissions would change anything about EPA's separate regulation of fuels or fuel production under distinct Clean Air Act authorities. *See, e.g.*, 42 U.S.C. §§ 7545 ("Regulation of Fuels"), 7546 ("Renewable Fuel"); *see also Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 162 (D.C. Cir. 2025) (Con-gress created EPA's renewable fuels program to "promote renewable energy and lower greenhouse gas emissions by requiring the petroleum industry to introduce increasing volumes of renewable fuel."). For still another, the proposed rules do not—and could not—alter *Massachusetts v. EPA*'s holding that four greenhouse gases, including carbon dioxide and methane, are "air pollutant[s]" under the Clean Air Act, 549 U.S. 497, 528–29 (2007), which puts "the decision whether and how to regulate" greenhouse gas emissions "within EPA's regulatory ken," *AEP*, 564 U.S. at 416, 426. Indeed, "[t]he Clean Air Act . . . permits emissions *until* EPA acts," so even if EPA were "to decline to regulate [greenhouse gas] emissions altogether," states would still "have no war-rant . . . to upset the Agency's expert determination." *Id.* at 426; *see also Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978) (state law preempted "where failure of federal officials affirmatively to

exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute" (cleaned up)).

More fundamentally, even if Congress had *barred* EPA from regulating interstate emissions of carbon dioxide, methane, or other greenhouse gases under the Clean Air Act, state law would still have no role to play. After all, it would be "too strange to seriously contemplate" that state law "suddenly become[s] presumptively competent to address [an] issue[] that demand[s] a unified federal standard simply because Congress" chose not to regulate in that area. *City of New York*, 993 F.3d at 98–99. Again, interstate air pollution is an inherently federal question necessarily governed by federal law, and however one interprets the Clean Air Act, it plainly does not "authorize" resort to *state law* to regulate out-of-state greenhouse gas emissions. *Id.* at 99.

The Superfund Act conflicts with the Clean Air Act in other ways as well. For example, the Superfund Act clashes with the Clean Air Act's comprehensive system for regulating cross-boundary air pollution, under which each state is alone responsible for controlling air pollution within its borders. *See* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution control *at its source* is the primary responsibility of States and local governments." (emphasis added)). Congress added to the Clean Air Act's National Ambient Air Quality Standards ("NAAQS") program the "Good Neighbor Provision"—which requires upwind states to reduce emissions that affect air quality in downwind states, *id.* § 7410(a)(2)(D)(i)—precisely *because* downwind states "lack authority to control" the "influx of out-of-state pollution," *EPA v. EME Homer City Generation*, 572 U.S. 489, 495 (2014); *see also id.* (observing that the Good Neighbor Provision addresses "a complex problem: air pollution emitted in one State, but causing harm in other States").

The Clean Air Act thus contemplates no role for states reaching out and applying their law in *other* states. Rather, the Clean Air Act affords affected states specific avenues for voicing their

cross-boundary pollution concerns to EPA—for example, by petitioning EPA for action on inter-state pollution after the agency has identified a criteria pollutant under the NAAQS program. *See, e.g.*, 42 U.S.C. § 7506a(a) (permitting states to petition EPA when "interstate transport of air pol-lutants" from other states contributes to a violation of a NAAQ standard in the petitioning state); *id.* § 7426(b) (similar). Allowing states to regulate out-of-state emissions in other ways works an end-run around these statutory provisions and clashes with the text, structure, and objectives of the Clean Air Act by "undermin[ing] [its] carefully drawn" terms. *Ouellette*, 479 U.S. at 494; *City of New York*, 993 F.3d at 100.

Consider, too, if laws like the Superfund Act were upheld. The Act provides a blueprint for other states to enact their own liability regimes—indeed, New York has already enacted a sim-ilar law, and several other states are considering their own legislation. *See supra* at 15 & n.2. If the fifty states (and the thousands of political subdivisions within them) could apply their own laws in this area, the Nation would be left with a chaotic patchwork of conflicting regulations—some states would regulate more, some less—that undermine the Clean Air Act's integrated ap-proach to air pollution control and regulation. *See Ouellette*, 479 U.S. at 496–97 ("For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states" and produce "an irrational system of regulation." (cleaned up)); *City of New York*, 993 F.3d at 90–95.

Such chaos would also enable Vermont and other states to "do indirectly what they could not do directly—regulate the conduct of out-of-state sources" through the imposition of crippling liabilities, thereby forcing out-of-state companies to "change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495. And

"these liabilities would attach even though the source had complied fully with its state and fed-
eral . . . obligations." *Id.* That dynamic would "undermine [the] regulatory structure" of the Clean
Air Act and "effectively override . . . the policy choices made by" the federal government and
other states, *id.* at 495–97, not to mention throttle national energy production.

*    *    *

Whether conceived as field preemption, conflict preemption, or a preemption rule specific
to interstate pollution, the result is the same: The Clean Air Act bars the Superfund Act's attempt
to police out-of-state greenhouse gas emissions under in-state law.

## IV.    The Superfund Act Exceeds Constitutional Limits On Extraterritorial Regulation.

Clean Air Act aside, the Superfund Act exceeds the legitimate reach of Vermont's legisla-
tive power. As explained above, Vermont's extraterritorial regulation of greenhouse gas emissions
flies in the face of our constitutional structure, which "does not permit" interstate (and global)
pollution to be governed "under state law." *Tex. Indus.*, 451 U.S. at 641; *see supra* at 2–3, 29–30.
More generally, the Constitution limits the ability of states to prescribe rules that govern conduct
beyond their "territorial limits." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1
(2023) (recognizing such limits "under the Constitution's horizontal separation of powers").

### A.    State Law Cannot Govern Out-of-State Greenhouse Gas Emissions.

"[T]he basic scheme of the Constitution" forecloses Vermont's attempt to apply in-state
law to emissions emanating beyond its borders. *AEP*, 564 U.S. at 421. Federal law must govern
air pollution in its "ambient or interstate aspects," *Milwaukee*, 406 U.S. at 103, because "a federal
rule of decision is necessary to protect uniquely federal interests," including "the conflicting rights
of States" and "our relations with foreign nations," *Tex. Indus.*, 451 U.S. at 640–41 (cleaned up);
*City of New York*, 993 F.3d at 91–92 (stressing "the overriding need for a uniform rule of decision

42

on matters influencing national energy and environmental policy" (cleaned up)); *see supra* at 2–3, 29–30. In other words, the "interstate" and "international nature of" global greenhouse gas emissions "makes it inappropriate for state law to control" in this area. *Tex. Indus.*, 451 U.S. at 641; *EME Homer City Generation*, 572 U.S. at 495 (states "lack authority to control" "out-of-state pollution").

It therefore follows, as night follows day, that the Superfund Act is an unconstitutional extraterritorial extension of state law. Vermont seeks to penalize emissions emanating "simultaneously across just about every jurisdiction on the planet," not just emissions within the state. *City of New York*, 993 F.3d at 92; Vt. Stat. Ann. tit. 10, § 596(7). Under our constitutional structure, that effort "is simply beyond the limits of state law." *City of New York*, 993 F.3d at 92; *supra* at 2–3, 29–30.

Vermont misses the point when it faults the United States for allegedly failing to "identify" a specific "constitutional provision that preempts the Act." Vt. Mem. at 24. The cases it cites involved ordinary statutory preemption questions. *See Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011) (considering whether federal immigration law preempted a state statute); *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019) (Gorsuch, J., in lead opinion) (considering whether "the federal Atomic Energy Act preempts a state law banning uranium mining"). And neither decision casts any doubt on the longstanding principle that "the basic scheme of the Constitution" requires that certain subjects be governed by federal law. *AEP*, 564 U.S. at 421; *Tex. Indus.*, 451 U.S. at 641. As case after case has affirmed (and reaffirmed), one of those subjects is interstate pollution. *See, e.g.*, *AEP*, 564 U.S. at 421; *Ouellette*, 479 U.S. at 487–88, 492; *Milwaukee*, 406 U.S. at 103, 107 n.9; *City of New York*, 993 F.3d at 91–92 (collecting cases).[6]

---

[6] Federal law governs here not because of some "brooding" policy interest (Vt. Mem. at 24), but because the issue "implicate[s] two federal interests that are incompatible with the application of

43

**B.    The Constitution Broadly Imposes Territorial Limits on the Exercise of State Power.**

**1.**   More generally—putting aside the inherently federal nature of interstate pollution—"[s]tate sovereign authority is bounded by the States' respective borders." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025); *Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 978 F.3d 829, 836 (2d Cir. 2020) ("the boundaries of a state's territory . . . generally limit the reach of the state's sovereign powers"). "Each State's equal dignity and sovereignty under the Constitution implies certain constitutional limitations on the sovereignty of all of its sister States." *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 245 (2019). Thus, states' retention of "autonomy . . . within their respective spheres" necessarily means that any one state may not deliberately "project its legislation" into the territory of another. *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489–90 (4th Cir. 2007) (first quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935), then quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336–37 (1989)).

This rule against extraterritorial regulation flows from the "horizontal separation of powers" and is thus "implicit in [the Constitution's] structure." *Pork Producers*, 598 U.S. at 376 n.1; *Hyatt*, 587 U.S. at 247–48 (collecting "constitutional doctrines that are not spelled out in the Constitution" but are "historically rooted [and] embedded in the text and structure of the Constitution"). But it also finds expression in certain constitutional provisions, including the Commerce Clause and the Fourteenth Amendment's Due Process Clause. *See Pork Producers*, 598 U.S. at 376; *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154–55, 157–59 (2023) (Alito, J., concurring in part); *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255,

---

state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *City of New York*, 993 F.3d at 91–92 (quoting *Milwaukee*, 406 U.S. at 105 n.6); *accord Tex. Indus.*, 451 U.S. at 640–41.

44

263 (2017); *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236–37 (11th Cir. 2001).

For example, the Commerce Clause bars "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336–37. Or said another way, it "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (plurality op.). So state laws are invalid if they have "the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021) (quotation marks omitted).

Similarly, under the Due Process Clause, "a state is without power to exercise 'extraterritorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries," *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70–71 (1954), especially when a state wields its own law to "punish a defendant for conduct that may have been lawful where it occurred," *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003); *Gore*, 517 U.S. at 572 ("a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States").[7] Still other provisions—such as the Import-Export Clause, the Privileges and Immunities Clause, and the Full Faith and Credit Clause—reflect constitutional limits on extraterritorial lawmaking. *See Pork Producers*, 598 U.S. at 408–09 (Kavanaugh, J., concurring in part and dissenting in part).

---

[7] Vermont tries to distinguish *Campbell* and *Gore* by asserting that the Superfund Act is merely "compensatory" and "does not seek to punish or alter any conduct." Vt. Mem. at 26. For reasons explained above, this argument falls flat. *See supra* at 35–36 (explaining why the Superfund Act is not merely compensatory but also *regulatory*).

45

**2.**  Vermont and the Intervenors dispute the propriety of a standalone extraterritoriality claim that isn't pegged to a specific constitutional provision.  *See* Vt. Mem. at 25; Int. Mem. at 40.  But "[t]o resolve disputes about the reach of one State's power," the Supreme Court often invokes "the Constitution's structure and the principles of sovereignty and comity it embraces," rather than relying solely on "the Constitution's express provisions."  *Pork Producers*, 598 U.S. at 376 (cleaned up); *see also id.* at 375 (observing that "courts must sometimes referee disputes about where one State's authority ends and another's begins—both inside and outside the commercial context"); *Mallory*, 600 U.S. at 154 (Alito, J., concurring in part) (that a state may not legislate extraterritorially "is not confined to any one clause or section" of the Constitution, "but is expressed in the very nature of the federal system that the Constitution created"); *accord New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).  That is why the Supreme Court has recognized "territorial limits" on "state authority under the Constitution's horizontal separation of powers."  *Pork Producers*, 598 U.S. at 376 n.1.

In fact, the position of Vermont and the Intervenors (again) "proves too much."  *Hyatt*, 587 U.S. at 247.  "There are many other constitutional doctrines that are not spelled out in the Constitution but are nevertheless implicit in its structure and supported by historical practice—including, for example, judicial review; intergovernmental tax immunity; executive privilege; executive immunity; and the President's removal power."  *Id.* at 247–48 (citations omitted).  "Like these doctrines," the rule against extraterritorial regulation "is a historically rooted principle embedded in the text and structure of the Constitution."  *Id.* at 248.

Still, the Court could also ground the United States' extraterritoriality claim in the Commerce Clause or the Due Process Clause.  And although Vermont insists that "[t]here is no freestanding 'extraterritoriality' claim under the dormant Commerce Clause," Vt. Mem. at 55, binding

precedent says otherwise, *Healy*, 491 U.S. at 336–37; *Edgar*, 457 U.S. at 642–43; *Grand River*, 988 F.3d at 123; *see also Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025).

### C.    The Superfund Act Directly Regulates Conduct Outside Vermont that Bears No Discernible Connection to the State.

The Superfund Act is a textbook example of unconstitutional extraterritorial legislation. Far from incidentally affecting extraterritorial activity by regulating in-state sales, *see Pork Producers*, 598 U.S. at 374–76 & n.1, the Superfund Act on its face targets "the total quantity of greenhouse gases released into the atmosphere . . . resulting from the use of fossil fuels extracted or refined by" certain producers over the past three decades, and it holds those producers strictly liable for these worldwide emissions.  Vt. Stat. Ann. tit. 10, § 596(7).  The Act's universal reach necessarily means that Vermont has "projected its legislation into other States, and *directly regulated* commerce therein," *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (cleaned up), even if the activity was legal where it occurred, *see Ouellette*, 479 U.S. at 495; *Campbell*, 517 U.S. at 572.

In other words, the Act, on its face, does not merely have "extraterritorial effect," Vt. Mem. at 27; it exerts direct "extraterritorial control" over "commerce occurring entirely outside the boundaries of" Vermont, *Grand River*, 988 F.3d at 123, which is even more obvious given Vermont's complete lack of in-state fossil fuel production and relatively low emissions, *see supra* at 7–8.  This extraterritorial reach is per se unlawful and precluded by the Constitution because it intrudes into an inherently federal area necessarily governed by federal law.  *See supra* at 43.

But it is also unlawful because the regulated conduct bears no discernible connection to Vermont.  *See Pork Producers*, 598 U.S. at 376 n.1; *Edgar*, 457 U.S. at 642.  Although the Supreme Court  has recognized cases in which "a person acting outside the State may be held responsible according to the law of the State for injurious consequences within it," *Young* v. *Masci*, 289

47

U.S. 253, 259 (1933), that exception applies only when there is a direct and traceable connection between the out-of-state conduct and the in-state harm, *see id.* at 256 (owner of a car in one state allowed someone else to drive the car into another state, where the driver struck a man with the car).

Here, no such connection exists. Vermont alleges that fossil-fuel activities around the world have caused injuries to the State and its residents—and it claims that the Superfund Act's "cost recovery demands are tied concretely and directly to [those] in-state harms." *See* Vt. Mem. at 3–5, 26; Vt. Stat. Ann. tit. 10, § 599c. But the medium allegedly transmitting those injuries is the Earth's entire atmosphere, where "[g]reenhouse gases once emitted 'become well mixed,'" making it impossible to trace any particular activity outside Vermont to any particular injury within it. *AEP*, 564 U.S. at 422 (citation omitted); *City of New York*, 993 F.3d at 92 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere." (record citation omitted)). Indeed, Vermont cannot trace its asserted injuries to any specific source of emissions—let alone to the specific extraction and refining activity that is even further down the alleged causal chain. After all, the mixing of greenhouse gases in the atmosphere means that "emissions in New Jersey may contribute no more to flooding in [Vermont] than emissions in China." *AEP*, 564 U.S. at 422.

Thus, contrary to Vermont's assertion of a "concrete[] and direct[]" nexus (Vt. Mem. at 26), any connection between a company's out-of-state conduct and any alleged injury within Vermont is far too attenuated to support the Act's universal reach. If such an indirect and untraceable chain of causation were enough to justify applying a state's laws extraterritorially, there would be no real limit on state authority to reach out-of-state conduct.[8]

---

[8] The Constitution likewise precludes Vermont's attempt to reach fossil-fuel activities outside the United States altogether. "The Constitution confers upon the Federal Government—and it alone—

48

Because the Superfund Act penalizes companies for out-of-state fossil fuel production and greenhouse gas emissions without linking any specific production or emissions to in-state harm, the Act will necessarily "*directly* regulate[] out-of-state [activity] by those with no [relevant] connection to the State." *Pork Producers*, 598 U.S. at 376 n.1; *Edgar*, 457 U.S. at 641–43 (holding unenforceable an Illinois law that "directly regulate[d] transactions which [took] place . . . wholly outside the State" and involved individuals "having no connection with Illinois"); *Am. Booksellers*, 342 F.3d at 103–04 (the "boundary-less nature" of an issue "makes state regulation impracticable").

This is so despite the Act defining responsible parties to "not include any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." Vt. Stat. Ann. tit. 10, § 596(22). That provision does not solve the problem of the Act's unconstitutional extraterritorial reach, as the Act still "impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *City of New York*, 993 F.3d at 93. So even if an entity had sufficient contacts with Vermont to satisfy personal jurisdiction, applying the Act to that entity would still exceed the territorial limits of state authority under the Constitution because the Act by its plain terms imposes liability for out-of-state conduct in violation of the Constitution's horizontal separation of powers. In any event, the Act does nothing to limit liability to activities that arise from or relate to a company's Vermont contacts. *See Gerling Global*, 267 F.3d at 1238 (noting that the court "must look not only at whether the parties regulated by the Act have contacts with [the forum], but also and more importantly here at whether the *subject* about which this Act [regulates] has a sufficient nexus to

_____

both nationwide and extraterritorial authority." *Fuld*, 606 U.S. at 15. Accordingly, Vermont can no more invoke state law to reach conduct in a foreign country than it can to reach conduct in another state.

49

[the forum]"). Nor could it—Vermont lacks in-state fossil fuel extraction and refining, and for the reasons just discussed, it is impossible to trace specific fossil fuel production and use outside Vermont to alleged in-state harm.

*     *     *

Consider the upshot of Vermont's position. If the Superfund Act is permissible, then nothing prevents other states from enacting identical laws. The ensuing balkanization—whereby states impose crippling costs on lawful energy production in other states—would destroy the national market for energy and nullify Congress's power over interstate commerce, all while bankrupting the Nation's largest energy producers. *See Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979) (noting that the Framers of the Constitution sought "to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation"); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 190 (1824) ("The power over commerce . . . was one of the primary objects for which the people of America adopted their government[.]"); *Pork Producers*, 598 U.S. at 404 (Kavanaugh, J., concurring in part and dissenting in part) (explaining that "the Framers . . . adopted a new Constitution" to "create a national economic market and overcome" the "state interference with interstate commerce" that "was cutting off the lifeblood of the Nation").

Fortunately, the Constitution does not condemn our Nation to such a fate. True, "our constitutional order . . . allows different communities to live with different *local* standards." *Pork Producers*, 598 U.S. at 375 (cleaned up, emphasis added). But whatever Vermont's desired energy policy, the Constitution forbids it from imposing its preferences on *other* states. While "Congress has ample authority to enact such a policy for the entire Nation, it is clear that no single [s]tate" like Vermont can do so. *Gore*, 517 U.S. at 571 (footnote omitted).

50

## V.    The Foreign Affairs Doctrine Preempts The Superfund Act.

Vermont's attempt to globalize its regulatory reach also collides with the Foreign Affairs Doctrine.  Under that doctrine, a state law is conflict-preempted "when it conflicts with an express federal foreign policy."  *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012) (en banc) (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003)); *accord In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 117–19 (2d Cir. 2010).  And "even in the absence of any express federal policy," a state law is field-preempted "if it intrudes on the field of foreign affairs without addressing a traditional state responsibility."  *Movsesian*, 670 F.3d at 1072; *Zschernig v. Miller*, 389 U.S. 429, 441 (1968) (a state cannot "establish its own foreign policy").  That is because "the Constitution entrusts foreign policy exclusively to the National Government."  *Garamendi*, 539 U.S. at 419 n.11.

The Act fails on both scores.  It clashes with "our nation's foreign policy goals" and "circumvent[s] Congress's" and the President's "own expectations and carefully balanced scheme of international cooperation on a topic of global concern."  *City of New York*, 993 F.3d at 103; Landau Decl. ¶¶ 14–20 (explaining how the Superfund Act conflicts with U.S. foreign policy); SUMF ¶ 21.  And it fails to address a traditional state responsibility, instead regulating "a uniquely international problem of national concern" that is "not well-suited to the application of state law."  *City of New York*, 993 F.3d at 85–86.  The Foreign Affairs Doctrine therefore preempts it.

### A.    The Superfund Act Clashes with U.S. Foreign Policy.

State law is preempted when there is a "likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy."  *Garamendi*, 539 U.S at 420.  Because foreign affairs is the "exclusive responsibility" of the National government, *Hines*

51

*v. Davidowitz*, 312 U.S. 52, 63 (1941), the threshold for establishing such conflict is low. That threshold is easily met here.

To begin, the Superfund Act is "out of place given that Congress created a comprehensive scheme designed to address greenhouse gas emissions—the Clean Air Act—which it declined to extend beyond our borders." *City of New York*, 993 F.3d at 103. Because "the Clean Air Act contemplates the need for foreign nations to promulgate reciprocal legislation," the Superfund Act "circumvent[s] Congress's own expectations and carefully balanced scheme of international co-operation on a topic of global concern." *Id.* Indeed, in the Global Climate Protection Act, Congress declared that the United States should "work toward multilateral agreements" on greenhouse gas emissions, with a "coordinated national policy," including in the international arena. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901; Landau Decl. ¶ 4; SUMF ¶¶ 10–11. The Superfund Act—and the state-by-state regulatory regime it helps create—is the antithesis of a "coordinated national policy."

To get around this problem, Vermont describes the Act at a highly specific level of generality: There is no foreign affairs preemption here, Vermont argues, because "[n]o federal foreign policy prohibits what [the Act] does, which is to secure payments from fossil fuel producers with Vermont impacts to help fund in-state climate adaptation projects." Mem. at 29; *see also* Int. Mem. at 41–46 (same). But Vermont's attempt to manipulate the level of generality mirrors what the City of New York tried (and failed) to do by saying its tort suit concerned only "'the production, promotion, and sale of fossil fuels,' not the regulation of [global] emissions." *City of New York*, 993 F.3d at 91. Just as the Second Circuit rejected the City's "[a]rtful pleading," so this Court should reject Vermont's artful framing and recognize the Superfund Act for what it is: a liability

52

scheme that regulates "global greenhouse gas emissions" and thus squarely implicates U.S. foreign policy. *Id.* at 91, 103.

In fact, the Act "directly conflicts with . . . U.S. foreign policy in multiple respects." Landau Decl. ¶ 15; SUMF ¶ 21. It exacerbates the national energy emergency by imposing crushing penalties on global energy production, "thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy" and the President's express determination that more production is imperative to our national security and foreign policy. Landau Decl. ¶¶ 12–13, 15; SUMF ¶¶ 18–21. It undercuts the United States' policy decision to abstain from restrictive measures to reduce global greenhouse gas emissions. Landau ¶ 17; SUMF ¶ 21; 90 Fed. Reg. at 8,455 (directing withdrawal from the Paris Agreement); S. Res. 98, 105th Cong. (1997) (disapproval of Kyoto Protocol); *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 66 (2002) (reasoning that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated"). "It hampers what President Trump has lauded as the ability of the United States to 'grow its economy and maintain jobs for its citizens while playing a leadership role in global efforts to protect the environment.'" Landau Decl. ¶ 19 (quoting 90 Fed. Reg. at 8,455); SUMF ¶ 21. And it penalizes productive activities in foreign countries despite the President's judgment that energy is such a critical piece of our national security and foreign policy that he exempted it from reciprocal tariffs imposed on U.S. trading partners. 90 Fed. Reg. at 15,045–46.

But the conflict doesn't stop there. When it comes to international cooperation, the Superfund Act "bypass[es] the various diplomatic channels that the United States uses to address" global greenhouse gas emissions, *City of New York*, 993 F.3d at 103, and compromises the Nation's capacity to "speak . . . with one voice" on the world stage, *Crosby v. Nat'l Foreign Trade Council*,

53

530 U.S. 363, 381 (2000). For example, Vermont seeks to regulate global greenhouse gas emissions by circumventing the Framework Convention and "employ[ing] a different, state system of economic pressure" on energy companies. *Garamendi*, 539 U.S. at 423–24 (cleaned up). The Superfund Act also "harms the federal government's capacity to speak with one voice when conducting commercial and political relations with foreign governments on issues such as climate change, regulation of greenhouse gas emissions, energy production, and national security." Landau Decl. ¶ 19; SUMF ¶ 21. On this score, the Act seeks to regulate global greenhouse gas emissions despite the United States having made foreign policy decisions to address that issue of global concern through a purpose-built international agreement—the Framework Convention—and to refrain from participating in certain other international efforts to do the same. Landau Decl. ¶ 17 (explaining that the Superfund Act "interferes with . . . the United States' participation in the Framework Convention and announcement of its intention to withdraw from the Paris Agreement"); SUMF ¶ 21.

Vermont argues that the even if the Superfund Act discourages fossil fuel production and use, that effect "obviously" does not conflict with "the Framework Convention's goal of 'stabilization of greenhouse gas emissions' at levels 'that would prevent dangerous anthropogenic interference.'" Mem. at 29–30. But to avoid preemption, "it is not enough to say that the ultimate goal of both federal and state law" is the same. *Ouellette*, 479 U.S. at 494. "A state law also is preempted if it interferes with the methods by which the federal [law] was designed to reach [its] goal." *Id.* That is even more true in the field of foreign affairs, where "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby*, 530 U.S. at 379–80 (rejecting the state's argument that state and federal law "share[d] the same goals" and thus "there [wa]s no real conflict" with foreign affairs). And here, the Superfund Act short-circuits the "means" by which federal

54

law addresses global greenhouse gas emissions—through a coordinated policy with other nations, as reflected in the Global Climate Protection Act and Framework Convention. *Id.*; Landau Decl. ¶¶ 4–5; SUMF ¶¶ 9–13.

The Superfund Act also "undermines important ongoing diplomacy to advance U.S. interests." Landau Decl. ¶ 16; SUMF ¶ 21. For instance, "in international climate-change negotiations, the United States has long opposed the establishment of liability and compensation schemes at the international level." Landau Decl. ¶ 16; SUMF ¶ 21; *see also City of New York*, 993 F.3d at 103 n.11 (noting that "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level"). The Act "interferes with this longstanding position by establishing just such a program and therefore foments new frictions in international climate negotiations by targeting fossil fuel companies for actions they took overseas." Landau Decl. ¶ 16; SUMF ¶ 21. In other words, the Act "expresses a distinct political point of view on a specific matter of foreign policy" that contradicts the view of the National government. *Movsesian*, 670 F.3d at 1076. This "obviously sow[s] confusion and needlessly complicate[s] the nation's foreign policy." *City of New York*, 993 F.3d at 103.

Finally, the Superfund Act, "by imposing costs on energy producers for global greenhouse gas emissions, threatens to harm foreign relations between the United States and foreign countries where such producers are based or have substantial operations." Landau Decl. ¶ 18; SUMF ¶ 21; *City of New York*, 993 F.3d at 103 (holding companies "accountable for purely foreign activity . . . would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad"). "Because foreign fossil fuel producers that have a connection with Vermont will necessarily be affected by this Act, their home countries"—who

55

also could be held liable, Vt. Stat. Ann. tit. 10, § 596(10)—"may seek to respond to the Act through their relations with the United States, including expressing their concerns through diplomatic engagements or retaliating through increased costs on U.S. fossil fuel producers operating in those countries," Landau Decl. ¶ 18; SUMF ¶ 21; *see, e.g.*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 269 (2010); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 450 (1979) (explaining that affected foreign nations "may retaliate against American-owned instrumentalities present in their jurisdictions"). "These types of actions could impair the Executive Branch's ability to achieve the President's foreign policy goals, especially related to energy." Landau Decl. ¶ 18; SUMF ¶ 21.

All this establishes a clear conflict with express U.S. foreign policy—or, at the very least, a "likelihood" that the Superfund Act will have a "more than incidental effect" on foreign policy, which is all that is required for foreign affairs preemption. *Garamendi*, 539 U.S at 420. "These foreign policy harms," moreover, "would multiply if other states started enacting similar laws, as New York recently did." Landau Decl. ¶ 20; SUMF ¶ 21. Such a state-by-state regime would make it "even more difficult—if not impossible—to maintain a coherent national position on the regulation of global greenhouse gas emissions." Landau Decl. ¶ 20; SUMF ¶ 21.

### B.    The Superfund Act Intrudes into the Field of Foreign Affairs Without Addressing a Traditional State Responsibility.

The Act is preempted for another, independent reason: Vermont is intruding into a field occupied by federal law without addressing a traditional state responsibility. The National government enjoys *exclusive* domain over foreign affairs. *See Zschernig*, 389 U.S. at 436; *Hines*, 312 U.S. at 63. And global greenhouse gas emissions is a subject that falls squarely within that domain, presenting "a uniquely international problem of national concern" that "is simply beyond the limits of state law." *City of New York*, 993 F.3d at 85, 92.

56

The Superfund Act's plain text reveals that it does not address a traditional state responsibility, even though the "general subject area of the statute"—mitigating the effects of pollution—may fit that bill. *Movsesian*, 670 F.3d at 1074. "Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010); *Garamendi*, 539 U.S. at 425–26 (insurance); *Zschernig*, 389 U.S. at 437–38 (descent of property).

And the Superfund Act is no "garden variety" pollution regulation. *Von Saher*, 592 F.3d at 964. The Act covers "the total quantity of greenhouse gases released into the atmosphere . . . resulting from the use of fossil fuels extracted or refined by an entity during the covered period," Vt. Stat. Ann. tit. 10, § 596(7), and "entity" includes certain "foreign nation[s]," *id.* § 596(10). As both Vermont and the Intervenors acknowledge as well, the Act puts domestic and foreign companies on equal footing. Vt. Mem. at 61 (stating that the Act treats "domestic and foreign responsible parties . . . equally"); Int. Mem. at 46 (noting that "the Act puts foreign-owned companies on the same footing as domestic ones"). But global emissions is "a uniquely international problem" that is "beyond the limits of state law." *City of New York*, 993 F.3d at 85, 92. On its face, then, the Act works "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Zschernig*, 389 U.S. at 432.

Despite the obvious global reach of the Act, Vermont argues that it represents a lawful exercise of State authority "to raise revenue," "protect the safety and welfare of its citizens," and to "adapt to climate change impacts." Mem. at 27–29. But Vermont cannot further a purported traditional state responsibility—in-state adaptation to climate change—by imposing liability for global emissions—an area traditionally governed by federal, not state, law. Indeed, in *City of New York*, the Second Circuit rejected the City's similar attempt to frame the dispute as "merely a local

57

spat about the City's eroding shoreline, which will have no appreciable effect on national energy or environmental policy." *City of New York*, 993 F.3d at 91.

What is more, the "real purpose" of the Act makes plain that "the state interest actually underlying [it]," *Movsesian*, 670 F.3d at 1074 (cleaned up), is the desire to extract significant sums of money from "the world's largest and most profitable fossil fuel corporations" so they will "pay their fair share and help clean up the climate mess their products and activities have caused." SUMF ¶ 22.[9]  Making out-of-state and foreign energy companies pay for the alleged effects of *global* climate change is not a traditional state responsibility.

*     *     *

Because the Superfund Act (1) conflicts with the express foreign policy of the United States and (2) intrudes into the field of foreign affairs without addressing a traditional state responsibility, it is preempted under the Foreign Affairs Doctrine. *Movsesian*, 670 F.3d at 1071–72.

## VI.    The Superfund Act Violates The Commerce Clause.

Finally, the Superfund Act violates the Commerce Clause, as applied to both interstate and foreign commerce. *See, e.g.*, *Healy*, 491 U.S. at 336–37; *Grand River*, 988 F.3d at 123.  "Because discrimination is not required when a statute has the specific extraterritorial effect of controlling . . . wholly out-of-state transactions," the Commerce Clause violation rests on the same analysis as above.  *Ellison*, 140 F.4th at 961 (holding that a statute violated the Commerce Clause because it "directly regulate[d] transactions which [took] place . . . wholly outside the State" (quotation marks omitted)); *Pork Producers*, 598 U.S. at 376 n.1 (quoting *Edgar*, 457 U.S. at 641–43); *Grand River*, 988 F.3d at 123 (state law violates the Commerce Clause if it has "the practical effect

---

[9] *See also* SUMF ¶ 23 (statement of State Treasurer that Vermont stands ready under the Act to "ensure the costs of climate change are shouldered by the polluters responsible, not Vermonters"); *id*. (statement of Secretary of Natural Resources that Vermont will "hold fossil fuel companies accountable" for "climate change").

of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question" (quotation marks omitted)); *see supra* at 47–50. In short, there is no fossil fuel extraction and refining in Vermont, so the Act directly regulates "commerce occurring entirely outside the boundaries of the [S]tate." *Grand River*, 988 F.3d at 123.

But the Act also defies the "antidiscrimination principle" that "lies at the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *Pork Producers*, 598 U.S. at 369; *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Finance*, 505 U.S. 71, 81 (1992) ("Absent a compelling justification . . . a State may not . . . facially discriminate against foreign commerce."). The Superfund Act discriminates against interstate and foreign commerce by targeting worldwide commercial activity that exclusively occurs outside Vermont and then using the "revenue for climate change adaptation projects within the State." Vt. Stat. Ann. tit. 10, § 597. The statute thus runs headlong into the Commerce Clause's prohibition on states "build[ing] up domestic commerce through burdens upon the industry and business of other States." *Pork Producers*, 598 U.S. at 369 (cleaned up).

Because the Act discriminates against interstate commerce, strict scrutiny applies, and it can be upheld only if "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988). There is no legitimate local purpose here. *See City of New York*, 993 F.3d at 85–86, 92. But even if the Court were to conclude otherwise, the Superfund Act would still fail strict scrutiny because its funding objectives can be adequately served by reasonable, nondiscriminatory alternatives. For example, Vermont could fund its adaptation projects through general taxation, such as state income or sales taxes. Because these alternatives would achieve Vermont's goals

without imposing penalties on out-of-state energy producers, the Act's discriminatory approach is unconstitutional. *New Energy*, 486 U.S. at 278.

All this is especially problematic as applied to foreign commerce. "In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 310 (1994) (cleaned up). Thus, "[t]he scope of the foreign commerce power" is "the greater" of the two. *Japan Line*, 441 U.S. at 448 & n.12 (collecting sources); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Finance*, 505 U.S. 71, 79 (1992) (noting that the constitutional protection for foreign commerce "is broader than the protection afforded to interstate commerce, in part because matters of concern to the entire Nation are implicated" (citation omitted)). If the state burden on foreign commerce is enough to "prevent[] the Federal Government from speaking with one voice when regulating commercial relations with foreign governments," it is unconstitutional under the Commerce Clause. *Japan Line*, 441 U.S. at 451 (quotation marks omitted). And a state law "at variance with federal policy will violate the 'one voice' standard if it . . . implicates foreign policy issues which must be left to the Federal Government." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983).

For reasons explained above, the Superfund Act directly implicates U.S. foreign policy and obscures the federal government's ability to speak with one voice. *Supra* at 52–56. It violates the Commerce Clause on that basis alone. *See Japan Line*, 441 U.S. at 451. But the Act also discriminates against foreign commerce the same way it discriminates against interstate commerce, so it is unconstitutional for all the same reasons. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999) (holding that a state law violated the Foreign Commerce Clause because it "discriminate[d] against foreign commerce," "impede[d] the federal government's ability to speak

60

with one voice in foreign affairs," and "attempt[ed] to regulate conduct outside [the state] and outside of this country's borders"), *aff'd sub nom. Crosby*, 530 U.S. 363; *see City of New York*, 993 F.3d at 103 (liability for foreign producers "would presumably affect the price and production of fossil fuels abroad").

## VII.    The United States Is Entitled To Permanent Injunctive Relief.

In addition to declaratory relief, the United States is entitled to a permanent injunction against enforcement of the Superfund Act.  *See* Compl. at 28.  The Superfund Act inflicts irreparable injury on the United States by violating federal law and usurping federal authority.  *NOPSI*, 491 U.S. at 366–67; *supra* at 24–25.  That injury is not redressable by monetary damages.  *See Arizona*, 641 F.3d at 366.  And the balance of hardship and public interest favor relief.  *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("The Government does not have an interest in the enforcement of an unconstitutional law." (cleaned up)).

## CONCLUSION

Vermont is defying federal law, the Constitution, and binding precedent—all so it can punish disfavored businesses for ill-defined harms, without regard to the real harm to our federal system and the Nation's energy needs.  The Court should end Vermont's lawless overreach by denying the motions to dismiss, granting the United States' motion for summary judgment, declaring the Superfund Act invalid and unenforceable, and permanently enjoining Defendants from taking any actions to implement or enforce it.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

JUSTIN D. HEMINGER
*Acting Deputy Assistant Attorney General*

/s/ *Riley W. Walters*
RILEY W. WALTERS
*Counsel to the Acting Assistant Attorney General*
JOHN K. ADAMS
*Senior Counsel to the Acting Assistant Attorney General*
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov

September 15, 2025
Washington, D.C.

62

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2025, I electronically filed the foregoing consoli-

dated response in opposition to the motions to dismiss and memorandum in support of motion for

summary judgment using the CM/ECF system, which electronically served all counsel of record.

/s/ *Riley W. Walters*
RILEY W. WALTERS
*Counsel to the Acting Assistant Attorney General*
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov