# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br>　　　　　　　　Plaintiffs,<br>　　　and<br><br>STATE OF WEST VIRGINIA et al.,<br>　　　　　　　　Intervenor-Plaintiffs,<br>　　　v.<br><br>JULIE MOORE et al.<br>　　　　　　　　Defendants,<br>　　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　Intervenor-Defendants. | Case No. 2:24-cv-01513 |
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br>　　　　　　　　Plaintiffs,<br>　　　v.<br><br>STATE OF VERMONT et al.,<br>　　　　　　　　Defendants,<br>　　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　Intervenor-Defendants. | Case No. 2:25-cv-00463 |

## DECLARATION OF HAROLD HONGJU KOH

　　　Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.      I submit this declaration in support of Defendants' (together, the State's) opposition to the motions for summary judgment filed by Plaintiffs and Intervenor-Plaintiffs in the above-captioned cases.

## EDUCATIONAL BACKGROUND AND EXPERIENCE

2.      I am Sterling Professor of International Law (2013-present) and former Dean (2004-2009) of Yale Law School in New Haven, Connecticut, where I have taught since July 1, 1985. My credentials are described more fully in paragraphs 3-9 below and in my curriculum vitae, which is included as Exhibit A to this declaration.

3.      During the past 45 years, I have developed expertise as a government official, professor, scholar, and lawyer in the areas of public and private international law and the law of United States foreign policy. I am an expert in the fields of foreign relations and national security law, constitutional law, civil procedure, public and private international law, international environmental law, and international human rights law. In both my private and governmental capacities, I have testified before Congress on numerous occasions on a broad range of issues, including United States national security policy, human rights policy, foreign policy, the lawfulness of proposed foreign policy actions, and refugee law and policy.

4.      *Government Service.* I served in the United States Department of State as Legal Adviser from 2009-2013 and from January to October 2021 as Senior Advisor in the Office of the Legal Adviser, the senior political appointee in that office. From 1998-2001, I served as Assistant Secretary of State for Democracy, Human Rights, and Labor in the Clinton Administration. I served from 1983-1985 as an Attorney-Adviser at the Office of Legal Counsel at the United States Department of Justice in the Reagan Administration, from 1981-1982 as a law clerk to Justice Harry A. Blackmun of the United States Supreme Court, and from 1980-

1981 as a law clerk to Judge Malcolm Richard Wilkey of the United States Court of Appeals for
the D.C. Circuit.

5.      *Teaching.* I began teaching as Associate Professor at the Yale Law School in New
Haven, Connecticut in 1985 and have held multiple titles since then, including, since 2013,
Sterling Professor of International Law, the highest professorial rank recognized by Yale
University. I teach courses, give lectures, and supervise students conducting research on
international environmental law and the law of climate change, foreign affairs and national
security law, international law, transnational law, international human rights law, and civil
procedure. I have also been an invited lecturer, taught courses and seminars, and conducted
workshops on international law and related subjects—including international climate change
law—at universities around the country and the world. I have served as a visiting professor or
lecturer at numerous institutions, including Oxford University, Cambridge University, Stanford
University, Columbia University, New York University, Georgetown University, George
Washington Law School, the University of Hawaii, Fordham Law School, the Hague Academy
of International Law, and the University of Toronto Faculty of Law. I have also served regularly
as a faculty member on international and foreign affairs law at the Federal Judicial Center, the
NYU-Columbia Law Judges Colloquium, and the Aspen Institute Judicial Seminar.

6.      *Editorial Boards.* I served for more than two decades on the Board of Editors of
the American Journal of International Law (where I currently sit on the Honorary Board of
Editors) and the West Academic/Foundation Press Casebook Series, as well on the Editorial
Boards of Human Rights Quarterly and the Editorial Advisory Board of Human Rights Watch
World Report (Yale University Press).

7.      *Publications.* I am the author/coauthor of more than 275 articles and book

3

chapters on constitutional law, civil procedure, international law, human rights, and other legal topics. I am the author, editor, or co-editor of ten books on national security and foreign affairs law, international law, and international human rights, including most recently, *The National Security Constitution in the 21st Century* (2024). While writing this latest book, I conducted research into the background of the various laws and treaties discussed in this declaration.

8.    *Professional Activities*. I have served as counsel, co-counsel, or legal adviser for parties or amici in many cases involving environmental law, human rights, and international law, before federal district and circuit courts, and the United States Supreme Court. For example, I argued before the United States Supreme Court on behalf of Haitian and Cuban refugees, *see Sale v. Haitian Ctrs. Council*, 509 U.S. 155 (1993); *Cuban American Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir. 1995); and have served as counsel for former American diplomats or national security officials with respect to several amicus curiae briefs filed before the Supreme Court and the lower courts regarding the national and international law of climate change. I have also regularly appeared before international courts and tribunals as an international lawyer on behalf of the United States, other governments, and organizations and am currently Counsel in the following pending international cases: for Canada, Sweden, United Kingdom, and Ukraine in *Aerial Incident of 8 January 2020* (Can., Swed., Ukr. & U.K. v. Iran), I.C.J. (2025) and *Appeal relating to the Jurisdiction of the ICAO Council under Article 84 of the Convention on International Civil Aviation (Islamic Republic of Iran v. Canada, Sweden, Ukraine and United Kingdom),* ICJ (2025); for International Trade Unions Confederation on the *Right to Strike Under ILO Convention No. 87*, Request for Advisory Opinion, 2023 I.C.J. (Nov. 10, 2023); and for Ukraine in *Dispute Concerning Coastal State Rights in the Black Sea, Sea of Azov, and*

4

*Kerch Strait* (Ukr. v. Russ.), No. 2017-06, Merits Hearing (P.C.A. Sept. 2024) and *Allegations of Genocide Under the Convention on the Prevention and Punishment of the Crime of Genocide* (Ukr. v. Russ.).

9.      *Professional Recognition*. I have received eighteen honorary degrees, several law school medals, and dozens of awards and recognitions from various bar and nongovernmental organizations, including the 2024 Robert A. Katzmann Award for Academic Excellence from the Burton Awards; the 2023 Raphael Lemkin Rule of Law Guardian Award from Duke Law School; the 2003 Wolfgang Friedmann Award from Columbia Law School; and the 2004 Louis B. Sohn Award from the American Bar Association Section on International Law for lifetime achievements in law. I am Counselor (and was previously Co-Chair) of the American Law Institute's *Restatement (Fourth) of the Foreign Relations Law of the United States*, a Fellow of the American Academy of Arts and Sciences and the American Philosophical Society, a Member of the Council of the American Law Institute (since 2007), and Honorary Counsellor of the American Society of International Law.

## SCOPE OF WORK AND SUMMARY OF CONCLUSIONS

10.      I have been retained by the Vermont Attorney General's Office, which represents the State in this action, to opine on international law, multilateral agreements, and United States climate policy relevant to the imposition of liability on fossil fuel corporations through Vermont's Climate Superfund Act (the Act).

11.      I have reviewed the Climate Superfund Act, the United States' Complaint, the United States' Consolidated Response in Opposition to Motions to Dismiss and Memorandum in Support of Motion for Summary Judgment (US Brief), the United States' Statement of Undisputed Material Facts (US SUMF), and the Declaration of Deputy Secretary of State

Christopher Landau (US Landau Declaration). The United States asserts that:

- "President Trump has taken multiple actions that make clear the U.S. foreign policy with respect to energy and climate change" (US SUMF #16); and

- "The Act conflicts with U.S. foreign policy" (US SUMF #21).

12.    I have evaluated these assertions and disagree. I have also evaluated similar assertions by Plaintiffs United States Chamber of Commerce and American Petroleum Institute and Intervenor-Plaintiffs West Virginia et al. Based on my expertise and experience in this area, I conclude that the Plaintiffs have incorrectly represented the international law and agreements that form the basis of their legal allegations. Below is the basis for these conclusions:

- International environmental law has long recognized a "polluter pays" principle.

- No international agreement addresses the liability of corporations or other private entities for recovering costs for harms and adaptation needs caused by climate change, much less embodies or requires a policy of corporate immunity for climate change cost recovery under duly enacted state laws.

  o The UN Framework Convention on Climate Change, which is a treaty ratified by the Senate under Article II of the Constitution, neither dictates how individual nations will implement it, nor broadly immunizes any private actor within a member country for its actions that may promote the proliferation of greenhouse gases.

  o The 2015 Paris Agreement mainly binds member countries to meet certain requirements regarding maintaining information, transparency, and reporting of nationally determined contributions (NDCs) to be aggregated to meet global emissions goals. Nothing in the Paris Agreement

immunizes private corporations from complying with state law requiring compensation for the costs of climate adaptation measures caused by their actions. Although President Trump has declared his intention to withdraw from this agreement, that withdrawal has not yet been finalized. Whether or not that withdrawal becomes final, the Act remains consistent with the United States' existing domestic and international legal obligations.

## DISCUSSION

### I.    *The Polluter Pays Principle*

13.    International environmental law and agreements have long recognized a "polluter pays" principle. That principle originated in the 1941 *Trail Smelter Case,* in which a binational arbitration panel addressed the costs caused by pollution from a mining and smelting company in Trail, British Columbia that crossed the border into the United States and caused injury to residents of United States border towns. *See Trail Smelter* (U.S. v. Can.), 3 R.I.A.A. 1905 (Trail Smelter Arb. Trib. 1938); *Trail Smelter* (U.S. v. Can.), 3 R.I.A.A. 1938 (Trail Smelter Arb. Trib. 1941). The arbitral award established the principle that the "polluter pays" for the damage it causes, including compensating for harm to injured individuals and property in another nation-state. Under this principle, the polluting entity should not benefit financially from injury that it causes to others without their consent; instead, it is required to internalize (i.e., pay for) the costs of the negative externalities (i.e., the economic harms) that its profit-making activities impose on neighboring people and entities. *See generally* Alan Boyle, *Polluter Pays*, OXFORD PUB. INT'L L. (Mar. 2009). The Act is consistent with this principle.

14.    In the 1970s, the "polluter pays" principle became the subject of a series of discussions and recommendations by the Paris-based Organization for Economic Co-operation and Development (OECD), of which the United States was a founding member. The OECD is

currently a group of 38 member countries, consisting mostly of European member nations, but also including the United States and Canada, that works to promote economic growth, prosperity, and sustainable development by coordinating national policies and best practices on a range of public policy issues, including climate change. It was founded in 1961 as a successor to the Organization for European Economic Co-operation, which was created to administer the Marshall Plan after World War II. The OECD concluded that the "polluter pays" principle is a fair and sensible economic policy by which governments may allocate the costs of environmental damage caused to their citizens by private activity. *See* OECD, *Recommendation of the Council on Guiding Principles Concerning International Economic Aspects of Environmental Policies*, OECD/LEGAL/0102; OECD, *Recommendation of the Council on the Implementation of the Polluter-Pays Principle*, OECD/LEGAL/0132; OECD, *Recommendation of the Council Concerning the Application of the Polluter-Pays Principle to Accidental Pollution*, OECD/LEGAL/0251. The OECD position on the subject thus sought to encourage private entities to pay for ("internalize") the economic costs of pollution control, cleanup, and protection measures, so as to ensure that governments did not distort international trade and investment by subsidizing these environmental costs.

15.    In 1992, the United Nations Conference on Environment and Development—also known as the first "Earth Summit"—was held in Rio de Janeiro, Brazil. More than 175 countries—by consensus and including the United States—adopted the *Rio Declaration on Environment and Development,* U.N. Doc. A/CONF.151/26/Rev.1 (Vol. I), annex I (Aug. 12, 1992), which established 27 principles to guide nations towards sustainable development. Article 16 of the Rio Declaration provides that:

> National authorities should endeavour to promote the internalization of
> environmental costs and the use of economic instruments, taking into

account the approach that *the polluter should, in principle, bear the cost of pollution,* with due regard to the public interest and without distorting international trade and investment.

*Id*. at Art. 16 (emphasis added).

16.    Since then, the "polluter pays" principle has become a well-accepted global tool to internalize the external costs of pollution by making polluters responsible for remediation and prevention of the pollution they cause. The principle has been incorporated into a broad range of international environmental treaties including: the Convention for the Protection of the Marine Environment of the North-East Atlantic, Sep. 22, 1992, art. 2, ¶ 2(b), 2354 U.N.T.S. 67; the Convention on the Protection and Use of Transboundary Watercourses and International Lakes, Mar. 17, 1992, art. 2, ¶ 5(b), 1936 U.N.T.S. 269; the Convention for the Protection of the Marine Environment and the Coastal Region of the Mediterranean, Feb. 16, 1976, 1102 U.N.T.S. 27; the Amendments to the Convention for the Protection of the Mediterranean Sea Against Pollution, U.N. Doc. UNEP(OCA)/MED IG.6/7(1995); the 1996 Protocol to the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, Nov. 17, 1996, art. 3, ¶ 2, S. TREATY DOC No. 110-5; and the Energy Charter Treaty of 1991, art. 19, ¶ 1, Dec. 17, 1991, 2080 U.N.T.S. 95.

17.    The preambles of both the 1992 Convention on the Transboundary Effects of Industrial Accidents of the United Nations Commission for Europe, Mar. 17, 1992, 2105 U.N.T.S. 457, and the Protocol on Civil Liability and Compensation for Damage Caused by the Transboundary Effects of Industrial Accidents on Transboundary Waters to the 1992 Convention on the Protection and Use of Transboundary Watercourses and International Lakes and to the 1992 Convention on the Transboundary Effects of Industrial Accidents, May 21, 2003, U.N. Doc. ECE/MP.WAT/11-ECE/CP.TEIA/9, describe the polluter pays principle as a "general

principle of international environmental law." The "polluter pays" principle also appears in numerous post-Rio Declaration treaties and protocols addressing pollution of international watercourses, marine pollution, transboundary industrial accidents, and energy. *See, e.g.,* the Convention on Cooperation for the Protection and Sustainable Use of the Danube River, art. 2, ¶ 4, 1997 O.J. (L. 342) 19; and the Energy Charter Treaty, Dec. 17, 1991, 2080 U.N.T.S. 95. More recent treaties to which the United States is either a party or a signatory incorporating the "polluter pays" principle include the Agreement Under the United Nations Convention on the Law of the Sea on the Conservation and Sustainable Use of Marine Biological Diversity of Areas Beyond National Jurisdiction, art. 7, June 19, 2023, U.N. Doc. A/CONF.232/2023/4, and the Agreement on Cooperation on Marine Oil Pollution Preparedness and Response in the Arctic, May 15, 2023, Preamble, T.I.A.S. No. 16-325.

## II.     *The UN Framework Convention on Climate Change*

18.     At the 1992 Rio Earth Summit, UN member nations also began signing the United Nations Framework Convention on Climate Change (Framework Convention), *opened for signature* June 4, 1992, S. TREATY DOC. No. 102-38, 1771 U.N.T.S. 107. That Framework Convention has now been ratified by 197 states and the European Union, all of whom have committed to act on climate change and to report regularly on their progress. The Framework Convention states as its goal the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic [i.e., human-caused] interference with the climate system" within a timeframe that would allow people everywhere to adapt and economies to develop sustainably. The Framework Convention does not set specific emission targets for particular member countries. Rather, as its title suggests, it provides a legal and institutional framework within which future climate change research, negotiations, policies,

and agreements may be discussed among member nations. The Framework Convention parties gather every fall at an annual Conference of Parties (COP) held at various locations around the world. Those parties also established the Secretariat, a standing international administrative entity for climate discussions and negotiations, which operates year-round and prepares for the annual COPs, the thirtieth of which is being held in November 2025 in Belem, Brazil. The Framework Convention and the international organization it has spawned have served as the foundation for every subsequent international climate negotiation, including the Kyoto Protocol of 1997 and the Paris Agreement of 2015.

19.    Member nations, including the United States, who join the Framework Convention acknowledge the existence of the threat of climate change and agree to undertake efforts to combat it. The Framework Convention does not, however, say anything about intergovernmental or corporate liability for past emissions. In Article 3, the Framework Convention directs member states to "protect the climate system for the benefit of present and future generations of humankind, on the basis of equity and in accordance with their common but differentiated responsibilities and respective capabilities. Accordingly, the developed country Parties should take the lead in combating climate change and the adverse effects thereof."

20.    On October 7, 1992, under the presidency of George H.W. Bush, the United States Senate gave its unanimous (95-0; 5 senators not present) advice and consent to ratification of the Framework Convention. Soon thereafter, the United States became the first industrialized nation, and fourth nation overall, to ratify the treaty. As a ratified Article II treaty, the Framework Convention imposes binding horizontal commitments between member parties under international law, as well as commitments that vertically bind the United States and its states and localities as United States domestic law under the United States Constitution's Supremacy

11

Clause. Upon signing the instrument of ratification, the first President Bush summarized the

commitments being assumed as follows:

> As proposed by the United States, the convention is comprehensive in scope and action-oriented. All parties must inventory all sources and sinks of greenhouse gases and establish national climate change programs. Industrialized countries must go further, outlining in detail the programs and measures they will undertake to limit greenhouse emissions and adapt to climate change and quantifying expected results. Parties will meet on a regular basis to review and update those plans in the light of evolving scientific and economic information .… The United States was one of the first nations to lay out its action plan [in 1992] … Through such measures as the newly enacted national energy legislation, the Clean Air Act Amendments of 1990, the Intermodal Surface Transportation Efficiency Act of 1992, and other programs and policies of this administration, I am confident the United States will continue to lead the world in taking economically sensible actions to reduce the threat of climate change.

President George H.W. Bush, Statement on Signing the Instrument of Ratification for the United

Nations Framework Convention on Climate Change, 1992 PUB. PAPERS 1818 (Oct. 13, 1992).

III.  ***The Kyoto Protocol of 1997***

21.    The Kyoto Protocol of 1997, negotiated under the auspices of the Framework

Convention, established a legally binding "targets-and-timetable" approach to reducing global

greenhouse gas emissions. Kyoto Protocol, art. 3, Dec. 11, 1997, 2303 U.N.T.S. 162. The

Protocol established legally binding quantitative emissions reduction targets for developed

country parties, but did not subject developing nations to binding emissions targets. Although the

Kyoto Protocol did not enter into force until 2005, the United States was concerned about what it

perceived to be an asymmetry of obligations imposed on developed versus developing nations.

Accordingly, the Clinton Administration did not sign the Kyoto Protocol, S. Res. 98, 105th

Cong. (1997), and President Clinton never submitted it to the Senate for advice and consent.

22.    In March 2001, shortly after President George W. Bush took office, he wrote a

letter to senators stating his opposition to the Kyoto Protocol, in large part because the Protocol

did not legally require major developing economies like China and India to reduce their emissions within the same timeframe as developed countries like the United States. *See* Letter from President George W. Bush to Senators Jesse Helms, Larry E. Craig, Pat Roberts, & Chuck Hagel, 11 PUB. PAPERS 444 (Mar. 13, 2001). The administration of the second President Bush did not, however, withdraw from or otherwise disturb the continuing United States membership in the Framework Convention.

## IV.    *<u>The Paris Agreement</u>*

23.    The twenty-first session of the Conference of the Parties to the Framework Convention (COP-21) took place in December 2015 in Paris, France. The resulting Paris Accords constitute multiple documents. These include a formal decision of the UN Framework 21st Conference of Parties (COP-21 Decision), which includes as an annex the Paris Agreement, a treaty which consists of 29 articles addressing such disparate issues as Mitigation, Adaptation, Ambition, Climate Finance, Technology Transfer, Capacity-Building, and Transparency. *See* Rep. of the Conf. of the Parties on its Twenty-First Session, Jan. 29, 2016, U.N. Doc. FCCC/CP/2015/10/Add.1.

24.    In 2015, 191 parties signed the Paris Agreement. To enter into force, at least 55 Framework Convention members accounting for at least 55% of all global greenhouse gas emissions were required to accept. These thresholds were met on October 5, 2016, and the Paris Agreement entered into force on November 4, 2016. *Paris Agreement - Status of Ratification*, United Nations Climate Change, https://UN FrameworkTreaty.int/process/the-paris-agreement/status-of-ratification [https://perma.cc/C8QN-AGU3].

25.    The Paris Agreement has now been approved by 195 countries representing over 94 percent of the world's greenhouse gas emissions. *Overview*, ClimateWatch,

https://www.climatewatchdata.org/ndc-overview [https://perma.cc/ ANF8-98UJ]. As described in paragraph 21 above, the Kyoto Protocol had adopted a prescriptive, top-down architecture based on legally binding, internationally negotiated emission targets and rules, with some emission targets applied only to developed countries. The Paris Agreement, by contrast, was designed to have a non-prescriptive, "bottom-up" architecture, including mostly "political" (i.e., moral)—as opposed to legally binding—obligations, with a greater symmetry of duties between developed and developing nations. A lay analogy would be to a university fundraising bar graph, whereby each of one hundred donors "pledges" a certain amount of money that each expects to donate each year. These "pledges" are not legally binding, but can be aggregated from the bottom up to determine whether the institution can reach its overall fundraising goal by a certain time. In much the same way, the Paris Agreement requires each member state to maintain and pledge to meet a national emission target, then aggregates the various national pledges from the bottom up to determine when an overall global emission target can be met.

26.    Under United States domestic law, the Paris Agreement is neither an Article II treaty nor a sole executive agreement. Rather, the Paris Agreement is what may be called an "executive agreement authorized by prior treaty," in this case, the 1992 UN Framework Convention. The Paris Agreement was negotiated pursuant to the 2011 Durban Platform to the Framework Convention. *See generally* Daniel Bodansky, *Paris Agreement*, Audiovisual Libr. of Int'l Aff., (Dec. 12, 2015), https://legal.un.org/avl/ha/pa/pa.html [https://perma.cc/TPF2-27VE]. The Durban Platform provided that the forthcoming climate change instrument would be "under the [Framework] Convention," thus bringing the subsequent Paris Agreement within the scope of the Senate's original advice and consent, as preauthorized by an existing Article II treaty.

27.    Those few provisions of the Paris Agreement that are legally binding under

international law are largely procedural in nature. In many instances, they are duplicative of existing United States obligations under the Framework Convention and, therefore, could be fully implemented under existing United States law. This feature allowed President Obama to enter the Paris Agreement without submitting it for Senate approval, because he had sufficient domestic authority to implement any legal obligations assumed under the agreement by carrying out preexisting domestic legal obligations. These procedural obligations to assemble, maintain, and publicly transmit information to the Secretariat do not conflict with any provision of the Act.

28.    In particular, the Paris Agreement binds the United States under international law: (1) to communicate its first intended "National Determined Contribution" (NDC) to nationwide emissions targets upon ratification (which the United States did in 2015, which then converted into the first formal United States NDC); (2) thereafter to prepare, communicate, and maintain its NDCs every five years (which the United States did in 2024); (3) to pursue domestic mitigation measures to achieve its stated NDCs; and (4) to provide transparent information regarding its stated NDCs, anthropogenic emissions and removals, and national inventory and progress in achieving its NDCs, which the United States has provided at each subsequent COP meeting (excepting COP30 in Belem, Brazil, which it did not attend). *See* Paris Agreement, arts. 3, 4, 13, Dec. 12, 2015, 3156 U.N.T.S. 79. Each member country develops its NDC in its own way through a "bottom-up" process, which involves creating a national climate action plan after technical analysis, consultation with many stakeholders, and public domestic discussion regarding achievable and sustainable emission reduction goals, adaptation measures, and financial capacity. Such plans generally do not discuss the price or availability of fossil fuels. Instead, their focus is predictive: what overall national emissions levels would likely be achieved by aggregating various domestic sectoral emission-reduction measures?

29.    Since taking office in January 2025, President Trump has indicated his intent to withdraw the United States from the Paris Agreement. *See* Exec. Order No. 14,162, 90 Fed. Reg. 8455, 8455 (Jan. 20, 2025). But under the Vienna Convention on the Law of Treaties, arts. 54-56, May 23, 1969, 1155 U.N.T.S. 331, a single state party cannot invalidate an entire multilateral agreement; it can only withdraw from the treaty in accordance with its terms. The specific terms of the Paris Agreement do not allow a party to withdraw from the agreement except by giving "written notification" with "[a]ny such withdrawal . . . tak[ing] effect upon expiry of one year from the date of the receipt . . . of the notification of withdrawal." Paris Agreement, art. 28, Dec. 12, 2015, 3156 U.N.T.S. 79. Thus, at the earliest, the United States could not withdraw from the Paris Agreement until January 20, 2026, one year after the second Trump Administration sent formal notification of its intent to withdraw to the United Nations Secretary General.

30.    Even then, there is constitutional doubt as to whether the President acting alone may unilaterally withdraw the United States from the Paris Agreement. As I have explained elsewhere, "[t]he Paris Agreement was not a sole executive agreement in the traditional sense, but rather, an *agreement approved by Congress through both ex ante treaty and general legislative preauthorization*" and hence, not an agreement from which the President may withdraw without comparable congressional input. See generally Harold Hongju Koh, *Presidential Power to Terminate International Agreements,* Yale L.J.F. 432, 472 (2018). In any event, until the United States formally withdraws from the Paris Agreement, it is obliged under international law not to violate its object and purpose, which is fully consistent with the Act under challenge here.

31.    The Paris Agreement says nothing about intergovernmental liability for past

emissions. Article 8, which addresses "loss and damage," explicitly "does not involve or provide a basis for any liability or compensation" by any *government*. Rep. of the Conf. of the Parties on the Twenty-First Session, ¶ 51, U.N. Doc. FCCC/CP/2015/10/Add.1 (2016). Former United States Special Envoy for Climate Change Todd Stern stated, in words mischaracterized by the Plaintiffs in their filings, *see*, *e.g.*, U.S. Consolidated Mem. at 55; Chamber Mem. in Supp. Summ. J. at 18; W. Va. Consolidated Mem. at 41, that "[t]here's one thing that we don't accept and won't accept in this agreement and that is the notion that there should be liability and compensation for loss and damage." *COP21 Press Availability with Special Envoy Todd Stern*, U.S. Dep't of State, (Dec. 4, 2015), https://2009-2017.state.gov/s/climate/releases/2015/ 250305.htm [https://perma.cc/LS9M-9D7S]. But in so saying, Special Envoy Stern was simply reiterating the United States' traditional opposition to any Paris Agreement provisions establishing the liability to other countries of the United States *government or the governments* of the several states for past greenhouse gas emissions. I have personally heard him and other senior government officials involved in the Paris climate negotiations repeat this point unambiguously.

32.    The Declaration of Deputy Secretary of State Christopher Landau effectively confirms this point when he says at paragraph 16, "in international climate-change negotiations, the United States has long opposed the establishment of liability and compensation schemes *at the international level*." US Landau Declaration, para. 16 (emphasis added). In other words, the United States' position in international climate-change negotiations has not announced a policy opposing the establishment of compensation schemes for cost-recovery at the domestic level. Thus, properly read in context, Special Envoy Stern's discussion of the United States' traditional opposition to its *own* governmental liability in no sense signaled that past or present United

States foreign policy opposes the imposition of any private *corporate* liability of fossil fuel companies to provide cost-recovery for adaptation measures or injuries that those producers may cause within the several States.

33.    In sum, neither of the two agreements at the heart of international climate diplomacy—the Framework Convention and the Paris Agreement—immunizes private corporations from complying with state laws, like the Act, that may require some to pay compensation for the costs of climate adaptation measures caused by their actions. These agreements were expressly designed to apply only to countries and regional economic integration organizations like the European Union, not to corporate entities like fossil fuel companies.

34.    Finally, a judgment upholding the Act would not affect ongoing intergovernmental climate negotiations or complicate ongoing diplomacy and foreign affairs respecting climate change. The multilateral discussions involving countries engaged in international climate negotiations over the last two decades are intergovernmental in nature. They do not and have not addressed questions of corporate legal liability nor the narrower issue of whether corporations should be immunized from responsibility for injury caused within states or localities by private business activity.

35.    Finally, notwithstanding the Justice Department's claim that "President Trump has taken multiple actions that make clear the U.S. foreign policy with respect to energy and climate change" (US SUMF #16), the current administration's climate and energy policy is far from "clear." During this administration, Congress has enacted no statute altering the many prior U.S. legal commitments on climate change. In particular, Congress has not modified any provision of the Global Climate Protection Act of 1987, referenced in the US SUMF paras. 9-11, which provides that the United States should "work toward multilateral agreements" on the issue

of greenhouse gas emissions. US Landau Declaration, para. 4. As noted above, while the Trump Administration has announced its intent to withdraw from the Paris Agreement, the United States is still a member of that agreement. Even if the Trump Administration should lawfully complete U.S. withdrawal from the Paris Agreement, the Act still would not interfere with clear federal policy, absent congressional legislation affirmatively opposing that state law. It is thus inaccurate to say, as Deputy Secretary of State Landau states in his declaration at paragraph 17, that Vermont's "Climate Superfund Act … interferes with the United States foreign policy on greenhouse gas regulation, including … the United States participation in the Framework Convention…." US Landau Declaration, para. 17. Because the Trump Administration is not currently participating in the ongoing intergovernmental climate negotiations under the Framework Convention and is not even attending the most recent COP30 climate talks in Belem, Brazil, there is no ongoing "United States participation in the Framework Convention" for Vermont's actions to disrupt.

36.    In sum, the Framework Convention, the Paris Agreement, and whatever climate policy the Trump Administration may seek to put in place—after such time as the United States finally and lawfully withdraws from the Paris Agreement—do not conflict with any requirement of the Act. That state law is directed not at foreign policy, but at seeking cost-recovery for past private corporate behavior that causes injury within Vermont to its people and environment.

## CONCLUSION

37.    For the foregoing reasons, I conclude that the Act is consistent with international environmental law and agreements, which have long recognized a "polluter pays" principle. International climate negotiations and agreements have never established a policy of corporate immunity for climate cost recovery. The United States remains a party to the Framework

Convention, with which the Act is entirely consistent. The Act is also entirely consistent with the United States' obligations under the Paris Agreement. Although President Trump has declared his intention to withdraw from the Paris Agreement, that withdrawal has not yet been finalized and may not prove legally effective. Any such withdrawal would not in any event preempt the Act, absent some definitive congressional legislation affirmatively opposing that law, which has not been enacted.

38.     I reserve the right to modify, amend, or expand this declaration as new information comes to light.

Dated:     November 17, 2025
                New Haven, CT

Harold Hongju Koh

# Harold Hongju Koh

**Yale Law School P.O. Box 208215  New Haven, CT 06520  203 432 4932  harold.koh@yale.edu**

**Employment:**

2013-            Sterling Professor of International Law, Yale Law School (Procedure, Public and Private International Law, Human Rights, Law and U.S. Foreign Policy, Law and National Security, International Business Transactions, Constitution and Foreign Affairs, International Trade,  International Organizations, Law of Climate Change, International Law and Political Science, Brexit and the  Law,)

2021:            Senior Advisor in the Office of the Legal Adviser, U.S. Department of State from January to October 2021 (only Biden political appointee in that office)(on leave from Yale)

2009-13:          Legal Adviser, U.S. Department of State (on leave from Yale) (awarded Secretary of State's Distinguished Service Award 2013);  Head of Delegation for U.S. Government: U.N. Human Rights Council, Assembly of States Parties  International Criminal Court (Kampala 2010)

2004-2009:        Dean of Yale Law School & Gerard C. and Bernice Latrobe Smith Professor of International Law, Yale Law School

1998-2001:        Assistant Secretary of State for Democracy, Human Rights and Labor, United States Department of State (on leave from Yale); Commissioner, Commission for Security and Cooperation in Europe; U.S. Delegate or  Head of Delegation to United Nations General Assembly (Third Committee), the United Nations Human  Rights Commission, the Organization of American States, the Council of Europe, the Organization for  Security and Cooperation in Europe, the U.N. Committee Against Torture, Inaugural Community of  Democracies Meeting (Warsaw 2000); U.N. Conference on New and Restored Democracies (Cotonou,  Benin 2000)

2004-09: Martin R. Flug '55 Professor of  International Law, Yale Law School (on leave)
1993-2004: Gerard C. & Bernice Latrobe Smith Professor of International Law, Yale Law School
1998-2004: Director, Orville H. Schell Jr., Center for International Human Rights, Yale Law School
1990-93: Professor, Yale Law School
1985-90: Associate Professor, Yale Law School
1983-85: Attorney-Adviser, Office of Legal Counsel, United States Department of Justice
1982-83: Associate, Covington & Burling, Washington, DC
1981-82: Law Clerk to Hon. Harry A. Blackmun, Associate Justice, United States Supreme Court
1980-81: Law Clerk to Hon. Malcolm Richard Wilkey, Circuit Judge, U.S. Court of Appeals, D.C.Circuit
1978-79: Teaching Assistant in Contracts and Civil Procedure, Harvard Law School
1979: Summer Associate, Covington & Burling, Washington, D.C.
1978: Summer Research Assistant to Professor Arthur R. Miller, Harvard Law School

**Visiting Positions:**

Spring 2026: Distinguished Visiting Professor, Center for Transnational Legal Studies, London
Winter 2025: Herman Phleger Distinguished Visiting Professor of Law, Stanford Law School
Spring 2023: Bacon-Kilkenny Distinguished Visiting Fellow, Fordham Law School
2021-22: George Eastman Visiting Professor at Law Faculty and Fellow, Balliol College Oxford
2019: Hague Academy of International Law, Keynote Lecture, Inaugural Winter Session
2018-19: Phi Beta Kappa Visiting Scholar at various U.S. colleges and universities
2018-19: Arthur Goodhart Professor of Visiting Legal Science and Fellow of Lauterpacht Centre for International Law and Trinity and Christ's Colleges, Cambridge)
2016: University of Hawaii School of Law
2014, 2017:  NYU Law School, NYU Abu Dhabi
2014: Law Faculty, European University Institute, Florence Italy
2014:  Clarendon Law Lecturer, Oxford Law Faculty
2013: Robert F. Drinan S.J. Visiting Professor of Human Rights, Georgetown Law School
          Distinguished Visitor, Columbia Law School
2012: Oliver Smithies Lecturer Oxford Law   Faculty and Balliol College, Oxford
2002, 1990:  University of Toronto Faculty of Law
1996: Visiting Fellow, All Souls College, and Waynflete Lecturer, Magdalen College, Oxford
1993: Hague Academy of International Law, Special Course in Private International Law
1982-85: Visiting Lecturer, George Washington Law School

**Education:**

1996: M.A. Oxford, Philosophy Politics & Economics
1980: Harvard Law School, J.D. *cum laude*; Developments Editor, *Harvard Law Review*; Tutor, Mather House, Harvard College
1977: Magdalen College, Oxford University, Honours B.A. in Philosophy, Politics & Economics *with First Class Honours*; Marshall Scholar; Magdalen College Underhill Exhibitioner; President, Magdalen College Middle Common Room
1975: Harvard College, Harvard University A.B. in Government, *Summa Cum Laude*; Phi Beta Kappa; Harvard National Scholar; Charles Bonaparte Scholar (Outstanding Junior Government Major); Harvard Club of Southern Connecticut Distinguished Senior; National Merit Scholar; State of Connecticut Scholar

**Honorary Degrees (18)**

2024: University of Toronto Faculty of Law
2014: Quinnipiac Law School; University of Denver Sturm College of Law
2012: American University School of Law
2010: Wayne State University; Northeastern University
2009: New School for Social Research
2008: Iona College, Jewish Theological Seminary
2005: University of Hartford, Widener School of Law
2002: Skidmore College
2001: Connecticut College
2000: University of Connecticut; Dickinson College
1999: Suffolk Law School; Albertus Magnus College
1998: CUNY-Queens Law School
1990: M.A., Yale University

**Medals (7)**
2023: Raphael Lemkin Rule of Law Guardinan Medal, Duke Law School
2009: Yale Law School Medal of Merit
2008: Western New England School of Law
2004: Presidential Medal, Central Connecticut State College
2000: Villanova Medal, Villanova Law School
2000: Arthur J. Goldberg Award, Jacob Fuchsberg Law Center, Touro Law School

**Awards**
2024: Robert A. Katzmann Award of Academic Excellence, Burton Awards
2018: Honoree (with Koh Family), National Immigrant Heritage Hall of Fame
2015: Inaugural Public Service Award, Council on Korean Americans, Washington, DC
2014: Frederick K. Cox Humanitarian Award for Advancing Global Justice, Case Western Reserve University Law School
2013: Secretary of State's Distinguished Service Award; William Green Award for Professional Excellence, University of Richmond, Law School
2010: Library of Congress George Wickersham Award for Outstanding Public Service
2008: Judith Lee Stronach Human Rights Award (given for outstanding contribution to global justice by the Center for Justice and Accountability, San Francisco); Sengbe Pieh Award, First and Summerfield United Methodist Church; IRIS Human Rights Award (for refugee advocacy)
2007: *Green Bag* Award for "exemplary writing in a long article" *Green Bag Almanac and Reader* (2007)
2007, 8, 9 *Lawdragon* 500 Leading Lawyers in America
2007-08: Connecticut Bar Association Young Lawyers Section Diversity Award; Pacific Islander, Asian, and Native American (PANA) Distinguished Service Award
2006: Philip Burton Award for Advocacy, Immigrant Legal Resource Center; Boston College 75th Anniversary Celebration Law School's Distinguished Service Award; Asian American Bar Association of New York Award; The Asian American Law Students Association (Pace Law School) Award of Distinction; Connecticut Super Lawyer, *Connecticut* Magazine (International Law)
2005: Louis B. Sohn Award, given by the International Law Section of the American Society of International Law for Lifetime Achievement in International Law; Equal Access to Justice Award, New Haven Legal Assistance; Allies for Justice Award, ABA National Lesbian and Gay Law Association; 100 Most Influential Asian Americans of the 1990s, *A Magazine*
2002: Wolfgang Friedmann Award, given by Columbia Journal of Transnational Law "to an individual who has made outstanding contributions to the field of international law"; Connecticut Bar Association Distinguished Public Service Award; John Quincy Adams Freedom Award, Amistad America 2001: Korean American Coalition Public Service Award
2000: Institute for Corean-American Studies Liberty Award

1999, 1997: "Public Sector 45" (45 leading American Public Sector Lawyers Under the Age of 45), *American Lawyer* Magazine 1997: Named one of nation's leading Asian-American Educators, *Avenue Asia* Magazine; Asian-American Lawyer of the Year, Asian-American Bar Association of New York; FACE (Facts About Cuban Exiles) Excellence Award
1995: Trial Lawyer of the Year Award, Trial Lawyers for Public Justice (co-recipient)
1994: Cuban-American Bar Association; Political Asylum Immigration Representation Project; Asian-American Lawyers of Massachusetts; Haiti 2004; Korean-American Alliance
1993: Asian Law Caucus; Asian-American Legal Defense & Education Fund, Justice in Action Award
1992: Co-recipient, American Immigration Lawyers' Association Human Rights Award
1991: Richard E. Neustadt Award, Presidency Research Section, American Political Science Association

**Fellowships**
Fellow, Balliol College Oxford (2021-22)
Fellow, Bonavero Human Rights Institute Oxford (2021-22)
Fellow, Christ's College Cambridge (2019)
Visiting Fellow, Trinity College Cambridge (2018)
Fellow, Jonathan Edwards College, Yale University (2013-)
Honorary Bencher, Lincoln's Inn, London (2013-)
Fellow, American Philosophical Society (2007-)
Honorary Fellow, Magdalen College (2002-)
Fellow, American Academy of Arts and Sciences (2000-)
Guggenheim Fellow (1996-97)
Twentieth Century Fund Fellow (1996-)
Visiting Fellow, All Souls College, Oxford (1996-97)
James Cooper Lifetime Fellow, Connecticut Bar Association (2006-)
Fellow, Timothy Dwight College (1985-2000)

**Publications:**

**Books and Monographs**

**The 21st Century National Security Constitution** (Yale University Press 2024)

**American Schools of International Law**, 410 **Recueil des Cours** (Martinus Nijhoff 2020) (Monograph of Inaugural Keynote Lecture at first Winter Session at The Hague Academy of International Law (2019))

**The Trump Administration and International Law** (2019) (Oxford University Press); (2d edition forthcoming 2026)

**Transnational Business Problems** (6th ed. 2019) (Foundation Press), with Detlev F. Vagts & William S. Dodge & Hannah Buxbaum

**A Reader's Guide to the Twenty-Fifth Amendment** (2018), with Yale Law School Rule of Law Clinic.

**Foundations of International Law and Politics** (with Oona A. Hathaway Oxford 2009)

**Transnational Litigation in United States Courts** (2008) (Foundation Press)

**Justice Harry A. Blackmun Supreme Court Oral History Project**, Federal Judicial Center/Supreme Court Historical Society (Editor 1994-1996) (public release 2004)

**The International Human Rights of Persons with Intellectual Disabilities: Different but Equal** (Oxford University Press 2002) (with Stanley Herr and Lawrence Gostin, eds)

**Deliberative Democracy and Human Rights** (with Ronald C. Slye) (Yale University Press 1999) (translated into Spanish)

**International Business Transactions in United States Courts,** 261 **Recueil des Cours** (Martinus Nijhoff 1998) (Monograph of Lectures in Private International Law at The Hague Academy of International Law)

**Transnational Legal Problems** (with Henry M. Steiner & Detlev F. Vagts) (Foundation Press 4th ed. 1994) and Documentary Supplement (1994)

**The National Security Constitution: Sharing Power After the Iran-Contra Affair** (Yale University Press 1990) (Winner, Richard E. Neustadt Award, awarded by the Presidency Research Section, American Political Science Association, to the best book published in 1990 that contributed most to research and scholarship on the American Presidency)

## Articles and Book Chapters

"Keynote Chapter: How Finally to End the Forever War" in **Perpetual War and International Law: Enduring Legacies of the War on Terror."** (Brianna Rosen ed. Oxford University Press 2025)

"The Yale School of Internaitonal Law," Yale J. Int'l Law Online (Sept. 22, 2024)

"Transnational Legal Process and the 'New' New Haven School of International Law," **International Legal Theory: Foundations and Frontiers**, Jeffrey Dunoff & Mark Pollack eds. Cambridge 2022)

*The "Gants Principles" for Online Dispute Resolution, Realizing the Chief Justice's Vision for Courts in the Cloud*, 62 B.C. L. Rev. 2759 (2021)

*Could the President Unilaterally Terminate All International Agreements? Questioning Section 313*, in **The Restatement and Beyond: The Past, Present and Future of US Foreign Relations Law** (Paul Stephan & Sarah Cleveland, eds. Oxford 2020)

Trump Change: Unilateralism and the "Disruption Myth" in International Trade, Yale J. Int'l L. Online, https://cpb-us-w2.wpmucdn.com/campuspress.yale.edu/dist/8/1581/files/2019/02/Koh_YJIL-_Symposium_Trump-Change_02.05.19-2amriyq.pdf

Trump vs International Law, Who's Winning?, 2018 Aus.J.Int'l L. 1 (2018)

Presidential Power to Terminate International Agreements, 2018 YALE L.J. F. 128 (2018)

"Trump vs. International Law: He's Not Winning", Opinio Juris (October 2, 2018) http://opiniojuris.org/2018/10/02/trump-vs-international-law-hes-not-winning/

"Trump v. International Law: Who's Winning?", Australian J. Int'l L., Vol. 24 (2018), p. 1.

Harold Hongju Koh, "Missile Strikes Against Syria: Against the Never-Never Rule", Proceedings of the Annual Meeting of the American Society of International Law (2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3125112

"The Trump Administration and International Law," 56 Washburn L.J. 413 (2017)

"Humanitarian Intervention: Time for Better Law", Symposium on Unauthorized Military Interventions for the Public Good, AJIL Unbound (2017), https://www.researchgate.net/publication/320169019_Humanitarian_Intervention_Time_for_Better_Law.

"State of Play and the Road Ahead: Humanizing Security," Chapter in Dapo Akande, et al., **Human Rights & 21st Century Challenges (**OUP 2017).

"Triptych's End: A Better Approach to 21st Century International Lawmaking,"126 Yale L.J. Forum (2016-17), https://www.yalelawjournal.org/forum/triptychs-end

"The Emerging Law of 21st Century War," 66 Emory L.J. 487 (2017)

"The Enduring Legacies of the Haitian Refugee Litigation," 61 N.Y.L.S. L. Rev. 155 (2016/17)

"Global Tobacco Control as a Health and Human Rights Imperative," 57 Harv. Int'l L.J. 433 (2016)

The War Powers and Humanitarian Intervention, 53 Houston L. Rev. 971 (2016)

"The Crime of Aggression: The United States Perspective" (with Todd F. Buchwald), in Claus Kress & Stefan Barriga, eds., **The Crime of Aggression: A Commentary** (Cambridge University Press 2016)

"The Legal Adviser's Duty to Explain," 41 Yale J. Int'l Law 189 (2016)

"The Legal Adviser's Duty to Explain," **The Role of Legal Advisers in International Law** (Andraz Zidar & Jean-Pierre Gauci eds. 2016)

"The People," Interview with HanYang Law Review, 2015 Han Yang L. Rev. 97 (2015)

"Reflections on the Law and Politics of the *Kosovo* Case," Chapter 18 in **The Law and Politics of the Kosovo Advisory Opinion** (M. Wood & M. Milanovic eds. 2015)

"The Crime of Aggression: The United States Perspective", (with T. F. Buchwald), 109 Am. J. Int'l L. 257 (2015).

"International Law in the Obama Administration," Plenary Session, 2014 Proceedings of the American Society of International Law

"The UN High Commissioner for Human Rights: from the personal to the institutional," in **The United Nations High Commissioner for Human Rights : conscience for the world**  (Felice D. Gaer & Christen L. Broecker eds, 2014)

"International Criminal Justice 5.0," 38 Yale J. Int'l Law 525 (2013)

"The Case for International Law" (with Michael Doyle), 92 Foreign Affairs 162 (2013)

"21st Century International Law Making," 101 Georgetown L.J. 725 (2013)

"Syria and the Law of Humanitarian Intervention, Parts I, II, III," http://justsecurity.org/2013/09/26/koh-syria/; justsecurity.org

REMARKS AT THE OXFORD UNION: HOW TO END THE FOREVER WAR? 14 (May 7, 2013), *available at* http://opiniojuris.org/wp-content/uploads/2013-5-7-corrected-koh-oxford-union-speech-as-delivered.pdf

"International Law in Cyberspace: Remarks of Harold Koh," 54 Harv. Int'l L.J. Online 1 (2012), available at http://www.harvardilj.org/2012/12/online_54_koh

"The State Department Legal Adviser's Office: Eight Decades in Peace and War," 100 Georgetown L.J. 1747 (2012)

"The Obama Administration and International Law,"   Keynote Speech at the Annual Meeting of the American Society of International Law (Mar. 25, 2010),   available at https://2009-2017.state.gov/s/l/releases/remarks/139119.htm

"America and the World, 2020," in **The Constitution in 2020** (R. Siegel & J. Balkin eds. 2009)

"Commentary" in Michael W. Doyle, **Striking First: Preemption and Prevention in International Conflict** 99 (2008)

"Human Rights and National Security," in Mark Green, et al., eds, **Change for America: Progressive  Blueprint for the Next Administration** (2008)

"Filártiga v. Pena-Irala: Judicial Internalization of the Customary International Law Norm Against Torture" in **International Law Stories (**Noyes, Dickinson & Janis, eds.; Law Stories Series, Foundation Press 2007)
The Future of Lou Henkin's Human Rights Movement, 38 Col. H.Rts Rev. 487 (2007)

"The Bright Lights of Freedom," NPR: THIS I BELIEVE, Jay Allison & Dan Gediman, eds., (New York: Henry Holt & Company, 2006) 141-143; paperback edition (2007)

"Can the President Be Torturer in Chief?," Ind. L. Rev. 81:1145 (winner 2007 Green Bag Award for "exemplary writing in a long article" *Green Bag Almanac and Reader* (2007)

"A World Drowning in Guns," **International Law and International Relations: Bridging Theory and Practice,** Thomas J. Biersteker, Peter J. Spiro, Chandra Lekha Sriram, and Veronica Raffo, eds., (London: Routledge Press, 2006) 59

"The New Global Slave Trade," **Displacement, Asylum, Migration** 232 (Oxford Amnesty Lectures) (Kate Tunstall ed. 2006)

"Unveiling Justice Blackmun," 72 Brooklyn L. Rev. 9 (2006)

"Setting the World Right," 115 Yale L.J. 2350 (2006)

"Why Transnational Law Matters," 24 Penn State Int'l L.Rev. 745 (2006)

"Keynote Address: A Community of Reason and Rights," 77 Fordham L. Rev. 583 (2008)

"A Law Unto Itself?," Yale L.J.115  (The Pocket Part) (2006) https://www. yalelawjournal.org/forum/a-law-unto-itself.

"Commentary: A World Drowning in Guns," in **International Law and International Relations** 59-76  (Thomas Biersteker, Veronica Raffo, Peter Spiro and Chandra Sriram, eds Routledge 2006)

"Standing Together," 15 Law & Sexuality, 15:1 "Internalization Through Socialization," Duke L.J. 54: 975  (2005)

"The Wolfgang Friedmann Lecture: A World Without Torture," Columbia Journal of Transnational Law  (2005)

"America's Jekyll and Hyde Exceptionalism," chapter in Michael Ignatieff, **American Exceptionalism and  Human Rights** (Princeton University Press 2005)

"The Value of Process," in *Why Obey International Law?,* 10 Int'l Legal Theory 1 (2004)

"The Ninth Annual John W. Hager Lecture, The 2004 Term: The Supreme Court Meets International Law,"  Tulsa Journal of Comparative & International Law 12: 1 (2004)

"International Law as Part of Our Law," 98 Am. J. Int'l Law 43 (2004)

"Separating Myth and Reality about Corporate Responsibility Litigation," 7 J. Intl Econ. L. 263 (2004)

"Transnational Legal Process After September 11," 22 Berkeley J. Int'l L. (2004)

"International Human Rights of Persons with Mental Disabilities," 63 Md. L. Rev. 1 (2004)

"Advice to the Next High Commissioner," Columbia Human Rights L. Rev. 2003

"American Diplomacy and the Death Penalty" (with Thomas Pickering) 80 Foreign Service Journal 19 (October 2003)

"On American Exceptionalism," 55 Stan. L. Rev. (2003)

"A World Drowning in Guns," 71 Fordham L. Rev. (2003)

The Law Under Stress After September 11, 31 Int'l Legal Info. 317 (2003)

Why the United States should ratify the Convention for the Elimination of Discrimination Against Women (CEDAW), 34 Case W. Res. L. Rev. 258 (2002)

Paying "Decent Respect" to the World Opinion on the Death Penalty, 35 U.C. Davis L. Rev. 1085 (2002)

Paying Decent Respect to International Tribunal Rulings, 2002 Proceedings of the American Society of International Law

"Preserving Our Values: The Challenge At Home and Abroad," chapter 6 in **The Age of Terror: America  and the World After September 11** at 143 (Strobe Talbott & Nayan Chanda, eds. Basic Books 2002)

"The Spirit of the Laws," 43 Harv. Int'l L.J. 23 (2002)

"The 2001 Richard Childress Memorial Lecture: A United States Human Rights Policy for the 21st  Century," 46 St. Louis U. L. J. 293 (2002) (special issue with nine commentators)

"The Case Against Military Commissions," 96 Am. J. Int'l L. 337 (April 2002)

"Transnational Legal Process Illuminated," in **Transnational Legal Processes: Globalisation and Power Disparities** 327 (Michael Likosky ed. Butterworths Press 2001)

"The Globalization of Freedom,"26 Yale J. Int'l L. 305 (2001)

*"Sale v. Haitian Centers Council*: Guantanamo and Refoulement" (with Michael J. Wishnie), in Ford, Hurwitz & Satterthwaite, **Human Rights Advocacy Stories** (2000)

"Complementarity Between International Organisations on Human Rights/The Rise of Transnational  Networks as the "Third Globalization," 21 Human Rights Journal 307 (2000)

"The Third Globalization: Transnational Human Rights Networks," Introduction to the 1999 Human Rights Report, U.S. Dept. of State, **Country Reports on Human Rights Practices for 1999** at xv (vol.1) (2000)

"The Right to Democracy," Introduction to the 1998 Human Rights Report, U.S. Dept. of State, **Country  Reports on Human Rights Practices for 1998** at xv (vol.1) (1999)

"1998 Harris Lecture: How Is International Human Rights Law Enforced?" 74 Indiana L. J. 1397 (1999)

"1998 Frankel Lecture: Bringing International Law Home," 35 Houston L. Rev. 623 (1998)

"Is International Law Really State Law?", 111 Harv. L. Rev. 1824 (1998)

"Why Do Nations Obey International Law?", 106 Yale L.J. 2599 (1997)

"Ten Lessons About Appellate Oral Argument,"71 Connecticut Bar Journal 218 (1997)

"Congressional Protection of International Human Rights,"170 Fed. R. D. 285 (1997)

"Book Review, Chayes & Chayes, **The New Sovereignty**," 91 American Journal of International Law 389  (1997)

"War and Responsibility in the Dole/Gingrich Congress," 50 Miami L. Rev. 1 (1996)

"Transnational Legal Process," 75 Neb. L. Rev. 181 (1996)

"The Constitution," in **Encyclopedia of U.S. Foreign Relations** (Oxford University Press 1996)

"A World Transformed," 20 Yale Journal of International Law vii (1995)

Broadening Access to International Law Resources Through New Technology," 89 American Society of International Law Proc. (1995)

"Bitter Fruit of the Asian Immigration Cases," 6 Constitution 68 (1994) (reproduced in Cong. Record, Jan. 6, 1995 at S569)

"America's Offshore Refugee Camps," 29 Richmond L. Rev. 139 (Allen Chair 1994)

"Refugees, The Courts, and the New World Order," 1994 Utah L. Rev. 999

"The 'Haiti Paradigm' in United States Human Rights Policy," 103 Yale L.J. 2391 (1994)

"Democracy and Human Rights in U.S. Foreign Policy?: Lessons from the Haitian Crisis," 48 SMU L. Rev.  189 (1994)

"The Haitian Refugee Litigation: A Case Study in Transnational Public Law Litigation," 18 Md. J. Int'l L &   Trade 1 (1994)

"Reflections on Refoulement and Haitian Centers Council," 35 Harv. Int'l L.J. 1 (1994)

"Who Are the Archetypal 'Good' Aliens?" 88 American Society of International Law Proc. 450 (1994)

"Justice Blackmun and the 'World Out There'," 104 Yale L.J. 23 (1994)

"DIANA: A Human Rights Data Base," 16 Human Rights Quarterly 753 (1994) (with N. Finke, T. Fitchett,  and R. Slye)

"The New New International Economic Order," 87 American Society of International Law Proc. 259 (1994)

"Aliens and the Duty of Nonrefoulement: *Haitian Centers Council, Inc. v. McNary*," 6 Harvard Human Rights Journal 1 (1993) (with the Lowenstein Human Rights Clinic)

"The Role of the Courts in War Powers Cases," in **Constitutional Government and Military Intervention After the Cold War** (M. Halperin & G. Stern eds.) (Westview Press 1993)

"The Human Face of the Haitian Interdiction Program," 33 Virginia Journal of International Law 483   (1993)

"Two Cheers for Feminist Procedure," 61 University of Cincinnati Law Review 1201 (1993)

"Protecting the Office of Legal Counsel from Itself," 15 Cardozo Law Review 1601 (1993)

"The War Powers Resolution," in **Cold War Patriot and Statesman: Richard M. Nixon** 321 (L. Friedman and W. Levantrosser, eds.) (Greenwood Press, 1993)

Selections, **Encyclopedia of the American Presidency** (1993)

"Reflections on **Kissinger**," Constitution (Winter 1993)

"Against Specialization in The Teaching of International Law," Contemporary International Law Issues: Sharing Pan-European and American Perspectives 198 (1992)

"The Fast Track and United States Trade Policy," 18 Brooklyn J. Int'l L. 143 (1992)

"Dollar Diplomacy/Dollar Defense: The Fabric of Economics and National Security Law," 26 International Lawyer 715 (1992) (with JC Yoo)

"Los regímenes de formulacion de politica comercial del Congreso y del Ejecutivo estadunidenses y su relacion con un posible acuerdo de libre comercio entre Canada, México y Estados Unidos," **México/Estado Unidos 1990** at 193 (G. Vega ed. 1992)

"Begging Bush's Pardon," 29 Hous. L. Rev. 889 (1992)

"The Constitution and the Bill of Rights," 85 American Society of International Law Proc. 199 (1991)

"Transnational Public Law Litigation," 100 Yale L.J. 2347 (1991)

"The Coase Theorem and the War Power: A Response," 1991 Duke L.J. 122 (1991)

"Presidential War and Congressional Consent: The Law Professors' Memorandum in Dellums v. Bush," 27 Stanford J. Int'l L. 247 (1991)

"The Constitutional Roles of Congress, the Executive and the Courts in the Conduct of U.S. Foreign Policy," (with K. Stith-Cabranes and S.Y. Koh) (Woodrow Wilson Center monograph) (Fall 1991)

"The War Powers Debate," **Ending the Cold War at Home** 41 (M.H. Halperin ed. 1990)

"The President Versus the Senate in Treaty Interpretation: What's all the Fuss About?" 15 Yale Journal of International Law 331 (1990)

"Reply to Book Reviews of **The National Security Constitution: Sharing Power After the Iran Contra Affair**, 15 Yale Journal of International Law 382 (1990)

"A History of the Fast Track Approval Mechanism," Chap. 1, A. Holmer & J. Bello, eds., **The Legislative Fast Track: Its Illustrative Use for the U.S.-Canada Free Trade Agreement** (Prentice Hall 1990)

"The Iran-Contra Affair," **The Guide to American Law Yearbook** 1990 (West 1990)

"A Level Playing Field for Global Problems: Section 337 of the Tariff Act -- A Case Study," Proceedings of the Eighth Annual Judicial Conference of the U.S.Court of Appeals for the Federal Circuit, 133 F.R.D. 257 (1990)

"The Liberal Constitutional Internationalism of Justice Douglas," He Shall Not Pass This Way Again: The Legacy of Justice William O. Douglas 297 (S. Wasby ed., U. of Pittsburgh Press 1990)

"The Responsibility of the Importer State," Chapter 8, in G. Handl & R. Lutz, eds., **Transferring Hazardous Technologies and Substances: The International Legal Challenge** 171 (Graham & Trotman/Martinus Nijhoff 1989)

"Why the President (Almost) Always Wins in Foreign Affairs: Lessons of the Iran-Contra Affair," 97 Yale  Law Journal 1255 (1988) (republished as Chapter 6 in **The Constitution and the Conduct of American Foreign Policy** (David Gray Adler & Larry N. George eds. 1996)

"The Palestine Liberation Organization Mission Controversy," 82 American Society of International Law Proc. 534 (1988)

"Four Dichotomies in American Trade Policy," in Symposium, American Trade Policy: Actors, Issues, and Options, Special Issue No. 1, Yale L. & Pol'y Rev. 4 (1988)

"Rebalancing the Medical Triad: Justice Blackmun's Contributions to Law and Medicine," 13 Am. J. L. &  Med. 201 (1988)

"The Treaty Power," 43 U. Miami L. Rev. 106 (1988)

"A Legal Perspective," Chapter 5, in **Perspectives On A U.S.-Canadian Free Trade Agreement** (R. Stern, P. Trezise & J. Whalley, eds.) (Brookings Institution 1987) (based on 12 Yale Journal of International Law 193 (1987))

"Civil Remedies for Uncivil Wrongs: Combatting Terrorism Through Transnational Public Law Litigation," 22 Texas Int'l.L.J. 169 (1987)

"Why the President (Almost) Always Wins in Foreign Affairs," 81 American Society of International Law   Proc. 248 (1987)

Book Review, H. Steiner & D. Vagts, **Transnational Legal Problems** and D.Vagts, **Transnational Business Problems**, 20 Int'l. Law 1417 (1986)

"Judge Wilkey's Contributions to International Law and the Foreign Relations Law of the United States," 1985 B.Y.U. Law Rev. 647 (1985)

"Congressional Controls on Presidential Trade Policymaking after INS v. Chadha," 18 N.Y.U.J.Int'l.L. &  Pol. 1191 (1986)

"Equality with a Human Face: Justice Blackmun and the Equal Protection of Aliens," 8 Hamline Law Rev. 51 (1985)

Note, "The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns," 93 Harv.L.Rev. 535 (1980)

Case Comment, "Discovery from Media Defendants in Public Figure Defamation Actions: Herbert v. Lando," 93 Harv.L.Rev. 149 (1979)


**Prefaces**

Foreword, Richard Abel, **Law's Trials: The Performance of Legal Institutions in the U.S. War on Terror** (Cambridge University Press 2018)

Preface to **Eugene Fidell, Beth Hillman & Dwight Sullivan, Military Justice: Cases and Materials** (2007)

Preface to **William J. Aceves, The Anatomy of Torture: A Documentary History of *Filártiga v. Peña-Irala*** (2007)

Preface to Jaya Ramji & Beth van Schaack, **Bringing the Khmer Rouge to Justice: Prosecuting Mass Violence Before the Cambodian Courts** (2004)

"Foreword," **Asian Americans and the Supreme Court: A Documentary History** ix (H.C. Kim ed.) (Greenwood Press 1992)

"Introduction," Focus: Foreign Affairs Under the Constitution, 13 Yale J. Int'l L. 1 (1988)

**Opinion Pieces and Blogposts**

After CASA: The Administrative Procedure Act Option for Challenging the Birthright Citizenship and Other Illegal Executive Actions" (With Alan Raul & Fred Halbhuber), Just Security, June 30, 2025

"100 Days of Lawlessness," Project Syndicate, https://www.project-syndicate.org/onpoint/trump-100-days-of-lawlessness-what-to-do-about-it-by-harold-hongju-koh-2025-05 May 2, 2025

"No, the President Cannot Enforce the Law-Firm Deals," Just Security Apr. 28, 2025 (With Fred Halbhuber & Inbar Pe'er)

"No, the President Cannot Issue Bills of Attainder**," (**With Fred Halbhuber & Inbar Pe'er), Just Security, April 9, 2025

The Just Security Podcast: 'The National Security Constitution in the 21st Century' Book Talk **Just** Security, Feb. 5, 2025

"National Security Resilience and Reform: Trump 2.0 and Beyond," Just Security Jan. 8, 2025

"America's Overlooked National Security Threat," Just Security, Sep. 11, 2024

"Where is the International Law We Believed In Ukraine?," Just Security Mar. 14, 2024

"Past Time to Liquidate Russian Assets," Just Security, March 5, 2024

"Finally Ending America's Forever War, Part I: Diagnosis, Part II: Prescription," Just Security Sep. 12-13, 2023

"International Law and the Russia-Ukraine Cybercrisis," February 20, 2022 (with Dapo Akande, Antonio Coco, Talita de Souza Dias, Duncan B. Hollis, James C. O'Brien and Tsvetelina van Benthem)

"The President's Legal Authority to Commit Troops Domestically Under the Insurrection Act" (with M. Loughlin) 22 September 2020, American Constitution Society Issue Brief, https://www.acslaw.org/analysis/issue-briefs/

"Joining COVAX Could Save American Lives " https://foreignpolicy.com/2020/09/15/covax-vaccine-covid-19-trump-save-lives-equitable-distribution/, September 15, 2020 (with Eric A. Friedman, Lawrence O. Gostin, Matthew M. Kavanagh and John T. Monahan)

"The Second Oxford Statement on International Law Protections of the Healthcare Sector During Covid-19: Safeguarding Vaccine Research," Just Security, August 11, 2020, https://www.justsecurity.org/71952/the-second-oxford-statement-on-international-law-protections-of-the-healthcare-sector-during-covid-19-safeguarding-vaccine-research/ (with Dapo Akande, Antonio Coco, Talita de Souza Dias, Duncan B. HollisJames C. O'Brien and Tsvetelina van Benthem)

"Oxford Statement on International Law Protections Against Cyber Operations Targeting the Health Care Sector", Just Security (with D. Akande, D. Hollis, and J. O'Brien) (May 21, 2020), https://www.justsecurity.org/70293/oxford-statement-on-the-international-law-protections-against-cyber-operations-targeting-the-health-care-sector/

"Is Trump's Assault on International Law Working?," OUP Blog, March 11, 2019; https://blog.oup.com/2019/03/trumps-international-law/

"Trump v. International Law," Yale Global Online, Feb. 15, 2019, https://yaleglobal.yale.edu/content/trump-vs-international-law

"The Twenty-Fifth Amendment," Skullduggery Podcast, https://finance.yahoo.com/video/skullduggery-tv-zucked-233352772.html, Feb. 8, 2019

"Trump v. Hawaii, Koremetsu's Ghost and National Security Masquerades", Scotusblog (June 28, 2018) https://www.scotusblog.com/2018/06/symposium-trump-v-hawaii-koremetsus-ghost-and-national-security-masquerades/ (also published in *Just Security*)

"International Law vs Donald Trump: A Reply," http://opiniojuris.org/2018/03/05/international-law-vs-donald-trump-a-reply/, Opinio Juris, March 5, 2018 (conclusion of online symposium on Koh, The Trump Administration and International Law, Oxford University Press, September 2018)

"'Effective' Policy in Syria: Ambassador Robert Ford's View," Just Security Blog, June 21, 2016, https://www.justsecurity.org/31590/effective-policy-syria-ambassador-robert-fords-view/

"Pain Versus Gain," Just Security Blog, June 20, 2016, https://www.justsecurity.org/31544/pain-gain/

"Another Legal View of the Dissent Channel Cable on Syria," Just Security Blog, June 20, 2016, https://www.justsecurity.org/31571/legal-view-dissent-channel-cable-syria/

Rapporteur's Report, "Global Migration Crisis: Its Challenges to the United States, Europe and Global Order," Richard C. Holbrooke Forum at the Brookings Institution, http://www.americanacademy.de/home/program/past/global-migration-crisis-0.

"Sunset and Supersede: Striking the Right Balance in the AUMF against ISIL," https://www.justsecurity.org/20570/sunset-supersede-striking-balance-authorization-military-force-aumf-isil/ March 2, 2015

"The Torture Report is Only the First Step, https://foreignpolicy.com/2014/12/12/the-torture-report-is-only-the-first-step/ https://www.justsecurity.org/18372/torture-report-step/; December 12, 2014

"America's 'Unequivocal Yes' to the Torture Ban," https://www.justsecurity.org/17551/americas-unequivocal-yes-torture-ban/ November 18, 2014

"Obama's ISIL Legal Rollout: Bungled, Clearly. But Illegal? Really?", JUST SECURITY, Sept. 29, 2014, 8:03 AM, https://www.justsecurity.org/15692/obamas-isil-legal-rollout-bungled-clearly-illegal-really/

"Ending the Forever War: One Year After President Obama's NDU Speech", EJIL TALK! (May 24, 2014), https://www.ejiltalk.org/ending-the-forever-war-one-year-after-president-obamas-ndu-speech/

YLS *Sale* Symposium, "*Sale*'s Legacies," http://opiniojuris.org/2014/03/17/yls-sale-symposium-sales-legacies/

"POTUS' view on who counts as Al Qaeda" https://www.justsecurity.org/5964/potus-view-counts/

"Ending the Forever War: A Progress Report," October 28, 2013, http://justsecurity.org/2013/10/28/ending-war-progress-report

"Strike on Syria for Chemical Weapons – Not Illegal," YaleGlobal https://yaleglobal.yale.edu/content/strike-syria-chemical-weapons-not-illegal

"A Day in Court Denied," The Washington Post, Monday, March 31, 2008 Page A19

"No Torture. No Exceptions," The Washington Monthly, January/February/March 2008

"Repair America's Human Rights Reputation"—op-ed appeared in the Summer 2007 issue of the Yale Law Report as part of a collection of op-eds written by Yale Law School faculty members

"Wrong on Rights," YaleGlobal Online (2004)

"Snatched in Sudan, Captive" in *Khartoum,* Times Higher Education Supplement, Feb. 20, 2004

"On America's Double Standard: The Good and Bad Faces of American Exceptionalism," American  Prospect (October 2004)

"Rights to Remember," Economist, November 2003 at 24

"Against Military Tribunals," Dissent Magazine 58 (Fall 2002)

"One Year Later, America Deserves Mixed Reviews," Yale Daily News (September 13, 2002)

"A Better Way to Deal with Iraq," Hartford Courant, October 20, 2002

"We Have The Right Courts for Bin Laden," N.Y. Times, Nov. 23, 2001

Six Civil Rights Experts Weigh in on Sept. 11, Time.com, December 1, 2001

"The U.S. Can't Allow Justice to Be Another War Casualty," The Los Angeles Times; Dec. 17, 2001

"The Best Defense: Article I," The Hartford Courant (September 16, 2001)

"America the Pariah," Project Syndicate (August 2001) (op ed piece published in 20 foreign newspapers)

"Estados Unidos y Europa, divididos por la pena de muerte," LA NACION (Argentina) July 23, 2001

"A Dismal Record on Executing the Retarded," New York Times (June 14, 2001)

"A Wake Up Call on Human Rights" Washington Post (May 8, 2001)

"A Breakthrough in North Korea," Washington Post (November 2, 2000)

"Aliens in Our 'Beloved Community,'" Smithsonian Working Paper (1995)

"One Step Forward, One Step Back," Miami Herald, May 4, 1995 A27

"Standing Up for Principle: A Personal Journey," 5 Korean and Korean-American Studies Bulletin 4 (1994)

Closed Door Policy for Refugees," Legal Times 36 (July 26, 1993)

"We the People --and Congress-- Have Yet to Be Heard" (with B. Ackerman), L.A. Times (May 5,  1993)

Conversation/By Steve Kemper," Northeast Magazine, July 26, 1992

"Good News, Bad News," Constitution 13 (Spring-Summer 1991)

"Bush Honors the Law When It Pleases Him," Newsday (January 20, 1991)

"Summary Remarks, Conference on The Dynamics of U.S.-Korea Trade Relations: Economic, Political,   Legal and Cultural," (East Rock Press, 1991)

"Don't Close the Books on Iran-Contra Mess," New Haven Register (May 13, 1990)

"Graduation Address to Yale Law School," (May 1989), excerpted in S. Lee & M. Fox, Learning Legal Skills 207 (1991) and Yale Law Report 14 (Fall 1989)

"What Congress Must Do To Reassert National Security Power," First Principles 5 (September 1988)

Looking Beyond Achievement: After `the Model Minority,' Then What?"," 3 Korean And KoreanAmerican Studies Bulletin 15 (Fall/Winter 1987)

"Thoughts on Being a Korean-American Legal Academic," 1 Korean-American Journal 5 (May 1986)

"Asians in American Law", Yale Law Report 28 (Fall 1986)

**Tributes**

*"*Remembering Ralph" (with Scott Gilbert & Lawrence Tu), 62 BC L. Rev. 2684 (2021)

"In Memory of Anthony P. Lester," Just Security, August 11, 2020, https://www.justsecurity.org/71959/in-memory-of-anthony-p-lester/ (co-published with EJILTalk!)

"Lea Brilmayer: How Contacts Count," **Resolving Conflicts in the Law** 20 (C. Georgetti & N. Klein eds 2019)

"Michael Ratner: The Leading Progressive Lawyer of a Generation," May 12, 2016, https://www.justsecurity.org/31010/michael-ratner/

Restoring Justice: The Legacy of Edward H. Levi, Bulletin of the American Academy of Arts and Sciences, Winter 2014, at 26; available at http://www.amacad.org/sites/default/files/academy/multimedia/pdfs/publications/bulletin/winter2014/bulletin_Winter2014.pdf

In Memoriam, Detlev F. Vagts (1929-2013) (with William Dodge and Hannah Buxbaum), http://opiniojuris.org/2013/08/23/in-memoriam-detlev-f-vagts-1929-2013/

Nelson Mandela, 1918-2013; https://www.justsecurity.org/4273/nelson-mandela-1918-2013/

Tom Eagleton: True Senator, 52 St. Louis U. L Journal 25 (2008)

Mirjan Damaska: A Bridge Between Two Cultures, in Maximo Langer, et al., **Festschrift for Mirjan Damaska** (2008)

In Memoriam: Robert F. Drinan, S.J. (1920-2007) 95 Georgetown Law Journal 1709 (2007)

The Activist: Robert S. Drinan S.J., Stirring the Human Rights Revolution, BC Law Magazine 7 (Summer 2007) (tribute to Father Drinan)

Harry Andrew Blackmun, in **Yale Biographical Dictionary of American Law** (2007)

Louis B. Sohn: Present at the Creation, 48 Harvard International Law Journal 13 (2006)

The Healing Wisdom of Jay Katz, 6 Yale J. Health Policy, Law and Ethics 397 (Spring 2006)

"Mark Janis and the American Tradition of International Law," 21 Conn. J. Int'l L. 191 (2006)

"Choosing Heroes Carefully" (Tribute to John Hart Ely), 57 Stan. L. Rev. 723 (2005)

"Tribute to President Francis Daly Fergusson," upon her retirement from Vassar College, Vassar Quarterly, "Energy in the Executive" (2005)

"Tribute to John Sexton," 60 Annual Survey of American Law (2003) (tribute to John Sexton)

"A Tribute to Tom the Frank," 35 NYU Journal Int'l L. & Pol. (2003) (tribute to Thomas Franck)

"In Memoriam: Dean Eugene V. Rostow," Yale Law Report 16 (Summer 2003)

"A Passion for Service," 45 N.Y.L.S. L. Rev. 17 (2001) (tribute to Dean Harry Wellington)

"An Uncommon Lawyer," 42 Harv. Int'l L.J. 7 (2001) (tribute to Abram Chayes)

"A Tribute to Justice Harry A. Blackmun," 108 Harv. L. Rev. 20 (1994)

"Terms for Assessment," Roundtable on Justice Blackmun, ABA Journal 52 (July 1994)

"Justice Done," New York Times, Apr. 8, 1994, at A27 (tribute to Justice Harry A. Blackmun)

"The Justice Who Grew," 1994 J. SCt. Hist. 5  (1994) (tribute to Justice Harry A. Blackmun)

Remarks at Proceedings Held on the Occasion of the Induction of Jose A. Cabranes As U.S. Circuit Judge,  2d Cir. (Sept. 26, 1994)

Remarks at Presentation of the Portrait of the Honorable Malcolm R. Wilkey, 992 F.2d lxxi (1993) (U.S. Ct. App. D.C. Dec 17, 1992)

"A Justice for Passion," 1990 Annual Survey of American Law (1991) (tribute to Justice Harry A. Blackmun)

"Malcolm R. Wilkey: Jurist and Scholar," 19 Int'l Law. 1289 (1985)


**Selected Congressional Testimony:**
Testimony before the Senate Foreign Relations Committee Regarding Authorization for use of Military Force After Iraq and Afghanistan, May 21, 2014; Testimony before the Senate Foreign Relations Committee Regarding Use of Military Force in Libya, June 28, 2011; Testimony before the Senate  Judiciary Committee Subcommittee on the Constitution regarding Restoring the Rule of Law (September 16, 2008); Testimony before the House Foreign Relations Committee regarding "The 2006 Country Reports on Human Rights Practices and the Promotion of Human Rights in U.S. Foreign Policy" (March 29, 2007); Testimony before the Senate Committee on the Judiciary regarding "Hamdan v. Rumsfeld: Establishing a Constitutional Process" (July 11, 2006); Testimony before the Senate Committee on the Judiciary regarding "Wartime Executive Power and the National Security Agency's Surveillance Authority" (February 28, 2006); Testimony before the Senate Judiciary Committee regarding "The Nomination of the Honorable Alberto R. Gonzales as Attorney General of the United States" (January 7, 2005); Testimony before the House Committee on International Relations regarding "A survey and analysis of supporting human rights and democracy: The U.S. record 2002–2003" (July 9, 2003) "United States Ratification of the Convention on the Elimination of All Forms of Discrimination Against Women," Hearing Before the U.S. Senate Foreign Relations Committee (June 13, 2002) "Human Rights in Turkey," Hearing before the Commission on Security and Cooperation in Europe, Washington, DC (March 9, 2000). "Country Reports on Human Rights Conditions," Testimony before the Subcommittee on International Operations and Human Rights, U.S. House of Representatives Washington, DC, (March 8, 2000). "The Global Problem of Trafficking in Persons: Breaking the Vicious Cycle," Hearing Before the House Committee on International Relations (Sept. 14, 1999) "Human Rights at the End of the 20th Century," Hearing before the Commission on Security and Cooperation in Europe; Washington, DC, (March 17, 1999). "Country Reports on Human Rights Conditions," Testimony "Country Reports on Human Rights Conditions," Testimony before the Subcommittee on International Operations and Human Rights, U.S. House of Representatives (March 3, 1999) "Human Rights in China," Testimony International

Operations and Human Rights, U.S. House of Representatives, Washington DC (January 20, 1999) "U.S. Policy Toward Haiti": Hearing Before the Subcommittee on Western Hemisphere and Peace Corps Affairs of the Senate Committee on Foreign Relations, 103d Cong. 2d Sess. (Mar. 8, 1994) "The Nonrefoulement Reaffirmation Act of 1992," House Foreign Affairs Committee (June 11, 1992) "U.S. Human Rights Policy Toward Haiti," Hearing before Legislation and National Security Suboccmittee; House Government Operations Committee, 102nd Cong., 2nd Sess. 97 (April 9, 1992) "The Constitutional Roles of Congress and the President in Waging and Declaring War," Senate Judiciary Committee (January 8, 1991) "Executive-Congressional Relations in a Multipolar World," Hearings Before the Senate Foreign Relations Committee, 101st Cong., 2d Sess. 92 (Nov. 26, 1990) Testimony on H.R. 3665, the Official Accountability Act, before the House Judiciary Committee, Subcommittee on Criminal Justice, (June 15, 1988)

**Selected Legal Activities:**

**Domestic Cases:**

Co-founder (with Michael Wishnie, Phil Spector and Hope Metcalf) of Peter Gruber Rule of Law Clinic Yale Law School (2016-), (with Michael Wishnie) 9/11 Clinic Yale Law School (2001-09), and (with Michael Ratner), Allard K. Lowenstein International Human Rights Clinic at Yale Law School (1991-)

Human Rights: Counsel for plaintiffs and amici curiae in numerous international human rights cases before United States courts, e.g., counsel of record to Haitian and Cuban refugees before the U.S. Supreme Court, see Sale v. Haitian Centers Council, 509 U.S. 155 (1993); Counsel for respondents, Royal Dutch Petroleum Co. v. Ken Wiwa, et al., (U.S. S.Ct., No. 00-1168, cert. denied March 26, 2001) Of counsel and oralist for plaintiffs, Cuban-American Bar Ass'n v. Christopher, 43 F.3d 1413 (11th Cir. 1995) cert. denied, 515 U.S. 1142 (1995) (For work done on this case, received 1994 Human Rights Award from Cuban- American Bar Ass'n) Lead counsel for plaintiffs, Sale v. Haitian Centers Council, Inc., 113 S.Ct. 2549 (1993), 823 F.Supp. 1028 (E.D.N.Y. 1993), and 969 F.2d 1326 (2nd Cir. 1992) (For work done on this case, recognized by Haiti 2004, Korean-American Alliance, Political Asylum Immigration Representation Project and as co-recipient, 1993 Justice in Action Award, Asian-American Legal Defense and Education Fund; Co-recipient, 1992 Human Rights Award, American Immigration Lawyers' Association; Asian Law Caucus) Foreign and Comparative Law Scholars, Hollingsworth v. Perry (U.S. S. Court 2014); Co-counsel for plaintiffs, Doe v. Karadzic, 70 F. 3d 232 (1995); 176 F.R.D. 458 (S.D.N.Y. 1997) (represented from filing of complaint until 1998, then withdrew from representation to join U.S. government; after a two-week jury trial in September 2000, a jury awarded plaintiffs approximately $ 4.5 billion in compensatory and punitive damages);Greenpeace, Inc. (U.S.A.) v. France, 946 F. Supp. 773 (C.D. Cal. 1996);Paul v. Avril, 812 F. Supp. 207 (S.D. Fla. 1993) ($41 million judgment awarded); Todd v. Panjaitan, No 92-12255WD (D. Mass. decided October 25, 1994) ($14 million judgment awarded); Xuncax v. Gramajo, No. 91-11564WD (D.Mass., filed June 6, 1991); Ortiz v. Gramajo (D.Mass. 1992)($47.5 million judgment awarded); Doe v. Karadzic, 866 F. Supp. 734 (1994); No. 94-9035 (2d Cir. 1995); Belance v. FRAPH, No. 94-2619 (E.D.N.Y.) (Nickerson, J.) (For work done on Avril and Gramajo cases, named as co-recipient, 1995 Trial Lawyer of the Year Award, by the Trial Lawyers for Public Justice). Amicus Curiae, U.S. Supreme Court, Argentine Republic v. Amerada Hess (1990); United States v. Alvarez-Machain, (1992); Nelson v. Saudi Arabia, No. 91-522 (1993); Jaffe v. Snow, No. 93-241 (1993); Trajano v. Marcos, 978 F.2d 493, 499−500 (9th Cir. 1992), cert. denied, 113 S. Ct. 2960 (1993); No. 93-9133 Negewo v. Abebe-Jira, 11th Cir. 1995; Abebe-Jiri v. Negewo, No. 90- 2010, Slip Op. at 7 (N.D. Ga. Aug. 20, 1993). Co-author (with David Cole and Jules Lobel), "Interpreting the Alien Tort Statute: Amicus Curiae Memorandum of International Law Scholars and Practitioners in Trajano v. Marcos," 12 Hastings Int'l & Comp. L. Rev. 1 (1988) (published Amicus Curiae Brief on behalf of nineteen international law scholars and practitioners in international human rights case). Co-author, Brief Amicus Curiae Urging Denial of Certiorari, Tel-Oren v. Libyan Arab Republic, reprinted in 24 I.L.M. 427 (1985) (as Justice Department Attorney) Litigation before Iran-U.S. Claims Tribunal, Case No. 55, Amoco Iran v. Islamic Republic of Iran (as Private Practitioner) Co-counsel for Iranian Hostages in Persinger v. Iran (D.C. Cir. 1982) and Cooke v. United States (Cl. Ct. 1982) (as Private Practitioner)

*Death Penalty:*

Counsel for former American diplomats or national security officials as *amici curiae in Medellin v. Texas,* 552 U.S. 491 (2008); *Sanchez-Llamas v. Oregon,* 126 S. Ct. 2669 (2006); *Medellin v. Dretke,* 544 U.S. 660, 687 (2005) (cert. dismissed as improvidently granted); *Roper v. Simmons* 543 U.S. 551 (2005), *Atkins v. Virginia,* 122 S. Ct.

2242 (No. 00-8452 decided June 20, 2002), and *McCarver v. North Carolina* (No. 00-8727, *cert. dismissed* Sept. 25, 2001). Co-author, Law Professors Letter to Senate Judiciary Committee Regarding Military Commission, December 5, 2001, available http://www.yale.edu/lawweb/liman/letterleahy.pdf Counsel for U.S. Diplomats Morton Abramowitz, et al, Amicus Curiae in McCarver v. North Carolina, No. 00-8727 (U.S. cert. Dismissed Sept. 25, 2001) (arguing that execution of those with mental retardation violates Eighth Amendment's cruel and unusual punishments clause)

National Security: Counsel for former American diplomats or national security officials as *amici curiae* in: see, e.g.,  Counsel of Record, Brief of Amici Curiae Former National Security Officials In Support Of Respondents Trump v. Mazars & Trump v. Deutsche Bank AG  (No. 19-175 and 19-760 U.S. 2020), https://law.yale.edu/sites/default/files/documents/pdf/Clinics/19-715_19-760bsacmazarsformernationalsecurityofficials.pdf

Signed Amicus brief of former Office of Legal Counsel Officials as Amici curiae in support of Respondents in *Trump v. Vance* (19-635 U.S. 2020), https://www.supremecourt.gov/DocketPDF/19/19-635/134893/20200304104133763_Vance%2019-635%20-%20Brief%20-%20Final.pdf

Counsel of Record, Amicus brief on behalf of former U.S. government officials for Yale Law School Peter Gruber Rule of Law Clinic in support of Respondents in *Trump v. Hawaii,* (U.S. 2018), and joint declarations of former national security officials in  *Washington v. Trump* (WD Was 2018), *Hawaii v. Trump* (D. Haw. 2018) and *Pars Equality Center v.  Trump* (D.D.C. 2018) (all challenging Travel Ban 3.0); Amicus Curiae Briefs for Yale Law School Rule of Law Clinic on behalf of 50 Former National Security Officials in IRAP v. Trump (Supreme Court 2017); IRAP v. Trump (4th Cir. 2017) & Hawaii v. Trump Brief (9th Cir. 2017), and joint declarations before assorted district courts (challenging Travel Ban 1.0, 2.0 & 3.0); Amicus Brief of National Security Officials, IRAP v. Trump (DMd. 2017); Amicus Brief of National Security Officials, Darweesh v. Trump (EDNY 2017)

Counsel of Record, Amicus Brief on behalf of Former National Security Officials in Asylum Ban/ "Remain in Mexico" case, *Innovation Law Lab v. Trump* (9th Cir.) https://law.yale.edu/sites/default/files/documents/pdf/news/rol_amicus_brief_062619.pdf;

Counsel of Record on behalf of Former National Security Officials in *Stone v. Trump* (D.D.C. 2017) (challenging transgender ban)

Counsel of Record on behalf of Former National Security Officials in *Blumenthal v. Trump* in support of Plaintiffs' Memorandum in Opposition to  Defendant's Motion to Dismiss (arguing for applicability of Foreign Emoluments Clause to President's  private business dealings)

Counsel, Joint Declaration of Former U.S. Government Officials regarding Claimed National Emergency, Feb. 25, 2019,  https://www.cnn.com/2019/02/25/politics/read-former-senior-national-security-trump-national-emergency/index.html

Counsel of Record, Amicus brief on behalf of Former National Security Officials in *Cockrum v. Donald Trump for President* (D.D.C. 2017) (amicus brief in support of neither party discussing Russian active measures)

Counsel of Record, Amicus brief on behalf of former U.S. government officials for Yale Law School Peter Gruber Rule of Law Clinic in support of Respondents in Supreme Court DACA case, *Department of Homeland Security v. Regents of the University of California* (Oct. 4, 2019) *available at* https://law.yale.edu/sites/default/files/area/clinic/document/rolc_national_security_officials_amicus_brief.pdf described in https://www.justsecurity.org/66462/51-former-senior-national-security-officials-to-supreme-court-rescinding-daca-was-arbitrary-and-capricious/

Counsel, Brief of Former U.S. Government officials As Amici Curiae in Support of Plaintiffs-Appellees Cross-Appellants, *El Paso County, Texas v. Trump* (No. 19-17501 5th Circuit 2020), https://protectdemocracy.org/resource-library/document/el-paso-county-v-trump-us-officials-amicus/

Counsel for Ryan Goodman and JUST SECURITY in filing Request Under the Freedom of Information Act (FOIA)

seeking troop numbers in Afghanistan, Iraq, and Syria https://law.yale.edu/yls-today/news/rolc-files-foia-requests-seeking-troop-numbers-afghanistan-iraq-syria and https://www.theguardian.com/us-news/2020/apr/22/us-troop-levels-afghanistan-iraq-syria-military-foia.

Counsel for former U.S. Senators Russ Feingold & Chuck Hagel, "Presidential Impeachment Trial: What A Senator Should Know," Dec. 5, 2019, https://law.yale.edu/sites/default/files/area/clinic/document/impeachmenttrialmemo.pdf Described in https://law.yale.edu/yls-today/news/clinic-assists-former-us-senators-drafting-impeachment-trial-memorandum

Co-author (with ten other constitutional law scholars) of  Memorandum Amicus Curiae of Law Professors in Ronald v. Dellums v. George Bush (D.D.C. 1990),  reprinted in 27 Stanford Journal International Law 257 (1991)

Co-author (with nine other constitutional law scholars)   of Correspondence With Assistant Attorney General Walter Dellinger re Legality of United States Military   Action in Haiti, reprinted in 89 American Journal International Law 127 (1995)

*Environmental cases:*

Counsel of Record, Brief of Former U.S. Government Officials as Amici Curiae Supporting Affirmance of the District Court's Decision, *Rhode Island v. Shell Oil Products Co. LLC* (No. 19-1818 1st Cir. 2019), http://blogs2.law.columbia.edu/climate-change-litigation/wp-content/uploads/sites/16/case-documents/2019/20191223_docket-19-1818_amicus-brief-1.pdf

Counsel, Brief of Former U.S. Government Officials as Amici Curiae Supporting California in *United States v. California (2:19-cv-02142 E.D. Cal. 2020)* (California-Quebec Cap & Trade Litigation), https://www.crowell.com/files/AmiciCuriaeBriefofFmrUSDiplomatsandGovtOfficials.pdf

Counsel, Brief of Former U.S. Government officials as Amici Curiae on behalf of former U.S. diplomats in support of Baltimore in *Mayor and City Council of Baltimore v. BP P.L.C.*, no. 24-C-18-004219 (Circuit Court Baltimore County 2020), http://climatecasechart.com/case/mayor-city-council-of-baltimore-v-bp-plc/

Counsel of  Record, Brief of Former U.S. Government Officials as Amici Curiae Supporting Reversal of the District Court's Decision, in No. 18-16663, City of Oakland v. BP p.l.c. (9th Cir. March 20, 2019), see https://law.yale.edu/studying-law-yale/clinical-and-experiential-learning/our-clinics/peter-gruber-rule-law-clinic

Counsel, Brief of Conflict of Laws and Foreign Relations Scholars as *Amici Curiae*   in support of Plaintiff-Appellant and Reversal of the District Court's Decision City of New York v. BP   P.L.C., No. 18-2188, Second Circuit, November 15, 2018

As State Department Legal Adviser, counsel to the United States before the U.S. Supreme Court in 18 cases between 2009-13: *Arizona v. U.S., Abbott v. Abbott, Kingdom of Spain v. Cassirer, Samantar v. Yousuf, Rubin v. Islamic Republic of Iran, Placer Dome v. Provincial Government of Marinduque, City of NY v. Permanent Mission of India to the UN, Louisiana Safety Ass'n v. Certain Lloyds Underwriters, Holy See v. Doe, Faculty Senate of FIU v. Florida, EM Ltd. V. Argentina, Chafin v. Chafin, Bank Melli Iran NY v. Weinstein, Zivotofsky v. Clinton (Zivotofsky I), Von Saher v. Norton Simon Museum, Venezuela v. DRFP LLC, Mohamad v. Palestinian Authority, Kiobel v. Royal Dutch Petroleum (Kiobel I)*

Expert Witness:

*CITGO Petroleum Corp. v. Ascot Underwriting Ltd.* (SDNY 2022)

*Merck & Co., Inc. et al. vs. ACE American Ins. Co., et al.* (NJ Super. Court 2020)

*Universal Cable Productions LLC et al v. Atlantic Specialty Insurance Co.* (C.D. Cal. 2019),

**Selected International Litigation, Arbitration, and Consultation:**

Arbitrator, Binational Dispute Settlement  Panel Convened Under Chapter 19 of the U.S.-Canada Free Trade Agreement, No. U.S.A.-93-1904-05, *In  re Certain Flat-Rolled Carbon Steel Products from Canada* (Nov. 4, 1994);

**Counsel for parties in international tribunals as Associated Member of the Blackstone Chambers, London (from 2014),** including:

*Counsel for Canada, Sweden, United Kingdom, and Ukraine, in Aerial Incident of 8 January 2020* (Can., Swed., Ukr. & U.K. v. Iran), I.C.J. (2025)

*Counsel for International Trade Unions Confederation on the Right to Strike Under ILO Convention No. 87*, Request for Advisory Opinion, 2023 I.C.J. (Nov. 10, 2023)

Council for Ukraine in *Allegations of Genocide Under the Convention on the Prevention and Punishment of the Crime of Genocide* (Ukr. v. Russ.).

Counsel for Ukraine in *Dispute Concerning Coastal State Rights in the Black Sea, Sea of Azov, and Kerch Strait* (Ukraine v. Russian Federation) (PCA No. 2017-06 September 2024)

Counsel for Ukraine in *Application of the International Convention for the Suppression of the Financing of Terrorism and the International Convention on the Elimination of All Forms of Racial Discrimination* (Ukraine v. Russian Federation) (ICJ Provisional Measures *(*April 19, 2017); Preliminary Objections (8 November 2019); Merits (2022)

Counsel for Timor-Leste, Compulsory Conciliation with Australia regarding Maritime Bounday (Permanent Court of Arbitration 2018)

Counsel for Republic of Chile in *Obligation to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)* (ICJ 1 October 2018)

Counsel for Uruguay in *Phillip Morris Brands Sarl v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award (July 8, 2016)

Counsel for the United States of America in *Grand River Enterprises Six Nations, Ltd. v. United States of America*, UNCITRAL, Final Award (Jan. 12, 2011).

Counsel for United States of America in *Advisory Opinion on the Accordance with International Law of the Unilateral Declaration of Independence by the Provisional Institutions of Self-Government Kosovo*, ICGJ 423 (ICJ 22 July 2010)

Counsel for the United States of America in *Ecuador v. U.S.* (PCA 2012)

Counsel for the United States of America in *Apotex* (ICSID 2010), Counsel for United  States in *Case A(15)(2)(a)* (Iran U.S. Claims Tribunal 2012)

Co-counsel for petitioners, In re civilian population of Chiapas, Mexico and certain Members of the Ejercito Zapatista de Liberacion Nacional (Inter-American Commission on Human Rights) (filed  January 27, 1994); In re Haitian population of Bahamas

Counsel for the applicant in  *Amoco Iran (Case 55)* (Iran-U.S. Claims Tribunal 1987)

Counsel for U.S., *Nicaragua v. United States*,  Provisional Measures, 1986 I.C.J. 14 (as U.S. Justice Department Attorney).

Consultant, United Nations High Commissioner on Refugees Global Consultations on reformation of the UN

Refugee Convention, Cambridge University (Summer 2001)

Advisory Committee for Council on Foreign Relations Study on "Countering   Sexual Violence in Conflict" (Jamille Bigio & Rachel Vogelstein eds. 2017)

Consultant for "Legal  Report for the Inquiry on Protecting Children in Conflict" submitted to Special Representative for the   Secretary General on Children in Armed Conflict and United Nations Special Envoy for Global Education  Gordon Brown by Legal Panel headed by Shaheed Fatima, QC editor)

**Selected Named Lectures:**
2022 Louis Henkin Human Rights Lecture, University of Miami School of Law; 2020 Inaugural Ralph D. Gants Memorial Lecture, Center on the Legal Professor, Harvard Law School; 2020-19 Phi Beta Kappa Lectures in seven colleges or universities; 2019 Brand-Manatt Lecture, George Washington University School of Law; F.A. Mann Lecture, Lincoln's Inn, London; David Caron Memorial Lecture, Center for Transnational Legal Studies, London; 2018 Sterry R. Waterman Lecture, Vermont Law School; Lady Margaret Lecture, Christ's College  Cambridge (2017); Robinson Lecture, University of California Irvine School of Law (2017); Handa Lecture, Stanford University (2017); Baldy Lecture, University of Buffalo School of Law (2017);  Vacketta-DLA Piper Lecture, University of Illinois College of Law (2017); Dickey Lecture, Dartmouth  College (2017); Raoul Wallenberg Lecture, McGill University (2016); Thrower Lecture, Emory Law School (2016), 2016 Max Soerenson Lecture, Aarhus, Denmark; Justice Stephen Breyer Lecture on  International Law, Brookings Institution, 2016; Frankel Lecture, University of Houston Law Center (2015, 1998); Clarendon Law Lectures (Oxford 2014); Oliver Smithies Lecture, Balliol College, Oxford (2013); Inaugural Thomas Bingham Lecture, Bingham Centre, London 2013; Inaugural International Law Lecture, U.K. Foreign and Commonwealth Office, 2013; Sir George F. Turner Lecture, 2013, Faculty of Law, University of Melbourne;  Benjamin Gupta Lecture, Oxford Human Rights Programme, 2013; 2013 George P. Smith Lecture, University of Indiana Maurer School of Law, 2013 Tamisiea Distinguished Lecture,  University of Iowa College of Law; Ryan Lecture, Georgetown Law School 2011; Cecil Wright Lecture, University of Toronto School of Law (2002); Korematsu Lecture, New York University School of Law  (2002); George Wythe Lecture, William and Mary College of Law (2002); Robert Levine Lecture, Fordham Law School (2002); Frank Strong Lecture, Ohio State University School of Law (2002); Barbara  Harrell-Bond Lecture, Oxford University (2001); Edward Barrett Lecture, University of California at Davis  School of Law (2001); Bruce Klatsky Lecture, Case Western Reserve University School of Law (2001); Richard Childress Lecture, St. Louis University School of Law (2001); Harris Lecture, University of Indiana Law School (1998); Scuola Santa Anna (Pisa, Italy) (1997); Bartlett Lecture, Yale Divinity School (1997); Waynflete Lectures, Magdalen College, Oxford University (1996); Enrichment Lecturer, George Washington University National Law Center (1995); Scholar-in-Residence, Hofstra University (1995); Ralph Kharas Lecture, Syracuse University (1995); Mason Ladd Lecture, Florida State University (1995); 1995 Martin Luther King Lecture,  Smithsonian Institution (1995); Roscoe Pound Lecture, University of Nebraska College of Law (1994); Emmanuel Emroch Lecture, University of Richmond Law School (1994); George Allen Distinguished Visiting Professor, University of Richmond Law School (1994); Roy R. Ray Lecture, Southern Methodist University School of Law (1994); William H. Leary Lecture, University of Utah Law School (1993); Convocation Lecturer, Duke Law School (1993); McGill Law School (1993); Gerber Lecture, University of  Maryland (Baltimore) (1993).

**Selected Commencement Addresses: George Washington Law School (2025); University of Toronto Faculty of Law (2024);** Yale Law School (1987, 1989, 2000, 2009),  Quinnipiac Law School (2014); University of Denver Sturm College of Law (2014); American University School of Law (2012); Wayne State University (2010); Northeastern University (2010);  New School for Social Research (2009); Iona College (2008); Jewish Theological Seminary (2008);  Skidmore College (2002); University of Connecticut School of  Law (2000); Dickinson College (2000); Villanova Law School (2000); Touro College of Law (2000);  Albertus Magnus College (1999); NYU Law School (1999); University of Maryland (Baltimore) School of  Law (1995).

**Boards:** American Law Institute, Council (2006-09, 2013-);  Foundation Press Board of Editors (1994-1998, 2001-2009, 2013-22); Counselor, American Law Institute, Restatement Fourth of the Foreign Relations Law of the United States (2014-19); International Advisory Panel, National University of Singapore Law Faculty (2017); Secretary of State's Advisory Committee on Public International Law (1994-98, 2013-); Advisory Committee, Salzburg Global Seminar; Brookings Institution Board of Directors (2004-09); Connecticut Bar Foundation Board of Directors (2004-05); Harvard University Overseer (2001-8); Visiting Committee, Harvard Law School (1996-2002); Visiting Committee, Harvard  Kennedy School of Government (2007-19); Visiting Committee, University of Toronto

Faculty of Law  (2004); Board of Directors, American Arbitration Association (2007-9, 2013-22); Board of Directors, Human  Rights in China (2002-5); Counsellor, American Society of International Law, Washington, DC (honorary post; 2008-); Thomas J. Dodd Research Center National Advisory Board (2001-); Board, National Democratic Institute (2001-); Board of Human Rights First (formerly Lawyers Committee for Human Rights) (2001-); Board of Human Rights in China (2001-); Board of International Campaign for Tibet  (2001-); Human Rights Watch (1994-98); Hopkins School (1997-); Interights (1996-98); St. Thomas's Day  School (1993-96); Connecticut Civil Liberties Union (1993-7); Initiative for Public Interest Law at Yale  (Chair, 1988-90); East Rock Institute (Secretary); YLS Early Learning Center (Treasurer 1987-88).

**Bars:**

New York (1981); District of Columbia (1981); Connecticut (1985); U.S. Supreme Court (1985); U.S. Ct. App., Eleventh Circuit (1995); D.C. Circuit (1981); U.S. Dist. Ct., D.C. (1981); D. Conn. (1985); U.S. Claims Ct. (1983).

**October 23, 2025**