## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br>　　　　　　　　Plaintiffs,<br>　　and<br><br>STATE OF WEST VIRGINIA et al.,<br>　　　　　　　　Intervenor-Plaintiffs,<br>　　v.<br><br>JULIE MOORE et al.<br>　　　　　　　　Defendants,<br>　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　Intervenor-Defendants. | Case No. 2:24-cv-01513 |
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br>　　　　　　　　Plaintiffs,<br>　　v.<br><br>STATE OF VERMONT et al.,<br>　　　　　　　　Defendants,<br>　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　Intervenor-Defendants. | Case No. 2:25-cv-00463 |

## DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW

### (1) IN REPLY IN SUPPORT OF THEIR MOTION TO DISMISS;

### (2) IN OPPOSITION TO PLAINTIFFS' AND INTERVENOR-PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT; AND

### (3) IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iv

TABLE OF PARTY AND BRIEF ABBREVIATIONS ............................................... xii

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................2

LEGAL STANDARDS .................................................................................................4

    Motion to Dismiss......................................................................................................4

    Cross-Motions for Summary Judgment ....................................................................4

    Facial Challenge.........................................................................................................5

ARGUMENT ...............................................................................................................6

I.    The Court should dismiss West Virginia's Vermont constitutional claims. ........................7

    A.    West Virginia does not have standing to bring claims under the Vermont Constitution........................................................................................................7

    B.    The Court lacks jurisdiction to hear the Vermont constitutional claims under *Pennhurst*. ................................................................................................9

II.    The Court should dismiss the Chamber's claims insofar as they are brought under 42 U.S.C. § 1983.................................................................................................10

III.    The Act is not preempted or precluded by federal law.
*Motion to Dismiss and Summary Judgment*.....................................................12

    A.    The Act is a cost recovery and adaptation statute; it does not "regulate" fossil fuels or emissions........................................................................................12

    B.    The Clean Air Act does not preempt Act 122.
*Motion to Dismiss and Summary Judgment*
(Chamber Count II; W. Va. Count II; U.S. Count I). ............................................15

        1.    The Clean Air Act does not field-preempt Act 122..................................16

        2.    Act 122 does not conflict with the Clean Air Act. .....................................19

i

C.    The Act is not precluded by the Constitution.
*Motion to Dismiss and Summary Judgment*
(Chamber Count I; W. Va. Count I; U.S. Counts II & V) .....................................22

    1.    The federal common law of interstate pollution does not preempt
the Act. ....................................................................................................22

    2.    The Act is not structurally precluded by the Constitution as an
"extraterritorial" regulation.........................................................................25

        a.    The "structure" of the Constitution does not ban extraterritorial
regulation. .......................................................................................26

        b.    The Act does not raise extraterritoriality concerns under the Due
Process Clause or the Commerce Clause.......................................28

        c.    The Act does not regulate conduct outside Vermont's borders. ....29

    3.    The Act does not interfere with foreign affairs. .........................................30

        a.    No express foreign policy preempts Act 122.................................30

        b.    Act 122 does not intrude on any areas of uniquely federal
interest.............................................................................................34

IV.    Act 122 does not violate the Commerce Clauses.
*Motion to Dismiss (all complaints) and*
*Motion for Summary Judgment (U.S. Complaint)* ..............................................38

A.    Act 122 is consistent with the dormant Interstate Commerce Clause.
(Chamber Count IV; W. Va. Count III; U.S. Count III) ..........................38

B.    The Act does not offend the dormant Foreign Commerce Clause.
(Chamber Count IV; W. Va. Count III; U.S. Count IV)..........................40

V.    Act 122 does not violate due process.
*Motion to Dismiss*
(Chamber Count III; W. Va. Counts IV, V) ......................................................41

A.    Act 122 comports with substantive due process..................................................41

B.    The Act comports with procedural due process and is not unconstitutionally
vague. ..................................................................................................................47

VI.    Act 122 does not violate the Equal Protection Clause or the Common Benefits Clause.
*Motion to Dismiss*
(W. Va. Counts VI, VII) .....................................................................................49

VII.    The Act does not impose excessive fines.
        *Motion to Dismiss*
        (Chamber Count V; W. Va. Count VIII) ............................................................50

        A.      The Act is not punitive. ............................................................................51

        B.      The Act is not disproportional. ...............................................................53

VIII.   The Act does not affect a taking.
        *Motion to Dismiss*
        (Chamber Count VI; W. Va. Counts IX, X) ........................................................54

IX.     Act 122 comports with separation of powers under the Vermont Constitution.
        *Motion to Dismiss*
        (W. Va. Count XI) ................................................................................................58

CONCLUSION ........................................................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Affinity Empowering, Inc. v. Eurofins Sci., Inc.*, No. 21-1843-GBW, 2022 WL 6734604 (D. Del. Oct. 11, 2022)........................................................................23

*Akew v. Am. Waterways Operators, Inc.*, 411 U.S. 325 (1973)....................................15

*Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017) ................................................13

*Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011)..............................17, 18, 22

*Am. Fed'n of Labor v. Am. Sash & Door Co.,* 335 U.S. 538 (1949) ............................44

*Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903 (9th Cir. 2018) ...................35

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ........................................30, 31, 34

*Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024) ..........................................................5

*Arizona v. United States*, 567 U.S. 387 (2012) .............................................................16

*Athens School Dist. v. Vt. State Bd. of Educ.,* 2020 VT 52, 212 Vt. 455, 237 A.3d 671 ............................................................................................................58, 60

*Austin v. United States*, 509 U.S. 602 (1993)................................................................51

*Baker v. State*, 170 Vt. 194, 744 A.2d 864 (1999) .......................................................50

*Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298 (1994).............31, 32, 40

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..........................................................42

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) ............................28, 29, 40

*Boyle v. United Techn. Corp.*, 487 U.S. 500 (1988).......................................................22

*Calder v. Jones*, 465 U.S. 783 (1984) ...........................................................................26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)................................................................4

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) ........................................................................................11

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y. 2019) ......................................................................11

*Cifarelli v. Vill. of Babylon*, 93 F.3d 47 (2d Cir. 1996) .................................................5

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) ..................................................23

*City of Evansville, Ind. v. Ky. Liquid Recycling, Inc.*, 604 F.2d 1008 (7th Cir. 1979) ..................23

*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981) ........................................17, 18, 23

*City of New York v. Berretta U.S.A. Corp.*, 315 F. Supp. 2d 256 (E.D.N.Y. 2004) ......................26

*City of New York v. Chevron Corporation*, 993 F.3d 81 (2d Cir. 2021) ...........17, 18, 21, 22, 23, 24

*Clark v. Allen*, 331 U.S. 503 (1947) ..................................................34, 36, 37

*Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001) .............................45

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986) ..........................................56

*Cmty. Housing Improvement Program v. City of New York,*
492 F. Supp. 3d 33 (E.D.N.Y. 2020) ......................................................56

*Cmty. Housing Improvement Program v. City of New York,*
59 F. 4th 540 (2d Cir. 2023) ......................................................57

*Connecticut v. Cahill*, 217 F.3d 93 (2d Cir. 2000) ..................................................9, 10

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ........................................30

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) ..................................................21

*Douglas by Douglas v. Hugh A. Stallings, M.D., Inc.,*
870 F.2d 1242 (7th Cir. 1989) ......................................................50

*E. Enters. v. Apfel*, 524 U.S. 498 (1998) ..................................................46, 54, 55, 56, 57

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978) ........................................39

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) ..................................................16

*Fabian v. Pappalardo,* 395 F. Supp. 3d 257 (S.D.N.Y. 2019) ........................................55

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ..........................................48

*Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co.,* 289 U.S. 266 (1933) ........................59

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351 (2021) ................................28

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ..................................37

*Gehlbach v. Gifford Med. Ctr.*, No. 2:23-cv-00066,
2024 WL 4108538 (D. Vt. Sept. 6, 2024) ......................................................4

*Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103 (1989)......................................11

*Hines v. Davidowitz*, 312 U.S. 52 (1941)......................................................................................19

*In re Chateaugay Corp.,* 53 F.3d 478 (2d Cir. 1995)....................................................................44

*In re Handy,* 171 Vt. 336, 764 A.2d 1226 (2000) ........................................................................60

*In re Korrow Real Estate, LLC,* 2018 VT 39, 207 Vt. 274, 187 A.3d 1125................................59

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ............................................................................................................20

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) .................................................16, 17, 20, 21, 22

*James Square Assocs. LP v. Mullen,* 993 N.E. 2d 374 (N.Y. 2013)............................................46

*Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434 (1979) ......................................................40

*Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
644 F.3d 934 (9th Cir. 2011) ........................................................................................................13

*Kampfer v. Cuomo,* 993 F. Supp. 2d 188 (N.D.N.Y. 2014).........................................................5

*Kansas v. Garcia*, 589 U.S. 191 (2020) ......................................................................................18

*Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470 (1987) ....................................57

*League of Women Voters of Nassau Cty. v. Nassau Cty. Bd. of Sup'rs*,
737 F.2d 155 (2d Cir. 1984) ..........................................................................................................11

*Lighthouse Rest. Inc. v. Inslee*, 429 F. Supp. 3d 736 (W.D. Wash. 2019)...................................32

*Long Island Oil Products Co. v. Local 553 Pension Fund*,
775 F.2d 24 (2d Cir. 1985) ............................................................................................................44

*McCarthy v. City of Cleveland,* 626 F.3d 280 (6th Cir. 2010) .....................................................55

*Medellin v. Texas*, 552 U.S. 491 (2008) ......................................................................................31

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)......................................................................15, 23

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985).................................................34-35

*Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067 (9th Cir. 2012) ...................................30

*MVP Health Ins. Co.,* 2016 VT 111, 203 Vt. 74, 155 A.3d 1207 ...................................................8

*MyWebGrocer, Inc. v. Adlife Mktg. & Commc'n Co., Inc.,* No. 5:16-cv-310,
2019 WL 13177905, (D. Vt. Aug. 27, 2019) ................................................. 4-5

*N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79 (2d Cir. 2017)..............................39

*Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025)................................................37

*Nat'l Pork Producers Council v. Ross,* 598 U.S. 356 (2023) ........................ 27, 28, 29, 38, 39-40

*Nat'l Shooting Found., Inc. v. James*, 144 F.4th 98 (2d Cir. 2025) ........................................40

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .........................................................................11

*N.Y. State Citizens' Coal. for Child. v. Velez*, 629 F. App'x 92 (2d Cir. 2015),
*aff'd*, 788 F. App'x 85 (2d Cir. 2019) ....................................................................................11

*Olcott v. Fond du Lac Cnty.*, 83 U.S. 678 (1872) ......................................................................34

*O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994).............................................................24-25

*Panama Refining Co. v. Ryan,* 293 U.S. 388 (1935)...............................................................58, 59

*Parella v. Retirement Bd. of R.I. Emps.' Retirement Sys.,*
173 F.3d 46 (1st Cir. 1999) ....................................................................................................54-55

*Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104 (1978).............................................55

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ........................................9, 10

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984)..................................41, 44

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)................................................................28

*Plum Creek Me. Timberlands, LLC v. Vt. Dep't of Forests, Parks & Recreation,* 2016 VT 103,
203 Vt. 197, 155 A.3d 694 ........................................................................................................59

*Rest. Law Ctr. v. City of New York*, 90 F.4th 101 (2d Cir. 2024)................................................20

*Rogers v. Watson*, 156 Vt. 483, 594 A.2d 409 (1991)...................................................................58

*Shapiro v. U.S. Soc. Sec. Admin.*, 525 F. Supp. 3d 528 (D. Vt. 2021) ...........................................4

*Slaughter-House Cases*, 16 Wall. 36, 21 L.Ed. 394 (1873) .........................................................35

*State v. Auclair,* 110 Vt. 147, 4 A.2d 107 (1939) .........................................................................58

*State v. Brunelle*, 148 Vt. 347, 534 A.2d 198 (1987)....................................................................49

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ....................................29, 48-49

*Strassheim v. Daily,* 221 U.S. 280 (1911) .................................................................27

*Tendo v. United States*, No. 2:23-cv-438, 2024 WL 3650462 (D. Vt. Aug. 5, 2024) ..................55

*Town of Westford v. Kilburn,* 131 Vt. 120, 300 A.2d 523 (1973) ..............................................59, 60

*Union Bridge Co. v. United States,* 204 U.S. 364 (1907) ....................................... 58-59

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solic Waste Mgmt. Auth.,*
550 U.S. 330 (2007) ..............................................................................................39

*United States v. Alcan Aluminum Corp.,* 315 F.3d 179 (2d Cir. 2003) ........................55

*United States v. Arthrex, Inc.,* 594 U.S. 1 (2021) ........................................................37

*United States v. Bajakajian,* 524 U.S. 321 (1998) ................................................53, 54

*United States v. Ferro,* 681 F.3d 1105 (9th Cir. 2012) ................................................53

*United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir. 1988) ......................................52

*United States. v. Raines,* 362 U.S. 17 (1960) ...............................................................5

*United States v. Salerno,* 481 U.S. 739 (1987) ...........................................................56

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1 (1976)..................................44, 45, 46

*Util. Air Regul. Grp. v. EPA,* 573 U.S. 302 (2014) ....................................................19

*Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011) ...................................10

*Village of Hoffman Estates v. Flipside*, 455 U.S. 489 (1982) .......................................48

*von Hofe v. United States,* 492 F.3d 175 (2d Cir. 2007).......................................... 52-53

*Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.,* 373 F.3d 241 (2d Cir. 2004) .................4

*Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442 (2008) ............5, 14

*WHYY, Inc. v. Borough of Glassboro,* 393 U.S. 117 (1968)........................................50

*Wyeth v. Levine*, 555 U.S. 555 (2009) .......................................................................19

*Young v. Masci*, 289 U.S. 253 (1933).........................................................................26

*Zschernig v. Miller*, 389 U.S. 429 (1968) ..............................................................36, 37

## Constitutional Provisions

U.S. Const. Art. VI, cl. 2 .................................................................................................30

Vt. Const. ch. I ...............................................................................................................7

## Statutes

15 U.S.C. § 2901 note .....................................................................................................33

28 U.S.C. § 1251(a) ..........................................................................................................9

42 U.S.C. § 1983 ..........................................................................................................10-11

42 U.S.C. § 7416 .............................................................................................................16

42 U.S.C. § 7604(e) .........................................................................................................16

Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399 ...................46

Clean Water Act of 1972, Pub. L. No. 92-500, 86 Stat. 816 ..........................................46

Global Climate Protection Act, Pub. L. No. 100-204, § 1005,
101 Stat. 1331, § 1105 (1987) ........................................................................................33

Occupational Safety and Health Act of 1970, Pub. L. No. 91-596, 84 Stat. 1601 ..........46

Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484 ......................................46

Vt. Stat. Ann. tit. 10, § 10c ............................................................................................35

Vt. Stat. Ann. tit. 10, §§ 751 *et seq.* ..............................................................................35

Vt. Stat. Ann. tit. 10, § 951 ............................................................................................35

Vt. Stat. Ann. tit. 20, § 38 ..............................................................................................35

2024 Vt. Acts & Resolves No. 122 ...................................................................................2

    Act 122 Sec. 2, § 596(2) .....................................................................3, 35, 57, 58

    Act 122 Sec. 2, § 596(7) .........................................................................2, 12, 58

    Act 122 Sec. 2, § 596(8) ...............................................................................2, 12

    Act 122 Sec. 2, § 596(22) ............................................................2, 3, 28, 35, 37, 39

Act 122 Sec. 2, § 597 .................................................................................................35, 57

Act 122 Sec. 2, § 597(1) ................................................................................................2, 3

Act 122 Sec. 2, § 598 ........................................................................................................35

Act 122 Sec. 2, § 598(a)(1) ................................................................................................3

Act 122 Sec. 2, § 598(b) ...............................................................................2, 3, 12, 29

Act 122 Sec. 2, § 598(d) ............................................................................................2, 39

Act 122 Sec. 2, § 598(f) ......................................................................................................3

Act 122 Sec. 2, § 599(a) .....................................................................................................3

Act 122 Sec. 2, § 599(a)(1) ................................................................................................3

Act 122 Sec. 2, § 599a(b)(1) ............................................................................................2, 3

Act 122 Sec. 2, § 599a(b)(2) ..............................................................................................3

Act 122 Sec. 2, § 599c ....................................................................................2, 3, 29, 58

2025 Vt. Acts & Resolves No. 47 ....................................................................................2

Act 47 Sec. 21 ......................................................................................................................3

Act 47 Sec. 22 .............................................................................................3, 28, 37, 39

Act 47 Sec. 22, § 596(7) ...............................................................................2, 12, 58

Act 47 Sec. 22, § 596(8) ...............................................................................................2, 12

Act 47 Sec. 22, § 596(10) ..................................................................................................2

Act 47 Sec. 22, § 596(22) ..........................................................................2, 3, 28, 35, 37, 39

Act 47 Sec. 23, § 598(b) ...............................................................................2, 3, 12, 29

Act 47 Sec. 24, § 599c ....................................................................................2, 3, 29, 58

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................4

**Other Authorities**

C.W. Callahan & J.S. Mankin, *Carbon Majors and the Scientific Case for Climate Liability*, Nature, Apr. 23, 2025, https://doi.org/10.1038/s41586-025-08751-3 ............................................43

The Federalist No. 32 (Alexander Hamilton) ...............................................................................34

Vermont Agency of Natural Resources, *Act 122 Climate Superfund Cost Recovery Program Report to the General Assembly* (Jan. 15, 2025), https://perma.cc/6MU8-G7NR .................43, 44

*How can people reduce the risks of climate change?*, Frequently Asked Questions About Climate Change, U.S. Environmental Protection Agency (last visited Nov. 15, 2025), https://perma.cc/H8SH-7VBN .......................................................................................................12

## TABLE OF PARTY AND BRIEF ABBREVIATIONS

**State** or **Vermont**          Defendants State of Vermont, Governor Philip Scott, Secretary Julie Moore, and Program Manager Jane Lazorchak

**Chamber** or                    Plaintiffs United States Chamber of Commerce and American
**Chamber Plaintiffs**            Petroleum Institute (*Chamber* case)

**West Virginia** or              Intervenor-Plaintiffs West Virginia and twenty-three other states
**West Virginia Plaintiffs**      (*Chamber* case)

**United States**                 Plaintiffs United States of America and United States Environmental Protection Agency

**Vt. MTD**                       Memorandum of Law in Support of Defendants' Motion to Dismiss; ECF No. 076-01 (*Chamber* case); ECF No. 035-01 (*US* case)

**Vt. SUMF**                      Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment

**Chamber MTD Opp.**              Chamber Plaintiffs' Response in Opposition to Defendants' and Intervenor-Defendants' Motions to Dismiss; ECF No. 101 (*Chamber* case)

**Chamber SJ Mem.**               Chamber Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment on Counts I and II; ECF No. 100-1 (*Chamber* case)

**W. Va. Mem.**                   Intervenor States' Memorandum in Support of Their Motion for Summary Judgment and Opposition to Defendants' Motions to Dismiss; ECF No. 102-1 (*Chamber* case)

**W. Va. SUMF**                   Intervenor-Plaintiffs Statement of Undisputed Material Facts; ECF No. 102-2 (*Chamber* case)

**Resp. W. Va. SUMF**             Defendants' Response to Intervenor-Plaintiffs' Rule 56 Statement of Undisputed Material Facts

**U.S. Mem.**                     United States Plaintiffs' Consolidated Response in Opposition to Motions to Dismiss and in Support of Motion for Summary Judgment; ECF No. 50-1 (*US* case)

**Resp. U.S. SUMF**               Defendants' Response to Plaintiffs' Rule 56 Statement of Undisputed Material Facts

## INTRODUCTION

Despite Plaintiffs' efforts to paint it as outlandish overreach, the Climate Superfund Act is a thoughtful, fair-minded approach to recover some of Vermont's costs for responding to climate change impacts in the State. It is a remedial statute aimed at recovering a proportional share of the State's costs from those whose past activities contributed to the problem. And it was designed with the constitutional limits on Vermont's authority in mind: only those responsible parties who are subject to Vermont's jurisdiction will be covered.

Plaintiffs have not plausibly alleged, nor have they substantiated in either law or fact, any of the assumptions on which their claims are based: that the Act is, or functions as, a regulation of fossil fuel production or emissions; that it is impossible to implement; that it is certain to drastically influence global oil production or energy prices in other states; that it conflicts with some federal law that "comprehensively" governs all climate-related issues; or that its attempt to recover in-state adaptation costs implicates any specific U.S. foreign policy or foreign affairs more broadly. And they certainly have neither plausibly alleged nor substantiated a claim that the Act—whose implementation is still years away—will do any of these things in *all* its possible applications.

States are not powerless to hold polluters responsible for in-state environmental harms just because the harm they set in motion began somewhere else, or because that harm is so broad and severe that it is also felt in other places. The Act is within Vermont's authority to protect the health, safety, and welfare of its citizens. The Act does not violate any existing constitutional prohibition, and Congress has not precluded Vermont from adapting to climate change in this way. This Court is not the appropriate forum for Plaintiffs to resolve policy disagreements about the wisdom of the Act. The Court should uphold the Act as facially constitutional.

## BACKGROUND

The State incorporates by reference the Background section of its memorandum of law in support of its motion to dismiss, which provides an overview of Act 122 and its legislative record. Vt. MTD at 3-11. To summarize, Act 122 establishes a cost recovery framework to help provide revenue for climate change adaptation projects in Vermont. 2024 Vt. Acts & Resolves No. 122 (Act 122) Sec. 2, § 597(1). The framework has three primary components: (i) an assessment of Vermont's costs from climate change, to be completed by the State Treasurer; (ii) the development of cost recovery demands, to be issued by the Agency of Natural Resources (ANR) to responsible parties in proportion to those parties' contributions to Vermont's climate change adaptation costs; and (iii) identification and implementation of climate change adaptation projects throughout the State, utilizing funds from the cost recovery demands, appropriations, and other approved monies.

The Act sets up a stepwise process. First, the Treasurer's Office will determine the universe of "covered greenhouse gas emissions," meaning those emissions resulting from the use of fossil fuels extracted or refined from 1995 through 2024. Act 122 Sec. 2, 2025 Vt. Acts & Resolves No. 47 (Act 47) Sec. 22, § 596(7), (8), (10).[1] Then, it will quantify the costs to Vermont resulting from those covered emissions, including Vermont's climate change adaptation costs. Act 122 Sec. 2, Act 47 Sec. 24, § 599c. For its part, ANR will identify the entities whose extraction and refining activities during the covered period resulted in more than one billion metric tons of covered greenhouse gas emissions, as well as the amount attributable to each entity. Act 122 Sec. 2, Act 47 Secs. 22 & 23, §§ 596(22), 598(b), (d), 599a(b)(1). If an entity has

---

[1] Act 47 of 2025 amended certain provisions of Act 122. *See* Vt. MTD at 1 n.1; Vt. MTD Ex. A (Act 122); Vt. MTD Ex. B (relevant parts of Act 47).

sufficient connection with Vermont to satisfy constitutional nexus requirements, and therefore qualifies as a "responsible party," ANR will issue a cost recovery demand to the responsible party. Act 122 Sec. 2, Act 47 Sec. 22, §§ 596(22), 598(f).

The amount of the cost recovery demand will be a percentage of Vermont's climate change adaptation costs, proportional to the responsible party's share of covered greenhouse gas emissions. Act 122 Sec. 2, Act 47 Sec. 23, §§ 597(1), 598(a)(1), (b), 599(a)(1). This means that each responsible party only is responsible for its proportional contribution to Vermont's climate change adaptation costs—because the cost assessment only includes costs to address covered greenhouse gas emissions (not all emissions) and the cost recovery demands only allocate those costs based on a responsible party's share of the covered emissions. Funds will be used to help Vermont "respond to, avoid, moderate, repair, [and] adapt to [the] negative impacts caused by climate change and . . . assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions." Act 122 Sec. 2, §§ 596(2), 599(a).

The Treasurer has not done the cost assessment yet. Vt. SUMF ¶ 1. The deadline is January 15, 2027, and the Treasurer plans to complete the assessment on or around that date. Act 122 Sec. 2, Act 47 Sec. 24, § 599c; Vt. SUMF ¶ 1.[2] Similarly, ANR has not yet developed the rules for identifying and registering responsible parties, determining responsible parties' applicable shares, and issuing notices of the cost recovery demands. Vt. SUMF ¶ 2. The deadline is January 1, 2028, and ANR plans to complete the rulemaking on or around that date. Act 122 Sec. 2, § 599a(b)(1)-(2); Act 47 Sec. 21; Vt. SUMF ¶ 2. ANR plans to issue cost recovery demands according to the statutory timeline, on or around July 1, 2028. Vt. SUMF ¶ 2.

---

[2] As one of the steps in the process, the Treasurer's Office recently selected the consulting firm Industrial Economics, Incorporated (IEc) to perform the cost assessment. Minter Decl. ¶ 5 (in support of Vt. Cross-Motion for Summ. J.). *See also* https://indecon.com/.

# LEGAL STANDARDS

## Motion to Dismiss

The legal standards governing Vermont's pending motion to dismiss for lack of subject matter jurisdiction and failure to state a claim are set forth in Vermont's memorandum of law in support of its motion to dismiss. *See* Vt. MTD at 11-12.

## Cross-Motions for Summary Judgment

"Where parties file cross-motions for summary judgment, each party's motion must be examined on its merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Gehlbach v. Gifford Med. Ctr.*, No. 2:23-cv-00066, 2024 WL 4108538, at *3 (D. Vt. Sept. 6, 2024) (citation omitted).

A moving party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "moving party always 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Shapiro v. U.S. Soc. Sec. Admin.*, 525 F. Supp. 3d 528, 535 (D. Vt. 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Summary judgment must be denied "[i]f the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production . . . even if no opposing evidentiary matter is presented." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (emphasis removed) (internal quotation marks and citation omitted). If the movant meets its initial burden, "the burden shifts to the nonmoving party to set out

4

specific facts showing a genuine issue for trial." *MyWebGrocer, Inc. v. Adlife Mktg. & Commc'n Co., Inc.,* No. 5:16-cv-310, 2019 WL 13177905, at *3 (D. Vt. Aug. 27, 2019) (quoting *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)).

### Facial Challenge

The parties agree that, for Plaintiffs to prevail in their facial challenge, they must establish that Act 122 is unconstitutional in all its applications. *See Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008); Vt. MTD at 21-22; Chamber MTD Opp. at 3, 7, 14, 21; W. Va. Mem. at 64; U.S. Mem. at 28.

And whether at the motion to dismiss or summary judgment stage, Plaintiffs may not rely on speculative allegations to make this showing. *See* Vt. MTD at 22-23 (citing, e.g., *Wash. State Grange,* 552 U.S. at 444, 449-51 (summary judgment and preliminary injunction); *Antonyuk v. James,* 120 F.4th 941, 987 (2d Cir. 2024) (preliminary injunction); *Kampfer v. Cuomo,* 993 F. Supp. 2d 188, 194, 196 (N.D.N.Y. 2014) (motion to dismiss)). Plaintiffs do not seriously contest this. The United States cites the motion to dismiss standard without addressing the authorities establishing that speculative allegations are particularly disfavored in a facial challenge. U.S. Mem. at 8. The West Virginia Plaintiffs do similarly. W. Va. Mem. at 8. And the Chamber Plaintiffs suggest that even speculative allegations must be accepted as true, but without support or argument. Chamber MTD Opp. at 41.

The Supreme Court's position on facial challenges, however, is clear: facial challenges are "disfavored" and a court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange,* 552 U.S. at 449-50 (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

5

**ARGUMENT**

The Court should dismiss all three complaints. The Court should also deny Plaintiffs'

summary judgment motions on all claims for which they seek summary judgment—preemption,

preclusion, and Commerce Clause.[3] Further, if the Court does not grant the State's Motion to

Dismiss on those claims, it should grant summary judgment in favor of the State on them.

*Motion to Dismiss*. First, the Court should grant Vermont's motion to dismiss all three

Complaints in their entirety for lack of subject matter jurisdiction (on West Virginia's state law

claims and the Chamber's § 1983 claims)[4] and for failure to state a claim upon which relief can

be granted (on all claims). Plaintiffs have not plausibly alleged that Act 122 will be

unconstitutional in all its applications, or that the Court has jurisdiction over all their claims.

Plaintiffs are wrong on the law and many of their claims rest on implausible allegations that

cannot establish valid facial claims against the Act.[5]

*Plaintiffs' Summary Judgment Motions*. Second, the Court should deny the United States'

motion for summary judgment on all its claims (federal preemption/preclusion and dormant

Interstate and Foreign Commerce Clauses), and the Chamber's and West Virginia's motions for

summary judgment on Counts I and II of their complaints (federal preclusion/preemption, Clean

Air Act preemption). The fact statements Plaintiffs have submitted in support of those motions

do not entitle them to summary judgment because: (1) Plaintiffs' claims fail as a matter of law

because none of the facts they have offered change the legal analysis in the State's motion to

---

[3] The claims implicated by the pending motions for summary judgment are Chamber Compl.
Counts I & II; W. Va. Compl. Counts I & II; U.S. Compl. Counts I-V.

[4] In consideration of the declarations the Chamber submitted with its summary judgment
motion, the State no longer contests the Chamber Plaintiffs' standing to bring claims under *Ex
parte Young*. *Cf.* Vt. MTD at 12-14.

[5] Further, their summary judgment motions have not cured the speculative nature of their
allegations for the reasons explained directly below.

dismiss; (2) the "facts" Plaintiffs seem to rely on—such as those related to the Act's purported economic and foreign policy impacts—are based on speculation, otherwise not supported by evidence, or not facts but legal conclusions; and (3) even if the Court accepted those facts as properly supported "facts," the State has nonetheless properly disputed them.[6]

_Vermont's Cross-Motion for Summary Judgment_. Finally, if the Court does not grant the State's motion to dismiss the preemption, preclusion, and dormant Interstate and Foreign Commerce claims, it should grant the State's cross-motion for summary judgment on those claims. There is no genuine dispute of fact as to Plaintiffs' central claims and they have not shown the Act will be preempted, precluded, or a violation of the dormant Commerce Clauses no matter how it is implemented. They cannot succeed in a facial challenge and Vermont is therefore entitled to judgment as a matter of law on those claims if they are not dismissed.

Act 122 is facially constitutional and the Court should declare it so.

## I.    The Court should dismiss West Virginia's Vermont constitutional claims.

### A.    West Virginia does not have standing to bring claims under the Vermont Constitution.

West Virginia misunderstands the State's argument. The State does not dispute that entities or individuals subject to Vermont law—for instance, because of their contacts with or residence in Vermont—can be beneficiaries of the Vermont Constitution's protections (to the extent those protections otherwise apply). This is how "inhabitants of the State" should be understood. _See_ Vt. Const. ch. I ("Chapter I: A Declaration of the Rights of the Inhabitants of the State of Vermont"). Thus, as West Virginia points out, a New York health insurance company that sold insurance in Vermont could include a Vermont constitutional claim in its challenge to a

---

[6] _See_ Resp. W. Va. SUMF; Resp. U.S. SUMF.

Green Mountain Care Board decision. *See* W. Va. Mem. at 57 (citing *MVP Health Ins. Co.,* 2016 VT 111, ¶¶ 2, 11, 17 n.3, 203 Vt. 74, 155 A.3d 1207).

But it does not follow that West Virginia or any other plaintiff state qualifies as an "inhabitant" of Vermont in this case. The West Virginia Plaintiffs have not offered any allegations or argument to support the idea that they—the states themselves—are Vermont "inhabitants." And while the plaintiff states might theoretically be able to invoke the Vermont Constitution to protect the interests of their residents if their residents qualified as Vermont "inhabitants," they make no allegations or argument that their residents qualify as inhabitants, either.

Instead, they have relied on *parens patriae* standing to raise claims on behalf of "energy producers" under the Vermont Constitution. *See* W. Va. Compl. ¶¶ 199 (Vermont due process claim), 212 (Vermont common benefits claim).[7] Though not expressed in their Complaint, they might be assuming their energy producers sold fossil fuels into Vermont. The problem with this approach is threefold: (i) they did not actually make these allegations in their Complaint or summary judgment declarations; (ii) even if they had, they do not have *parens patriae* standing to represent the private interests of fossil fuel producers, Vt. MTD at 19 n.18; and (iii) they appear to have abandoned any claim that they do, instead focusing their *parens patriae* standing on alleged economic and consumer harms to their residents, who as noted above are not alleged to be "inhabitants" of Vermont, *see* W. Va. Mem. at 17-20.

---

[7] The West Virginia Plaintiffs did not articulate their standing for the Vermont takings and separation of powers claims.

West Virginia therefore does not have any legally protected interest under the Vermont Constitution—and thus no injury to such interest—to support standing. Vt. MTD at 17-18. The Vermont constitutional claims should be dismissed.

**B.    The Court lacks jurisdiction to hear the Vermont constitutional claims under *Pennhurst*.**

Because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law," the Article III judicial power does not extend to West Virginia's claims against Vermont under Vermont law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). West Virginia argues that this principle does not apply here because "a State does not enjoy sovereign immunity from suit by another State in federal court." W. Va. Mem. at 57-58 (quoting *Connecticut v. Cahill*, 217 F.3d 93, 101 (2d Cir. 2000)).

That may be true, but this is not a suit by one state against another. If it were, jurisdiction in this Court likely would not be proper anyway. *See* 28 U.S.C. § 1251(a) (vesting "original and exclusive jurisdiction" over such controversies in the Supreme Court). West Virginia has instead sued two state officers in their official capacity. And it is well established that absent an overriding need to vindicate a *federal* interest, sovereign immunity bars claims against state officers in their official capacities. *See Pennhurst*, 465 U.S. at 104-05 (noting that *Ex parte Young* exception to this sovereign immunity bar exists "to vindicate federal rights and hold state officials responsible to the supreme authority of the United States" (quotation and citation omitted)). State officials' compliance with *state* law, however, is not such an overriding federal interest. *See id.* at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the authority of federal law.").

9

Moreover, contrary to West Virginia's suggestion, the Second Circuit's *Cahill* decision did not purport to limit *Pennhurst's* holding to private-plaintiff lawsuits. *See* W. Va. Mem. at 57-58. In *Cahill*, the Second Circuit held only that a suit by a state against officials of another state seeking to vindicate *federal law* could be maintained in federal district court, notwithstanding the Supreme Court's exclusive jurisdiction over suits between two states.[8] 217 F.3d at 104-05. It says nothing about whether one state can sue another state's officers in federal court over a question of state law. On the contrary, the Supreme Court has held that the availability of sovereign immunity to a state official turns on the nature of the relief requested, not the identity of the plaintiff. *Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011) ("[T]here is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff."). *Pennhurst* makes clear that a suit seeking relief under state law would "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment." 465 U.S. at 106. West Virginia's claims under the Vermont Constitution fail.

## II.     The Court should dismiss the Chamber's claims insofar as they are brought under 42 U.S.C. § 1983.

The Chamber appears to conflate *Ex parte Young* and § 1983, arguing their § 1983 claims should survive because they "alternatively pleaded" them under *Ex parte Young*. Chamber MTD Opp. at 19. But the State does not argue that the Chamber cannot bring claims under *Ex parte Young*. The issue is that Section 1983 is not a proper basis for the Chamber's claims. Vt. MTD at 14-17.

---

[8] Though not relevant here, the Second Circuit qualified that holding: to avoid the Supreme Court's exclusive jurisdiction, the plaintiff-state's claim also must not "implicate a core aspect of [the defendant official's state's] sovereignty." *Id*. at 104.

In the Second Circuit, "an organization only has standing to sue under § 1983 on its own behalf, not that of its members." *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 271-72 (S.D.N.Y. 2019) (citing *N.Y. State Citizens' Coal. for Child. v. Velez*, 629 F. App'x 92, 93-95 (2d Cir. 2015) (summary order)), *aff'd*, 788 F. App'x 85 (2d Cir. 2019). The Second Circuit has interpreted the rights § 1983 secures to be personal to those purportedly injured. *League of Women Voters of Nassau Cty. v. Nassau Cty. Bd. of Sup'rs*, 737 F.2d 155, 160 (2d Cir. 1984). The Second Circuit has continued to apply this rule after the Supreme Court cases cited by the Chamber. *Contrast* Chamber MTD Opp. at 20 (citing cases from 1975, 1977, and 1993) *with Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) ("It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983[.]" (citing *League of Women Voters of Nassau Cnty.*, 737 F.2d at 160)); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 123 (2d Cir. 2017) ("[w]e continue to rely on th[e] 'implicit determination'" in *Nnebe*) (Jacobs, J., dissenting).. Accordingly, this Court is bound by Second Circuit precedent to dismiss the Chamber's claims insofar as they are brought under Section 1983.

Further, the Chamber's preclusion and preemption claims are not properly brought under § 1983 for the additional reason that "the Supremacy Clause, of its own force, does not create rights enforceable under § 1983." *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107 (1989); *see* Vt. MTD at 17. The Chamber has not responded to this argument, other than to say that it pleaded its claims under *Ex parte Young*, which does not speak to the propriety of pleading them under § 1983. *See* Chamber MTD Opp. at 20 n.9. All claims based on § 1983 should be dismissed.

11

### III.  The Act is not preempted or precluded by federal law.
### *Motion to Dismiss and Summary Judgment*

#### A.    The Act is a cost recovery and adaptation statute; it does not "regulate" fossil fuels or emissions.

Plaintiffs' preemption and preclusions claims are premised in part on an assumption that the Act is, or functions as, a "regulation" of fossil fuel production or emissions. The Court should reject that premise.

1.  As a structural matter, nothing in Act 122 regulates fossil fuels or climate emissions. It creates a climate change *adaptation* program and does not concern itself with climate change *mitigation*. *See*, *e.g.*, *How can people reduce the risks of climate change?*, Frequently Asked Questions About Climate Change, U.S. Environmental Protection Agency (last visited Nov. 15, 2025), https://perma.cc/H8SH-7VBN (describing difference between "mitigation" and "adaptation" strategies). That is, the purpose of Act 122 is not to limit carbon emissions or slow global warming; its purpose is to help Vermont adapt to the warming climate by raising some of the money needed to do so from companies who (1) rationally bear responsibility for a part of the harm and (2) have sufficient contacts with Vermont to satisfy jurisdictional standards.

The Act does not restrict fossil fuel production or emissions. It does not set emissions limits or air quality standards or limit the amount of fossil fuels that may be produced or consumed in Vermont or any other jurisdiction. Indeed, it does not impose *any* forward-looking obligations on responsible parties. The obligation the Act imposes is an obligation to pay costs based on conduct that has already occurred. Act 122 Sec. 2, Act 47 Secs. 22 & 23, §§ 596(7), (8), 598(a), (b). As a matter of law, it is not a "regulatory" statute.

Indeed, Plaintiffs seem to concede that Act 122 does not directly regulate anything. Instead, they argue the Act will indirectly *function* as a regulation because it will have economic

12

impacts on responsible parties that could change their behavior. But this proves too much. Every law that imposes costs on a private party—think taxes, highway tolls, use/registration fees, etc.—has some potential to impact behavior. But the fact that the economic effects of a law could lead to changes in behavior does not convert a statute that is fundamentally compensatory into a regulatory one. *See*, *e.g.*, *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 940-41 (9th Cir. 2011) (requirement to register and pay fees for certain kinds of diesel engines was not a "standard[] or other requirement[] relating to the control of emissions" under Clean Air Act).

In *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017), for example, a utility company challenged Connecticut's request for proposals from energy utilities which, in the utility's view, would "increase the supply" of available electricity so would "place downward pressure" on wholesale energy prices. *Id.* at 101. The utility argued that the state policy amounted to regulation of the wholesale energy market so was preempted by federal energy law. *Id.* at 97. The Second Circuit rejected that argument, explaining that an "incidental effect" on energy prices did not "amount to a regulation" so did not infringe on federal authority. *Id.* at 101. So too here: even if the Act's compensatory provisions were to incidentally affect fossil fuel prices, this would not amount to a *de facto* regulation of emissions.

2. Even if the Act's effects on responsible parties' behavior were relevant to their "regulation" claim, however, Plaintiffs still have neither plausibly alleged (for purposes of surviving the motion to dismiss) nor offered any appropriate or sufficient evidence (for purposes of summary judgment) that the Act will necessarily—or even is likely to—alter behavior. Tellingly, Plaintiffs provided only one statement of "undisputed" material fact regarding the amount of cost recovery demands: an entirely unsupported claim by the Chief Geologist from the

13

Oil and Gas Division of the Texas Railroad Commission that fossil fuel producers will be "forced to spend billions of dollars on liability paid to Vermont instead of making capital investments." W. Va. SUMF ¶ 118; Declaration of Leslie Savage ¶ 9, ECF No. 102-23 (*Chamber* case). Again, the Treasurer has not yet determined what Vermont's total adaptation costs are; cost recovery demands will not be issued for almost another three years.

Likewise, Plaintiffs have not plausibly alleged or offered proper evidentiary support for their claim that large cost recovery demands will influence global fossil fuel production, emissions, or prices. And that is important, because it is Plaintiffs' burden in this facial challenge to show not that the Act *might* have some impermissible regulatory impact,[9] but rather that the Act *will* have such an impact in *all* its applications. *Wash. State Grange,* 552 U.S. at 449. Plaintiffs have not supported such a claim; instead, they repeat unfounded, speculative assumptions and hypotheticals about what they think the Act might do. *See generally* Resp. W. Va. SUMF; Resp. U.S. SUMF; *see also* Br. of Economists Joseph E. Stiglitz et al. as *Amici Curiae* (ECF No. 89 (*Chamber* case), ECF No. 48 (*United States* case)) (explaining that Plaintiffs' claims about the Act's impacts conflict with basic economic principles).

3. Finally, although Plaintiffs have not provided proper evidentiary support or plausible, non-speculative factual allegations to support their theories about the Act's economic impacts, Vermont has nonetheless provided evidence refuting those "facts" in the form of an expert declaration from Professor Don Fullerton, Ph.D. *See* Resp. W. Va. SUMF ¶¶ 20, 29, 57, 60, 73, 84, 92, 96, 118, 127, 131, 134, 138, 142, 150, 156, 160, 162, 164, 167, 169, 171, 174; Resp. U.S.

---

[9] Again, for the reasons explained throughout this brief, the Act is not a regulation as a matter of law. But because Plaintiffs rely on allegations about the Act's impacts to support their theory that it is a regulation, it is useful to show that, even accepting their theory, they have not shown the Act is a regulation.

SUMF ¶¶ 24, 25, 26. Professor Fullerton's analysis, relying on basic economic principles and standard economic models, makes clear that cost recovery demands issued under the Act are unlikely to—and, at the very least, will not necessarily—have an effect on fossil fuel production, use, or prices because they are fixed costs that are not expected to impact future behavior. Fullerton Decl. ¶¶ 11-42 (in support of Resp. W. Va. SUMF and Resp. U.S. SUMF). Thus, if it were appropriate to credit Plaintiffs' speculative and conclusory statements that the Act *will* do so (and again, it is not), Professor Fullerton's declaration creates a dispute of fact that precludes the Court from entering summary judgment in favor of the Plaintiffs.[10]

**B.    The Clean Air Act does not preempt Act 122.**
   ***Motion to Dismiss and Summary Judgment***
   **(Chamber Count II; W. Va. Count II; U.S. Count I)**

Act 122 falls within Vermont's traditional authority to raise funds to protect its citizens and its environment by adapting to climate change. *See* Vt. MTD. at 44 (citing cases); *infra* at 34-35 (same); *Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325, 336 (1973) (sustaining Florida law imposing liability for damages caused by oil spills against preemption challenge, noting "[s]o far as liability without fault for damages to state . . . interests is concerned, the police power has been held adequate for that purpose"). The Act therefore is entitled to a strong presumption against preemption. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488 (1996) (exercises of states' traditional powers "not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress").

---

[10]   However, the Court may grant summary judgment for the State because a factual dispute on the Act's impacts means Plaintiffs cannot demonstrate the Act will be unlawful in all its applications (even if Plaintiffs were right on the law, which they are not). The Court should dismiss before reaching summary judgment, though, because Plaintiffs are incorrect on the law and their speculative factual allegations remain speculative, which means they have failed to state a claim that the Act is facially unconstitutional.

Plaintiffs' Clean Air Act preemption claims fail with or without that presumption. Plaintiffs do not even argue that the Clean Air Act expressly preempts Act 122. And they have not offered any convincing rationale for their claims of field or conflict preemption either.

### 1.    The Clean Air Act does not field-preempt Act 122.

All three Plaintiffs begin by suggesting that the Clean Air Act (CAA) broadly occupies the entire field of "interstate air pollution." Chamber SJ Mem. at 19-20; W. Va. Mem. at 44; U.S. Mem. at 28-29. Unsurprisingly, though, they have not cited a case actually holding that. Indeed, the CAA itself expressly contemplates a significant role for the states in addressing air pollution through direct regulation, 42 U.S.C. § 7416, or by seeking "any other relief" related to air pollution under "statute or common law," 42 U.S.C. § 7604(e). *Cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (similar language in Clean Water Act "saving clause negates the inference that Congress 'left no room' for state causes of action"). Moreover, as discussed in Vermont's motion to dismiss, the CAA also does not comprehensively regulate greenhouse gas emissions. Vt. MTD at 37-38.

The CAA is concerned with controlling emissions and does so primarily through the establishment of emissions standards. *See* Vt. MTD at 35-36. In this way, its regulatory scheme is like the Clean Water Act's, which the Supreme Court has held "does not displace compensatory remedies for consequences of water pollution, even those for economic harms." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 (2008). Thus, the CAA plainly does not occupy the entire field of "interstate air pollution." *See*, *e.g.*, *Arizona v. United States*, 567 U.S. 387, 401 (2012) ("Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.").

16

Perhaps recognizing this, the Chamber and the United States advance a narrower theory. Relying primarily on the reasoning of *American Electric Power Company v. Connecticut*, 564 U.S. 410 (2011) (*AEP*), and *City of New York v. Chevron Corporation*, 993 F.3d 81 (2d Cir. 2021), they argue that the CAA preempts any state law claim that would have been preempted by the displaced common law of interstate air pollution. Chamber SJ Mem. at 20-22; U.S. Mem. at 29-30. That argument also fails.

Plaintiffs cannot rely on displaced federal common law to show that the CAA now occupies the entire field of air pollution. After holding that the CAA displaces federal common law, for example, the *AEP* Court itself unanimously confirmed that statutory preemption principles govern the question of whether state law is preempted by the CAA. *See AEP*, 564 U.S. at 429 ("In light of our holding that the Clean Air Act displaces federal common law, the availability vel non of a state lawsuit depends, inter alia, on the preemptive effect of the federal Act.").[11] Indeed, in *Ouellette,* the Supreme Court did not consider federal common law in holding that the Clean Water Act preempted a state common law claim. *See* 479 U.S. at 491 ("[T]he question presented [is] whether the [Clean Water] Act pre-empts Vermont common law."). That is because it would be inappropriate to rely on common law when Congress has chosen to speak in a particular area. *See City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 319 (1981) ("The establishment of such a self-consciously comprehensive program by Congress

---

[11] The United States tries to escape *AEP*'s observation about statutory preemption by arguing that the "preemptive effect" of the Clean Air Act depends, in turn, on the scope of the federal common law. U.S. Mem. at 31-32. That is not a plausible reading of *AEP*. Were that the case, the Court would not have remanded the case to the Second Circuit—which already had found the state law claims preempted by federal common law—for a determination of whether the Clean Air Act preempted those claims.

. . . strongly suggests that there is no room for courts to attempt to improve on that program with federal common law.")

Plaintiffs' reliance on *City of New York* is also misplaced. *City of New York* did not address the preemption of a state statute by the CAA or, it follows, the scope of the "field" preempted by the CAA. The question in that case was whether a state common law claim that was preempted by federal common law "snap[ped] back" into existence when federal common law was in turn displaced by the CAA. *City of New York,* 993 F.3d at 91-95, 98. As Plaintiffs repeatedly note, the court looked to whether the CAA "authorized" the City's state law claim, but the court did not conduct a "traditional statutory preemption analysis." *Id*. at 98-99. It therefore did not determine whether, under a "traditional statutory preemption analysis," a state compensation statute like Act 122 is preempted by the CAA.[12]

Further, statutory displacement of common law and federal preemption of state law are different. *City of Milwaukee*, 451 U.S. at 317 n.9 ("Since the States are represented in Congress but not in the federal courts, the very concerns about displacing state law which counsel against finding pre-emption of *state* law in the absence of clear intent actually suggest a willingness to find congressional displacement of *federal* common law."). Accordingly, claims of statutory preemption face a much higher bar, *see*, *e.g.*, *City of New York*, 993 F.3d at 95 (describing displacement as a "less rigorous standard" that "does not require the same sort of evidence of a clear and manifest congressional purpose demanded for preemption of state law" (quoting *AEP*, 564 U.S. at 423)), and "must be grounded in the text and structure of the statute at issue," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (internal citation and quotation marks omitted). Applying *City of New York*'s relaxed displacement standard (federal statutory law to federal common law)

---

[12] As explained below, the displaced federal common law also does not preempt Act 122.

18

to the CAA statutory preemption claim at issue here would be contrary to well-settled statutory preemption analysis.

No court has previously held that the CAA occupies the entire field of "interstate air pollution" for the purpose of federal preemption. The statute's cooperative framework directly contradicts Plaintiffs' assertion that the CAA forecloses any state regulation. Nor does Act 122 regulate air pollution. Accordingly, Plaintiffs' argument that Act 122 is field-preempted fails.

      **2.    Act 122 does not conflict with the Clean Air Act.**

Act 122 does not conflict with the CAA. Courts will find conflict preemption only when it is impossible to comply with both state and federal law or when state law stands as an "unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). As discussed in the State's Motion to Dismiss, the purpose of the CAA is to "prevent and control air pollution." Vt. MTD at 39; 42 U.S.C. § 7401(a)(4). It does that by "regulat[ing] pollution-generating emissions from . . . stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014), and by imposing limits on emissions of various air pollutants, *see, e.g.*, 42 U.S.C. §§ 7411(b)(1)(B), 7521(a)(1).

Act 122 does not do any of that or otherwise stand in the way of the CAA's objectives or methods. The Act creates a cost-recovery program requiring fossil fuel producers to compensate the state for a portion of its costs in responding and adapting to climate change based on their proportional contribution to the harm. But the Act does not set any limits on air pollution or impose any emission standards. In other words, the Act is agnostic as to the central concern of the CAA, which is the emission of air pollution.

And even if market effects of the Act were relevant to the analysis, in this facial challenge Plaintiffs have not shown—and cannot show—that those impacts will, in all the Act's applications, directly and substantially interfere with the purposes or methods of the CAA. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 97, 101 (2d Cir. 2013) (holding that state law is conflict preempted only where "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together"; mere "tension" is not enough); *Rest. Law Ctr. v. City of New York*, 90 F.4th 101, 117 (2d Cir. 2024) (successful "facial preemption challenge" must "demonstrate that there is no possible set of conditions under which the challenged state [regime] could be constitutional").

Plaintiffs' conflict preemption arguments lean heavily on the reasoning of *Ouellette*, Chamber SJ Mem. at 22-23; W. Va. Mem. at 48-52; U.S. Mem. at 30-31, but those arguments are misplaced here. *Ouellette* held that a private party's Vermont-common-law nuisance claim for water pollution originating in New York was preempted by the Clean Water Act because allowing a state "to impose separate discharge standards on a single point source . . . would be a serious interference with" the "purposes and objectives" of the CWA. 479 U.S. at 493. Central to that holding, however, was the Court's finding that the nuisance lawsuit would function as a separate, out-of-state "regulation" of a point source also regulated by the CWA. *Id*. at 493-97.

*Ouellette* does not control here because, unlike the common-law nuisance claim at issue in that case (which sought, in addition to compensatory damages, punitive damages and injunctive relief, *id*. at 484), the Act is purely compensatory. Act 122 does not regulate anything. *See supra* at 12-15. But even if Plaintiffs could show that Act 122 will have the so-called "regulatory" effects they allege (a showing they have not made and cannot make now, as explained above), those alleged effects would not operate directly on individual point sources

regulated by the CAA (unlike the point source at issue in *Ouellette*), but on fossil fuel

production. What's more, even if the Act could theoretically function as a regulation of

production, Plaintiffs have neither plausibly alleged nor substantiated their claim that it *will*. *See*

*supra* at 13-15 (noting that Plaintiffs' conclusory allegations about Act's economic effects violate

basic economic principles, are based on speculation about how the Act will be implemented, and

are unsupported by proper evidence).

      *City of New York* does not save Plaintiffs' argument on this point. Again, the Court's

reasoning in that case simply does not apply to Plaintiffs' Clean Air Act preemption arguments

because that case, unlike this one, addressed a question of Clean Air Act displacement, not Clean

Air Act preemption. *See supra* at 18-19. Plaintiffs assert that Act 122 "forces fossil fuel

businesses 'to adopt different or additional means of pollution control.'" U.S. Mem. at 36

(quoting *Ouellette*, 479 U.S. at 498 n.19). But there is *no* factual support for the idea that Act 122

will require "different" pollution controls and any claims about "additional" pollution controls

are speculative, implausible, and inadequately supported (as explained above). This Court's

preemption analysis must look to the specific effect and purpose of Act 122. *See CSX Transp.,*

*Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("To prevail on the claim that the regulations have

pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that

subject matter").

      The Clean Air Act does not preempt Act 122. The Court should dismiss Plaintiffs' Clean

Air Act claims for failure to state a claim (Chamber Count II, W. Va. Count II, U.S. Count I). In

the alternative, the Court should deny Plaintiffs' summary judgment motions on these claims and

grant summary judgment to the State.

**C.    The Act is not precluded by the Constitution.**
***Motion to Dismiss and Summary Judgment***
**(Chamber Count I; W. Va. Count I; U.S. Counts II & V)**

**1.    The federal common law of interstate pollution does not preempt the Act.**

Relying heavily on *City of New York*, Plaintiffs also argue that the federal common law of interstate air pollution preempts the Act.[13] But even if it is appropriate to apply the displaced federal common law of interstate air pollution to preclude state law, *contra Ouellette*, 479 U.S. at 491-92 (applying statutory preemption principles, and not common law of interstate pollution, in claim that Vermonter's cross-border water pollution lawsuit was preempted by the Clean Water Act),[14] *City of New York* does not govern here. The federal common law of interstate pollution would not have precluded a state from enacting a remedial statute that seeks to recover costs from past pollution.

First, Plaintiffs have not offered any authority holding that displaced federal common law—that is, where Congress has replaced federal common law with a federal statute—can nonetheless preempt a state statute. On the contrary, the Supreme Court already has unanimously held it cannot. *See AEP*, 564 U.S. at 429 ("In light of our holding that the Clean Air Act displaces federal common law, the availability vel non of a state lawsuit depends, inter alia, on the preemptive effect of the federal Act.").

---

[13] West Virginia cites *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1988), for the proposition that a state law is preempted "if it hinders an identifiable policy or interest." W. Va. Mem. at 27. But that is not an accurate characterization of *Boyle's* analysis, or even the quoted material. *Boyle* makes clear that for common law to govern, Plaintiffs must first identify a "uniquely federal interest"—there, federal procurement contracting—and then show that a "significant conflict" exists between that "identifiable federal policy or interest and the operation of state law"—there, a state-law claim for design defects in military equipment. 487 U.S. at 507 (emphasis added). As discussed below, Plaintiffs cannot show either here.

[14] Again, Vermont reserves the right to take the position on appeal that *City of New York* was wrongly decided on this point. *See* Vt. MTD at 34, n. 25.

And that makes sense because, if Congress has chosen to fill the space of federal common law and has not chosen to preempt state statutory law, it would be inappropriate for a court to second-guess that choice through federal common law. *See City of Milwaukee*, 451 U.S. at 325 (observing that "[t]he invocation of federal common law . . . in the face of congressional legislation supplanting it is peculiarly inappropriate" in complex areas).[15] Common law and statutory law serve distinct aims. Civil common law's primary purpose is to compensate private parties, which "sets it apart" from statutory regimes that aim instead to directly implement the public good. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 536 (1992) (Blackmun, J., concurring). Additionally, recognizing federal common law preemption of state statutory law would threaten to upset both the vertical and the horizontal separation of powers that lies at the heart of our Constitutional system. *See City of Milwaukee*, 451 U.S. at 316 (discussing federalism consideration inherent in "deciding if federal law pre-empts state law").

Preemption is "a serious intrusion into state sovereignty," *Medtronic, Inc.*, 518 U.S. at 488, and *City of New York*'s holding should be limited to the circumstances presented in that case, which rested in the first instance on federal common law preempting state common law. This Court should not read *City of New York* so broadly that it would conflict with Supreme Court precedent on the preemption of state legislation.

---

[15] The Chamber cites a few cases for the proposition that federal common law can displace a state statute, *see* Chamber MTD Opp. at 25 n. 15, but none of them found a state statute preempted by federal common law at all, let alone *displaced* federal common law. *See City of Milwaukee*, 451 U.S. at 304 (holding that Clean Water Act supplanted federal common law); *City of Evansville, Ind. v. Ky. Liquid Recycling, Inc.*, 604 F.2d 1008, 1021 (7th Cir. 1979) (dismissing three "state law claims" as displaced by federal common law, and relying on decision overturned by the Supreme Court in *City of Milwaukee*); *Affinity Empowering, Inc. v. Eurofins Sci., Inc.*, No. 21-1843-GBW, 2022 WL 6734604, at *5-6 (D. Del. Oct. 11, 2022) (declining to find state-law, breach-of-contract contract claim preempted by federal common law).

Second, even if displaced federal common law could preempt state statutes that "regulate cross-border emissions," *City of New York*, 933 F.3d at 93,[16] Act 122 does not—either directly or indirectly—regulate cross-border emissions. As discussed above, the Act is a compensation statute. It does not regulate emissions at all or impose any ongoing liability for emissions. Further, even under Plaintiffs' incorrect theory that any indirect effects of the Act are impermissible, Plaintiffs have neither plausibly alleged nor substantiated their claim that the law will somehow function as a regulation of emissions through indirect effects (and again, certainly not that it will do so in *all* its applications). *See supra* at 13-15. Vermont has also offered compelling evidence that the Act likely will *not* have the economic effects Plaintiffs have posited. *See generally* Fullerton Decl.

These circumstances distinguish the Act from the common-law claims at issue in *City of New York*, in which the court assumed—based on its understanding of "economic reality"—that tort damage claims against fossil fuel companies would alter their behavior and function as a regulation of their conduct. 993 F.3d at 92. The plaintiff in that case also asserted a direct claim for abatement in the event its damages were not paid. *Id.* at 93. The procedural posture and the record are different here; Plaintiffs cannot demonstrate common-law preemption of the Act by asking the Court to simply assume that it will have regulatory effects. At a minimum, they must show that the Act is an attempt to regulate cross-border pollution. *See*, *e.g.*, *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 87-88 (1994) (party invoking federal common law bears burden of

---

[16] As discussed in the State's Motion to Dismiss, the now-displaced common law of interstate air and water pollution would not have preempted Act 122 in the first place. Vt. MTD at 32-33. That body of law was developed to give states a way to abate sources of pollution outside their borders. There is no indication that it was intended to create a rule of immunity from compensation for the harms created by cross-border pollution. In other words, the common law of interstate pollution would not have preempted the Act because that common law addressed only cross-state controls on pollution, not efforts to secure compensation.

showing a "significant conflict" between a "federal policy or interest and the use of state law"). As discussed above, *see supra* at 12-15, Plaintiffs have not and cannot plausibly do that.

Accordingly, the Act is not preempted by federal common law because (1) federal common law did not survive displacement by the Clean Air Act for purposes of preempting legislation of a sovereign state, (2) the relevant federal common law addressed only cross-border *abatement* actions, and (3) the Act does not attempt to "regulate" cross-border emissions, either directly or indirectly.

**2.    The Act is not structurally precluded by the Constitution as an "extraterritorial" regulation.**

All three Plaintiffs also raise—to varying degrees—arguments that the Act is "structurally precluded" by the constitution as an "extraterritorial" regulation. *See, e.g.*, Chamber SJ Mem. at 9 ("[T]he Constitution itself precludes state laws that run afoul of its delineation of authority."). As West Virginia puts it, this purported implied constitutional restriction "emanates" from the "structure and history of the constitution." W. Va. Mem. at 36. For its part, the United States looks to poetic syllogism to define the doctrine: because climate change is an international problem, the United States says, it "follows, as night follows day, that the [Act] is an unconstitutional extension of state law." U.S. Mem. at 43.

But states have ample authority to pass laws addressing in-state harms and Plaintiffs have not cited any authority supporting an unbounded theory that the Constitution bans all state laws that have effects beyond the state's borders. The cases they rely on for that principle are instead based on discrete, longstanding constitutional doctrines grounded in the actual text of the Constitution—primarily in the Due Process Clause and the dormant Commerce Clause—that

25

incorporate concerns about the geographic limits of state power.[17] And the Act survives

constitutional scrutiny under those doctrines. *See infra* at 28-29, 38-41.

Moreover, even if Plaintiffs' structural theory of constitutional preclusion were

appropriate, their extraterritorial "preclusion" claims—like their statutory preemption claims—

rely heavily on their unsupported assertion that the Act functions as extraterritorial regulation.

*E.g.*, W. Va. Mem. at 34. As already discussed, though, none of the Plaintiffs have either

plausibly alleged or substantiated that the Act will function as a "regulation" at all, let alone a

purely extraterritorial one. Plaintiffs' "structural" constitutional claims fail.

> **a.    The "structure" of the Constitution does not ban extraterritorial regulation.**

The Constitution does not "structurally" preclude the states from addressing harms within

their borders arising primarily from out-of-state conduct. On the contrary, courts have long

recognized that states may apply their laws to out-of-state actors whose actions have in-state

consequences. *See Young v. Masci*, 289 U.S. 253, 258-59 (1933) ("[A] person acting outside the

state may be held responsible according to the law of the state for injurious consequences within

it."); *Calder v. Jones*, 465 U.S. 783, 791 (1984) ("Jurisdiction over petitioners is therefore proper

in California based on the 'effects' of their Florida conduct in California."); *City of New York v.

Berretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 286 (E.D.N.Y. 2004) (relief sought by New York

City would not violate the Due Process Clause by attempting to regulate conduct outside its

borders because relief sought was for in-state harm on itself). Plaintiffs' claims that the Act

operates "wholly outside" Vermont cannot be squared with this caselaw or the fact that

---

[17] *See* U.S. Mem. at 44 (observing the "rule against extraterritorial regulation . . . finds expression in certain constitutional provisions, including the Commerce Clause and the Fourteenth Amendment's Due Process Clause").

greenhouse gas emissions create very real impacts in the State. *See* MTD at 10-11; *Nat'l Pork Producers Council v. Ross,* 598 U.S. 356, 376 n.1 (2023) (distinguishing California humane treatment law at issue from law that "*directly* regulated out-of-state transactions by those with *no* connection to the State") (emphasis in original).[18]

All three Plaintiffs rely on remarks in Supreme Court cases discussing territorial constraints on state jurisdiction, but those remarks invariably arise in cases applying specific constitutional doctrines, not some amorphous constitutional ban on "extraterritorial" laws. *See*, *e.g.*, Chamber SJ Mem. at 14-18 (citing, in support of its extraterritoriality argument, cases interpreting the Full Faith and Credit Clause, the Privileges and Immunities Clause, personal jurisdiction under the Due Process Clause, and the dormant Commerce Clause). For example, while West Virginia chides the State for suggesting that a stand-alone "extraterritoriality" doctrine does not exist, W. Va. Mem. at 37, it cites as contrary authority only a statement in *Pork Producers* that *rejected* a broad conception of the dormant Commerce Clause limit on states' extraterritorial powers, *see Pork Producers*, 598 U.S. at 376.

True, the Court has looked to the "original and historical understandings of the Constitution's structure," *id.* at 376, and concepts of horizontal federalism to aid in its interpretation of specific constitutional provisions like the Due Process Clause, *see BMW of*

---

[18] Contrary to West Virginia's assertion, *Strassheim v. Daily* did not hold that "States can *only* regulate out-of-State conduct when the conduct was 'intended to produce and produc[ed] the detrimental effects within it.'" W. Va. Mem. at 38 (citing *Strassheim v. Daily,* 221 U.S. 280, 285 (1911)). *Strassheim* was not about economic legislation at all, but about criminal liability, and it held that Michigan *could* indict someone who had performed various criminal activities outside Michigan with the intent to cause detrimental effects in Michigan. 221 U.S. at 284-85. West Virginia cites no other authority, much less any recent authority about extraterritoriality, for its claim that "[a]n out-of-State individual must both intend to have his conduct reach across the border, and it must do so and cause harm." W. Va. Mem. at 38. Further, to the extent it is relevant and which no Plaintiff contests, the fossil fuel industry knew its products were contributing to climate change. *See* Vt. MTD at 4.

*North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996), the dormant Commerce Clause, *Pork Producers*, 598 U.S. at 376, or the Full Faith and Credit Clause, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985). But it has not, as Plaintiffs suggest, assembled from the "emanat[ions]," W. Va. Mem. at 36, of those specific constitutional provisions a general constitutional ban on extraterritorial regulation. Thus, to the extent Plaintiffs' claims are grounded on a constitutional prohibition on extraterritoriality that is broader than existing Due Process Clause and dormant Commerce Clause limits, those claims fail.

> **b.    The Act does not raise extraterritoriality concerns under the Due Process Clause or the Commerce Clause.**

Moreover, Plaintiffs' "extraterritoriality" claims fail when they are properly analyzed under the Due Process Clause and the dormant Commerce Clause. *See* Vt. MTD at 26-27, 55-60.

With respect to due process, the Act on its face applies only to potentially responsible parties with sufficient connections to Vermont to satisfy constitutional "nexus" requirements. *See* Vt. MTD at 26 (citing Act 122 Sec. 2, Act 47 Sec. 22, § 596(22)). The Chamber argues this provision does not facially preclude its challenge because (1) responsible parties will not be located in Vermont and (2) the State will therefore be required to "argue that a company qualifies as a 'responsible party' merely by having done business in the state—even if its fossil-fuel extraction activities occurred in other states and on other continents." Chamber MTD Opp. at 39-40. But the Due Process Clause does not require that a claim arise directly from the defendant's in-forum contacts for the forum to exercise jurisdiction. *See, e.g.*, *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 362 (2021) (liability need not directly "arise out of" forum contacts to satisfy due process requirements). Therefore, Plaintiffs have not plausibly alleged—let alone substantiated with evidence—that Vermont will be unable to constitutionally exercise jurisdiction over *any* potentially responsible party.

The Act also does not run afoul of due process cases like *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), and *BMW of North America, Inc.*, which stand for the proposition that states cannot use punitive damage awards solely to alter lawful conduct in other states. Vt. MTD at 25-26. As discussed elsewhere, the Act is not "punitive," nor is it designed, intended, or even likely to alter extraterritorial conduct. *See supra at* 12-15, *infra* at 51-53. Moreover, the conduct the states sought to punish in those cases "had no impact on [the forum state] or its residents." *Gore*, 517 U.S. at 572-73. Not so here. *See* Act 122 Sec. 2, Act 47 Secs. 23 & 24 §§ 598(a), (b), 599c (liability based on in-state costs from emissions attributable to responsible parties' fossil fuel extraction and refining).

Finally, as explained in greater detail below, the dormant Commerce Clause does not render state laws unconstitutional merely because they implicate out-of-state conduct. *See* Vt. MTD at 55; *infra* at 38-40. Indeed, even state laws that have "the practical effect of controlling commerce outside the state" do not run afoul of the dormant Commerce Clause so long as they do not discriminate against interstate commerce. *Pork Producers*, 598 U.S. at 371 (internal quotation marks omitted); *see also id*. at 374 (noting that "many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior" without raising constitutional concerns). The Act does not run afoul of any extraterritoriality concerns incorporated into the dormant Commerce Clause.

### c.    The Act does not regulate conduct outside Vermont's borders.

In any event, Act 122 is not an "extraterritorial regulation" because it does not regulate conduct at all. As discussed elsewhere, the Act is designed to recover costs for climate change adaptation consistent with long-established "polluter pays" principles, *see infra* at 32, it is not designed or intended to influence fossil fuel production or emissions. Moreover, even if it were

enough to show the Act will have some indirect "regulatory" effects (and it is not—incidental effects are not enough), Plaintiffs have not plausibly alleged or substantiated their repeated claims that the Act will influence behavior. *See supra* at 12-15. Finally, even if Plaintiffs' claims about the "regulatory" impacts of the Act were correct on the law and were not founded on speculation, Vermont has offered evidence contradicting those claims, meaning their facial challenge fails because they cannot demonstrate the Act will have "regulatory" effects in all its applications. *See* Resp. W. Va.  SUMF; Resp. U.S. SUMF.

### 3.    The Act does not interfere with foreign affairs.

The so-called foreign affairs doctrine comprises two distinct components; the Act offends neither. First, the doctrine holds that express enactments of foreign policy preempt conflicting state laws by virtue of the Supremacy Clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. Art. VI, cl. 2); *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003) ("[S]tate law must give way where . . . there is evidence of clear conflict between the policies adopted by the two."). Second, the doctrine recognizes that "even in the absence of any express foreign policy," a state law may still be preempted "if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012). Neither version of the foreign affairs doctrine preempts the Act.

### a.    No express foreign policy preempts Act 122.

Just as in the domestic context, validly entered international foreign agreements with the force and effect of law can preempt contrary state laws. *Crosby*, 530 U.S. at 372. To establish preemption under this theory, a litigant must show that two elements are met. First, that the asserted federal foreign policy has the force and effect of law so is "fit to preempt"; that is, an

executive action can preempt only if it was taken pursuant to Article II of the Constitution or, in a "narrow set of circumstances," when there is a "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned." *Medellin v. Texas*, 552 U.S. 491, 531 (2008). And second, a litigant must show that the state law in question "conflict[s]" with or "stands in the way" of federal foreign policy. *Garamendi*, 539 U.S. at 416, 427. The mere existence of an international agreement in a given area is not sufficient. Plaintiffs have not identified a single federal agreement or practice that preempts Act 122 under this standard.

To start, most of the putative "foreign policy" enactments that Plaintiffs cite are not "rule[s] of domestic law binding in state and federal courts," so they have no preemptive effect. *Medellín*, 552 U.S. at 523, 532 (presidential memorandum in support of human rights treaty had not been approved by Congress so was not legally binding). For instance, Plaintiffs cite certain executive orders and Presidential pronouncements supporting increased energy production and opposing international cooperation on climate change. *See* U.S. Mem. at 53; Chamber SJ Mem. at 18. But even if these statements comprised actual "foreign policy," "Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional . . . otherwise valid" legislation. *Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 330 (1994) (concluding that federal adoption of particular accounting methodology did not preempt state's competing accounting methodology, as applied to foreign businesses).

Similarly, Plaintiffs cite the President's stated opposition to Act 122, Chamber SJ Mem. at 18, and the United States' supposed past opposition to certain loss and damage funds at the international level, U.S. Mem. at 55. But mere inchoate policy preferences likewise are irrelevant

31

for preemption purposes. *Barclays*, 512 U.S. at 327 n.28; *see also Lighthouse Rest. Inc. v. Inslee*, 429 F. Supp. 3d 736, 740-41 (W.D. Wash. 2019) ("generalized remarks favoring development of the coal industry and the export of coal are not in clear conflict with the State's decision" to deny water permit for coal export terminal).

Plaintiffs also mischaracterize the United States' opposition to "international" liability schemes. U.S. Mem. at 55. While it is true that "the United States has long opposed the establishment of liability and compensation schemes *at the international level*," U.S. Mem. at 55 (quoting Landau Decl. ¶ 16) (emphasis added),that simply means the United States has opposed arrangements under which nations would compensate one another for the harms of climate change. That position is irrelevant to the Act, which involves payments by private parties under domestic law. Indeed, the United States has consistently supported "polluter pays" schemes under which a broad coalition of private parties would pay for the environmental damage caused by their commercial activities. *See* Koh Decl. ¶¶ 13-17; *see also id.* ¶¶ 31-32 ("Special Envoy Stern's discussion of the United States' traditional opposition to its *own* government liability in no sense signaled that past or present United States foreign policy opposes the imposition of any private *corporate* liability of fossil fuel companies to provide cost-recovery for adaptation measures or injuries that those producers may cause within the several States."). On this score, Act 122 thus supports rather than conflicts with U.S. foreign policy.

To the limited extent that Plaintiffs do cite binding foreign agreements, they fail to demonstrate any conflict between those agreements and Act 122. The United States and West Virginia principally argue that Act 122 conflicts with the United Nations Framework Convention and subsequent executive decisions to not join the Kyoto Protocol and to leave the Paris Agreement. US Mem. at 53-55; W. Va. Mem. at 41.

32

But Act 122 has nothing to do with those international treaties. To begin, the Act does not

conflict or interfere with the United States' decision to "regulate global greenhouse gas

emissions" through the U.N. Framework Convention, as the United States claims. U.S. Mem. at

54. Again, the Act does not "regulate global greenhouse gas emissions." *See supra* at 12-15.

Moreover, as Professor Koh points out, the Trump Administration is "not currently participating

in the ongoing intergovernmental climate negotiations under the Framework Convention and is

not even attending the most recent COP30 climate talks in Belem, Brazil." Koh Decl. ¶ 35. Thus,

"there is no ongoing 'United States participation in the Framework Convention' for [the Act] to

disrupt." *Id*. ¶ 35 (quoting Landau Decl. ¶ 17).

Similarly, the Kyoto Protocol and the Paris Agreement both seek to mitigate climate

change by reducing greenhouse gas emissions, *see* Koh Decl. ¶¶ 20, 21, 25. Act 122, on the other

hand, places no limits on greenhouse gas emissions; its concern is with financing in-state climate

change adaptation projects. Further, the international treaties in question address the rights and

duties of sovereign nations, not private parties. *See* Koh Decl. ¶ 33 (noting that the agreements

were "expressly designed to apply only to countries and regional economic integration

organizations like the European Union, not to corporate entities like fossil fuel companies").

The United States and West Virginia also assert without explanation that Act 122 conflicts

with the Global Climate Protection Act, Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331,

1407-09 (1987) (reprinted at 15 U.S.C. § 2901 note). *See* U.S. Mem. at 52; W. Va. Mem. at 41.

But that statute simply expresses Congress' desire that the United States develop a "coordinated

national policy on global climate change" and its aspiration that the United States "should seek

to . . .  work toward multilateral agreements" on climate change. *See* 101 Stat. 1407-09. Plaintiffs

do not identify a "coordinated national policy" with which Act 122 conflicts, or any "multilateral

agreements" that the United States is currently pursuing. And Plaintiffs fail to explain how, in the absence of such a coordinated national policy or multilateral agreements (conflicting or otherwise), the Global Climate Protection Act's aspirational instructions preempt Vermont's duly enacted Act 122. Plaintiffs have neither plausibly alleged nor substantiated a claim that the Act conflicts with U.S. foreign policy.

> **b.    Act 122 does not intrude on any areas of uniquely federal interest.**

Plaintiffs also argue that the Act is preempted under the "field preemption" theory of foreign affairs. Chamber SJ Mem. at 17-18; W. Va. Mem. at 30-31; U.S. Mem. at 56. Those arguments fail.

The foreign affairs doctrine bars states from legislating outside their "areas of traditional competence" in a manner that will produce "more than [an] incidental effect" on foreign relations. *Garamendi*, 539 U.S. at 420. Thus, a state may not "take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility." *Id.* at 419 n.11. But the mere fact that a state law "will have some incidental or indirect effect in foreign countries" does not offend the Constitution. *Clark v. Allen*, 331 U.S. 503, 517 (1947). Just so here: the Act operates in an area of traditional state responsibility, and it is unlikely to have *any* effect on foreign countries, let alone an effect that is more than incidental or indirect.

First, Act 122 is within Vermont's traditional state responsibilities of raising revenue and protecting the health, safety, and welfare of its residents. The Founders made clear that states have the authority to "raise their own revenues for the supply of their own wants," and that states "retain that authority in the most absolute and unqualified sense" under the Constitution. The Federalist No. 32 (Alexander Hamilton). *See also*, *e.g.*, *Olcott v. Fond du Lac Cnty.*, 83 U.S. 678, 689 (1872) (noting state authority "to raise money for a public use"). States similarly have "great

34

latitude" to "legislate as 'to the protection of the lives, limbs, health, comfort and quiet of all persons,'" *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (quoting *Slaughter-House Cases*, 16 Wall. 36, 62, 21 L.Ed. 394 (1873)), including by "combatting the adverse effects of climate change on [their] residents," *Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018).[19]

Vermont has lawfully exercised these authorities for decades. For instance, Vermont has enacted laws empowering state officials to prevent floods, *see* Vt. Stat. Ann. tit. 10, §§ 751 *et seq.*; *see also id.* § 951; to build and repair bridges, *see id.* tit. 19, § 10c; and to respond to natural disasters and other emergencies, *see id.* tit. 20, §§ 1 *et seq*. Vermont similarly has enacted statutes that authorize state officials to raise and spend money to fund those projects. *See, e.g.*, Vt. Stat. Ann. tit. 20, § 38 (creating Hazardous Chemical and Substance Emergency Response Fund). Act 122 continues these responsibilities. It establishes a Vermont fund to pay for climate change adaptation projects in Vermont. Act 122 Sec. 22, § 597. It calls for Vermont officials to raise revenue for that fund from fossil fuel companies. Act 122 Sec. 2, Act 47 Secs. 22 & 23, §§ 596(22), 597, 598. And it instructs Vermont officials to use that fund to pay for projects that will help Vermonters address and live with the adverse effects of climate change. Act 122 Sec. 2, §§ 596(2), 597. What Act 122 does not do is regulate emissions or air quality, or by extension interstate pollution. Plaintiffs' foreign affairs argument—like other of their arguments—therefore is premised on a conception of the Act inconsistent with the Act's language, structure, and aims.

---

[19] Indeed, the United States recently articulated a national policy recognizing that state government can and should play a leading role in "national resilience and preparedness." https://www.whitehouse.gov/presidential-actions/2025/03/achieving-efficiency-through-state-and-local-preparedness/.

Second, the Act is not field-preempted because it has at most an incidental effect on international affairs. A pair of mid-20th century Supreme Court cases on probate statutes provides the clearest illustration of this principle. First, in *Clark v. Allen*, the Supreme Court rejected a facial challenge to the reciprocity provision of California's probate law. 331 U.S. at 517-18. California's law forbade testamentary transfers to non-resident aliens whose home countries did not ensure that U.S. citizens enjoyed a "reciprocal right . . . to take personalty on the same terms and conditions as residents and citizens of the other nation." *Id.* at 516. The Court recognized that California's law likely would "have some incidental or indirect effect in foreign countries," but noted that the same could be said of "many state laws" that, like California's probate law, arose in traditional areas of state competence. *Id.* at 517. Accordingly, the Court held that California's law was not preempted. *Id.* at 518.

Two decades later, in *Zschernig v. Miller*, the Court invalidated a more involved reciprocity provision in Oregon's probate law. 389 U.S. 429, 430-31 (1968). In addition to the sort of "general reciprocity" language upheld in *Clark*, the Oregon statute also called on probate courts to analyze the ability of funds to freely flow in and out of the putative heir's home country and whether the home country would confiscate the proceeds. *Id.* at 431. The Court concluded that these provisions invited "minute inquiries concerning the actual administration of foreign law [and] the credibility of foreign diplomatic statements," so constituted impermissible "state involvement in foreign affairs and international relations." *Id.* at 435-36. Whereas *Clark* was a facial challenge, *Zschernig* was an as-applied challenge. *Id.* at 433. Thus, while the Court expressly reaffirmed its prior holding in *Clark*, *id.* at 432, it concluded that the particular applications under review "impair[ed] the effective exercise of the Nation's foreign policy" so were preempted, *id.* at 440.

36

This case is like *Clark* and unlike *Zschernig*. Like *Clark*, this case is a facial challenge to Act 122. And like *Clark*—but unlike *Zschernig*—Act 122 does not instruct state actors to "launch[] inquiries into the type of governments that obtain in particular foreign nations" or otherwise adopt "foreign policy attitudes." *Zschernig*, 389 U.S. at 434, 437. Indeed, Act 122 is even farther removed from foreign relations than was the statute the Court upheld in *Clark.* Whereas California's reciprocity provision expressly applied only to foreign nationals, the provisions of Act 122 that Plaintiffs challenge here apply only to entities with "sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." Act 122 Sec. 2, Act 47 Sec. 22, § 596(22). The Chamber's own declarant acknowledges that Act 122's effects "will primarily fall on U.S.-based companies" because "foreign entities—particularly those owned by sovereign governments—are likely to avoid these costs due to jurisdictional limitations that prevent enforcement by state authorities." Swarup Decl. ¶ 22, ECF No. 100-6 (*Chamber* case).[20] In *Clark*, the Supreme Court concluded that even the explicitly extraterritorial language in California's reciprocity provision did not support a facial preemption challenge. Act 22 is far less likely to impact foreign affairs.

In sum, Plaintiffs fail to demonstrate or plausibly allege that the Act conflicts with the United States' express foreign policy or intrudes upon a uniquely federal area of policy.

---

[20] Moreover, even if the Court were to conclude that the Act's application to foreign entities was preempted, the Court could simply sever the portion of the Act that would allow foreign entities to be "responsible parties." *See Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 229 n.16 (2d Cir. 2025) (courts must "consider partial invalidation (and by extension, a provision's severability), when evaluating facial challenges"); *United States v. Arthrex, Inc.*, 594 U.S. 1, 24 (2021) (noting "normal rule that partial, rather than facial, invalidation is the required course"); *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508-09 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any "problematic portions while leaving the remainder intact" (citation omitted)).

\* \* \*

The U.S. Constitution does not preclude Act 122. The Court should dismiss Plaintiffs'

preclusion claims for failure to state a claim (Chamber Count I, W. Va. Count I, U.S. Counts II &

V). In the alternative, the Court should deny Plaintiffs' summary judgment motions on these

claims and grant summary judgment to the State.

## IV.   Act 122 does not violate the Commerce Clauses.
   *Motion to Dismiss (all complaints) and Summary Judgment (United States complaint)*

### A.   Act 122 is consistent with the dormant Interstate Commerce Clause.
   **(Chamber Count IV; W. Va. Count III; U.S. Count III)**

Plaintiffs' efforts to rehabilitate their dormant Commerce Clause claims fail. Most

notably, and as explained above, Plaintiffs' claims continue to hinge primarily on a suggestion

that the dormant Commerce Clause imposes a *per se* ban on efforts to "regulate wholly out-of-

state conduct." Chamber MTD Opp. at 44; *see also* W. Va. Mem. at 63-65; U.S. Mem. at 58-60.

As explained above, however, the Act does not "regulate" any conduct, let alone wholly out-of-

state conduct. *See supra* at 12-15.  But even if it did, the Supreme Court has expressly rejected

Plaintiffs' reading of the dormant Commerce Clause. *See* Vt. MTD at 55-56 (discussing *Pork*

*Producers*, 598 U.S. at 371-75).

True, the *Pork Producers* Court observed that its decision was not meant to "trivialize the

role territory and sovereign boundaries play in our federal system." *Id*. at 375. But it clearly held

that reading a *per se* "extraterritoriality" prohibition into the dormant Commerce Clause was not

the appropriate way to police those boundaries. *See id*. at 376 (rejecting proposition that "*any*

question about the ability of a State to project its power extraterritorially must yield to an 'almost

*per se*' rule under the dormant Commerce Clause"); *see also id.* at 380 (opinion of Gorsuch, J.)

("[O]ur cases have expressly cautioned against judges using the dormant Commerce Clause as 'a

roving license for federal courts to decide what activities are appropriate for state and local governments to undertake.'" (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solic Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007)). Plaintiffs have therefore not alleged a valid "extraterritoriality" claim under the dormant Commerce Clause.

Instead, the touchstone of dormant Commerce Clause analysis is whether the state policy at issue discriminates against out-of-state producers. *See, e.g.*, *Pork Producers*, 598 U.S. at 377 (noting that the "antidiscrimination rule . . . lies at the core of our dormant Commerce Clause jurisprudence"). And Act 122 does not discriminate against out-of-state producers. *See* Vt. MTD at 57-58. It extends liability to "any entity" that engaged in fossil fuel extraction or refining during the covered period, Act 122 Sec. 2, Act 47 Sec. 22, § 596(22), and allocates liability on a volumetric basis, *id.* § 598(d). Nor does Act 122 implicitly discriminate against out-of-state producers simply because Vermont lacks a fossil fuel production industry. Even if "the burden of" Act 122 "falls solely on interstate companies," that "does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978); *see also N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 91 (2d Cir. 2017) ("The Supreme Court has considered and rejected the argument that a statute is discriminatory because it will apply most often to out-of-state entities in a market that has more out-of-state than in-state participants.").

Plaintiffs have not adequately pleaded a *Pike* claim either.[21] To do so, they must demonstrate that all applications of the Act would impose a burden on interstate commerce that so clearly outweighs the local benefits as to reveal a discriminatory purpose. *See Pork*

---

[21] The Chamber and the United States do not raise express *Pike* arguments in their briefs, but West Virginia does. W. Va. Mem. at 65-67.

*Producers*, 598 U.S. at 377-79 (purpose of the *Pike* analysis is to determine whether the "practical effect" of a challenged law reveals a "discriminatory purpose"). Again, *Pike* claims are particularly ill-suited for facial challenges because they require plaintiffs and the court to speculate about the economic burdens and effects of a challenged law. Vt. Mem. at 60 (quoting *Nat'l Shooting Found., Inc. v. James*, 144 F.4th 98, 115-16 (2d Cir. 2025)). And in any event, the Act's in-state benefits are plain: Vermont has experienced disastrous consequences from climate change, which will only accelerate in the coming years. *See* Vt. MTD at 10-11. By directing and funding adaptation projects, the Act will help Vermonters avoid some of the worst consequences of climate change and live with those consequences they cannot avoid. The "burdens," particularly at this stage, are entirely speculative—Plaintiffs cannot demonstrate that the Act will have *any* particular burden, let alone one that so far outweighs the benefits to Vermont as to suggest a potential pretext for intentional discrimination against interstate commerce.

### B.   The Act does not offend the dormant Foreign Commerce Clause. (Chamber Count IV; W. Va. Count III; U.S. Count IV)

Plaintiffs' foreign commerce clause arguments likewise fail. To state a claim under the dormant foreign Commerce Clause, a plaintiff must plausibly allege that the challenged state policy undermines "Congress' power" to regulate commerce with foreign nations. *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 453-54 (1979); *see also* W. Va. Mem. 67 (noting that claim is grounded in Constitutional grant of Congressional authority to regulate commerce). But Plaintiffs do not cite a single Congressional action in the realm of foreign affairs with which Act 122 conflicts. *See Barclays*, 512 U.S. at 329-30 (rejecting dormant Foreign Commerce Clause claim where Congress declined to enact a federal policy bearing on the statute). That is because no such conflict exists. And even if some application of the Act could result in liability to a foreign entity or country, *but see* Swarup Decl. at ¶ 22, ECF# 100-6 (*Chamber* case) (noting that

Act 122's impacts "will primarily fall on U.S.-based companies" because "foreign entities . . . are likely to avoid these costs to due jurisdictional limitations"), *and* Plaintiffs could show that such an application somehow could impact Congress' authority to regulate foreign commerce—which they have not—that would be insufficient to support Plaintiffs' facial challenge, which requires a showing that the Act is unconstitutional in all its application.

* * *

The Act comports with the Constitution's dormant Commerce Clauses. The Court should dismiss Plaintiffs' interstate and foreign Commerce Clause claims for failure to state a claim (Chamber Count IV, W. Va. Count III, U.S. Counts III, IV). In the alternative on the United States' claims (U.S. Counts III, IV), the Court should deny the United States' summary judgment motion and grant summary judgment to the State.

## V.    Act 122 does not violate due process.
### *Motion to Dismiss*
### (Chamber Count III; W. Va. Counts IV, V)

Plaintiffs' due process arguments primarily are another recitation of the allegations in their complaints. Those allegations remain insufficient to state a due process claim.

### A.    Act 122 comports with substantive due process.

The parties appear to agree on the standard: an economic statute, including a retroactive one, comports with substantive due process unless it is arbitrary and irrational. *See* Vt. MTD at 42-43; Chamber MTD Opp. at 38-39; W. Va. Mem. at 58.[22] And Plaintiffs do not seriously dispute that Act 122 advances a legitimate legislative purpose: to raise revenue for climate

---

[22] West Virginia also excerpts other language from various cases, apparently to suggest that any legislation with retroactive effect is *per se* unconstitutional. *See* W. Va. Mem. at 59, 62. However, it is well established that retroactivity alone does not offend due process. *See, e.g.*, *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984); Vt. MTD at 42-43.

change adaptation projects that help the State's communities, households, and businesses respond to and prepare for the negative impacts of climate change. *See* Vt. MTD at 44. For example, the Chamber "assum[es]" the purpose is valid and only takes issue with the "means" Vermont has chosen "to achieve it." Chamber MTD Opp. at 40. West Virginia has not addressed the issue at all.

On the arbitrary element, Plaintiffs point again to their allegations that Vermont "cannot with any accuracy or fairness" conduct the "impossible" cost assessment and attribution work required by the Act. *See* Chamber MTD Opp. at 2, 40 (citing Complaint); *see also* W. Va. Mem. at 61-62. They state these allegations "must be accepted as true." Chamber MTD Opp. at 41. But they provide no support for the claim that even conclusory, speculative allegations must be accepted as true. As the State has discussed, such allegations cannot be accepted as true in a facial challenge. *See* Vt. MTD at 21-23; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[23]

Additionally, the Chamber's argument relies on a misunderstanding of what the Act does. It does not, as the Chamber seems to suggest, require anyone to trace particular "molecules" of greenhouse gases "to their source." Chamber MTD Opp. at 40. Rather, it requires the State to determine: (i) the covered greenhouse gas emissions (quantity of $CO_2$ equivalent released into the atmosphere from fossil fuel extraction or petroleum refining from January 1, 1995, to December 31, 2024), (ii) Vermont's climate change adaptation costs resulting from the covered emissions, (iii) the responsible parties (an entity (or successor) engaged in extracting fossil fuel or refining crude oil, that is responsible for more than one billion metric tons of covered emissions), and (iv)

---

[23] Moreover and with good reason, Plaintiffs have not even attempted to assert any undisputed material facts regarding the purported infeasibility of implementing the Act.

the portion of covered emissions attributable to each responsible party—all of which the Legislature heard could be done.[24] With this information, ANR can issue cost recovery demands to responsible parties based on their proportional share of the State's climate change adaptation costs.

For its part, West Virginia's critique of the social cost of carbon is irrelevant. W. Va. Mem. at 61-62. Even if the critique were valid (which the State does not concede), that would not establish that it is impossible for Vermont to accurately and reliably attribute costs under the Act—the Act does not require the Treasurer to use the social cost of carbon. West Virginia's further statement that "Vermont's own Department [sic] of Natural Resources has concluded that [attribution science] is not reliable enough to actually implement," W. Va. Mem. at 39, is simply not accurate. ANR's report to the Legislature explained that attribution science has "developed as a scientific field in the past two decades" and summarized some of those developments, including an approach that assesses "a full causal chain from emissions to impacts" (a.k.a. "end-to-end attribution"). ANR, *Act 122 Climate Superfund Cost Recovery Program Report to the General Assembly* 7 (Jan. 15, 2025), https://perma.cc/6MU8-G7NR; *see also* Callahan & Mankin, *supra* note 24 (describing end-to-end attribution). Then the report noted that "[w]hile attribution science is key to the development of the cost assessment, it will require further development to address the full scope of climate impacts contemplated by the Act." *Report* at 7.

---

[24] *See* Vt. MTD at 5 n.6 (feasibility of linking costs to particular emissions), 7 n.11 (feasibility of attributing emissions to particular entities); Oral Testimony of Ben Edgerly Walsh (Vermont Public Interest Group), Senate Committee on Natural Resources & Energy (Apr. 4, 2025), https://www.youtube.com/watch?v=m-U4goznyKM (at 1:01:25-1:06-03) (regarding 2025 amendment to definition of "covered greenhouse gas emissions"). *See also* C.W. Callahan & J.S. Mankin, *Carbon Majors and the Scientific Case for Climate Liability*, Nature, Apr. 23, 2025, at 640, 893-901, https://doi.org/10.1038/s41586-025-08751-3 (click "Download PDF") (article published in peer-reviewed journal, draft previously provided to Legislature).

Far from "concluding" attribution science is "not reliable enough," this statement recognizes the importance of ensuring a robust approach. *See id.* at 8-9 (noting additional time and funding were needed to ensure a "robust, accurate" cost assessment).

Plaintiffs also complain that the Act singles out a "subset of energy producers" instead of targeting the end users who used these companies' products (and presumably paid to do so). Chamber MTD Opp. at 41; W. Va. Mem. at 60-61 (accusing State of seeking "retribution" because Act does not charge individuals for their use of fossil fuel companies' products). But Plaintiffs offer no legal argument or authority to address what the State has shown: (i) there were rational reasons to assign liability to large fossil fuel producers (with rationality being the test for due process)—e.g., that their products are the main contributors of greenhouse gas emissions, and (ii) according to the Supreme Court, a law "need not embrace all the evils within its reach" if it "approaches the problem of cost spreading rationally." Vt. MTD at 47-48, 45-46 (quoting *Am. Fed'n of Labor v. Am. Sash & Door Co.,* 335 U.S. 538, 542 (1949) (citation omitted), *then Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 19 (1976)). By assigning payments based on greenhouse gas emissions attributable to a party and only for the amount of Vermont's climate change adaptation costs proportional to those emissions, this is what the Act does.

The Chamber's argument that the Act is "overly harsh and oppressive" because the retroactive period is too long fares no better. Retroactive periods are not assessed in a vacuum, so it is of little relevance that "courts have invalidated laws of similar and even shorter lengths of retroactive liability." Chamber MTD Opp. at 42; *see also* W. Va. Mem. at 59. The relevant question is whether the retroactive application is rational. *See, e.g., Pension Benefit Guar. Corp.*, 467 U.S. at 733; *Long Island Oil Products Co. v. Local 553 Pension Fund,* 775 F.2d 24, 27 (2d Cir. 1985); *In re Chateaugay Corp.,* 53 F.3d 478, 491 (2d Cir. 1995) ("The proposition that the

Due Process Clause imposes a time limit on a law's retrospective effect elicits no support from the case law . . . ."). Here, it was reasonable for the Legislature to choose 1995 to 2024 as the covered period. The Legislature heard testimony that fossil fuels were contributing to climate change during this time and that the fossil fuel industry knew it (which Plaintiffs do not dispute). *See* Vt. MTD at 4 n.3, n.4, n5, 47-48.

Plaintiffs also complain that fossil fuel producers "had no way to know" and "could not 'have reasonably expected'" to be held liable for costs based on conduct during this period. Chamber MTD Opp. at 42; W. Va. Mem. at 59 (citation omitted). But even if these assertions were credible,[25] expectations about liability are not determinative. Vt. MTD at 47-48. Further, though West Virginia relies on *Commonwealth Edison Co. v. United States,* that case held that "[w]here a Due Process violation is alleged because the government has ordered the payment of money, we think that reasonable expectations are to be judged as of the point at which the complaining party entered into the activity that triggered the obligation." 271 F.3d 1327, 1350 (Fed. Cir. 2001). Here—to the extent expectations are relevant—the "point at which" liability begins is 1995 and, as noted above, this is a point by which the fossil fuel industry knew the harmful impacts its products would cause. *See Commonwealth Edison,* 271 F.3d at 1349 ("A number of Supreme Court decisions make clear that company knowledge of the dangers present in their operations is relevant to a determination of reasonable expectations.").[26] Further, the

---

[25] Documents in the public record suggest they are not. *See* Vt. MTD at 48 & n.36 (citing industry statements). And while the American Petroleum Institute's (API's) comments on S.259 (which became Act 122) assert that past fossil fuel production activities were "legal," the comments do not claim that fossil fuel companies never anticipated any liability. *See* Letter from API to Senate Committee on Judiciary (Feb. 14, 2024), https://perma.cc/8RW5-HG8V.

[26] The *Commonwealth Edison* court also looked at two other factors—whether the industry was highly regulated and the regulatory environment. 271 F.3d at 1348. Plaintiffs have not offered any argument on any of the factors, and they have the burden to show the Act violates due process. *Usery,* 428 U.S. at 15. Nevertheless, the State notes that as of 1995, there were

question is not even what a particular company actually anticipated, but "what a reasonable company in [that] position should have anticipated." *Id.* at 1348.

Additionally, the cases Plaintiffs cite regarding particular retroactive timeframes do not help them. Both sets of Plaintiffs rely on *Eastern Enterprises*, but Justice O'Connor actually noted "this Court has expressed *concerns* about using the Due Process Clause to invalidate economic legislation." *E. Enters. v. Apfel,* 524 U.S. 498, 537 (1998) (O'Connor, J., plurality) (emphasis added). And though Justice Kennedy's concurrence mentioned a timeframe, the opinion supports that a monetary assessment is consistent with due process so long as it bears a "legitimate relation to the interest which the Government asserts," as in the case of a "remedial" statute linked to an "'actual, measurable cost'" that companies have avoided in the past. *Id.* at 549 (citing *Usery,* 428 U.S. at 19) (Kennedy, J., concurring). Act 122 fits this bill because it is designed to assign portions of Vermont's actual, measurable climate adaptation costs to the companies responsible for producing the fossil fuels giving rise to those costs. *Cf. id.* at 537 (reasoning that Coal Act required payments "unrelated to . . . any injury [the employers] caused") (O'Connor, J., plurality).

The Chamber also cites a non-controlling decision from New York in which a state court applied a state-law, tax-specific test to invalidate a retroactive tax law. Chamber MTD Opp. at 42 (citing *James Square Assocs. LP v. Mullen,* 993 N.E. 2d 374, 380, 382-83 (N.Y. 2013)). While the timeframe of retroactivity was a factor in that case, the central problem was that the plaintiff businesses had relied on an earlier law that granted them tax benefits, and the new law took those

---

numerous regulatory statutes with potential application to fossil fuel extraction and refining activities. *See., e.g.,* Occupational Safety and Health Act of 1970, Pub. L. No. 91-596, 84 Stat. 1601; Clean Water Act of 1972, Pub. L. No. 92-500, 86 Stat. 816; Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399; Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 484.

previously granted benefits away. *Id.* at 382-83. Here, Plaintiffs have not suggested that Vermont or Congress has ever had any law exempting potentially responsible parties from liability for harms arising from climate change (and the State is not aware of one). Further, the *James Square* court found that New York's retroactive tax benefit recission sought only to raise general revenue so did not serve a "valid public purpose" to justify retroactivity. *Id.* at 383. In contrast here, the revenue raised by Act 122 will go directly toward supporting critical climate change adaptation projects in Vermont and is expressly tied to the activities of fossil fuel producers during a time they knew their activities were contributing to human-caused climate change. *See supra* at 42-43 (explaining how costs will be assessed and attributed); Vt. MTD at 3-9.

The Chamber's final point—about the "controlled group" provision of the Act— is that this provision "should not be read in isolation" and is part of a "larger irrational scheme." Chamber MTD Opp. at 43. However, this neither refutes the State's point that the Chamber's theory rests on a series of speculative assumptions about how the "controlled group" provision will be implemented—which have not and may never come to pass—nor why the Act's reliance on the Internal Revenue Code is unreasonable. *See* Vt. MTD at 49.

In essence, Plaintiffs' theory is that Act 122 is irrational because they say it is. But the law is not on their side, and neither is the statute itself nor the legislative record. Plaintiffs have not come close to demonstrating that Act 122 will be arbitrary and irrational in any application, much less all applications—and they cannot prevail in their facial challenge.

### B. The Act comports with procedural due process and is not unconstitutionally vague.

The Chamber's procedural due process and vagueness arguments lack any basis. Because Act 122 does not prohibit (or prescribe) any conduct, there is no requirement or prohibition with which fossil fuel producers need to figure out how to comply. Vt. MTD at 49-50. In contrast, the

Chamber's cases involved actual prohibitions on speech or conduct. In *FCC v. Fox Television Stations, Inc.*, there was a statutory prohibition on "obscene, indecent, or profane language." 567 U.S. 239, 243, 254 (2012). In *Village of Hoffman Estates v. Flipside* (which *rejected* a vagueness challenge)*,* there was a local ordinance that required a license to sell items "'designed or marketed for use with illegal cannabis or drugs.'" 455 U.S. 489, 491 (1982). There is no parallel here.

Similarly, the "discriminatory enforcement" issue in a vagueness challenge relates to whether the relevant requirement or prohibition applicable to the public or regulated entity is so vague that the government enforcer will apply it arbitrarily. *See FCC,* 567 U.S. at 243-44 (prohibition applicable to broadcasters); *Hoffman Estates,* 455 U.S. at 492 (license requirement applicable to businesses). The Chamber has not provided any case applying the void-for-vagueness doctrine to a statute that directs governmental bodies to implement the statute but has no extant requirement or prohibition for anyone else.

Instead, the Chamber's allegation that Act 122 gives "unfettered discretion" to ANR and the Treasurer, Chamber MTD Opp. at 44, relates to non-delegation, and the Chamber has not brought a non-delegation claim. *See infra* at 58-60 (addressing West Virginia's non-delegation claim). Likewise, the Chamber's complaint that fossil fuel producers had "no notice" their prior activities would lead to liability in Vermont, Chamber MTD Opp. at 44, relates to retroactivity, not vagueness*. See supra* at 44-47 (addressing retroactivity). And the Chamber's assertion that the Act is arbitrary, Chamber MTD Opp. at 44, relates to substantive due process, addressed above. Finally, the cases the Chamber cites in its "procedural due process" paragraph are not relevant to anything at issue in this case. Both cases address considerations regarding punitive damages awards (which expressly are not compensatory). *See State Farm Mut. Auto Ins. Co.,*

538 U.S. at 416; *Gore,* 517 U.S. at 574-5. Neither speaks to the legality of a compensatory statute that expressly bases a fossil fuel producer's liability on the costs attributable to the fossil fuel producer.

The Court should dismiss all due process claims in their entirety for failure to state a claim.

## VI. Act 122 does not violate the Equal Protection Clause or the Common Benefits Clause.
### *Motion to Dismiss*
### (W. Va. Counts VI, VII)

West Virginia has not addressed any of the State's arguments or case law on equal protection and common benefits: (i) that statutes like Act 122, which do not implicate suspect or quasi-suspect classifications, are subject to rational basis review and a plaintiff must negate "every conceivable basis" that might support a legislative classification; (ii) that Supreme Court case law makes clear that legislative judgments about where to focus problem-solving efforts in economic legislation are "virtually unreviewable"; (iii) that the Vermont Legislature had actual reasons to focus on fossil fuel companies (fossil fuels being the largest contributor to climate change impacts); (iv) that this focus is rationally related to Vermont's goal of addressing climate change impacts in the State (with the fossil fuel companies only being responsible for their actual share of impacts); (v) that the Vermont Common Benefits Clause does not apply because the West Virginia Plaintiffs are not being excluded from any benefit; and (vi) that even if the Common Benefits Clause applied, it was reasonable for the Legislature to focus on the parties responsible for the larger part of the problem. *See* Vt. MTD at 51-55.[27]

---

[27] Oddly, West Virginia cites *State v. Brunelle* for the proposition that Vermont's "Common Benefit Clause tracks the federal Equal Protection Clause." W. Va. Mem. at 62 (citing *State v. Brunelle*, 148 Vt. 347, 350-51, 534 A.2d 198, 201 (1987)). But *Brunelle* does not address the Common Benefits Clause. *See Brunelle*, 148 Vt. at 350-51 (noting similarities between "the Vermont Constitution's self-incrimination clause [and] its federal counterpart"). In fact, it is well

Instead, West Virgina states that "[u]njustified treatment between in-state and out-of-state corporations violates the Equal Protection Clause." W. Va. Mem. at 63. The case they cite for this unremarkable proposition held that New Jersey could not deny a tax exemption it provided to in-state corporations to a Pennsylvania corporation "solely on the basis of [the Pennsylvania company's] foreign incorporation." *WHYY, Inc. v. Borough of Glassboro,* 393 U.S. 117, 119 (1968). That case is inapposite. Vermont's decision to apportion liability among large fossil fuel producers as the largest contributors to climate change, Vt. MTD at 7, does not depend on whether the producers are in-state or out-of-state. *See also supra* at 39; Vt. MTD at 57-58 (explaining why Act 122 does not discriminate against interstate commerce).

West Virginia's other point—that Act 122 is "'discrimination itself'"—simply ignores the terms of the statute and the legislative record. The case they cite was describing two prior cases where the legislative classifications had rested on (i) "'an irrational prejudice'" against persons with intellectual disabilities and (ii) differential tax rates between in-state and out-of-state insurance companies, respectively. *Douglas by Douglas v. Hugh A. Stallings, M.D., Inc.,* 870 F.2d 1242, 1247 (7th Cir. 1989) (citation omitted). Neither is the case here. The Court should dismiss West Virginia's equal protection and common benefits claims for failure to state a claim.

## VII. The Act does not impose excessive fines.
### *Motion to Dismiss* (Chamber Count V; W. Va. Count VIII)

Plaintiffs' excessive fines claims should be dismissed because they still have neither established that Act 122 is either punitive nor that the cost recovery demands issued under the Act will be grossly disproportional to the activities giving rise to the costs.

---

established that "the Common Benefits Clause of the Vermont Constitution differs markedly from the federal Equal Protection Clause." *Baker v. State*, 170 Vt. 194, 202 (1999). West Virginia does not even try to explain how it has alleged a valid claim under the Common Benefits Clause, and it has not. *See* Vt. MTD at 54-55.

### A.    The Act is not punitive.

Both the Chamber and West Virginia appear to appreciate that the Excessive Fines Clause applies only to government actions that serve as punishment. *See* Chamber MTD Opp. at 47 (citing *Austin v. United States*, 509 U.S. 602 (1993)); W. Va. Mem. at 68 (same). They make much of *Austin*'s recognition that a fine that is punitive "in part" is subject to the Excessive Fines Clause. Chamber MTD Opp. at 47; W. Va. Mem. at 68. However, *Austin* provides that even a fine serving more than one purpose is not punitive unless it "can *only* be explained as serving in part to punish." 509 U.S. at 610 (emphasis added). The Court relied on that rule to strike down certain federal forfeiture provisions because it could not conclude they "serve[d] solely a remedial purpose." *Id.* at 622. Instead, the Court reasoned, "the 'forfeiture of property . . . [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law.'" *Id.* at 621 (citation omitted). Act 122, by contrast, is all about compensation for the climate change impacts "sustained by society."

To support their "partly punitive" argument, West Virginia points to a statement from a State Senator who referred to "making Big Oil pay" during an interview. W. Va. Mem. at 69; *see also* Chamber MTD. Opp. at 47 (referencing non-legislative statements about "Big Oil"). But the Senator's reference is innocuous and true—Act 122 *is* designed to make large fossil fuel producers pay cost recovery demands to compensate Vermont for those producers' proportional share of the State's climate change adaptation costs.[28] Further, even if lawmakers had made explicit statements that the purpose of the Act was to punish fossil fuel producers for their bad

---

[28] Plaintiffs fail to mention the parts of the Senator's statement that described the bill as "mitigating the effects of climate change" by requiring payment from those "who created the harm," to "finance . . . restoration and improve resiliency in Vermont." (Live link available at: https://vnrc.org/climate-dispatch-senate-climate-priorities-with-sen-alison-clarkson/.)

behavior, that would not change the Act itself, whose text and structure are clear that it only is compensatory (because, again, the cost recovery demands are to compensate the State for its climate change adaptation costs, and only to the extent those costs are attributable to each responsible party). Vt. MTD at 64-68; *see United States v. Monsanto Co.*, 858 F.2d 160, 174-75 (4th Cir. 1988) (noting that recovery for "cleanup costs" was "not intended to operate, nor does it operate in fact, as a criminal penalty or a punitive deterrent"). Plaintiffs offer no authority for the idea that statements about a law—even if there had been "punitive" statements here—could override the law itself when determining whether the law is punitive.

Next, West Virginia claims the Act is punitive because the timeframe for the covered period takes into account the time by which the fossil fuel industry knew for certain that its products were contributing to climate change. W. Va. Mem. at 69. But the State should not be faulted for ensuring the Act's retroactive application is fair. The time by which fossil fuel producers knew their products were contributing to climate change impacts is a permissible consideration. *See* Vt. MTD at 47-48.

The Chamber adds that the Act must be punitive because there is "no purpose" for "singling out" "major fuel producers." Chamber MTD Opp. at 47. Of course there is. *See* Vt. MTD at 51-54 (noting that "fossil fuels are the single largest contributor to climate change impacts"); *supra* at 49-50. In any event, the Chamber does not offer any authority for the notion that creating a legislative classification means a "fine" is punitive under the Excessive Fines Clause.  Finally, the Chamber wrongly cites two cases for the proposition that there need not be any violation of law for a fine to be punitive. Chamber MTD Opp. at 48. In both cases, the court held that a spouse's violation of law could not be held against the *other* spouse—not that there was no violation of law in the first instance. *See von Hofe v. United States,* 492 F.3d 175, 179,

191 (2d Cir. 2007) (criminal charges related to marijuana cultivation); *United States v. Ferro,* 681 F.3d 1105, 1108, 1116 (9th Cir. 2012) (violation of felon-in-possession of firearms statute).

Act 122 is not punitive.

## B.    The Act is not disproportional.

Even if the Act's cost recovery demands were punitive, they would not be grossly disproportional. Citing *United States v. Bajakajian,* 524 U.S. 321 (1998), Plaintiffs assert that any payment under the Act is grossly disproportional because fossil fuel extracting and refining activities were "lawful or even encouraged at the time" and "produced tremendous benefits associated with modernity," W. Va. Mem. at 70, or were not any "'offense' at all," Chamber MTD Opp. at 48. Even if true, these points only highlight the ill fit between an excessive fines claim and a non-punitive statute like Act 122.

*Bajakajian* dealt with the federal crime of failing to report the transport of more than $10,000 in currency outside the United States. The Supreme Court held that forfeiture of the entire amount the defendant failed to declare ($357,144) would constitute an excessive fine. 524 U.S. at 337. The Court first reasoned the forfeiture was punitive because it required the conviction of an underlying felony, was presented by the government as a form of "deterrence," which has "traditionally been viewed as a goal of punishment," and "d[id] not serve the remedial purpose of compensating the Government for a loss." 524 U.S. at 328-29. It then reasoned that forfeiture of the entire amount would be grossly disproportional because, among other things, the offense was "solely a reporting offense," the harm was "minimal," and there was "no loss to the public fisc." *Id.* at 337, 339. None of these apply here. Cost recovery demands are not based on a crime, they are not for deterrent purposes, and they *do* "serve the remedial purpose of compensating the Government for a loss." Further, they are based on more than "reporting"

activities, the climate change impacts they seek to address are not "minimal," and the whole point of the law is to help the "public fisc" deal with those impacts.

Instead, *Bajakajian* is relevant for its central rule about "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause," which is "the principle of proportionality: [t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334. Here, the Act's cost recovery demands bear more than "some relationship" to the activities of responsible parties: the demands are directly proportional to a responsible party's share of the covered emissions giving rise to the climate change adaptation costs attributable to those emissions. *See, e.g.,* Vt. MTD at 3-9.[29] Plaintiffs' speculative claims that demands may "stretch[] into the hundreds of millions or billions of dollars"[30] (which is not yet known) are beside the point: the key is proportionality.

The Court should dismiss the excessive fines claims for failure to state a claim.

## VIII. The Act does not affect a taking.
### *Motion to Dismiss*
### (Chamber Count VI; W. Va. Counts IX, X)

Plaintiffs' takings claims fail for two independent reasons. First, Plaintiffs have not identified a good reason for this Court to depart from historical precedent that a specific property interest is a prerequisite for any takings claim. *See E. Enters.,* 524 U.S. at 541 (Kennedy, J., concurring) ("in all of the cases where the regulatory taking analysis has been employed, a specific property right or interest has been at stake"). Though the plurality in *Eastern Enterprises* did not follow this requirement, a "majority of justices" concluded that "a Takings Clause issue

---

[29] The Chamber Plaintiffs continue to be incorrect when they state that the Act "pin[s] all the purported costs of climate change—caused by countless sources—onto a select group of energy producers." Chamber MTD. Opp. at 48. By design, it does not. *See* Vt. MTD at 8, 46 n.30.

[30] Chamber MTD Opp. at 48; *see also* W. Va. Mem. at 71 (forecasting "fines in the billions of dollars").

can arise only after a plaintiff's property right has been independently established." *Parella v. Retirement Bd. of R.I. Emps.' Retirement Sys.,* 173 F.3d 46, 58 (1st Cir. 1999); *see also E. Enters.,* 524 U.S. at 540-41 (Kennedy, J., concurring), 554 (Breyer, J., dissenting for himself and three other Justices). Further, the Second Circuit has been clear there is no "law of the land" on the reasoning in *Eastern Enterprises,* given its splintered decision. *United States v. Alcan Aluminum Corp.,* 315 F.3d 179, 189 (2d Cir. 2003). Thus, Plaintiffs are incorrect to suggest that *Eastern Enterprises* altered the traditional understanding of what constitutes a takings claim. *See* Chamber MTD Opp. at 49, W. Va. Mem. at 73-74.

This Court should follow the persuasive authority from other circuits and the reasoning from Justice Kennedy's concurrence (which Plaintiffs cite with favor in other portions of their briefs and with which four other Justices agreed), and hold that Plaintiffs have not alleged any property interest to support a taking in the first instance. *See McCarthy v. City of Cleveland,* 626 F.3d 280, 285-86 (6th Cir. 2010) (collecting cases regarding property interest); *E. Enters.,* 524 U.S. at 543 ("we have been careful not to lose sight of the importance of identifying the property allegedly taken, lest all governmental action be subjected to examination under the constitutional prohibition against taking without just compensation") (Kennedy, J., concurring); *Fabian v. Pappalardo,* 395 F. Supp. 3d 257, 264 n.2 (S.D.N.Y. 2019) (relying on other circuit decisions where Second Circuit had not decided issue) (cited in *Tendo v. United States*, No. 2:23-cv-438, 2024 WL 3650462, at *9 n.9 (D. Vt. Aug. 5, 2024)).

Second, even if Plaintiffs do not need to identify a specific property interest, their takings claims fail under *Penn Central's* factors. *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978) (identifying factors). On the economic impact factor, *see id.* at 124, Plaintiffs insist the Act's economic impact will be "significant" and "much greater" than $5

billion. W. Va. Mem. at 72; *see also* Chamber MTD Opp. at 49 (impact is "obvious"). But Plaintiffs cannot deny that Vermont has not yet conducted the cost assessment that will form the basis for cost recovery demands, nor that responsible parties have not yet been identified, nor that each party's applicable share of Vermont's climate change adaptation costs has not yet been determined, nor that, even once determined, the total amount of cost recovery demands will not cover all Vermont's adaptation costs (because the assessed costs are only for impacts from covered greenhouse gas emissions (not all emissions) and responsible parties are only those responsible for more than one billion metric tons of covered emissions (not all covered emissions)). They simply cannot show what the economic impact of one cost recovery demand will be—much less the impact of every single cost recovery demand, as they must in a facial challenge. *See Cmty. Housing Improvement Program v. City of New York,* 492 F. Supp. 3d 33, 46 (E.D.N.Y. 2020) (noting that lack of clarity regarding economic impact made it "'virtually impossible' to show there is no set of circumstances" in which law would apply constitutionally) (citing *United States v. Salerno,* 481 U.S. 739, 745 (1987)).

More importantly, courts weigh the economic impact factor not in absolute terms, but in relationship to the activity giving rise to the taking. *See, e.g.*, *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 225-26 (1986) (discussing proportionality); *E. Enters.,* 524 U.S. at 528-29 (O'Connor, J., plurality) (considering whether "the extent of . . . liability is disproportionate to the parties' experience"). Here, as discussed at length above, Act 122's liability is proportional to the activities of responsible parties. *See, e.g.,* Vt. MTD at 8, 44-46; *supra* at 42-43.

Plaintiffs offer little on *Penn Central*'s reasonable investment-backed expectations factor. The Chamber states that the Act's interference with such expectations is "obvious," Chamber MTD Opp. at 49, and West Virginia claims fossil fuel producers did not have "sufficient notice,"

W. Va. Mem. at 72. But the Chamber offers no law and West Virginia turns again to *Eastern Enterprises'* plurality. However, the plurality did not hold that the Coal Act failed the reasonable expectations factor based on retroactivity alone, as Plaintiffs suggest. W. Va. Mem. at 72. Rather, the plurality considered the extent of retroactivity, the magnitude of liability, and the fact that—unlike here—a company's liability was "not calibrated" to its "past actions." *E. Enters.,* 524 U.S. at 534-36 (O'Connor, J., plurality). In any event, the fossil fuel industry not only knew its products were contributing to climate change but also anticipated future government action. *See* Vt. MTD at 47-48. And, again, the Act is calibrated to the industry's activities.

Finally, on the character of governmental action factor, Plaintiffs complain the Act "singles out" energy producers, W. Va. Mem. at 73, or "places a targeted and specific group of covered energy producers on the hook," Chamber MTD Opp. at 50. Again, the Chamber offers no law and West Virginia turns to *Eastern Enterprises'* plurality. And again, the plurality does not help West Virginia because it was concerned in part with singling out entities for liability unrelated "to any injury they caused"—a marked difference from how liability is structured in the Act. *E. Enters.,* 524 U.S. at 537 (O'Connor, J., plurality). The essence of this factor is "the extent to which a regulation was 'enacted solely for the benefit of private parties' as opposed to a legislative desire to serve 'important public interests.'" *Cmty. Housing Improvement Program v. City of New York,* 59 F. 4th 540, 555 (2d Cir. 2023) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 485-86 (1987)). Explicitly, Act 22 serves the important public interest of helping Vermont respond and adapt to the significant impacts of climate change felt throughout the State. Act 122 Sec. 2, §§ 596(2), 597; Vt. MTD at 10-11 (summarizing impacts).

The takings claims should be dismissed for failure to state a claim.

IX.    **Act 122 comports with separation of powers under the Vermont Constitution.**
    *Motion to Dismiss*
    **(W. Va. Count XI)**

A statute is constitutional if it provides a "sufficient standard or policy to guide" its implementation. *Athens School Dist. v. Vt. State Bd. of Educ.,* 2020 VT 52, ¶ 38, 212 Vt. 455, 237 A.3d 671 (citing *Rogers v. Watson,* 156 Vt. 483, 493, 594 A.2d 409, 415 (1991)); *see also Athens,* 2020 VT 52, ¶¶ 38-40 (comprehensively articulating standard). Act 122 does this: it confines the Treasurer's cost assessment to costs arising from covered greenhouse gas emissions (which is itself a defined term); identifies the categories of information to include in the assessment; explains what climate change adaptation projects are (which helps inform the assessment of climate change adaptation costs); and provides for consultation with other entities, including to facilitate the use of "credible data or methodologies" in developing the assessment. Act 122 Sec. 2, Act 47 Sec. 24, §§ 596(2), (7), 599c; Vt. MTD at 73-74.

Citing no law, West Virginia claims the Act must prescribe a methodology for conducting the assessment. W. Va. Mem. at 74. But "legislation must often be adapted to complex conditions involving a host of details, with which the law making body cannot deal directly." *State v. Auclair,* 110 Vt. 147, 4 A.2d 107, 114 (1939) (citing *Panama Refining Co. v. Ryan,* 293 U.S. 388, 421 (1935)); *see also Union Bridge Co. v. United States,* 204 U.S. 364, 387 (1907) ("[I]t is not too much to say that a denial to Congress of the right . . . to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business." (citation omitted)).

It is entirely appropriate for the Legislature to delegate technical functions without prescribing particular methodologies. *See, e.g., Union Bridge,* 204 U.S. at 385-86 (holding no

unconstitutional delegation where Congress "committed to the Secretary of War the duty of ascertaining all the facts essential in any inquiry whether particular bridges, over the water ways of the United States, were unreasonable obstructions to free navigation"); *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co.,* 289 U.S. 266, 285 (1933) (noting "weight of the evidence" and "all other pertinent facts" were appropriate for federal commission to determine when exercising statutory authority "to make a 'fair and equitable allocation'" of broadcasting services). Such delegation also is consistent with the recognition that specialized bodies in the executive branch often employ complex methodologies to implement legislative policy. *See, e.g., In re Korrow Real Estate, LLC*, 2018 VT 39, ¶¶ 21-22, 207 Vt. 274, 187 A.3d 1125 (complex methodology to determine floodway); *Plum Creek Me. Timberlands, LLC v. Vt. Dep't of Forests, Parks & Recreation,* 2016 VT 103, ¶¶ 28-29, 203 Vt. 197, 155 A.3d 694 (complex methodology to measure tree cutting violation).

West Virginia also claims the Treasurer's cost assessment will "say what the law" is. W. Va. Mem. at 74 (citation omitted). Obviously, the cost assessment will not be law. *Contrast with, e.g., Panama Refining,* 293 U.S. at 415 (striking down Presidential authority to "prohibit the transportation" of petroleum where there was no statutory guidance on circumstances that would warrant prohibition).

Finally, West Virginia's assertion that *Town of Westford v. Kilburn,* 131 Vt. 120, 300 A.2d 523 (1973), "exemplifies the 'constitutional rule'" in separation of powers cases is incorrect, but also harmless. *Kilburn* addressed whether a zoning ordinance satisfied the enabling statute's mandate to ensure appropriate safeguards in any approvals to zoning exceptions. 131 Vt. at 124, 125-26, 300 A.2d at 525-27 ("Because [the ordinance] fail[s] to prescribe appropriate conditions and safeguards . . . [it] must be found invalid for [its] failure to comply with 24 V.S.A. § 3014.").

59

While the case touched on constitutional issues when noting that a "legislative body" (there, the Town) must "spell out guiding standards," *id.* at 124, it did not purport to establish any rule about separation of powers, *see id*. *See also In re Handy,* 171 Vt. 336, 345-47, 764 A.2d 1226, 1235-37 (2000) (explaining *Kilburn's* focus on enabling statute and constitutional theory related to equal protection). In any event, *Kilburn* is consistent with Vermont's separation of powers precedents, and Act 122 is consistent with both. The Act provides guiding standards and more than an "intelligible principle" to the Treasurer. *See Athens,* 2020 VT 52, ¶ 39 (noting U.S. Supreme Court's "repeated admonition that legislative body 'must lay down . . . an intelligible principle'") (citation omitted).

West Virginia's separation of powers claim should be dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons and the reasons discussed in the State's Memorandum of Law in support of its motion to dismiss, the State respectfully requests that the Court dismiss all claims in both cases in their entirety. If the Court does not, on the claims where the parties so moved, the Court should deny summary judgment to Plaintiffs and grant summary judgment to the State.

[Signature Block on Next Page]

DATED November 17, 2025

Respectfully submitted,

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By:    /s/ Jonathan T. Rose
JONATHAN T. ROSE
*Solicitor General*
LAURA B. MURPHY
*Director, Environmental Protection Unit*
HANNAH W. YINDRA
PATRICK T. GAUDET
*Assistant Attorneys General*
SAMUEL B. STRATTON*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
jonathan.rose@vermont.gov
laura.murphy@vermont.gov
hannah.yindra@vermont.gov
patrick.gaudet@vermont.gov
sam.stratton@vermont.gov

*Vermont Bar Attorney-Applicant
Admission before this Court pending*

**With contributions from legal intern
Phoebe Cykosky*