**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

UNITED STATES OF AMERICA and UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

        *Plaintiffs*,

    v.

STATE OF VERMONT, et al.,

        *Defendants*,

    and

NORTHEAST ORGANIC FARMING ASSOCIATION
OF VERMONT and CONSERVATION LAW
FOUNDATION,

        *Intervenor-Defendants*.

No. 2:25-cv-00463

CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA and AMERICAN PETROLEUM
INSTITUTE,

        *Plaintiffs*,

    and

STATE OF WEST VIRGINIA, et al.,

        *Intervenor-Plaintiffs*,

    v.

JULIE MOORE, et al.,

        *Defendants*,

    and

NORTHEAST ORGANIC FARMING ASSOCIATION
OF VERMONT and CONSERVATION LAW
FOUNDATION,

        *Intervenor-Defendants*.

No. 2:24-cv-01513

**MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR-DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT, IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR
SUMMARY JUDGMENT, AND REPLY MEMORANDUM IN SUPPORT OF
INTERVENOR-DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... iii

TABLE OF ABBREVIATIONS ............................................................... xi

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

RELIEF REQUESTED ON PENDING DISPOSITIVE MOTIONS ................ 2

ARGUMENT .......................................................................................... 4

I.      The Act does not regulate emissions ........................................... 4

II.     Government Plaintiffs lack standing ........................................... 10

        A.      The Court must address State Plaintiffs' standing ............... 11

        B.      Government Plaintiffs have not established any injury in
                fact ...................................................................... 11

        C.      Government Plaintiffs have not established *parens patriae*
                standing ............................................................... 14

        D.      Government Plaintiffs have not established sovereign
                interest standing ................................................... 16

III.    Government Plaintiffs lack a cause of action ............................. 18

IV.     Plaintiffs' claims are unripe ...................................................... 22

V.      Federal law does not preempt the Act ....................................... 32

        A.      The presumption against preemption applies ..................... 32

        B.      *City of New York* does not control the preemption analysis............. 33

                1.      The Vermont Act does not conflict with federal
                        common law ............................................... 34

                2.      None of the concerns raised by the Second Circuit
                        in *City of New York* is implicated by the Vermont
                        Act ........................................................... 36

        C.      The Clean Air Act does not preempt the Vermont Act........... 38

                1.      The Clean Air Act does not occupy the field
                        addressed by the Vermont Act............................. 39

i

      2.      The Vermont Act poses no obstacle to the Clean Air Act's regulation of greenhouse gas emissions ........................................... 41

VI.    The Act is not an unconstitutional extraterritorial regulation ............................................ 44

VII.   Foreign affairs preemption does not apply ........................................................................ 52

     A.    Plaintiffs have not identified a foreign policy with the force of law that conflicts with the Vermont Act ............................................................ 53

     B.    Plaintiffs provide no justification for expanding the rarely invoked doctrine of field preemption to the Act ..................................................... 57

CONCLUSION ........................................................................................................................... 60

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967) .................................................................................. 26, 27, 29

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) .................................................................................. 15, 16, 17

*Am. Elec. Power Co. v. Connecticut* (*AEP*),
    564 U.S. 410 (2011) .................................................................................. 34, 35

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) .................................................................. 52, 53, 54, 58, 59

*Arizona v. United States*,
    567 U.S. 387 (2012) .................................................................................. 16, 19, 37

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) .................................................................................. 20, 21

*ASARCO LLC v. Goodwin*,
    756 F.3d 191 (2d Cir. 2014) ............................................................................ 51

*Ass'n for Accessible Meds. v. Ellison*,
    140 F.4th 957 (8th Cir. 2025) .......................................................................... 46

*Beatty v. Gilman*,
    718 F. Supp. 3d 166 (D. Conn. 2024) ............................................................. 30

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ............................................................................ 40

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) .................................................................................. 36, 51

*Bonaparte v. Appeal Tax Ct. of Balt.*,
    104 U.S. 592 (1881) ........................................................................................ 45

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) .................................................................................. 32, 34, 35

*Brinkerhoff-Faris Tr. & Sav. Co. v. Hill*,
    281 U.S. 673 (1930) ........................................................................................ 19

*Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*,
    492 F.3d 484 (4th Cir. 2007) .......................................................................... 45

*Cayuga Indian Nation of N.Y. v. Seneca Cnty.*,
    978 F.3d 829 (2d Cir. 2020) ............................................................................ 45

*City of Charleston v. Brabham Oil Co.*,
    No. 2020-CP-10-03975, 2025 WL 2269770 (S.C.C.P. Aug. 6, 2025) ............. 37

*City of Honolulu v. Sunoco LP*,
    537 P.3d 1173 (Haw. 2023) ............................................................................. 37

*City of New York v. Chevron Corp.*,
   993 F.3d 81 (2d Cir. 2021) ................................................ 14, 32, 34, 35, 36, 58

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................ 10, 11

*Clark v. Allen*,
   331 U.S. 503 (1947) ........................................................................................ 58

*Cnty. Comm'rs v. Suncor Energy USA, Inc.*,
   -- P.3d --, 2025 CO 21 (Colo. 2025) .............................................................. 37

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*,
   906 F.3d 41 (2d Cir. 2018) .............................................................................. 43

*Commonwealth Edison Co. v. Montana*,
   453 U.S. 609 (1981) .................................................................................. 38, 43

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
   138 F. Supp. 3d 352 (S.D.N.Y. 2015) .............................................................. 23

*Conn. ex rel. Blumenthal v. Cahill*,
   217 F.3d 93 (2d Cir. 2000) .............................................................................. 19

*Connecticut v. Duncan*,
   612 F.3d 107 (2d Cir. 2010) .............................................................. 29, 30, 31

*Cronin v. Aetna Life Ins. Co.*,
   46 F.3d 196 (2d Cir. 1995) ................................................................................ 6

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ........................................................................................ 55

*Ecogen, LLC v. Town of Italy*,
   438 F. Supp. 2d 149 (W.D.N.Y. 2006) ............................................................ 23

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ........................................................................................ 47

*Energy & Env't Legal Inst. v. Epel*,
   793 F.3d 1169 (10th Cir. 2015) ...................................................................... 46

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) .......................................................................................... 39

*Espinal v. AFNI, Inc.*,
   No. 17 CIV. 3439 (KPF), 2018 WL 2733366 (S.D.N.Y. June 7, 2018) ............ 39

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021) .............................................................................. 45, 47, 48

*Franchise Tax Bd. of Cal. v. Hyatt*,
   587 U.S. 230 (2019) .................................................................................. 16, 45

*Freedom Holdings, Inc. v. Spitzer*,
   357 F.3d 205 (2d Cir. 2004) ............................................................................ 47

iv

*Fuld v. Palestine Liberation Org.*,
   606 U.S. 1 (2025) ................................................................... 45

*Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*,
   93 F.3d 68 (2d Cir. 1996) ...................................................... 29

*Georgia v. Tenn. Copper Co.*,
   206 U.S. 230 (1907) ............................................................. 35

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
   267 F.3d 1228 (11th Cir. 2001) .............................................. 48

*Giallanzo v. City of New York*,
   630 F. Supp. 3d 439 (S.D.N.Y. 2022) ....................................... 8

*Giannullo v. City of New York*,
   322 F.3d 139 (2d Cir. 2003) .................................................. 49

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
   988 F.3d 114 (2d Cir. 2021) .................................................. 46

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
   508 F. Supp. 2d 295 (D. Vt. 2007) ................................... 56, 58

*Gross v. Rell*,
   585 F.3d 72 (2d Cir. 2009) .................................................... 57

*Hodel v. Va. Surface Min. & Reclamation Ass'n*,
   452 U.S. 264 (1981) ............................................................. 25

*Illinois v. City of Milwaukee*,
   406 U.S. 91 (1972) ............................................................... 35

*In re Debs*,
   158 U.S. 564 (1895) ....................................................... 18, 20

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) ............................................. 33, 41

*In re Mylan N.V. Sec. Litig.*,
   379 F. Supp. 3d 198 (S.D.N.Y. 2019) ..................................... 57

*In re NOS Commc'ns*,
   495 F.3d 1052 (9th Cir. 2007) ............................................... 39

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987) ................................................... 33, 39, 43

*Japan Line, Ltd. v. L.A. Cnty.*,
   441 U.S. 434 (1979) ............................................................. 56

*Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
   644 F.3d 934 (9th Cir. 2011) ................................................. 42

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ....................................................... 39, 57

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012) .................................................................................................. 36

*La Unión del Pueblo Entero v. Abbott*,
    604 F. Supp. 3d 512 (W.D. Tex. 2022) ...................................................................... 27

*Lab. Council for Latin Am. Advancement v. EPA*,
    12 F.4th 234 (2d Cir. 2021) ....................................................................................... 26

*LeClair v. Saunders*,
    627 F.2d 606 (2d Cir. 1980) ...................................................................................... 33

*Lugo v. City of Troy*,
    114 F.4th 80 (2d Cir. 2024) ....................................................................................... 10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................. 10

*Madeira v. Affordable Hous. Found., Inc.*,
    469 F.3d 219 (2d Cir. 2006) ...................................................................................... 41

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) .................................................................................................. 45

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) .................................................................................................. 15

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) .................................................................................................. 18

*Mayor & City Council of Balt. v. BP P.L.C.*,
    2024 WL 3678699 (Md. Cir. Ct. July 10, 2024) ........................................................ 37

*Medellín v. Texas*,
    522 U.S. 491 (2008) ..................................................................................... 53, 54, 55

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) .................................................................................................. 33

*Merrick v. Diageo Americas Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) .............................................................................. 33, 40

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) .................................................................................................. 56

*Movsesian v. Victoria Versicherung AG*,
    670 F.3d 1067 (9th Cir. 2012) ............................................................................ 57, 59

*N. Carolina, ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) ...................................................................................... 40

*N.Y. Life Ins. Co. v. Head*,
    234 U.S. 149 (1914) .................................................................................................. 45

*N.Y. State Vegetable Growers Ass'n v. Cuomo*,
    No. 19-cv-1720-LJV-MJR, 2021 WL 2651996 (W.D.N.Y. May 28, 2021) .................... 29

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) ........................................................................ 22

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ............................................................................ 24, 28

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ...................................................................... 45, 46, 47

*Nat'l Shooting Sports Found. v. James*,
  144 F.4th 98 (2d Cir. 2025) .................................................................. 44, 49

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
  491 U.S. 350 (1989) .................................................................................. 28

*New York v. Nat'l Serv. Indus., Inc.*,
  460 F.3d 201 (2d Cir. 2006) ...................................................................... 35

*New York v. Niagara-Wheatfield Cent. Sch. Dist.*,
  119 F.4th 270 (2d Cir. 2024) ..................................................................... 15

*NRDC v. NHTSA*,
  894 F.3d 95 (2d Cir. 2018) ............................................................. 5, 14, 36

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*,
  489 U.S. 493 (1989) .................................................................................. 43

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ...................................................................... 26, 27, 30

*Omega SA v. 375 Canal, LLC*,
  984 F.3d 244 (2d Cir. 2021) ...................................................................... 28

*Oneok, Inc. v. Learjet, Inc.*,
  575 U.S. 373 (2015) .................................................................................. 39

*Overnite Transp. Co. v. Tianti*,
  926 F.2d 220 (2d Cir. 1991) ...................................................................... 39

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983) .................................................................................. 44

*Patterson v. Cnty. of Oneida, N.Y.*,
  375 F.3d 206 (2d Cir. 2004) ................................................................. 7, 25

*Pennsylvania v. Kleppe*,
  533 F.2d 668 (D.C. Cir. 1976) .................................................................. 13

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923) .................................................................................. 23

*Platkin v. Exxon Mobil Corp.*,
  2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025) ....................................... 37

*Rest. L. Ctr. v. City of New York*,
  90 F.4th 101 (2d Cir. 2024) ...................................................................... 44

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*,
    10 F.4th 87 (2d Cir. 2021) ............................................................................ 30, 31

*S. Lyme Prop. Owners Ass'n v. Town of Old Lyme*,
    539 F. Supp. 2d 524 (D. Conn. 2008) ................................................................. 24

*Sanitary Dist. of Chicago v. United States*,
    266 U.S. 405 (1925) ............................................................................. 18, 20, 21

*Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*,
    667 F.2d 305 (2d Cir. 1981) ................................................................................ 4

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013) ......................................................................................... 45

*Simmonds v. I.N.S.*,
    326 F.3d 351 (2d Cir. 2003) ........................................................................ 27, 28

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002) ........................................................................................... 57

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
    742 F.3d 37 (2d Cir. 2014) ................................................................................ 34

*Suitum v. Tahoe Reg'l Plan. Agency*,
    520 U.S. 725 (1997) ......................................................................................... 24

*Texaco, Inc. v. Dep't of Energy*,
    490 F. Supp. 874 (D. Del. 1980) ....................................................................... 30

*Texas v. Becerra*,
    577 F. Supp. 3d 527 (N.D. Tex. 2021) .............................................................. 28

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................... 27, 28

*Transunion LLC v. Ramirez*,
    594 U.S. 413 (2021) ......................................................................................... 11

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ..................................................................................... 19

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) ............................................................................ 28

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ......................................................................................... 24

*United States v. Brand Jewelers, Inc.*,
    318 F. Supp. 1293 (S.D.N.Y. 1970) .................................................................. 18

*United States v. Idaho*,
    623 F. Supp. 3d 1096 (D. Idaho 2022) .............................................................. 16

*United States v. Mattson*,
    600 F.2d 1295 (9th Cir. 1979) .......................................................................... 17

*United States v. Minnesota*,
   270 U.S. 181 (1926) .......................................................................... 21

*United States v. Missouri*,
   114 F.4th 980 (8th Cir. 2024) .......................................................... 21

*United States v. San Jacinto Tin Co.*,
   125 U.S. 273 (1888) .......................................................................... 20

*United States v. Supreme Court of N.M.*,
   839 F.3d 888 (10th Cir. 2016) ........................................................ 20

*United States v. Texas*,
   557 F. Supp. 3d 810 (W.D. Tex. 2021) ........................................... 21

*United States v. Texas*,
   566 F. Supp. 3d 605 (W.D. Tex. 2021) ........................................... 19

*United States v. Texas*,
   719 F. Supp. 3d 640 (W.D. Tex. 2024) ........................................... 28

*United States v. Washington*,
   596 U.S. 832 (2022) .......................................................................... 21

*United States v. West Virginia*,
   295 U.S. 463 (1935) .......................................................................... 17

*Usery v. Turner Elkhorn Mining Co.*,
   428 U.S. 1 (1976) .............................................................................. 51

*Va. Uranium, Inc. v. Warren*,
   587 U.S. 761 (2019) .......................................................................... 32

*VIZIO, Inc. v. Klee*,
   886 F.3d 249 (2d Cir. 2018) ............................................................ 46

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   592 F.3d 954 (9th Cir. 2010) .......................................................... 59

*Vt. Agency of Nat. Res. v. United States*,
   529 U.S. 765 (2000) .......................................................................... 16

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) .................................................................. 22, 31

*Watson v. Emps. Liab. Assur. Corp.*,
   348 U.S. 66 (1954) ............................................................................ 45

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) .................................................................. 10, 13

*Whole Women's Health v. Jackson*,
   2021 WL 5016707 (U.S. Oct. 27, 2021) ........................................ 19

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
   164 F.3d 123 (2d Cir. 1999) ............................................................ 35

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ................................................................................ 45

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ................................................................................ 32

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ................................................................................ 18

*XY Plan. Network, LLC v. U.S. SEC,*
    963 F.3d 244 (2d Cir. 2020) ................................................................... 13

*Young v. Masci,*
    289 U.S. 253 (1933) ................................................................................ 47

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................................ 57

*Zschernig v. Miller,*
    389 U.S. 429 (1968) .......................................................................... 58, 59

## Statutes

42 U.S.C. § 7401 ......................................................................................... 40

42 U.S.C. § 7410 ......................................................................................... 42

42 U.S.C. § 7411 ......................................................................................... 41

42 U.S.C. § 7416 ......................................................................................... 40

42 U.S.C. § 7521 ......................................................................................... 41

42 U.S.C. § 7543 ......................................................................................... 42

Global Climate Protection Act,
    Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331 (1987) ................ 54

Vt. Stat. Ann. tit. 10, § 596(22) .............................................................. 25, 48

Vt. Stat. Ann. tit. 10, § 598(i) ..................................................................... 30

Vt. Stat. Ann. tit. 10, § 599a ........................................................................ 50

Vt. Stat. Ann. tit. 10, § 599c ........................................................................ 50

## Court Rules

D. Vt. L.R. 56(d) ........................................................................................... 7

Fed. R. Civ. P. 56 ............................................................................... 7, 8, 10

## Other Authorities

90 Fed. Reg. 36,288 (Aug. 1, 2025) ............................................................ 40

United Nations Framework Convention on Climate Change Art. 4,
    May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 ................ 54

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **State** or **Vermont** | Defendants State of Vermont, Governor Philip Scott, Secretary Julie Moore, and Director Jane Lazorchak |
| **Chamber Plaintiffs** | Plaintiffs United States Chamber of Commerce and American Petroleum Institute (*Chamber* case) |
| **State Plaintiffs** | Intervenor-Plaintiffs West Virginia and twenty-three other states (*Chamber* case) |
| **United States** | Plaintiffs United States of America and United States Environmental Protection Agency |
| **Government Plaintiffs** | State Plaintiffs and the United States |
| **Int.-Defs.' Mem.** | Intervenor-Defendants' Memorandum of Law in Support of Motion to Dismiss ECF No. 84-1 (*Chamber* case); ECF No. 43-1 (*United States* case) |
| **Defs.' Mot. Dismiss** | Defendants' (Vermont's) Memorandum of Law in Support of Motion to Dismiss ECF No. 76-1 (*Chamber* case); ECF No. 35-1 (*United States* case) |
| **Defs.' Mem.** | Defendants' (Vermont's) Consolidated Memorandum of Law in Reply in Support of Motion to Dismiss; in Opposition to Plaintiffs' Motions for Summary Judgment; and in support of Defendants' Cross-Motion for Summary Judgment ECF No. 109 (*Chamber* case); ECF No. 53 (*United States* case) |
| **Defs.' SUMF** | Defendants' (Vermont's) Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ECF No. 110-2 (*Chamber* case); ECF No. 54-2 (*United States* case) |
| **Int.-Defs.' SUMF** | Intervenor-Defendants' Statement of Undisputed Material Facts in Support of Moton for Summary Judgment |

| | |
|---|---|
| **Chamber Opp. Mot. Dismiss** | Chamber Plaintiffs' Response in Opposition to Defendants' and Intervenor-Defendants' Motions to Dismiss<br>ECF No. 101 (*Chamber* case) |
| **Chamber Summ. J. Mem.** | Chamber Plaintiffs' Memorandum in Support of Motion for Summary Judgment<br>ECF No. 100-1 (*Chamber* case) |
| **Chamber SUMF** | Chamber Plaintiffs' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment<br>ECF No. 100-2 (*Chamber* case) |
| **Defs.' Resp. Chamber SUMF** | Defendants' (Vermont's) Response to Chamber Plaintiffs' Statement of Undisputed Material Facts<br>ECF No. 109-1 (*Chamber* case) |
| **Int.-Defs.' Resp. Chamber SUMF** | Intervenor-Defendants' Response to Chamber Plaintiffs' Statement of Undisputed Material Facts |
| **W. Va. Mem.** | State Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to Defendants' Motions to Dismiss<br>ECF No. 102-1 (*Chamber* case) |
| **W. Va. SUMF** | State Plaintiffs' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment<br>ECF No. 102-2 (*Chamber* case) |
| **Defs.' Resp. W. Va. SUMF** | Defendants' (Vermont's) Response to State Plaintiffs' Statement of Undisputed Material Facts<br>ECF No. 109-2 (*Chamber* case) |
| **Int-Defs.' Resp. W. Va. SUMF** | Intervenor-Defendants' Response to State Plaintiffs' Statement of Undisputed Material Facts |
| **U.S. Mem.** | United States' Memorandum in Opposition to Motions to Dismiss and in Support of Motion for Summary Judgment<br>ECF No. 50-1 (*United States* case) |
| **U.S. SUMF** | United States' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment<br>ECF No. 50-2 (*United States* case) |

**Defs.' Resp. U.S. SUMF**          Defendants' (Vermont's) Response to United States'
                                    Statement of Undisputed Material Facts
                                    ECF No. 53-1 (*United States* case)

**Int.-Defs.' Resp. U.S. SUMF**     Intervenor-Defendants' Response to United States'
                                    Statement of Undisputed Material Facts

## INTRODUCTION AND SUMMARY OF ARGUMENT

Vermont is facing a real and pressing problem: climate change is harming its residents, including members of Intervenor-Defendants Northeast Organic Farming Association and Conservation Law Foundation, and the state needs additional resources to adapt. To address this problem, the Vermont Legislature passed the Vermont Climate Superfund Act ("Vermont Act" or "Act"). The Act requires large fossil fuel companies with a sufficient connection to Vermont to make one-time payments to a fund for climate adaptation projects. The statute thereby shifts part of the mounting cost of climate adaptation from Vermonters to companies that bear significant responsibility for causing the pollution—companies that profited enormously from producing and refining fossil fuels. Under the rulemaking process set forth in the statute, it will be several years before the state identifies which companies will be responsible for paying into the fund and issues cost assessments to those companies.

The Act is a constitutional exercise of Vermont's broad powers to raise revenue and protect the health and safety of its people from the ruinous consequences of climate change. While Plaintiffs[1] insist otherwise, their position boils down to a single flawed and unsupported premise: the Act regulates greenhouse gas emissions. But the Act does no such thing. It does not control pollution or limit emissions. And that a state statute may have the potential to indirectly *affect* future emissions does not mean it *regulates* those emissions. Even if such potential effects could render the Act a regulation, Plaintiffs have submitted no credible evidence that the Act will even indirectly affect future production, pricing, or emissions, while Defendants have submitted powerful evidence that it will not.

---

[1] "Plaintiffs" refers to all three groups of Plaintiffs in these two matters: the Chamber of Commerce and American Petroleum Institute ("Chamber Plaintiffs"); the United States, et al.; and Intervenor-Plaintiffs West Virginia et al. ("State Plaintiffs").

This flawed premise dooms Plaintiffs' claims that the Act is preempted by the Clean Air Act, is an unconstitutional extraterritorial regulation, and interferes with foreign affairs. And because State Plaintiffs and the United States (collectively, "Government Plaintiffs") base their claims of injury on the same error, their complaints should be dismissed for lack of standing. Plaintiffs' claims are also premature: the implementing agency has not even issued proposed rules yet, and the Act will not impose obligations on any responsible party until 2028.

To minimize duplication with State Defendants' arguments, this brief focuses on the following: Government Plaintiffs lack standing and a cause of action; all Plaintiffs' claims are unripe for judicial review; and, as to Counts I and II of all three complaints and Count V of the United States' complaint, Plaintiffs' claims fail as a matter of law. These claims should be dismissed or, in the alternative, the Court should grant summary judgment in favor of Intervenor-Defendants. Because the substantive issues in Intervenor-Defendants' Motion to Dismiss and the parties' cross-motions for summary judgment overlap substantially, Intervenor-Defendants are filing a combined memorandum.

Intervenor-Defendants incorporate by reference the background section of their memorandum in support of their Motion to Dismiss, which explained Vermont's climate adaptation needs leading to passage of the Climate Superfund Act and why the Act is an exercise of traditional state sovereign power. *See* Int-Defs.' Mem. 2-6. Intervenor-Defendants adopt the State's discussion of the applicable standards under Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 56, *see* Defs.' Mem. 4-5.

## RELIEF REQUESTED ON PENDING DISPOSITIVE MOTIONS

For the Court's convenience, Intervenor-Defendants summarize below the relief requested and supporting grounds on their Motion to Dismiss and the parties' cross-motions for summary judgment.

***The Court should grant Intervenor-Defendants' Motion to Dismiss:***

- The Court should dismiss the United States' and State Plaintiffs' complaints in their entirety, because those plaintiffs lack standing and a cause of action.

- If the Court finds that all plaintiffs have standing, and that the United States and State Plaintiffs have invoked a proper cause of action, the Court should dismiss Counts I and II of all three complaints (preemption, preclusion, and extraterritoriality) and Count V of the United States' complaint (foreign affairs preemption) for failure to state a claim.[2]

- If the Court finds that the United States and State Plaintiffs have standing and a cause of action, it should nevertheless dismiss their complaints, and the Chamber Plaintiffs' complaint, as unripe.

***If the Court does not dismiss the complaints in their entirety under Rule 12(b)(6) or Rule 12(b)(1), it should grant Intervenor-Defendants' Motion for Summary Judgment and deny all Plaintiffs' motions for summary judgment:***

- As to the United States and State Plaintiffs, the Court should grant Intervenor-Defendants' Motion for Summary Judgment and deny those Plaintiffs' motions for summary judgment because they do not submit sufficient evidence to demonstrate standing, and because they lack a cause of action.

- As to all Plaintiffs, the Court should grant Intervenor-Defendants' Motion for Summary Judgment on Counts I and II of all three complaints (preemption, preclusion, and extraterritoriality) and Count V of the United States' complaint (foreign affairs preemption)

---

[2] Intervenor-Defendants also agree with State Defendants that the Court should dismiss all three complaints under Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs cannot show that the Vermont Act is unconstitutional on its face. *See* Defs.' Mem. 12-59.

and deny Plaintiffs' motions for summary judgment on those same counts because Plaintiffs' claims fail as a matter of law.

- As to all Plaintiffs' claims, the Court should grant Intervenor-Defendants' Motion for Summary Judgment and deny Plaintiffs' motions for summary judgment because the undisputed facts demonstrate that Plaintiffs' claims are unripe.

***At a minimum, the Court should deny all Plaintiffs' motions for summary judgment:***

- To the extent the Court disagrees that Plaintiffs' claims fail as a matter of law and finds that any of their claims turns on a question of fact, the facts Plaintiffs rely on are disputed and their motions for summary judgment should be denied on that basis.[3]

## ARGUMENT

### I.    The Act does not regulate emissions

Plaintiffs' summary judgment motions and oppositions to Intervenor-Defendants' motion to dismiss rest on the mistaken premise that the Vermont Act "regulates" interstate greenhouse gas emissions, *e.g.*, Chamber Opp. Mot. Dismiss 23-27; Chamber Summ. J. Mem. 9-14; W. Va. Mem. 27; U.S. Mem. 33, but a one-time statutory assessment based on past fossil fuel production is not an emissions regulation. The Act imposes no emissions limits or pollution control standards. It does not require or incentivize fossil fuel producers to alter their production or pricing in any way. As Plaintiffs Chamber of Commerce and American Petroleum Institute concede, whatever fossil fuel producers choose to do going forward will not affect their liability under the Act, which will derive entirely from their historical production of fossil fuels from

---

[3] While Intervenor-Defendants' position is that no issues of material fact prevent the court from ruling in their favor as a matter of law, this does not bar them from asserting that disputed issues of fact prevent entry of summary judgment for Plaintiffs. *See Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981).

1995 to 2024.[4] While the Act's cost recovery approach looks to emissions attributable to the fossil fuels previously produced and refined by responsible parties to determine the amount of each assessment, that methodology does not direct or encourage anyone to reduce or otherwise alter future emissions. Rather, it is a rational legislative choice concerning how to calculate and allocate responsibility among fossil fuel producers for the consequences of their past activity.

Plaintiffs nonetheless speculate that the Act may have an indirect effect on future emissions—and assert that it therefore amounts to a regulation. *See, e.g.*, Chamber Summ. J. Mem. 12; W. Va. Mem. 34; U.S. Mem. 17. Not so. A statute that requires certain parties to emit less of a particular substance is an example of an emissions regulation. *See Regulate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ regulate (last visited Oct. 22, 2025) (to "regulate" means to "govern or direct according to rule"). Ongoing fines covering future conduct may also amount to regulation. *See NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 105 (2d Cir. 2018). But a one-time statutory assessment based solely on past activity is not regulatory. It does not impose any ongoing duty and does not subject responsible parties to future liability under any circumstances. *See also* Declaration of Don Fullerton (Fullerton Decl.) ¶¶ 30-32, ECF No. 109-3 (*Chamber* case), ECF No. 53-2 (*United States* case) (State's expert explaining that the Act is not an economic regulation because it "will not change the incentives for assessed companies to produce and sell their [fossil fuel] products" and will not reduce greenhouse gas emissions).

Although the assumption that a one-time, retroactive statutory assessment is a form of regulation is central to Plaintiffs' claims, they cite no authority to support that proposition.

---

[4] Compl. ¶ 161, *Chamber of Com. v. James*, No. 1:25-cv-1738-MKV (S.D.N.Y. Feb. 28, 2025), ECF No. 1 ("Nothing energy producers can do today can affect their liability under the Act.").

Instead, Plaintiffs ask the Court to find that the Act is an emissions regulation based on an attenuated and speculative chain of events: fossil fuel producers may react to the Act's assessments by decreasing their production of fossil fuels or increasing prices, consumers of fossil fuels could choose to reduce purchases, and the result would be lower greenhouse gas emissions.[5] Accepting this theory would recast myriad state laws with the potential to raise costs for fossil fuel producers—everything from health and safety regulations to real estate taxes—as "emissions regulations." Moreover, even if the Court accepts Plaintiffs' premise that a statute's alleged indirect effects on fossil fuel production and pricing could in some instances amount to emissions regulation, Plaintiffs have submitted no competent evidence supporting their theory that the Act will affect future emissions at all, let alone to a degree that could amount to "regulating" those emissions. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) ("The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.").

The United States submitted no evidence of its own on this issue. The declarations submitted by the Chamber Plaintiffs—from four fossil fuel company executives who presumably have some knowledge of fossil fuel production and pricing—include no claims that the Vermont Act is likely to lead to reduced production or price increases.[6] The Exxon executive, for example, says only that Exxon, if assessed under the Act, will have to make unspecified "strategic business decisions" about investments, production volumes, or pricing. Declaration of Vijay Swarup (Swarup Decl.) ¶ 27, ECF No. 100-6. That vague speculation falls far short of

---

[5] *See, e.g.*, Chamber Summ. J. Mem. 12; W. Va. Mem. 34; W. Va. SUMF ¶¶ 156, 162, 164, 167, 169, 171; U.S. Mem. 17; U.S. SUMF ¶¶ 24-26.

[6] Declaration of Vijay Swarup, ECF No. 100-6; Declaration of John Martini, ECF No. 100-7; Declaration of Travis A. Torrence, ECF No. 100-8; Declaration of Sean Philip Cochrane, ECF No. 100-9.

proof, as required at summary judgment, that Exxon will have to reduce production volumes or attempt to increase fossil fuel prices as a result of this Act.[7]

The State Plaintiffs fare no better on this point. They rely on declarations from several state employees asserting—without support, and in strikingly similar boilerplate—that the Act will "inevitably cause the price of electricity to increase."[8] These conclusory statements lack any foundation or personal knowledge and therefore must be disregarded.[9] *See* Fed. R. Civ. P. 56(c)(4) (declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); D. Vt. L.R. 56(d) (each paragraph in a party's statement of undisputed material facts in support of summary judgment "must be followed by citation to admissible evidence"); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (affidavits must be based on

---

[7] *See* Int.-Defs.' Resp. U.S. SUMF ¶¶ 24-25. Notably, while Government Plaintiffs cite to this statement as evidence that the Act will cause energy prices to rise, W. Va. Mem. 15, 34; U.S. Mem. 14, 17; U.S. SUMF ¶¶ 24-25, the Chamber Plaintiffs do not.

[8] Declaration of Brian Renner ¶ 4, ECF No. 102-5; Declaration of Greg Bright ¶ 6, ECF No. 102-11; Declaration of Gregory Sorrels ¶ 4, ECF No. 102-12; Declaration of Jason Glass ¶ 5, ECF No. 102-13; Declaration of John Rogers ¶ 12, ECF No. 102-16; Declaration of Kenneth Yoakum ¶ 5, ECF No. 102-19; Declaration of Kirk Grable ¶ 4, ECF No. 102-21; Declaration of Nathan Oliver ¶ 5, ECF No. 102-27; Declaration of Paul Bowling ¶ 3, ECF No. 102-29; Declaration of Robert Kilpatrick ¶ 7, ECF No. 102-31; *see also* Declaration of Christopher Thacker ¶ 22, ECF No. 102-7; Declaration of Jazzmin Randall ¶ 5, ECF No. 102-15; Declaration of Leslie Savage ¶¶ 9-11, ECF No. 102-23; Declaration of Scott Adkins ¶¶ 11-12, ECF No. 102-32.

[9] State Plaintiffs submitted additional declarations from employees who—apparently recognizing the limits of their personal knowledge—claim only that *if* the Vermont Act caused fossil fuel production to decrease and energy prices to increase, that would harm those states. *See* Declaration of Christopher Ayotte ¶ 4, ECF No. 102-6; Declaration of Eric Peate ¶ 3, ECF No. 102-10; Declaration of Jason Wolfe ¶ 10, ECF No. 102-14; Declaration of Karen Perry ¶ 4, ECF No. 102-17; Declaration of Karl Boston ¶ 3, ECF No. 102-18; Declaration of Lee Wilkinson ¶ 5, ECF No. 102-22; Declaration of Matthew Irby ¶ 6, ECF No. 102-25; Declaration of Matthew Sachse ¶ 6, ECF No. 102-26; Declaration of Nolan Wiggins ¶ 3, ECF No. 102-28; Declaration of Sherry Queen ¶ 6, ECF No. 102-33; Declaration of Andrew Kuhlmann ¶ 5, ECF No. 102-35; Declaration of Stefanie Higgins ¶ 5, ECF No. 102-36; Declaration of Tabetha Mallonee ¶ 8, ECF No. 102-37. Those declarants do not assert that the Act *will* have such effects.

personal knowledge); *see also, e.g.*, Int.-Defs.' Resp. W. Va. SUMF ¶¶ 73, 96, 156, 162, 171. These declarants offer nothing more than a single sentence claiming that the Act will affect fossil fuel production and energy prices. They proffer no personal knowledge of how fossil fuel companies make decisions about investments, production volumes, or pricing. No "reasonable trier of fact could believe" these declarants have "personal knowledge" about the Act's asserted effects on fossil fuel producers' decisions. *See Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 458 (S.D.N.Y. 2022). In short, none of the plaintiffs has submitted competent evidence that the Vermont Act will impact fossil fuel producers' investments, production volumes, or prices.[10]

If the Court does not disregard the declarants' statements that the Act will affect future fossil fuel production, investments, or pricing, and finds that those statements are material to any issues to be decided, it should not accept the validity of those assertions without discovery. *See* Fed. R. Civ. P. 56(d) Declaration of Adeline Rolnick (identifying factual issues requiring discovery if the Court deems any of them material to the pending motions).

In contrast to Plaintiffs, Defendants have submitted persuasive evidence establishing that, under widely accepted economic principles, the Act's imposition of a fixed cost on fossil fuel producers will not change their future investments or production volumes or affect energy prices. Fullerton Decl. ¶¶ 11, 21-35;[11] Int-Defs.' Statement of Add'l Facts Resp. Chamber SUMF ¶¶ 3-

---

[10] State Plaintiffs cite an article about the general concept of "polluter pays" to argue that the Act creates an incentive for "pollution abatement." *See* W. Va. Mem. 10 (citing *Polluter Pays Principle: Definition Analysis Implementation* at 16, ORG. ECON. CO-OPERATION & DEV. (2008)). That article discusses an array of "polluter pays" regimes, including direct pollution control and "process and product standards" that are entirely different from a one-time retroactive assessment for past fossil fuel production. *Id.* at 15-16, 28.

[11] Professor Fullerton explains that the Act will have no direct effect on fossil fuel production or pricing. *See, e.g., id.* ¶¶ 11, 21. Because any indirect effects would be unlikely or negligible, *id.* ¶¶ 21-26, he ultimately concludes that the Act will have no effect on fossil fuel production, availability, supply, investments, or prices, and thus no effect on state or federal government tax or lease revenues. *Id.* ¶¶ 27-42.

10; Int-Defs.' Statement of Add'l Facts Resp. U.S. SUMF ¶¶ 3-10; Int-Defs.' Statement of Add'l

Facts Resp. W. Va. SUMF ¶¶ 3-10. Government Plaintiffs' response to similar principles set forth

in the economists' amicus brief, *see* ECF No. 89 at 12-14 (*Chamber* case), ECF No. 48 (*United*

*States* case), are unpersuasive. First, State Plaintiffs cite "Bayes Theorem" to argue that rational

fossil fuel producers will expect additional assessments in the future, beyond those under the Act,

and adjust their pricing accordingly. W. Va. Mem. 16-17; *see also* U.S. Mem. 36 (speculating that

Vermont could, in the future, pass a similar law seeking assessments based on post-2024

production); Chamber Opp, Mot. Dismiss 26 n.16 (same). But, as Defendants' expert explains,

there is no generally accepted economic theory about how businesses form expectations, and, in

any event, future pricing decisions based on the possibility of new legislation would be a result

of that legislation, not the Vermont Act. Fullerton Decl. ¶ 25.

Second, State Plaintiffs argue that because Vermont asserts that responsible parties could

reasonably have expected some sort of liability for their fossil fuel production from 1995-2024, it

follows that it would be rational for them to hold that belief for future time periods after 2024,

and thus build that assumption into production and pricing decisions going forward. W. Va.

Mem. 33. This argument only confirms the point just made—as fossil fuel producers factor

climate-change related costs into their planning, it is because of a wide range of existing

circumstances and contingencies, like potential emissions regulations and litigation. Plaintiffs

have submitted no competent evidence that the Vermont Act *alone*, as opposed to other

hypothetical liability, will change fossil fuel producers' production or pricing decisions, and

Vermont submitted compelling evidence to the contrary. *See generally* Fullerton Decl. There is

no basis to conclude the Act will have any effect on emissions, much less have so strong an

effect as to be tantamount to "regulating" them.

## II.    Government Plaintiffs lack standing[12]

Government Plaintiffs have failed to allege or prove an injury that is concrete, particularized, and actual or imminent. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). To establish standing, a plaintiff must show that its alleged injuries are "certainly impending," *id.*, or that there is a "substantial risk that the harm will occur," *id. at* 414 n.5. Allegations of merely "possible" future injury are insufficient. *Id.* at 409; *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). At the summary judgment stage, Government Plaintiffs "can no longer rest on [the complaint's] allegations" of standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up), but instead must "set forth by affidavit or other evidence specific facts" showing that there is no genuine dispute as to facts that attest to its standing, *id.* (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c); *Lugo v. City of Troy*, 114 F.4th 80, 87-88 (2d Cir. 2024).

Government Plaintiffs' claims of injury rest on the assumption that the Vermont Act's assessment will affect fossil fuel production or pricing, greenhouse gas emissions, the energy market, or interstate commerce. *See* U.S. Mem. 12, 14-18; W. Va. Mem. 14-15. All of these supposed impacts depend on actions by third parties: fossil fuel companies. Courts are "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. It is the plaintiffs' burden "to show that those choices will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (cleaned up). As discussed below, Government Plaintiffs have not come close to meeting that burden. Their allegations of injury are speculative and implausible,

---

[12] These arguments support dismissal of the United States' and State Plaintiffs' complaints in their entirety and, in the alternative, entry of summary judgment for Intervenor-Defendants and denial of summary judgment to the United States and State Plaintiffs.

requiring dismissal of their claims for lack of standing. Int.-Defs.' Mem. 8-15. If the Court does

not dismiss their claims on this basis, it should deny Government Plaintiffs' motions for

summary judgment and grant Intervenor-Defendants' motion for summary judgment, because

Government Plaintiffs have not met their burden to set forth "by affidavit or other evidence

'specific facts'" establishing their standing. *Clapper*, 568 U.S. at 412.

### A.    The Court must address State Plaintiffs' standing

As a threshold matter, State Plaintiffs argue that the Court need not reach their standing if

it finds that other plaintiffs have standing. W. Va. Mem. 9. But a plaintiff must have standing for

each claim it asserts and each form of relief it seeks. *See Transunion LLC v. Ramirez*, 594 U.S.

413, 431 (2021). Since only State Plaintiffs present claims and seek relief for alleged violations

of the Due Process, Common Benefits, Takings, and Separation of Powers Clauses of the

Vermont Constitution, and the Equal Protection Clause of the United States Constitution, *see* W.

Va. Compl. at 53, 55, 56, 61, 62 (Counts V, VI, VII, X, XI), the Court must address their

standing.[13]

### B.    Government Plaintiffs have not established any injury in fact

Government Plaintiffs have neither plausibly alleged, Int-Defs.' Mem. 8-11, nor

submitted any competent evidence showing that the Act will or is substantially likely to affect

future fossil fuel production or energy prices and result in financial harm to any state or to the

federal government. *See supra* at 6-8 (explaining that State Plaintiffs' witnesses have no

foundation for their speculative assertions of harm from the Act and that no fossil fuel witness

claims fossil fuel production levels or prices will change); Defs.' Mem. 14. Government

Plaintiffs' claim that the Vermont Act "will deplete" producer's fossil fuel reserves and thus

---

[13] The United States does not argue that the Court should refrain from deciding whether it has standing.

"predictably reduce capital investment and raise energy prices," W. Va. Mem. 13; *see also* U.S. Mem. 16-17, is therefore nothing more than attorney say-so. In contrast, Vermont has submitted an expert declaration explaining why the Act will not result in any reduction of fossil fuel production or investments or increase energy prices. Defs.' Mem. 14-15; Fullerton Decl. ¶¶ 27-42; Int-Defs.' Statement of Add'l Facts Resp. W. Va. SUMF ¶¶ 3-10; Int-Defs.' Statement of Add'l Facts Resp. U.S. SUMF ¶¶ 3-10.

State Plaintiffs' argument that "predictable" actions by third parties can suffice for standing even if those actions are "illogical or unnecessary," W. Va. Mem. 15, is of no moment because, as Defendants' expert explains, impacts on production or pricing will not occur, and thus are not predictable. Fullerton Decl. ¶¶ 27-42. The cases cited by State Plaintiffs recognizing that indirect harm can sometimes be sufficient for standing, W. Va. Mem. 13, are also not relevant, as the States have failed to show the Act will cause them *any* injury—direct or indirect.

Apart from a declaration regarding foreign affairs issues, addressed in part VII below, the United States has not submitted any evidence of its own in support of its claims of injury. It relies on a declaration from an Exxon executive (submitted by the Chamber Plaintiffs), *see* U.S. Mem. 14, 17, that is most remarkable for what it does not say. Exxon does not say that it will reduce investments in fossil fuel projects, reduce fossil fuel production, or attempt to raise energy prices. *See supra* at 6-7.[14] And the additional Chamber declaration cited by the United States, U.S. Mem. 15, says even less—stating only that the Vermont Act "could" affect

---

[14] In their Motion to Dismiss, Intervenor-Defendants pointed to Government Plaintiffs' failure to allege that any particular business subject to the Act is planning to make profitable new investments in any particular state that is a plaintiff here; that the cost recovery demands would prevent them from making such investments; and that no other firms—including companies not subject to the Act—have capital sufficient to make those investments. Int.-Defs.' Mem. 10. Government Plaintiffs did not provide any such evidence in their subsequent filings.

production or prices. Declaration of Dustin Meyer ¶ 17, ECF No. 100-5. Even if Mr. Meyer had provided any foundation for his guesswork about potential actions by fossil fuel producers, mere "possible" injury does not suffice for standing. *Whitmore*, 495 U.S. at 158. Thus, the United States' discussion of its fossil fuels purchases and tax revenues from fossil fuel production is irrelevant. Like State Plaintiffs, the United States never connects the dots with competent evidence that the Vermont Act will actually impact investments, production, or pricing. In short, Government Plaintiffs rely "on 'conclusory statements'" and a "causal chain that is too attenuated and speculative to support standing." *XY Plan. Network, LLC v. U.S. SEC*, 963 F.3d 244, 252-53 (2d Cir. 2020) (cleaned up).[15]

Unable to meet their burden to establish concrete injury from the Act itself, Government Plaintiffs fall back to speculating that they *might* be injured by future fossil fuel company actions *if* other states were to pass laws similar to the Vermont Act. U.S. Mem. 15. Government Plaintiffs cannot, however, establish standing to challenge the Vermont Act by conjecturing about the unknown potential impacts of laws that do not exist. And even if other states were to pass laws identical to Vermont's, that would amount at most to additional retroactive liability which would not impact ongoing fossil fuel production levels, investments, or pricing. *See also* Fullerton Decl. ¶¶ 14-20, 25, 27-42.[16] Courts can consider challenges to new state statutes if they are enacted and implemented, and when their content is actually known.

---

[15] A "fairly direct link" is required when a state challenges a federal policy because "the unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing." *XY Plan*, 963 F.3d at 252 (quoting *Pennsylvania v. Kleppe,* 533 F.2d 668, 672 (D.C. Cir. 1976)). There is no reason, and Government Plaintiffs offer none, why the same principle would not apply to government challenges to state laws.

[16] The only other existing statute similar to Vermont's is New York's Climate Superfund law. That statute is already the subject of lawsuits filed by the plaintiffs in this action. While the New York statute is not before this Court, it bears noting that it also involves only retroactive liability;

With no facts to support their claim of concrete injury, Government Plaintiffs argue that they have standing as a matter of law. They do not. State Plaintiffs cite *NHTSA*, 894 F.3d at 105, for the proposition that "basic economics . . . tell us that the increased cost of . . . conduct," such as producing traditional fuels, "will make that conduct less common," i.e., reduce output. W. Va. Mem. 10. But that case involved ongoing "coercive penalties intended to induce compliance" in the future, *NHTSA*, 894 F.3d at 104, not a one-time retroactive assessment. And here, Vermont has submitted compelling evidence that under "basic economics," the Act will *not* reduce fossil fuel production. *Supra* at 8-9.

The United States' reliance on *City of New York v. Chevron Corp.*, U.S. Mem. 15, where the court "presume[ed]" an impact on price and production, 993 F.3d 81,103 (2d Cir. 2021), fails for similar reasons. As discussed in part V.B below, that case involved a tort claim and thus ongoing duties, not a retroactive cost assessment with no impact on future production or prices. The plaintiff there conceded that "tort damages could work production-side changes," *id.* at 93 (internal quotation marks omitted). Here the State has submitted expert evidence that the retroactive statutory assessment will not result in any production side changes, and at summary judgment Plaintiffs cannot rest on allegations alone.

### C.    Government Plaintiffs have not established *parens patriae* standing

Government Plaintiffs have not plausibly alleged, let alone submitted evidence to meet their burden on summary judgment, that a sufficiently substantial segment of their populations will be harmed by the Vermont Act for purposes of *parens patriae* standing, or that their alleged injuries carry a "universal sting." *New York v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th

---

Professor Fullerton has submitted a declaration in the New York litigation explaining why the New York act will not impact fossil fuel production or pricing. *See* Declaration of Don Fullerton, *United States v. James*, No. 1:25-cv-03656-PKC (S.D.N.Y. Oct. 27, 2025), ECF No. 85.

270, 282 (2d Cir. 2024) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982)). They fail to do so for the reasons just discussed—they have not established through competent evidence that the Vermont Act will affect energy investments, production, or pricing. Absent such an impact, facts concerning private and governmental purchases and use of energy, energy sector employment, and government tax revenues from energy production, W. Va. Mem. 11-12, 17-19, U.S. Mem. 14-18, are not relevant.[17]

The authority cited by Government Plaintiffs, U.S. Mem. 13, W. Va. Mem. 11, 17-18, is distinguishable. In *Niagara-Wheatfield* the Court found that the challenged conduct affected a "substantial segment of New York's population," including an entire school district community, 119 F.4th at 279, and in *Snapp* the Court found that the challenged action carried a "universal sting" against the Puerto Rican labor force and Puerto Rican residents as a whole. 458 U.S. at 609-10. *Maryland v. Louisiana*, 451 U.S. 725 (1981), involved a state law with a direct impact on other states—an ongoing tax that was already being passed on to the plaintiff states and their consumers. *Id*. at 736-37. Here, in contrast, there is no evidence of an impact beyond assessments on certain fossil fuel producers, and states cannot justify *parens patriae* standing merely to protect those businesses. Int.-Defs.' Mem. 14; *Snapp*, 458 U.S. at 607.

Finally, citing *Snapp*, 458 U.S. at 607, State Plaintiffs argue that they need only show they have been denied their "rightful status within the federal system." W. Va. Mem. 20. But nothing in the Vermont Act purports to deny the "general population" of any state the "benefits

---

[17] Government Plaintiffs' position here would also lead to absurd results. If any state law that could increase a producer's cost in any way, or indirectly reduce demand for its products, were deemed a concrete injury to a different state whose residents work in the same industry, or to a state that purchases the producer's goods or receives tax revenues from the producer, any state would have standing to challenge any other state's law that resulted in increased costs to a business—or, for that matter, any law that could indirectly result in less demand for its products.

of the federal system," *Snapp*, 458 U.S. at 608. And the States' reliance on *Franchise Tax Board of California. v. Hyatt*, 587 U.S. 230 (2019), W. Va. Mem. 20, is even farther afield. That case involved a question of state sovereign immunity, not state standing. *Id*. at 233.

### D.    Government Plaintiffs have not established sovereign interest standing

While the United States claims standing based on a variety of national interests, it fails to either plausibly allege or meet its burden to show an actual injury to any of them.[18] Int.-Defs.' Mem. 11-13. It recites the general principle that sovereign interests are injured whenever federal laws are "violated," U.S. Mem. 10-11, but does not identify any violation of federal law. The United States does not cite any provision of the Clean Air Act—or of any other federal statute— that has been "violated" by the Vermont Act, for the simple reason that no such violation exists. *Infra* Argument V (explaining lack of conflict between the Act and federal law). It does not claim to be enforcing any affirmative obligations in any federal statute.

The cases the United States cites involving alleged violations of federal law are readily distinguishable on this basis. *See, e.g., Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 770 (2000) (discussing violation of False Claims Act through alleged submission of fraudulent documents to the federal government); *United States v. Idaho*, 623 F. Supp. 3d 1096, 1101 (D. Idaho 2022) (state law would make it "impossible" for doctors to comply with federal law).[19]

The United States further argues that the Vermont Act injures its sovereignty by usurping its authority to "regulate interstate commerce and global air pollution," U.S. Mem. 11, but the

---

[18] State Plaintiffs claim in passing that they have sovereign interest standing, W. Va. Mem. 9, but do not include any argument on the issue. *See* W. Va. Mem. 10-20. To the extent sovereign interest standing is intended to be part of their argument for *parens patriae* standing, it is addressed above.

[19] The United States also relies on *Arizona v. United States*, 567 U.S. 387 (2012), U.S. Mem. 10, but *Arizona* does not even discuss standing. The case involved a state law that created state remedies for the violation of federal immigration requirements. The Vermont Act does not create a state remedy for violation of any aspect of federal law.

Act does not regulate anything.[20] The United States asserts that for purposes of standing the Court must accept the merits of its legal claims, U.S. Mem. 12, but the argument that the Vermont Act affects interstate commerce and air pollution rests on erroneous *factual* premises—that the Vermont Act's assessments will affect future fossil fuel investments, production, pricing, and/or emissions. As discussed above, there is no competent evidence that the Act will have any such effect, and powerful evidence to the contrary. *Supra* Argument I.[21]

Finally, the United States falls back on an argument that it should not even have to show any actual impairment of a federal interest. U.S. Mem. 11. But this defies Supreme Court precedent requiring the United States to do more than merely identify a federal interest. In *United States v. West Virginia*, 295 U.S. 463 (1935), for example, the Court held that the United States failed to establish Article III jurisdiction in a suit against a state where the United States identified a federal interest but did not show "an actual or threatened interference with the authority of the United States." *Id*. at 473. The government must show injury in fact like any other litigant; "[a]ny lesser standard . . . would require a court to rule on important constitutional issues in the abstract, and allow a potential abuse of the judicial process." *United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979).

---

[20] The United States' suggestion that it has standing based on its "exclusive control" over interstate commerce and global pollution under the Clean Air Act also confuses the doctrine of preemption with standing and mischaracterizes the scope of the Clean Air Act. The issues of preemption and the scope of the Clean Air Act are addressed *infra*, Argument V.

[21] The United States also makes a passing reference to standing based on its interest in protecting "foreign policy on greenhouse gas regulation," U.S. Mem. 12, but the Act does not regulate greenhouse gases, let alone set foreign policy. Nor has the United States shown how the Act interferes with either the United States' interest in recognition by other sovereigns, *Snapp*, 458 U.S. at 601, or its ability to comply with its obligations under international agreements. *See infra* Argument VII; Defs.' Mem. 30-37.

Similarly, none of the "general welfare" or *parens patriae* cases cited by the United

States, U.S. Mem. 13-14, support its assertion that it can establish standing without showing an

actual injury to federal interests. These cases either did not involve a suit by the United States;

*see Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923) (holding that a state cannot represent the

interests of U.S. citizens as *parens patriae* in a suit to invalidate a federal statute); involved

tangible injuries to federal interests, *In re Debs*, 158 U.S. 564, 584 (1895) (upholding judiciary's

power to issue injunction to prevent physical obstruction of interstate railways and mail);

*Sanitary Dist. of Chicago v. United States*, 266 U.S. 405, 426 (1925) (permitting suit by United

States to prevent state from diverting water from federal waterways); or accepted the United

States's standing allegations only for purposes of a motion to dismiss, *United States v. Brand*

*Jewelers, Inc.*, 318 F. Supp. 1293, 1299 (S.D.N.Y. 1970).

### III.    Government Plaintiffs lack a cause of action[22]

Government Plaintiffs do not contest that they require a cause of action, U.S. Mem. 18,

W. Va. Mem 22, but their claimed equitable cause of action is precluded by the historical

traditions of equity, which do not extend to suing a State to pursue an abstract interest in

enforcing federal law such as the Supremacy Clause absent a concrete injury. In the absence of

congressional authorization for such a suit, it must fail.

The State Plaintiffs rely on authority that they have the same rights to sue in equity as

private plaintiffs; this is true but irrelevant. Their case law, W. Va. Mem. 24, supports suits

against sister States when they suffer "direct injury," *Wyoming v. Oklahoma*, 502 U.S. 437, 451

(1992), or "suits brought by States acting as *parens patriae*," *Conn. ex rel. Blumenthal v. Cahill*,

---

[22] These arguments support dismissal of the United States' and State Plaintiffs' complaints in
their entirety and, in the alternative, entry of summary judgment for Intervenor-Defendants and
denial of summary judgment to the United States and State Plaintiffs.

217 F.3d 93, 97 (2d Cir. 2000). But as noted above, State Plaintiffs have neither direct injury nor a viable *parens patriae* claim.

As for the United States, it distinguishes *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), as a case only "about universal injunctions," U.S. Mem. 19-20, but does not appear to dispute that any equitable cause of action is limited by "traditional principles of equity," *see United States v. Texas*, 566 F. Supp. 3d 605, 643 (W.D. Tex. 2021). That general proposition is the only principle for which Intervenor-Defendants rely on *CASA*. (The State Plaintiffs agree. *See* W. Va. Mem. 24.) And while the traditions of equity allow suits against state officers for constitutional violations that inflict a concrete injury on the plaintiffs, there is no historical precedent for the United States to invoke an equitable cause of action to sue a state to pursue an abstract interest in enforcing federal law under the Supremacy Clause in the absence of such a concrete injury. The United States does not dispute that it requires a statutory cause of action to sue States to enforce individual constitutional rights, unless the aggrieved individuals have been deprived of the ability to sue.[23] Its claim that it may sue States, without congressional authorization, to enforce a generic interest in ensuring the supremacy of federal law fails to find any authoritative support.

None of the Supreme Court cases the United States cites, U.S. Mem. 18-19, confronted or resolved the question at issue here. The Court's resolution of the merits in *Arizona v. United States*, 567 U.S. 387 (2012), carries no implication about the existence of a cause of action

---

[23] The United States invokes Vermont's brief in *Whole Women's Health v. Jackson*, 2021 WL 5016707 (U.S. Oct. 27, 2021). U.S. Mem. 19. But that brief merely endorsed the district court's view in that case that "a state may not deprive a person of all existing remedies for the enforcement of a right," *Texas*, 566 F. Supp. 3d at 643 (quoting *Brinkerhoff-Faris Tr. & Sav. Co. v. Hill*, 281 U.S. 673, 682 (1930)), and thus that where a state law was "deliberately structured so that no adequate remedy at law exists by which to test its constitutionality," the United States could invoke equity to "vindicate a fundamental constitutional right," *id.* at 646-47. Here, any party aggrieved by the Act will have every opportunity to vindicate its rights, and the predicate for the equitable cause of action is missing.

19

because that issue was neither raised nor decided. *In re Debs*, 158 U.S. 564 (1895), and *Sanitary District of Chicago v. United States*, 266 U.S. 405 (1925), were both public nuisance suits rather than Supremacy Clause suits, and neither was brought against a State. In *Debs*, the Court found that equitable tradition allowed the Government to sue in equity to abate a public nuisance, 158 U.S. at 587-89, but the Court made clear that it was *not* proper for the United States to sue merely to vindicate the rights of individuals where it had no pecuniary interest of its own, *id.* at 586. In *Sanitary District*, the Court's statement that no statute was necessary to authorize the Attorney General's suit referred to the question of *who* was authorized to sue on behalf of the United States, not the existence of a cause of action.[24] *See* 266 U.S. at 426. And the Court's recognition, in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), that equitable tradition may provide a basis for entertaining a suit "to enjoin unconstitutional actions by state and federal officers," *id.* at 327, was made in the context of private entities suffering concrete, personal injuries as a result of such unlawful action, *id*. at 323-24. The Court did not endorse a broader supervisory authority of the United States, unlimited by congressional mandate, to sue any State for any claimed Supremacy Clause violation in the absence of a concrete injury.

The United States thus falls back on lower court decisions that do not control this Court, but even those cases offer scant support. In *United States v. Supreme Court of New Mexico*, 839 F.3d 888 (10th Cir. 2016), the Tenth Circuit addressed only standing and ripeness. And although the Eighth Circuit recently rejected the argument that "the United States cannot sue to enforce

---

[24] This is made clear by the Court's citation to *United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888), which included an extensive discussion of the Attorney General's authority to conduct the United States' litigation. *Id.* at 278-82. *San Jacinto* did not endorse the idea that the United States can sue to vindicate the Supremacy Clause, but expressly held that it could sue only under "the same general principles which would authorize a private citizen" to sue, and that an interest equivalent to that of a "private person . . . must exist as the foundation of the right of action." *Id.* at 285-86. No such interest underlies the claimed U.S. cause of action here.

the Supremacy Clause because it lacks a cause of action," *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024), the authority it cited for this proposition undermines the Government's position. The Eighth Circuit cited *Armstrong*, *id.*, which as noted above addressed a cause of action for private entities suffering concrete injury. The court then stated that "the United States has sued in other cases to enjoin a state law[]," *id.*, citing *Sanitary District* (discussed above); *United States v. Minnesota*, 270 U.S. 181 (1926), where "the United States ha[d] a real and direct interest in [a] matter" arising out of its "guardianship over" Native Americans, *id.* at 194; and *United States v. Washington*, 596 U.S. 832 (2022), a case which both did not address the Government's cause of action and is so recent as to say nothing about equitable tradition.

Last, the United States relies on *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021), which it notes lists "six preemption cases brought by the United States between 2018 and 2020," U.S. Mem. 19. But while recent federal Administrations have sued States under the Supremacy Clause, this tactic does not establish that all such suits are situated in the same "long history" of private enforcement suits recognized by the Supreme Court, *Armstrong*, 575 U.S. at 327. The United States presents no on-point evidence of an equitable tradition permitting suits to enforce the Supremacy Clause in the absence of a concrete injury. The Government does not contest that it would require congressional authorization to sue to directly enforce the individual constitutional rights of the other Plaintiffs in these cases. It cannot evade that limitation on its authority, and the supervision of Congress, by recasting its suit as vindicating the United States' own abstract interest in ensuring the supremacy of federal law.

## IV.    Plaintiffs' claims are unripe[25]

Intervenor-Defendants agree with the State Defendants that Plaintiffs' facial claims should be dismissed as a matter of law because Plaintiffs have not, and cannot, establish that "no set of circumstances exists under which the Act would be valid." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citation omitted). If the Court does not dismiss Plaintiffs' claims for failure to state a claim, however, it should dismiss them as unripe for review. Plaintiffs' pre-enforcement challenges to the Act—brought years before the Act imposes legal obligations on any responsible party, and before the Agency has addressed relevant questions about how the Act will be implemented—are premature. *See* Int.-Defs.' Mem. 19-20 (describing ripeness standard). In the alternative, the Court should grant Intervenor-Defendants' motion for summary judgment on this basis, because the undisputed facts likewise demonstrate that Plaintiffs' claims are unripe.

### A.    Government Plaintiffs' claims are constitutionally unripe

The United States' and the States' claims are constitutionally unripe for review for the same reasons they lack Article III standing. *Supra* Argument II; *see Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (describing the overlap between Article III standing and constitutional ripeness and explaining that a plaintiff's claim is "constitutionally unripe" if it is "not 'actual or imminent,' but instead 'conjectural or hypothetical'" (citation omitted)).

Contrary to the States' argument, W. Va. Mem. 21-22, this case is distinguishable from *Pennsylvania v. West Virginia*, where the Supreme Court held that Pennsylvania and Ohio's suit to enjoin a West Virginia statute regulating the supply of natural gas was not premature. 262 U.S.

---

[25] These arguments support dismissal of all three complaints in their entirety and, in the alternative, entry of summary judgment for Intervenor-Defendants and denial of summary judgment to Plaintiffs.

553, 593 (1923). Unlike in that case, the Vermont Act does not require "immediate obedience" with "direct and certain" mandates. *See id*. Responsible parties have not even been identified yet, and cost recovery demands—let alone any alleged downstream impacts on the States—are years away. *See* Int.-Defs.' Mem. 18.

The United States objects to Intervenor-Defendants' characterization of its suit as a "pre-enforcement, pre-implementation challenge," *see* U.S. Mem. 21-22, but it is undisputed that the Act has not yet been enforced—i.e., no cost recovery demands have been served—against anyone. Defs.' SUMF ¶ 2; Int.-Defs.' SUMF ¶ 2. While the Agency has begun the administrative process, the United States does not explain how those pre-enforcement implementation steps—such as the publication of a feasibility report—cause it any injury.

### B. All Plaintiffs' claims are prudentially unripe

If the Court does not dismiss Plaintiffs' facial claims as a matter of law, it should dismiss Plaintiffs' claims as prudentially unripe. Plaintiffs' claims rely on speculation about how the Act *may* be implemented and the impacts it *may* have. But the administrative process will shed light on those facts, and the Court should not prematurely decide that the Act will be unlawful in every application. And Plaintiffs will not suffer hardship from delaying review.[26]

### 1. Plaintiffs' claims are unfit for review

Plaintiffs insist that the Court does not need to know the magnitude of liability or the number or identity of responsible parties to determine that the Act facially violates the due

---

[26] The Chamber argues that facial challenges to legislative acts are ripe from the moment of enactment, Chamber Opp. Mot. Dismiss 14, but the cases it cites are inapposite: each involved a facial challenge to land use restrictions that immediately prohibited plaintiffs from their desired property use. *See Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 152 (W.D.N.Y. 2006) (challenge to moratorium that prohibited construction of wind turbines); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 370 (S.D.N.Y. 2015) (challenge to zoning and environmental ordinances that prohibited building a planned college);

process, takings, commerce, and excessive fines clauses. *See* W. Va. Mem. 56; Chamber Opp.

Mot. Dismiss 16-18. But there can be no serious doubt that this information will "significantly

advance [the court's] ability" to adjudicate Plaintiffs' claims that the Act is unlawful in every

application of the statute. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003).

For example, knowing the amount of a cost recovery demand is relevant to whether the amount

is "grossly disproportional" to the underlying conduct and whether it bears an "articulable

correlation to any injury suffered by the Government," for purposes of an excessive fines claim.

*United States v. Bajakajian*, 524 U.S. 321, 339-40 (1998). Plaintiffs have not cited a single case

in which an assessment was declared unconstitutionally excessive even though the amount was

unknown. The Chamber points to allegations in its complaint that the cost recovery demands will

amount to millions or billions of dollars, Chamber Opp. Mot. Dismiss 48, but those allegations

are speculative given that Vermont has not yet determined the overall magnitude of liability or

apportioned it among a yet-to-be-identified group of responsible parties. Defs.' SUMF ¶¶ 1-2;

Int-Defs.' SUMF ¶¶ 1-2.

      Nor do the Chamber's declarations provide any competent evidence to support their

allegations. A Chamber executive opines that the cost recovery demands "may" reach millions or

---

*S. Lyme Prop. Owners Ass'n v. Town of Old Lyme*, 539 F. Supp. 2d 524, 527, 543 (D. Conn. 2008) (challenge to seasonal use restrictions in zoning regulations that prohibited plaintiffs from using property in certain months). In such cases, plaintiffs may bring facial challenges arguing that the "mere enactment" of a challenged law "amount[s] to a taking"; those challenges are "generally ripe the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 & n. 10 (1997). But here, the Chamber has not argued— nor could it—that "mere enactment" of the Act itself constitutes a taking. The contrast between those land-use prohibitions and the Vermont Act could not be clearer. The Chamber's takings claim here is premised on eventual cost recovery demands for unknown amounts against as-yet unidentified companies, following a rulemaking process that will take years to unfold. *See* Chamber Compl. ¶¶ 178-79.

billions of dollars, but he does not provide any basis (nor could he) for personal knowledge of that purported fact. Declaration of Martin Durbin ¶ 14, ECF No. 100-4; *see also Patterson*, 375 F.3d at 219 (Rule 56(c)(4)'s "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief'"). Simply put, the Court lacks sufficient information to hold that the Act will violate the Excessive Fines Clause as applied to every (as-yet-unidentified) responsible party.

The amount of liability and the identity of responsible parties are likewise relevant in determining the "economic impact" of the cost recovery demands and any interference with "investment-backed expectations," as required for the "ad hoc, factual inquiries" central to a regulatory takings analysis. *See Hodel v. Va. Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 295 (1981) (citation omitted). So too is the assessment of whether responsible parties have a "sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution," Vt. Stat. Ann. tit. 10, § 596(22), which is a prerequisite to liability. Without that analysis, the Court does not have sufficient information to conclude—as Plaintiffs request—that the Act will exceed extraterritorial limits, whether imposed by the Due Process Clause or the dormant Commerce Clause, in every application of the statute. *See infra* Argument VI. Under the dormant Commerce Clause, too, the Court cannot conclude that any purported burdens on interstate commerce are "clearly excessive" in relation to local benefits, W. Va. Mem. 65, until it knows the magnitude of any such benefits and burdens. Nor can it effectively conclude that the Act's cost recovery demands will be "harsh and oppressive" under the Due Process Clause, *e.g.*, Chamber Compl. ¶ 125, as applied to every (as-yet-unidentified) responsible party, without knowing the magnitude of the cost recovery demands. It likewise cannot conclude that the Act relies on an "arbitrary and irrational method," Chamber Compl. ¶ 124, before the State has actually

implemented a methodology for apportioning liability. While the Court can sustain the Act against each of these facial challenges now, Plaintiffs' claims—which ask the Court to hold that the Act is unconstitutional in every potential application—will be "better fit for judicial review after [the] rulemaking process is complete" and the Act's scope and impacts have "sufficiently crystallized." *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 254 (2d Cir. 2021) (citation omitted).

Plaintiffs' claims that the Act is preempted by the Clean Air Act and the federal Constitution are also not purely legal questions for purposes of assessing prudential ripeness. Plaintiffs' claims are premised, at least in part, on unsubstantiated or disputed factual assertions—such as their claim that future assessments of unknown amounts under the Act will influence emissions (as relevant to Plaintiffs' preemption claims, *infra* Argument V and VII) and their assertion that Vermont cannot trace emissions to specific sources (a topic to be addressed in the administrative proceedings that is raised in Plaintiffs' extraterritoriality claims, *infra* Argument VI). *See Lab. Council for Latin Am. Advancement*, 12 F.4th at 254 (issue was not ripe for review as a "pure question of law" where it was "not as if the issue in dispute simply involved the . . . application of law to undisputed facts"). To the extent it deems these facts relevant, the Court will be better able to evaluate them once the administrative process has been completed.

### 2.    Plaintiffs will not suffer hardship from delaying review

Plaintiffs will not suffer hardship from delaying review because the Act does not require "immediate and significant change in the plaintiffs' conduct of their affairs," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967), nor does it "now inflict[] significant practical harm" on any Plaintiff, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

State Plaintiffs suggest they will face "practical harm" if review is delayed because the Act will lead to increased energy prices, W. Va. Mem. 23, and deny their sovereignty, *id*. at 56. Their allegations that the Act will lead to increased energy prices are speculative, unsupported by competent evidence, and contradicted by the State's expert evidence establishing the Act will not affect energy prices. *Supra* Argument I. And even if State Plaintiffs could adduce evidence of alleged impacts on energy prices, those alleged impacts would only come after the issuance of cost recovery demands, which are not due until 2028. Under these circumstances, State Plaintiffs have not shown how the Act "*now* inflicts significant practical harm" on them. *Ohio Forestry Ass'n*, 523 U.S. at 733 (emphasis added); *see also Abbott Lab'ys*, 387 U.S. at 153 ("possible financial loss" does not establish hardship); *Simmonds v. I.N.S.*, 326 F.3d 351, 360 (2d Cir. 2003) ("mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship"). And because the Act has no impact on the States' "primary conduct," *Texas v. United States*, 523 U.S. 296, 302 (1998), the alleged injury to their sovereign interests does not establish hardship, either.

The United States argues, in effect, that it automatically suffers hardship from delaying review whenever it asserts a preemption claim. *See* U.S. Mem. 24. But it cites no ripeness cases in support of that proposition. It cites one case that found standing based on a sovereign injury, *see* U.S. Mem. 24 (citing *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 526 (W.D. Tex. 2022)), but as discussed above, the United States has not established "sovereign interest" standing here. *Supra* Argument II.D. And even if the United States were found to have standing, the whole point of prudential ripeness is that some cases "will be *better* decided later" even when

they present "a real or concrete dispute affecting cognizable current concerns of the parties" for Article III purposes. *Simmonds*, 326 F.3d at 357.[27]

Contrary to the United States' argument, U.S. Mem. 25, *Texas v. United States* is directly on point. Where a sovereign's "primary conduct" is not affected because it is "not required to engage in, or refrain from, any conduct," the purported "immediate hardship of a 'threat to federalism'" is "an abstraction no graver than the 'threat to personal freedom' that exists whenever an agency regulation is promulgated." 523 U.S. at 301-02. Nor can the United States escape this reasoning by dismissing it as an "alternative" ground. *See Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 251 n.4 (2d Cir. 2021) ("where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum") (citation omitted).

The Chamber Plaintiffs will not suffer hardship from delaying review, either. The Chamber argues that its members must make "pressing strategic decisions" to account for the risk of payments required under the Act, Chamber Opp. Mot. Dismiss 19, but that amounts to an argument about "mere uncertainty as to the validity of a legal rule." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811. This is not sufficient for hardship, as "most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved." *Id.* The Chamber's declarations reference various preliminary steps that its members must take to

---

[27] The United States also cites cases that found irreparable harm to sovereign interests in the context of awarding injunctive relief. *See* U.S. Mem. 24-25. But in those cases, unlike this one, courts had already concluded that the sovereign plaintiff was likely to succeed—or did succeed—on the merits of its claims; they did not purport to assess whether the plaintiff would suffer hardship from delaying adjudication of the merits. *See United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011); *United States v. Texas*, 719 F. Supp. 3d 640, 695 (W.D. Tex. 2024); *Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2021). The final case it cites deals with irreparable injury to a *private* party from a state statute or proceeding that violates federal law—not hardship to a sovereign interest. *See* U.S. Mem 24 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989)).

prepare for compliance with the Act—such as planning disclosures to the Securities and

Exchange Commission, analyzing data, participating in rulemaking, and preparing for legal

defense, *see, e.g.*, Durbin Decl. ¶¶ 16-17, Meyer Decl. ¶¶ 16, Swarup Decl. ¶ 24-25, Torrence

Decl. ¶ 14—but these are routine planning and compliance costs incidental to operating a

business in a highly regulated space. *See, e.g.*, *Connecticut v. Duncan*, 612 F.3d 107, 115 (2d Cir.

2010) (finding dispute unripe where the state faced no imminent enforcement, even though it

must continue to expend funds on compliance); *N.Y. State Vegetable Growers Ass'n v. Cuomo*,

No. 19-cv-1720-LJV-MJR, 2021 WL 2651996, at *7 (W.D.N.Y. May 28, 2021), *report and

recommendation adopted*, 2021 WL 2649646 (W.D.N.Y. June 28, 2021) (compliance costs

associated with educating association's members about potential liability and engaging with the

state did not constitute undue hardship). Accepting these routine expenditures as sufficient to

demonstrate hardship would effectively render the hardship prong meaningless, as nearly every

pre-enforcement challenge would then qualify as ripe.

The Chamber's routine expenditures are distinguishable from cases in which plaintiffs

suffer hardship because they are forced to choose between incurring significant costs to comply

with a challenged law and facing other serious consequences, such as prosecution or the loss of

their business entirely. *See, e.g.*, *Abbott Lab'ys*, 387 U.S. at 152 (drug manufacturers suffered

hardship where they had to choose between compliance costs and criminal and civil penalties for

noncompliance); *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir. 1998) (livery business

owners suffered hardship where they faced choice of significant compliance costs or the risk of

losing their license); *cf. Gary D. Peake Excavating Inc. v. Town Bd. of Hancock*, 93 F.3d 68, 72

(2d Cir. 1996) (landfill owner suffered hardship where he must either abandon plans to construct

landfill or expend "considerable sums" to obtain a potentially futile permit). And *Revitalizing

*Auto Communities Environmental Response Trust v. National Grid USA* is inapposite, *contra*
Chamber Opp. Mot. Dismiss 18: unlike in that case, Plaintiffs have not already incurred statutory
costs, nor are they seeking contribution to those costs from anyone else. *See* 10 F.4th 87, 101 (2d
Cir. 2021).

The Chamber's argument that its members will suffer hardship because they must litigate
in a worse position in the future is also unpersuasive. *Beatty v. Gilman* does not support the
Chamber: in that case the court concluded plaintiffs would suffer hardship from delayed
adjudication because they would have "far greater difficulty" overcoming the defendants'
Eleventh Amendment defense, which would preclude them from the damages relief they sought.
718 F. Supp. 3d 166, 183 (D. Conn. 2024). Here, delayed adjudication will not bar the
Chamber's members from seeking their desired relief. Indeed, the Act expressly permits the
Chamber's members to dispute the cost recovery demands both administratively and in court. Vt.
Stat. Ann. tit. 10, § 598(i). "The availability of this potentially salutary administrative remedy"
also weighs in favor of finding Plaintiffs' claims unripe. *See Duncan*, 612 F.3d at 115. The
Chamber's position boils down to an argument it would be "easier, and certainly cheaper, to
mount one legal challenge against the [Act] now" rather than waiting for the State to undergo the
administrative process. *Ohio Forestry Ass'n*, 523 U.S. at 734. But courts have rejected "this kind
of litigation cost saving" as sufficient on its own to demonstrate hardship. *Id.* at 735. Nor would
any potential reputational injury, *e.g.*, Torrence Decl. ¶ 19, establish hardship: if "injury to
reputation . . . justified immediate judicial review under the ripeness doctrine, judicial pre-
emption of the administrative process would be the rule rather than the exception." *Texaco, Inc.
v. Dep't of Energy*, 490 F. Supp. 874, 889 (D. Del. 1980).

In contrast, premature adjudication of Plaintiffs' claims threatens real hardship to Vermont and the Intervenor-Defendants. *Contra* U.S. Mem. 26. Intervenor-Defendants agree with the State that the Act is constitutional on its face. But Plaintiffs bring their claims seeking to strike down the Act as unconstitutional in every application years before the Act will have any concrete impact on any entity, in a transparent effort to stop Vermont from even developing the relevant methodologies and implementing an appropriate administrative process. These premature claims "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented" and denying Vermont the opportunity to implement the Act "in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451. And Intervenor-Defendants have interests in engaging in multiple steps of the administrative process—even before the Agency issues cost recovery demands—that would be cut short by Plaintiffs' pre-enforcement suit. *See* Int.-Defs.' Reply Supp. Mot. Intervene at 7, ECF No. 25 (*Chamber* case). The Court should stay its hand and allow that process to unfold.

Finally, while Plaintiffs point out that the doctrine of prudential ripeness is disfavored, the Second Circuit has continued to apply it as a "a narrow exception" to its obligation to decide cases within its jurisdiction. *Revitalizing Auto Cmtys.*, 10 F.4th at 102. For the reasons stated above, and because the "doctrine of constitutional avoidance" further counsels in favor of finding Plaintiffs' claims prudentially unripe, *Duncan*, 612 F.3d at 113 n.3, that narrow exception is warranted in this case.

V.    **Federal law does not preempt the Act[28]**

In all preemption cases, courts must "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). While typically only acts of Congress may preempt state law, *see id.* (the "purpose of Congress is the ultimate touchstone in every preemption case" (citation omitted)), the Supreme Court has also recognized narrow circumstances in which federal common law may preempt state law, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). To meet their burden, Plaintiffs may not "invoke some brooding federal interest or appeal to a judicial policy preference"; instead, they "must point specifically to a constitutional text or a federal statute" that displaces or conflicts with the state act. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality op.) (cleaned up).

Plaintiffs have not met their burden. They ask the Court to disregard longstanding preemption standards established by the Supreme Court, asserting that the Second Circuit's decision in *City of New York*, 993 F.3d 81, dictates a different analysis. But as detailed below, *City of New York*'s holding does not control this case. And Plaintiffs' arguments that the Clean Air Act preempts the Vermont Act lack merit.

A.    **The presumption against preemption applies**

Plaintiffs argue that the presumption against preemption does not apply because the Act "regulates" interstate pollution, an area of the law Plaintiffs assert is exclusively federal.

---

[28] These arguments support dismissal of Counts I and II of the Chamber Plaintiffs' and State Plaintiffs' Complaints and Count I of the United States Complaint and, in the alternative, entry of summary judgment for Intervenor-Defendants and denial of summary judgment to Plaintiffs on those counts.

Chamber Summ. J. Mem. 9-10, 21 & n.6; Chamber Opp. Mot. Dismiss 21 & n.11, 23; U.S. Mem. 11, 33, 43; W. Va. Mem. 46. But the Act does not regulate pollution. And as explained below, to the extent federal common law (historically) and the Clean Air Act (presently) govern interstate air pollution, they do so by *limiting* pollution.[29] *Infra* at 34-35, 41-42. The Act, by contrast, does not limit pollution at all. It falls well within Vermont's historic sovereign powers to raise revenue for projects that will protect its citizens. *See, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (states have broad police powers to "protect the health and safety of [their] citizens"); *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980) ("[e]conomic regulation concerned with public health is squarely within the state's police power"); *see also* Int-Defs.' Mem 4-6 (explaining that the Act is an exercise of traditional state sovereign power); Defs.' Mem. 34-35. And because the State is legislating "to protect the health [and] safety . . . of its citizens," the presumption against preemption is "particularly strong." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (applying the presumption and determining that a state law making compliance with a Clean Air Act requirement more expensive was not preempted). The presumption against preemption therefore applies here.

B. *City of New York* **does not control the preemption analysis**

Plaintiffs are incorrect that *City of New York* held that *all* liability related to greenhouse gas emissions—including the one-time, retroactive statutory liability imposed by the Vermont Act—is preempted by the Clean Air Act. Rather, the court decided it would not apply a "traditional statutory preemption analysis" to the tort claims at issue, instead holding that

---

[29] Regulation of interstate air pollution is also not exclusively federal. For example, while both the Clean Air Act and Clean Water Act limit the application of state law to control such pollution, they do not preempt it entirely: the law of the state in which pollution originates may be used to control interstate pollution. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497-99 (1987); *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 695 (6th Cir. 2015).

"resorting to state law on a question previously governed by federal common law is permissible only to the extent authorized by federal statute." 993 F.3d at 98-99 (cleaned up). That holding does not govern preemption of the Vermont Act for two reasons: the Act neither involves a matter previously governed by federal common law nor conflicts with any federal common law; and the Act does not impose ongoing tort liability.

### 1.    The Vermont Act does not conflict with federal common law

*City of New York's* departure from traditional preemption analysis applies only where a state operates in an area "previously governed by federal common law." *Id.* at 99. The Vermont Act does not do so. While a limited body of federal common law historically governed disputes to abate interstate pollution, *see Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 421 (2011), the Vermont Act does not fall within this sphere because it does not regulate or seek to abate pollution at all. *See supra* Argument I. State common law nuisance, at issue in *City of New York*, created an ongoing duty not to pollute, just as federal common law nuisance does, and thus operated in an area "previously governed by federal common law." 993 F.3d at 99. The Vermont Act, by contrast, imposes no ongoing duty whatsoever, let alone one to abate pollution. *See also infra* Argument V.B.2; Int.-Defs.' Mem. 37-39 (explaining why nuisance imposes ongoing duties but the Act does not). The Act presents no "significant conflict" with federal common law for the same reason: it imposes no conflicting duty of care. *See, e.g.*, *Boyle*, 487 U.S. at 509, 512; *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 42 (2d Cir. 2014).

That conclusion is reinforced by the historical context of this limited body of federal common law. Contrary to Plaintiffs' characterization, this area of federal common law did not govern *all* "interstate and global pollution," U.S. Mem. 2-3; *see* Chamber Summ. J. Mem. 21, but was only applied in a narrow context: when a state brought a nuisance action "to abate

pollution emanating from another State." *AEP*, 564 U.S. at 421. This body of law arose because of a need for an alternative to armed conflicts between states seeking to abate pollution from a specific source in another state. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 104, 107 (1972) *(Milwaukee I*); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237-38 (1907). The Court recognized a federal common law nuisance action as a "more peaceful means" to serve the same end. *Milwaukee I*, 406 U.S. at 107. While the Supreme Court has also observed in dicta that these interstate disputes warranted federal common law because a "uniform rule of decision" was needed to adjudicate states' "alleged federal rights" in the quality of interstate waters, *id*. at 105 n.6, 107 n.9, it has never applied this federal common law outside the context of nuisance suits by one state to abate pollution originating in another. *Contra* Chamber Opp. Mot. Dismiss 2; Chamber Summ. J. Mem 10; W. Va. Mem. 27; U.S. Mem. 42. The Act is far removed from that context. *See also* W. Va. Mem 32 ("the federal common law of interstate air pollution did not make [responsible parties] liable for" past fossil fuel production.).

Plaintiffs assert that any statute involving greenhouse gas emissions requires "national standards," W. Va. Mem. 27, Chamber Summ. J. Mem. 10, U.S. Mem. 33-34, and thus must yield to federal common law. But "a mere federal interest in uniformity is insufficient to justify displacing state law in favor of a federal common law rule." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 208 (2d Cir. 2006) (cleaned up); *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 129 (2d Cir. 1999) ("vague assertions about the need for uniformity" are insufficient to displace state law).

The Vermont Act thus does not fall within an area "previously governed by federal common law," *City of New York*, 993 F.3d at 99, or present any "significant conflict" with that federal common law, *Boyle*, 487 U.S. at 507.

### 2.    None of the concerns raised by the Second Circuit in *City of New York* is implicated by the Vermont Act

The panel in *City of New York* did not hold that all types of financial liability for past fossil fuel production amount to a de facto regulation of emissions. *Contra* Chamber Opp. Mot. Dismiss 31; Chamber Summ. J. Mem. 19; W, Va. Mem. 26-27; U.S. Mem. 30-31. Nor did the court, as Plaintiffs contend (U.S. Mem. 34), focus only on "the *federal* laws in question" without regard to the type of state law at issue. Rather, it identified specific concerns with the effects of specific state law tort claims and focused on how those claims would operate. The court concluded that *tort* liability (which imposes ongoing duties) may amount to pollution control, and that courts might be forced to apply vague or conflicting rules to determine whether those standards were violated. 993 F.3d at 92-93. By contrast, the Vermont Act is not a de facto emissions regulation: Unlike the tort claims in *City of New York*, the Act does not include injunctive relief, does not impose ongoing duties, and does not require a court to apply vague nuisance standards.[30] All of these factors were key to *City of New York*'s finding that the tort claims there amounted to emissions regulation, and none is present here.

Plaintiffs do not grapple with these important differences. Instead, they rely exclusively on cases and secondary sources that, like *City of New York*, observe that tort and other forms of ongoing financial liability may influence future conduct. Chamber Opp. Mot. Dismiss 26; W. Va. Mem. 33, 52-53; U.S. Mem. 35. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) (noting that tort damages may in some cases operate as a regulation); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (same); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 & n.17 (1996) (same); *NRDC*, 894 F.3d at 105 (observing that certain ongoing

---

[30] Nor have Plaintiffs met their burden to show, as a matter of undisputed fact, that the Act will actually cause fossil fuel producers or users to alter their behavior. *Supra* Argument I.

36

civil penalties for specific conduct will "make that conduct less common"), Louis Kaplow, *An Economic Analysis of Legal Transitions*, 99 Harv. L. Rev. 509, 600 (1986) (observing that tort liability may affect future behavior because tortfeasors will factor evolving tort law into their decision making). None of these sources is relevant to the question whether a one-time statutory assessment based on past fossil fuel production may operate as an emissions regulation.[31] And tort liability is fundamentally different than the Act's assessments: the former recognizes that the tortfeasor violated an ongoing legal duty, while the latter does not impose an ongoing duty and does not subject responsible parties to liability for future fossil fuel production. *See* Int.-Defs.' Mem. 37-39.

Defendant-Intervenors are not asking the Court to hold that federal common law can never displace a state statute. *Contra* Chamber Opp. Mot. Dismiss 24-25; W. Va. Mem. 29-31; U.S. Mem. 33-34. But, as explained above, the differences between the common law claims in *City of New York* and *this* statute are significant and material. *City of New York's* holding does not control the preemption analysis in this case.[32]

---

[31] For the same reason, the state trial court decisions cited by Plaintiffs, *see* Chamber Summ. J. Mem. 12-13, are irrelevant: all of those found that *City of New York*'s reasoning applied to state law claims for damages. *City of Charleston v. Brabham Oil Co.*, No. 2020-CP-10-03975, 2025 WL 2269770, at *4-5 (S.C.C.P. Aug. 6, 2025); *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846, at *3 (N.J. Super. Ct. Feb. 5, 2025); *Mayor & City Council of Balt. v. BP P.L.C.*, 2024 WL 3678699, at *6 (Md. Cir. Ct. July 10, 2024). In any event, while three state trial courts have chosen to follow *City of New York*, two state supreme courts have declined to do so. *City of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1199-200 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025); *Cnty. Comm'rs v. Suncor Energy USA, Inc.*, -- P.3d --, 2025 CO 21, ¶ 57 (Colo. 2025).

[32] Accepting Plaintiffs' view of *City of New York* would put that panel decision in serious tension with binding Supreme Court precedent. Preemption of state statutes is fundamentally a question of congressional intent. *See, e.g.*, *Arizona*, 567 U.S. at 399-400. This Court should not stretch *City of New York's* analysis of the tort claims at issue in that case to alter settled Supreme Court precedent governing the analysis of whether the Clean Air Act evinces a clear congressional intent to preempt the Vermont Act. *See also* Int.-Defs.' Mem. at 33 n.33 (summarizing criticism of *City of New York's* approach to preemption).

### C.    The Clean Air Act does not preempt the Vermont Act

Plaintiffs assert that the Vermont Act is preempted because Congress has occupied the field of interstate air pollution regulation (field preemption), U.S. Compl. ¶ 50, and because the Act poses an obstacle to implementation of the Clean Air Act (conflict preemption), U.S. Compl. ¶¶ 52-57; W. Va. Compl. ¶¶ 155-60; Chamber Compl. ¶¶ 108-120. Plaintiffs fail to meet their burden under either theory.

At bottom, Plaintiffs argue that the Act indirectly regulates greenhouse gas emissions and therefore legislates in the field allegedly occupied by the Clean Air Act and poses an obstacle to its pollution reduction goals. But the Vermont Act does not regulate emissions, and as discussed below, any potential, indirect effects on greenhouse gas emissions are insufficient to either bring the Act within the allegedly occupied field or create a conflict with the Clean Air Act. Plaintiffs have neither plausibly alleged nor submitted evidence to show that the Act will affect energy production, prices, or emissions. *Supra* Argument I; Int.-Defs.' Mem 8-11.

Under Plaintiffs' preemption theory, countless state laws that have the potential to indirectly affect greenhouse gas emissions—whether those are laws intended to increase fossil fuel production (e.g., tax credits and subsidies for fossil fuel producers), decrease greenhouse gas emissions (e.g., rebates or tax credits for purchasing energy efficient appliances; investments in public transit), or neither (e.g., state taxes on oil and gas production)—would be preempted as well. Congress did not intend such an extreme result. *See Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 633 (1981) (rejecting argument that congressional policy favoring the use of coal over other fuels "demonstrate[s] a congressional intent to preempt all state legislation that may have an adverse impact on the use of coal").

1.    **The Clean Air Act does not occupy the field addressed by the Vermont Act**

Plaintiffs claim that the Clean Air Act "occupies the field of interstate [greenhouse gas] pollution." Chamber Opp. Mot. Dismiss 36-37; W. Va. Mem. 47-48; U.S. Mem. 37. That is not a basis for preemption here because, as described above, the Vermont Act does not regulate pollution. Even if Plaintiffs had submitted undisputed evidence that the Act's one-time assessment on some fossil fuel producers will indirectly affect future greenhouse gas emissions (they have not), "tangential" effects are not sufficient for field preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 85 (1990) (holding that "not every state law that in some remote way may affect" nuclear safety falls within that preempted field). "[N]o one could claim" that EPA's regulation of interstate air pollution "forecloses every other form of state regulation that affects" that pollution. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 386-87 (2015). Plaintiffs have not identified any federal statute that occupies the actual field addressed by the Vermont Act: raising revenue to address harm from past greenhouse gas production.

Plaintiffs' underlying premise is wrong for an additional reason: the Clean Air Act is not one of the "rare cases" where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation omitted). Indeed, the Supreme Court has expressly rejected the argument that the Clean Water Act occupies the field of interstate pollution, finding that the statute's savings clause alone "negates the inference that Congress 'left no room' for state" regulation. *Ouellette*, 479 U.S. at 492. *See also, e.g.*, *Espinal v. AFNI, Inc.*, No. 17 CIV. 3439 (KPF), 2018 WL 2733366, at *8 (S.D.N.Y. June 7, 2018) (savings clauses "are 'fundamentally incompatible with complete field preemption'" (quoting *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007)); *Overnite Transp. Co. v. Tianti*, 926 F.2d 220, 222 (2d Cir. 1991) (per curiam) (finding that a

savings clause was evidence of "Congress' intent to allow state regulation to coexist with the federal scheme"). The Clean Air Act is no different. As Plaintiffs acknowledge, it contains savings clauses retaining a significant role for states in the regulation of air pollution sources. *See*, *e.g.*, 42 U.S.C. § 7401(a)(3); *id*. § 7416.

Plaintiffs do not cite a single case finding that the Clean Air Act occupies the field of interstate pollution. Instead, they rely on *Ouellette*, which they characterize as holding that the Clean Water Act occupies the field. Chamber Opp. Mot. Dismiss 36. As explained above, however, *Ouellette* came to the opposite conclusion. The other cases on which Plaintiffs rely, U.S. Mem. 31, are also all conflict preemption cases. These cases uniformly held, consistent with *Ouellette* and contrary to Plaintiffs' position, that the Clean Air Act does not occupy the field of interstate pollution, but instead permits the application of source-state law to pollution that crosses state lines. *See Merrick*, 805 F.3d at 695; *Bell v. Cheswick Generating Station*, 734 F.3d 188, 196-97 (3d Cir. 2013); *N. Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306 (4th Cir. 2010).

Plaintiffs' field preemption theory is also inconsistent with positions the federal government has taken elsewhere. While Plaintiffs insist that the Clean Air Act comprehensively regulates greenhouse gases, *see* Chamber Summ. J. Mem. 19; W. Va. Mem. 44; U.S. Mem. 38, the federal government recently stated in a proposed rule that Clean Air Act section 202(a) "does not authorize the EPA to prescribe standards for [greenhouse gas] emissions based on global climate change concerns," Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36,288, 36,298 (Aug. 1, 2025). The United States cannot premise its litigating position in this case on an argument that the Clean Air Act comprehensively

regulates greenhouse gas emissions when the responsible agency is advancing a contrary statutory interpretation.[33] Under any of Plaintiffs' theories, there is no field preemption here.

### 2. The Vermont Act poses no obstacle to the Clean Air Act's regulation of greenhouse gas emissions

To establish that the Vermont Act poses an obstacle to implementation of the Clean Air Act, Plaintiffs must point to a "repugnance or conflict . . . so direct and positive that the two acts cannot be reconciled or consistently stand together." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (internal quotation marks omitted). "The mere fact of tension between federal and state law" is insufficient. *MTBE*, 725 F.3d at 101 (cleaned up). *See also* Int-Defs.' Mem. 28-29 (describing obstacle preemption standards). Plaintiffs do not meet this burden.

The Vermont Act does not conflict with the Clean Air Act. The Clean Air Act does not give EPA unlimited discretion to "decid[e] whether and how to regulate [greenhouse gas] emissions on a nationwide basis," U.S. Mem. 3-4, 38. It does not direct EPA, for example, to identify and achieve an overall level of national greenhouse gas emissions while balancing the nation's energy and economic needs. Instead, it directs EPA to identify specific stationary and mobile sources that, in EPA's judgment, contribute to harmful air pollution, and set pollution control standards for some of those sources. *See* 42 U.S.C. §§ 7411, 7521. Even as to those sources, EPA's standards do not set an overall cap on greenhouse gas emissions.

Nor does the Clean Air Act provide a regime for addressing harms from greenhouse gas emissions, *contra* W. Va. Mem. 50; U.S. Mem. 40, or adapting to climate change. While the Clean Air Act's "Good Neighbor Provision" requires upwind states to reduce emissions affecting

---

[33] Many scientific, public health, and environmental organizations have commented in opposition to EPA's proposed rule. Intervenor-Defendants reserve the right to address the purported justification for, and any impact of, the proposed rule when it is finalized.

air quality in downwind states, it applies only to a subset of air pollutants, not including greenhouse gases.[34] And where it applies, that provision requires states to reduce their emissions going forward, not to address harm from past emissions. 42 U.S.C. § 7410 (a)(2)(D)(i).

In the absence of any actual conflict between the Vermont Act and the Clean Air Act's pollution control standards for greenhouse gas emissions, Plaintiffs fall back on an argument that the Act "thwarts" EPA's "discretion . . . to balance environmental, economic, and energy concerns" because it will indirectly lead to higher energy costs. U.S. Mem. 15, 35; *see also* Chamber Summ. J. Mem. 12; W. Va. Mem. 3, 49. The Vermont Act's purported—and disputed— effects on future emissions do not interfere with EPA's limited discretion. The Act's assessments are based on past fossil fuel production and leave EPA free to regulate future emissions as it chooses. Plaintiffs have neither plausibly alleged nor submitted evidence to show that the Act will affect greenhouse gas emissions, *supra* Argument I; Int.-Defs.' Mem. 8-11, let alone emissions from the limited categories of sources EPA may regulate.

Moreover, courts have repeatedly held that such indirect effects do not amount to obstacle preemption. Even where Congress has expressly barred state standards "relating to the control of emissions" from new motor vehicles and nonroad engines or vehicles, 42 U.S.C. §§ 7543(a), 7543(e)(1), courts are reluctant to find that state laws that indirectly affect emissions amount to controls of those emissions. *See, e.g., Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 940 (9th Cir. 2011) (requirement to register and pay fees for certain kinds of diesel engines was not "standard[] or other requirement[] relating to the control of emissions"). In other statutory contexts, too, "incidental effect[s]" on matters governed

---

[34] *See* 42 U.S.C. § 7410(a)(2)(D)(i). EPA's rules under this provision apply only to specific smog- and soot-forming air pollutants. *See* Cross-State Air Pollution, Environmental Protection Agency, https://perma.cc/N3F9-LNKS (last visited Oct. 27, 2025).

by federal statute are not a basis for obstacle preemption. *See, e.g.*, *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 55-57 (2d Cir. 2018) (state law that indirectly decreased energy costs was not preempted by the Federal Power Act because it did "not amount to a regulation of the interstate wholesale electricity market" (cleaned up)); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 517-18 (1989) (state law that might have increased the cost of natural gas was not preempted by Natural Gas Act, which gave Congress exclusive authority over the interstate sale of natural gas). Plaintiffs speculate that the Act may influence owners of EPA-regulated sources to make choices as independent economic actors that result in fewer emissions from the use of fossil fuels, but Congress did not intend for the Clean Air Act to preempt every state law with the potential to generate ancillary effects on greenhouse gas emissions. *Cf. Commonwealth Edison*, 453 U.S. at 633.

Plaintiffs' continuing reliance on the source-state rule from *Ouellette*—the principle that the Clean Air Act preempts the application of state common law claims to limit pollution from out-of-state sources, Chamber Summ. J. Mem. 21-22; W. Va. Mem. 28; U.S. Mem. 30-32—is unavailing because the Vermont Act does not control pollution. *See* Int.-Defs.' Mem. 30-31 (explaining the source-state rule). And none of Plaintiffs' arguments that *Ouellette* nonetheless requires preemption here is persuasive. The Chamber Plaintiffs' attempt to recast *Ouellete* as a departure from normal preemption principles, Chamber Opp. Mot. Dismiss 34-35, is simply incorrect. *Ouellette* explicitly cited to precedential statutory preemption principles, 479 U.S. at 491-92 (describing standards for field and conflict preemption); applied those principles to determine the statute did not occupy the field of interstate water pollution, *id.* at 492; and went on to consider obstacle preemption, concluding that application of non-source state law would "'stand as an obstacle' to the full implementation of the" Clean Water Act. *Id*. at 492-94. Nor

does *City of New York* dictate how *Ouellette* should inform the preemption analysis here. *Contra* Chamber Opp. Mot. Dismiss 35. *City of New York* merely relied on *Ouellette* to hold that tort claims involving out-of-state pollution—the same types of claims at issue in *Ouellette*—were preempted. As explained above, that reasoning does not apply to the Act, which imposes no ongoing duties. *Supra* at 36-37.

Plaintiffs speculate that the Act could lead to "a chaotic patchwork of conflicting regulations" over the same pollution sources. U.S. Mem. 41; *see* Chamber Summ. J. Mem. 23. But since the Act does not regulate pollution sources, there is no possibility of conflicting obligations. In any event, that other states may adopt laws similar to Vermont's does not transform this permissible exercise of state power into a preempted one. Such speculation should not be credited in the context of a facial preemption challenge. *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117 (2d Cir. 2024); *Nat'l Shooting Sports Found. v. James*, 144 F.4th 98, 112 (2d Cir. 2025). And if Congress were someday to determine that permitting other states to follow Vermont's lead would "undercut a federal objective," the Constitution gives Congress the authority to craft its preferred solution. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 222-23 (1983). "The courts should not assume the role which our system assigns to Congress." *Id.* at 223.

## VI.    The Act is not an unconstitutional extraterritorial regulation[35]

Plaintiffs maintain that the Act is an unconstitutional extraterritorial regulation, either as a standalone claim, *see* U.S. Mem. 42-50, or as part of a structural constitutional preclusion claim, *see* Chamber Opp. Mot. Dismiss 27-30; Chamber Summ. J. Mem. 14-18; W. Va. Mem. 34-40.

---

[35] These arguments support dismissal of Counts I of the Chamber Plaintiffs' and State Plaintiffs' Complaints and Count II of the United States Complaint and, in the alternative, entry of summary judgment for Intervenor-Defendants and denial of summary judgment to Plaintiffs on those counts.

Yet in response to Intervenor-Defendants' Motion to Dismiss, no Plaintiff has identified a single case recognizing "extraterritoriality" as an independent constitutional violation. *See* Int.-Defs.' Mem. 40.[36]

Plaintiffs invoke only general constitutional principles of equal sovereignty, comity, territorial borders, and separation of powers. W. Va. Mem. 34-36; U.S. Mem. 44, 46; Chamber Summ. J. Mem. 15. While those principles have informed the Supreme Court's Commerce Clause and personal jurisdiction cases, they have not led it to create a freestanding constitutional claim against state laws with "extraterritorial" effects. In *National Pork Producers v. Ross*, the Supreme Court concluded that "none" of those principles warranted recognizing an "almost *per se*" rule against laws with extraterritorial impact. 598 U.S. 356, 376, 390-91 (2023).

Even if a standalone "extraterritoriality" claim were cognizable, Plaintiffs' claims here lack merit. The United States argues that the Vermont Act cannot govern out-of-state emissions because doing so would intrude into an inherently federal area. *See* U.S. Mem. 42-43. That argument fails because, as described above, the Act does not regulate emissions and is not preempted by the Clean Air Act or any other federal law.

---

[36] The principal cases Plaintiffs cite involve alleged violations of *specific* constitutional provisions—in particular, the Due Process Clause (primarily in the personal jurisdiction context), Commerce Clause, Contracts Clause, or Full Faith and Credit Clause. *See, e.g.*, *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025) (personal jurisdiction); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) (Commerce Clause); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023) (Alito, J., concurring) (personal jurisdiction and Commerce Clause); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (personal jurisdiction); *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484 (4th Cir. 2007) (Commerce Clause); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) (personal jurisdiction); *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66 (1954) (Due Process Clause); *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149 (1914) (Contracts Clause); *Bonaparte v. Appeal Tax Ct. of Balt.*, 104 U.S. 592, 594 (1881) (Full Faith and Credit Clause). Plaintiffs also cite cases that are even farther afield, not involving "extraterritoriality" challenges at all. *Cayuga Indian Nation of N.Y. v. Seneca County*, 978 F.3d 829 (2d Cir. 2020); *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013); and *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230 (2019).

The Act also does not run afoul of any extraterritorial limitations imposed by the Commerce Clause. *Contra* U.S. Mem. 45, 47. In *Pork Producers*, the Supreme Court clarified that its prior cases recognizing extraterritoriality limitations dealt with "'price control or price affirmation statutes' that tied 'the price of . . . in-state products to out-of-state prices.'" 598 U.S. at 374 (citation omitted). They had "a *specific* impermissible extraterritorial effect": "they deliberately prevented out-of-state firms from undertaking competitive pricing or deprived businesses and consumers in other States of . . . competitive advantages . . . ." *Id.* (cleaned up).

The Vermont Act is not a "price control" or "price affirmation" statute, let alone one that ties in-state fossil fuel prices to out-of-state fossil fuel prices. *Id.* The Act does not "regulate[] the price of out-of-state transactions," "insist[] that out-of-state manufacturers sell their [products] for a certain price," or "tie[] the price" of fossil fuels to anything at all. *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025); *see also Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1171, 1173 (10th Cir. 2015) (Gorsuch, J.) (rejecting extraterritoriality challenge to Colorado's renewable energy mandate, which allegedly harmed out-of-state coal producers, because "it isn't a price control statute, it doesn't link prices paid in Colorado with those paid out of state, and it does not discriminate against out-of-staters"). Responsible parties remain free to set their production levels and prices at whatever amount they want—regardless of the Act. When, as here, the Act is alleged to have an indirect impact on prices, there is no dormant Commerce Clause violation.[37] This makes sense: as the Supreme Court has recognized, "[i]n our

---

[37] *See, e.g.*, *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 124 (2d Cir. 2021) (upholding statute that did not have and was not intended to have "a controlling effect" on transactions and any effect was "indirect as well as incidental"); *VIZIO, Inc. v. Klee*, 886 F.3d 249, 256 (2d Cir. 2018) (upholding law that assessed fees based on national market share because it "does nothing to *control* interstate commerce, but rather merely *considers* out-of-state activity in imposing in-state charges," and is one of "'innumerable valid state laws affect[ing] pricing decisions in other States'" (citation omitted)); *Freedom Holdings, Inc. v. Spitzer*, 357

interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Pork Producers*, 598 U.S. at 374 (citation omitted). Plaintiffs' theory here "would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Id.* at 375.

Plaintiffs are also off base in contending that the Act unlawfully targets wholly out-of-state activity without a sufficient connection to the State. *See* U.S. Mem. 47-49; Chamber Summ. J. Mem. 17; Chamber Opp. Mot. Dismiss 27-29; W. Va. Mem. 38-39. The Supreme Court has long recognized that, consistent with due process, "a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it." *Young v. Masci*, 289 U.S. 253, 258-59 (1933). And it recently affirmed that "when a corporation has continuously and deliberately exploited a State's market, it must reasonably anticipate being haled into that State's courts to defend actions based on products causing injury there." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 364 (2021) (cleaned up). The Act falls comfortably within these principles: it seeks to hold fossil fuel companies accountable for the "injurious" in-state consequences caused by their products, and only with respect to those companies that have a sufficient connection to Vermont.

True, a State may not "*directly* regulate[] out-of-state transactions by those with *no* connection to the State," *Pork Producers*, 598 U.S. at 376 n.1 (citing *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)), but the Act does not do that. It does not regulate "transactions," such as fossil fuel sales, at all. And responsible parties do have a connection to the State, because the Act mandates one: it defines a "responsible party" to exclude "any person who lacks sufficient

---

F.3d 205, 220 (2d Cir. 2004) (upholding statute where the "extraterritorial effect . . . amounts to no more than the upstream pricing impact of a state regulation").

connection with the State to satisfy the nexus requirements of the United States Constitution."
Vt. Stat. Ann. tit. 10, § 596(22). Contrary to Plaintiffs' insistence that the nexus provision "does
not solve the problem," U.S. Mem. 49; *see also* W. Va. Mem. 39, 65; Chamber Opp. Mot.
Dismiss 29, private companies remain free to raise the extraterritoriality arguments advanced by
Plaintiffs here—many of which are rooted in the Supreme Court's personal jurisdiction cases—to
argue that they do not meet the Act's nexus requirement. And as described below, the Act is fully
consistent with the personal jurisdiction principles Plaintiffs invoke to support their
extraterritoriality argument. *Supra* at n.36.

Plaintiffs insist that the link between Vermont's harm and emissions related to out-of-
state fossil fuel activities is too attenuated. *See* U.S. Mem. 48; Chamber Summ. J. Mem. 17;
Chamber Opp. Mot. Dismiss 27. But no Supreme Court "precedent[] has suggested that only a
strict causal relationship between the defendant's in-state activity and the litigation will do."
*Ford Motor Co.*, 592 U.S. at 362. No "proof that the plaintiff's claim came about because of the
defendant's in-state conduct" is required; in fact "some relationships will support jurisdiction
without a causal showing." *Id.* State Plaintiffs are simply wrong that fossil fuel companies must
have *intended* to cause harm in Vermont. *Contra* W. Va. Mem. 38.[38] And the "subject [of] this
Act" plainly has a "sufficient nexus" to Vermont: the very objective of the Act is to help protect
Vermonters from in-state climate harm. *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
267 F.3d 1228, 1238 (11th Cir. 2001); *contra* U.S. Mem. 49. At this point—when responsible
parties have not even been identified—Plaintiffs cannot establish, as required for a facial

---

[38] The case State Plaintiffs cite for this proposition, *Strassheim v. Daily*, explains only that a state
may criminally prosecute an act that was "intended to produce and produc[ed] detrimental effects
within it." 221 U.S. 280, 285 (1911). That case is inapposite because the Act does not authorize
Vermont to criminally prosecute anyone.

challenge, that the Act will violate any extraterritorial limits under the Due Process or Commerce

Clauses "*in every application of the statute*." *Nat'l Shooting Sports Found., Inc*, 144 F.4th at 116.

Even if a tighter casual connection were required, however, Plaintiffs have not met their

burden to prove—based on undisputed facts—that Vermont cannot reliably attribute in-state

harm to particular emission sources. *See* U.S. Mem. 48. Plaintiffs simply assert, citing the

Supreme Court's nearly 15-year-old decision in *AEP*, that greenhouse gas emissions cannot be

traced to their source. *See* W. Va. Mem. 38-39; U.S. Mem. 48; Chamber Opp. Mot. Dismiss 28.

But the traceability of climate harm is a question of fact, not a question of law, and Plaintiffs

have not submitted any declarations or other evidence supporting their position. Nor have they

included any facts about attributing emissions in their Statements of Undisputed Material Facts.

Because Plaintiffs have failed to meet their initial burden of proffering admissible evidence in

support of material facts, their motion for "summary judgment must be denied, even if no

opposing evidentiary matter is presented, for the non-movant is not required to rebut an

insufficient showing." *See Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003)

(cleaned up).[39]

In any event, the Legislature heard testimony that scientists *can* quantify the harm from

climate change to a region like Vermont and attribute harm to particular emissions or emitters.

*See* Testimony of Dr. Justin Mankin, Vt. House Comm. on Judiciary and House Comm. on Env't

& Energy, Consideration of S. 259 (Apr. 11, 2024), https://perma.cc/G4MX-28S6; *see also* Defs.'

Mot. Dismiss 5 & nn. 6-8.[40] Contrary to State Plaintiffs' assertion, the Vermont Agency of

---

[39] As noted above, this causal connection is not required as a matter of law, so the Court can
grant Intervenor-Defendants' Motion to Dismiss or Motion for Summary Judgment without
resolving potential factual disputes concerning climate damage attribution.

[40] In that testimony, Dartmouth Professor Justin Mankin explained that "using peer-reviewed,
consensus scientific methods, scientists can *quantify* the economic losses a region like Vermont

Natural Resources did not conclude that attribution science is "not reliable." W. Va. Mem. 39.

Rather, it simply acknowledged—in a feasibility report required by the Act—that attribution

science would require "further development" for the cost assessment to "address the full scope of

impacts contemplated by Act." Vt. Agency of Nat. Res., Act 122 Climate Superfund Cost

Recovery Program Rpt. to the General Assembly 7 (Jan. 15, 2025), https://perma.cc/G6BZ-

GZHY. The Act calls on the implementing agencies, and not the Court, to make those scientific

judgments in the first instance. *See* Vt. Stat. Ann. tit. 10, § 599a(b)(1) (directing Agency to

"adopt[] methodologies using available science and publicly available data to identify

responsible parties" and determine share of emissions); *id.* § 599c (calling on State Treasurer to

"obtain[] and utiliz[e] credible data or methodologies" to complete the required cost assessment).

---

has endured from the impacts of global warming to date" as well as "*attribute* those losses back
to particular emissions or emitters." Testimony of Dr. Justin Mankin at 1, Vt. House Comm. on
Judiciary and House Comm. on Env't & Energy, Consideration of S. 259 (Apr. 11, 2024),
https://perma.cc/G4MX-28S6. The method known as "end-to-end" attribution "isolates and
quantifies *particular* climate damages attributable to *particular* emitters" and can be applied to
different contexts, ranging from "single events to cumulative harms," and to different emitters,
ranging from "individual firms to nations." *Id.* at 2. Climate attribution is a "well-established
consensus science" that has informed reports published by the Intergovernmental Panel on
Climate Change and the National Climate Assessment. *Id.* at 3. It is well-represented in the peer-
reviewed literature. *See, e.g.*, Christopher W. Callahan & Justin S. Mankin, *Carbon majors and
the scientific case for climate liability*, Nature 640, 893-901 (2025) (relying on climate
attribution to quantify economic losses attributable to extreme heat caused by emissions from
individual companies), https://www.nature.com/articles/s41586-025-08751-3; Yann Quilcaille et
al., *Systematic attribution of heatwaves to the emissions of carbon majors*, Nature 645, 392-98
(2025) (relying on climate attribution to conclude that 180 companies substantially contributed to
over 200 historical heatwaves from 2000-23), https://www.nature.com/articles/s41586-025-
09450-9; Colin J. Carlson et al., *Health losses attributable to anthropogenic climate change*,
Nature Climate Change 15, 1052-55 (2025) (surveying peer-reviewed publications that
conducted end-to-end attribution of health impacts from climate change),
https://www.nature.com/articles/s41558-025-02399-7. The source that State Plaintiffs cite to cast
doubt on climate attribution science—which is a "comment," not a peer-reviewed article—does
not support their argument: it merely offers one author's views on an article about the impact of
global warming on global gross domestic product. *See* W. Va. Mem. 39.

For this reason, too, the Court should not credit Plaintiffs' unsupported assertion that climate harm cannot be attributed to particular emissions.

Contrary to Plaintiffs' arguments, Chamber Opp. Mot. Dismiss 28; U.S. Mem. 45, 50, the Supreme Court's cases concerning a state's ability to impose punitive damages support Defendants. Those cases clarify that a state's authority to impose economic penalties "must be supported by the State's interest in protecting its own consumers and its own economy" and may not reach out-of-state conduct "that had no impact on [the State] or its residents." *Gore*, 517 U.S. at 572-73. Here, the core purpose of the Act is to protect Vermont's "own [residents] and its own economy" from climate harm in the State. *Id.* at 572.

State Plaintiffs' remaining arguments fare no better. They insist that their extraterritoriality concerns are heightened because the Act operates retroactively. W. Va. Mem. 36. But as the Supreme Court has long held, retroactive legislation "readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations," including when it "impose[s] a new duty or liability based on past acts," *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 200 (2d Cir. 2014) (statute's unlimited retroactivity did not violate due process). State Plaintiffs also complain that the Act reflects "hostility" to other states' laws because it imposes financial liability on the very activities that other states promote. W. Va. Mem. 37. That argument is self-defeating and hypocritical: states that promote fossil fuel activities *also* impose financial assessments on those same activities. *See, e.g.,* W. Va. SUMF ¶ 25 (West Virginia generated over $1 billion in severance taxes from fossil fuels in fiscal year 2023); *id.* ¶ 119 (Texas generates billions from gas and oil severance taxes each year).

## VII.    Foreign affairs preemption does not apply[41]

Plaintiffs' arguments overstate the Act's reach and the breadth of foreign affairs preemption. For foreign affairs conflict preemption, it is not enough to identify a policy goal that a state statute can affect. Rather, Plaintiffs must identify a federal foreign policy that is "fit to preempt" and creates a "clear conflict" with the Act. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416, 421 (2003). Plaintiffs' speculative arguments that the Act will somehow affect general negotiations around emission reductions do not meet this test. Nor does the Act intrude upon the "field" of foreign affairs, creating a need for preemption even in the absence of a conflict. The Act does not "take a position on a matter of foreign policy" and address an issue outside a "traditional state responsibility" simply because fossil fuels and their emissions can harm people outside the places they were produced. *See id*. at 419 n.11. The Court should therefore dismiss Plaintiffs' foreign affairs preemption arguments as a matter of law without the need to consider any evidence.

Even if the complaints survive the motions to dismiss, the evidence Plaintiffs proffer fails to support summary judgment in their favor. The only evidence they introduce is a declaration from a State Department official, which simply reiterates their complaints' discussion of generalized conflicts based on indirect economic effects or speculation about retaliation. *See* Declaration of Christopher Landau, ECF No. 50-3. In addition, Vermont's declaration from a foreign policy expert, Harold Koh, confirms several of Plaintiffs' purported conflicts are misstatements. *See* Declaration of Harold Koh ("Koh Decl."), ECF No. 109-4 (*Chamber* case),

---

[41] These arguments support dismissal of Counts I of the Chamber Plaintiffs' and State Plaintiffs' Complaints and Count V of the United States Complaint and, in the alternative, entry of summary judgment for Intervenor-Defendants and denial of summary judgment to Plaintiffs on those counts.

ECF No. 53-3 (*United States* case); Int-Defs.' Statement of Add'l Facts Resp. U.S. SUMF ¶¶ 11-15. The Court should therefore grant Intervenor-Defendants' motion for summary judgment.

### A. Plaintiffs have not identified a foreign policy with the force of law that conflicts with the Vermont Act

To the extent that Plaintiffs' foreign affairs conflict preemption arguments—whether based on multilateral negotiations or executive energy policies—turn on the assumption that the Vermont Act regulates foreign greenhouse gas emissions, those arguments fail for the same reason as their Clean Air Act preemption arguments. As explained above, the Act does not regulate emissions anywhere.

In addition, for foreign policies to be preemptive, they must have the force of law; in other words, the policy must be based on a clear source of authority, whether constitutional, statutory, or a long-standing executive practice. *Compare Medellín v. Texas*, 522 U.S. 491, 528 (2008) (presidential memorandum could not displace state law that conflicted with international tribunal decision because it lacked force of law), *with Garamendi*, 539 U.S. at 415, 423 (preempting state law requiring European insurance companies to disclose more information than required under executive agreement negotiated pursuant to long-exercised wartime claim settlement authority).

Plaintiffs' primary argument is that the Vermont Act conflicts with Congress's decision not to regulate foreign emissions through the Clean Air Act and directives that the executive branch negotiate emission reductions with other countries. *See* U.S. Mem. 52-54; W. Va. Mem. 41. The Clean Air Act does not, however, preempt every state law that has some effect on emissions. *See supra* Argument V.C; Int.-Defs.' Mem. 31-32. This applies with equal force to state laws that may have some indirect effect on foreign emissions. And the Global Climate Protection Act and Framework Convention simply outline general goals and affirmative acts that

the United States will take.[42] Neither contains *any* prohibitions on state action, let alone where the alleged impact of a state's actions would be at most indirect. *See also* Koh Decl. ¶¶ 12, 35; Int-Defs.' Statement of Add'l Facts Resp. U.S. SUMF ¶¶ 12-13.

In the absence of an express prohibition on state action, Plaintiffs essentially argue that the executive branch may preempt any state law it disagrees with if the subject matter relates at all to not just enacted foreign policy like a treaty, but the mere negotiating positions of the United States. Plaintiffs suggest that the Act's (speculative and disputed) economic effects are a basis for preemption due to their (speculative and unspecified) effects on emission reduction negotiations, but they overread Supreme Court precedent. While the Court in *Garamendi* considered economic effects as part of a preemption analysis, it did so only because a "different, state system of economic pressure" was the state's mechanism of enforcing conflicting *legal standards* against foreign companies. *Compare* U.S. Mem. 54, *with Garamendi*, 539 U.S. at 423-24 (cleaned up), *and* Int.-Defs.' Mem. 43. In contrast, the Vermont Act does not enforce any conflicting standard on fossil fuel companies. Moreover, the executive branch undertook the negotiations at issue in *Garamendi* pursuant to its long-recognized authority to settle wartime claims. *See* 539 U.S. at 415. Both the specific conflict (different disclosure requirements for foreign companies) and the specific power (wartime claims settlement) allowed for preemption, not the mere fact that the state law touched on a subject of international negotiations. *See also Medellín*, 552 U.S. at 532 (rejecting the executive branch's attempt to shoehorn other foreign policy actions into the "narrow and strictly limited" wartime claim settlement authority for preemption purposes).

---

[42] Global Climate Protection Act, Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1407-09 (1987) (directing President and State Department to work towards multilateral agreements as part of a mandate for action on climate change); United Nations Framework Convention on Climate Change Art. 4, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (listing commitments under treaty, which consist of technology sharing and reporting).

Nor do the Supreme Court's pronouncements that the federal government must be able to speak with "one voice" in foreign affairs mean that the executive branch may preempt any state law that touches on a subject of multi-lateral negotiations. U.S. Mem. 54 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000)). *Crosby* was a *statutory* preemption case in which Congress granted the President authority to impose a specific set of sanctions against the government of Burma (Myanmar); the Court found that Massachusetts could not impose additional sanctions outside Congress's authorized range. *See* 530 U.S. at 368-69, 377. If the executive branch could preempt state law based on general negotiation authority, there would have been no need for the *Crosby* Court to carefully examine the federal statutory scheme to determine the narrowly defined economic area under which Congress intended executive branch control.

All congressional enactments cited by Plaintiffs include only generalized negotiation directives like those the Supreme Court in *Medellín* found insufficient to give the executive authority to preempt state law. There, too, the government argued that general authorizations by Congress to "represent the United States" before international bodies provided authority to preempt state law. *Medellín*, 552 U.S. at 529. But the Court found that those authorizations spoke only to the "President's *international* responsibilities, not any unilateral authority to create domestic law." *Id.* at 530. Plaintiffs thus cannot argue that the executive branch may preempt any state law that could have any effect on its negotiations pursuant to the Global Protection Act and Framework Convention. Even if the Vermont Act had some effects on emissions, and even if those effects factored into countries' negotiating positions (an argument that layers speculation on speculation), the same could be true of a host of state laws that affect fossil fuel production, costs, or consumption, from workplace safety to consumer protection. *See supra* at 38 (listing

examples); Int.-Defs.' Mem. 45 (same); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 396 (D. Vt. 2007) (same congressional enactments did not preempt Vermont law reducing greenhouse gas emissions); *see also* Koh Decl. ¶¶ 34-35 (stating Act would not affect ongoing intergovernmental climate negotiations and that the United States is not currently engaging in negotiations under the Framework Convention); Int-Defs.' Statement of Add'l Facts Resp. U.S. SUMF ¶ 14.

Some of Plaintiffs' arguments go even further and suggest that a state asking foreign fossil fuel producers for payments could disrupt foreign relations by causing offense even if it did not have any concrete effects. The cases Plaintiffs cite where courts reference retaliation involved subjecting foreign companies to incompatible standards if the court found that U.S. laws applied. *See* U.S. Mem. 56; *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 269 (2010) (explaining Congress would have provided clear statement if it wanted federal statute to apply to foreign transactions due to "probability of incompatibility with the applicable laws of other countries"); *Japan Line, Ltd. v. L.A. County*, 441 U.S. 434, 450 (1979) (declining to apply state tax to foreign companies due to risk of multiple taxation). Allowing retaliation concerns to preempt state law beyond this context would sweep in large swaths of state laws just as allowing any state law that affected emissions in any way to be preempted.

Plaintiffs also repeat their claim that the United States has opposed "liability and compensation schemes," U.S. Mem. 55, W. Va. Mem. 41, but do not dispute that the executive branch opposed only *country-to-country* payments based on developed countries' emissions. Int.-Defs.' Mem. 43-44; *see also* Koh Decl. ¶ 32; Int-Defs.' Statement of Add'l Facts Resp. U.S. SUMF ¶ 15. Even if United States negotiating positions had the force of law, and there was some link between private fossil fuel producer payments and country-to-country liability (one

Plaintiffs never explain), that relationship would be far afield from the defined sphere of executive negotiation control found in other conflict preemption cases.

Similarly, Plaintiffs repeat the claim that the Act conflicts with policy decisions to exempt fossil fuel imports from reciprocal tariffs, the President's declaration of a national energy emergency, and withdrawal from the Paris Agreement,[43] but do not dispute that these are nothing more than policies favoring low energy prices or higher domestic energy production. *Compare* U.S. Mem. 53, *with* Int.-Defs.' Mem. 44-45. Simply put, the executive branch's Article II authority does not include power to make laws (and displace state laws) furthering its general economic views. *See* Int.-Defs.' Mem. 42 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952)); *Garcia*, 589 U.S. at 212 ("The Supremacy Clause gives priority to 'the Laws of the United States," not the . . . priorities or preferences of federal officers."). Thus, these policies neither conflict with nor are fit to preempt the Vermont Act.[44]

### B.    Plaintiffs provide no justification for expanding the rarely invoked doctrine of field preemption to the Act

Plaintiffs cite no instance in which the Second Circuit has applied foreign affairs field preemption. Even their out-of-circuit cases acknowledge that "[f]ield preemption is a rarely invoked doctrine" in foreign affairs. *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1075 (9th Cir. 2012) (en banc). A state law is not preempted simply because it has "some

---

[43] Plaintiffs suggest that federal inaction can be an authoritative decision to leave an area unregulated. *See* U.S. Mem. 53. But in the case they cite, the Court held that it was "quite wrong to view" the agency's decision not to regulate "as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation" given the statutory context. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002).

[44] State Plaintiffs suggest, without citation, that the Vermont Act is improper because it may ask foreign governments who are also producers to make payments "without meeting the . . . Foreign Sovereign Immunities Act." W. Va. Br. 42. This "single, conclusory, one-sentence argument is insufficient to adequately raise an issue." *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 208 n.4 (S.D.N.Y. 2019) (cleaned up); *see also Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) (litigants must "state the issue *and* advance an argument" (cleaned up)).

incidental or indirect effect in foreign countries." *Clark v. Allen*, 331 U.S. 503, 517 (1947).

Rather, the state law must "have no serious claim to be addressing a traditional state

responsibility," *Garamendi*, 539 U.S. at 419 n.11, and in fact be "establish[ing] its own foreign

policy." *Zschernig v. Miller*, 389 U.S. 429, 441 (1968). The Vermont Act does no such thing.

Plaintiffs suggest that the Second Circuit has found state laws touching on climate change

to create foreign policy, but *City of New York* was not a foreign affairs preemption case. *See* U.S.

Mem. 57-58; W. Va. Mem. 42; Chamber Opp. Mot. Dismiss 30-31. Nor did the court hold that

states could do nothing to address the impacts of greenhouse gas emissions simply because they

are an international problem; rather, after finding that Plaintiffs' claims arose under federal

(rather than state) common law, *City of New York* declined to apply federal common law to

foreign businesses "to avoid unintentionally stepping on the toes of the political branches."

*Compare* 993 F.3d at 102, *with Green Mountain*, 508 F. Supp. 2d at 395 (rejecting argument that

state greenhouse gas emissions law was field preempted).[45] That aspect of *City of New York* is

irrelevant here, because the State is not seeking to apply federal common law outside the United

States, and the Act does not legislate in an area previously governed by federal common law.

*Supra* Argument V.B.1. And *City of New York's* separation of powers concerns about applying

"judge-made" rules to foreign entities, 993 F.3d at 101, do not apply to democratically enacted

state statutes like the Vermont Act, particularly statutes that impose no ongoing liability. *Supra*

Argument V.B.2.

---

[45] Unlike the other Plaintiffs, the Chamber Plaintiffs also cite *City of New York* for foreign affairs
conflict preemption. They claim that *City of New York* held that the Paris Agreement and
Framework Convention conflict-preempted state laws affecting global emissions. Chamber Opp.
Mot. Dismiss 31. But *City of New York* cited these policies to illustrate its view that it was not the
court's place to create federal common law. 993 F.3d at 103. The case sheds no light on how to
analyze these policies vis-à-vis a democratically enacted state law.

The cases cited by Plaintiffs that actually involve field preemption show how states can try to make their own foreign policy—by taking a side in a foreign policy conflict and imposing consequences on foreign actors based on that position. In the only Supreme Court case to find a state statute field-preempted, *Zschernig v. Miller*, the Court set aside an Oregon estate law whose operation resulted in state probate courts "critici[zing] . . . [other] nations" and determining the "credibility of foreign diplomatic statements" in determining whether to allow foreign residents to inherit Oregon property. 389 U.S. 429, 435, 440-41 (1968).[46] Plaintiffs' out-of-circuit cases involved statutes enacted specifically to allow the victims of international conflicts to litigate claims in the state. *See Movsesian*, 670 F.3d at 1069 (preempting state law intended to provide "a friendly forum for those who suffered from certain foreign events"); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 965 (9th Cir. 2010) (preempting state law "creating friendly forum for litigating Holocaust restitution claims"). These were "*not* . . . neutral law[s] of general application, but involved states "express[ing] a distinct political point of view" on foreign countries' conduct. *Movsesian*, 670 F.3d at 1075-76.

In contrast, the Vermont Act is facially neutral and applies to domestic and foreign fossil fuel producers alike. It applies only to companies with sufficient connection to Vermont to be subject to personal jurisdiction there. Its purpose is not to express disapproval of a foreign government's conduct but to raise revenue for Vermont to protect the property and health of its residents. Far from creating its own foreign policy, the Vermont Act is social and economic legislation that falls squarely within the state's traditional responsibilities. *See* Int.-Defs.' Mem. 4-6; Defs.' Mem. 34-35; *supra* at 33.

---

[46] The United States also cites *Garamendi* in its brief, but the Court resolved that case on conflict preemption grounds. *See* 539 U.S. at 420. Regardless, there the state also took a side in a conflict about how European insurance companies should address Holocaust era claims. *See supra* at 53.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' complaints. If the Court does not dismiss the complaints in their entirety, it should grant summary judgment to Intervenor-Defendants on Counts I and II of all three complaints and Count V of the United States' complaint, and deny Plaintiffs' motions for summary judgment.

Dated: November 21, 2025

Respectfully submitted,

/s/ Bridget Asay
Bridget Asay
Michael Donofrio
STRIS & MAHER LLP
15 East State Street, Suite 2
Montpelier, VT 05602
Phone: (802) 858-4285
basay@stris.com

*Counsel for Northeast Organic Farming
Association of Vermont*

/s/ Adeline S. Rolnick
Adeline S. Rolnick
Natural Resources Defense Council, Inc.
1152 15th Street, Suite 300
Washington, DC 20005
Phone: (202) 513-6240
arolnick@nrdc.org

Mitchell S. Bernard
Natural Resources Defense Council, Inc.
40 West 20th Street, 11th Floor
New York, NY 10011
Phone: (212) 727-4469
mbernard@nrdc.org

*Counsel for Northeast Organic Farming
Association of Vermont and Conservation
Law Foundation*

/s/ Elena M. Mihaly
Elena M. Mihaly
Conservation Law Foundation, Inc.
15 East State Street, Ste. 4
Montpelier, VT 05602
Phone: (802) 622-3012
emihaly@clf.org

*Counsel for Conservation Law Foundation*