# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| *Plaintiffs*, | |
| v. | No. 2:25-cv-00463 |
| STATE OF VERMONT, et al., | |
| *Defendants*, | |
| and | |
| NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION, | |
| *Intervenor-Defendants*. | |
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE, | |
| *Plaintiffs*, | |
| and | |
| STATE OF WEST VIRGINIA, et al., | |
| *Intervenor-Plaintiffs,* | |
| v. | No. 2:24-cv-01513 |
| JULIE MOORE, et al., | |
| *Defendants*, | |
| and | |
| NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION, | |
| *Intervenor-Defendants*. | |

**BRIEF OF VERMONT PUBLIC INTEREST RESEARCH GROUP
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS'
AND INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS AND CROSS-MOTIONS
FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFFS'
AND PLAINTIFF-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................III

STATEMENT OF IDENTITY AND INTERESTS OF *AMICUS CURIAE* ...................................1

SUMMARY OF ARGUMENT ..........................................................................................1

BACKGROUND ............................................................................................................2

ARGUMENT ................................................................................................................4

      I.      Vermont Communities Suffer from the Devastating Effects of Climate Change ...4

            A.      Vermont Is Rapidly Warming—Resulting in Adverse Effects to Agriculture, the Economy, Human Health, and Biodiversity Within the State..........................................................................................................4

            B.      The Catastrophic Flooding of 2023 and 2024 Hit Vermonters Hard, Drowning Residents in Costly Repairs No One Can Afford. .....................7

      II.      The Act Is Specially and Intentionally Designed to Protect Vermonters From Carrying the Full Financial Burden of Climate Disasters and Adaptation .............9

            A.      The Act Uses Cost Recovery to Raise Revenue to Protect Vermonters....10

            B.      The Act Is Not Intended to Punish.............................................................11

            C.      The Act Prescribes a Detailed, Upcoming Process to Identify Responsible Parties' Cost Recovery Demands.............................................................12

      III.     The Act Is a Valid Exercise of Traditional State Power to Protect Residents and Raise Revenue.......................................................................................................13

      IV.     Plaintiffs' Claims that the Act Is Preempted Rest on a Fundamental Misunderstanding of the Act and Therefore Should Be Dismissed......................17

            A.      Federal Common Law Does Not Preempt the Act. ...................................17

            B.      The Clean Air Act Does Not Preempt the Act..........................................19

CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*, 441 U.S. 418 (1979) ................................................... 14

*Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011) ................................ 18

*Austin v. United States*, 509 U.S. 602 (1993) .............................................. 12

*Bond v. United States*, 572 U.S. 844 (2014) ............................................... 13

*Burlington Elec. Dept. v. Dept. of Taxes*, 154 Vt. 332, 576 A.2d 450 (1990)............. 15

*Commonwealth Edison Co. v. Montana*, 453 U.S. 609 (1981).................................. 16

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707 (1972) ......... 13

*Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440 (1960) ......................... 15

*Maine v. Taylor*, 477 U.S. 131 (1986) ................................................... , 18

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) ............................... 14

*Milwaukee v. Illinois*, 451 U.S. 304 (1981) .............................................. 18

*Moore v. United States*, 602 U.S. 572 (2024) ............................................. 18

*Nat'l Elec. Mfs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) .......................... 15

*New York Tel. Co. v. New York State Dep't of Lab.*, 440 U.S. 519 (1979) .................. 18

*Richford Sav. Bank & Trust Co. v. Thomas*, 111 Vt. 393, 17 A.2d 239 (1941) ............... 14

*Thornhill v. Alabama*, 310 U.S. 88 (1940) ............................................... 15

*Town of St. Albans v. Nat'l Car Co.*, 57 Vt. 68 (1885)................................... 14

*United States v. County of Fresno*, 429 U.S. 452 (1977).............................. 14, 18

*United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988)............................. 12

*United States v. Ward*, 448 U.S. 242 (1980).............................................. 11

*User v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976).................................... 12

*Vermont Agency of Nat. Res. v. Parkway Cleaners*, 209 Vt. 620, 210 A.3d 445 (2019) ............ 16

*Vermont Home Mortg. Credit Agency v. Montpelier Nat'l Bank*, 128 Vt. 272, 262 A.2d 445 (1970)................................................................... 11

*Vermont Nat'l Tel. Co. v. Dep't of Taxes*, 213 Vt. 421, 250 A.3d 567 (2020) ........................... 18

*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................................................. 19

**Constitutional Provisions**

VT. CONST. ch. I, art. 6 .........................................................................................

VT. CONST. ch. I, art. 7 ........................................................................................ 15

VT. CONST. ch. I, art. 9 ................................................................................... 14, 18

**Statutes**

2024 Vt. Acts & Resolves No. 153 ........................................................................ 16

2025 Vt. Acts & Resolves No. 28 ......................................................................... 13

42 U.S.C. § 7401(c) ........................................................................................... 19

VT. STAT. ANN. tit. 10, § 596 .............................................................................. 4

VT. STAT. ANN. tit. 10, § 596(2) ..................................................................... 9, 18

VT. STAT. ANN. tit. 10, § 596(22) ...................................................................... 16

VT. STAT. ANN. tit. 10, § 597 ................................................................. 10, 11, 15, 16

VT. STAT. ANN. tit. 10, § 597(1) ............................................................... 10, 17, 19

VT. STAT. ANN. tit. 10, § 599a. ........................................................................ 10

VT. STAT. ANN. tit. 10, § 599a(b)(1)–(2). ........................................................ 10, 12

VT. STAT. ANN. tit. 10, § 6615 ........................................................................ 16

**Treatises**

THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATION WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION (2d ed. 1871) ........................... 14

**Other Authorities**

16A Am. Jur. 2d *Constitutional Law* § 333 (2025) ................................................. 14

Alice Finno & Charlotte Oliver, *Vermont's drought is straining communities and leading residents to suffer*, VTDIGGER (Sept. 28, 2026, 6:48 AM), https://perma.cc/V5J4-LP6M ............. 5

CLIMATE ACTION OFF., VERMONT CLIMATE ACTION PLAN (2025) ............................... 17

Climate Action Office, *Climate Change in Vermont*, VT. AGENCY OF NAT. RES. (Aug. 6, 2025), https://perma.cc/7EU5-F6WV ........................................................................ 4, 5, 6, 7

Douglas Farnham, *Match estimate for the summer 2023 Floods* (Dec. 20, 2023), https://perma.cc/VMB5-HGS5 ............................................................................................ 3

Emma Huvos, *Despite Bold Targets, VT's Climate Pollution Continues to Rise*, VPIRG (July 29, 2019), https://perma.cc/FQ3B-75GQ ......................................................................... 16

*FEMA Releases Over $83M to Help Vermont Communities Rebuild After Devastating Floods*, GTSC HOMELAND SECURITY TODAY (Nov. 8, 2024), https://perma.cc/J286-RU6Z ................... 8

*Hazard Mitigation Funding Programs*, VERMONT EMERGENCY MANAGEMENT: DEP'T OF PUBLIC SAFETY (updated April 10, 2025), https://perma.cc/8SLU-7H59................................................ 9

Jen Kimmich, *The Vermont economy demands climate action*, VTDIGGER (May 8, 2025, 8:43 AM), https://perma.cc/3ATX-A22T ........................................................................................ 7

Jennifer DeCasaro & Sarah Labowitz, *The Trump Administration Is Quietly Curbing the Flow of Disaster Funding*, EMISSARY (Sept. 19, 2025), https://perma.cc/5L3C-ZES9 ............................ 9

Julia Tilton, *FEMA Funding at Risk for Vermont's Rural Communities After Trump Denies Disaster Declaration Request*, THE DAILY YONDER (Oct. 28, 2025), https://perma.cc/Z8T5-DUGZ ........................................................................................................................................... 9

Lana Cohen, *Thanks to climate change, toxic bacterial blooms stick around for the fall*, VTDIGGER (Oct. 15, 2021, 6:33 AM), https://perma.cc/66RJ-2J4H................................................ 7

Lisa Friedman, *Democrats Seek $500 Billion in Climate Damages From Big Polluting Companies*, N.Y. TIMES (Aug. 4, 2021), https://perma.cc/2LRE-YCPL ...................................... 2

*Loans*, U.S. SMALL BUS. ASS'N, https://perma.cc/56LU-S9JE (last visited Nov. 6, 2025)............ 8

*Lyme disease is caused by an infection with the bacteria Borrelia burgdorferi, spread to humans by backlegged "deer" ticks*, VTLYME, https://perma.cc/6ACT-L7YM (last visited Nov. 6, 2025) ...................................................................................................................................................... 6

Meredith King, *Vermont Now One of Top 3 States for Lyme Disease*, UNIV. OF VT. (June 26, 2014), https://perma.cc/8SB5-PRPW ............................................................................................ 6

*Mosquito-borne Diseases*, VT. DEP'T OF HEALTH (last updated June 5, 2025), https://perma.cc/M722-U7JU........................................................................................................... 6

OECD, THE POLLUTER PAYS PRINCIPLE (1973) ................................................................................ 3

Olivia Gieger, *'We need help': While tallying recent assistance, Vermont officials consider a future without FEMA*, NEWS FROM THE STATES (May 29, 2025), https://perma.cc/6NGD-LF4L 8

*Our Work*, VPIRG https://perma.cc/8YC8-3JH7 (last visited Nov. 10, 2025)............................... 2

Pam Reynolds, *Progress Report: In Vermont, A Push for Stronger Flood Protections*, CONSERVATION LAW FOUND. (June 11, 2025), https://perma.cc/M55R-W924............................ 8

Patrick Whittle & Michael Casey, *Why does Vermont keep flooding? It's complicated, but experts warn it could become the norm*, VERMONTPUBLIC (July 31, 2024), https://perma.cc/YF96-9B9W ..................................................................................... 7

THE FEDERALIST NO. 32 (Alexander Hamilton) ........................................................ 14

*The Story of the Vermont Climate Superfund Campaign*, VPIRG (Sept. 2024), https://perma.cc/5HCJ-YGV3.................................................................................. 4

Vermont Agency of Natural Resources, *Act 122 Climate Superfund Cost Recovery Program Report to the General Assembly* (Jan. 15, 2025), https://perma.cc/6MU8-G7NR ...................... 13

*Vermont Climate Superfund*, DATA FOR PROGRESS (May 2023), https://perma.cc/G9EF-UUHN  3

*Vermont Community Foundation grants $130,000 for 2024 flood relief*, COMMON GOOD VERMONT (July 26, 2024), https://perma.cc/94KY-7ZV3............................................................ 9

*VERMONT IS THE #1 MAPLE PRODUCER IN NATION FOR 2020*, VT. MAPLE SUGAR MAKERS' ASS'N https://perma.cc/Z3DN-9HE8 (last visited Nov. 6, 2025) .................................. 5

Vern Grubinger, *Census of Agriculture Captures Changes in Vermont Agriculture*, UNIV. OF VT. (Feb. 21, 2024), https://perma.cc/9BYA-W6LA .................................................................. 5

VT. AGENCY OF NAT. RES. & VT. STATE TREASURER'S OFF., VERMONT RESILIENCE IMPLEMENTATION STRATEGY 13 (2025).......................................................................... 10

VT. DEPT. OF ENVIRONMENTAL CONSERVATION, REGIONAL HAZE STATE IMPLEMENTATION PLAN (2018-2028)................................................................................................................ 20

*What Climate Change Means for Vermont*, EPA (Jan. 9, 2017), https://perma.cc/9SBD-ACUZ.. 5

Written Testimony of Anthony Iarrapino (Conservation Law Foundation), House Environment & Energy Committee and House Committee on Judiciary (Apr. 11, 2024), https://perma.cc/FD2E-SEZF .............................................................................................. 2, 12, 16, 19

Written Testimony of Ben Edgerly Walsh (Vermont Public Interest Group), House Environment & Energy Committee (Apr. 17, 2024), https://perma.cc/FD6A-HQW7.......................... 11, 12, 17

Yangdon Fenner, *Climate Change is Already Impacting Vermonters' Health—Here's How*, VT. PUB. HEALTH ASS'N (April 8, 2025), https://perma.cc/LKF9-EX8D ........................................ 4, 6

**STATEMENT OF IDENTITY AND INTERESTS OF *AMICUS CURIAE***

The Vermont Public Interest Research Group (VPIRG) is the largest non-profit consumer and environmental advocacy organization in Vermont. With over 30,000 members and contributors, VPIRG conducts non-partisan public interest advocacy in support of priority issues and campaigns. Having led campaigns in the state for over 50 years, VPIRG is intimately familiar with promoting and protecting the health of Vermont's people, environment, and locally-based economy through advocating for major state legislation.

VPIRG and its members have a strong interest in the Vermont Climate Superfund Act ("Act"). The Act exists because of VPIRG action: VPIRG and its members brought the issue of Vermonters' climate-related economic harm to the state legislature and supported the Act through its passage. VPIRG continues to represent Vermonters by lobbying to fund the Act's implementation. As a leading advocate for the Act, VPIRG has special knowledge and can provide local insight into the Act's original intent. This unique perspective will assist the Court in resolving this case. VPIRG urges the Court to dismiss Plaintiffs' and Intervenor Plaintiffs' (together, Plaintiffs) complaints, or grant summary judgment in the State's favor.

**SUMMARY OF ARGUMENT**

Vermont communities continue to suffer the devastating impacts of climate change, which are causing widespread adverse effects on human health, biodiversity, agriculture, and the economy. The Act was specifically designed to address these impacts by cataloging the adaptation needs of the State, creating a plan to undertake adaptation projects, and raising revenue from historically responsible parties to fund those projects. The Act is a lawful exercise of Vermont's traditional state powers to protect its residents from environmental harms. The Act was designed to address adaptation and funding, and not air pollution prevention or control, and is therefore not preempted by either federal common law or federal statute. It is both legally

1

sound and a necessary exercise of Vermont's authority to protect the health and welfare of its residents and to raise revenue to pursue such purposes. For these reasons, the Court should deny Plaintiffs' motions for summary judgment and grant Defendants' and Intervenor-Defendants' motions to dismiss or cross-motions for summary judgment.

## BACKGROUND

VPIRG has long advocated for state legislative action on environmental issues that harm Vermonters. In the past, VPIRG actively supported environmental protection and climate legislation in Vermont, including advocating for statewide Clean Heat and Renewable Energy Standards, modernizing the State's Bottle Bill, and pushing for the implementation of a toxic chemicals bill to better regulate dangerous chemicals like PFAS in consumer products. *Our Work*, VPIRG, https://perma.cc/8YC8-3JH7 (last visited Nov. 21, 2025).

After experiencing a series of devastating extreme weather events, Vermonters acutely felt the need for disaster relief funding and improved State adaptation to climate change. VPIRG heard from its coalition members they felt frustrated by the lack of accountability of major polluters that have contributed the most to climate change while avoiding responsibility for the resulting costs. Therefore, VPIRG advocated for a climate liability strategy in the federal Build Back Better (BBB) legislation. Lisa Friedman, *Democrats Seek $500 Billion in Climate Damages From Big Polluting Companies*, N.Y. TIMES (Aug. 4, 2021), https://perma.cc/2LRE-YCPL; Written Testimony of Anthony Iarrapino (Conservation Law Foundation) at 4–5, House Environment & Energy Committee and House Committee on Judiciary (Apr. 11, 2024), https://perma.cc/FD2E-SEZF [hereinafter Iarrapino Testimony]. When Congress failed to act, VPIRG brought this common-sense concept to its home territory: the State of Vermont. In 2023, VPIRG built a state-wide coalition through a public advocacy campaign ("Campaign"). The Campaign gained the support of 64% of all Vermonters who believed fossil fuel companies

2

should be held accountable for climate change resilience and adaptation infrastructure costs. *Vermont Climate Superfund*, DATA FOR PROGRESS (May 2023), https://perma.cc/G9EF-UUHN.

Before and after the devastating flooding in July 2023, VPIRG canvassers went door-to-door connecting Vermonters to information and petitions to support a climate superfund bill, which would allow the State to recover costs from major polluters to help fund climate adaptation projects. The Campaign could not have come at a timelier hour; Vermonters felt firsthand the dangerous and imminent impacts of climate change. Canvassers moved around waterlogged areas, attempting to maintain an on-the-ground presence in towns and cities across the State. Many VPIRG canvassers' families dealt with flooding; some left shifts to pump water out of their basements. Downtown Montpelier, a vibrant, thriving city of small businesses, stood several feet underwater. Nearly all affected buildings suddenly required thousands of dollars in renovations and rebuilding.[1]

Many struggled with the financial burden caused by the floods and felt there was a lack of accountability for polluting companies' greenhouse gas (GHG) emissions and contributions to climate change. Along the Campaign trail, Vermonters resonated with the polluter-pays principle—a longstanding theory that those who cause a mess should be required to clean it up. OECD, THE POLLUTER PAYS PRINCIPLE 6 (1973). Vermonters felt it was only right that the companies that profited from and caused climate impacts should be held financially responsible, instead of state taxpayers.

With the support of VPIRG's Campaign, Vermonters mobilized and worked with key

---

[1] Recovered damage costs totaled near $620 million, with $50 million covering from insurance payouts, $513 million from FEMA, and the remaining $57 million from the State and municipalities. Douglas Farnham, *Match estimate for the summer 2023 Floods* (Dec. 20, 2023), https://perma.cc/VMB5-HGS5.

3

allies in the State legislature to bring the bill to a vote. In the process, VPIRG joined legislative champions in recruiting 20 co-sponsors for the bill in the Senate and 87 in the House. *The Story of the Vermont Climate Superfund Campaign*, VPIRG (Sept. 2024), https://perma.cc/5HCJ-YGV3. After the bill made it to the floors of the State's legislative chambers, both the Senate and House passed it with an overwhelming majority: 26 out of 30 Senators and 106 out of 150 Representatives voted in favor of the bill in the spring of 2024. *Id.* At the end of May, the Act became law. *Id.*; VT. STAT. ANN. tit. 10, § 596. Now, VPIRG is highly involved in assuring the Act's success. Through its grassroots organizing, VPIRG continues to represent Vermonters and advocates in the Legislature for full implementation of the Act.

## ARGUMENT

### I.    Vermont Communities Suffer from the Devastating Effects of Climate Change

Climate change has caused real and concrete harm to Vermonters, resulting in costly damage throughout the State. The harms described below illustrate the need for decisive action to plan for and fund climate adaptation for all Vermonters.

### A.    Vermont Is Rapidly Warming—Resulting in Adverse Effects to Agriculture, the Economy, Human Health, and Biodiversity Within the State.

Since the early 20th century, temperatures in Vermont have risen approximately three degrees Fahrenheit, and they are expected to rise another nine degrees by 2100. Climate Action Office, *Climate Change in Vermont*, VT. AGENCY OF NAT. RES. (Aug. 6, 2025), https://perma.cc/7EU5-F6WV [hereinafter CAO 2025]; Yangdon Fenner, *Climate Change is Already Impacting Vermonters' Health—Here's How*, VT. PUB. HEALTH ASS'N (April 8, 2025), https://perma.cc/LKF9-EX8D. Vermont's average annual precipitation has increased nearly six inches since the 1960s, resulting in millions of dollars of infrastructure damage. CAO 2025. Chaotic and unpredictable weather patterns caused by climate change have plagued Vermont this

4

year with a summer drought, which adversely affected aquatic habitats and drinking water for residents throughout the State. Alice Finno & Charlotte Oliver, *Vermont's drought is straining communities and leading residents to suffer*, VTDIGGER (Sept. 28, 2026, 6:48 AM), https://perma.cc/V5J4-LP6M.

The impact of climate change on food systems is severe, especially for a state that values its tradition of small farming and agriculture. Vern Grubinger, *Census of Agriculture Captures Changes in Vermont Agriculture*, UNIV. OF VT. (Feb. 21, 2024), https://perma.cc/9BYA-W6LA. Fluctuations in temperature cause tougher growing conditions for crops, as do heavy floodings and more frequent droughts. CAO 2025. Increased temperatures impact the output of Vermont's iconic sugar maple trees, risking the industry's annual production of 2.22 million gallons. *What Climate Change Means for Vermont*, EPA (Jan. 9, 2017), https://perma.cc/9SBD-ACUZ; *VERMONT IS THE #1 MAPLE PRODUCER IN NATION FOR 2020*, VT. MAPLE SUGAR MAKERS' ASS'N, https://perma.cc/Z3DN-9HE8 (last visited Nov. 6, 2025). Vermont's agricultural economy is already suffering, as the declarations previously submitted by Intervenor-Defendants confirm. In the last few years alone, climate change has cost $60 million in documented losses to Vermont farms. Oedel Decl. ¶ 7, ECF No. 19–5 (*Chamber* case). Smaller Vermont farms are losing an average of $8,000 a year, needing other sources of income besides farming to stay afloat. *Id.* ¶ 6. Farmers are going out of business. *Id.* ¶ 7. Andy Jones, a manager of Intervale Community Farm since 1994, detailed how major flooding events cost over $100,000 in infrastructure upgrades to the farm's facilities and the destruction of $200,000 worth of crops. Jones Decl. ¶ ¶ 8, 9, ECF No. 19–6 (*Chamber* case). Executive Director of the Northeast Organic Farming Association (NOFA) of Vermont, Grace Oedel, noted NOFA had 198 member dairy farms five years ago—now it has 117. Oedel Decl. ¶ 7. For a state with such a

strong tradition of agriculture, climate change has an even more costly impact on Vermont's economy.

Climate change also contributes to a set of public health crises in Vermont. Warming temperatures have resulted in higher white-tailed deer populations, causing higher numbers of Lyme-disease ridden ticks. Meredith King, *Vermont Now One of Top 3 States for Lyme Disease*, UNIV. OF VT. (June 26, 2014), https://perma.cc/8SB5-PRPW. Tick season is longer, and Vermont now has one of the highest rates of Lyme disease in the country. *Lyme disease is caused by an infection with the bacteria Borrelia burgdorferi, spread to humans by backlegged "deer" ticks*, VTLYME, https://perma.cc/6ACT-L7YM (last visited Nov. 6, 2025). In addition, increased rain and warmer temperatures result in higher rates of mosquito-borne illnesses, including West Nile virus, Eastern equine encephalitis, and Jamestown Canyon virus. *Mosquito-borne Diseases*, VT. DEP'T OF HEALTH (last updated June 5, 2025), https://perma.cc/M722-U7JU.

Many Vermont housing and energy systems are not equipped to deal with or protect against extreme heat events, making it harder for residents to handle hotter homes. Fenner, *supra* at 4. For vulnerable Vermonters, especially the elderly and children, higher temperatures mean increased risks of heart attacks, strokes, and other medical conditions. Malgeri Decl. ¶¶ 5, 6, ECF No. 19–10 (*Chamber* case). Rising temperatures also contribute to poorer air quality, exacerbating respiratory conditions such as asthma or bronchitis. *Id.* The extension of warmer seasons results in higher rates of dehydration and pollen allergies. Fenner, *supra* at 4. Doctors in Vermont are seeing these medical conditions firsthand in their patients. Malgeri Decl. ¶¶ 8, 9.

There are myriad other climate impacts threatening Vermonters' health and economic and social wellbeing. Over the next 25 years, 92 bird species are expected to disappear from the State. CAO 2025. Snow conditions are becoming wetter and the snowy season shorter, affecting

6

Vermont's renowned ski and tourism industry. CAO 2025. Warmer temperatures result in algal blooms and the growth of cyanobacteria in waters, releasing toxins and affecting drinking water. Lana Cohen, *Thanks to climate change, toxic bacterial blooms stick around for the fall*, VTDIGGER (Oct. 15, 2021, 6:33 AM), https://perma.cc/66RJ-2J4H. These impacts actively harm human health, biodiversity, agriculture, and economy in Vermont, and costs are only rising.

> **B.    The Catastrophic Flooding of 2023 and 2024 Hit Vermonters Hard, Drowning Residents in Costly Repairs No One Can Afford.**

Vermonters across the State bear the brunt of the escalating costs necessary to recover from and adapt to climate change—a brutal reality that the Act seeks to help address. More than a decade ago, Vermont faced devastating flooding during the climate-change-driven Tropical Storm Irene. For Vermonter Jen Kimmich, the co-founder and CEO of The Alchemist Brewery in Waterbury and Stowe, Irene's impacts were a major economic and personal setback. Her flood insurance covered a mere 30% of repair costs. Jen Kimmich, *The Vermont economy demands climate action*, VTDIGGER (May 8, 2025, 8:43 AM), https://perma.cc/3ATX-A22T. The loss of the original Waterbury brewpub, along with all of its inventory and equipment, totaled over a half-million dollars in damages. *Id.* Despite efforts to recover, banks and insurance companies would not insure new construction. *Id.* Kimmich was never able to rebuild the original pub. *Id.*

Then came the floods of 2023. As the climate warms at a faster pace—a result of increased carbon dioxide in the atmosphere—storms become more intense, resulting in heavier rainfall. Patrick Whittle & Michael Casey, *Why does Vermont keep flooding? It's complicated, but experts warn it could become the norm*, VERMONTPUBLIC (July 31, 2024), https://perma.cc/YF96-9B9W. Consequently, more frequent extreme precipitation events and more persistent storms have caused and will continue to cause floodings throughout Vermont. *Id.* Take the example of Three Penny Taproom co-owner Wesley Hamilton, who faced flooding

7

troubles in Montpelier. Hamilton Decl. ¶ 1, ECF No. 19–9 (*Chamber* case). After beginning as
an extremely popular bar in 2009, the Three Penny Taproom expanded to include a full
restaurant in 2013. *Id.* ¶ 2. Hamilton financed all expansion costs—a decision he came to regret
when the 2023 summer flooding completely destroyed of the restaurant's equipment, inventory,
and building. *Id.* He received $125,000 from his flood and property insurance and $68,000 in
Vermont state grants, leaving over $180,000 in remaining repairs costs. *Id.* ¶ 6. Hamilton
eventually reopened the restaurant months later, but only with the help of a Small Business
Administration emergency loan; he is still paying it off today. *Id.* ¶ 7. Given the volatility of
federal loans and funding, it is difficult for Vermonters to rely on such programs because they
are not consistently available year to year. *Loans*, U.S. SMALL BUS. ASS'N,
https://perma.cc/56LU-S9JE (last visited Nov. 6, 2025).

State officials estimated the cost of damage to state and municipal property between 2023
and 2024 totaled nearly $800 million. Olivia Gieger, *'We need help': While tallying recent
assistance, Vermont officials consider a future without FEMA*, NEWS FROM THE STATES
(May 29, 2025), https://perma.cc/6NGD-LF4L. The 2023 floods alone took out 143 businesses in
Montpelier. Trautz Decl. ¶ 7 ECF No. 19–12 (*Chamber* case). The State contributed nearly $410
million of public dollars to repairs. Pam Reynolds, *Progress Report: In Vermont, A Push for
Stronger Flood Protections*, CONSERVATION LAW FOUND. (June 11, 2025),
https://perma.cc/M55R-W924. FEMA helped cover some, but not all, of the remaining costs.
*FEMA Releases Over $83M to Help Vermont Communities Rebuild After Devastating Floods*,
GTSC HOMELAND SECURITY TODAY (Nov. 8, 2024), https://perma.cc/J286-RU6Z. Some
Vermonters were forced to relocate rather than face continuous climate risks. In Plainfield,
Vermont, over 30 families took FEMA buyouts to move to higher elevations in the state,

8

choosing to avoid future flood risks and, in turn, sacrificing their homes. Bissex Decl. ¶ 11, ECF No. 19–8 (*Chamber* case).

For a state with a small economy that already struggles with funding recovery efforts, a lack of federal assistance could be disastrous.[2] From their own pockets, Vermonters are doing their best to support their communities and raise funds to cover the costs of dealing with climate disasters. In July of 2024, the Vermont Community Foundation distributed $130,000 to assist community members. *Vermont Community Foundation grants $130,000 for 2024 flood relief*, COMMON GOOD VERMONT (July 26, 2024), https://perma.cc/94KY-7ZV3. Yet, when funding is distributed for one climate disaster, another occurs. Vermont needs infrastructure modernization, storm cleanups, home buyouts, disaster relief, public health initiatives, and flood protection efforts, all of which cost money. Thus, Vermont needs funds to protect its residents, infrastructure, and businesses. The Act helps fill this gap, while allocating financial responsibility to polluting companies that contributed to these needs.

## II. The Act Is Specially and Intentionally Designed to Protect Vermonters from Carrying the Full Financial Burden of Climate Disasters and Adaptation

The Act's primary purpose is to create a state fund designated solely for projects "designed to respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change." VT. STAT. ANN. tit. 10, § 596(2). The Act will help repair Vermont communities devastated by climate change and will minimize future climate-related damages.

---

[2] The future of FEMA support is unclear. Julia Tilton, *FEMA Funding at Risk for Vermont's Rural Communities After Trump Denies Disaster Declaration Request*, THE DAILY YONDER (Oct. 28, 2025), https://perma.cc/Z8T5-DUGZ. As of April of 2025, FEMA cancelled its Building Resilient Infrastructure and Communities Program and the FY2024 Funding Round. *Hazard Mitigation Funding Programs*, VERMONT EMERGENCY MANAGEMENT: DEP'T OF PUBLIC SAFETY (updated April 10, 2025), https://perma.cc/8SLU-7H59. Vermonters are again burdened with disaster costs and expensive repairs with the suspension of FEMA's Hazard Grant Mitigation Program. Jennifer DeCasaro & Sarah Labowitz, *The Trump Administration Is Quietly Curbing the Flow of Disaster Funding*, EMISSARY (Sept. 19, 2025), https://perma.cc/5L3C-ZES9.

A.    **The Act Uses Cost Recovery to Raise Revenue to Protect Vermonters.**

The Act is a cost recovery tool to raise funds for climate change adaptation projects in Vermont. VT. STAT. ANN. tit. 10, § 597. To achieve this goal, the Act establishes the Resilience Implementation Strategy ("Strategy") to identify how Vermont should adapt and to estimate costs of adaptation, and creates the Climate Superfund Cost Recovery Program ("Program") to generate a cost recovery formula based on companies' liability for their fair share of the pollution causing harm to Vermont. *Id.* §§ 597, 599a.

The Act designates the Strategy as a mechanism for identifying and prioritizing "adaptation projects to be funded" by the Program. VT. AGENCY OF NAT. RES. & VT. STATE TREASURER'S OFF., VERMONT RESILIENCE IMPLEMENTATION STRATEGY (2025). Published in September 2025, the Strategy "identifies actions that will strengthen planning and ensure Vermont uses the best available science to prepare for" climate change. *Id.* at 7. It "identifies investments in resilience" that will reduce the costs of climate change impacts. *Id.* at 11. The Strategy sets out priority actions state agencies can take to enhance Vermont's climate resiliency. *Id.* at 46. However, many of the actions identified will require additional funding beyond the preexisting funding framework. *Id.*

The Program will "secure compensatory payments from responsible parties…to provide a source of revenue for climate change adaptation projects," laid out in the Strategy. VT. STAT. ANN. tit. 10, § 597(1). The cost recovery demands to responsible parties—those that contributed to climate-driven costs in Vermont—will be proportional to the responsibility of those parties. *Id.* In short, the State will ask those responsible for more GHG emissions during the covered period to contribute more to the Program's fund. The Agency of Natural Resources (ANR) is tasked with adopting rules that include methodologies and requirements for determining responsible parties and their cost recovery demands. *Id.* § 599a(b)(1)–(2).

Basing the cost recovery demand on a responsible party's share of covered GHG emissions follows the "polluter pays" principle. As discussed above, polluter pays is an equitable and well-established principle in state and federal law that courts have upheld and lies within the heartland of Vermont's authority. Written Testimony of Ben Edgerly Walsh (Vermont Public Interest Group) at 1, House Environment & Energy Committee (Apr. 17, 2024), https://perma.cc/FD6A-HQW7 [hereinafter Edgerly Walsh Testimony]. After hearing from Vermonters, VPIRG advocated for this legislation based on the polluter pays principle. The cost recovery demand component of the Act is necessary to ensure Vermont has financial resources to rebuild from past climate disasters and to minimize future impacts through adaptation.

### B.    The Act Is Not Intended to Punish.

While West Virginia Plaintiffs attempt to use VPIRG's Campaign to claim that the Act punishes fossil fuel companies, it does not. W. Va. Mem. at 69.[3] The Act is a cost recovery program. *Supra* Section II.A. Payments recovered under the Act serve a legitimate and recognized purpose: protecting Vermonters from climate change. *Infra* Section III; Vt. STAT. ANN. tit. 10, § 597. Plaintiffs fail to show the Act "bears no rational relation to that purpose." *Vermont Home Mortg. Credit Agency v. Montpelier Nat'l Bank*, 128 Vt. 272, ₱ 276, 262 A.2d 445, 448 (1970) (holding legislative declarations control when an act is rationally related to its purpose). Plaintiffs also fail to provide any concrete proof the Act is punitive and do not contend with the Legislature's clear compensatory purpose. *See United States v. Ward*, 448 U.S. 242, 248–49 (1980) (requiring "clearest proof" to overcome legislative intent).

---

[3] This brief uses the same party and brief abbreviations as Defendants' Consolidated Memorandum of Law. Defendants' Consolidated Memorandum of Law xii, ECF No. 108 (*Chamber* case) [hereinafter, Def. Con. Mem.].

Instead, Plaintiffs attempt to distort the Act into punishment for decades of pollution. Chamber MTD Opp. at 47 (citing *Austin v. United States*, 509 U.S. 602 (1993)); W. Va. Mem. at 68. While "Act 122 *is* designed to make large fossil fuel producers pay cost recovery demands," it is not to exact retribution but rather "to compensate Vermont for those producers' proportional share of the State's climate change adaptation costs." Def. Con. Mem. at 51. Potentially responsible parties have been reaping the economic benefits of extracting and refining fossil fuels for decades, while imposing the economic burden of adapting to climate change on Vermonters—this Act is about "adjusting the burdens and benefits" of those actions. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976) ("legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality"). Liability under the Act creates compensatory obligations for responsible parties to reimburse the State; it does not serve as a punishment. *Cf. United States v. Monsanto Co.*, 858 F.2d 160, 174–75 (4th Cir. 1988) (noting recovered cleanup costs did not operate as punitive deterrent).

C.    **The Act Prescribes a Detailed, Upcoming Process to Identify Responsible Parties' Cost Recovery Demands.**

The Act outlines a stepwise process that is a "lawful, scientific… rational, fair, and necessary" way to raise revenue to compensate the State for climate adaptation costs. Iarrapino Testimony, at 2. As a key stakeholder in the Act's implementation, VPIRG can attest that the Act's implementation is still in the early stages of this process. *See* Edgerly Walsh Testimony, at 1–2 (detailing steps laid out under the Act). The Act requires ANR to identify responsible parties, determine their share of covered GHG emissions, and issue proportional cost demands. Vᴛ. Sᴛᴀᴛ. Aɴɴ. tit. 10, § 599a(b)(1)-(2). None of these actions have occurred.

In January 2025, ANR published a report which provided updates on the feasibility of and progress towards the Act's requirements. Vermont Agency of Natural Resources, *Act 122*

*Climate Superfund Cost Recovery Program Report to the General Assembly* (Jan. 15, 2025),

https://perma.cc/6MU8-G7NR. It included a detailed assessment of information gathered through

a Request for Information conducted the previous year and next steps for advancing the

implementation of the Act. *Id.* at 6. The report demonstrates the rigor behind developing the

adaptation and cost-recovery calculations and dedication to a transparent, fair, and data driven

process. *Id.* at 7–8. In June 2025, in line with recommendations in the report for additional time,

the Legislature extended the filing date for proposed rules to 2027 and the date for the final rules

to 2028. 2025 Vt. Acts & Resolves No. 28. Vermont clearly is approaching the cost calculation

and adaptation identification processes with utmost care and is willing to extend that process.

ANR and the State Treasurer have yet to calculate the cost assessments for responsible

parties—in fact, the responsible parties have not even been identified yet. The calculation of such

cost assessments will take time, and therefore the Act at present, and in the near future, has no

binding implications or obligations on the Plaintiffs. As the Intervenor-Defendants' motion

argues, the nascent status of the Act's implementation presents substantial questions about the

justiciability of the arguments presented by the Plaintiffs. Memorandum of Law in Support of

Intervenor-Defendants' Motion to Dismiss at 17–26, ECF No. 84-1 (*Chamber* case).

### III.   The Act Is a Valid Exercise of Traditional State Power to Protect Residents and Raise Revenue

In the United States, states possess historically broad powers to self-govern. *E.g.*, *Bond v.*

*United States*, 572 U.S. 844, 855 (2014) (holding federal government powers are limited and

States and people "retain the remainder"). States' broad authority includes protecting its

residents' health, safety, and welfare. *Maine v. Taylor*, 477 U.S. 131, 151 (1986). States can also

employ reasonable means of raising revenue. *Evansville-Vanderburgh Airport Auth. Dist. v.*

*Delta Airlines, Inc.*, 405 U.S. 707, 720–22 (1972) (upholding state-levied enplaning charge on

airlines used for airport construction and maintenance); *see also United States v. County of Fresno*, 429 U.S. 452, 462 (1977) (recognizing states' power to tax private entities using government property). States' powers in these arenas must be expansive so that states can address specific, changing societal needs, such as climate change. 16A Am. Jur. 2d *Constitutional Law* § 333 (2025); *see Addington v. Texas*, 441 U.S. 418, 431 (1979) (holding flexibility of state power to address issues is "[t]he essence of federalism"). Courts historically respect the broad nature of state powers and only invalidate state laws when they conflict with the Constitution or exclusive federal powers. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (granting states traditionally "great latitude" to legislate under their state power).

A core principle of our system of government is a legislature's "power to originate all money bills, or bills for raising revenue." THE FEDERALIST NO. 32 (Alexander Hamilton); THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATION WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 479 (2d ed. 1871) (explaining power to "raise money for public purpose" is "inherent in every sovereignty"). Vermont's constitution affirms this authority and empowers the Legislature to originate revenue bills and to "raise a tax" when it would be of "service to community." VT. CONST. ch. I, art. 9. The Vermont Supreme Court has consistently upheld state revenue raising systems. *See, e.g.*, *Richford Sav. Bank & Trust Co. v. Thomas*, 111 Vt. 393, 399, 17 A.2d 239, 242 (1941) (stating "the prerogative of the Legislature [is] to establish a system of taxation"); *Town of St. Albans v. Nat'l Car Co.*, 57 Vt. 68, 74–76 (1885) (the power of the state to tax extends to persons, property, corporations, and stocks). Not only does the State have broad authority to enact laws, it also owes its residents a duty of protection. *See Thornhill v. Alabama*, 310 U.S. 88, 105 (1940) (holding states' duty to protect residents "cannot be doubted"); VT. CONST. ch. I, art. 6 ("[A]ll

14

officers of government...are [the people's] trustees and servants; and at all times, in a legal way, accountable to them."); VT. CONST. ch. I, art. 7 ("[G]overnment is...instituted for the common benefit, protection, and security of the people, nation, or community.").

This Act is a necessary response to climate change. In Vermont, climate change continues to cause extensive damage, costing Vermonters millions of dollars in recovery, cleanup, and repairs. *Supra* Section I. Climate change undoubtedly poses a massive threat to Vermont's residents, communities, and natural resources, which the State has an obligation to protect. *Cf. Thornhill*, 310 U.S. at 105. Vermont's intent to fulfill that obligation by adapting the State to climate change serves a legitimate and recognized goal. *Nat'l Elec. Mfs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (legitimizing Vermont's interest in protecting human health and environment). Acting within its traditionally recognized powers, the Legislature carefully crafted a climate adaptation framework. *Cf. Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443 (1960) (upholding state law protecting residents from air pollution); *see supra* Section II.A. The Act squarely falls within Vermont's traditional state powers.

In enacting the Act, Vermont appropriately exercised its power to raise revenue. The Act raises and appropriates funds for climate change adaptation and resilience projects: an established public purpose. VT. STAT. ANN. tit. 10, § 597. The Act uses a transparent, fair, and data-driven process to establish a reasonable relationship to responsible parties for covered emissions. *Supra* Section II.C; *see Burlington Elec. Dept. v. Dept. of Taxes*, 154 Vt. 332, 338, 576 A.2d 450, 453–54 (1990) (upholding State tax when tax's purpose has "reasonable relationship" to taxpayer). The Act follows the constitutional requirement that a State can only collect funds from responsible parties with a sufficient connection to that state. *Commonwealth*

15

*Edison Co. v. Montana*, 453 U.S. 609, 626 (1981) ("[I]nterstate business must have a substantial

nexus with the State before any tax may be levied on it."); VT. STAT. ANN. tit. 10, § 596(22).

      Vermont has a history of exercising these broad authorities to protect its residents and the

environment. *See* Def. Con. Mem. at 35 (listing multiple State acts lawfully addressing

environmental harms). For example, Vermont's waste management laws hold parties liable for

hazardous material pollution and allows recovery of investigative, removal, and remedial costs as

"necessary to protect the public health or the environment." VT. STAT. ANN. tit. 10, § 6615; *see*

*Vermont Agency of Nat. Res. v. Parkway Cleaners*, 209 Vt. 620, 625, 210 A.3d 445, 448 (2019)

(affirming defendant liability under hazardous waste statute). Akin to that lawful cost-recovery

program, this Act holds parties liable for their share of climate-related destruction and allows the

State to recover the cost of repairs and adaptation to protect Vermont's people and environment.

VT. STAT. ANN. tit. 10, § 597; Iarrapino Testimony at 4, 10. Both Vermont's hazardous waste

remediation statute and the Act use power traditionally afforded to the State under the

Constitution to address environmental harms.

      The Act is also consistent with Vermont's previously enacted legislation addressing

climate change. After years of insufficient legislative action, VPIRG mobilized Vermonters to

call upon the legislature to enact effective climate change policy. Emma Huvos, *Despite Bold*

*Targets, VT's Climate Pollution Continues to Rise*, VPIRG (July 29, 2019),

https://perma.cc/FQ3B-75GQ. In 2020, Vermont passed legislation that set legally binding

climate mitigation requirements and established the Vermont Climate Council. 2024 Vt. Acts &

Resolves No. 153. That council created the Vermont Climate Plan that sets forth specific

initiatives, programs, and strategies to achieve three main goals: reducing emissions; building

resilience in the State's communities, infrastructure, and economy; and adapting the State to the

current and anticipated effects of climate change. CLIMATE ACTION OFF., EXECUTIVE SUMMARY, VERMONT CLIMATE ACTION PLAN (2025), https://perma.cc/PQ4X-KNEM. The Act is distinct from other state initiatives focused on the first goal and instead serves the latter two goals: resilience and adaptation. *See supra* Section II. By implementing the Act, the State continues to use its recognized authority to protect Vermonters.

IV.    **Plaintiffs' Claims that the Act Is Preempted Rest on a Fundamental Misunderstanding of the Act and Therefore Should Be Dismissed**

Plaintiffs claim that federal common law and the Clean Air Act (CAA) preempt the Act because it regulates GHG emissions. W. Va. Mem. at 25, 48; Chamber MTD Opp. at 23, 32. Like many Vermonters, VPIRG has "advocated for actions specifically designed to reduce climate pollution" but, as VPIRG explained to the legislature from the outset, "that's not what this bill is about." Edgerly Walsh Testimony at 1. Plaintiffs' arguments thus fail because they rest on mischaracterizing the Act as a regulation of GHG emissions and ignoring the Act's express and true purpose of funding adaptation efforts. The Program is intended "to secure compensatory payments from responsible parties…[and] to provide a source of revenue for climate change adaptation projects." VT. STAT. ANN. tit. 10, § 597(1). The Act utilizes Vermont's traditional state powers to raise revenue for protecting the health and welfare of Vermonters. *Supra* Section III.

Ultimately, Plaintiffs' baseless challenges to the Act threaten the State's authority to raise revenue and to promote the wellbeing of its communities and natural resources.

A.    **Federal Common Law Does Not Preempt the Act.**

Plaintiffs argue that federal common law preempts the Act. W. Va. Mem. at 25; Chamber MTD Opp. at 23. But as Defendants and Intervenor-Defendants explain, federal common law is limited in scope and application. Def. Con. Mem. at 22– 25; *Am. Elec. Power Co. v. Connecticut*,

564 U.S. 410, 421 (2011) (describing limits of federal common law). The U.S. Supreme Court has applied federal common law when a state attempts to regulate point-source pollution from another state. *Milwaukee v. Illinois*, 451 U.S. 304, 312 (1981). That is not the case here.

This Act does two things: it creates a plan to help Vermont and its residents adapt to climate change and it raises revenue to fund these adaptation measures. It does not, in essence or in practice, regulate emissions. *See* VT. STAT. ANN. tit. 10 § 596(2); *supra* Section II.B. The Act's requirements fall squarely within state's traditional powers to raise revenue and "protect the health and safety of its citizens and . . . natural resources." *Maine*, 477 U.S. at 151; VT. CONST. ch. I, art. 9; *see, e.g.*, *Moore v. United States*, 602 U.S. 572, 593–94 (2024) (discussing ability of states to tax partnerships and businesses); *see County of Fresno*, 429 U.S. at 462 (upholding state's right to raise revenues on basis of property). Further, a state can tax "based on the 'protection, opportunities and benefits [it] confers.'" *Vermont Nat'l Tel. Co. v. Dep't of Taxes*, 213 Vt. 421, 435, 250 A.3d 567 (2020). It is crucial that all State governments retain these rights to protect their residents and govern businesses.

Plaintiffs rely on *City of New York* to argue the Act is preempted by federal common law. Chamber SJ Mem. at 11; Chamber MTD Opp. at 22. But, as Defendants and Intervenor-Defendants have explained, *City of New York* is inapposite. Def. Con. Mem. at 22; Vt. MTD at 33–34. At issue here is not a state common law action, but the Legislature's specific state statute with a tailored and intentional process for assigning liability. *See New York Tel. Co. v. New York State Dep't of Lab.*, 440 U.S. 519, 540 (1979) (granting deference to New York statute as a law "of general applicability that protected interests 'deeply rooted in local feeling and responsibility'"). The arguments presented by Defendants and Intervenor-Defendants are

18

correct—federal common law does not preempt this state statute which aims to help the state adapt to climate change and raise revenue.

### B.    The Clean Air Act Does Not Preempt the Act.

Plaintiffs argue that the Clean Air Act preempts the Act. W.Va. Mem. at 43; Chamber SJ Mem. at 27; Chamber MTD Opp. at 33. The CAA regulates emissions and air pollutants with the primary goal of pollution prevention. 42 U.S.C. § 7401(c). That is not the purpose nor outcome of the Act. *See Supra* Section II. The Act is not statutorily preempted under field, conflict, or explicit preemption. Vt. MTD at 15–21; Def. Con Mem. at 15.

The CAA does not occupy the field of planning and revenue raising for climate change adaptation. In fact, federal legislators have advocated for a federal-level bill similar to the Act that would create a federal Polluters Pay Climate Fund. Iarrapino Testimony at 4–5. If the CAA occupied this area, there would be no need for additional federal legislation. Where the federal government does not occupy a field, the states take the torch. *Cf. West Virginia v. EPA*, 597 U.S. 697, 733 (2022). That is precisely what Vermont did here. Since neither the CAA nor other federal laws contain any comprehensive scheme addressing climate adaptation, the Act is not field preempted under federal statutes.

Plaintiffs argue the Act conflicts with the CAA but point to nothing doing so in the Act. Chamber SJ Motion at 20; W. Va. Mem. at 47. Here, the Act does not prevent air pollution, nor mitigate emissions—it raises, from potentially diverse sources, revenue to help Vermont adapt to climate change. VT. STAT. ANN. tit. 10 § 597(1). This fund would help Vermonters, the state treasury, and the state economy respond to ongoing and future climate change disasters, such as extreme heat waves, droughts, and the floods of 2011, 2023, and 2024. *Supra* Section I. The Act's required payments are "compensatory payments" and calculated proportionally. VT. STAT. ANN. tit. 10 § 597(1). Nothing in the Act requires emitters and polluters to change their behavior

or mitigate their emissions. The Act only asks polluters to pay an equitable share of the bill to help Vermont adapt to climate change—a demand that in fact supports the CAA's goal of protecting public health and welfare, rather than conflicting with it.

Even if the Act did regulate emissions, far from explicitly preempting state action, the CAA relies on cooperative federalism, in which Vermont actively participates. *E.g.,* VT. DEPT. OF ENVIRONMENTAL CONSERVATION, REGIONAL HAZE STATE IMPLEMENTATION PLAN (2018-2028). The federal and state government work in tandem to achieve the CAA's purpose of reducing air pollution and protecting the public health and welfare.

Contrary to Plaintiffs' arguments, the Act falls squarely within traditional state powers and is not preempted by federal common law or the CAA.

## CONCLUSION

The Court should deny Plaintiffs' motions for summary judgment and grant Defendants' and Intervenor-Defendants' motions to dismiss or cross-motions for summary judgment.[4]

Respectfully submitted this 21st day of November 2025.

*/s/ Christophe Courchesne*
Christophe Courchesne
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Amicus Curiae Vermont
Public Interest Research Group*

*Parenteau Climate Action Fellow Rachel Westrate and student attorneys Abigail Durrant, Kaya Mark, Cassidy McMann, and Matthew Olsem contributed to this brief.*

---

[4] VPIRG also supports the Defendants' and Intervenor-Defendants' other arguments for summary judgment and dismissal of these actions.