## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>STATE OF VERMONT, et al.,<br><br>      *Defendants*,<br><br>  and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT AND CONSERVATION LAW FOUNDATION,<br><br>      *Intervenor-Defendants*. | No. 2:25-cv-00463 |

## REBUTTAL DECLARATION OF LUKE FROEB, Ph.D.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct.

1.      I submit this rebuttal declaration in response to (1) Defendants' Consolidated Memorandum of Law, *United States v. Vermont*, No. 2:25-cv-00463, Dkt. 53 (D. Vt.), and (2) Intervenor-Defendants' Motion for Summary Judgment, *id*. Dkt. 57.

### EDUCATION AND EXPERIENCE

2.      I am the William C. Oehmig Professor of Entrepreneurship and Free Enterprise, Emeritus at Vanderbilt University's Owen Graduate School of Management. For over three dec-

ades, I have taught the core Managerial Economics class at Vanderbilt's Master of Business Administration program. I have also taught graduate level courses in industrial organization (the field in economics that studies the strategic behavior of firms) and econometrics (the application of statistics in economics) at Tulane University, and in 1989, I spent a year as the Kramer Foundation Fellow at the University of Chicago Law School. I am the co-author of the textbook *Managerial Economics: A Problem-Solving Approach,* now in its sixth edition.

3.    In June 2018, I completed a one-year term as Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice, the highest-ranking economics position in the Antitrust Division. In this capacity, I oversaw all economic analysis within the Division and directed its Economic Analysis Group. Previously, I completed a two-year term as Director of the Bureau of Economics at the U.S. Federal Trade Commission, where I managed 110 people, including 75 economists, who provided economic analysis to support enforcement of the antitrust and consumer-protection laws.

4.    Over the last three decades, my research has focused on the economics of competition policy. I have developed a series of models that are used by government agencies throughout the world to help enforce competition laws.

5.    My publications have appeared in prominent academic and practitioner journals, including RAND Journal of Economics; Journal of Industrial Economics; Journal of Law, Economics & Organization; and the Journal of Econometrics, among others.

6.    I received my Ph.D. in economics from the University of Wisconsin and an A.B. in economics from Stanford University. Additional details regarding my qualifications and experience are given in my curriculum vitae, a copy of which is attached to this report. *See* Appendix 1.

2

## SCOPE OF WORK AND ASSIGNMENT

7.    I understand that Vermont's Climate Superfund Act (the "Vermont Act" or the "Act") establishes a cost recovery program under which the Vermont Agency of Natural Resources will issue cost recovery demands or monetary assessments on so-called "responsible parties" that engaged in fossil fuel activities from 1995 through 2024.[1]

8.    Defendants, Intervenor-Defendants, and their expert, Dr. Don Fullerton, assert that the "cost recovery demands issued under the Act are unlikely to—and, at the very least, will not necessarily—have an effect on fossil fuel production, use, or prices because they are fixed costs that are not expected to impact future behavior." *Defendants' Consolidated Memorandum of Law*, Dkt. 53 at 15 (citing the Declaration of Don Fullerton, Ph.D., Dkt. 53-2 (Nov. 17, 2025) (the "Fullerton Declaration")); *see, e.g.*, Fullerton Decl. ¶ 11.d ("[T]he Act will have no effect on market prices and provide no reason for any fossil fuel company to change its future innovation, investment technology, production of energy, or market supply and sales of energy products.").

9.    I have been retained by the U.S. Department of Justice, which represents the United States and the U.S. Environmental Protection Agency, to provide an expert opinion concerning the analysis and conclusions in the Fullerton Declaration.

10.    As part of my investigation, I (or staff working under my direction) have considered case-related documents and other sources of information. The materials include, but are not limited to, the following:

---

[1] Specifically, the Act levies retroactive penalties on energy companies, under a strict liability standard, for what Vermont alleges is each company's pro rata contribution to global greenhouse gas emissions "released into the atmosphere" from 1995 to 2024. Vt. Stat. Ann. tit. 10, §§ 596(7), (8), (22); *id*. § 598(a)(1). Those forced to pay under the Act are called "responsible parties" and include "any entity . . . that, during any part of the covered period [1995 to 2024] was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the [Agency of Natural Resources] attributable to for more than one billion metric tons of covered greenhouse gas emissions." *Id.* § 596(22). I use the term "responsible parties" and "firms" interchangeably in my declaration.

      a.      Vermont Superfund Act, S.259 (Act 122) (2024), *as amended by* H.231 (Act 47) (2025), Vt. Stat. Ann. tit. 10, §§ 596-599c;

      b.      U.S. Complaint, Dkt. 1;

      c.      The parties' motions and their memoranda and exhibits in support, *see, e.g.*, Dkts. 35, 43, 49–50, 52–54;

      d.      The Fullerton Declaration;

      e.      Related academic literature; *City of Charleston v. Brabham Oil Co., Inc.*, No. 2020-CP-10-03975, 2025 WL 2269770, at *2 (S.C.Com.Pl. Aug. 06, 2025); and NY S.2129-B § 3 (Dec. 26, 2024); S.824 § 3 (Feb. 28, 2025); and

      f.      Empirical studies related to capital costs and liability risk.

11.     My opinions below are based on economics and are offered to a reasonable degree of professional certainty. My research into the matters discussed above continues, and I reserve the right to modify or supplement my opinions as additional information becomes available. I am compensated at an hourly rate of $1,000, and my compensation is not contingent on the outcome of this proceeding.

## SUMMARY OF CONCLUSIONS

12.     Dr. Fullerton concludes that the Vermont Act will have "*no* effect" on prices, production, or innovation in markets involving fossil fuels.[2] *See* Fullerton Decl. ¶ 11.d (emphasis added). But that conclusion fails to account for capital market effects and risk exposure not only through the Act's immediate liability but also through expectations of additional liabilities in both Vermont and other jurisdictions. In addition, there is empirical evidence that these omissions are

---

[2] Dr. Fullerton uses the term "innovation" in discussing the effects of the Vermont Act. In this report, I instead frame the analysis in terms of investment, because investment is the channel through which firms expand productive capacity, whether using existing or new technologies.

important.

13.     First, Dr. Fullerton claims that a monetary assessment under the Act "is a fixed cost" that will be "fully absorb[ed]" by the responsible parties and, as a result, will have "no effect" on fossil fuel production, prices, or innovation. *Id*. ¶¶ 11.b & 11.d. However, the Vermont Act could affect price, production, and investment by increasing the responsible parties' costs of equity and debt financing (collectively, their "cost of capital"), thereby reducing their willingness to undertake costly capital expenditures. Reduced investment would lead to lower future fossil fuel output and, all else equal, higher prices. Dr. Fullerton's analysis does not consider this transmission mechanism.

14.     Second, Dr. Fullerton assumes a static world in which Vermont never amends its Act and other jurisdictions do not implement similar laws or otherwise take similar actions against energy producers. Yet Vermont could amend the Act to expand the covered period, and empirical research shows that adoption of climate laws (or policies) in one jurisdiction increases the probability of adoption in other jurisdictions. Accordingly, the Vermont Act increases the responsible parties' risk exposure not only through its immediate liability effects but also by creating expectations of future additional liabilities in both Vermont and other jurisdictions. Enforcement of the Act—combined with the increased likelihood of policy replication—could raise the risk borne by investors in fossil fuel firms; if so, rational investors would demand higher returns on their investments to compensate them for bearing this risk. Following increases in responsible parties' cost of capital, it is reasonable to expect that they would invest less than they otherwise would.

15.     In sum, Dr. Fullerton (1) fails to account for capital markets and (2) overlooks the risk that Vermont might expand its covered period and that other jurisdictions might enact legislation similar to the Vermont Act. The conclusions drawn from such an analysis are not reliable.

## ANALYSIS

### I.    LIABILITY RISKS INCREASE CAPITAL COSTS

16.    Dr. Fullerton claims that each "monetary assessment" under the Vermont Act "is a fixed cost" that "will be absorbed by the firm and its shareholders and cannot be passed on to customers through an increase in price." Fullerton Decl. ¶ 11.b; *see id*. ¶ 18 ("[A] fossil fuel company is unlikely to be able to change its own price" as a result of the Act). He therefore predicts that the Act's cost recovery program will have "*no* effect" on the responsible parties' production, prices, or investments because those firms "will fully absorb" those costs without any change in their behavior or business practices. *Id*. ¶ 11.d (emphasis added). To the extent that the monetary assessments leave the responsible parties with minimal cashflow, he further opines, "outside sources of funds" will cover future investments. *Id*. ¶¶ 33–34; *id*. ¶ 35 (asserting that the "Act will not affect the future availability of fossil fuels or of consumer energy products" because it "will not affect the supply of new energy" or "fossil fuel prices").

17.    Dr. Fullerton's claim that the Act will have "no effect" on production, prices, or investment rests on a model of economic behavior that does not incorporate well-established features of investment decision-making by profit-maximizing firms. Contrary to his claim, the Vermont Act could affect economic outcomes through well-understood mechanisms—most importantly by increasing the responsible parties' "cost of capital" for new investments, thereby reducing their willingness to undertake costly capital expenditures.

18.    The fossil fuel sector is capital-intensive and requires continuous investment—such as in exploration, production, refining, and transportation infrastructure—to maintain or increase output. Because the cost of capital is a key determinant of whether a firm undertakes investments that sustain and expand productive capacity (and thus future output), any increase in that cost predictably would reduce investment and future output, all else equal.

19.    The Act imposes potentially large legal liabilities on the responsible parties. As Dr. Fullerton states, the responsible parties' assessment will be determined by Vermont's Treasurer and allocated "in proportion to the share of covered emissions attributable to that" party. Fullerton Decl. ¶ 9. The impending liability and uncertainty surrounding the magnitude of these potential liabilities increases firms' exposure to financial risk. That increased risk, in turn, could reduce firms' willingness to undertake costly, long-lived investments in future energy production. It also could reduce the willingness of debt providers and equity financers to supply capital, except on more expensive terms.

20.    Empirical research has shown that increases in liability risk have had these effects in the oil and gas industry. For example, Dr. Matteo P. Arena provides a clear illustration of these effects. In the immediate aftermath of the Deepwater Horizon oil spill, Standard & Poor's downgraded British Petroleum's (BP's) credit rating from AA to A, increasing BP's borrowing costs by approximately 1.75 percentage points. *See* M. Arena, *Corporate litigation and debt*, 87 Jour. Banking and Fin. 202, 202 & n.1 (2018), https://perma.cc/27A4-9KWQ. As Dr. Arena concludes, "litigation risk can have strong and lasting consequences" on corporate creditworthiness and financing costs. *Id*. at 202.

21.    Dr. Arena's analysis is not limited to BP. Using detailed firm-level lawsuit data, he finds that higher litigation risk is associated with significant increases in financing costs. Dr. Arena also finds that adverse lawsuit outcomes—particularly large settlements and judgments—further increase financing costs.

22.    Accordingly, if the Act increases the responsible parties' cost of capital, it is reasonable to expect that they will undertake less investment than they otherwise would. Reduced investment would imply lower future fossil fuel output compared to a world absent the Act and,

7

all else equal, higher prices. Dr. Fullerton's analysis does not address this possibility.

## II.   THE VERMONT ACT IS SUBJECT TO CHANGE AND INCREASES THE LIKELIHOOD OF SIMILAR ACTIONS OR LAWS IN OTHER JURISDICTIONS

23.    Dr. Fullerton assumes a static world in which Vermont never amends its Act to expand the covered period and in which other jurisdictions do not implement similar laws or otherwise take similar action against energy producers. He claims that "[s]ome observers have advanced a hypothesis about future laws that other states might enact that could affect future liabilities, energy markets, or fossil fuel prices, but no such hypothesis has been validated by evidence." Fullerton Decl. ¶ 25. He then states that, "even if other states were to enact similar legislation, any effect of that legislation on price cannot be attributed to any direct effect of this Act." *Id*. He therefore "conclude[s] that expectations about future liability have no definitive impact on predictions about the economic effects of the Act." *Id*.

24.    But Vermont could amend the Act at any time to expand the covered period and, in any event, its mere existence could increase risk by helping to create a regulatory path that other jurisdictions might follow—and at least one state already has.

25.    New York's 2024 Climate Change Superfund Act is widely recognized as part of the same family of "climate superfund" laws as Vermont's statute. *See* N.Y. Envtl. Conserv. Law § 76-0101 *et seq.* New York enacted its law soon after Vermont enacted its statute, becoming the second state to adopt such a law, and the New York Act authorizes $75 billion in climate-related assessments over 25 years.

26.    Empirical research shows that adoption of climate policy in one state can materially increase the probability of adoption by other states, particularly neighboring or ideologically similar states. *See, e.g.*, Mitali Das, *et al*., *Climate Policy Diffusion Across U.S. States*, IMF Working

Paper, 2024 International Monetary Fund, https://perma.cc/33K4-52ME.[3]

27.     Vermont could also amend its law to impose additional liabilities. By demonstrating a willingness to "look back" and impose retroactive assessments under a strict liability regime for emissions over a 30-year period, Vermont has established a precedent that rational investors would consider when assessing the risk of future liabilities—whether through additional retroactive periods or new assessments tied to future emissions. Rational investors, for example, would consider the fact that New York already amended its superfund statute to expand the covered period from 2000–2018 to 2000–2024, and that Vermont could do the same. *See* NY S.2129-B § 3 (Dec. 26, 2024); S.824 § 3 (Feb. 28, 2025); *see also supra* ¶ 26 (explaining Das report).

28.     Accordingly, the Vermont Act could increase the responsible parties' risk exposure not only through its immediate liability effects, but also because rational investors might expect additional such liabilities in Vermont and other jurisdictions. Dr. Fullerton's declaration does not recognize or address these spillover effects and instead concludes, without analysis, that the Vermont Act will have no such effects.

29.     Enforcement of the Act—combined with the increased possibility of these policy spillovers—raises the risk borne by investors in fossil fuel firms. As explained above, investors require compensation for bearing additional risk, which increases the required rate of return on both equity and debt and therefore increases firms' cost of capital. This increased compensation is sometimes described as a "carbon premium." *See* P. Bolton & M. Kacperczyk, *Global Pricing of Carbon-Transition Risk*, Jour. of Fin., Vol. LXXVIII, No. 6 at 3677 (2023),

---

[3] The same phenomena exist with lawsuits. Whereas just a few climate change lawsuits existed ten years ago, there are dozens of them today. The lawsuits, which seek significant damages against energy producers, are modeled after each other and show real-world effects of climate policy adoption in one jurisdiction increasing the probability of adoption in others.

https://perma.cc/G5DQ-RLQW.

30.    Empirical research supports the existence of carbon premiums. For example, Bolton and Kacperczyk "found evidence of a widespread, significant, and rising carbon premium." *Id.* at 3752. In addition, Bogmans and his co-authors found that "oil and gas investment fell by 6.5 percent between 2015 and 2019 as a result of a strengthening of climate policy pledges and announcements in the years following the Paris agreement." C. Bogmans, A. Pescatori, & E. Prifti, *The impact of climate policy on oil and gas investment: Evidence from firm-level data*, 165 European Economic Review 104750 at 2 (2024), https://perma.cc/846Q-VQCM.

31.    If the Vermont Act retroactively imposes substantial costs tied to historical emissions and signals a willingness to impose large ex post liabilities on carbon-intensive business models, rational investors would respond by demanding higher compensation for that risk and by reducing valuations of projects most exposed to future liability. Such higher capital costs would result in higher prices, lower output and investment.

32.    Because the Fullerton Declaration does not account for how financial markets price regulatory and liability risk in the fossil fuel sector—including spillover risk and the associated increases in financing costs—it does not provide an adequate economic basis for the conclusion that the Vermont Act "will have no effect on a fossil fuel company's incentive to invest in new innovation or physical infrastructure." Fullerton Decl. ¶ 33. Dr. Fullerton does not test, quantify, or otherwise substantiate his "no effect" conclusion in the context of the Vermont Act.

## CONCLUSION

33.    The Fullerton Declaration does not provide a reliable economic assessment of the likely effects of the Vermont Act for two principal reasons:

      a.      **Failure to account for capital market effects**. It does not adequately consider the Act's predictable effects on capital markets—namely, that imposing substantial and uncertain liabilities is likely to increase firms' cost of equity and debt financing (their "cost of capital"), which would discourage productive, output increasing investments that otherwise would be undertaken.

      b.      **Overlooks spillover risk**. It ignores the possibility that the Act could be amended and rejects, without analysis or supporting evidence, the possibility that the Act increases the likelihood of similar legislation in other jurisdictions, which would further elevate regulatory and litigation risk, raise capital costs, and deter investment that would otherwise occur, all else equal.

34.     Dr. Fullerton's failure to consider these possibilities and incorporate them into his analysis means that his analysis is incomplete and that his conclusions about the effects of the Vermont Act are unreliable.


*Luke Froeb*
_____

**Luke Froeb, Ph.D.**

**Date:**     12/14/2025
         _____

**Location:**   Nashville, TN 37215
          _____

# APPENDIX 1

Dec 12, 2025

# Luke M Froeb
## William C. Oehmig Professor of Free Enterprise and Entrepreneurship, Emeritus

luke.froeb@vanderbilt.edu   Bio   Textbook   Blog
LearnRegression.com   CompetitionToolBox.com

Owen Graduate School of Management                401 21st Avenue South
Vanderbilt University                             Nashville, TN 37203

**Summary:**
Luke M. Froeb, an economist and professor at Vanderbilt University's Owen Graduate School of Management, has spent his professional life going in and out of academia: Tulane, Dept of Justice, University of Chicago, Vanderbilt University, Federal Trade Commission (chief economist), Vanderbilt, US Dept of Justice (chief economist, Antitrust Division), and back to Vanderbilt.  As a government enforcer, Froeb gets exposed to interesting problems, and when he returns to academia, he gets time to work on them.

His most influential work centers on merger analysis. With Greg Werden, he developed the "Antitrust Logit Model" (ALM), a tractable framework for predicting the post-merger loss of competition.  The methodology--fit a model to observed competition, and then use it predict the unobserved counterfactual-- has been applied to horizontal and vertical mergers, patent infringement and damage estimation for different modes of competition: price, quantity, bidding, and bargaining.

Today, his merger models are used by agencies around the world to enforce competition laws. Some of them are online at CompetitionToolBox.com, a suite of interactive web apps.

His textbook *Managerial Economics: A Problem-Solving Approach* (now in its 6th edition) teaches students to identify profitable decisions using cost-benefit analysis, and then ensure they get made using the principles of organizational design.

### Education
**Stanford University, A.B.** (1978), Economics, with honors and academic distinction.
**University of Wisconsin, Ph.D.** (1983), Econometrics, passed with distinction.

### Experience
1993-    **Asst.(1993)/Assoc.(1998)/chaired(2002)/Emeritus(2024) Professor** at Vanderbilt University. Teach managerial economics (textbook; blog) to MBA's, executive MBA's, and assorted topics in non-degree programs.

2017-8   **Deputy Asst. Attorney General, Antitrust Division, U.S. Dept. of Justice**. Managed 50 PhD's who provided economic analysis to support enforcement of antitrust laws.

2003-5   **Director, Bureau of Economics, U.S. Federal Trade Commission**. Managed 110 employees, including 75 PhD economists who provided economic analysis to support enforcement of antitrust and consumer protection laws. (talks)

1989     **Kramer Foundation Fellow, University of Chicago Law School**

1986-92  **Economist, Antitrust Division, U.S. Department of Justice**. Merger and price-fixing cases and policy: litigation support; expert witness; data analysis; policy analysis. Work for Sentencing Commission.

1984-5   **Asst. Professor, Department of Economics, Tulane University**. Taught grad and undergrad econometrics; grad industrial organization; undergrad micro

### Awards, grants, professional activities
2020     Antitrust Writing Awards Nomination for "Antitrust and Tech: Europe and the United States Differ, and It Matters," *Competition Policy International* (Sept. 5, 2019)
2019-2021 *Koch Foundation Grant* for research on bargaining models
2012-    Co-editor of *Economic Inquiry*

| 2012 | Nominee, *Acquisition International* Legal Awards |
| 2011 | Finalist, 'Matter of the Year' for Imperial Tobacco vs. OFT, *Global Competition Review* |
| 2005-09 | Editorial Board of *Competition Policy International* |
| 1998- | Editorial Board of *International Journal of the Economics of Business* |
| 2005-07 | Outstanding Professor of Vanderbilt's Executive MBA program |
| 2005 | FTC Award for Distinguished Service |
| 2005 | ABA Economic Evidence Task Force |
| 2002 | Dean's Award for Outstanding and Widespread Research Impact |
| 2001 | Klebler-Gerry Lecturer, St. Olaf's College. |
| 2001 | Dell STAR (Strategic Technology And Research) Grant to update web-based *Mathematica* simulation games. |
| 2000 | Dean's Award for Teaching Excellence. |
| 1999 | Outstanding Professor of the Vanderbilt International Executive MBA program |
| 1998 | Outstanding Technological Innovation in Business Education for web-based *Mathematica* simulation games, by Price-Waterhouse and the University of Virginia McIntire School of Commerce. |
| 1995 | Grant Recipient, the Provost's Initiative on Technological Innovation in the Classroom to develop the Vanderbilt University *Mathematica* Web Server. |
| 1994-02 | Editor, *Antitrust.org,* resource linking economic research, policy, and cases. |
| 1993-7 | Steering Committee Member for the Undergraduate Computation and Engineering Sciences to promote the emerging field of computational science. |

**RESEARCH:** (4986 Citations, H Index=33, i10 Index=64, GoogleScholar)

**Working Papers**

Froeb, Luke M. and Tschantz, Steven T., Capacity-Constrained Competition in Rental Markets (December 01, 2025). Available at SSRN: https://ssrn.com/abstract=5845364

Froeb, Luke M. and Lane, Mark and Powell, Ed and Shor, Mikhael and Tschantz, Steven T., Big is Green, Procompetitive, and Saves Lives: The Economics of Route Consolidation (June 23, 2023). Available at SSRN: https://ssrn.com/abstract=4489828

Froeb, Luke M. and Shor, Mikhael, Formularies, Rebates, and the Economics of PBM Bargaining (May 8, 2023). Vanderbilt Owen Graduate School of Management Research Paper, Available at SSRN: https://ssrn.com/abstract=4442064

Froeb, Luke and Mares, Vlad and Tschantz. Steven, Horizontal Mergers Do Not Necessarily Harm the Auctioneer (March 4, 2020).

Froeb, Luke M., A Simple App to Teach Regression (link), (Dec 19, 2019). SSRN

Froeb, Luke M. and Mares, Vladimir and Tschantz, Steven T., Nash-in-Shapley:  Bargaining with Recursive Threat Points (December 22, 2018). SSRN.

Froeb, Luke M. and Mares, Vladimir and Tschantz, Steven T., Horizontal Mergers in Optimal Auctions (January 30, 2017). Vanderbilt Owen Graduate School of Management Research Paper No. 2742187, SSRN: https://ssrn.com/abstract=2742187

Doane, Michael J., Luke M. Froeb, Gregory Werden, and David Zimmer. Predicting the Price Effects from Retail Mergers, (Jan, 2013), SSRN.

Doane, Michael J., Froeb, Luke M. and Van Horn, R. Lawrence, How Well Do Travel Cost Models Measure Competition Among Hospitals? (September 16, 2011). SSRN

Froeb, Luke M., Mikhael Shor, Steven Tschantz, Mergers in Auctions with an Incumbent Advantage (September 2, 2008). SSRN.

Werden, Gregory, Luke Froeb, and Steven Tschantz, Incentive Contracts as Merger Remedies, (October 2005). SSRN

Froeb, Luke M., Tschantz, Steven T. and Crooke, Philip, "Mergers Among Asymmetric Bidders: A Logit Second-Price Auction Model" (February 27, 1998). SSRN

Froeb, Luke and Steven Tschantz, How Much Information is Required to Accurately Predict Merger Effects?, Owen Working paper (2001).

Froeb, Luke, Steven Tschantz & Philip Crooke, Second-price Auctions with Power-related Distributions: Owen Working paper (2001). SSRN

Froeb, Luke, An Innovation Variance Ratio Test, Owen working Paper (1996)

**Publications (most recent first)**

1. Willem H. Boshoff, Luke M. Froeb, Wihan Marais†, Roan J. Minnie, Steven Tschantz, Bargaining Competition and Vertical Mergers: The Problem of Model Selection, *Review of Industrial Organization* 66 (2025) 141-183.

2. Froeb, Luke M. and Michael Vita, Advice for New FTC Leadership, *Competition Policy International* (Nov. 26, 2024).

3. Froeb, Luke M. and Michael Vita, *U.S. v. AT&T*: Five Lessons for Vertical Merger Enforcement, *Competition Policy International* (Oct 20, 2024).

4. Froeb, Luke M. and Tschantz, Steven T. and Werden, Gregory J., Deterrence in Merger Review: Likely Impacts of Recent U.S. Policy Changes, *Antitrust Chronicle* (May 2024). Available at SSRN: https://ssrn.com/abstract=4709897

5. Froeb, Luke M. and Michael Vita, Vertical Mergers and Restraints. *Encyclopedia of Competition Economics*, Edward Elgar. (2024).

6. Froeb, Luke M. and Sokol, D. Daniel and Wagman, Liad, Cost-Benefit Analysis Without the Benefits or the Analysis: How Not to Draft Merger Guidelines. 2023. *Southern California Law Review*, 97 (2023) 1-10.

7. Froeb, Luke M. and Kobayashi, Bruce H. and Yun, John M., Organizational Form and Enforcement Innovation, *Antitrust Law Journal*, Vol. 85 No. 2 (2023), Available at SSRN: https://ssrn.com/abstract=4626034

8. Werden, Gregory J. and Froeb, Luke M., Can the FTC Turn Back the Clock? (August 15, 2021). *Antitrust Magazine Online*, Oct. 2021, Available at SSRN: https://ssrn.com/abstract=3909851

9. Werden, Gregory J., Luke M Froeb, Bernhard Ganglmair, and Steven Tschantz, Technology Economics: Innovation, Licensing, and Antitrust, *The Global Antitrust Institute's Report on the Digital Economy,* (2020).

10. Gregory J. Werden and Luke M. Froeb, *Werden and Froeb: The Conspicuous Silences of the Proposed Vertical Merger Guidelines*, Truth on the Market (February 06, 2020), https://truthonthemarket.com/2020/02/06/werden-froeb-vmg-symposium/

11. Werden, Gregory J. and Froeb, Luke M., Antitrust and Tech: Europe and the United States Differ, and It Matters, *Competition Policy International (Sept. 5, 2019)*. SSRN, Nominated for 2020 Antitrust Writing Awards
    • Comment by Maria Coppola & Renato Nazzini, The European and U.S. Approaches to Antitrust and Tech: Setting the Record Straight - A Reply to Gregory J. Werden and Luke M. Froeb's Antitrust and Tech: Europe and the United States Differ, and It Matters, *Competition Policy International* (May, 2020)

12. Gregory Werden and Luke Froeb. Why Patent Hold-up does not Violate Antitrust Law, 27 *Texas Intellectual Property Law Journal* 27 (2019) 1. SSRN

13. Luke M. Froeb, Russell W. Pittman, Charles S. Taragin, Tschantz, Gregory J. Werden, Economics at the Antitrust Division: 2017–2018. *Review of Industrial Organization* (2018) 53:637–651. DOJ

14. Gregory Werden and Luke Froeb. Dᴏɴ'ᴛ Pᴀɴɪᴄ: A Guide to Claims of Increasing Concentration, *Antitrust*, (Fall 2018). SSRN

15. Froeb, Luke and Vladimir Mares, Steven Tschantz, Charles Taragin. The simple algebra of surplus in private values open auctions: A nested logit merger model, Economics Bulletin, vol. 38(4) (2018) 2304-12. SSRN

16. Luke M. Froeb, Russell W. Pittman, Charles S. Taragin, Steven Tschantz, Gregory J. Werden. Economics at the Antitrust Division: 2017–2018. Review of Industrial Organization (2018).

17. Doane, Michael, Luke Froeb, Gregory Werden, and David Zimmer. Hertz–Dollar Thrifty: Fixing a Merger to Avoid Litigation, in *The Antitrust Revolution* 87 (Lawrence J. White & John W. Kwoka, eds., 7th ed. 2018).

18. Gregory Werden and Luke Froeb. Increased Margins and Merger Assessment, *Journal of European Competition Law and Practice*, 9:8 (2018), pp. 519-522.

19. Kalnins, Arturs, Luke M. Froeb, and Steven T. Tschantz, Can Mergers Increase Output: Evidence from the Lodging Industry. *RAND Journal of Economics*, 48(1) (Spring 2017) 178–202.

20. Froeb, Luke M., Bernhard Ganglmair, and Steven Tschantz, Adversarial Decision Making: Choosing Between Models Constructed by Interested Parties, *Journal of Law & Economics* 59:3 (2016) 527-548. SSRN

21. Doane, Michael J., Luke M. Froeb, Brijesh J. Pinto, and David S. Sibley, "Screening for Collusion as a Problem of Inference," in *Oxford Handbook of International Antitrust Economics*, edited by Roger Blair and Daniel Sokol, Oxford University Press: Kettering, U.K., 2015.

22. Froeb, Luke M. and Mikhael Shor, Innovators, Implementors and Two-sided Hold-up, Antitrust Source 14(6) (August, 2015) 1-10.

23. Froeb, Luke, Brian McCann, Mikhael Shor and Michael Ward, *Managerial Economics: A Problem-solving Approach*, 5th Edition, (Cincinnati, Cengage/Southwestern, 2016).

24. Werden, Gregory J. and Luke M. Froeb, "Merger Strategies and Antitrust Concerns," in Oxford Handbook of Managerial Economics, edited by Christopher R. Thomas and William F. Shughart II, Oxford University Press: Kettering, U.K., 2013.

25. Froeb, Luke M. and Larry van Horn, Regulators Using New 'Travel Cost' Models in Merger Enforcement, *Hospitals & Health Networks Daily* July 18 (2013). H&HN

26. Froeb, Luke M. and Ward, James C., Teaching Managerial Economics with Problems Instead of Models (April 5, 2011). THE INTERNATIONAL HANDBOOK ON TEACHING AND LEARNING IN ECONOMICS, Gail Hoyt, KimMarie McGoldrick, eds., Edward Elgar Publishing, 2012. Available at SSRN

27. Ganglmair, Bernhard, Luke M. Froeb, and Werden, Gregory J., Patent Hold Up and Antitrust: How a Well-Intentioned Rule Could Retard Innovation, *Journal of Industrial Economics* 60(2), (June 2012) 249-273. SSRN

28. Froeb, Luke, and Bruce Kobayashi, Adversarial versus Inquisitorial Justice, *Procedural Law And Economics, Encyclopedia of Law and Economics,* vol. II, (edited by Chris William Sanchirico, (Edward Elgar, 2012).

29. Werden, Gregory J. and Froeb, Luke M. Choosing Among Tools for Assessing Unilateral Merger Effects. *European Competition Journal* 155 (2011). SSRN

30. Werden, Gregory J., Luke M. Froeb, and Mikhael Shor. Behavioral Antitrust and Merger Control, *Journal of Institutional and Theoretical Economics*, (2011, Vol. 167, No. 1, 126-142). SSRN

31. Doane, Michael, Luke Froeb, and Steven Tschantz, WARNING: Improper Use of the New *Horizontal Merger Guidelines* Can Result in Overly Narrow Markets, Mistaken Inferences of Market Power, and Wrong-Headed Analyses. *CPI Antitrust Journal* 10(2), (October 28, 2010). link

32. Tenn, Steven, Luke Froeb, and Steven Tschantz, Merger Effects When Firms Compete by Choosing Both Price and Promotion, *International Journal of Industrial Organization*, 28:6 (November 2010), Pages 695-707.

33. Froeb, Luke, Paul Pautler, and Lars-Hendrik Roeller, The Economics of Organizing Economists, *Antitrust Law Journal* 76(2) (2009) 101-116. SSRN

34. Froeb, Luke, On Revising the Merger Guidelines, *Global Competition Policy*, (Oct., 2009). Available at http://www.globalcompetitionpolicy.org/index.php?id=1926&action=907

35. Froeb, Luke, Pingping Shan, Reconciling the Conflicting Views of the DOJ Report on Single-Firm Conduct, *Global Competition Policy*, (Oct., 2008). link

36. Rosa Abrantes-Metz & Luke Froeb, "Competition Authorities are Screening for Conspiracies: What are they Likely to Find?" *The American Bar Association Section of Antitrust Law Economics Committee Newsletter*, 8(1) (Spring, 2008) 10-16.

37. Werden, Gregory and Luke Froeb, Unilateral Competitive Effects of Horizontal Mergers II: Auctions and Bargaining, *Issues in Competition Law and Policy*, W. Dale Collins (ed.), ABA Section of Antitrust Law, 2008, vol. 2, 1343. SSRN

38. Gandhi, Amit, Luke Froeb, Steven Tschantz, and Gregory Werden, Post-Merger Product Repositioning, *Journal of Industrial Economics,* 41 (March, 2008) 49-67. SSRN.

39. Froeb, Luke, Steven Tschantz, and Gregory Werden, Vertical Restraints and the Effects of Upstream Horizontal Mergers, *The Political Economy of Antitrust*, Vivek Ghosal and Johann Stennek (Eds.), Amsterdam: North-Holland Publishing, (2007) p. 369. SSRN

40. Werden, Gregory J., and Luke M. Froeb, Unilateral Competitive Effects of Horizontal Mergers, in *Handbook of Antitrust Economics*, Paolo Buccirossi (ed.), (Boston: MIT Press), 2007, 43-104. SSRN:

41. Froeb, Luke M. and Pautler, Paul A., Consumer Protection. International Encyclopedia of the Social Sciences, Forthcoming; Vanderbilt Law and Economics Research Paper No. 07-10. Available at SSRN: https://ssrn.com/abstract=980781

42. Froeb, Luke, Review of "Economy of Grace" *Journal of Lutheran Ethics*, vol. 29, July, 2006. (link)

43. Froeb, Luke, If Merger is the Answer, What is the Question? *M&A Journal.* (March, 2006), reprinted in *Owen Manager* (2006) and in *Proceedings of the I Lisbon Conference on Competition Law and Economics* (Kluwer Law International, forthcoming).

44. Abrantes-Metz, Rosa, Luke Froeb, John Geweke, Christopher Taylor, A Variance Screen for Collusion, *International Journal of Industrial Organization*, 24 (May, 2006) 467-486. SSRN:

45. Cooper, James, Luke Froeb, Daniel O'Brien, and Michael Vita, Vertical Antitrust Policy as a Problem of Inference, *International Journal of Industrial Organization*, 23 (2005) 639–664. SSRN
    - Comment by John Comanor, Frederick Scherer, and Robert Steiner
    - Reply by authors
    - Rejoinder by John Comanor, Frederick Scherer, and Robert Steiner

46. Cooper, James, Luke Froeb, Daniel O'Brien, and Michael Vita, A Comparative Study of United States and European Union Approaches to Vertical Policy, *George Mason Law Review*, 13:2 (Winter, 2005) 289-308. SSRN

47. Cooper, James, Luke Froeb, Daniel O'Brien, and Michael Vita, Vertical Restraints and Antitrust Policy: What about the Evidence? *Competition Policy International*, 1:2 (Autumn, 2005) 45-64. SSRN
    - Comment by Frederick Scherer (2005)
    - Comment by Ralph Winter (2005)
    - Reply by authors (2006)
    - Rejoinder by Ralph Winter (2006)

48. Auctions, Evidence, and Antitrust, in *Econometrics: Legal Practical and Technical Issues*, John Harkrider (ed.), ABA Section on Antitrust Law, 2005. (with Mikhael Shor).

49. Merger Simulation, in *Econometrics: Legal, Practical, and Technical Issues*, John D. Harkrider (ed.), ABA Section of Antitrust Law, 2005, p. 269 (with Steven Tschantz and Gregory Werden).

50. Froeb, Luke, James Cooper, Mark Frankena, Paul Pautler, and Louis Silvia, Economics at the FTC: Cases and Research with a Focus on Petroleum, *Review of Industrial Organization*, 26 (2005) 1-30.

51. Froeb, Luke and Steven Tschantz, and Gregory Werden, Pass-Through Rates and the Price Effects of Mergers, *International Journal of Industrial Organization*, 23 (2005) 703-715. SSRN.

52. Werden, Gregory J., Luke M. Froeb and Steven Tschantz, The Effects of Merger Efficiencies on Consumers, *European Competition Journal*, 1:2 (October, 2005) 245-264. SSRN.

53. Werden, Gregory and Luke Froeb, The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy, *Journal of Law, Economics, & Organization*, 10 (1994) 407-426, reprinted in *Antitrust and Competition Policy* (Andrew N. Kleit ed., 2005)

54. Cooper, James, Luke Froeb, Daniel O'Brien and Steven Tschantz, Does Price Discrimination Intensify Competition? Implications for Antitrust, *Antitrust Law Journal*, 72:2 (2005) 327-374.

**Dec 12, 2025**

55. Froeb, Luke, Daniel Hosken, Janis Pappalardo, Economics Research at the FTC: Information, Retrospectives, and Retailing, *Review of Industrial Organization*, 25:4 (Dec., 2004) 353-374. SSRN

56. Werden, Gregory J., Luke M. Froeb, and David T. Scheffman, A *Daubert* Discipline for Merger Simulation, *Antitrust*, 18:3 (Summer, 2004) 89-95.

57. Werden, Gregory J., Luke M. Froeb and David T. Scheffman, Whither Merger Simulation?, *Antitrust Source*, (May, 2004).

58. Froeb, Luke, Steven Tschantz & Philip Crooke, Bertrand Competition with Capacity Constraints: Mergers Among Parking Lots, *Journal of Econometrics* 113(1) (March, 2003) 49-67.

59. Froeb, Luke and Steven Tschantz, Mergers Among Bidders with Correlated Values in *Economic Issues in Measuring Market Power--Contributions to Economic Analysis*, Vol. 255, edited by Daniel J. Slottje, Amsterdam: North-Holland Publishing, 2002, 31-46.

60. Werden, Gregory, and Luke Froeb, The Antitrust Logit Model For Predicting Unilateral Competitive Effects, *Antitrust Law Journal*, 70(1), (2002).

61. Werden, Gregory, and Luke Froeb, Calibrated Economic Models Add Focus, Accuracy, and Persuasiveness to Merger Analysis in the *Pros and Cons of Merger Control*, edited by the Swedish Competition Authority, Swedish Competition Authority, Stockholm, 2002. SSRN

62. Froeb, Luke, and Bruce Kobayashi, Evidence Production in Adversarial vs. Inquisitorial Regimes, *Economics Letter*s 70(2), (2001) 267-272. SSRN

63. Werden, Gregory J., Luke M. Froeb, and James Langenfeld, Lost Profits from Patent Infringement: The Simulation Approach, *International Journal of the Economics of Business*, 7(2) (July, 2000) 213-227.

64. Froeb, Luke, Book Review of *Modern Competitive Analysis* by Sharon Oster, *Managerial and Decision Economics,* 21:5 (July-Aug., 2000) 209-210.

65. Crooke, Philip, Luke Froeb & Steven Tschantz, Teaching MBA Students to Compete in Simulated Oligopoly Environments, *Interactive Learning*, Vignettes from America's most Wired Campuses, edited by Donald Brown, (Anker Publishing: Bolton, MA, 2000) 141-143.

66. Froeb, Luke, and Gregory Werden, An Introduction to the Symposium on the Use of Simulation in Applied Industrial Organization, *International Journal of the Economics of Business*, 7(2) (July, 2000) 133-137.

67. Brannman, Lance, and Luke Froeb, Mergers, Cartels, Set-Asides and Bidding Preferences in Asymmetric Second-price Auctions, *Review of Economics and Statistics*, 82(2) (2000) 283-290.

68. Tschantz, Steven, Philip Crooke, and Luke Froeb, Mergers in Sealed vs. Oral Auctions, *International Journal of the Economics of Business*, 7(2) (July, 2000) 201-213.

69. Werden, Gregory J., Luke M. Froeb, and Lucian Wayne Beavers, Economic Analysis of Lost Profits from Patent Infringement With and Without Noninfringing Substitutes, *American Intellectual Property Law Association Quarterly Journal*, 27 (1999) 305-333. SSRN

70. Werden, Gregory J., Lucian Wayne Beavers, and Luke M. Froeb, Quantity Accretion--The Mirror Image of Price Erosion from Patent Infringement, *Journal of the Patent and Trademark Office Society*, 81 (1999) 479-482.

71. Crooke, Philip, Luke Froeb, Steven Tschantz, and Gregory Werden The Effects of Assumed Demand Form on Simulated Post-Merger Equilibria, *Review of Industrial Organization*, 15(3), (November, 1999) 205-217.

72. Crooke, Philip, Luke Froeb and Steven Tschantz, Maximum Likelihood Estimation, *Mathematica in Education and Research*, 8(1) (winter, 1999) 17-23.

73. Froeb, Luke, Log Spectral Analysis: Variance Components in Asset Prices, in *Computational Economics and Finance: Modeling and Analysis with Mathematica*, edited by Hal Varian (TELOS, Springer-Verlag) 1996.

74. Froeb, Luke, and Gregory Werden, Simulating Mergers among Noncooperative Oligopolists, in *Computational Economics and Finance: Modeling and Analysis with Mathematica,* edited by Hal Varian (TELOS, Springer-Verlag) 1996.

75. Werden, Gregory, and Luke Froeb, The Entry-Inducing Effects of Horizontal Mergers, *Journal of Industrial Economics*, 46:4 (1998) 525-543.

76. Froeb, Luke and Gregory Werden, A Robust Test for Consumer Welfare Enhancing Mergers Among Sellers of a Homogeneous Product, *Economics Letters*, 58 (1998) 267-269.

77. Cooil, Bruce, and Luke Froeb, A Difference Estimator for Testing Equality of Variances for Paired Time Series, *Journal of Time Series Analysis,* 19(3) (May, 1998) 285-290. [SSRN]:

78. Werden, Gregory, and Luke Froeb, Correlation, Causality, and all that Jazz: the Inherent Shortcomings of Price Tests for Antitrust Market Delineation, *Review of Industrial Organization,* 8 (June, 1993) 329-354; reprinted in the *Journal of Reprints for Antitrust Law and Economics*, 28(1) (1998) p. 175.

79. Froeb, Luke and Gregory Werden, Residual Demand Estimation for Market Delineation: Complications and Limitations, *Review of Industrial Organization,* 6 (1991) 33-48, reprinted in the *Journal of Reprints for Antitrust Law and Economics*, 28(1) (1998) p. 357.

80. Crooke, Philip, Luke Froeb & Steven Tschantz, Pedagogy using *Mathematica* through the Web *ALN Magazine*, vol. 2:2, Oct., 1998. ([link])

81. Froeb, Luke, Timothy Tardiff, and Gregory Werden, The Demsetz Postulate and the Effects of Mergers in Differentiated Products Industries, *Economic Inputs, Legal Outputs: The Role of Economists in Modern Antitrust,* London: John Wiley & Sons, edited by Fred McChesney, 1998.

82. Crooke, Philip, Luke Froeb & Steven Tschantz, Simulate Mergers On-Line, *Antitrust* 11 (1997) 29.

83. Werden, Gregory, Luke Froeb, and Timothy Tardiff, The Use of the Logit Model in Applied Industrial Organization, *International Journal of the Economics of Business*, vol. 3, no. 1, (1996) 85-107.

84. Werden, Gregory, and Luke Froeb, Simulation as an Alternative to Structural Merger Policy in Differentiated Products Industries, chapter 4 in *The Economics of the Antitrust Process,* edited by Malcolm Coate and Andrew Kleit, Boston: Kluwer Academic Press, 1996.

85. Froeb, Luke, and Bruce Kobayashi, Naive, Biased, yet Bayesian: Can Juries interpret Selectively-Produced Evidence. *Journal of Law, Economics, & Organization,* vol. 12, no. 1 (1996) 257-276; reprinted in *Economics of Evidence, Procedure and Litigation (*edited by Chris W. Sanchirico, Edward Elgar, forthcoming).

86. Froeb, Luke, Richard W. Oliver, and David Weiskopf, Geographic Variation in Internet Connectivity, Papers & Proceedings of the Twenty Ninth IEEE *Hawaii International Conference on Systems Sciences*, vol. 29, 1996.

87. Froeb, Luke, Book Review of *Business Economics* by Maria Moschandreas, *Managerial and Decision Economics*, 16:1 (Jan-Feb, 1995) 93-94.

88. Froeb, Luke, & Robert Koyak, Measuring and Comparing Smoothness in Time Series: The Production Smoothing Hypothesis, *Journal of Econometrics,* 64 (1994) 97-122.

89. Froeb, Luke, Robert Koyak & Gregory Werden. What is the Effect of Bid-Rigging on Prices? *Economics Letters,* 42 (1993) 419-423. [link]

90. Evans, William, Luke Froeb, and Gregory Werden, Endogeneity in the Concentration-Price Relationship: Causes, Consequences, and Cures, *Journal of Industrial Economics,* 41 (September, 1993) 1-8.

91. Froeb, Luke, The Adverse Selection of Cases for Trial, *International Review of Law and Economics,* 13(3), (June, 1993) 317-324

92. Froeb, Luke and Gregory Werden, The Reverse Cellophane Fallacy in Market Delineation, *Review of Industrial Organization,* 7 (1992) 241-247.

93. Froeb, Luke, Evaluating Mergers in Durable Goods Industries, *Antitrust Bulletin,* 34 (Spring, 1989) 99-119.

94. Froeb, Luke, and John Geweke, Long Run Competition in the Post-war U.S. Aluminum Industry, *International Journal of Industrial Organization,* 5 (1987)

**Software**

[CompetitionToolBox.com], a suite of vertical and horizontal merger model and trade models to simulate the effects of mergers and trade barriers.

Crooke, Philip, Luke Froeb, and Steven Tschantz, SimMerger™, a *Mathematica* package that simulates the effects of mergers, commissioned by the U.S. Department of Justice (1998).

[LearnRegression.com], interactive software that teaches regression analysis to lay persons (1993)

**Policy Advocacy**

2009
- **Ticketmaster/LiveNation Merger**
  Written Testimony of Luke Froeb before the House Subcommittee on Courts and Competition Policy on the Ticketmaster/Live Nation Proposed Merger.

2006
- **Antitrust, *per se* Unlawfulness of Resale Price Maintenance**
  Brief of *Amici Curiae* Economists in Support of Petitioner, et al., Leegin. v. PSKS, 75 U.S.L.W. 3207 (U.S. Nov. 3, 2006) (No. 06-480) (On Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit).

- **FCC, Media Ownership Rules**
  2006 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 06-121, Joint Declaration of Luke Froeb, Padmanabhan Srinagesh and Michael Williams in support of Comments of Hearts-Argyle Television, Inc.

- **Antitrust, Burden of Proof**
  Brief of *Amici Curiae* Economists in Support of Petitioner, et al., Bell Atl. Corp. v. Twombly, 74 U.S.L.W. 3517 (U.S. Apr. 6, 2006) (No. 05-1126) (On Writ of Certiorari to the United States Court of Appeals for the Second Circuit).
  - WSJ Editorial supporting certiorari

2005
- **Fraud, Government Symbols**
  FTC Staff Comment to the United States Mint Concerning Civil Penalties for Misuse of Mint Words, Letters, Symbols, and Emblems (Mar. 2005) (V050005)
  - News Releasex
- **Optometry**
  FTC Staff Comment to the Honorable Harry R. Purkey Concerning Virginia H.B. 2518, H.B. 160, and S.B. 272 Relating to the Practice of Optometry (Mar. 2005) (V050004)
  - News Release
- **Health Care, Pharmacy Benefit Managers**
  FTC Staff Comment to the Honorable Richard L. Brown Concerning North Dakota H.B. 1332 to Regulate the Contractual Relationship Between Pharmacy Benefit Managers and Covered Entities (Mar. 2005) (V050003)
  - News Release
  - News Release

2004
- **Contact Lenses**
  FTC Staff Comment to the Honorable Doug Matayo Concerning Arkansas H.B. 2286 and the Fairness to Contact Lens Consumers Act and Contact Lens Rule (Oct. 2004) (V040026)
  - News Release
- **Housing, Real Estate**
  FTC Staff and Department of Justice Antitrust Division Comment to the Honorable Paul Kujawski Concerning Proposed Massachusetts H.B. 180 to Authorize Non-Attorneys to Perform Certain Real Estate Settlement Services (Oct. 2004) (V040025)
  - News Release
- **Health Care, Pharmacy Benefit Managers**
  FTC Comment to the Honorable Greg Aghazarian Concerning California A.B. 1960 Requiring Pharmacy Benefit Managers to Make Specified Disclosures to "Purchasers" and "Prospective Purchasers" Regarding Revenues and Drug Formularies (Sep. 2004) (V040027)
  - News Release

Dec 12, 2025

- **Labeling, Food**
  FTC Staff Comment Before the Food and Drug Administration Concerning Nutrient Claims (Jul. 2004) (V040020)
  - News Release
- **Gasoline**
  FTC Staff Comment to the Honorable Gene DeRossett Concerning Michigan H.B. 4757, the "Petroleum Marketing Stabilization Act"(Jun. 2004) (V040019)
  - News Release
- **Labeling, Pharmaceuticals, Medical Devices**
  FTC Staff Comment Before the Food and Drug Administration Concerning Consumer-Directed Promotion (May 2004) (V040016)
  - News Release
- **Labeling, Food**
  FTC Staff Comment Before the Food and Drug Administration Concerning Food Labeling: Trans Fatty Acids in Nutrition Labeling (Apr. 2004) (V030017)
  - News Release
  - News Release
- **Health Care, Pharmaceuticals**
  FTC Staff Comment to the Honorable Patrick C. Lynch and Honorably Juan M. Pichardo Concerning the Competitive Effects of Rhode Island General Assembly Bills Containing Pharmaceutical "Freedom of Choice" and "Any Willing Provider" Provisions (Apr. 2004) (V040013)
  - News Release
- **Funeral Homes**
  FTC Staff Comment to the Honorable Joanne C. Benson Concerning Maryland H.B. 795 Regarding Corporate Ownership of Funeral Homes (Apr. 2004) (V040011)
  - News Release
- **Internet Commerce, Contact Lenses**
  Possible Anticompetitive Barriers to E-Commerce: Contact Lenses: A Report from the Staff of the Federal Trade Commission (Mar. 2004) (V040007)
  - News Release
- **Internet Commerce, Alcohol**
  FTC Staff Comment to the Honorable William Magee et al. Concerning New York A.B. 9560-A; S.B. 606-A; and S.B. 1192 to Allow Out-of State Vendors to Ship Wine Directly to New York Consumers (Mar. 2004) (V040012)
  - News Release
- **Gasoline**
  FTC Staff Comment to the Honorable Les Donovan Concerning Kansas H.R. 2330 Prohibiting a "Marketer" or "Retailer" From Selling Motor Fuel Below Cost (Mar. 2004) (V040009)
  - News Release
- **Gasoline**
  FTC Staff Comment to the Honorable Demetrius C. Newton Concerning the Alabama Fuels Marketing Act (Jan. 2004) (V040005)
  - News Release
- **Labeling, Food**
  FTC Staff Comment Before the Food and Drug Administration Concerning Labeling: Health Claims; Dietary Guidance (Jan. 2004) (V040006)
  - News Release
- **Commodity Future Exchanges**
  FTC Comment Before the Commodity Futures Trading Commission Regarding the Application of U.S. Futures Exchange, LLC for Contract Market Designation (Jan. 2004) (V040004)
  - News Release