## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA and UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY,

*Plaintiffs*,

v.

STATE OF VERMONT, et al.,

*Defendants*,

and

NORTHEAST ORGANIC FARMING ASSOCIA-
TION OF VERMONT AND CONSERVATION
LAW FOUNDATION,

*Intervenor-Defendants*.

No. 2:25-cv-00463

## PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION
## TO CROSS-MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................2

I.  This Case Presents A Justiciable Controversy, And The United States Has
    Authority To Seek Equitable Relief..................................................................2

    A.  The United States Has Standing. ...............................................................3

    B.  This Suit Is Ripe.........................................................................................11

    C.  The United States Has Authority to Sue in Equity. ................................14

II.  The Clean Air Act Preempts The Superfund Act. .........................................17

    A.  The Clean Air Act Does Not Authorize Vermont to Impose
        Liability Under Vermont Law for Out-of-State Greenhouse Gas
        Emissions. ..................................................................................................18

        1.  Vermont is unable to distinguish *City of New York*...................19

        2.  There is no distinction between regulation and
            compensation in this context, and the Superfund Act
            regulates ongoing emissions as a matter of law.........................23

        3.  Because federal law must govern interstate air emissions,
            both state common law and state statutes are preempted. ........29

    B.  The Superfund Act Unlawfully Intrudes into the Field of Interstate
        Emissions and Conflicts with the Clean Air Act. ..................................30

III.  The Superfund Act Defies Constitutional Limits On Extraterritorial
      Regulation. ......................................................................................................36

    A.  The Constitution Precludes the Superfund Act Because It Imposes
        Liability for Greenhouse Gas Emissions Originating Out of State......36

    B.  The Superfund Act Exceeds the Territorial Limits of Vermont's
        Legislative Power........................................................................................37

IV.  The Foreign Affairs Doctrine Preempts The Superfund Act. ...........................42

i

A.      The Superfund Act Intrudes into the Field of Foreign Affairs
        Without Addressing a Traditional State Responsibility........................................42

B.      The Superfund Act Conflicts with U.S. Foreign Policy. .......................................44

V.      The Superfund Act Violates The Commerce Clause.............................................................51

VI.     The Superfund Act Is Facially Invalid..................................................................................53

CONCLUSION...........................................................................................................................53

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Alden v. Maine,*
527 U.S. 706 (1999) ................................................................................................... 15, 16

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ................................................................................................... 3, 5, 7

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) ......................................................................................... 52

*Am. Elec. Power Co., Inc. (AEP) v. Connecticut,*
564 U.S. 410 (2011) ................................................................................................... passim

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ................................................................................................... passim

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................................................... passim

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015) ................................................................................................... 14, 15

*Ass'n for Accessible Meds. v. Ellison,*
140 F.4th 957 (8th Cir. 2025) ................................................................................... 51

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014) ........................................................................................ 11

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996) ................................................................................................... 24

*Boyle v. United Techs. Corp.,*
487 U.S. 500 (1988) ................................................................................................... 33, 36, 37, 45

*Calder v. Jones,*
465 U.S. 783 (1984) ................................................................................................... 39

*City of Charleston v. Brabham Oil Co.,*
2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025) ............................................... 37

*City of Milwaukee v. Illinois and Michigan,*
451 U.S. 304 (1981) ................................................................................................... 20, 37

*City of New York v. Beretta U.S.A. Corp.*,
   315 F. Supp. 2d 256 (E.D.N.Y. 2004) .................................................................. 39

*City of New York v. Chevron Corp.*,
   993 F.3d 81 (2d Cir. 2021) ................................................................................ passim

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .............................................................................................. 11

*Connecticut v. Am. Elec. Power Co., Inc.*,
   Case No. 1:04-cv-05669 (S.D.N.Y. Dec. 6, 2011), Dkt. No. 94 ............................ 21

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) .................................................................... 47, 48, 49, 53

*Ctr. for Biological Diversity  v. EPA*,
   141 F.4th 153 (D.C. Cir. 2025) ............................................................................ 30

*Diamond Alt. Energy, LLC v. EPA*,
   606 U.S. 100 (2025) .............................................................................................. 10

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) .............................................................................................. 52

*EduMoz, LLC v. Republic of Mozambique*,
   968 F. Supp. 2d 1041 (C.D. Cal. 2013) ............................................................... 51

*EPA v. EME Homer City Generation, L.P.*,
   572 U.S. 489 (2014) .............................................................................................. 35

*Ex Parte Young*,
   209 U.S. 123 (1908) .............................................................................................. 15

*Exxon Corp. v. Governor of Maryland*,
   437 U.S. 117 (1978) .............................................................................................. 52

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ........................................................................................ 32, 33

*FEC v. Cruz*,
   596 U.S. 289 (2022) ........................................................................................ 6, 13

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
   592 U.S. 351 (2021) ........................................................................................ 41, 42

*Franchise Tax Bd. of Cal. v. Hyatt*,
  587 U.S. 230 (2019) ................................................................................ 36, 37

*Fuld v. Palestine Liberation Org.*,
  606 U.S. 1 (2025) ........................................................................................ 37

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
  988 F.3d 114 (2d Cir. 2021) ....................................................................... 51

*Heckman v. United States*,
  224 U.S. 413 (1912) .................................................................................... 16

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................................................ 45

*Illinois v. City of Milwaukee*,
  406 U.S. 91 (1972) .......................................................................... 18, 29, 36

*Illinois v. City of Milwaukee*,
  731 F.2d 403 (7th Cir. 1984) ................................................................. 20, 39

*In re Assicurazioni Generali, S.P.A.*,
  592 F.3d 113 (2d Cir. 2010) ........................................................... 43, 46, 47

*In re Debs*,
  158 U.S. 564 (1895) ............................................................................. passim

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013) ..................................................................... 11, 13

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) .............................................................................. passim

*Japan Line, Ltd. v. Cnty. of Los Angeles*,
  441 U.S. 434 (1979) .................................................................................... 52

*Kentucky v. Yellen*,
  54 F.4th 325 (6th Cir. 2022) ......................................................................... 6

*Kumar v. Republic of Sudan*,
  880 F.3d 144 (4th Cir. 2018) ....................................................................... 45

*Kurns v. R.R. Friction Prods. Corp.*,
  565 U.S. 625 (2012) .................................................................................... 24

*Lexington Ins. Co. v Rounds*,
   349 F. Supp. 2d 861 (D. Vt. 2004) .......................................................................... 50

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ............................................................................................... 7

*Medellin v. Texas*,
   552 U.S. 491 (2008) .............................................................................................. 46

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988) ...................................................................... 45

*Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.*,
   425 U.S. 463 (1976) ............................................................................................... 5

*Movsesian v. Victoria Versicherung AG*,
   670 F.3d 1067 (9th Cir. 2012) ................................................................ 42, 43, 44

*N.Y. Pet Welfare Ass'n, Inc. v. City of New York*,
   850 F.3d 79 (2d Cir. 2017) ................................................................................... 52

*Nat. Res. Def. Council (NRDC) v. NHTSA*,
   894 F.3d 95 (2d Cir. 2018) ............................................................................ 24, 25

*Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999),
   *aff'd sub. nom. Crosby*, 530 U.S. 363 (2000) ..................................................... 53

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023) ...................................................................... 37, 38, 51

*Regan v. Wald*,
   468 U.S. 222 (1984) .............................................................................................. 45

*Saleh v. Titan Corp.*,
   580 F.3d 1 (D.C. Cir. 2009) ................................................................ 44, 46, 47

*Sanitary Dist. of Chi. v. United States*,
   266 U.S. 405 ............................................................................................ 15, 16, 17

*Simmonds v. INS*,
   326 F.3d 351 (2d Cir. 2003) ................................................................................. 12

*Stauffer v. Brooks Bros., Inc.*,
   619 F.3d 1321 (Fed. Cir. 2010) .............................................................................. 3

*Sys. Application & Techs., Inc. v. United States*,
    691 F.3d 1374 (Fed. Cir. 2012) ........................................................................ 13

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ......................................................................................... 20

*Texas v. United States*,
    523 U.S. 296 (1998) ......................................................................................... 13

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ......................................................................................... 14

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ........................................................................ 16

*United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011),
    *rev'd on other grounds*, 567 U.S. 387 (2012) ................................................ 4, 12

*United States v. Articles of Banned Hazardous Substances Consisting of an*
    *Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91 (2d Cir. 1994) ........ 50, 51

*United States v. Bd. of Cnty. Comm'rs of Cnty. of Otero*,
    843 F.3d 1208 (10th Cir. 2016) ........................................................................ 16

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ........................................................................... 16

*United States v. California*,
    2020 WL 8183945 (E.D. Cal. Feb. 26, 2020) ...................................................... 5

*United States v. City of Arcata*,
    629 F.3d 986 (9th Cir. 2010) ........................................................................... 16

*United States v. Idaho*,
    623 F. Supp. 3d 1096 (D. Idaho 2022) ............................................................ 4, 7

*United States v. Locke*,
    529 U.S. 89 (2000) ...................................................................................... 18, 19

*United States v. Minnesota*,
    270 U.S. 181 (1926) .................................................................................... 15, 16

*United States v. Missouri*,
    114 F.4th 980 (8th Cir. 2024) ...................................................................... 16, 17

*United States v. S. Carolina*,
  720 F.3d 518 (4th Cir. 2013) ...................................................................... 16

*United States v. Stanley*,
  483 U.S. 669 (1987) ...................................................................................... 15

*United States v. State Water Res. Control Bd.*,
  988 F.3d 1194 (9th Cir. 2021) .................................................................... 16

*United States v. Supreme Ct. of N.M.*,
  839 F.3d 888 (10th Cir. 2016) ............................................................... 16, 17

*United States v. Texas*,
  566 F. Supp. 3d 605 (W.D. Tex. 2021) ...................................................... 15

*United States v. Texas*,
  719 F. Supp. 3d 640 (W.D. Tex. 2024) ........................................................ 4

*United States v. Washington*,
  596 U.S. 832 (2022) ...................................................................................... 16

*United States v. West Virginia*,
  295 U.S. 463 (1935) ........................................................................................ 5

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021) ...................................................................................... 10

*Va. Off. for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011) ................................................................................. 14, 15

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) .................................................................................... 3, 4

*Wachovia Bank, N.A. v. Burke*,
  414 F.3d 305 (2d Cir. 2005) ........................................................................ 18

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................................ 6

*Whiteman v. Dorotheum GmbH & Co. KG*,
  431 F.3d 57 (2d Cir. 2005) .......................................................................... 45

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967) ................................................................................. 14, 15

*Wyoming ex rel. Crank v. United States*,
   539 F.3d 1236 (10th Cir. 2008) ................................................................. 5

*Young v. Masci*,
   289 U.S. 253 (1933) ................................................................................. 39, 40

*Zschernig v. Miller*,
   389 U.S. 429 (1968) ....................................................................................... 44

**Statutes**

42 U.S.C. § 7411 .............................................................................................. 33

42 U.S.C. 7521 ........................................................................................... 30, 33

42 U.S.C. § 7416 .............................................................................................. 31

42 U.S.C. § 7545 ........................................................................................ 30, 33

42 U.S.C. § 7546 ........................................................................................ 30, 33

42 U.S.C. § 7604(e) .......................................................................................... 31

42 U.S.C. § 7675 .............................................................................................. 33

Vt. Stat. Ann. tit. 10, § 596(7) ............................................................. 19, 34, 38

Vt. Stat. Ann. tit. 10, § 596(10) ................................................................. 44, 49

Vt. Stat. Ann. tit. 10, § 596(22) ........................................................... 34, 41, 44

Vt. Stat. Ann. tit. 10, § 598(b) ........................................................................ 34

Vt. Stat. Ann. tit. 10, § 598(f) ........................................................................ 11

Vt. Act No. 47 (H. 231) 2025 .......................................................................... 11

N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105 .......................................... 28

Pub. L. No. 100-204, 101 Stat. 1331 (1987), reprinted as note to 15 U.S.C. § 2901 .................. 47

**Rules**

Fed. R. Civ. P. 56(c)(4) .................................................................................... 50

**Other Authorities**

*Putting America First in International Environmental Agreements*,
    Exec. Order No. 14162, 90 Fed. Reg. 8,455 (Jan. 20, 2025) ................................................... 48

Louis Kaplow, *An Economic Analysis of Legal Transitions*,
    99 Harv. L. Rev. 509 (1986) ........................................................................................ 8

Tara Leigh Grove, *Standing As an Article II Nondelegation Doctrine*,
    11 U. Pa. J. Const. L. 781 (2009) ................................................................................ 3

## INTRODUCTION

Vermont cannot hold fossil-fuel producers "liable, under [Vermont] law, for the effects of [greenhouse gas] emissions made around the globe." *City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021). But it is undisputed that Vermont's Climate Superfund Act does exactly that. That resolves this case. The Clean Air Act and Foreign Affairs Doctrine preempt the Superfund Act, and the Constitution precludes it.

In Vermont's view, states *can* impose liability on energy producers under state law for alleged injuries caused by global emissions—so long as they do so by enacting *statutes* rather than by filing *tort suits*. The question here is whether the Superfund Act's liability regime, which concededly could not be imposed through a tort suit, is somehow revived because Vermont codified it in a statute. Law and logic confirm that the intuitive answer is the right one: States cannot use in-state law to impose liability for out-of-state emissions, regardless of the source of in-state law.

Vermont's contrary position rests (mostly) on a supposed distinction that *City of New York* rejected as illusory: regulating emissions, on the one hand, and compensating for harm caused by emissions on the other. That rejection is binding here, notwithstanding Vermont's futile attempt to turn this legal issue into a factual one with an irrelevant (and flawed) expert declaration. More than that, Vermont offers no cogent explanation for how the tort suit in *City of New York* could be about regulating emissions, while the Superfund Act—a mirror image of that tort suit—is only about compensation for harm. Nor does Vermont ever explain why this assumed difference even matters in the first place. In the end, Vermont's arguments for distinguishing *City of New York* are really arguments for *overruling* it.

This legal error taints Vermont's position on each of the United States' claims. Once the error is corrected, Vermont's case unravels, because all it has left are cramped statements of law,

1

bouts with strawmen, and misuses of expert declarations. Again, common sense is decisive here: Vermont may not do by statute what it cannot do by tort suit.

For their part, the Intervenor-Defendants (the "Intervenors") add nothing to Vermont's arguments—besides rehashing their misguided challenge to the United States' ability to bring this lawsuit. They also admit the obvious implication of their (and Vermont's) arguments: Every state is free to pass a law identical to the Superfund Act, and so long as liability is retroactive, nothing prevents Vermont and other states from repeatedly amending their statutes to reach post-2024 fossil fuel production and emissions. That would nullify the federal government's authority over the national energy market—by destroying that market.

The Court should grant the United States' motion for summary judgment and deny Vermont's and the Intervenors' cross-motions. And the Court should do so even though Vermont has tried to create fact disputes by filing two expert declarations. None of the purported "facts" offered by those declarations is material to the resolution of these motions, which present purely legal issues controlled by binding precedent. Accordingly, the Court need not wade into any fact disputes to decide this case. The Superfund Act fails as a matter of law.

## ARGUMENT

### I.    This Case Presents A Justiciable Controversy, And The United States Has Authority To Seek Equitable Relief.

The Intervenors double-down on their view that the United States is powerless to defend its sovereignty against Vermont's unconstitutional attempt to usurp federal authority. That position is meritless. This case presents a justiciable controversy, and the United States has authority to bring this suit in equity.

2

### A.    The United States Has Standing.

The Superfund Act injures the United States in three ways.  Each independently suffices for standing.

**Sovereign interests.**  The Intervenors do not (and cannot) contest that the United States has standing when it suffers an "injury to its sovereignty arising from violation of its laws."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (recognizing "beyond doubt" that the United States has standing in such cases).  When a state violates federal law by enacting a preempted and unconstitutional statute, it causes concrete harm to the United States' sovereign interest in "creat[ing] and enforc[ing] a legal code," as well as in having that code "recogni[zed]" by "other sovereigns."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *see also Arizona v. United States*, 567 U.S. 387, 398 (2012).

The United States' sovereign interest in upholding the supremacy of federal law is no mere "abstract interest."  Dkt. No. 55 at 21 ("Int. Mem.").  Although the United States "must show injury in fact like any other litigant," Int. Mem. at 17, the United States—as sovereign—can suffer injuries that a private plaintiff cannot.  For example, "a private individual's abstract interest in seeing that the law is obeyed" does not support standing, but "the government's interest in seeing that its own law is obeyed" plainly does.  *Stauffer v. Brooks Bros., Inc*., 619 F.3d 1321, 1326 (Fed. Cir. 2010); *see also* Tara Leigh Grove, *Standing As an Article II Nondelegation Doctrine*, 11 U. Pa. J. Const. L. 781, 802 (2009) ("It has been well-established for over a century that the Executive Branch has standing to bring suit in federal court to 'see that federal law is obeyed[,]'" but "[i]t is equally well-established that private plaintiffs may not assert such an abstract grievance.").  Thus, "[f]rom the government's perspective, a harm arises from an 'injury to its sovereignty arising from violation of its laws.'"  *Stauffer*, 619 F.3d at 1326 (quoting *Vt. Agency*, 529 U.S. at 771).  This is

why violating a federal criminal statute does not cause an abstract injury to the United States but an injury that "suffices to support a criminal lawsuit by the Government." *Vt. Agency*, 529 U.S. at 771.

The Intervenors cite no authority to the contrary. Nor could they. In *Arizona*, 567 U.S. 387, for example, the Supreme Court exercised jurisdiction over a pre-enforcement suit by the United States to enjoin enforcement of a state statute based on federal preemption. In deciding the merits, the Court expressed no doubt that the United States is injured by preempted state laws, despite its obligation to assure itself of its own jurisdiction. Likewise, lower courts routinely hold that "the United States' sovereign interests are harmed when its laws are violated." *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022); *see* Dkt. No. 50-1 at 11 ("U.S. Mem.") (collecting cases). In fact, usurping exclusive federal authority not only injures the United States but inflicts "per se irreparable harm." *United States v. Texas*, 719 F. Supp. 3d 640, 695 (W.D. Tex. 2024); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd on other grounds*, 567 U.S. 387 (2012) (finding irreparable harm to the United States based on preempted state law).

Unable to deny the mountain of precedent supporting the United States' standing, the Intervenors retreat to contending that the United States fails to "identify any violation of federal law" because it "does not cite any provision of the Clean Air Act—or of any other federal statute—that has been 'violated' by the [Superfund] Act." Int. Mem. at 16. In making this argument, the Intervenors appear to assume that the United States cannot suffer injury unless it identifies a specific and discrete statutory provision that the Superfund Act violates.

But that is obviously wrong (and, again, unsupported by a single citation). States violate federal law when they enact preempted and unconstitutional statutes. Because the Superfund Act is such a statute, it violates federal law—and thus injures the United States. *See Arizona*, 567 U.S.

at 398–99 (states violate federal law and the Constitution when they enact preempted statutes); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.,* 425 U.S. 463, 474 n.13 (1976) (recognizing that the United States has standing to bring preemption claims); *United States v. California*, 2020 WL 8183945, at *3 (E.D. Cal. Feb. 26, 2020) (United States' injury was "the usurpation of federal authority to conduct foreign affairs").

Because this violation of federal law *is* an "actual impairment of a federal interest," Int. Mem. at 17, the Intervenors' reliance on *United States v. West Virginia* is misplaced. There was no "actual or threatened interference with the authority of the United States" in that case because the federal government, "[a]t most," had alleged "a difference of opinion between" it and a state government over certain water rights. 295 U.S. 463, 469, 473 (1935). Unlike here, no federal law was alleged to have been violated.

In addition, the Superfund Act interferes with the United States' enforcement of federal law because it imposes retroactive strict liability for interstate and global greenhouse gas emissions, which conflicts with the federal government's own regulatory regime. Put differently, the Superfund Act siphons (what will surely be) billions of dollars from an entire industry for activity that falls under the exclusive regulatory authority of the federal government. That, too, is a concrete impairment of a federal interest. *See Snapp*, 458 U.S. at 601 (the United States, like each state, has a legally protected sovereign interest in "the exercise of sovereign power over individuals and entities within [its] jurisdiction"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (injury in fact based on a competing claim of sovereignty that invaded interest in exercising sovereign power over subjects within jurisdiction).

In fact, this interest parallels the one at issue in *In re Debs*, 158 U.S. 564 (1895). There, the Supreme Court emphasized that the Constitution assigns the federal government "power over

interstate commerce" and that Congress had legislated to assume jurisdiction over rail commerce. *Id.* at 581.  Similarly, the Constitution and Clean Air Act vest the federal government with exclusive authority over nationwide and global greenhouse gas emissions.  As in *Debs*, it therefore "follows" that the federal government has a concrete interest in preventing "any unlawful and forcible interference" with that authority.  *Id.*

Finally, to the extent that the Intervenors challenge standing based on their view that the Superfund Act does not violate federal law or otherwise harm federal interests, *see* Int. Mem. at 16, that is a premature attempt to litigate the merits.  "For standing purposes," the Court must "accept as valid the merits of [the United States'] legal claims."  *FEC v. Cruz*, 596 U.S. 289, 298 (2022); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff 's contention that particular conduct is illegal"); *Kentucky v. Yellen*, 54 F.4th 325, 349 n.16 (6th Cir. 2022) ("it would be inappropriate for us, at the justiciability stage, to render a merits interpretation . . . and to then declare based on that merits interpretation that the controversy is not even justiciable").  That means assuming as true the United States' claims that the Superfund Act usurps federal authority by violating the Clean Air Act, the Constitution's restrictions on extraterritorial regulation, the Foreign Affairs Doctrine, and the Commerce Clause.  And it means assuming as true the United States' merits argument (developed below) that the Superfund Act is regulatory *as a matter of law* and that there is no *legal* distinction between controlling ongoing emissions and seeking compensation for harm caused by past emissions.  *See infra* at 23–29; *contra* Int. Mem. at 17 (wrongly asserting that this argument "rests on erroneous *factual* premises").

So considered, the Superfund Act's arrogation of federal authority injures the United States and gives it standing to pursue each claim.  This injury to the United States' sovereign interests suffices for standing, so the Court need not address the United States' other injuries discussed

below. But those injuries also give the United States standing; in disputing them, the Intervenors rely entirely on a facially flawed expert declaration filed by Vermont. That declaration cannot bear the weight the Intervenors place on it.

**General welfare and *parens patriae*.** The United States also has "standing" based on "injury to the general welfare." *Debs*, 158 U.S. at 584; *see also Idaho*, 623 F. Supp. 3d at 1107 ("As a general principle, the United States may sue to redress widespread injuries to the general welfare."). Relatedly, "the United States . . . represents [the American People] as parens patriae" at the federal level and has standing to assert injuries on their behalf, *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923), particularly injuries to their "economic" "health and well-being," *Snapp*, 458 U.S. at 607; *see also* U.S. Mem. at 13. The Superfund Act injures the general welfare, especially the Nation's economic well-being, by disrupting the national energy market. *See* U.S. Mem. at 14–15.

The Intervenors do not dispute these legal principles. *See* Int. Mem. at 14–16. Relying on a declaration from an economics professor, they instead argue that the United States cannot show injury because the Superfund Act allegedly will have zero effect on energy production or prices. *See* Int. Mem. at 12–15 (citing Declaration of Don Fullerton, Ph.D., Dkt. No. 53-2 ("Fullerton Decl.")). This extraordinary and counterintuitive claim is just "basic economics," the Intervenors say. Int. Mem. at 14.

Not so. *See City of New York*, 993 F.3d at 93 ("[T]he notion that financial incentives" affect environmental behavior "is hardly novel as common sense and basic economics tells us that increased cost of conduct will make that conduct less common." (cleaned up)). As explained below, Dr. Fullerton does not provide a reliable economic analysis because he ignores basic concepts and relies on a series of simplifying and results-oriented assumptions that do not hold in the real

world.  But the Court need not wade into any of that; it need only rely on common sense to see Dr. Fullerton's central folly, which is clear on the face of his declaration and requires no evidence to refute:  Dr. Fullerton's conclusions assume that the energy producers subject to the Superfund Act will make business decisions as if the Act imposes a one-time assessment based on purely past conduct.  *See* Fullerton Decl. ¶¶ 30–31.  Put another way, in Dr. Fullerton's view, a firm forced to pay billions of dollars in retroactive liability will wake up the next day and engage in the same activity—at the same levels—that gave rise to that liability.  And it will do so even though Vermont can always target that activity by expanding the covered period.

That makes no sense.  The risk of future liability will of course affect a firm's decisions related to investment, production, and prices.  *See, e.g.*, Louis Kaplow, *An Economic Analysis of Legal Transitions*, 99 Harv. L. Rev. 509, 600 (1986) ("[T]he expectation that future evolution in the law will be made applicable to harms arising . . . prior to the announcement of new rules will have a[n] . . . effect on behavior.").  Because Dr. Fullerton completely ignores how firms will respond to this risk, his conclusions rest on sand.  The Court should disregard the declaration.[1]

If more were needed, however, the United States has introduced evidence confirming what common sense already tells us.  *See generally* Rebuttal Declaration of Luke Froeb, Ph.D. ("Froeb Decl.").  To put the point above in economics terms, Dr. Fullerton "assumes a static world" in which Vermont never expands the Superfund Act's covered period to reach post-2024 fossil fuel

---

[1] The Intervenors suggest that Dr. Fullerton addressed the risk of Vermont extending the covered period to reach future production.  *See* Int. Mem. at 9 (citing Fullerton Decl. ¶ 25).  But the cited paragraph discussed the risk of *other states* passing similar statutes, not of Vermont amending *its* statute.  In all events, the paragraph underscores why the Fullerton Declaration is facially flawed and should be disregarded.  Dr. Fullerton claims that "economists have no generally accepted theory about how firms and individuals form expectations," so it is supposedly impossible to know how firms might respond to the risk of future liability if Vermont's statute is upheld.  Fullerton Decl. ¶ 25.  In other words, according to Dr. Fullerton, the economics profession has nothing to say about how the risk of liability for certain activity will affect a firm's propensity to engage in that activity.  That defies common sense and basic economics.  *See infra* at 8–9.

production and emissions.  Froeb Decl. ¶¶ 14, 23; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 5, 7.  But the world is not frozen in time, and Vermont's ability to expand its covered period—along with the ability of other states to enact similar laws, as New York has done—increases "responsible parties' risk exposure" and disincentivizes "costly, long-lived investments in future energy production."  Froeb Decl. ¶¶ 14, 19; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 7–8, 10.  What is more, "rational investors would consider . . . the risk of future liabilities" when making investment decisions and "require compensation for bearing additional risk"—also known as a "carbon premium"—which "increases the required rate of return on both equity and debt and therefore increases firms' cost of capital."  Froeb Decl. ¶¶ 27–29; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 6, 9–10.  And the cost of capital "is a key determinant of whether a firm undertakes investments that sustain and expand productive capacity."  Froeb Decl. ¶ 18; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 6, 9–10.  All this leads to less investment, lower production, and, ultimately, higher prices. Froeb Decl. ¶¶ 22, 31; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 6, 9–10.[2]

Because Dr. Fullerton fails to consider and properly analyze capital-market effects and the risk of future liabilities, his economic analysis of the Superfund Act is "incomplete" and "unreliable."  Froeb Decl. ¶¶ 33–34; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 3–10.  Accordingly, the Court should not assign the Fullerton Declaration any weight.

**Pecuniary interests.**  Finally, the United States has standing to protect its pecuniary interests from being injured by the Superfund Act.  The United States operates at both ends of the energy market.  On one end, the United States earns revenue and royalties from fossil-fuel leasing on federal lands, which generated over $13.8 billion in 2024.  Declaration of Matthew Warren

---

[2] Empirical evidence shows how legal liability can affect a firms' cost of capital.  In the wake of the Deepwater Horizon oil spill, "Standard & Poor's downgraded British Petroleum's (BP's) credit rating from AA to A, increasing BP's borrowing costs by approximately 1.75 percentage points." Froeb Decl. ¶ 20 (citation omitted); *see also id.* ¶ 21; U.S. Resp. Int. Statement of Add'l Facts ¶ 6.

("Warren Decl.") ¶¶ 4–6; U.S. Statement of Add'l Facts ¶¶ 1–4  Any decrease in leasing or production on federal lands injures the United States because it will necessarily reduce revenue.  On the other end, the United States purchases fossil fuels.  *See* U.S. Mem. at 16; Warren Decl. ¶¶ 8–9; U.S. Statement of Add'l Facts ¶¶ 5–6.  Any increase in fuel costs therefore injures the United States' pecuniary interests.  *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (even "one dollar" lost is an Article III injury).

The Intervenors fall back by arguing that the causal chain—the link between billions of dollars in liability and increased prices—is too attenuated and speculative.  *See* Int. Mem. at 13. But it is "predictable" that imposing billions of dollars in liability will "cause downstream . . . economic injuries to others in the chain," including the United States.  *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) (relying on "commonsense economic realities" in assessing causation and redressability); *see also City of New York*, 993 F.3d at 103 (relying on common sense in concluding that retroactive liability for fossil-fuel production "would presumably affect the price and production of fossil fuels").[3]  And the United States has introduced evidence confirming as much.  *See, e.g.*, Froeb Decl. ¶¶ 22, 31; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 3–10.

*     *     *

For all these reasons, the Superfund Act injures the United States.  And because those injuries will be redressed by a ruling from this Court declaring the statute unlawful and enjoining its enforcement, the United States has standing.

---

[3] The Intervenors cast aside *City of New York* because "that case involved a tort claim and thus ongoing duties, not a retroactive cost assessment with no impact on future production or prices." Int. Mem. at 14 (relying on Fullerton Declaration).  But as explained, the Intervenors are wrong that the Superfund Act will have no impact on production or prices, *see* Froeb Decl. ¶¶ 22, 31; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 3–10, and as the United States discusses below, there is no distinction between the tort claim in *City of New York* and the Superfund Act as a *legal* matter, *see infra* at 23–29.

### B.    This Suit Is Ripe.

The United States' claims are constitutionally ripe for the same reasons it has standing to sue.  *See* U.S. Mem. at 21–22.  As explained in the United States' opening brief, this dispute is not an "abstract disagreement[]" in which the United States' "injury is merely speculative and may never occur."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013).  Rather, the United States is suffering injury *now* because the Superfund Act, which has been in full effect since July 2024, usurps federal authority and violates federal law.  *See supra* at 3–7 (violation of federal law causes injury to the United States); *Arizona*, 567 U.S. 387 (pre-enforcement preemption challenge to state law).  In fact, Vermont has already taken concrete steps to implement the unlawful statute.  *See* U.S. Mem. at 21–22; *see also* Dkt. No. 52 at 3 n.2 ("Vt. Mem.") (noting that the State recently selected the consulting firm that will perform the cost as-sessment).

The United States' injury thus does not hinge on the incoming cost recovery demands that will issue to fossil-fuel producers.  But even if it did, that would be no barrier to constitutional ripeness, because those cost demands are certainly impending.  *See* Vt. Stat. Ann. tit. 10, § 598(f) (mandating that "[t]he Agency *shall issue* the cost recovery demands required under this section not later than" July 2028 (emphasis added)); Vt. Act No. 47 (H.231) Sec. 21(b) (2025); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (an "injury is not too speculative for Article III purposes" if "the injury is certainly impending"); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 105 (2d Cir. 2014) ("certainly impending" requirement for imminence applies when deciding standing and constitutional ripeness).

On prudential ripeness, most of the Intervenors' response is aimed at claims that the United States has not brought.  *See* Int. Mem. at 23–25 (arguing that the due process, takings, excessive

fines, and *Pike* theory claims are unfit for review). As relevant to the United States, the Intervenors contend only that (1) "the Court does not have sufficient information to conclude . . . that the Act will exceed extraterritorial limits . . . in every application of the statute" and (2) the Clean Air Act and constitutional claims are not "purely legal questions" but rather are "premised" on "disputed factual assertions." Int. Mem. at 25–26.

The Intervenors are wrong on both scores. First, for reasons given in the United States' opening brief, the Superfund Act exceeds the territorial limits of Vermont's authority in every application because it *necessarily* sweeps in out-of-state conduct and emissions. *See* U.S. Mem. at 27–28. Neither the Intervenors nor Vermont ever respond to this point. And there will never be a sufficient connection between this out-of-state activity and alleged in-state harm to justify the Act's extraterritorial reach. *See infra* at 39–42. Second, the United States' preemption and constitutional claims are *not* premised on disputed facts, because (*contra* Int. Mem. at 26) whether the Superfund Act regulates emissions, and whether it applies to conduct with a sufficient nexus to Vermont, are *legal* questions, not factual ones. *See* U.S. Mem. at 35–36, 47–50; *infra* at 23–29, 39–42. In short, the United States' claims are fit for review because they "would not benefit from any further factual development," and "the court would be in no better position to adjudicate the issues in the future than it is now." *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003).

The United States would also suffer hardship if Vermont could continue implementing a preempted law that usurps federal authority. Indeed, the United State suffers *irreparable* harm from the Superfund Act being in effect. *See* U.S. Mem. at 24–25 (collecting cases); *Arizona*, 641 F.3d at 366 (finding irreparable harm in pre-enforcement posture based on preempted state law). The Intervenors fault the United States for relying on cases about irreparable harm in the context of awarding injunctive relief, *see* Int. Mem. at 28 n.27, but "the standard for ripeness requires a

*lesser* showing of hardship" than the "irreparable harm" "standard for obtaining injunctive relief," *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1385 (Fed. Cir. 2012) (emphasis added). And the Intervenors badly misrepresent the holding in *Texas v. United States*, 523 U.S. 296 (1998), by splicing quoted language to suggest that a "sovereign's 'primary conduct'" must be affected to meet the hardship prong of prudential ripeness. Int. Mem. at 28. The Court held no such thing. *See Texas*, 523 U.S. at 302 (noting that the "threat to personal freedom" is "inadequate to support suit" by a *private party* unless "the person's primary conduct is affected"). It simply held that Texas had not established hardship because the mere "threat to federalism" was too much of "an abstraction" when multiple contingencies were necessary for that threat to be realized. *Id.* Here, by contrast, the United States is not suffering a mere "threat" to its sovereignty that is contingent on future events; Vermont has *already* violated its sovereignty and will continue to do so for as long as the Superfund Act remains in effect.

Vermont would also suffer hardship from delayed review—a point the Intervenors do not dispute. *See* U.S. Mem. at 26. And although the Intervenors argue that deciding this case now would harm both them and Vermont, the question is whether the *United States* would suffer hardship from *delayed* review, not whether deciding a ripe case would harm Vermont and the Intervenors. *See MTBE*, 725 F.3d at 110. The Intervenors also beg the question by assuming that adjudicating this case now would be "premature." Int. Mem. at 31. And they assume that the Superfund Act could be implemented lawfully, *see* Int. Mem. at 31, which is an assumption that the Court should not credit when determining ripeness. If anything, when deciding ripeness, the Court should accept the United States' legal argument that the Act is preempted and unconstitutional on its face (*i.e.*, in every application). *Cf. Cruz*, 596 U.S. at 298 (courts accept the merits of a plaintiff's legal claims when deciding standing). And on that view, enjoining the Act does not "short

13

circuit the democratic process" or "deny[] Vermont the opportunity to implement the Act in a manner consistent with the Constitution." Int. Mem. at 31 (cleaned up). Rather, enjoining the Act *prevents* Vermont from implementing an unlawful statute and provides legal clarity *before* Vermont takes further costly steps toward full implementation.

### C.    The United States Has Authority to Sue in Equity.

The United States may seek equitable relief to protect federal interests, including its sovereign interests. Centuries of precedent support the "general rule that the United States may sue to protect its interests," *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967), even absent an express statutory cause of action, based on the fundamental principle that "[e]very government . . . has a right to apply to its own courts for any proper assistance in the exercise of [its powers] and the discharge of [its duties]," *Debs*, 158 U.S. at 584. Here, the United States has done just that—indeed, it brings the very sort of action the Supreme Court recognized as appropriate in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015): a suit in equity to obtain injunctive relief against "state regulatory actions [that are] preempted." *Id.* at 326.

The Intervenors' only counter is that "there is no historical precedent for the United States to invoke an equitable cause of action to sue a state to pursue an abstract interest in enforcing federal law under the Supremacy Clause in the absence of . . . a concrete injury." Int. Mem. at 19. This gerrymandered response falls flat.[4] For one thing, the Intervenors load the dice—of course

---

[4] To the extent that the Intervenors demand a precise historical precedent for this suit, they misunderstand equity. *See Trump v. CASA, Inc.*, 606 U.S. 831, 841, 846–47 (2025) ("Equity is flexible" and requires a "sufficiently analogous" antecedent, not "an exact historical match" (cleaned up)). And besides, as the United States shows, there is a long tradition of the federal government seeking equitable relief against states to vindicate the supremacy of federal law, which is all the United States seeks to do here.

Relatedly, the Intervenors are wrong if they believe that only private plaintiffs have authority to sue in equity. *See Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011) (the authority to sue does not "turn on the identity of the plaintiff"). "The United States may, as may any private

14

there is no historical precedent for a suit in equity "in the absence of a concrete injury," as there would be no standing in such a suit. Because the Intervenors are simply repackaging their meritless standing argument, rejecting that argument would also dispense with their only argument against the United States' authority to sue.

In any event, the Supreme Court has broadly recognized non-statutory authority to sue in equity "to enjoin unconstitutional actions by state and federal officers." *Armstrong*, 575 U.S. at 327. The United States' suit here, which seeks traditional relief against those responsible for enforcing an unlawful state statute, is thus consistent with "a long history of judicial review of illegal executive action, tracing back to England." *Id.*; *see also Ex parte Young*, 209 U.S. 123, 155–56 (1908) (recognizing suit in equity to enjoin enforcement of unconstitutional state law); *United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[R]edress designed to halt or prevent [a] constitutional violation" is a "traditional form[] of relief" that "d[oes] not ask the Court to imply a new kind of cause of action." (cleaned up)). *Debs*, for instance, teaches that the United States can sue in equity to prevent unlawful interference with the National government's authority. 158 U.S. at 581–82, 584. And that is so even if "the government has no pecuniary interest in the controversy," *id.* at 586, though the United States *does* have a pecuniary interest here, *see supra* at 9–10.

Nor is there anything novel about the United States suing a state in equity. "[T]he Constitution contemplates suits among the members of the federal system," including suits "commenced and prosecuted against a State in the name of the United States." *Alden v. Maine*, 527 U.S. 706,

plaintiff with standing, resort to equity to protect its interests." *United States v. Texas*, 566 F. Supp. 3d 605, 647 (W.D. Tex. 2021); *see, e.g.*, *Debs*, 158 U.S. at 584; *Wyandotte*, 389 U.S. at 201; *United States v. Minnesota*, 270 U.S. 181, 194 (1926) (recognizing United States' "right to invoke the aid of a court of equity in removing unlawful obstacles to the fulfillment of its obligations"); *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 425–26 (1925) ("The Attorney General by virtue of his office may bring this proceeding and no statute is necessary to authorize the suit.").

755–56 (1999). Consistent with that fact, the United States repeatedly brings suits in equity against states and localities when necessary to vindicate federal interests, including its sovereign interest in upholding the supremacy of federal law. *See, e.g.*, *Arizona*, 567 U.S. 387; *United States v. Washington*, 596 U.S. 832 (2022); *United States v. Minnesota*, 270 U.S. 181, 194 (1926); *Heckman v. United States*, 224 F.4th 413, 438–39 (1912); *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024); *United States v. State Water Res. Control Bd.*, 988 F.3d 1194 (9th Cir. 2021); *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019); *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016); *United States v. Bd. of Cnty. Comm'rs of Cnty. of Otero*, 843 F.3d 1208 (10th Cir. 2016); *United States v. S. Carolina*, 720 F.3d 518, 524 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1279 (11th Cir. 2012); *United States v. City of Arcata*, 629 F.3d 986, 988 (9th Cir. 2010).

The Intervenors fail to muster a single citation denying the United States' authority to sue on this basis. That is no surprise—the Court would break new ground if it held that the United States cannot sue states in equity to enjoin preempted and unconstitutional laws. Worse, such a holding would *contravene* longstanding precedent, including *Arizona*, 567 U.S. 387. The Intervenors note that the United States' authority to sue was not discussed in that case, Int. Mem. at 19–20, but that fact only bolsters the United States' position. That neither the parties nor the Court bothered to address the issue merely demonstrates that such authority is firmly rooted in the traditions of equity. More to the point, *Arizona*—and the legion of cases cited above—show that there is ample historical precedent for these suits, even if the issue isn't litigated in every case.

Finally, the Intervenors misrepresent several cases cited in the United States' opening brief. Both *Debs*, 158 U.S. 564, and *Sanitary District of Chicago v. United States*, 266 U.S. 405 (1925), involved suits to vindicate the supremacy of federal law absent statutory causes of action—and in

16

*Sanitary District*, the United States sued a *state* agency. *See Debs*, 158 U.S. at 579 (quoting Supremacy Clause); *Sanitary Dist.*, 266 U.S. at 425–26 ("The United States is asserting its sovereig[n] power to regulate commerce and to control the navigable waters within its jurisdiction" and "[t]here is no question that this power is superior to that of the States[.]"); *contra* Int. Mem. at 20. Moreover, in *United States v. Supreme Court of New Mexico*, the Tenth Circuit addressed more than standing and ripeness (*contra* Int. Mem. at 20); it also recognized "federal courts' equitable authority to entertain the United States's suit for injunctive relief on preemption grounds" under *Armstrong* and the equitable principle "that the United States may sue to protect its interests." 839 F.3d at 906 n.9 (cleaned up). The Intervenors' attempt to distinguish *United States v. Missouri*, 114 F.4th at 986, also fails because it wrongly assumes that Vermont's violation of federal law does not injure the United States. *See* Int. Mem. at 21.

In sum, the United States may challenge preempted and unconstitutional state action in equity to protect the supremacy of federal law. Our equitable tradition squarely supports such suits, and the Intervenors cite no authority to the contrary. But if there were any doubt, the United States may also sue in equity to protect its pecuniary interests. *See Debs*, 158 U.S. at 583–84; *see also supra* at 9–10 (discussing the United States' pecuniary interests).

## II.    The Clean Air Act Preempts The Superfund Act.

On the merits, this case is equally clear-cut. The Clean Air Act preempts the Superfund Act because, as the Second Circuit made clear in *City of New York*, it "does not authorize" the recovery of "damages for the harms caused by global greenhouse gas emissions . . . under [state] law." 993 F.3d at 91, 99–100 (citing *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492, 497 (1987)). That is enough to decide this case. But the Superfund Act also intrudes on a field occupied by the

Clean Air Act and conflicts with that statute's text, structure, and purpose by undermining its comprehensive regulatory scheme.

### A. The Clean Air Act Does Not Authorize Vermont to Impose Liability Under Vermont Law for Out-of-State Greenhouse Gas Emissions.

The core holding in *City of New York*, which flows from *Ouellette*, is straightforward and dispositive here. Since the beginning, federal law, not state law, has governed interstate air pollution because it implicates "uniquely federal interests." *City of New York*, 993 F.3d at 90–91; *Ouellette*, 479 U.S. at 487–91; U.S. Mem. at 2–3, 28–30, 42–43. Until the Clean Air Act, federal common law governed. *Illinois v. City of Milwaukee*, 406 U.S. 91, 103, 105 n.6 (1972) ("*Milwaukee I*"); *Am. Elec. Power Co., Inc. (AEP) v. Connecticut*, 564 U.S. 410, 421 (2011); *City of New York*, 993 F.3d at 90–95. And "resorting to state law on a question previously governed by federal common law is permissible only to the extent authorized by federal statute." *City of New York*, 993 F.3d at 99 (cleaned up).

This preempted-unless-authorized rule applies because the Clean Air Act operates in a field—interstate air emissions—that state law has "traditionally *not* occupied." *Id.* at 98. After all, "[t]he presumption against federal preemption disappears . . . in fields of regulation that have been substantially occupied by federal authority for an extended period of time." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005); *United States v. Locke*, 529 U.S. 89, 108 (2000) (presumption against preemption is "not triggered when [a] State regulates in an area where there has been a history of significant federal presence"); U.S. Mem. at 29–30.

As the Second Circuit explained, the Clean Air Act authorizes only a "slim reservoir" of state action in this area: State-imposed liability for out-of-state emissions must be based on "the law of the pollution's *source* state." *City of New York*, 993 F.3d at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497). The tort suit in *City of New York*, however, did not seek to "take

18

advantage" of this "narrowly circumscribed" authorization. *Id.* It instead sought to impose "New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world"—true *interstate* regulation. *Id.* Because the Clean Air Act does not authorize such use of state law, the Second Circuit held that the claims were preempted. *Id.*

So too here. The Superfund Act explicitly targets "the total quantity of greenhouse gases released into the atmosphere . . . resulting from the use of fossil fuels extracted or refined by an entity during the covered period," no matter where those greenhouse gases were emitted. Vt. Stat. Ann. tit. 10, § 596(7). In other words, Vermont, like the City of New York before it, seeks to impose billions of dollars in liability for greenhouse gas emissions originating in every state and nation of the world. Under *City of New York*, the Superfund Act is therefore preempted.

### 1.    Vermont is unable to distinguish *City of New York*.

Vermont's effort to distinguish *City of New York* fails out of the gate. The State starts with the assumption that ordinary preemption principles—including the presumption against preemption—apply here. Vt. Mem. at 15–17. Then, having taken for granted that key issue, Vermont brushes *City of New York* aside because the Second Circuit "did not conduct a 'traditional statutory preemption analysis.'" Vt. Mem. at 18 (quoting *City of New York*, 993 F.3d at 98).

But the "traditional statutory preemption analysis" does not apply here either. And that is for the same reason as in *City of New York*: because the Superfund Act, like the City's tort suit, operates in a field that "states have traditionally *not* occupied." 993 F.3d at 98; *see also Locke*, 529 U.S. at 108. True, as Vermont repeatedly points out, the Clean Air Act displaced the federal common law that historically governed interstate emissions. *See AEP*, 564 U.S. at 424. But as the Second Circuit explained, state law does not presumptively govern issues previously governed by

19

federal common law, such that the presumption against preemption kicks in. *See City of New York*, 993 F.3d at 98.

Vermont's opposing view ignores the reasons why federal common law governed in the first place. *See* Vt. Mem. at 17 (disputing argument that the Clean Air Act "preempts any state law claim that would have been preempted by the displaced common law of interstate air pollution"). Federal common law governs where "the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). Thus, "where 'federal common law exists, it is because state law cannot be used'" as a constitutional matter. *City of New York*, 993 F.3d at 98 (quoting *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 313 n.7 (1981) ("*Milwaukee II*")). So when Congress displaced the federal common law of interstate emissions with the Clean Air Act, it "did nothing to undermine" the "reasons why the state claiming injury cannot apply its own state law to out-of-state discharges." *Id.* (quoting *Illinois v. City of Milwaukee*, 731 F.2d 403, 410 (7th Cir. 1984) ("*Milwaukee III*"). Vermont's competing view—that state law "suddenly become[s] presumptively competent to" govern interstate emissions because Congress "displace[d] a federal court-made standard with a legislative one"—is, as the Second Circuit aptly described, "too strange to seriously contemplate." *Id.* at 98–99.[5]

Neither *AEP* nor *Ouellete* are to the contrary. *Contra* Vt. Mem. at 17. Vermont stresses that *AEP*, after holding that the Clean Air Act displaces federal common law, "confirmed that

---

[5] Thus, the United States is *not* arguing that displaced federal common law preempts the Superfund Act. *Contra* Vt. Mem. at 22. On the contrary, the United States argues (as *City of New York* held) that the traditional statutory preemption analysis does not apply because federal common law would govern *absent* the Clean Air Act. Or put another way, the fact that federal common law governed before the Clean Air Act shapes how preemption works under the statute.

statutory preemption principles govern the question of whether state law is preempted by the" Clean Air Act. Vt. Mem. at 17. But the Supreme Court, in remanding the state-law claims, simply instructed that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act." *AEP*, 564 U.S. at 429. And in doing so, the Court cited *Ouellette*'s holding that "the Clean Water Act does not preclude aggrieved individuals from bringing a 'nuisance claim pursuant to the law of the *source* State.'" *Id.* By directing lower courts to apply the source-state rule from *Ouellette*, the Court in *AEP* made clear that the Clean Air Act's "preemptive effect" incorporates the source-state rule.[6] That is exactly what the United States argues here— and it is exactly what the Second Circuit held in *City of New York* by relying on *Ouellette* to determine the preemptive effect of the Clean Air Act. *City of New York*, 993 F.3d at 99 (citing *Ouellette*, 479 U.S. at 492, for rule that the Clean Air Act must affirmatively authorize resort to state law in the field of interstate air emissions); *see also Ouellette* 479 U.S. at 492 ("In light of this pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law, it is clear that the only state suits that remain available are those *specifically preserved by the Act*." (citation omitted, emphasis added)).

Vermont counters with the confounding claim that *City of New York* didn't consider whether the Clean Air Act preempts the Superfund Act; according to Vermont, the issue in that case was simply "whether a state common law claim that was preempted by federal common law

---

[6] Vermont claims that *AEP* would not have remanded the case if the preemptive effect of the Clean Air Act turned on whether federal common law previously governed the subject. Vt. Mem. at 17 n.11. But *AEP* explained why it sent the case back down—the parties had not briefed preemption or addressed the viability of state tort claims. 564 U.S. at 429. On remand, the plaintiffs voluntarily dismissed their suit. *See Connecticut v. Am. Elec. Power Co., Inc.*, Case No. 1:04-cv-05669 (S.D.N.Y. Dec. 6, 2011), Dkt. No. 94. So the question *AEP* remanded wasn't answered by the Second Circuit until *City of New York*, 993 F.3d at 98 (holding that courts should not apply the "traditional statutory preemption analysis" in determining the preemptive effect of the Clean Air Act because doing so is incompatible with the fact that "federal common law governed this issue in the first place").

'snapped back' into existence when federal common law was in turn displaced by the [Clean Air Act]." Vt. Mem. at 18 (cleaned up).  True, *City of New York* did answer that question—but it did so to address a specific argument pressed by the City, *see* 993 F.3d at 98, and to set up its analysis on the preemptive effect of the Clean Air Act, *see id.* at 99–100, which Vermont skips over.  Indeed, to say the Second Circuit addressed only "Clean Air Act displacement, not Clean Air Act preemption," Vt. Mem. at 21, cannot explain *City of New York*'s bottom-line holding that the s*tate tort claims* were "barred."  993 F.3d at 100.  After all, as Vermont takes pains to point out, statutory "displacement" of *federal common law* is different from federal "preemption" of *state law*.  *See* Vt. Mem. at 18.  Even worse, Vermont's assertion that *City of New York* addresses displacement but not preemption is really an assertion that the Second Circuit ignored *AEP*'s instruction that courts consider the "preemptive effect" of the Clean Air Act in resolving these issues.  564 U.S. at 429.  This Court should not entertain such a low—and inaccurate—reading of binding authority.

Unable to square its position with key precedents, Vermont resorts to torching a strawman. It accuses the United States of applying the "relaxed" rule for "statutory displacement of common law" to the "statutory preemption" question.  Vt. Mem. at 18–19.  That is incorrect.  The United States agrees that the Clean Air Act's displacement of federal common law is distinct from its preemption of state law.  But preemption in this context still doesn't follow the traditional model. As *City of New York* held, when a federal statute displaces federal common law, it does not "vaporize[] any preemptive effect that federal common law had on state law," but continues to preempt any application of state law that is not specifically authorized by the statute.  993 F.3d at 98–99.

2.    **There is no distinction between regulation and compensation in this context, and the Superfund Act regulates ongoing emissions as a matter of law.**

**a.**  Vermont, joined by the Intervenors, follows up with a more ambitious argument:  *City of New York* does not apply at all because the Superfund Act does not operate in an area previously governed by federal common law.  *See* Vt. Mem. at 22, 24–25; Int. Mem. at 33–37.  That is so, the argument goes, because federal common law foreclosed only state efforts to control or regulate interstate emissions, not efforts to seek compensation for harm caused by such emissions.  *See* Vt. Mem. at 24 (asserting that the Superfund Act does not "regulate emissions at all or impose any ongoing liability for emissions" but rather "is a compensation statute"); Int. Mem. at 34 (asserting that the Superfund Act "does not regulate or seek to abate pollution at all").

This argument runs directly into the teeth of *City of New York*.  There, the City made the same argument: that "because it [sought] damages—not abatement or the imposition of pollution standards—its claims d[id] not threaten to regulate emissions at all[.]"  *City of New York*, 993 F.3d at 92.  But the Second Circuit said this "ignores economic reality" and held that "regulation can be effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."  *Id.* (cleaned up); *see also id.* at 91 (disagreeing with the City's claim that "because it seeks damages rather than abatement" its suit "will not result in the regulation of global emissions" or have any "appreciable effect on national energy or environmental policy").  The court thus recognized, as a matter of law, that "a substantial *damages award* like the one requested by the City would effectively *regulate* the [p]roducers' behavior far beyond New York's borders."  *Id.* at 92 (emphasis added).  If anything, the court noted, imposing "strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)"

23

is "even more ambitious" than regulating emissions through "a standard of care" or "emission restrictions." *Id.* at 93; *cf. id.* at 95–96 (holding that the Clean Air Act displaces federal common-law actions for both "abatement of future emissions" and "damages for past emissions").

Vermont and the Intervenors try to reframe these legal conclusions as inapposite factual findings given Dr. Fullerton's claim that the Superfund Act will have zero impact on the market or firm behavior and thus is "not an 'economic regulation,' as defined and understood by economists." Fullerton Decl. ¶ 11(d); *see* Vt. Mem. at 14–15, 24; Int. Mem. at 4–9, 34. But the Second Circuit, as an appellate court, did not make any findings of fact—the appeal was on a motion to dismiss, so there was no evidentiary record, and all inferences would have favored the City.

In rejecting the City's argument, the Second Circuit instead *held as a matter of law* that a damages award is an effective means of regulation, relying not on a factual record but on multiple Supreme Court decisions holding the same on purely legal grounds. *City of New York*, 993 F.3d at 92–93; *see, e.g.*, *Ouellete*, 479 U.S. at 495, 498 n.19 (refusing to "draw a line between the types of relief sought" and thus rejecting plaintiffs' argument that they were "seeking to be compensated for a specific harm rather than trying to 'regulate'"); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) ("regulation can be . . . effectively exerted through an award of damages"); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 & n.17 (1996) ("Regulation can be as effectively exerted through an award of damages as through some form of preventive relief." (cleaned up)); *Nat. Res. Def. Council (NRDC) v. NHTSA*, 894 F.3d 95, 104–05 (2d Cir. 2018) (reasoning that "[t]he notion that financial incentives deter environmental misconduct is hardly novel" as "common sense and basic economics tell us that the increased cost of . . . conduct will make that conduct less common" (cleaned up)). The upshot: Whether the Superfund Act regulates emissions is a legal question,

24

not a factual one. And the law is clear that seeking compensation for harm caused by past emissions is an effective means of regulation.

Vermont and the Intervenors cannot duck this precedent by invoking the Fullerton Declaration—an expert declaration is not a get-out-of-law-free card. Indeed, Dr. Fullerton does not and could not opine on whether the Superfund Act is a *legal* regulation; he instead claims that "the Act is not an '*economic* regulation,' *as defined and understood by economists*, because it does not intervene in the private actions of firms and individuals to change their behavior." Fullerton Decl. ¶ 11(d) (emphasis added). This statement clashes with what the Second Circuit called "economic reality" and "common sense." *City of New York*, 993 F.3d at 93; *NRDC*, 894 F.3d at 104–05; *see also* Froeb Decl. ¶¶ 12–15, 17–34; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 3–10. At any rate, what is and is not an "economic regulation, as defined and understood by economists," is *legally* irrelevant, because the Act is a regulation as a matter of law under binding precedent, regardless of whether it ultimately leads to changes in behavior. Accordingly, any factual dispute over the Act's economic effects is an immaterial one that the Court need not resolve to decide this case.[7]

**b.** Vermont and the Intervenors counter that the Superfund Act imposes a one-time, purely retroactive assessment and thus isn't regulatory because it doesn't explicitly control ongoing emissions. Vt. Mem. at 12, 24; Int. Mem. at 4–5, 14, 33–34, 37, Fullerton Decl. ¶¶ 30–32. This response fails for two reasons.

---

[7] Vermont and the Intervenors jointly attack the strawman that any law with an indirect effect on greenhouse gas emissions would be preempted under the United States' argument. *See* Vt. Mem. at 13; Int. Mem. at 6, 38. Not true—the mere fact that a law indirectly affects economic activity does not necessarily mean that the law is regulating such activity. To decide this case, the Court need only hold, as *City of New York* held, that a state law is preempted if it imposes liability based on out-of-state greenhouse gas emissions. In this respect, the Superfund Act presents an even clearer case than the tort suit in *City of New York*, because the Act expressly targets *emissions* rather than other business activities in the causal chain. *See City of New York*, 993 F.3d at 91.

*First*, neither Vermont nor the Intervenors ever explain the *legal* significance of their alleged distinction between controlling ongoing emissions and imposing liability for past emissions. The latter method is also a way to regulate emissions—it's just an *ex post* standard ("you emitted too much") rather than an *ex ante* one ("your emissions shall not exceed 'x' amount"). If anything, retroactive standards are more burdensome than prospective ones because they do not give parties notice of how to conduct their affairs. Worse still, merging retroactive strict liability with extra-territoriality—as the Superfund Act does—forces parties to pay for past acts taken in jurisdictions across the world, even if a party fully complied with the standard that governed in the home jurisdiction.

This is perhaps why Vermont and the Intervenors fail to cite a single authority for their view that retroactive standards do not implicate the concerns discussed in *City of New York*. Just the opposite is true: By imposing retroactive strict liability and extraordinary penalties on energy producers for out-of-state emissions, the Superfund Act (if allowed to stand) will effectively lead to the imposition of "separate discharge standards" on a single source, *Ouellette*, 479 U.S. at 493—Vermont's retroactive strict liability standard, plus whatever standard might exist in the source state, plus whatever standards other states may impose. The Act thus "implicates the conflicting rights of states" regardless of whether it controls ongoing emissions, which means that federal law must govern. *City of New York*, 993 F.3d at 92 (cleaned up); *see also Ouellette*, 479 U.S. at 496–97 (multistate authority "over a single discharge would lead to chaotic confrontation between sovereign states" and make it "virtually impossible to predict the standard for a lawful discharge").

*Second*, the fact that the Superfund Act seeks damages for past emissions does not distinguish it from the tort suits in *City of New York* and *Ouellette*, which sought the same type of relief.[8]

---

[8] The Intervenors again misrepresent the role the City's request for injunctive relief played in the Second Circuit's analysis. They claim that the City's request for an injunction *in the event the*

Vermont and the Intervenors are therefore forced to contend that *tort* liability is somehow different from *statutory* liability because it purportedly creates ongoing duties and subjects parties to potential liability in the future. Vt. Mem. at 24; Int. Mem. at 14, 34, 36–37. But this supposed lesson from *City of New York* and *Ouellette*—that tort liability is unique because it creates ongoing duties—is nowhere to be found in those opinions.

More fundamentally, Vermont and the Intervenors are wrong to insist that there is no ongoing liability under the Superfund Act. The energy producers in *City of New York*, for example, would have faced ongoing liability only because they faced the risk of future tort suits seeking to impose liability for future emissions. So too, if the Superfund Act is permissible, then energy producers would be subject to future amendments of the Act extending the covered period to reach emissions attributable to future fossil-fuel production. In five years, for example, Vermont could expand the covered period to reach emissions and fossil-fuel production up to 2030—and the State would have free rein to do so again in perpetuity, so long as liability under the Act is always retroactive. *See supra* at 8–9. And in defending any future challenge to an amended statute, Vermont and the Intervenors could make the same argument they make now—that the Act is valid because liability is retroactive—creating a moving goalpost clearly designed to evade legal challenge.[9]

---

*defendants failed to pay damages* was "key to *City of New York*'s finding that the tort claims there amounted to emissions regulation." Int. Mem. at 36. That is false for the reasons the United States has already explained. *See* U.S. Mem. at 35 n.5. Nor did *Ouellette* turn on the request for injunctive relief and punitive damages. *Contra* Vt. Mem. at 20; *Ouellette*, 479 U.S. at 498 n.19 (declining to distinguish between the request for compensatory damages and other forms of relief and holding that the tort suit would still regulate conduct even if the plaintiffs "were entitled only to the requested compensatory relief").

[9] Producers must also consider the full regulatory environment, which includes the risk of other states enacting similar laws if Vermont's is upheld. Dr. Fullerton dismisses this concern as not "validated by evidence," Fullerton Decl. ¶ 25, but New York has already enacted a climate change

The Intervenors object to this concern as speculative (Int. Mem. at 9), but it is no more speculative than the prospect of future tort suits. And besides, this consideration goes to whether the Superfund Act regulates conduct on its face; the Court need not speculate about whether Vermont will *in fact* amend the Act, because it is the present-day *risk* of future liability that matters. So even if the Fullerton Declaration were relevant (it isn't, because the Act regulates emissions as a matter of law), it is fatally flawed. As explained above, Dr. Fullerton assumes that the Act imposes a one-time assessment based on purely past conduct. Fullerton Decl. ¶¶ 30–31. By ignoring the risk of further expansions of the covered period, he necessarily ignores how firms will respond to that risk.

To their credit, the Intervenors say the quiet part out loud: Every state in the Nation is free to pass a law "identical to Vermont's," and states could repeatedly amend those laws to reach new production and emissions, because those acts "would amount at most to additional retroactive liability which would not impact ongoing fossil fuel production levels, investment, or pricing." Int. Mem. at 13. If the Superfund Act is permissible, then the Intervenors' reasoning is sound: The legal and economic logic of Vermont, the Intervenors, and Dr. Fullerton leads straight to that outcome. The Court should not take such a blinkered view of reality.

Put simply, if producers wish "to avoid all liability," they would have to "cease global production altogether." *City of New York*, 993 F.3d at 93. "And even if some level of ongoing liability were deemed palatable, a significant damages award would no doubt 'compel' the Producers to develop new 'means of pollution control.'" *Id.* (cleaned up) (quoting *Ouellette*, 479 U.S.

---

superfund statute that is modeled on Vermont's law, as Dr. Fullerton knows full well—he submitted a nearly identical declaration in the United States' challenge to New York's statute. *See* N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105; Declaration of Don Fullerton, *United States v. New York*, No. 1:25-cv-03656 (S.D.N.Y. Oct. 27, 2025), Dkt. No. 85. Moreover, California and at least nine other states are considering their own legislation. *See Polluters Pay: How States are Filling the Federal Climate Funding Gap in 2025*, NCEL (Mar. 3, 2025), https://perma.cc/82CT-482U.

at 498 n.19); *see Ouellette*, 479 U.S. at 495 (holding that a damages award would force a company to "change its methods of doing business and controlling pollution to avoid the threat of ongoing liability").  So although the Superfund Act "would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless."  *City of New York*, 993 F.3d at 93.

**3.    Because federal law must govern interstate air emissions, both state common law and state statutes are preempted.**

Vermont cannot resurrect the tort suit from *City of New York* by writing it into a statute.  In arguing otherwise, Vermont claims that federal common law preempts only state common law, not state statutes, so *City of New York* does not control.  *See* Vt. Mem. at 22–23.

But as explained in the United States' opening brief, when (as here) a federal rule of decision is required, the source of state law is irrelevant—state common law and state statutes must both give way.  *See* U.S. Mem. at 33–34; *Milwaukee I*, 406 U.S. at 105 (when federal common law applies, "*state statutes* or decisions are not conclusive" (emphasis added)); *City of New York*, 993 F.3d at 89 ("whether the water of an interstate stream must be apportioned between two states is a question of federal common law upon which neither the statutes nor the decisions of either state can be conclusive" (cleaned up)).

Vermont has no real counter.  It vaguely states that common law and statutory law "serve distinct aims," Vt. Mem. at 23, but it never develops this point or explains how a state statute could supersede the "overriding federal interest in the need for a uniform rule of decision" on interstate air emissions, *Milwaukee I*, 406 U.S. at 105 n.6.  Nor does it explain why "federal common law preemption of state statutory law would threaten to upset both the vertical and horizontal separation of powers that lies at the heart of our constitutional system," even though preemption of state common law concededly doesn't pose such a threat.  Vt. Mem. at 23.  Notably, the Intervenors

distance themselves from Vermont's puzzling position.  *See* Int. Mem. at 37 ("Defendant-Interve-

nors are not asking the Court to hold that federal common law can never displace a state statute.").

\*      \*      \*

In the end, there is no daylight between this case and *City of New York*.   The Superfund

Act, like the tort suit, regulates out-of-state emissions.  The Superfund Act, like the tort suit, oper-

ates in an area that the Constitution reserves exclusively for federal control.  And the Superfund

Act, like the tort suit, is not authorized by the Clean Air Act.  It is therefore preempted.[10]

### B.    The Superfund Act Unlawfully Intrudes into the Field of Interstate Emissions and Conflicts with the Clean Air Act.

The Superfund Act is also unlawful under traditional principles of field and conflict

preemption.  To begin, the Act does not "fall[] within Vermont's traditional authority to raise funds

to protect its citizens and its environment by adapting to climate change," and so it is not "entitled

to a strong presumption against preemption."  Vt. Mem. at 15; *see also* Int. Mem. at 32–33.  For

reasons given above, there is no starting assumption that states' historic police powers govern

interstate pollution.  *City of New York*, 993 F.3d at 98.  And that is true even though Vermont

asserts that the Act protects its citizens and its environment.  The City of New York relied on the

same ends-justify-the-means reasoning to support its tort suit in *City of New York*, but the Second

---

[10] The United States' position here is consistent with EPA's proposed rescission of greenhouse gas emissions standards for motor vehicles under Clean Air Act section 202(a).  *See* Int. Mem. at 40. To begin, the question under *City of New York* is whether the Clean Air Act authorizes *states* to regulate interstate emissions, not whether specific provisions of the Clean Air Act authorize EPA to do so.  U.S. Mem. at 40.  And *City of New York* aside, the Clean Air Act vests EPA with exclusive authority to determine "*whether* and how" to regulate emissions.  *AEP*, 564 U.S. at 426 (emphasis added).  The preemptive effect of federal law here turns on the nature of interstate emissions and Congress' choice to vest regulatory authority in EPA, not on how EPA chooses to exercise that authority.  U.S. Mem. at 39–40.  More still, nothing in EPA's proposed rule would affect the agency's separate regulation of greenhouse gas emissions by setting fuel standards under distinct Clean Air Act authorities.  U.S. Mem. at 39; *see* 42 U.S.C. §§ 7545, 7546; *see also Ctr. for Biological Diversity  v.  EPA*, 141 F.4th 153, 162 (D.C. Cir. 2025).  So EPA is not "advancing a contrary statutory interpretation" to the one presented here.  Int. Mem. at 40–41.

30

Circuit was not swayed. *See id.* at 88 ("The City requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property[.]"); *see also id.* at 91, 97 & n.8.

**Field preemption.** The field preemption analysis largely tracks the analysis above—the Clean Air Act creates a comprehensive regulatory scheme for interstate emissions and leaves no room for states to regulate out-of-state emissions under their own law. *See id.* at 100. Instead, the Clean Air Act limits the reach of state law to emissions originating *within* the state's borders. *Id.* at 99. As for emissions emanating outside a state's borders—*interstate* emissions—the Clean Air Act occupies the field. *Id.* at 98–99.

In contending otherwise, Vermont first says that the United States hasn't cited any case holding that the Clean Air Act occupies the field of interstate regulation. Vt. Mem. at 16. Although *City of New York* didn't use the phrase "field preemption"—again, because traditional preemption principles don't apply here given the inherently federal nature of interstate emissions—the Second Circuit made clear that states cannot apply their own law to emissions originating in other states. *City of New York*, 993 F.3d at 99–100. Tellingly, Vermont cites no authority for applying state law to *out-of-state* emissions. The reason for that omission is simple: There is no authority.

Vermont next cites the Clean Air Act's savings clauses as purported evidence that the Clean Air Act "expressly contemplates a significant role for the states in addressing air pollution." Vt. Mem. at 16 (citing 42 U.S.C. §§ 7416, 7604(e)). But the savings clauses authorize a "narrowly circumscribed" role for state regulation, "permit[ting] states to create and enforce their own emissions standards applicable to *in-state* polluters." *City of New York*, 993 F.3d at 99–100 (emphasis added). In other words, like the Clean Water Act, the Clean Air Act's savings clauses "permit only [state-imposed liability] under 'the law of the pollution's *source* state.'" *Id.* at 100 (cleaned

31

up) (quoting *Ouellette*, 479 U.S. at 497).  And that makes sense, as such regulation is *intrastate* in nature—the polluter need only answer to *source-state* law.  *Contra* Int. Mem. at 33 n.29.  The Clean Air Act leaves absolutely no room for Vermont to apply its own law to emissions emanating beyond its borders.

The Intervenors point to *Ouellette*'s observation that the Clean Water Act's savings clause "negates the inference that Congress 'left no room' for state causes of action."  *Ouellete*, 479 U.S. at 492; Int. Mem. at 39.  In recognizing as much, *Ouellette* was discussing the "field of pollution regulation" writ large, not the field of *interstate* pollution regulation.  479 U.S. at 492.  And as *Ouellette* went on to hold, the Clean Water Act's savings clause permits only state claims brought "pursuant to the law of the *source* [s]tate."  *Id.* at 497.  The statute, like the Clean Air Act, "precludes a court from applying the law of an affected [s]tate against an out-of-state source."  *Id.* at 494.

Vermont finds no firmer ground in redefining the field as "compensatory remedies" for the consequences of pollution and then claiming that the Clean Air Act does not occupy *that* field.  Vt. Mem. at 16; *see also* Int. Mem. at 39 (redefining field as "raising revenue to address harm from past greenhouse gas production").  Vermont relies on a case that held the Clean Water Act does not bar punitive damages imposed under federal maritime law.  Vt. Mem. at 16 (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)).  The case did not address whether a state could seek relief, under its own law, for injuries caused by emissions from another state.  The Supreme Court decided *that* question in *Ouellette*, holding that the Clean Water Act precludes "applying the law of an affected State" in seeking damages from "an out-of-state source."  479 U.S. at 484, 494.  For that reason, and because "damages here would effectively control [energy producers'] behavior

beyond [Vermont's] borders," the State's "reliance on *Exxon Shipping Co. v. Baker* is . . . misplaced." *City of New York*, 993 F.3d at 96–97; *see Exxon Shipping*, 554 U.S. at 489 n.7 (noting that a claim would be preempted if it "amounted to arguments for [regulatory] standards different from those provided by [federal statute]").

**Conflict preemption.**   The Superfund Act also conflicts with the text, structure, and purpose of the Clean Air Act by undermining its comprehensive framework and EPA's carefully bounded regulatory discretion. *See City of New York*, 993 F.3d at 100; *see also Ouellette*, 479 U.S. at 493–494; U.S. Mem. at 38–42.  Because the relevant field is not one that states have traditionally occupied, "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

The Clean Air Act "anoints the EPA as the primary regulator of domestic greenhouse gas emissions." *City of New York*, 993 F.3d at 99 (cleaned up).  Pursuant to that authority, EPA sets nationwide emission standards under several provisions of the Clean Air Act, including section 111 (stationary sources), section 202 (motor vehicles), section 211 (regulation of fuels), and section 212 (renewable fuel). 42 U.S.C. §§ 7411, 7521, 7545, 7546; *cf. also id.* § 7675 (hydrofluorocarbons).  The Superfund Act conflicts with Congress's (and EPA's) chosen methods for controlling emissions by imposing a disparate system of control based on retroactive strict liability.  It is therefore conflict preempted.

Vermont's contrary view—that there is no conflict between the Superfund Act and the Clean Air Act—rests on its misguided assumption that the Superfund Act does not control or regulate emissions. *See* Vt. Mem. at 19–20.  But as explained, the Superfund Act regulates emissions as a matter of law, *supra* at 23–29—and, if more is needed, also as a matter of fact, Froeb Decl. ¶¶ 12–15, 17–34; U.S. Resp. Int. Statement of Add'l Facts ¶¶ 3–10.

33

For this reason, Vermont cannot wave away *Ouellette* by contending that its holding was based on "the Court's finding that the nuisance lawsuit would function as a separate, out-of-state 'regulation' of a point source also regulated by the [Clean Water Act]." Vt. Mem. at 20; *see also* Int. Mem. at 43. The Supreme Court specifically rejected (on purely legal grounds) the argument that "respondents [we]re seeking to be compensated for a specific harm rather than trying to 'regulate.'" *Ouellette*, 479 U.S. at 498 n.19. Refusing "to draw a line between the types of relief sought," the Court instead held that even if the "respondents were entitled only to the requested compensatory relief," that could still compel the adoption of "different or additional means of pollution control from those required by the [Clean Water] Act, regardless of whether the purpose of the relief was compensatory or regulatory." *Id.* The same is true here.

Nor does it matter that the Superfund Act imposes liability on fossil-fuel producers rather than on "individual point sources." *Contra* Vt. Mem. 20–21. "It is precisely *because*" Vermont deems fossil-fuel producers responsible for global greenhouse gas emissions that the Act declares them liable. *City of New York*, 993 F.3d at 91 (rejecting the City's similar attempt to obscure by pretending that its suit was not about greenhouse gas emissions). From top to bottom, the text of the Act makes clear that it is imposing liability on fossil-fuel producers *based on* greenhouse gas emissions. *See, e.g.*, Vt. Stat. Ann. tit. 10, § 596(7), (22) (defining "covered greenhouse gas emissions" and providing that "[r]esponsible part[ies]" are fossil-fuel producers that contributed to a certain threshold of "covered greenhouse gas emissions"); *see also id.* § 598(b) (setting cost recovery demands at amount proportional to each producer's contribution to aggregate "covered greenhouse gas emissions").

The Intervenors have no viable arguments of their own. They dispute that the Superfund Act conflicts with the Clean Air Act's Good Neighbor Provision because the latter applies to a

subset of pollutants not including greenhouse gases. Int. Mem. at 41–42. But the Good Neighbor Provision reflects a broader reality about the Clean Air Act: Under the statute, states "lack authority to control" the "influx of out-of-state pollution." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014). The Superfund Act blows past that reality and the "limited role" the Clean Air Act gives states in this context, which is generally confined "to commenting on proposed EPA rules or on another state's emission plan." *City of New York*, 993 F.3d at 88. And the Intervenors' false dichotomy between reducing future emissions and seeking compensation for harm allegedly caused by past emissions (Int. Mem. at 42) cannot be squared with *Ouellette* or *City of New York*. *See Ouellette*, 479 U.S. at 498 n.19 (holding that purely compensatory relief would conflict with the Clean Water Act); *City of New York*, 993 F.3d at 100 (holding that permitting a suit for compensatory damages would "undermine" the Clean Air Act's "carefully drawn" terms and "seriously interfere with the achievement of the full purposes and objectives of Congress" (cleaned up)).

Rounding out the long list of errors, the Intervenors assert that the Court cannot consider the effect of a state-by-state regulatory regime because to do so would be speculative and, in any event, only Congress—through future legislation—could prevent such an outcome. Int. Mem. at 44. But similar concern was critical to the Supreme Court's preemption holding in *Ouellette*. 479 U.S. at 496 ("For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states." (cleaned up)). There is no need to speculate about *whether* other states will enact similar laws—not only has New York already done so, the point is that upholding Vermont's law would greenlight an "irrational system of regulation" in which each state has independent authority over nationwide emissions, *id.*, an outcome openly acknowledged and embraced by the Intervenors, *see* Int. Mem.

at 13.  And allowing fifty states to impose fifty standards on the same conduct is simply incompatible with the Clean Air Act's integrated approach to air emissions control.  *See Ouellette*, 479 U.S. at 496–97.

### III.    The Superfund Act Defies Constitutional Limits On Extraterritorial Regulation.

For two reasons, the Superfund Act also flouts constitutional limits on extraterritorial regulation.  First, the Act seeks to regulate interstate air emissions, a uniquely federal interest that the Constitution commits exclusively to the federal government.  *See* U.S. Mem. at 42–43.  Second, and more generally, the Act exceeds the territorial bounds of state authority under the Constitution's horizontal separation of powers.  *See* U.S. Mem. at 44–50.

### A.    The Constitution Precludes the Superfund Act Because It Imposes Liability for Greenhouse Gas Emissions Originating Out of State.

Federal law must govern air pollution in its "ambient or interstate aspects."  *Milwaukee I*, 406 U.S. at 103.  That is because it "implicate[s] two federal interests that are incompatible with the application of state law: (i) the overriding need for a uniform rule of decision on matters influencing national energy and environmental policy, and (ii) basic interests of federalism."  *City of New York*, 993 F.3d at 91–92 (cleaned up); U.S. Mem. at 2–3, 29, 42–43.  This is why *City of New York* ditched the "traditional statutory preemption analysis"—state law is not "competent to address" the issue because it "demand[s] a unified federal standard."  993 F.3d at 98.

This rule flows directly from the U.S. Constitution, which "implicitly forbids" applying state law when the "interstate nature of the controversy makes it inappropriate for state law to control."  *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 246 (2019) (cleaned up); *AEP*, 564 U.S. at 421 (federal common law applies "where the basic scheme of the Constitution so demands"); *Boyle*, 487 U.S. at 504 (certain subjects involve "uniquely federal interests" and are "so

36

committed by the Constitution . . . to federal control that state law is pre-empted and replaced" by "federal common law"). Because "state law cannot be used" where "federal common law exists," congressional displacement of federal common law through the Clean Air Act did not open the door for a state statute like the Superfund Act. *Milwaukee II*, 451 U.S. at 313 n.7; *contra* Vt. Mem. at 22. So even if the Superfund Act weren't preempted by the Clean Air Act, our constitutional structure would still preclude it. *See City of New York*, 993 F.3d at 92 (holding that a tort suit targeting emissions emanating "simultaneously across just about every jurisdiction on the planet" is "simply beyond the limits of state law" under our constitutional structure).[11]

### B.    The Superfund Act Exceeds the Territorial Limits of Vermont's Legislative Power.

Beyond attempting to govern an inherently federal issue that the Constitution commits to the federal government, the Superfund Act exceeds the "territorial limits" of "state authority under the Constitution's horizontal separation of powers." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023); *Hyatt*, 587 U.S. at 245 ("Each State's equal dignity and sovereignty under the Constitution implies certain constitutional limitations on the sovereignty of all of its sister States." (cleaned up)); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders."). This rule against extraterritorial regulation is "implicit in [the Constitution's] structure," *Hyatt*, 587 U.S. at 247; *Pork Producers*, 598 U.S. at 376 & n.1, but it also finds expression in certain constitutional provisions, including the Commerce Clause and the Fourteenth Amendment's Due Process Clause, *see* U.S. Mem. at 44–47.

---

[11] This conclusion echoes the "growing chorus of state and federal courts across the United States" holding that the Constitution requires that federal law govern liability for out-of-state emissions. *City of Charleston v. Brabham Oil Co.*, 2025 WL 2269770, at *2 (S.C. Ct. Com. Pl. Aug. 6, 2025) (collecting cases) (quotation marks omitted).

Vermont and the Intervenors again deny that our constitutional structure imposes limits on states enacting extraterritorial legislation. *See* Vt. Mem. at 27–28; Int. Mem. at 45. This argument fails for the reasons given in the United States' opening brief. *See* U.S. Mem. at 46. Indeed, the Supreme Court has expressly recognized "territorial limits" on "state authority under the Constitution's horizontal separation of powers," untethered to a specific clause in the Constitution. *Pork Producers*, 598 U.S. at 376 n.1.

And the rule, simply stated, is this: A state cannot directly regulate out-of-state conduct unless that conduct has a sufficient connection to the state. *See id.*; U.S. Mem. at 47–50. Vermont flunks this test.

**Direct regulation**. The United States does not argue that the Constitution prohibits any state law that has extraterritorial effect. *Contra* Vt. Mem. at 25. To exceed the territorial limits of state authority under the Constitution, a state law must *directly* regulate extraterritorial conduct. *See Pork Producers*, 598 U.S. at 376 n.1 (describing "law that *directly* regulated out-of-state transactions by those with *no* connection to the State"). And on its face, the Superfund Act does just that by expressly targeting "the total quantity of greenhouse gases released into the atmosphere . . . resulting from the use of fossil fuels extracted or refined by" certain producers over the past three decades (extraction and refining that occurred entirely *outside* Vermont) and holding those producers strictly liable for these worldwide emissions. Vt. Stat. Ann. tit. 10, § 596(7). The Act does not merely *incidentally affect* extraterritorial conduct by regulating in-state activity. *Cf. Pork Producers*, 598 U.S. at 374–76 & n.1.

Both Vermont and the Intervenors respond with their mistaken belief that the Superfund Act is not a direct extraterritorial regulation because it does not regulate conduct at all. Vt. Mem. at 26, 29; Int. Mem. at 46–47. That is wrong for the reasons given above. *Supra* at 23–29.

38

**Nexus to Vermont**.  The extraterritorial conduct targeted by the Superfund Act—both out-of-state emissions *and* extraction and refining activity—lacks a sufficient connection to Vermont to justify the law's extraterritorial reach.  Although courts have sometimes said that "a person acting outside the State may be held responsible according to the law of the State for injurious consequences within it," *Young v. Masci*, 289 U.S. 253, 259 (1933); Vt. Mem. at 26 (citing cases); Int. Mem. at 47, this is not one of those situations for two independent reasons.

First, this case, unlike the ones cited by Vermont and the Intervenors, does not concern an "ordinary interstate tort" dispute but "the determination of liability and remedy for [emissions] within one state . . . into [the] interstate [air], which by [its] nature implicate[s] uniquely federal concerns."  *Milwaukee III*, 731 F.2d at 411 n.3.  Thus, the cases relied on by Vermont and the Intervenors are "not applicable" here.  *Id.*

Second, when courts have allowed states to apply their laws to out-of-state actors, there has been a direct and traceable connection from the out-of-state conduct to the in-state harm.  For example, in *Young*, the defendant owned a car in New Jersey and allowed a person to drive the car into New York, where the driver struck a man with the car.  289 U.S. at 256.  The other cases cited by Vermont also involved a direct and easily traceable connection.  *See Calder v. Jones*, 465 U.S. 783, 784 (1984) (California plaintiff sued Florida defendants for publishing allegedly defamatory article in national magazine with large circulation in California); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 262 (E.D.N.Y. 2004) (City brought nuisance suit against out-of-state manufacturers and distributors of firearms that were possessed and used illegally in the City).

Here, no direct and traceable connection exists.  It is impossible to trace alleged climate-related harm within Vermont to specific out-of-state fossil fuel production.  *See* U.S. Mem. at 48.

In response, the Intervenors contend that the United States needed to prove a negative by introducing evidence to support this point. But both the Supreme Court and the Second Circuit already answered the question by emphasizing that it is impossible to trace in-state injury to specific greenhouse gas molecules—let alone to the specific extraction and refining activity in a specific jurisdiction, as required if a state wishes to regulate that conduct—because greenhouse gas molecules quickly diffuse and mix in the atmosphere, where they can remain for centuries. *See AEP*, 564 U.S. at 422; *City of New York*, 993 F.3d at 86, 92.

Although the Intervenors cite legislative testimony alleging that in-state climate harm can be traced to particular producers, *see* Int. Mem. at 49 & n.40, that claim, even if true, doesn't link the right elements and thus fails as a matter of law. To reach conduct in another jurisdiction, Vermont must trace in-state injury to *specific conduct in that jurisdiction*, not to a specific company's contribution to aggregate global emissions. So, for example, Vermont must trace in-state climate harm (*e.g.*, flooding) to oil extraction in Texas or emissions originating in New Jersey. But the Intervenors do not dispute that it is impossible to link in-state harm to specific out-of-state greenhouse gas molecules and production. *See AEP*, 564 U.S. at 422; *City of New York*, 993 F.3d at 86, 92. And even if Vermont could trace climate-related injuries to specific greenhouse gas molecules—and those specific molecules to a specific company's production in a specific location—there still would not be a sufficiently *direct* link between out-of-state conduct and in-state harm, given the highly attenuated chain of causation needed to link fossil-fuel extraction and refining to alleged climate-related injuries inside Vermont. *Cf. Young*, 289 U.S. at 256 (owner of car in one state allowed person to drive car into another state, where driver struck man with car).

Finally, the Superfund Act's meaningless "nexus" requirement—which Vermont and the Intervenors interpret as incorporating personal jurisdiction principles—does not save it. *See* Vt.

Stat. Ann. tit. 10, § 596(22) (defining responsible parties to "not include any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution"); *see also* Vt. Mem. at 28; Int. Mem. at 48–49. For starters, the Superfund Act exceeds the territorial limits of state authority under the Constitution's horizontal separation of powers, whether or not it comports with minimum contacts principles. But even if those principles were to guide the analysis, the Act still falters. That is because the Act necessarily applies entirely to out-of-state extraction and refining, given Vermont's lack of any in-state production. And a company's wholly out-of-state extraction and refining activity will, by definition, never arise out of or relate to the company's contacts with Vermont.

Both the State and the Intervenors invoke *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021), for the principle that a claim need not directly arise out of forum contacts to satisfy due process requirements—it need only "relate to" those contacts. *See* Vt. Mem. at 28; Int. Mem. at 48. But *Ford Motor* offers no support for the Superfund Act's unbounded reach. In that case, the defendant—Ford—had "advertised, sold, and serviced" the very car models "that the plaintiffs allege[d] malfunctioned and injured them in" the forum states. 592 U.S. at 365. The Court thus had no trouble holding that the suit "related to" Ford's forum contacts, especially when "the owners of the[] cars might never have bought them, and so the[] suits might never have arisen, except for Ford's contacts with" the forums. *Id.* at 367. Importantly, the Court cautioned that its holding "does not mean anything goes," and that "the phrase 'relate to' incorporates real limits." *Id.* at 362.

The theory behind the Superfund Act—that Vermont can hold a company liable for wholly out-of-state conduct that allegedly and indirectly leads to in-state harm, so long as the company has done some business in the State, *see, e.g.*, Vt. Mem. at 26–28—stretches state authority far

beyond constitutional limits.  The Act, for example, targets oil that is extracted in Texas, refined in Louisiana, purchased in Tennessee, and used in Kentucky.  *See* Vt. Stat. Ann. tit. 10, § 596(7).  Even if the producers who extracted and refined that oil do business in Vermont, the extraction and refining activity would not "relate to" those forum contacts under any reasonable understanding of the phrase.  *See Ford Motor*, 592 U.S. at 362.  The Act's self-described "nexus" requirement is simply a smokescreen designed to obscure the statute's limitless reach.

Because it directly regulates out-of-state activity that lacks a sufficient connection to Vermont, the Superfund Act exceeds the territorial limits of Vermont's legislative authority.

## IV.    The Foreign Affairs Doctrine Preempts The Superfund Act.

The Superfund Act is both field and conflict preempted under the Foreign Affairs Doctrine.  Vermont's and the Intervenors' arguments to the contrary are unavailing.

### A.    The Superfund Act Intrudes into the Field of Foreign Affairs Without Addressing a Traditional State Responsibility.

Like the tort suit in *City of New York*, the Superfund Act addresses "a uniquely international problem of national concern" that is "beyond the limits of state law."  993 F.3d at 85–86, 92.  Or to say the same thing in terms of foreign affairs preemption, the Act "intrudes on the field of foreign affairs without addressing a traditional state responsibility."  *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003).  It is thus preempted regardless "whether the National Government ha[s] acted" and "without reference to the degree of any conflict."  *Garamendi*, 539 U.S. at 419 n.11.

The Second Circuit all but resolved this question when it rejected the City's claims concerning foreign greenhouse gas emissions.  *See City of New York*, 993 F.3d at 101.  In so holding, the court made clear that imposing liability for global emissions impermissibly intruded into foreign affairs.  *Id.* at 101–03.  And it reached this conclusion despite the City's asserted interest in

42

recovering damages for local harm allegedly caused by global emissions, *id.* at 88, 91—or said otherwise, the City had no serious claim to be addressing a traditional state responsibility.  So it is no response to say the Superfund Act falls "within Vermont's traditional state responsibilities of raising revenue and protecting the health, safety, and welfare of its residents."  Vt. Mem. at 34; *see also* Int. Mem. at 59; *see* U.S. Mem. at 57–58; *Movsesian*, 670 F.3d at 1073–74 (collecting cases that "struck down state laws which purport[ed] to regulate an area of traditional state competence, but in fact, affect[ed] foreign affairs" (quotation marks omitted)); *In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 119 (2d Cir. 2010); *cf. City of New York*, 993 F.3d at 91 (rejecting the City's attempt to frame the dispute as "merely a local spat about the City's eroding shoreline").

Nor is it any response to argue, as the Intervenors do, that *City of New York* is irrelevant because it was not "a foreign affairs preemption case."  Int. Mem. at 58.  The Second Circuit relied on the same fundamental principles animating the foreign affairs doctrine—including the "political branches' monopoly over foreign policy"—and concluded that recognizing a federal common-law claim based on foreign emissions would intrude on that monopoly.  *See City of New York*, 993 F.3d at 102–03.  Attempts to hold energy producers liable under state law for wholly foreign activity cause the same intrusion.

Moreover, the Superfund Act *does* "express[] a distinct political point of view" and "adopt foreign policy attitudes" on global energy production by determining that such production contributes to "climate change" and should subject fossil-fuel producers to retroactive strict liability.  *Contra* Int. Mem. at 59; Vt. Mem. at 37 (cleaned up); *see, e.g.*, *City of New York*, 993 F.3d at 88 (observing that "global warming . . . is a global problem that the United States cannot confront alone" and detailing international efforts to address the subject); U.S. Mem. at 55 (explaining that

the establishment of liability and compensation schemes for greenhouse gas emissions is a recur-ring topic in international diplomacy and that the United States consistently opposes such schemes); Declaration of Deputy Secretary of State Christopher Landau ("Landau Decl.") ¶ 16, Dkt. No. 50-3. And the Intervenors' point that the Superfund Act is "neutral" because it applies to both domestic and foreign producers (Int. Mem. at 59) does not save it. *Saleh v. Titan Corp.*, 580 F.3d 1, 12 n.8 (D.C. Cir. 2009) ("it is a black-letter principle of preemption law that generally applicable state laws may conflict with and frustrate the purposes of a federal scheme just as much as a targeted state law").

But the Act would also be preempted even if it didn't expressly weigh in on specific issues of foreign policy. What the Act does is far worse—it imposes crippling liability based on overseas energy production and use, including on foreign companies and foreign *nations* that have owner-ship interests in those companies. Vt. Stat. Ann. tit. 10, § 596(10), (22). The Act thus has far "more than some incidental or indirect effect in foreign countries." *Movsesian*, 670 F.3d at 1072 (quoting *Zschernig v. Miller*, 389 U.S. 429, 434 (1968)); *see also id.* at 1077 (holding that state law "ha[d] a direct impact upon foreign relations" because it "subject[ed] foreign insurance com-panies to suit in California" (quotation marks omitted)). Reaching conduct in foreign countries—and, in some cases, holding foreign governments themselves liable—is the entire point of the Act.

### B.    The Superfund Act Conflicts with U.S. Foreign Policy.

Vermont and the Intervenors fare no better in arguing that the Superfund Act does not conflict with U.S. foreign policy. State laws "must give way if they impair the effective exercise of the Nation's foreign policy." *Zschering*, 389 U.S. at 440. And because the Constitution vests the federal government with plenary authority over foreign affairs, state law is preempted if there is even a "likelihood that [it] will produce something more than [an] incidental effect in conflict

with express foreign policy of the National Government." *Garamendi*, 539 U.S. at 420. Or put differently, "the fact that the area in question *is* one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can." *Boyle*, 487 U.S. at 507–08.

In moving for summary judgment, the United States submitted a declaration from the Deputy Secretary of State, who serves as "the principal deputy, adviser, and alter ego to the Secretary of State" and "assist[s] the Secretary in the formulation and conduct of U.S. foreign policy." Landau Decl. ¶ 1. That declaration confirms that the Superfund Act conflicts with U.S. foreign policy, and the statements in it are "entitled to deference" as the considered judgment of the Executive on the Superfund Act's impact on foreign affairs. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (reasoning that "respect for the Government's conclusions" in a State Department official's affidavit was "appropriate"); *Regan v. Wald*, 468 U.S. 222, 243 (1984) (relying on the "opinion of the State Department" regarding question implicating foreign policy "[g]iven the traditional deference to executive judgment in this vast external realm" (cleaned up)); *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 73 (2d Cir. 2005) (deferring to judgment in United States' statement of interest that allowing lawsuit to continue would pose an obstacle to U.S. foreign policy); *Kumar v. Republic of Sudan*, 880 F.3d 144, 157 (4th Cir. 2018) ("In foreign affairs matters such as we consider here, we afford the view of the Department of State 'substantial deference.'" (collecting cases)); *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484–85 (S.D.N.Y. 1988) ("In the area of foreign affairs, a declaration by the coordinate branches of what is or is not in our national interest merits our deferential respect.").

But the Second Circuit has also already held, as a matter of law, that state laws like the Superfund Act "risk jeopardizing our nation's foreign policy," for many of the same reasons the

United States advances here. *City of New York*, 993 F.3d at 103.  Other cases cited by the United

States likewise confirm that conflict-preemption under the Foreign Affairs Doctrine is a question

of law, not fact.  Thus, Vermont cannot create a fact dispute by introducing a declaration from a

law professor to contradict the Deputy Secretary of State on U.S. foreign policy.  And for reasons

given below, that declaration should be disregarded in full anyway as lacking foundation and as-

serting impermissible legal conclusions.

    **1.**  The Superfund Act not only directly conflicts with U.S. foreign policy; it short-circuits

the means by which federal law addresses global greenhouse gas emissions—through a coordi-

nated national policy in cooperation with other nations.  Vermont and the Intervenors reach a dif-

ferent conclusion based in part on their assumption that the Act does not control or regulate global

emissions.  *See* Vt. Mem. at 35; Int. Mem. at 53.  As explained, that assumption is wrong.  *See*

*supra* at 23–29.

    The main defense of the Superfund Act—pressed by both Vermont and the Intervenors—

is that it doesn't directly conflict with the express provisions of any statute, international agree-

ment, or executive position that is "fit to preempt." Vt. Mem. at 30–31; Int. Mem. at 53–54.  But

the Foreign Affairs Doctrine doesn't require conflict with the express terms of federal law.  *Saleh*,

580 F.3d at 12–13.  And Vermont's reliance on *Medellin v. Texas*, 552 U.S. 491 (2008), to limit

the preemptive effect of federal foreign policy is misplaced.  That case had nothing to do with the

Foreign Affairs Doctrine and thus did not limit the preemption holding in *Garamendi*, which (*con-*

*tra* Int. Mem. at 53) did not "depend[] on the existence of executive agreements." *Generali*, 592

F.3d at 118–19 & n.2 (distinguishing *Medellin* and noting that the "executive agreements" in *Gar-*

*amendi* "illustrate[d]" and "express[ed] the national position, rather than define[d] it"). Instead,

the Supreme Court relied on statements from persons in "high levels of the Executive Branch" to

discern the content of U.S. foreign policy, which in turn constituted the "evidence" that state law was in "conflict" with that policy. *Garamendi*, 539 U.S. at 421–22; *see also Generali*, 592 F.3d at 118–19.

Properly stated, then, foreign-affairs preemption arises when state law, by its very existence, poses an "obstacle to the accomplishment" of the federal government's foreign policy "objectives." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Thus, in *Crosby*, the Supreme Court held that a state law was preempted because it imposed a parallel sanctions regime on a foreign nation that differed from the policies and objectives of Congress and the President. *Id.* at 373–86. And the state law was preempted even though it shared the same goals as federal law. *Id.* at 379–80; *see also Saleh*, 580 F.3d at 13 (explaining that "in both *Crosby* and *Garamendi,* preemption arose not because the state law conflicted with the express provisions of federal law, but because, under the circumstances, the very imposition of *any state law* created a conflict with federal foreign policy interests").

The Superfund Act conflicts with federal law in similar ways. Consider, first, federal statutes. The Superfund Act's global reach conflicts with the Clean Air Act because Congress "declined to extend" that statute "beyond our borders" and "contemplate[d] the need for foreign nations to promulgate reciprocal legislation." *City of New York*, 993 F.3d at 103. It also conflicts with the Global Climate Protection Act, which reflects not mere "aspiration" (Vt. Mem. at 33; Int. Mem. at 53), but U.S. foreign policy on the need for "multilateral agreements" and a "coordinated national policy." Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1408 (1987), reprinted as note to 15 U.S.C. § 2901. The Superfund Act—and the state-by-state regulatory regime it fosters—is the converse of a "coordinated national policy." In both these ways, the Superfund Act

"risk[s] jeopardizing our nation's foreign policy goals" and "circumvent[ing] Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *City of New York*, 993 F.3d at 103; *Crosby*, 530 U.S. at 374 (state law preempted because it undermined Congress's "directive to the President to proceed diplomatically in developing a comprehensive, multilateral strategy").

Turning to international agreements, the United States addresses global greenhouse gas emissions through a framework for international cooperation—the U.N. Framework Convention on Climate Change. The Superfund Act "bypasses" that framework and regulates global emissions directly under state law. *City of New York*, 993 F.3d at 103; *Crosby*, 530 U.S. at 380. In so doing, it also undermines concrete U.S. foreign policy on energy and climate change, which has been marked by efforts to *de*regulate emissions. *See Putting America First in International Environmental Agreements*, Exec. Order No. 14162 § 3(a)–(b), 90 Fed. Reg. 8,455, 8,455 (Jan. 20, 2025) (directing withdrawal from Paris Agreement and other pacts under the Framework Convention); *see also* Landau Decl. ¶ 17. By taking a different tack than the federal government on this topic of global concern, Vermont hampers "the President's capacity" for "effective diplomacy" and "compromise[s]" his ability "to speak for the Nation with one voice in dealing with other governments." *Crosby*, 530 U.S. at 381. And this conflict, which goes to the heart of the President's constitutional power to conduct foreign affairs, is fit to preempt. *See id.*; *see also Garamendi*, 539 U.S. at 414 (describing the President's "vast" and "independent" authority over foreign affairs, including "executive authority to decide what [our foreign] policy should be" (cleaned up)).

Vermont and the Intervenors next accuse the United States of misunderstanding its own policy on international liability and compensation schemes. *See* Vt. Mem. at 32; Int. Mem. at 56–57. But they miss the point by stressing that the United States' opposition to such schemes has

been about the liability of the federal government and states to foreign countries. The Superfund Act still conflicts with this concrete and longstanding foreign policy by putting the United States in the untenable (and hypocritical) position of opposing liability for itself and individual states, while one of those states (two, counting New York, and still more if state tort suits are considered) freely imposes liability on foreign companies, including *foreign nations*. *See* Vt. Stat. Ann. tit. 10, § 596(10) (providing that entities subject to the Act include any "foreign nation . . . that holds or held an ownership interest in a fossil fuel business during the covered period"). Here, too, the Act undercuts "effective diplomacy" and compromises the Nation's capacity to "speak . . . with one voice" on the world stage, as confirmed by the Deputy Secretary of State. *Crosby*, 530 U.S. at 381; *see* Landau Decl. ¶¶ 16–17 (explaining that the Act "interferes with" the United States' "longstanding position" on liability and compensation schemes and thus "foments new frictions in climate negotiations" and undermines "the federal government's capacity to speak with one voice" in international diplomacy). No wonder, then, that the Second Circuit relied on the United States' opposition to such liability schemes in holding that the City's tort suit would "sow confusion" and "needlessly complicate the nation's foreign policy." *City of New York*, 993 F.3d at 103 & n.11.

Finally, Vermont claims that the Superfund Act is consistent with the "polluter pays" principle present in other international agreements to which the United States is a party. *See* Vt. Mem. at 32. Not so. For one thing, Vermont fails to identify a single polluter-pays agreement that covers greenhouse gas emissions, which is a far more complex issue than other matters covered by such agreements. For another, even if the Superfund Act is generally consistent with the polluter-pays principle, it still conflicts with U.S. foreign policy and intrudes on foreign affairs because it is an effort by an *individual state* to impose liability for global emissions. That the *United States* may

adopt a global polluter-pays law consistent with international agreements does not mean *Vermont* may do so on its own accord, without the concurrence of the federal government.

**2.**  In making their foreign affairs arguments, Vermont and the Intervenors rely heavily on an expert declaration from Harold Koh, a professor at Yale Law School.  *See* Declaration of Harold Hongju Koh ("Koh Decl."), Dkt. No. 53-3.  The declaration, for the most part, describes and interprets international legal obligations and applies that law to the facts here.  *See, e.g.*, Koh Decl. ¶¶ 10 (admitting that Vermont retained him "to opine on international law, multilateral agreements, and United States climate policy" as relevant to the Superfund Act), 36 ("In sum, the Framework Convention, the Paris Agreement, and whatever climate policy the Trump Administration may seek to put in place . . . do not conflict with any requirement of the [Superfund Act]."), 37 ("I conclude that the [Superfund Act] is consistent with international environmental law and agreements[.]").  What is more, despite his current employment as a law professor—not as a government official—Koh pronounces that the Superfund Act does not interfere with "ongoing intergovernmental climate negotiations" because "there is no ongoing 'United States participation in the Framework Convention' for Vermont's actions to disrupt."  Koh Decl. ¶ 35.  But Koh does not purport to have personal knowledge, much less expertise, concerning the current Administration's foreign policy or conduct of foreign affairs.

The Court should accordingly disregard the Koh Declaration in full because it contains impermissible legal conclusions and factual assertions to which Koh is not competent to testify.  *See* Fed. R. Civ. P. 56(c)(4) (declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated"); *Lexington Ins. Co. v Rounds*, 349 F. Supp. 2d 861, 870 (D. Vt. 2004) ("An expert may not offer an opinion outside of his or her area of expertise."); *United States v. Articles of*

*Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1050 (C.D. Cal. 2013) (disregarding international law professor's expert declaration because "[i]nterpreting the [relevant law] and applying it to the facts are functions that the court is competent to perform without the aid of an expert"). The Koh Declaration is especially off-base in its attempt to contradict the sitting Deputy Secretary of State's view that the Superfund Act "interferes with the United States foreign policy on greenhouse gas regulation, including . . . the United States' participation in the Framework Convention and announcement of its intention to withdraw from the Paris Agreement." Landau Decl. ¶ 17; *see* Koh Decl. ¶ 35. Not only does Koh have no basis to weigh in given his lack of personal knowledge or competence regarding ongoing foreign affairs, his premise that preemption requires interference with specific negotiations is not the law.[12]

## V.    The Superfund Act Violates The Commerce Clause.

The Superfund Act violates the Commerce Clause for the same reason it exceeds constitutional limits on extraterritorial regulation. *See supra* at 37–42. A state law violates the Commerce Clause if it exerts direct "extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021). In such cases, "discrimination is not required." *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025).

Contrary to Vermont's claim, the United States is not advocating for a per se rule against laws that have extraterritorial effect. *Pork Producers* rejected such a rule, 598 U.S. at 375, but it

---

[12] The United States preserves all other evidentiary objections to the Koh Declaration.

did not disturb the settled principle that states cannot "*directly* regulate[] out-of-state transactions" that lack a sufficient connection to the state, *id.* at 376 n.1. That is precisely what the Superfund Act does, *see supra* at 38, and there is no requirement under the extraterritoriality doctrine that it regulate prices (*contra* Int. Mem. at 46), *see Edgar v. MITE Corp.*, 457 U.S. 624, 641–43 (1982) (securities regulation); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (internet regulation).

The Superfund Act also discriminates against out-of-state commerce by imposing crippling costs on fossil-fuel extraction and refining that takes place *entirely* in other states (and nations) and redistributing the funds for in-state projects. *See* U.S. Mem. at 59. The Act does not incidentally affect more out-of-state entities because there happen to be fewer in-state participants. *Cf. N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 91 (2d Cir. 2017). To the contrary, it *directly* targets *wholly* out-of-state commercial activity for the express purpose of shifting infrastructure costs away from Vermonters and onto out-of-state fossil fuel producers. *See* Vt. Mem. at 2 (noting that the Act "establishes a cost recovery framework to help provide revenue for climate change adaptation projects in Vermont"); Int. Mem. at 1 ("The statute thereby shifts part of the mounting cost of climate adaptation from Vermonters to companies that bear responsibility for causing the pollution[.]"). That is textbook discrimination, and the main case cited by Vermont does not compel a different result. *Cf. Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125–26 (1978) (holding that "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce" when out-of-state competitors are not burdened).

As applied to foreign commerce, the constitutional defects are even greater. U.S. Mem. at 60–61; *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 449 (1979) (Commerce Clause

protects the National government's ability to speak with "one voice" when regulating commerce with foreign nations); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999) (state law unconstitutional because it "discriminate[d] against foreign commerce," "impede[d] the federal government's ability to speak with one voice in foreign affairs," and "attempt[ed] to regulate conduct . . . outside of this country's borders"), *aff'd sub nom. Crosby*, 530 U.S. 363.

## VI.    The Superfund Act Is Facially Invalid.

The United States previously explained that, based on its claims, the Act could not be applied lawfully unless (1) all fossil-fuel extraction and refining activities of all responsible parties occurred in Vermont alone and (2) the fossil fuels extracted or refined by those entities stayed in Vermont, such that all emissions from their use originated in the State.  U.S. Mem. at 27.  For reasons given in the United States' opening brief, Vermont cannot satisfy either condition.

Neither Vermont nor the Intervenors dispute (or even respond) to this point, even though they repeatedly remind the Court that this is a facial challenge and that the United States must show that the Superfund Act is unlawful in every application.  The United States has made that showing.  *See* U.S. Mem. at 27–28.  Accordingly, if the Court agrees with the United States on the merits of any of its claims, it should hold that the Superfund Act is facially unlawful.

## CONCLUSION

For the reasons given above and in its opening brief, the Court should grant the United States' motion for summary judgment, declare the Superfund Act invalid and unenforceable, and permanently enjoin Defendants from taking any actions to implement or enforce it.[13]  The Court should deny all motions filed by Defendants and Intervenor-Defendants.

---

[13] Vermont and the Intervenors do not dispute that the United States would be entitled to a permanent injunction if it prevails on the merits.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
JUSTIN D. HEMINGER
*Acting Deputy Assistant Attorney General*

/s/ *Riley W. Walters*
RILEY W. WALTERS
*Counsel*
JOHN K. ADAMS
*Senior Counsel*
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov

December 15, 2025
Washington, D.C.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2025, I electronically filed the foregoing consolidated reply in support of the United States' motion for summary judgment and opposition to the cross-motions for summary judgment using the CM/ECF system, which electronically served all counsel of record.

Dated: December 15, 2025                    /s/ *Riley W. Walters*
                                            RILEY W. WALTERS
                                            *Counsel*
                                            U.S. Department of Justice
                                            Environment and Natural Resources Division
                                            950 Pennsylvania Ave., N.W.
                                            Washington, D.C. 20530
                                            (202) 514-5442
                                            Riley.Walters@usdoj.gov