# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>*Plaintiffs*,<br><br>v.<br><br>STATE OF VERMONT, et al.,<br><br>*Defendants*,<br><br>and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br><br>*Intervenor-Defendants.* | No. 2:25-cv-00463 |
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br><br>*Plaintiffs*,<br><br>and<br><br>STATE OF WEST VIRGINIA, et al.,<br><br>*Intervenor-Plaintiffs,*<br><br>v.<br><br>JULIE MOORE, et al.,<br><br>*Defendants*,<br><br>and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br><br>*Intervenor-Defendants.* | No. 2:24-cv-01513 |

## REPLY MEMORANDUM IN SUPPORT OF INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. iii

TABLE OF ABBREVIATIONS ......................................................................... viii

INTRODUCTION ................................................................................................ 1

ARGUMENT ........................................................................................................ 2

I.      The Act does not regulate emissions.......................................................... 2

II.     State Plaintiffs have not established injury in fact or *parens patriae*
        standing........................................................................................................ 5

III.    The United States lacks standing ............................................................... 7

IV.     Government Plaintiffs lack a cause of action ............................................. 9

V.      Plaintiffs' claims are unripe ..................................................................... 10

VI.     The Vermont Act is not preempted by the Clean Air Act or federal
        common law............................................................................................... 13

        A.      *City of New York v. Chevron* does not control the
                preemption analysis ....................................................................... 14

                1.      The Act is materially different from the tort claims
                        in *City of New York* ............................................................ 14

                2.      The Act does not conflict with federal common law ............... 17

        B.      The Clean Air Act does not preempt the Vermont Act........................ 18

                1.      The Clean Air Act does not occupy the field ........................... 18

                2.      The Vermont Act does not conflict with the Clean
                        Air Act's regulation of greenhouse gas emissions ................... 19

VII.    The Act comports with constitutional limitations on reaching out-
        of-state conduct......................................................................................... 22

VIII.   Foreign affairs preemption does not apply ............................................... 25

        A.      Effects on negotiation positions are insufficient for foreign
                affairs conflict preemption............................................................. 26

        B.      Liability for greenhouse gas emissions is not field
                preempted......................................................................................... 29

i

CONCLUSION....................................................................................................................... 30

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967) ................................................................................. 12

*Am. Elec. Power Co. v. Connecticut*,
    564 U.S. 410 (2011) ............................................................................ 14, 17

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ............................................................................ 27, 29

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................... 8

*In re Assicurazioni Generali, S.P.A.*,
    592 F.3d 113 (2d Cir. 2010) ........................................................... 26, 27, 28

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
    512 U.S. 298 (1994) .................................................................................. 27

*Bates v. Dow Agrosciences L.L.C.*,
    544 U.S. 431 (2005) .................................................................................. 15

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ..................................................................... 19

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) .................................................................................. 15

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ............................................................................ 18, 19

*Calcano v. Swarovski N. Am. Ltd.*,
    36 F.4th 68 (2d Cir. 2022) .......................................................................... 6

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) ....................................... 2, 6, 14, 16, 17, 18, 21, 29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................ 6, 7, 9

*Clark v. Allen*,
    331 U.S. 503 (1947) .................................................................................. 30

*Connecticut v. Cahill*,
    217 F.3d 93 (2d Cir. 2000) ........................................................................ 10

*Connecticut v. Duncan*,
  612 F.3d 107 (2d Cir. 2010) ....................................................... 13

*Crank v. United States*,
  539 F.3d 1236 (10th Cir. 2008) ..................................................... 8

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ............................................................. 14, 28

*In re Debs*,
  158 U.S. 564 (1895) ............................................................... 8, 9

*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ................................................................. 6

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ................................................................ 23

*Eternal Word Television Network, Inc. v. Sebelius*,
  935 F. Supp. 2d 1196 (N.D. Ala. 2013) ............................................. 13

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021) ................................................................ 24

*Fuld v. Palestine Liberation Org.*,
  606 U.S. 1 (2025) .................................................................. 25

*George E. Warren Corp. v. U.S. EPA*,
  159 F.3d 616 (D.C. Cir. 1998) ....................................................... 3

*Heckman v. United States*,
  224 U.S. 413 (1912) ................................................................ 10

*Hoyt v. Sprague*,
  103 U.S. 613 (1881) ................................................................ 22

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) ................................................. 14, 15, 16, 19, 20

*Kansas v. Garcia*,
  589 U.S. 191 (2020) ................................................................ 19

*Keeton v. Hustler Mag., Inc.*,
  465 U.S. 770 (1984) ................................................................ 24

*Lab. Council for Latin Am. Advancement v. EPA*,
  12 F.4th 234 (2d Cir. 2021) ..................................................... 11, 12

*Madeira v. Affordable Hous. Found., Inc.*,
    469 F.3d 219 (2d Cir. 2006) ........................................................ 20

*Marcus v. AT&T Corp.*,
    138 F.3d 46 (2d Cir. 1998) .......................................................... 17

*Medellín v. Texas*,
    552 U.S. 491 (2008) ............................................................. 26, 27

*Merrick v. Diageo Americas Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) ....................................................... 19

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    725 F.3d 65 (2d Cir. 2013) .......................................................... 19

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) .......................................................... 25

*N. Carolina, ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) ....................................................... 19

*Nat. Res. Def. Council, Inc. v. EPA*,
    859 F.2d 156 (D.C. Cir. 1988) ..................................................... 13

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ........................................................ 23

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013) ........................................................ 12

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ............................................................. 22, 23

*Nat'l Shooting Sports Found., Inc. v. James*,
    144 F.4th 98 (2d Cir. 2025) ........................................................ 25

*NRDC v. NHTSA*,
    894 F.3d 954 (2d Cir. 2018) ........................................................ 15

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ................................................................ 12

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) ................................................................ 21

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009) ........................................................ 30

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*,
    359 U.S. 236 (1959) ................................................................. 15

*Strassheim v. Daily*,
    221 U.S. 280 (1911) ................................................................. 22

*Texas v. United States*,
    523 U.S. 296 (1998) ........................................................... 12, 13

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................... 7

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ................................................................... 9

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ..................................................... 5

*Wachovia Bank, N.A. v. Burke*,
    414 F.3d 305 (2d Cir. 2005) ................................................... 14

*Watson v. Emps. Liab. Assurance Corp., Ltd.*,
    348 U.S. 66 (1954) ................................................................... 24

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
    164 F.3d 123 (2d Cir. 1999) ................................................... 18

*Wyandotte Transp. Co. v. United States*,
    389 U.S. 191 (1967) ............................................................. 9, 10

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ................................................................. 13

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ................................................................. 10

*Zschernig v. Miller*,
    389 U.S. 429 (1968) ................................................................. 29

## Statutes

Vt. Stat. Ann. tit. 10, § 596 .........................................11, 23, 24

Vt. Stat. Ann. tit. 10, § 598 ................................................. 23

Vt. Stat. Ann. tit. 10, § 599c ................................................ 23

**Rules**

Fed. R. Civ. P. 56(c)(4) ................................................................................................. 5

Fed. R. Evid. 702 .......................................................................................................... 5

**Other Authorities**

Vermont General Assembly, *Vermont's Legislative Process* ........................................ 16

White House, Memorandum Withdrawing the United States from International Organizations
    (Jan. 7, 2026).................................................................................................... 28

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **State** or **Vermont** | Defendants State of Vermont, Governor Philip Scott, Secretary Julie Moore, and Director Jane Lazorchak |
| **Chamber Plaintiffs** | Plaintiffs United States Chamber of Commerce and American Petroleum Institute (*Chamber* case) |
| **State Plaintiffs** | Intervenor-Plaintiffs West Virginia and twenty-three other states (*Chamber* case) |
| **United States** | Plaintiffs United States of America and United States Environmental Protection Agency |
| **Government Plaintiffs** | State Plaintiffs and the United States |
| **Chamber Compl.** | Chamber Plaintiffs' Complaint for Declaratory and Injunctive Relief ECF No. 1 (*Chamber* case) |
| **W. Va. Compl.** | State Plaintiffs' Complaint in Intervention for Declaratory and Injunctive Relief ECF No. 31 (*Chamber* case) |
| **Int.-Defs.' Aug. Mem.** | Intervenor-Defendants' Memorandum of Law in Support of Motion to Dismiss ECF No. 84-1 (*Chamber* case); ECF No. 43-1 (*United States* case) |
| **Chamber Opp. Mot. Dismiss** | Chamber Plaintiffs' Response in Opposition to Defendants' and Intervenor-Defendants' Motions to Dismiss ECF No. 101 (*Chamber* case) |
| **W. Va. Sept. Mem.** | State Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to Defendants' Motions to Dismiss ECF No. 102-1 (*Chamber* case) |
| **U.S. Sept. Mem.** | United States' Memorandum in Opposition to Motions to Dismiss and in Support of Motion for Summary Judgment ECF No. 50-1 (*United States* case) |
| **Int.-Defs.' Nov. Mem** | Intervenor-Defendants' Memorandum of Law in Support of Motion for Summary Judgment, in Opposition to |

|  | Plaintiffs' Motions for Summary Judgment, and Reply Memorandum in Support of Motion to Dismiss ECF No. 113-1 (*Chamber* case); ECF No. 57-1 (*United States* case) |
| --- | --- |
| **Int.-Defs.' SUMF** | Intervenor-Defendants' Statement of Undisputed Material Facts in Support of Moton for Summary Judgment ECF No. 113-2 (*Chamber* case); ECF No. 57-2 (*United States* case) |
| **Chamber Dec. Mem.** | Chamber Plaintiffs' Combined Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Cross-Motions for Summary Judgment ECF No. 123 (*Chamber* case) |
| **Chamber Resp. Int.-Defs.' SUMF** | Chamber Plaintiffs' Response to Intervenor-Defendants' Statement of Undisputed Material Facts ECF No. 123-2 (*Chamber* case) |
| **W. Va. Dec. Mem.** | State Plaintiffs' Reply in Support of Motion for Summary Judgment and Response in Opposition to Defendants' Motions for Summary Judgment ECF No. 121 (*Chamber* case) |
| **W. Va. Resp. Int.-Defs.' SUMF** | State Plaintiffs' Response to Intervenor-Defendants' Statement of Undisputed Material Facts ECF No. 121-2 (*Chamber* case) |
| **U.S. Dec. Mem.** | United States' Consolidated Reply in Support of Motion for Summary Judgment and Response in Opposition to Cross-Motions for Summary Judgment ECF No. 65 (*United States* case) |
| **U.S. Resp. Int.-Defs.' SUMF** | United States' Response to Intervenor-Defendants' Statement of Undisputed Material Facts ECF No. 66-2 (*United States* case) |
| **U.S. Resp. Int.-Defs.' Statement of Add'l Facts** | United States' Response to Intervenor-Defendants Statement of Additional Undisputed Material Facts ECF No. 65-1 (*United States* case) |

**INTRODUCTION**

It is a fundamental tenet of our federalist system that states may exercise all powers that the Constitution does not reserve for the federal government. *See* U.S. Const. amend. X. Vermont's Climate Superfund Act ("the Act") falls within this framework. The State seeks to solve the type of problem states routinely address: the need for additional resources to fund projects necessary to protect the State's natural resources and its residents' health, safety, and livelihoods. And its method—imposing a one-time retroactive fee on fossil fuel companies that have contributed to the need for climate adaptation and have a sufficient connection to the State—does not intrude on any area reserved for federal regulation.

Plaintiffs' attempt to nullify Vermont's exercise of sovereignty by recasting it as a regulation of interstate greenhouse gas emissions cannot stand. The Act does not limit emissions or set pollution control standards (a point Plaintiffs do not dispute), and the Act's assessments will not incentivize any fossil fuel company to decrease production or increase prices. Plaintiffs theorize that the potential for *future* legislation similar to the Act will have ripple effects on the international energy market, leading to lower emissions. This speculative chain of events cannot turn the Act itself into an emissions regulation. Even if it could, Plaintiffs have not submitted credible evidence substantiating their theory, while Defendants have shown that the Act will not affect future production, pricing, or emissions, even indirectly.

The Act is thus not preempted by the Clean Air Act, is not an unconstitutional extraterritorial regulation, and does not interfere with foreign affairs. And because Government Plaintiffs base their claims of injury on the assumption that the Act will affect future fossil fuel production and prices, and on the false premise that the Act prevents enforcement of federal laws, they lack standing. Plaintiffs' claims are also premature, because they rely on speculation about how the Act will be implemented. The Court should grant Intervenor-Defendants' Motion

for Summary Judgment on Counts I and II of all three complaints and Count V of the United

States' complaint.

## ARGUMENT

### I.     The Act does not regulate emissions

The linchpin of Plaintiffs' case has not changed: they contend that Vermont is attempting

to regulate interstate greenhouse gas emissions. But that's wrong. The Act does not impose

emissions limits or pollution control standards or require fossil fuel producers to alter their

production, investments, or pricing in any way. Int.-Defs.' Nov. Mem. 4-5.[1] The Court should

reject Plaintiffs' attempt to disregard the plain language of the statute.

Lacking support in the Act itself, Plaintiffs suggest that under *City of New York v.*

*Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), any statute that assesses costs for fossil fuel

production is effectively an emissions regulation. But *City of New York* did not involve

interpretation of a statute or its impact, let alone one that by its terms is purely retroactive. And,

as discussed further in Section VI.A.1, the court did not hold that *all* liability in any way related

to greenhouse gas emissions amounts to emissions regulation. It held that specific state tort

claims, which the city admitted could affect future fossil fuel production, were akin to emissions

regulation.[2] *Id.* at 93. The Court should not extend *City of New York* to sweep in a purely

retroactive state statute.

---

[1] Contrary to State Plaintiffs' assertion, Intervenor-Defendants have never argued that the Act has
"nothing to do" with emissions, W. Va. Dec. Mem. 2; *see also id.* at 30, only that the Act does
not *regulate* emissions.

[2] For the same reason, Chamber Plaintiffs are incorrect that it's immaterial whether the Act
regulates emissions. Chamber Dec. Mem. 29. *City of New York* was clear that the state tort
claims there were preempted *because* they amounted to emissions regulation. 993 F.3d at 93. To
bring this case within the ambit of *City of New York*, Plaintiffs must therefore establish that the
Act regulates emissions.

Plaintiffs next argue that the Act might have indirect forward-looking impacts on fossil fuel production. But even if the Court were to accept the unsupported premise that such impacts could transform the Act into an emissions regulation, Defendants have submitted persuasive evidence that the Act's assessment of a fixed cost on fossil fuel producers will not change their future investments or production volumes or affect energy prices. Declaration of Don Fullerton, Ph.D. ("Fullerton Decl.") ¶¶ 11, 21-35, ECF No. 109-3 (*Chamber* case), ECF No. 53-2 (*United States* case).[3]

Perhaps recognizing the validity of these widely accepted economic principles, Plaintiffs have all but abandoned their contention that a one-time assessment, without more, will affect fossil fuel production or pricing. Instead, they argue that the mere possibility that Vermont could someday extend the covered period, or that other states could pass laws similar to the Act, might lead fossil fuel producers to reduce their investments or attempt to change pricing.[4] U.S. Dec. Mem. 8-9, 27-28; Chamber Dec. Mem. 33; W. Va. Mem. 6, 23. This theory relies on a speculative, attenuated chain of events. Furthermore, Plaintiffs provide no support for their argument that a non-regulatory statute morphs into an "emissions regulation" because a state might someday enact a law materially different from Vermont's (e.g., covering periods after

---

[3] Both Dr. Fullerton and the amici economists explain that it would defy common-sense economic principles for a firm to forego profitable investments in the future simply because it has paid a fixed cost for past activities. *See* Fullerton Decl. ¶¶ 11, 31-42; Economists Amici Br. 2, 12-15, ECF No. 89 at 12-14 (*Chamber* case), ECF No. 48 (*United States* case); *see also George E. Warren Corp. v. U.S. EPA*, 159 F.3d 616, 628 (D.C. Cir. 1998) (profit-maximizing firms will only limit "additional production when marginal cost exceeds price").

[4] The United States erroneously suggests that Intervenor-Defendants acknowledge the likelihood that states could repeatedly pass new laws covering future fossil fuel production. U.S. Dec. Mem. 28. Intervenor-Defendants noted only that even if other states were to pass laws identical to Vermont's, i.e., laws basing cost recovery demands on production *prior to 2025*, those laws would amount to fixed costs for past activity that would not affect future fossil fuel production. Plaintiffs refer to states considering "climate Superfund" bills but do not point to any bill that would cover periods after 2024.

2024). *See also infra* Argument VI.A.1 (explaining that the potential for future legislation does not make the Act akin to ongoing tort liability).

And if the Act is likely to lead to reductions in fossil fuel production or price increases, it stands to reason that the leading firms would have said so. Chamber Plaintiffs submitted declarations from four of the world's largest fossil fuel producers. Remarkably (given Plaintiffs' assertions about the supposed impact of the Act), Shell, BP, and Chevron do not say a single word about curtailing investments in new fossil fuel projects, otherwise cutting production, or attempting to increase prices as a result of the Act.[5] For its part, ExxonMobil proffers only a perfunctory statement that after it pays an assessment years from now, in an amount not yet established, it will have to make some decisions about unspecified investments, production volumes, planning, pricing, contracts, and personnel. Declaration of Vijay Swarup (Swarup Decl.) ¶ 27, ECF No. 100-6. That vague assertion falls far short of proof, as required at summary judgment, that Exxon is likely to reduce fossil fuel production, including in any of the Plaintiff States, or attempt to increase prices due to the Act.

Government Plaintiffs attempt to prop up the Chamber's thin presentation with expert testimony, but that testimony does not satisfy Rule 56 because it is speculative and unsupported and thus inadmissible as expert opinion. State Plaintiffs' expert, Benjamin Zycher, not only presumes that Vermont will pass new laws covering later periods, but that it might do so until the end of time, forever subjecting the industry to liability for future fossil fuel production. *See* Declaration of Benjamin Zycher ("Zycher Decl.") ¶¶ 45, 55, ECF No. 121-1. This hypothesis— the very assumption on which Zycher's analysis is based, *id.* ¶ 45—is far-fetched, as Zycher

---

[5] *See* Declaration of John Martini, ECF No. 100-7; Declaration of Travis A. Torrence, ECF No. 100-8; Declaration of Sean Philip Cochrane, ECF No. 100-9.

seems to recognize when he states that the chances of this perpetual legislation and ongoing liability are "greater than zero." *See id*. ¶ 55. The United States' expert, Luke Froeb, asserts that there is a possibility Vermont "could" amend the Act or pass a new law, Declaration of Luke Froeb, Ph.D. ("Froeb Decl.") ¶¶ 24, 27, ECF No. 65-2, but that too is pure guesswork. Froeb's suggestion that investors and lenders "could" or "might" demand better terms when providing capital to fossil fuel producers, *id*. ¶¶ 19, 28-29, adds yet another layer of speculation: it assumes not only how fossil fuel producers might react to unknown payments three years from now, but also how other non-parties, another layer removed (fossil fuel companies' lenders and investors) might react.[6] The Court should disregard both Zycher's and Froeb's testimony because it is speculative and not backed by any reliable economic principles.[7] It should credit Fullerton's opinion because he explains how basic economic principles apply to the existing statute that is the subject of this litigation.

## II. State Plaintiffs have not established injury in fact or *parens patriae* standing

State Plaintiffs assert that future cost assessments under the Act, in yet-to-be-determined amounts, will force the fossil fuel industry to reduce investments or cut production volumes, thus harming the States. *See, e.g.,* W. Va. Dec. Mem. 4-5; W. Va. Compl. ¶¶ 61, 74; Int.-Defs.' Nov. Mem. 14-15. This claim is speculative and defies common-sense economic principles.[8] *See* Int.-Defs.' Aug. Mem. 12-13; Fullerton Decl. ¶¶ 14-20, 25, 27-42.

---

[6] In any event, Froeb suggests only that the subset of fossil fuel companies covered by the Act might face higher costs of capital and thus invest less, Froeb Decl. ¶¶ 28, 31, not that the fossil fuel industry as a whole would make fewer investments (which would be necessary to reduce overall output).

[7] *See* Fed. R. Civ. P. 56(c)(4) (declaration must "show that the affiant or declarant is competent to testify on the matters stated"); Fed. R. Evid. 702; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (discussing indicia of reliability for expert testimony).

[8] State Plaintiffs mischaracterize the Swarup declaration, claiming that ExxonMobil "has sworn it will be forced to *cut* output, *raise* prices, *reduce* investment, or some combination of the three

Apparently aware of the absurdity of suggesting that fossil fuel producers will act against their own interests by foregoing ongoing, profitable investments if they have to pay a one-time assessment to Vermont, State Plaintiffs now suggest that it's really the possibility of *new* state laws that might change fossil fuel producers' conduct. *See, e.g.*, W. Va. Dec. Mem. 6. Thus, they base their claim of injury on "speculation about the decisions of independent actors," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), and then double down by trying to predict how those independent actors might respond to hypothetical new laws. The States' expert's hypothesis that the industry will view the possibility of repeat legislation as "greater than zero," Zycher Decl. ¶ 55, is "mere speculation" insufficient to establish standing. *See Clapper*, 568 U.S. at 409-10; s*ee also Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) ("a court must conclude that third parties will *likely* react to the government regulation (or judicial relief) in predictable ways that will likely cause (or redress) the plaintiff's injury") (emphasis added) (cleaned up)); *see also Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) (a court should not "draw unwarranted inferences in order to find standing") (citation omitted)).[9]

Because actual evidence supporting standing is required at summary judgment, and because this is not a tort case, State Plaintiffs' reliance on *City of New York*, *see* W. Va. Dec. Mem. 9, is misplaced. State Plaintiffs have no answer to the fact that in *City of New York*, the city had conceded that "tort damages could work production-side changes," 993 F.3d at 93 (internal

---

because of the Climate Superfund Act." W. Va. Dec. Mem. 9 (emphasis added). But the declaration says nothing about "cutting" output, "raising" prices, or "reducing" investment, let alone doing so in any of the Plaintiff States.

[9] State Plaintiffs argue, W. Va. Dec. Mem. 8, that in *Diamond Alternative Energy* the Court looked beyond an individual state's regulation to find injury, but there a federal law required other states to adopt a federal standard or California's, and 17 states and the District of Columbia had *already* adopted California's standard, 606 U.S. 100 at 106-08. The Court discussed the likely impact of regulations already promulgated by multiple states. *Id.* at 113-14.

quotation marks omitted). In sharp contrast, here Defendants and Intervenor-Defendants have explained why fossil fuel producers faced with a fixed cost payment will not forego otherwise profitable ongoing investments and production.

The Court must decide State Plaintiffs' standing, *contra* W. Va. Dec. Mem. 3, because they and Chamber Plaintiffs do not seek the same relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Chamber Plaintiffs ask the Court to enjoin the defendants from "enforc[ing] the Act or the challenged portions of the Act against [their] covered members," Chamber Compl. p. 65. But State Plaintiffs seek broader relief—to enjoin the defendants "from taking any action to implement or enforce the Act," W. Va. Compl. p. 67—and would thus have the Court enjoin any implementation of the Act (beyond assessments against individual fossil fuel producers), such as issuance of agency reports the Act requires.[10]

## III.    The United States lacks standing

The United States relies on Froeb's assertions that fossil fuel producers "could" be impacted by higher capital costs and that there is an increased "possibility" investors will expect additional legislation, Froeb Decl. ¶¶ 19, 33b, but that conjecture amounts to a "highly attenuated chain of possibilities" insufficient to establish standing, *Clapper*, 568 U.S. at 410. Tellingly, none of the four fossil fuel companies who have weighed in suggests that their cost of capital has increased (or even "might" increase) because of the Act or hypothetical new statutes. *Supra* at 4. And Froeb's statement that investors have for years considered climate policies in their risk assessments and investment decisions, Froeb Decl. ¶¶ 29-30, proves too much. No Plaintiff has

---

[10] In addition, the Supreme Court recently emphasized that, in crafting equitable relief, courts should be guided by the needs of each party before the court. *See Trump v. CASA*, 606 U.S. 831, 851 (2025) ("The equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*." (internal quotation marks omitted)). That is all the more reason for the Court to establish from the outset who is a proper plaintiff in the case.

presented a shred of evidence that the Act has moved the needle in light of decades of state, national, and international climate policies and litigation. The United States thus fails to establish standing under its "pecuniary interest," "general welfare," or *parens patriae* theories.

The United States also asserts sovereign interest standing, repeating its unsupported claim that the Act "violates" federal law. The United States cites *Arizona v. United States*, 567 U.S. 387 (2012), for the proposition that it has standing to challenge any law it alleges is preempted. U.S. Dec. Mem. 4-5 (citing *Arizona*, 567 U.S. at 398-99). But *Arizona* did not discuss standing and involved a state law that—unlike the Act here—created state remedies for the violation of federal law. 567 U.S. at 393-94.[11] Intervenor-Defendants do not question that the United States at times sues states who interfere with enforcement of federal law, *see* U.S. Dec. Mem. 5, but the United States has not shown how the Act's one-time assessments prevent or interfere with the federal government's enforcement of any law.

Finally, the United States repeats its earlier argument that for standing purposes the Court must accept its legal claim that the Act is preempted because it "control[s] ongoing emissions." U.S. Dec. Mem. 6. But by its terms, the Act does not control interstate emissions in any way. *Supra* Argument I. The United States' argument that the Act might indirectly influence emissions is based on a *factual* assertion—presumably why the claim is made in witness declarations—that fossil fuel producers who receive cost assessments may reduce investments or production or attempt to change global energy prices. But, as discussed above, this is mere conjecture about a

---

[11] The United States' reliance on *Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008), and *In re Debs*, 158 U.S. 564 (1895), U.S. Dec. Mem. 5-6, is equally misplaced. In *Crank* the Court held that a state had standing to enforce its state legal code against the United States' claim of preemption, and *Debs* involved a question of the judiciary's power to issue an injunction to prevent the physical, forcible obstruction of interstate railways and mail.

"highly attenuated chain of possibilities" that is insufficient to establish standing. *Clapper*, 568 U.S. at 410.

## IV.     Government Plaintiffs lack a cause of action

To determine whether plaintiffs have an equitable cause of action, federal courts generally ask whether the remedy plaintiffs seek is "sufficiently 'analogous' to the relief issued by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act [of 1789]." *CASA*, 606 U.S. at 841-42 (cleaned up). Here, Government Plaintiffs fail to cite any sufficiently analogous founding-era example of government suits against states to challenge the validity of a state law under the Supremacy Clause when the plaintiff cannot demonstrate a concrete injury from the application of the statute. *See* U.S. Dec. Mem. 16 (collecting cases almost exclusively from the 20th and 21st centuries); Int.-Defs.' Nov. Mem. 20 (distinguishing single 19th-century case). Governmental Supremacy Clause suits against states are an invention of the last few administrations. *See* U.S. Dec. Mem. 16 (collecting cases from 2010 through 2024).

The United States nonetheless claims that as a "general rule," the government may sue "to protect its interests" without regard to Congress' decision to authorize or withhold a cause of action. U.S Dec. Mem. 14. But the cases it cites (*id.* at 16) do not establish this rule and, in fact, prove the opposite. In *Wyandotte Transp. Co. v. United States*, 389 U.S. 191 (1967), for example, the Court considered whether the United States could sue to remove obstructions from waterways. *See id*. at 193. On the United States' view, the answer should have been clear—the Government had "a right to apply to its own courts for any proper assistance in the exercise of [its powers] and the discharge of [its duties]." U.S Dec. Mem. 14 (quoting *Debs*, 158 U.S. at 584). But the Supreme Court held instead that "the Rivers and Harbors Act of 1899 . . . controls the issues presented here," engaged in an extensive and careful review of the Act, and ultimately

found an implied right of action *under the statute*. *Wyandotte Transp. Co.*, 389 U.S. at 196-97, 201-02. Likewise, *Heckman v. United States*, 224 U.S. 413, 428-44 (1912), engaged in a detailed examination of the specific context of the litigation and found a statutorily implied right of action. *See id.* The Government does not suggest that any statute provides such a cause of action here.

For their part, State Plaintiffs insist that *Wyoming v. Oklahoma*, 502 U.S. 437, 451-52 (1992), establishes that States have the same access to the *Ex Parte Young* cause of action as private plaintiffs, but denies that *Wyoming*'s "direct injury" requirement applies. W. Va. Dec. Mem. 15. This is so, they argue, because the relevant portion of *Wyoming* concerns the scope of the Supreme Court's original jurisdiction and therefore has "nothing to do with the existence of an equitable right to sue." *Id*. But that is also true of the portion of *Wyoming* on which the States rely. *See id.* (citing *Wyoming*, 502 U.S. at 451-52 (discussing right of private mining companies—not States—to bring *Ex Parte Young* actions, in the course of deciding whether to exercise original jurisdiction)); *see also id.* (citing *Connecticut v. Cahill*, 217 F.3d 93, 98 (2d Cir. 2000) (likewise addressing only scope of Supreme Court's original jurisdiction)). If State Plaintiffs are right that Wyoming's discussion of the requirements for exercise of original jurisdiction "have nothing to do with the existence of an equitable right to sue," W. Va. Dec. Mem. 15, then they are in the same position as the United States, with no case establishing their cause of action and no historical equitable tradition of such suits being entertained in lower federal courts. *See id*. at 14-15.

## V. Plaintiffs' claims are unripe

If the Court does not dismiss Plaintiffs' facial claims as a matter of law, it should dismiss them as unripe. Plaintiffs' claims rest on speculation about the impacts the Act may have, but it is undisputed that the State has not yet issued implementing regulations or determined the total cost

recovery amount. Chamber Resp. Int.-Defs.' SUMF ¶¶ 1-2; W. Va. Resp. Int.-Defs.' SUMF ¶¶ 1-2; U.S. Resp. Int.-Defs.' SUMF ¶¶ 1-2. Nor has the State identified responsible parties, including whether they have a sufficient connection to the State. *See* Vt. Stat. Ann. tit. 10, § 596(22).

Government Plaintiffs' claims are constitutionally unripe for the same reasons they lack Article III standing: their injuries rely on speculation about how independent companies may respond to the Act and hypothetical future legislation. *Supra* Arguments II-III.

All of Plaintiffs' claims are prudentially unripe: if the Court does not uphold the Act as facially constitutional, it "would benefit from postponing review" of Plaintiffs' claims until the Act's scope and impacts have "sufficiently crystallized," and Plaintiffs would not "endure hardship" if review is delayed. *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 252 (2d Cir. 2021) (citations omitted). Chamber Plaintiffs repeat their argument that facial challenges to legislation are inherently ripe, but the cases they cite are inapposite. *See* Int.-Defs.' Nov. Mem. at 23 n.26 (distinguishing Chamber Plaintiffs' cited cases, which involved challenges to land use restrictions with immediate impact on property use). As to the due process, excessive fines, commerce clause, and takings claims, Chamber Plaintiffs insist that the Court need only know that the cost demands will be in the hundreds of millions of dollars to render these claims fit for review, Chamber Dec. Mem. 12, but it is undisputed that the State has not yet determined the total cost recovery amount it will seek to collect, Chamber Resp. Int.-Defs.' SUMF ¶ 1.[12] These claims are therefore unripe because they "depend[] upon 'contingent future events that

---

[12] In support of their speculation about the cost recovery amount, Chamber Plaintiffs cite allegations in their complaint; the amount of climate-related investments Vermont made this year; and vague statements from lawmakers, the most specific of which raises a hypothetical scenario about the amount Vermont might seek to collect under the Act. Chamber Dec. Mem. 12 (citing Chamber Opp. Mot. Dismiss at 48 n.23). None of these is sufficient to overcome the undisputed fact that Vermont has not yet determined the total cost recovery amount.

may not occur as anticipated.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013). Chamber Plaintiffs' arguments also ignore the fact-specific nature of the judicial inquiries required to adjudicate these claims. *See* Int.-Defs.' Nov. Mem. 23-26.

Contrary to Plaintiffs' arguments, Claims I and II of all three complaints also do not involve "pure issue[s] of law, unaffected by factual considerations." *Lab. Council for Latin Am. Advancement*, 12 F.4th at 253. As to their extraterritoriality claims, Plaintiffs have not shown—as they must in a facial challenge—that Vermont will be unable to establish a connection between in-state climate harm and *any* fossil fuel producer. *Infra* Argument VII. As to their Clean Air Act and federal law preemption claims, they have not shown that assessments under the Act—of unknown amounts—will even influence emissions. *Supra* Argument I.[13]

No Plaintiff will suffer hardship from delayed review because the Act does not require "immediate and significant change in the plaintiffs' conduct of their affairs," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967), and it does not "now inflict[] significant practical harm" on any Plaintiff, *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). The United States accuses Intervenor-Defendants of misrepresenting *Texas v. United States*, 523 U.S. 296 (1998), to argue that a sovereign must—like a private plaintiff—establish an impact on its primary conduct to establish hardship. U.S. Dec. Mem. 13. But that is precisely what the Supreme Court required: it reasoned that unlike in cases "where the regulation at issue had a 'direct effect on the day-to-day business' of the plaintiffs," "Texas is not required to engage in, or to refrain from, any conduct . . . ." *Texas*, 523 U.S. at 301. Thus, Texas's claim "that it suffers the immediate hardship of a 'threat to federalism'" was "an abstraction . . . no graver than the 'threat to personal

---

[13] Moreover, an influence on emissions is an insufficient ground for preemption. *See infra* Argument VI.B.

12

freedom' that exists whenever an agency regulation is promulgated." *Id.* at 302. Government Plaintiffs' allegations of hardship from an injury to their sovereignty fail under that reasoning. State Plaintiffs cite the Act's impact on "*the regulated parties*," W. Va. Dec. Mem. 13 (emphasis added)—but State Plaintiffs are *not* regulated parties, so that hardship does not accrue to *them*. They assert the Act will increase fuel prices, but those allegations are speculative, unsupported by competent evidence, and contradicted by Vermont's evidence. *See supra* Argument I; Int.-Defs.' Nov. Mem. 6-9.

Chamber Plaintiffs will not suffer hardship from delaying review. They point to compliance expenditures on "personnel, research, reorganization, and planning," Chamber Dec. Mem. at 14, but these are all standard costs of doing business in a highly regulated space and do not constitute hardship. Int.-Defs.' Nov. Mem. 28-29; *see also, e.g.*, *Eternal Word Television Network, Inc. v. Sebelius*, 935 F. Supp. 2d 1196, 1225 (N.D. Ala. 2013); *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988) (no hardship from possibility of "mak[ing] capital budgeting decisions under a cloud of uncertainty"). Chamber Plaintiffs did not dispute that their compliance expenditures are distinct from the paradigmatic hardship situation: they are not forced to "'either incur great expense to comply' with a law or else 'run the risk of incurring potentially even greater burden' for noncompliance," such as prosecution or losing a business. *Connecticut v. Duncan*, 612 F.3d 107, 115 (2d Cir. 2010); *see also* Int.-Defs.' Nov. Mem. 30. The availability of administrative and judicial remedies for challenging the cost recovery demands also weighs against finding this dispute ripe. *See* Int.-Defs.' Nov. Mem. 30.

## VI.    The Vermont Act is not preempted by the Clean Air Act or federal common law

Because Vermont is exercising traditional state powers, the Court must "start with the assumption" that the Act is not preempted. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). Vermont is not regulating emissions, interstate or otherwise, but is raising revenue,

from parties subject to its jurisdiction, to protect its natural resources and its citizens' health and safety. This is a core exercise of state sovereign power. *See* Int.-Defs.' Nov. Mem. 33; Int.-Defs.' Aug. Mem. 4-6. The Act's assessments on certain fossil fuel companies—which do not control emissions—neither intrude on federal authority nor legislate in an area with a "history of significant federal presence." *Contra* W. Va. Dec. Mem. 19-20; U.S. Dec. Mem. 18.

As in all preemption cases, the core question for the Court to consider is congressional intent. *See Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005). Because Plaintiffs have not established Congress intended to preempt the Act, their preemption claims must fail.

**A.**　　***City of New York v. Chevron* does not control the preemption analysis**

*City of New York* departs from settled preemption principles and does not apply here.[14] The Act is materially different from the state tort claims in *City of New York*, and it neither legislates in an area previously governed by federal common law nor conflicts with it.

**1.**　　**The Act is materially different from the tort claims in *City of New York***

The Act is not "identical" to the tort claims in *City of New York. Contra* Chamber Dec. Mem. 19, 31-32; U.S. Dec. Mem. 26-27; W. Va. Mem. 22-23. There, the court found allowing state tort claims to proceed would create ongoing liability and require courts to apply "vague" or "indeterminate standards." *See* 993 F. 3d at 93, 97 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S.

---

[14] Chamber Plaintiffs suggest that even if *City of New York* does not govern the preemption analysis, this Court should still depart from the Supreme Court's statutory preemption principles and look instead to whether Congress has affirmatively "authorized" the Act. Chamber Dec. Mem. 41-42. But no other federal case requires this analysis, and the Court should not extend *City of New York*'s approach beyond its facts. The Supreme Court has made clear that once Congress has displaced federal common law by statute, the relevant inquiry is whether Congress intended to preempt the state law at issue. *Ouellette*, 479 U.S. at 491-92; *Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 429 (2011); Int.-Defs.' Aug. Mem 33 n.33. Chamber Plaintiffs' quote from *Crosby v. Nat'l Foreign Trade Council* is consistent with that precedent: it stands for the uncontroversial proposition that a federal statute may preempt state law either expressly or through the "implied preemption doctrines"—field preemption and conflict preemption. 530 U.S. 363, 387-388 (2000).

481, 496 (1987)). The Act, by contrast, creates no ongoing liability, much less vague nuisance liability. Int.-Defs.' Nov. Mem. 36-37; Int.-Defs.' Aug. Mem. 37-39.

Plaintiffs' arguments that the Act's one-time retroactive liability nonetheless mirrors the tort claims in *City of New York* are unpersuasive. First, Plaintiffs argue that because some tort claims for compensation may operate as regulations of ongoing behavior, the Act's one-time liability must as well. But they rely only on cases involving *tort* liability, which may recur. *See* Chamber Dec. Mem. 30 & n.10; W. Va. Dec. Mem. 21; U.S. Dec. Mem. 24. And even those cases don't stand for the proposition that tort damages *always* operate as a regulation.[15] *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 & n.17 (1996); *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 247 (1959).[16]

Plaintiffs also ignore that, under *City of New York*, tort claims may operate as a regulation for a specific reason: they can establish a duty of care and thus create ongoing liability. *See* Int.-Defs.' Aug. Mem. 38; Int.-Defs.' Nov. Mem. 36-37. The United States is incorrect that "this supposed lesson from *City of New York* and *Ouellette*—that tort liability is unique because it creates ongoing duties—is nowhere to be found in those opinions." U.S. Dec. Mem. 26-27. To the contrary, both opinions explained that tort claims seeking compensation for harm from interstate pollution could amount to pollution control *because* they created ongoing liability.

---

[15] *NRDC v. NHTSA*, on which the United States relies, U.S. Dec. Mem. 24, is even farther afield. That case involved ongoing civil penalties that were guaranteed to recur and thus "increased the cost of unlawful conduct." 894 F.3d 954, 105 (2d Cir. 2018). The Act, which imposes only retroactive liability, does not increase the cost of ongoing conduct at all.

[16] Indeed, in other contexts, the Court has made clear that tort liability does not always amount to regulation. *See, e.g.*, *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 445 (2005) (noting that, in assessing whether tort liability imposes a "requirement" on manufacturers, courts should not "speculat[e] as to whether a jury verdict will prompt the manufacturer to take any particular action (a question, in any event, that will depend on a variety of cost/benefit calculations best left to the manufacturer's accountants)").

*Ouellette* found that compensatory damages could have a regulatory effect because they established a legal basis for *future* damages if the tortfeasors did not alter their pollution control. 479 U.S. 495, 498 n.19. In *City of New York*, the court observed, the only way for defendants to avoid future liability "would be to cease global production altogether." 993 F.3d at 93. The prospect of future tortious conduct was far from speculative: the City specifically alleged that the defendants' conduct had not only harmed it in the past, but was continuing to do so—allegations the court accepted as true at the motion to dismiss stage. *See, e.g.*, Am. Compl. ¶¶ 1, 129-131, *City of New York v. Chevron*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018) (No. 18-cv-182-JFK), 2018 WL 8064051.[17]

In stark contrast, in this case a responsible party's liability is based solely on past conduct; as Chamber Plaintiffs concede, if fossil fuel producers alter their conduct it will have no effect whatsoever on their liability under the Act.[18] Plaintiffs point to the "*potential for*" Vermont or other states to at some point enact a law similar to the Act with a later covered period. Chamber Dec. Mem. 33; *see also* U.S. Dec. Mem. 27-28 ("risk"); W. Va. Dec. Mem. 23 ("contingent"). But this "potential" does not transform the Act into ongoing tort liability. For Vermont to "extend[]" or "reenact[]" the Act, Chamber Dec. Mem. 33, a new law would have to be drafted, introduced, proceed through multiple committees, pass both chambers of the Vermont Legislature, be signed by the governor (or allowed to become law without his signature), or receive sufficient votes to override a veto.[19] At every stage, the statute's prospects would depend

---

[17] The court also noted that plaintiffs did not seek compensation alone: they sought an injunction to abate the nuisance in the event defendants did not pay court-ordered damages. *City of New York*, 993 F.3d at 92 n.5.

[18] Compl. ¶ 161, *Chamber of Com. v. James*, No. 1:25-cv-1307 (N.D.N.Y. Feb. 28, 2025), ECF No. 1 ("Nothing energy producers can do today can affect their liability under the Act.").

[19] *See generally* Vermont General Assembly, *Vermont's Legislative Process*, https://perma.cc/68KW-ZSRG (last visited Jan. 15, 2026).

on the views of the 180 state legislators, each accountable to different constituencies and with different priorities. There is no basis to assume a future Vermont legislature would pass a new law covering later time periods, much less that any other state will do so.[20]

### 2. The Act does not conflict with federal common law

Plaintiffs are incorrect that the Act, like the tort claims in *City of New York*, would have been governed by federal common law. As Intervenor-Defendants previously explained, the federal common law historically applicable to some interstate pollution applied only in nuisance actions "to abate pollution emanating from another State." *AEP*, 564 U.S. at 421 (collecting cases). The panel in *City of New York* found that the tort claims in that case amounted to a regulation of interstate emissions and thus fell within that body of law. 993 F.3d at 93. The Act, by contrast, does not regulate emissions and is far afield from that federal common law.

Plaintiffs cast the historic federal common law as existing whenever "transboundary pollution [was] at issue." W. Va. Dec. Mem. 16. But that body of law was more limited. *See* Int.-Defs.' Nov. Mem 34-35. And *City of New York*—which relied on existing federal common law—did not create new federal common law or rewrite it. *See* 993 F.3d at 90-95. By attempting to broaden the scope of federal common law, Plaintiffs disregard the Supreme Court's "caution[] against the broad use of federal common law." *Marcus v. AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998) (collecting cases).

Plaintiffs argue that "[w]here a uniquely federal interest embodied in federal common law exists, State law cannot apply." W. Va. Dec. Mem. 16. But to displace state law, federal common law must involve both a federal interest *and* conflict with state law: a federal interest

---

[20] State Plaintiffs' expert's speculation about the supposed priorities of state officials, legislators, and voters only confirms that their theory is based on inference layered upon speculation, rather than actual fact. *See* Zycher Decl. ¶¶ 10(c)-(g), 12, 14, 33, 77.

alone is not enough. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 508 (1988); *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 129 (2d Cir. 1999) ("vague assertions about the need for uniformity" are insufficient). Consistent with this principle, *City of New York* found that the city's tort claims were "previously governed by federal common law," and conflicted with it. 993 F.3d at 99. Federal common law nuisance created a duty not to pollute; state common law nuisance created that same duty and, the panel found, must give way to the federal standard. *Id.* at 93-95. There is no similar conflict here. Since the Act neither comes within the scope of nor conflicts with federal common law, *City of New York* does not govern.

### B.     The Clean Air Act does not preempt the Vermont Act

Plaintiffs fail to establish that Congress intended the Clean Air Act to preempt state laws that do not control pollution, but merely are alleged to have the potential to indirectly affect pollution.[21] The Court should thus reject their claims that the Vermont Act is preempted under the doctrines of field and conflict preemption.

### 1.     The Clean Air Act does not occupy the field

The premise of Plaintiffs' field preemption arguments is that the Vermont Act "regulat[es] out-of-state emissions." U.S. Dec. Mem. 31; *see also* W. Va. Dec. Mem. 43; Chamber Dec. Mem. 43.[22] Because the Act does not regulate emissions anywhere, *supra* Argument I, Plaintiffs' field preemption arguments fail.

Plaintiffs are also incorrect that the Clean Air Act occupies the field of interstate emissions regulation. The Supreme Court held that the Clean Water Act—which contains nearly

---

[21] *See also generally* Br. of U.S. Senators as Amici Curiae, *West Virginia v. James*, No. 1:25-cv-00168 (N.D.N.Y. Dec. 22, 2025), ECF No. 232-2 (proposed amicus brief from two Senators explaining that Congress did not intend to preempt New York's similar Climate Change Superfund Act).

[22] Plaintiffs do not dispute that the Act's purported indirect effects on future emissions are insufficient for field preemption. *See* Int.-Defs.' Nov. Mem. 39.

identical savings clauses to the Clean Air Act—does *not* occupy the field of interstate pollution. *Ouellette*, 479 U.S. at 492; *see also id.* at 494-98 (performing conflict, not field, preemption analysis). And every federal court to consider the question has come to the same conclusion about the Clean Air Act. *See, e.g.*, *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 695 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 196-97 (3d Cir. 2013); *N. Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306 (4th Cir. 2010).

To evade this precedent, Plaintiffs make a puzzling and self-defeating argument. They assert that the Clean Air Act occupies the field of interstate pollution regulation—which they define as "emissions emanating outside a state's borders"—yet admit in the next breath that Congress permits the law of the source-state to regulate those same pollution sources. U.S. Dec. Mem. 31; Chamber Dec. Mem. 43. For a federal statute to occupy the field, Congress must "legislate[] so comprehensively" that it leaves "no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (citation omitted). Congress either entirely occupies a field, leaving *no* room for state regulation, or it does not. Because, as Plaintiffs concede, the Clean Air Act permits some state regulation of interstate pollution, it does not occupy the field.

## 2. The Vermont Act does not conflict with the Clean Air Act's regulation of greenhouse gas emissions

To succeed on their conflict preemption claim, Plaintiffs must prove an "actual" and "sharp conflict" with "the overriding federal purpose and objective" of the federal statute. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (cleaned up).[23] *See also* Int.-Defs.' Aug. Mem. 28-29. Plaintiffs have not done so. The Clean Air Act sets

---

[23] The United States cites the standard for federal common law to preempt state law, not the more rigorous standard for a federal statute to preempt. U.S. Dec. Mem. at 33 (citing *Boyle*, 487 U.S. at 507). But as the United States concedes, it is not arguing that displaced federal common law preempts the Act. *Id*. at 20 n.5.

pollution control standards for certain sources of greenhouse gas emissions; the Vermont Act does not control pollution from any source.[24] Int.-Defs.' Nov. Mem. 41-42. There is simply no conflict between the Vermont Act and the Clean Air Act, let alone one "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (internal quotation marks omitted).

Plaintiffs' attempts to manufacture a conflict are unavailing. First, Chamber Plaintiffs assert that even if the Vermont Act does not regulate emissions, it will still somehow "interfere" with the Clean Air Act's pollution control measures. Chamber Dec. Mem. 46. They do not explain how, if the Vermont Act does not actually control pollution, such interference would arise. Next, the United States attempts to broaden the source-state rule from *Ouellette*, asserting that it applies to the Act's one-time assessments. U.S. Dec. Mem. 34. But while *Ouellette* recognized that state law *tort* claims for compensation could pose an obstacle to the Clean Water Act, that was only because the Court found those tort claims would create ongoing liability and thus amounted to pollution control. 479 U.S. at 495, 498 n.19. The Act does not create ongoing liability or otherwise control pollution, *supra* Argument I, and so does not implicate the source-state rule. *See* Int.-Defs. Aug. Mem. 30-31.

Finally, Plaintiffs argue that the (speculative) potential for other states to enact laws similar to the Act creates a conflict. W. Va. Dec. Mem. 46; U.S. Dec. Mem. 35-36. But even if other states acted, no source would be subject to conflicting pollution control standards: any state law mirroring the Act would not control *any* pollution, let alone pollution from the limited sources whose greenhouse gas emissions EPA may regulate. *See* Int.-Defs. Nov. Mem 41

---

[24] For the same reason, the Act, which does not limit emissions from oil and gas production or regulate fuel composition, Int.-Defs.' Aug. Mem. at 29 n.31, does not conflict with EPA's regulation of those matters. *Contra* Chamber Dec. Mem. 47 n.22.

(describing scope of the Clean Air Act). Plaintiffs do not identify a single source that will be forced to change its emission controls as a result of the Act or future laws similar to the Act. If Congress later determines it does not wish to see multiple states enact laws like the Act, that is a problem for Congress—not the courts—to resolve. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 222-23 (1983).

Plaintiffs' (unsupported) theory is that the Act conflicts with federal emissions regulation because funds to cover the Act's cost recovery demands must "come from somewhere," and responsible parties thus may choose to reduce investments in fossil fuel projects, leading to less production and emissions. W. Va. Sept. Mem. 15 (quoting Swarup Decl. ¶ 27); U.S. Sept. Mem. 17 (same). The same is true of any cost. If, for example, a local or state government increased fees for hazardous waste generated by fossil fuel producers, those funds would also "have to come from somewhere" and, by Plaintiffs' logic, the fees would be preempted because they could affect future fossil fuel investments. There is no principled basis for confining such preemption, as Plaintiffs conveniently suggest, to state laws that impose liability for emissions, Chamber Dec. Mem. 42 n.20, U.S. Dec. Mem. 25 n.7, or that use emissions as a "link" in the chain of liability, W. Va. Dec. Mem. 26.

Even if Plaintiffs' hypothesized indirect effects on emissions were plausible, courts have repeatedly rejected similar arguments, Int.-Defs.' Nov. Mem 42-43 (collecting cases). Plaintiffs' only rejoinder to this authority is to ask the Court to disregard it, claiming it is inconsistent with *City of New York*. Chamber Dec. Mem. 47-48. But *City of New York* expressly declined to engage in a statutory preemption analysis, 993 F.3d at 98, and Plaintiffs do not dispute the fundamental principle that, for statutory preemption purposes, a state law must actually conflict with an area

of federal regulation—not merely indirectly affect it. Plaintiffs have failed to identify such a conflict.

## VII. The Act comports with constitutional limitations on reaching out-of-state conduct

The Court should not invalidate the Act based on the novel theory that it violates the so-called "extraterritoriality doctrine." Plaintiffs insist that this doctrine is deeply rooted in the Constitution's structure and legal history, citing a series of 19th century cases and principles such as equal sovereignty and the horizontal separation of powers. *See* W. Va. Dec. Mem. 29-30; U.S. Dec. Mem. 37-38; Chamber Dec. Mem. 21-22. Yet they do not cite a single case in which a court has invalidated a state law based on a standalone "extraterritoriality doctrine," absent a violation of a *specific* constitutional provision. *See* Int.-Defs.' Nov. Mem. at 45 n.6 (explaining that Plaintiffs' cited cases involve violations of specific constitutional provisions). Indeed, in *National Pork Producers Council v. Ross*, the Supreme Court considered the very principles and cases that Plaintiffs invoke before "unanimously disavow[ing] [an] 'almost per se' rule against laws with extraterritorial effects." 598 U.S. 356, 389 n.4 (2023); *see also id.* at 375-76 (discussing *Hoyt v. Sprague*, 103 U.S. 613 (1881) and *Strassheim v. Daily*, 221 U.S. 280, 285 (1911)). This Court should likewise decline Plaintiffs' "incautious invitations" to endorse a "new theor[y] of implied judicial power" by relying on the "extraterritoriality doctrine," *id.* at 390-91, and instead assess Plaintiffs' claims under the relevant constitutional provisions.[25]

The Act comports with the Court's precedents recognizing commerce clause limits on extraterritorial regulation because it is not a "price control or price affirmation statute[]," *Pork*

---

[25] The United States separately argues that the Act is an unconstitutional extraterritorial regulation because it seeks to regulate interstate emissions, a uniquely federal area. U.S. Dec. Mem. 36-37. For the reasons described above, the Act does not regulate emissions and it does not conflict with the historical federal common law appliable to some interstate pollution disputes. *Supra* Arguments I, VI.A.2.

*Producers*, 598 U.S. at 374, and it does not "*directly* regulate[] out-of-state transactions by those with *no* connection to the State," *id.* at 376 n.1 (citing *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)). Plaintiffs cannot dispute that the Act does not directly control fossil fuel pricing, production, or transactions: responsible parties may increase their prices, decrease their prices, increase their production, or decrease their production—all without violating the Act. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 111 (2d Cir. 2001) (rejecting commerce clause challenge to labeling requirement that plaintiffs alleged would drive manufacturers out of state because "none of the[] variables" on which companies base decisions was actually "controlled by the state"); *see also* Int.-Defs.' Nov. Mem. at 46 n.37 (citing cases rejecting commerce clause challenges based on indirect pricing impacts). And Plaintiffs have submitted no evidence that responsible companies will be "those with *no* connection to the State," *Pork Producers*, 598 U.S. at 376 n.1—nor could they, as the State has not yet identified responsible parties, and under the Act responsible parties are those who have contributed to climate harm in Vermont and have a "sufficient connection with the State." Vt. Stat. Ann. tit. 10, § 596(22); *see also id.* §§ 596(7), 598, 599c (describing liability of responsible parties for proportional share of costs to Vermont). State Plaintiffs argue that extraterritoriality concerns are heightened when commercial activities are involved, W. Va. Dec. Mem. at 34, but the commerce clause tolerates state laws that drive out-of-state commercial consequences—even significant ones. *See, e.g., Pork Producers*, 598 U.S. at 374 (recognizing "[s]tate income tax laws lead some individuals and companies to relocate to other jurisdictions" and "[e]nvironmental laws often prove decisive when businesses choose where to manufacture their goods"); *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 112 (whether statute would encourage companies to abandon Vermont was "an appropriate consideration for the Vermont legislature, not the federal courts").

The Act also comports with due process limitations on reaching out-of-state activity: liability is directly tethered to in-state climate harm, and companies will not be held liable unless they have a "sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." Vt. Stat. Ann. tit. 10, § 596(22). Vermont's Act therefore "is not a mere intermeddling in affairs beyond her boundaries which are no concern of hers." *Watson v. Emps. Liab. Assurance Corp., Ltd.*, 348 U.S. 66, 72 (1954). Plaintiffs object that the Act imposes liability on out-of-state production and refining of fossil fuels, Chamber Dec. Mem. 22, W. Va. Dec. Mem. 29-30, U.S. Dec. Mem. 39-42, but ignore that some of those fossil fuels are sold and used in Vermont and that their use contributes to climate harm within the State.

Plaintiffs' arguments that fossil fuel companies' activities are not connected with in-state harm ring hollow. First, Plaintiffs have adduced no evidence that Vermont cannot reliably attribute in-state harm to responsible parties' fossil fuel production. *See* Int.-Defs.' Nov. Mem. at 49 & nn. 39-40. The United States attacks a straw man by reiterating that it is "impossible to trace in-state injury to specific greenhouse gas molecules," U.S. Dec. Mem. 40: nothing in the Act or the due process clause requires the State to establish that causal chain. *See* Int.-Defs.' Nov. Mem. 48; *cf. Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (for personal jurisdiction, due process does not require "proof that the plaintiff's claim came about because of the defendant's in-state conduct" and "some relationships will support jurisdiction without a causal showing").

Second, the Supreme Court has long recognized that states have the authority to provide remedies for in-state injuries arising from out-of-state conduct. *See* Int.-Defs.' Nov. Mem. 47; *cf. Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776, 780 (1984) (in libel suit over nationwide

publication, noting that "it is beyond dispute that [a state] has a significant interest in redressing injuries that actually occur within the [s]tate").

Third, Plaintiffs have not shown—as they must, in a facial challenge—that Vermont will be unable to establish a "sufficient connection" between in-state climate harm and *any* fossil fuel producer, which is a fact-specific inquiry. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569-73 (2d Cir. 1996); *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 116 (2d Cir. 2025) (to prevail in facial constitutional challenge, plaintiffs must show that the Act "regulates wholly extraterritorial conduct *in every application of the statute*"). The Court should not prematurely invalidate the Act on this basis before Vermont has even attempted to identify responsible parties and decided whether they have a sufficient connection with the State.

Finally, Chamber Plaintiffs and State Plaintiffs contend that Defendants confuse personal jurisdiction with legislative power. Chamber Dec. Mem 23; W. Va. Dec. Mem. 35. But Plaintiffs are the ones who invoke personal jurisdiction cases in support of their novel extraterritoriality theory. *See, e.g.*, Chamber Dec. Mem. 23 (citing *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025)). The Court should reject that theory here.

## VIII.   Foreign affairs preemption does not apply

Plaintiffs insist that emissions negotiations have such substantial foreign policy implications that nearly any state action touching upon them should be preempted. But even if the Court credited all statements in the Landau Declaration about the government's foreign policy positions and foreign countries' projected reactions to the Vermont Act, those statements do not meet the criteria for either conflict or field foreign policy preemption.

## A. Effects on negotiation positions are insufficient for foreign affairs conflict preemption

Foreign affairs conflict preemption asks two questions: (1) what source of authority grounds the foreign policy and (2) what is the degree of conflict. *See Medellín v. Texas*, 552 U.S. 491, 520-23 (2008). Plaintiffs gloss over this first step. But when the executive branch seeks to preempt a state statute, it is in effect making its own "domestic law"—a power generally reserved for Congress. *Id.* Courts have therefore limited foreign affairs conflict preemption to circumstances in which the foreign policy is grounded in either a specific narrow power under which the executive can make domestic law or a delegation by Congress. *Id.* at 524.

Only the United States attempts to address this framework, and its two arguments fall flat. The Government first argues that *Medellín* has "nothing to do with the Foreign Affairs Doctrine." U.S. Dec. Mem. 46. While the Court in *Medellín* did not use that specific phrase, it (quoting the Solicitor General's brief) repeatedly framed the question presented as whether the President had power to "establish binding rules of decision that preempt contrary state law." *Medellín*, 552 U.S. at 523, 525, 530. Finding that none of the authorities cited gave the President authority to create domestic law, the Court declined to preempt—even though the President had issued a memorandum expressly stating the government's policy. *See id.* at 525-32.

Next, the United States argues that statements by government officials that a state law could pose an "obstacle" to foreign policy objectives (no matter how indirectly) can preempt state law. U.S. Dec. Mem. 46-47. Although *In re Assicurazioni Generali, S.P.A.,* 592 F.3d 113 (2d Cir. 2010), did not require a foreign policy to conflict with the "express terms of federal law" such as an "executive agreement" (something Intervenor-Defendants never argued), nothing in the Second Circuit's opinion suggests that the government may preempt state law whenever it says so. *Contra* U.S. Dec. Mem. 46. Like *American Insurance Association v. Garamendi*, 539

U.S. 396 (2003), the foreign policy at issue in *Generali* was based on the executive branch's long-exercised wartime claim settlement authority. *Generali*, 592 F.3d at 118-19; *see* Int.-Defs.' Nov. Mem. 53. The Supreme Court has unsurprisingly confined this authority to a "narrow set of circumstances." *Medellín*, 552 U.S. at 531. Nothing in *Generali* overrides the general rule that "Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional" an otherwise valid state statute. *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 330 (1994).

Plaintiffs fail to refute Intervenor-Defendants' basic point: conflict preemption requires examining the source of authority of the foreign policy and determining whether the state law conflicts. *See* Int.-Defs.' Nov. Mem. 53. Under this framework, even accepting the Landau Declaration's descriptions of foreign policy and consequences as true—*i.e.*, the United States is pursuing a deregulatory agenda towards fossil fuel production in part due to foreign policy concerns, *see* Landau Decl. ¶¶ 12-13, 19; higher energy prices would hamper foreign policy goals,[26] *id.* ¶ 15; the Act could create (unspecified) "frictions in climate negotiations" due to the United States' opposition to liability schemes,[27] *id.* ¶ 16; and foreign producers may retaliate against American fossil producers, *id.* ¶ 18—those policies are either not fit to preempt state law or do not create the level of conflict necessary for preemption.[28]

---

[26] Intervenor-Defendants dispute that the Act will raise energy prices. *See supra* Argument I. Even if it did, that alone would not create a conflict sufficient for preemption.

[27] Like Vermont, Intervenor-Defendants do not concede that the Court should disregard the Koh declaration. In any event, the United States no longer claims it opposes producer-based liability schemes, and now argues only that other countries would view it as "hypocritical." U.S. Dec. Mem. 49; U.S. Resp. Int.-Defs.' Statement of Add'l Facts ¶¶ 14-15. There is nothing inconsistent with producer-based liability and the United States' desire to avoid paying other countries based on its residents' emissions.

[28] Intervenor-Defendants agree with Vermont that the Court should not defer to legal conclusions by Landau. *See* U.S. Dec. Mem. 51; Chamber Dec. Mem. 27-28.

Plaintiffs' purported conflicts are little more than policies favoring fossil fuel production and lower energy prices for the United States and its allies and speculation about how other countries may respond to the Act in emissions negotiations. *See* Int.-Defs.' Nov. Mem. 54-56. These indirect effects are insufficient to preempt state law absent a finding that Congress intended an area to fall under complete executive control. *See id*. at 54 (explaining that *Garamendi* involved conflicting legal standards); *Generali*, 592 F.3d at 118 (allowing state law claims against Holocaust-era insurance claims "*directly*" conflicted with foreign policy of having all such claims heard by international arbitration forum). Indeed, Plaintiffs rely on a *statutory* preemption case, *Crosby v. National Foreign Trade Council*, to argue that a state law posing any sort of "obstacle" to foreign policy objectives may be preempted. U.S. Dec. Mem. 47 (quoting 530 U.S. at 373); *see also* W. Va. Dec. Mem. 38-40. In that case, the Court examined a statute to find that Congress intended to give the federal government complete control over specific economic sanctions. *See* Int.-Defs.' Nov. Mem. 55; *Crosby*, 530 U.S. at 374. Neither the Framework Convention nor the Global Climate Protection Act evince a similar Congressional intent to preclude any state laws that could affect the multitude of factors that countries consider as part of emissions reduction agreements. *See* Int.-Defs.' Nov. Mem. 55-56.[29]

*City of New York* does not change the preemption analysis. *Contra* U.S. Dec. Mem. 45-46; Chamber Dec. Mem. 25-26; W. Va. Dec. Mem. 42-43. The court did not consider foreign affairs preemption, but rather assessed whether to create federal common law to allow litigants to sue foreign actors—in other words, whether the area was one in which *courts* should proceed

---

[29] President Trump has directed agencies to effectuate the United States' withdrawal from the Framework Convention. *See* Memorandum Withdrawing the United States from International Organizations (Jan. 7, 2026), https://perma.cc/SZ8C-FB27. To the extent the United States views the withdrawal as further evidence of its deregulatory policy, that withdrawal is not fit to preempt state law for the same reasons as other deregulatory orders.

with caution. *See* Int.-Defs.' Nov. Mem. 58. In answering "yes," the court cited the potential

effects on international emissions negotiations as favoring judicial restraint. *See City of New*

*York*, 993 F.3d at 101. Here, the question is whether litigants may use the courts to nullify a

statute enacted by the political branches of a state. For all the reasons above, the answer is no.

**B.        Liability for greenhouse gas emissions is not field preempted**

For field preemption to apply, a state law must have "no serious claim to be addressing a

traditional state responsibility," *Garamendi*, 539 U.S. at 419 n.11, and in fact be "establish[ing]

its own foreign policy," *Zschernig v. Miller*, 389 U.S. 429, 441 (1968). Instead of grappling with

the field preemption framework, Plaintiffs continue to insist that liability for greenhouse gas

emissions is an exclusively federal domain based on *City of New York*. *See* U.S. Dec. Mem. 42;

Chamber Dec. Mem. 25. But for the same reasons that *City of New York* does not resolve the

conflict preemption question, it does not resolve the field preemption question either. *See supra*

at 28-29. The Government argues that *City of New York*'s acknowledgement of the "the political

branches' monopoly over foreign policy" means states may not take any actions in the sphere of

greenhouse gas emissions. U.S. Dec. Mem. 43 (quoting 993 F.3d at 102-03). *City of New York*'s

caution to the *federal judiciary* does not preclude state political branches from enacting their own

laws in areas of traditional responsibility that overlap with global greenhouse gas emissions.

Plaintiffs do not discuss the facts of actual field preemption cases, which all dealt with

states involving themselves in disputes arising from countries acting in their official (rather than

a business) capacity. *See* Int.-Defs.' Nov. Mem. 59. It is thus not enough for Plaintiffs to point to

the Act's policy objective—that producers pay for some of the damage caused by fossil fuels. *See*

U.S. Dec. Mem 43. Nor is a state law reaching conduct in foreign countries sufficient. For

example, in *Clark v. Allen,* the Court acknowledged that a state may have been trying to

influence foreign countries' conduct via a law that permitted residents of a foreign country to

inherit property only if their home country allowed Americans to inherit property. *See* 331 U.S. 503, 516-17 (1947). Yet the facially neutral state law did not intrude upon foreign affairs. *Id.*[30]

Here, the Act has an even less direct reach into foreign affairs: foreign governments are affected (if at all) only to the extent they previously chose to participate in commercial activity, and domestic actors are held equally liable. This is no different from numerous other situations where state laws apply equally to domestic and foreign business activity subject to a state's jurisdiction.

Nor does the Act legislate outside a traditional state responsibility. Unlike other field preemption cases, *see* Int.-Defs.' Nov. Mem. 59, Plaintiffs do not seriously dispute that Vermont residents are personally affected by responsible parties' actions. The purpose of the Act is not foreign policy, but to ensure Vermonters do not have to bear alone the cost of preventing damage to their health and property. This traditional state responsibility is not field preempted.

## CONCLUSION

For the reasons set forth above and in their prior submissions, the Court should grant summary judgment to Intervenor-Defendants on Counts I and II of all three complaints and Count V of the United States' complaint.


Dated: January 16, 2026                           Respectfully submitted,

                                                  */s/ Bridget Asay*
                                                  Bridget Asay
                                                  Michael Donofrio
                                                  STRIS & MAHER LLP
                                                  15 East State Street, Suite 2

---

[30] The Government also cites an out-of-circuit case involving Iraqi nationals bringing state law tort claims against military contractors for abuse in the Abu Ghraib prison. See U.S. Dec. Mem. 44 (citing *Saleh v. Titan Corp.*, 580 F.3d 1, 12 n.8 (D.C. Cir. 2009)). A passing remark in a footnote to a non-binding opinion's alternative holding is a thin basis for the United States' point. And even if the case had correctly found field preemption, there are insufficient similarities between emissions reduction negotiations and military wartime operations to support extending its unique reasoning to this case.

Montpelier, VT 05602
Phone: (802) 858-4285
basay@stris.com

*Counsel for Northeast Organic Farming*
*Association of Vermont*


/s/ Adeline S. Rolnick
Adeline S. Rolnick
Natural Resources Defense Council, Inc.
1152 15th Street, Suite 300
Washington, DC 20005
Phone: (202) 513-6240
arolnick@nrdc.org

Mitchell S. Bernard
Natural Resources Defense Council, Inc.
40 West 20th Street, 11th Floor
New York, NY 10011
Phone: (212) 727-4469
mbernard@nrdc.org

*Counsel for Northeast Organic Farming*
*Association of Vermont and Conservation*
*Law Foundation*


/s/ Elena M. Mihaly
Elena M. Mihaly
Conservation Law Foundation, Inc.
15 East State Street, Ste. 4
Montpelier, VT 05602
Phone: (802) 622-3012
emihaly@clf.org

*Counsel for Conservation Law Foundation*