## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br>　　　　　　　　Plaintiffs,<br>　　and<br><br>STATE OF WEST VIRGINIA et al.,<br>　　　　　　　　Intervenor-Plaintiffs,<br>　　v.<br><br>JULIE MOORE et al.<br>　　　　　　　Defendants,<br>　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　Intervenor-Defendants. | Case No. 2:24-cv-01513 |
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br>　　　　　　　Plaintiffs,<br>　　v.<br><br>STATE OF VERMONT et al.,<br>　　　　　　　Defendants,<br>　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　Intervenor-Defendants. | Case No. 2:25-cv-00463 |

## DEFENDANTS' REPLY MEMORANDUM IN
## SUPPORT OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ........................................................................................ vi

INTRODUCTION ............................................................................................................. 1

STANDARDS AND PROCEDURAL ISSUES ................................................................ 3

ARGUMENT ..................................................................................................................... 5

I.     The Clean Air Act does not preempt Act 122. ......................................................... 5

     A.     *City of New York* did not change the Clean Air Act preemption analysis. .............. 6

     B.     Act 122 is not preempted by the Clean Air Act. ............................................. 7

II.    Act 122 is not governed by *City of New York's* common law analysis. ........................... 11

III.   The Constitution's "structure" does not preempt Act 122. ................................... 13

     A.     *City of New York* does not support the Chamber's and the United States' common law "structural preclusion" theory. ...................................................... 14

     B.     Act 122 does not run afoul of existing constitutional doctrines concerned with extraterritoriality. ....................................................................................... 15

         1.     Act 122 does not offend principles of "equal sovereignty." .................... 16

         2.     Act 122 does not violate due process limitations on extraterritoriality. ..... 18

IV.   Act 122 does not interfere with foreign affairs. ................................................. 19

     A.     Act 122 does not intrude on a uniquely federal area of authority. ........................ 19

     B.     Act 122 does not conflict with foreign policy. .................................................... 21

V.    Act 122 does not violate the dormant Commerce Clause. ................................................ 24

     A.     Act 122 does not violate the dormant Interstate Commerce Clause. .................... 24

     B.     Act 122 does not violate the dormant Foreign Commerce Clause. ...................... 28

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) .............................................................21

*Arizona v. United States*, 567 U.S. 387 (2012)..............................................................................7

*Baldwin v. G.A.F. Seeling, Inc.*, 294 U.S. 511 (1935) ..................................................................27

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298 (1994).......................................29

*BMW of North Am., Inc. v. Gore*, 517 U.S. 559 (1996)................................................................12

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .....................................................8

*Calder v. Jones*, 465 U.S. 783 (1984) ........................................................................................18

*Calingo v. Meridian Res. Co. LLC*, No. 7:11-cv-628, 2011 WL 3611319
(S.D.N.Y. Aug. 16, 2011) ..........................................................................................................11

*City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973) ..........................................9

*City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021) ..........................................passim

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)..................................... 8, 21, 23, 29

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) ................................................................................27

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)....................................................................10

*Ford Motor Co. v. Mont. 8th Jud. Dist. Ct.*, 592 U.S. 351 (2021).........................................18-19

*Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230 (2019)............................................................16

*Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025).................................................... 17, 18, 19

*Granholm v. Heald*, 544 U.S. 460 (2005)...................................................................................25

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)...............................................................24

*Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977)........................................26

*Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440 (1960)...........................7, 12

*In re Methyl Tertiary Butyl Ether Products Liability Litigation*, 725 F.3d 65 (2d Cir. 2013)..................................................................................7, 8

*Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434 (1979).......................................29

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023)............................................18, 19

*McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) .............................................................19

*Medellin v. Texas*, 552 U.S. 491 (2008) ........................................................................21

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)................................................................7

*Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067 (9th Cir. 2012) ..............19, 20

*Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025), *petition for cert. filed sub nom.*, *Grant v. Higgins*, No. 25-566 (Nov. 7, 2025) .................................................................23

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001)...................................26

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) .........................15, 27, 28

*Nat'l Shooting Sports Found. v. James*, 144 F.4th 98 (2d Cir. 2025) ....................13, 25

*New Energy Co. of Ind. v. Limbach*, 486 U.S. 269 (1988) ...........................................26

*N.Y. Life Ins. Co. v. Head*, 234 U.S. 149 (1914) .........................................................17

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010) ...................8

*Rayonier Inc. v. United States*, 352 U.S. 315 (1957) ....................................................23

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982) ......................................................21

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ..................................................8

*Rodriguez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132 (2020)...................................13, 15

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959).............................12

*Strassheim v. Daily*, 221 U.S. 280 (1911) ....................................................................17

*Town of Southold v. Town of East Hampton*, 477 F.3d 38 (2d Cir. 2007) ..............25, 26

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004)............................................1

*Va. Uranium, Inc. v. Warren*, 587 U.S. 761 (2019) .................................................................15-16

*Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010) .............19

*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005).........................................................8

*Walden v. Fiore*, 571 U.S. 277 (2014) .........................................................................................18

*West Virginia v. EPA*, 597 U.S. 697 (2022)...............................................................................2, 9

*Young v. Masci*, 289 U.S. 253 (1933).........................................................................................15

*Zschernig v. Miller*, 389 U.S. 429 (1968) ..................................................................................20

**Statutes & Session Laws**

Global Climate Protection Act, Pub. L. No. 100-204, Title XI, 101 Stat. 1331 (1987) (reprinted at 15 U.S.C. § 2901 note) ....................................................................................................................21

2024 Vt. Acts & Resolves No. 122

    Act 122 Sec. 2, § 596(10) (Vt. Stat. Ann. tit. 10, § 596(10))...........................................20, 23

    Act 122 Sec. 2, § 596(22) (Vt. Stat. Ann. tit. 10, § 596(22))............................................16, 17

    Act 122 Sec. 2, § 597(1) (Vt. Stat. Ann. tit. 10, § 597(1)) ...................................................28

    Act 122 Sec. 2, § 598(a)(1) (Vt. Stat. Ann. tit. 10, § 598(a)(1))...........................................28

    Act 122 Sec. 2, § 598(b) (Vt. Stat. Ann. tit. 10, § 598(b)) ..................................................28

    Act 122 Sec. 2, § 599c (Vt. Stat. Ann. tit. 10, § 599c) ........................................................28

2025 Vt. Acts & Resolves No. 47

    Act 47 Sec. 22, § 596(22) (Vt. Stat. Ann. tit. 10, § 596(22))............................................16, 17

    Act 47 Sec. 23, § 598(b) (Vt. Stat. Ann. tit. 10, § 598(b)) ..................................................28

    Act 47 Sec. 24, § 599c (Vt. Stat. Ann. tit. 10, § 599c) ........................................................28

Vt. Stat. Ann. tit. 1, § 215...........................................................................................................30

**Other Authorities**

Somini Segupta & Lisa Friedman, *Trump Pulls Out of Global Climate Treaty*, N.Y. Times (Jan. 7, 2026), https://www.nytimes.com/2026/01/07/climate/trump-un-climate-treaty.html...............22

# TABLE OF ABBREVIATIONS

**State** or **Vermont**          Defendants State of Vermont, Governor Philip Scott, Secretary Julie Moore, and Program Manager Jane Lazorchak

**Chamber**          Plaintiffs United States Chamber of Commerce and American Petroleum Institute

**West Virginia**          Intervenor-Plaintiffs West Virginia and twenty-three other states (*Chamber* case)

**United States**          Plaintiffs United States of America and United States Environmental Protection Agency

**Vt. MTD**          Memorandum of Law in Support of Defendants' Motion to Dismiss. ECF No. 76-1 (*Chamber* Case); ECF No. 35-1 (*U.S.* Case)

**Vt. MTD/SJ Mem.**          Defendants' Consolidated Memorandum of Law (1) In Reply in Support of Their Motion to Dismiss; (2) In Opposition to Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment; and (3) In Support of Defendants' Cross-Motion for Summary Judgment. ECF Nos. 108, 109, 110-1 (*Chamber* Case); ECF Nos. 52, 53, 54-1 (*U.S.* Case)

**Chamber Resp.**          Plaintiffs the Chamber of Commerce of the United States of America and American Petroleum Institute's Combined Reply in Support of Motion for Summary Judgment on Counts I and II and Opposition to Defendants' Cross-Motions for Summary Judgment. ECF Nos. 123, 125 (*Chamber* Case)

**W. Va. Resp.**          Intervenor States' Reply in Support of Their Motion for Summary Judgment and Response in Opposition to Defendants' Motions for Summary Judgment. ECF Nos. 121, 124 (*Chamber* Case)

**U.S. Resp.**          Plaintiffs' Consolidated Reply in Support of Motion for Summary Judgment and Response in Opposition to Cross-Motions for Summary Judgment. ECF Nos. 65, 66 (*U.S.* Case)

**INTRODUCTION**

This case boils down to whether *City of New York* established a new doctrine that sprawls beyond the corners of that case to preclude Vermont's sovereign effort to recover some of its costs in responding to global climate change. Under Plaintiffs' theories, states are powerless unless and until Congress affirmatively authorizes state action. Even where, as here, there is no serious dispute that fossil fuel companies' extraction and refining activities have led to significant impacts within the State; even where, as here, the State has established a careful framework for allocating shares of its costs to those responsible;[1] and even where, as here, the state legislation satisfies existing doctrines that guard against state overreach—preemption, commerce clause, due process, etc.

But this case is not *City of New York*: (i) Act 122 is not the "mirror image" of the common law cause of action at issue in *City of New York;* (ii) the starting point for *City of New York's* reasoning—that state common law was displaced by federal common law—is absent here; (iii) no court has previously used displaced federal common law (that is, where Congress has spoken on an issue through enactment of a federal statute) to preempt a state statute; and (iv) legally, the Act does not "regulate conduct" even if it has some economic effects, and, factually, *City of New York* did not address the procedural posture here—where Plaintiffs have neither plausibly alleged (to survive a motion to dismiss) nor substantiated (to win summary

---

[1] The legislative record and peer-reviewed literature show that costs can be reliably attributed, and Plaintiffs have not credibly alleged or offered any competent evidence that this attribution is "impossible." *See* Vt. MTD at 3-9, 21-23, 44-46; Vt. MTD/SJ Mem. at 2-3, 42-43. West Virginia submitted an "expert" opinion touching on the issue, *see* Zycher Decl. (ECF Nos. 121-1, 124-1), but no party relied on it in their briefing or facts, and it is inadmissible because Dr. Zycher plainly is not qualified to testify about climate attribution science. *See United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (expert witness must have "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony"). The State reserves all rights regarding the admissibility of Plaintiffs' declarations.

judgment) that the Act *will* significantly alter fossil fuel production. In other words, *City of New York* does not control the outcome here.

Plaintiffs' claims under existing doctrines fail as well. The Clean Air Act does not preempt Act 122. Act 122 does not regulate emissions in the first instance, but even if it did, the Clean Air Act does not occupy the field of air emissions, interstate or otherwise. Among other things, the Supreme Court has declared that the Clean Air Act does not give the Environmental Protection Agency authority to impose measures "necessary to mitigate the dangers presented by climate change." *West Virginia v. EPA*, 597 U.S. 697, 727 (2022). And there certainly is no conflict with the Clean Air Act: it is not impossible for responsible parties to comply with both the Clean Air Act and Act 122, and nothing in Act 122 poses an obstacle to the Clean Air Act's objective of protecting air quality for the benefit of public health and welfare.

The Court should likewise rule in the State's favor on the other summary judgment claims. States are not constitutionally barred from addressing in-state harms simply because the conduct causing those harms originated out-of-state. Act 122 does not conflict with any foreign policy that has the force and effect of law, and Plaintiffs have not plausibly alleged or demonstrated that the Act will have any effect on foreign relations, much less an effect that is more than incidental or indirect. Finally, the Act does not violate the Commerce Clauses because it neither discriminates nor directly regulates out-of-state conduct by those with no connection to Vermont, and it does not impair the nation's ability to speak with one voice on foreign commerce.

The Court should reject Plaintiffs' facial challenge and declare the Act constitutional on its face.

## STANDARDS AND PROCEDURAL ISSUES

There is no genuine dispute of material fact with respect to the State's Cross-Motion for Summary Judgment. Chamber Resp. to Vt. SUMF (ECF No. 125-1); W. Va. Resp. to Vt. SUMF (ECF No. 124-3); U.S. Resp. to Vt. SUMF (ECF No. 66-1); Vt. Resp. to U.S. Additional SUMF (Jan. 16, 2026) (additional facts not genuinely disputed). Therefore, if the Court does not dismiss them, the Court should grant summary judgment to the State on the relevant counts.

To help the Court sift through the extensive filings and motions before the Court, the State offers the following summary of its position:[2]

*One:* This is a facial challenge. Therefore, to prevail at any stage of this litigation (motion to dismiss, summary judgment, or otherwise), Plaintiffs must establish that Act 122 is unconstitutional in all its applications, and they may not rely on speculative allegations. *See* Vt. MTD at 21-23; Vt. MTD/SJ Mem. at 5.

*Two:* Based on the law and the speculative nature of Plaintiffs' allegations regarding the Act's economic effects and the feasibility of its implementation (which remain speculative at best even after the parties' summary judgment filings), the Court should grant the State's motion to dismiss. *See generally* Vt. MTD; Vt. MTD/SJ Mem. at 6.

*Three:* If the Court does not grant the State's motion to dismiss, it should deny Plaintiffs' motions for summary judgment and grant the State's cross-motion for summary judgment on all relevant counts. This is because any material factual disputes bearing on Plaintiffs' motions foreclose summary judgment for Plaintiffs; there are no disputed facts with respect to the State's motion; and the State is correct on the law.

---

[2] Contrary to West Virginia's assertion that the State has challenged its standing generally, *see* W. Va. Resp. at 1, Vermont challenges West Virgina's standing only with respect to West Virginia's Vermont constitutional claims, *see* Vt. MTD at 17-19; Vt. MTD/SJ Mem. at 7-9.

At this juncture, the facts in dispute relate to (i) economic effects and (ii) foreign policy.

On economic effects, Plaintiffs' summary judgment filings rely on statements that the Act may or is certain to significantly affect the fossil fuel industry through increased prices, decreased investments, and the like. While mainly used to support standing, Plaintiffs also rely on such statements in their merits arguments.[3] In addition to objecting to these allegations as speculation, the State has properly disputed them.[4] And while the State agrees with Plaintiffs that it is unnecessary for the Court to decide such factual questions, the State disagrees on the result because (i) as a matter of law, even if the Act has some economic effects, it is not precluded by *City of New York* or otherwise; and (ii) if the Court determines the economic effects of the Act are material to any claims, then the State must prevail because Plaintiffs' allegations regarding economic effects are speculative (both on their own and as further demonstrated by the State's expert declaration), so Plaintiffs simply cannot prevail in this facial challenge.

On foreign policy, the United States' disputed "facts" relate to how foreign policy is determined and whether Act 122 creates a conflict with such policy. To begin, the State has disputed each of these to the extent they are legal conclusions and not facts.[5] Additionally, to the extent Plaintiffs rely on the "fact" that U.S. foreign policy is whatever they say it is, the State

---

[3] W. Va. MTD Opp./Mot. SJ at 34 (ECF No. 102-1) (citing Swarup declaration in preemption argument); Chamber Resp. at 35, 36 (citing Zycher, Swarup, Meyer, and Durbin declarations in preclusion argument); W. Va. Resp. at 24 (citing Swarup and Zycher declarations in preemption argument); U.S. Resp. at 25, 33 (citing Froeb declaration in preemption argument).

[4] *See, e.g.,* Vt. Resp. to W. Va. SUMF ¶¶ 20, 57, 73, 84, 92, 96, 118, 127, 131, 134, 138, 142, 150, 156, 160, 162, 164, 167, 169, 171, 174 (ECF No. 109-2); Vt. Resp. to U.S. SUMF ¶¶ 24, 25, 26 (ECF No. 53-1); Fullerton Decl. (ECF Nos. 109-3 & 53-2); Reply Declaration of Don Fullerton, Ph.D. (Jan. 16, 2026) (identifying flaws in analyses of Dr. Zycher and Dr. Froeb). The Court need not consider *any* of the declarations, but if it does, because Plaintiffs submitted their declarations primarily in connection with their summary judgment replies, the Court should also consider a responsive declaration from Professor Fullerton.

[5] Vt. Resp. to U.S. SUMF ¶¶ 16, 21 (ECF No. 53-1).

4

properly disputed that assertion through the declaration of Professor Harold Koh.[6] The State also properly disputed Plaintiffs' proposed "fact" that the Act conflicts with foreign policy.[7] As a result, Plaintiffs cannot prevail on summary judgment. Further, the State should prevail because regardless of what the United States litigants claim to be our country's "foreign policy," as a matter of law (i) there is no foreign policy with the force and effect of law that conflicts with Act 122, and (ii) Act 122 does not take any position on foreign policy, and any effects on foreign policy (incidental or otherwise) are speculative and unproven. *See infra* at 19-24.

In short, regardless of the flurry of declarations and factual statements, the State must prevail. Plaintiffs' speculative allegations cannot change that Act 122 survives all constitutional tests.

## ARGUMENT

### I. The Clean Air Act does not preempt Act 122.

*City of New York* did not do away with the longstanding, traditional statutory preemption test. Whether *City of New York* means that federal common law or the "structure" of the Constitution preempts Act 122—which it does not, *see infra* Sections II-III—is a separate question. But any assessment of Plaintiffs' Clean Air Act preemption claim must follow a standard preemption analysis. For the reasons discussed in the State's prior filings, a faithful application of traditional statutory preemption principles confirms that Act 122 is not preempted by the Clean Air Act. *See* Vt. MTD at 35-42; Vt. MTD/SJ Mem. at 15-21.

---

[6] *See id.* ¶ 16; Declaration of Harold Hongju Koh ("Koh. Decl.") (ECF No. 53-3).

[7] *See, e.g.*, Koh. Decl. ¶ 12.

**A.** *City of New York* **did not change the Clean Air Act preemption analysis.**

Plaintiffs do not want the Court to apply a Clean Air Act preemption analysis to Act 122, so they seem to argue *City of New York* changed the analysis. But in *City of New York,* the Second Circuit explicitly did not "engage in a traditional statutory preemption analysis." *See* 993 F.3d 81, 98 (2d Cir. 2021). It applied a different analysis instead, looking to whether the Clean Air Act "resuscitated" the City's common law claims. *Id.* at 98. The court did not hold that the Clean Air Act preempted the claims; rather, such claims were "barred" because they (i) should have been brought under federal common law, (ii) which was displaced by the Clean Air Act, (iii) which did not separately "authorize" the displaced claims. *Id.* at 90, 95, 98 (explaining in Section C, "The Clean Air Act's Displacement of Federal Common Law Does Not Resuscitate the City's State-Law Claims").

For the reasons explained throughout the State's filings, including *infra* at 11-13, *City of New York*'s analysis does not apply here because Act 122 is on different footing than the City's common law claims—but that is a separate issue from Clean Air Act preemption. Yet, Plaintiffs ask this Court to reject binding Supreme Court precedent and extend a new blanket rule based on a misreading of *City of New York.* For example, the United States characterizes *City of New York* as holding that "courts should not apply the 'traditional statutory preemption analysis' in determining the preemptive effect *of the Clean Air Act* because doing so is incompatible with the fact that 'federal common law governed this issue in the first place.'" U.S. Resp. at 21 n.6 (emphasis added); *see also* W. Va. Resp. at 44. But as explained above, the Second Circuit held no such thing. The *only* way for the *Clean Air Act* to preempt Act 122 is through express preemption, field preemption, or conflict preemption, and none of those apply here.

**B.     Act 122 is not preempted by the Clean Air Act.**

The State is entitled to the presumption against preemption. But with or without the presumption, the Clean Air Act does not preempt Act 122.

*Presumption*. Plaintiffs argue that the presumption against preemption does not apply because, as they tell it, Act 122 operates in an area states have not traditionally occupied. But Act 122 is a cost recovery and adaptation statute designed to protect the health and welfare of Vermonters, an area within traditional state authority. Vt. MTD at 44; Vt. MTD/SJ Mem. at 15, 34-35; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens."); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 725 F.3d 65, 96 (2d Cir. 2013) (recognizing "the state's historic powers to protect the health, safety, and property rights of its citizens"). Even Plaintiffs' incorrect contention that Act 122 operates as an environmental regulation would support the presumption. *See Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440, 442 (1960).

To avoid the presumption, Plaintiffs conflate the issue of traditional state authority (health, safety, welfare) with what they assert is a federally occupied field (cross-border emissions). However, states have traditionally operated in the areas of public health and environmental protection, and neither area is traditionally reserved to the federal government. The State's exercise of its traditional authority does not become something else just because the Plaintiffs think it also operates in an area governed by federal law. Were that the case, the presumption would have no meaning in any case alleging that a state law is preempted. In *Arizona v. United States*, for example, the Supreme Court applied the presumption to a local criminal law even though the law directly addressed immigration and was ultimately deemed

preempted. 567 U.S. 387, 400 (2012). Plaintiffs' contention that the presumption disappears where the state law touches on an area of federal interest is incorrect.

Equally without merit is Plaintiffs' theory that when the presumption does not apply, the Court must disregard traditional preemption analysis altogether and apply a different rule—that the state law is preempted unless specifically authorized. *City of New York* did not say this. *See supra* at 6. Nor, for that matter, do any of the other cases that Plaintiffs cite. *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 387-88 (2000) (stating that "courts will dependably apply" the "settled" preemption doctrine); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (applying presumption against preemption and traditional preemption analysis). Indeed, even when a case involves state action that is "inherently federal in character" and the presumption does not apply, the Supreme Court and the Second Circuit still conduct the traditional preemption analysis. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) (analyzing state law that "polic[ed] fraud against federal agencies" under traditional statutory preemption principles); *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313-14 (2d Cir. 2005) (applying principles of conflict preemption even where no presumption against preemption); *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown,* 612 F.3d 97, 104 (2d Cir. 2010) (discussing when presumption does not apply and analyzing traditional preemption principles).

***Field Preemption***. Plaintiffs argue that the Clean Air Act occupies the field of "interstate air pollution." Chamber Resp. at 43; U.S. Resp. at 31; W. Va. Resp. at 42. However, they do not explain how the Clean Air Act has resulted in such comprehensive regulation of interstate air pollution as to suggest "Congress intended to preempt state law in that entire subject area." *MTBE*, 725 F.3d at 97. Indeed, Plaintiffs avoid any real discussion of field preemption, instead

falling back on their theory that all state law is preempted unless authorized.[8] But that is not the test for field preemption, which, as the State has explained, Act 122 passes. Vt. MTD at 36-38; Vt. MTD/SJ Mem. at 16-19. Among other things, Plaintiffs do not dispute that states have an important role in air pollution regulation. *See* 42 U.S.C. § 7416. Nor can they answer the Supreme Court's declaration in *West Virginia v. EPA* that the Clean Air Act does not cover system-wide measures "necessary to mitigate the dangers presented by climate change." 597 U.S. 697, 727 (2022). The Clean Air Act does not occupy any field to the exclusion of Vermont's Act.

  ***Conflict Preemption***. Plaintiffs' conflict preemption theory rests mainly on an overly general application of the Court's conclusion about state tort claims in *International Paper Company v. Ouellette*, 479 U.S. 481 (1987). *See* Chamber Resp. at 44-45; W. Va. Resp. at 44-45; U.S. Resp. at 34. That case does not compel a finding of obstacle/conflict preemption here.

  Preemption analysis requires a court to consider the context of each federal and state statute at issue. *See City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638 (1973) ("[E]ach case turns on the peculiarities and special features of the federal regulatory scheme in question."). *Ouellette* turned on the Court's statement that "[a]fter examining the [Clean Water Act] as a whole, its purposes and its history, we are convinced that if affected States were

---

[8] The Chamber provides no evidence that Congress intended to occupy the field, relying only on the obstacle preemption holding in *Ouellette* (discussed *infra*) and the blanket assertion that "federal law" does not permit the Act, inappropriately relying on federal common law as evidence of congressional intent. Chamber Resp. at 43. West Virginia provides similarly sparse analysis, stating only that "the Second Circuit described the Clean Air Act as 'comprehensive' for a good reason" as their evidence of congressional intent to occupy the field. W. Va. Resp. at 43. Finally, the United States admits that its field preemption argument is not based on any congressional intent evident in the Clean Air Act, but on the novel notion that federal common law should guide a statutory preemption inquiry. U.S. Resp. at 31 (asserting that "City of New York didn't use the phrase 'field preemption' . . . because traditional preemption principles don't apply here given the inherently federal nature of interstate emissions").

allowed to impose *separate discharge standards* on a *single point source*, the inevitable result would be a serious interference with the achievement of the 'full purposes and objectives of Congress.'" *Ouellette*, 479 U.S. at 493 (emphases added). There, the Clean Water Act's permitting program set discharge standards for the point source that was the focus of the case. The Court reasoned that assigning any additional obligation to reduce discharges would in effect set a competing discharge standard, which would ultimately undermine the permit program created by the Clean Water Act. *See id.* at 494 ("[i]n this case the application of Vermont law against [the discharger] would allow respondents to circumvent the [Act's] permit system").

A similar conflict of standards is not present here. As the Supreme Court explained in *Exxon Shipping Company v. Baker*, "common law nuisance claims" that sought "effluent-discharge standards different from those provided by the [Clean Water Act]" are not the same as a claim for "economic injury," which does "not threaten similar interference with federal regulatory goals." 554 U.S. 471, 489 n.7 (2008). Though Plaintiffs make broad, speculative statements that Act 122 will result in "billions and billions of dollars in liability," W. Va. Resp. at 46, they fail to identify any regulatory standards set by the Clean Air At that would be undermined by Act 122. Act 122, unlike the nuisance suit in *Ouellette*, does not target a single identifiable point source, nor does it seek to curb emissions from any regulated entity.

Again, Plaintiffs neglect to include any serious analysis of the Clean Air Act or the congressional objectives therein, and the Chamber's conclusory claim that Act 122 "directly conflicts" with the Clean Air Act's "comprehensive scheme" is untethered from the test for conflict preemption. *See* Chamber Resp. at 47 n.22. As the State has explained, Act 122 easily meets that test. Vt. MTD at 38-42; Vt. MTD/SJ Mem. at 19-21. Accordingly, Plaintiffs' Clean Air Act preemption arguments must fail.

## II. Act 122 is not governed by *City of New York's* common law analysis.

*City of New York's* holding was premised on a finding that the City's nuisance claims were controlled not by state tort law, but rather by the "specialized" federal common law governing "disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 89, 91. The State has shown that the "common law" in this area is not broad enough to cover what Act 122 does. *See* Vt. MTD at 33-34 (discussing limited scope of federal common law of interstate pollution abatement). But even if the federal common law was as broad as Plaintiffs suggest, the Act would not be covered by it because—in addition to the problem of displaced federal common law preempting state legislation[9]—the Act is simply not the same as the tort claims at issue in *City of New York*. Vt. MTD at 33-34; Vt. MTD/SJ Mem. at 24-25.

As discussed in the State's prior memoranda, the Act is not regulatory in nature or effect. Vt. MTD/SJ Mem. at 12-15. The Act was designed as a one-time assessment based on past activities.[10] It is not like the common law claims at issue in *City of New York*, whose "goal," according to the court, was to "regulate" cross border emissions by "compel[ling] the Producers

---

[9] Vt. MTD at 33; Vt. MTD/SJ Mem. at 22-23. None of Plaintiffs' cases say (much less hold) that displaced federal common law preempts state statutes. Chamber Resp. at 18-19; W. Va. Resp. at 27-28. In particular, West Virginia is wrong that *Calingo v. Meridian Res. Co. LLC* dealt with displaced federal common law preempting a state statute. No. 7:11-cv-628, 2011 WL 3611319 (S.D.N.Y. Aug. 16, 2011). That case held that a federal insurance statute did not preempt a state insurance statute, and that "federal common law d[id] not displace plaintiffs' claims." *Id.* at *10-11. There was no indication in the decision that federal common law had been displaced by the federal statute; the court seemed concerned with whether federal common law existed in that area such that plaintiffs should bring federal vs. state claims. *Id.* at *11.

[10] As Professor Fullerton explained in opposition to Plaintiffs' summary judgment motions, had Vermont intended the Act to have an impact on fossil fuel production or emissions, it could have structured it in a manner that economists would predict to have those outcomes. Fullerton Decl. ¶¶ 28-30 (ECF Nos. 109-3 & 53-2). The declarations of Dr. Zycher and Dr. Froeb submitted by West Virginia and the United States, respectively, do not challenge Professor Fullerton's conclusion that cost assessments themselves are fixed costs that, under standard economic models, will not impact production or price.

to develop new means of pollution control." 993 F.3d at 93 (citation modified). It is also unlike the common law claims at issue in the hodgepodge of state trial-court decisions the Chamber characterizes as a "growing chorus" of similar authority. *See* Chamber Resp. at 20.[11]

Nonetheless, Plaintiffs still argue that there is no meaningful difference between the tort damages at issue in *City of New York* and the Act's cost-recovery assessments.

***First***, they argue that notwithstanding its actual mechanics, the Act regulates interstate pollution as a matter of law. Chamber Resp. at 30-31. They point to *City of New York's* discussion of Supreme Court decisions observing that "regulation can be effectively exerted through an award of damages." *Id*. at 30 (quoting *City of New York*, 993 F.3d at 92 (internal quotations omitted)); *see also* W. Va. Resp. at 21. But the recognition that a damages award *can* be "a potent method of governing conduct and controlling policy," *City of New York*, 993 F.3d at 92, does not mean that every compensation statute is regulation of conduct as a matter of law.

Indeed, compensation requirements run afoul of federal regulatory schemes only when they are "exerted to regulate activities." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959). "Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the constitution." *Huron Portland Cement*, 362 U.S. at 444. The Act is not designed to "chang[e]" any party's "conduct," *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996), but rather to collect revenue for Vermont to address in-state climate harms. That the Act and the tort claims in *City of New York* both seek forms of compensation does not put them on all fours and does not mean that the Act "regulates conduct" for purposes of the federal-common-law analysis.

---

[11] As the Chamber acknowledges, several state supreme court and federal appeals court decisions have gone the other way. *See* Vt. MTD at 34 n.25.

**Second**, Plaintiffs suggest that Vermont's economic analysis is incomplete. They say that even if, as a matter of basic economic principles, the Act itself does not influence the assessed parties' behavior, the Act will lead other states to pass similar laws, creating incentives like those purportedly created by the common law tort claims at issue in *City of New York*. Chamber Resp. at 33; *see generally* Zycher Decl. (ECF No. 121-1); Froeb Decl. (ECF No. 65-2). That line of argument is entirely speculative. *See* Vt. MTD/SJ Mem. at 12-13. And it is not appropriate for the Court—especially in the context of a facial challenge—to "speculat[e] about hypothetical or imaginary cases in which a law might be invalid" in deciding the constitutionality of the Act. *Nat'l Shooting Sports Found. v. James*, 144 F.4th 98, 112 (2d Cir. 2025). Even if the impacts of hypothetical future laws were relevant and appropriate for the Court to consider, the fossil fuel industry has long been facing the prospect of costs and liability from efforts to regulate, respond to, and cover costs incurred because of climate change. Plaintiffs' argument that ***Act 122*** will affect conduct because of industry expectations is speculative. *See, e.g.,* Fullerton Reply Decl. ¶¶ 29-34 *see also, e.g.,* W. Va. Resp. at 9 ("But, of course, Exxon cannot determine today how it will make 'strategic business decisions' in the future in fine detail.").

If Congress believes that Act 122 represents too great a risk to national energy or climate policy, then Congress can legislate to preempt the Act and others like it. The Court should recognize its "necessarily modest role," *Rodriguez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132, 136 (2020), and decline to find that the Act is governed by displaced federal common law.

### III. The Constitution's "structure" does not preempt Act 122.

Plaintiffs continue to take the position that regardless of the preemptive effect of the Clean Air Act, laws like Act 122 are structurally barred by the Constitution. The details of the argument vary, but all three plaintiff groups take their cue primarily from the Second Circuit's

suggestion in *City of New York* that the tort claims at issue there were "simply beyond the limits of state law." 993 F.3d. at 92. *See* Chamber Resp. at 17; W. Va. Resp. at 29; U.S. Resp. at 37. But *City of New York* did not create or apply a structural constitutional preemption doctrine; Plaintiffs' suggestion that it did reads too much into that case's discussion of federal common law. Moreover, Act 122 does not run afoul of any of the existing constitutional doctrines that incorporate extraterritoriality concerns.

A.   ***City of New York*** **does not support the Chamber's and the United States' common law "structural preclusion" theory.**

In the Chamber's and the United States' view, "*City of New York*'s holding addresses preclusion of state law by federal law under the basic scheme of the Constitution." Chamber Resp. at 17.[12] In support, they cite Supreme Court cases applying federal common law and *City of New York's* discussion of some of those cases. But the federal common law supplies a rule of decision where a federal rule of decision is needed; it does not operate as a structural constitutional bar to state action. Perhaps most importantly, the Chamber's and United States' theory would mean that federal courts retain the independent authority to decide whether a state may constitutionally act in a particular area *regardless* of whether Congress intended to preempt the action. That is not what *City of New York* held; indeed, it recognized that Congress can "grant states the authority to operate in an area of national concern." 993 F.3d at 99.

The constitutional theory is also impossible to square with the Supreme Court's admonition that federal common law "plays a necessarily modest role" in a system that "vests

---

[12] *See also* U.S. Resp. at 20 ("Where 'federal common law exists, it is because state law cannot be used' as a constitutional matter." (quoting *City of New York*, 993 F.3d at 98 (internal quotations omitted)). West Virginia does not expressly rely on a structural constitutional theory based on the common law, but argues that even displaced federal common law preempts the Act because the Clean Air Act does not expressly authorize state action. W. Va. Resp. at 16-17. That argument is addressed *supra* at 4, 11-13.

the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States." *Rodriguez*, 589 U.S. at 136; *see also City of New York*, 993 F.3d at 90 (federal common law "threatens a potent mix of judicial lawmaking and encroachment on our federalist structure"). The Chamber's and United States' novel theory of constitutional common law preemption is just the sort of "brooding federal interest" theory, untethered to constitutional or statutory text, that the Supreme Court has rejected. *See Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.). This Court should reject it, too.

### B. Act 122 does not run afoul of existing constitutional doctrines concerned with extraterritoriality.

The State has already demonstrated that states have authority to collect compensation for in-state harms from out-of-state conduct. *See* Vt. MTD/SJ Mem. at 26-27; *Young v. Masci*, 289 U.S. 253, 258-59 (1933) ("The cases are many in which a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it."). Thus, it is not surprising that the Supreme Court has recently rejected the sort of sweeping "extraterritoriality" doctrine Plaintiffs have proposed. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 371, 374-75 (2023).

"In our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Id.* at 374.[13] It is therefore best left to Congress and not the courts—under the guise of a "structural" constitutional analysis—to determine whether, under what circumstances, and to what extent such state laws should be preempted. As noted above, "[i]nvoking some brooding federal interest or appealing to a judicial

---

[13] Of course, as the State has pointed out repeatedly, Plaintiffs have neither plausibly pled nor proved that the Act will have the effect of controlling behavior anywhere. Vt. MTD at 34, 39-40; Vt. MTD/SJ Mem. at 12-15.

policy preference should never be enough to win preemption of a state law; a litigant must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law." *Va. Uranium*, 587 U.S. at 767 (lead opinion of Gorsuch, J.) (citation modified).

That is not to say states' ability to act extraterritorially is limitless. A number of constitutional doctrines incorporate concerns about extraterritoriality. But those doctrines do not, as the Chamber claims, "confirm" the existence of some broader structural preemption principle. Chamber Resp. at 21. Rather, they are the doctrinal *expression* of that principle. And the Act does not offend any of those doctrines.[14]

### 1. Act 122 does not offend principles of "equal sovereignty."

All three Plaintiff groups argue that by regulating or penalizing out of state conduct, the Act violates a heretofore unrecognized "equal sovereignty" doctrine alluded to in a few Supreme Court cases. *See* Chamber Resp. at 22-23; W. Va. Resp. at 29; U.S. Resp. at 37-38. As discussed elsewhere, the Act does not "regulate" anything or "penalize" anyone. *E.g.*, Vt. MTD at 64-65; Vt. MTD/SJ Mem. at 12-15; *supra* at 11-13. And it does not raise any of the same types of concerns as the cases Plaintiffs cite.

*Franchise Tax Board of California v. Hyatt*, for example, dealt with the question of interstate sovereign immunity—i.e., whether one state could be held liable in the courts of another. 587 U.S. 230, 233 (2019). That interstate dispute does not answer the question of whether Vermont may raise climate adaptation funds from responsible private parties who, by definition, will have sufficient contacts with Vermont to justify the exercise of jurisdiction. *See*

---

[14] Plaintiffs' arguments about "equal sovereignty" and due process are addressed immediately below. Plaintiffs' Foreign Affairs and Commerce Clause arguments are addressed *infra* at Sections IV and V, respectively.

Act 122 Sec. 2, Act 47 Sec. 23, § 596(22) (Vt. Stat. Ann. tit. 10, § 596(22)) (definition of responsible party).

*Strassheim v. Daily*—which West Virginia relies on for the proposition that states can only regulate out-of-state conduct that is "intended to produce" detrimental effects in state, *see* W. Va. Resp. at 29 (quoting *Strassheim*, 221 U.S. 280, 285 (1911))—is similarly unhelpful. *Strassheim* involved the extraterritorial application of a criminal law of which intent was an element. 221 U.S. at 284-85. Act 122, of course, is not a criminal statute.

*Fuld v. Palestine Liberation Organization* raised the question of whether the Fifth Amendment's Due Process Clause imposed the same limits on the federal courts' jurisdiction over foreign nationals as the Fourteenth Amendment's Due Process Clause imposes on the state courts' jurisdiction over citizens of other states. 606 U.S. 1, 104 (2025). The Court held that it does not. *Id.* at 16. In doing so, it reiterated the non-controversial proposition that the Fourteenth Amendment requires "minimum contacts" between a party's conduct and the forum state. *Id.* at 14. But the Act's scope is limited to align with the Fourteenth Amendment's "nexus" requirement. Vt. Stat. Ann. tit. 10, § 596(22).

Finally, *New York Life Insurance Company v. Head* is best viewed as a choice-of-law case. There, the Court held, unsurprisingly, that Missouri law did not govern a contract between a New York corporation and a citizen of New Mexico that was entered into in New York, even if the New York corporation was licensed to operate in Missouri. 234 U.S. 149, 163-65 (1914). The case did not address personal jurisdiction or hold that Missouri could not hold an actor liable for out-of-state conduct that had in-state effects.

**2.      Act 122 does not violate due process limitations on extraterritoriality.**

To show that the Act's out-of-state applications comport with due process, Vermont need only show "some relationship" between a responsible party's "in-state conduct" and the in-state harms, not a "causal showing." *Ford Motor Co. v. Mont. 8th Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021). And no party seriously disputes that fossil fuel companies conduct significant business in Vermont, that their products are used in Vermont, or that emissions from those products have contributed to harms in Vermont.

To the extent the Chamber suggests that a party must intentionally target a state to be subject to its jurisdiction, see Chamber Resp. at 24, that argument lacks support in the case law. To be sure, a party's intentional decision to target a state strongly indicates that the state's jurisdiction is proper. *See, e.g.*, *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). But intentional targeting has never been a necessary element of personal jurisdiction (and in any case, any question of intent would involve the fossil fuel industry's decades-long knowledge that their products were contributing to climate change). Rather, the "proper question" is whether a party's "conduct connects [it] to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

Of course, any discussion of responsible parties' individual conduct puts the cart ahead of the horse. For that reason, due process challenges based on the geographic scope of a state's jurisdiction overwhelmingly arise in the context of individual enforcement proceedings or civil disputes, not broad-based efforts to facially invalidate state laws. Indeed, all the due process cases Plaintiffs cite turned on individualized inquiries into whether a state may exercise jurisdiction over a particular litigant in a particular case. *See Ford Motor Co.*, 592 U.S. at 359; *Fuld*, 606 U.S. at 14; *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 126-27 (2023). "If, as the

plaintiffs predict, experience shows that" Vermont is applying the Act in a manner that offends due process, responsible parties could seek to "challenge the Act, as applied, in a concrete factual setting." *McGuire v. Reilly*, 260 F.3d 36, 47 (1st Cir. 2001). Until then, the Court should dismiss—or enter judgment in favor of the State on—Plaintiffs' facial due process challenge.

Seeking to avoid that conclusion, Plaintiffs accuse Vermont of confusing personal jurisdiction with "legislative jurisdiction." Chamber Resp. at 23. But the cases the Chamber cites in support of this proposition are personal jurisdiction cases. *See Fuld*, 606 U.S. at 14; *Mallory*, 600 U.S. at 127; *Ford Motor Co.*, 592 U.S. at 359. Whatever Plaintiffs' "extraterritorial due process" theory is, Act 122 comports with personal jurisdiction principles *and* it is within Vermont's authority to assess liability for out-of-state conduct causing in-state harms.

## IV. Act 122 does not interfere with foreign affairs.

### A. Act 122 does not intrude on a uniquely federal area of authority.

State law is field preempted under the foreign affairs doctrine only if it "intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012). Act 122 does address a traditional state responsibility: specifically, Vermont's authority to raise revenue and protect the public welfare. *See* Vt. MTD at 44; Vt. MTD/SJ Mem. at 15, 34-35. Notably, no Plaintiff disputes that those aims are traditional areas of state responsibilities or that the Act furthers those aims.

To be sure, some courts have recognized foreign affairs preemption where state laws "purport[ed] to regulate an area of traditional state competence" but "the real purpose" of the state laws was to "affect foreign affairs." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010). Here, Plaintiffs suggest that the Act seeks to indirectly reduce carbon emissions. *See* U.S. Resp. at 43. But it would be odd indeed for a

government to try to regulate future conduct by way of a one-time, purely retrospective cost assessment. *See supra* at 11-13 (discussing differences between Act 122 and tort claims at issue in *City of New York*). Act 122's "real purpose" is precisely what it says: establish a fund to finance climate change adaptation in Vermont. That fits squarely within states' traditional prerogatives.

*City of New York* is not to the contrary. Because *City of New York* did not involve foreign affairs preemption, the Second Circuit did not address whether state efforts to fund climate change adaptation reflect an area of traditional state responsibility. Instead, Plaintiffs selectively cite the Second Circuit's analysis of the distinct issue of whether the federal courts should apply federal common law extraterritorially. *See*, *e.g.*, Chamber Resp. at 25-26 (discussing *City of New York*, 993 F.3d at 101-03).

Nor, in any event, does the Act intrude on foreign affairs. The Act lays out a framework for identifying fossil fuel producers that contributed significantly to climate change, assessing contributions from those producers based on scientific data, allocating costs resulting from those contributions, and putting the cost recoveries to use for adaptation in Vermont. Nothing in the Act "decries the actions of" another nation or "imposes [a] politically charged label" to a dispute between nations. *Movsesian*, 670 F.3d at 1076. Nor does the Act "inquir[e] into the type of governments that obtain in particular foreign nations." *Zschernig v. Miller*, 389 U.S. 429, 434 (1968). To the extent the Act implicates foreign nations *at all*, it does so only in their proprietary capacity as shareholders in fossil fuel businesses. *See* Act 122 Sec. 2, § 596(10) (Vt. Stat. Ann. tit. 10, § 596(10)). The Act is nothing like the statutes that courts previously have struck down under the foreign affairs doctrine, and this case is nothing like the cases cited in Plaintiffs' briefs.

## B.     Act 122 does not conflict with foreign policy.

Plaintiffs similarly fail to rebut Vermont's showing that no federal law conflicts with the

Act. Most of the federal "law" Plaintiffs cite is merely inchoate policy objectives, not binding

rules of federal law that are "fit to preempt." *American Ins. Ass'n v. Garamendi*, 539 U.S. 396,

416 (2003). And all of Plaintiffs' conflict preemption arguments turn on "hypothetical or

potential conflict[s]" that are "insufficient to warrant the pre-emption of [a] state statute." *Rice v.*

*Norman Williams Co.*, 458 U.S. 654, 659 (1982).

Plaintiffs cite *Crosby v. National Foreign Trade Council* for the proposition that state law

is preempted any time it interferes with the federal executive branch's "objectives." U.S. Resp. at

47 (quoting and discussing 530 U.S. 363, 373 (2000)); W. Va. Resp. at 38-39 (same). But *Crosby*

involved a conflict between state and federal statutes that took inconsistent positions on the same

issue: who decided which American nationals could invest in Myanmar. 530 U.S. at 367-68. The

specific grant of Presidential authority at issue in *Crosby* is not like the policy aims Congress set

out in, for instance, the Global Climate Protection Act, which West Virginia cites in support of its

argument. W. Va. Resp. at 40. That statute merely announced a "goal[]" to "work toward"

international cooperation and instructed the President to "propos[e] to Congress" a national

climate policy.[15] Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1407-09 (1987)

(reprinted at 15 U.S.C. § 2901 note). Thus, the Global Climate Protection Act does not establish

any rule of domestic law that could preempt Act 122. *See Medellin v. Texas*, 552 U.S. 491, 532

(2008). Indeed, the Global Climate Protection Act is not even codified in operative statutory text.

*See* 101 Stat. at 1407-09.

---

[15] Tellingly, Plaintiffs do not identify any such proposed national climate policy.

Nor is Act 122 conflict preempted by the Clean Air Act, as the United States suggests. U.S. Resp. at 47-48. This is one area in which *City of New York* does control: there, the Second Circuit held that "the Clean Air Act regulates only domestic emissions" so cannot preempt state law with respect to foreign emissions. *City of New York*, 993 F.3d at 101. *City of New York* likewise fails to support Plaintiffs' assertion that the Act undermines U.S. foreign policy. *See* U.S. Resp. at 45-46; Chamber Resp. at 25. The Second Circuit's foreign policy analysis there turned not on federalism, but on "judicial caution" and the horizontal separation of powers. *City of New York*, 993 F.3d at 102. What "risk[ed] jeopardizing our nation's foreign policy goals" in that case was the prospect of the federal courts "infringing on the prerogatives of the political branches" by "[a]ffording extraterritorial effect to federal common law." *Id.* at 103.

Plaintiffs' arguments concerning international treaty obligations fare no better. The United States asserts that the federal government "addresses global greenhouse gas emissions through . . . the U.N. Framework Convention on Climate Change." U.S. Resp. at 48. But just last week, the United States government announced its withdrawal from the Framework Convention. *See* Somini Segupta & Lisa Friedman, *Trump Pulls Out of Global Climate Treaty*, N.Y. Times (Jan. 7, 2026), https://www.nytimes.com/2026/01/07/climate/trump-un-climate-treaty.html. Needless to say, even if the Framework could have preempted Vermont's Act, *but see* Vt. MTD/SJ Mem. at 33, a treaty to which the United States no longer is party is not "fit to preempt" state law.

Plaintiffs also cite the United States' lawsuit here as evidence that the Act conflicts with foreign policy. *See* Chamber Resp. at 27; W. Va. Resp. at 37-38. But that argument proves too much. Plaintiffs would have this court conclude that the federal government can preempt state law under the foreign affairs doctrine simply by challenging the law in court or asserting via

executive order that the law is preempted. *See* Chamber Resp. at 27. Of course, that sort of *ipse dixit* is not the standard for preemption. *See, e.g.*, *Crosby*, 530 U.S. at 372 (summarizing preemption standard).

Finally, in doubling down on their assertion that the United States "has long opposed" the establishment of loss and damage funds, Plaintiffs betray that they either misunderstand the Act or misunderstand the United States' longstanding positions in international climate negotiations. *See* U.S. Resp. at 48-49; Chamber Resp. at 26. As the United States implicitly acknowledges, it has only ever opposed loss and damage funds that would make states or countries liable to one another in their capacity as sovereigns. *See* U.S. Resp. at 48-49. And the Act contemplates liability for foreign governments only in their proprietary capacities. *See* Vt. Stat. Ann. tit. 10, § 596(10) (making foreign governments potentially liable to the extent they held "an ownership interest in a fossil fuel business during the covered period"); *see also Rayonier Inc. v. United States*, 352 U.S. 315, 319 (1957) (noting distinction between government's liability in sovereign capacity and government's liability in proprietary capacity). Thus, the Act is consistent with the United States' past support for "polluter pays" schemes.[16]

Plaintiffs do not rebut Vermont's argument that the Act cannot conflict with U.S. foreign policy because (among other things) the U.S. does not participate in ongoing international climate negotiation. *See* Vt. MTD/SJ Mem. at 33. Instead, Plaintiffs question the legitimacy of Vermont's declarant, Harold Koh. U.S. Resp. at 50; Chamber Resp. at 27. But Professor Koh is an expert on U.S. foreign policy who has held high-ranking positions under multiple presidential

---

[16] Even if this provision of the Act raised concerns, a court must "consider partial invalidation (and by extension, a provision's severability)" before invalidating a law *in toto*. *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 229 n.16 (2d Cir. 2025), *petition for cert. filed sub nom.*, *Grant v. Higgins*, No. 25-566 (Nov. 7, 2025); *see also* Vt. MTD/SJ Mem. at 37 n.20.

Administrations and who now draws on that experience as a scholar and teacher. Koh Decl. ¶¶ 4-5 (ECF No. 53-3). Accordingly, Professor Koh possesses extensive personal knowledge and expertise on both the specific substance of various international treaties to which the United States has been a party and, more generally, the procedures by which the United States creates and implements foreign policy. *Id.* ¶ 3. Independent of any legal conclusions, these insights are helpful in contextualizing the United States' statement of facts as it relates to U.S. foreign policy.

By the same token, this Court should not defer to the United States' declarant on the legal question of whether the Act conflicts or interferes with U.S. foreign policy. Though the Court may afford "respect" to the federal government's "evidence" and "factual inferences" in the foreign policy arena, "concerns of national security and foreign relations do not warrant abdication of the judicial role," and this Court should not defer to the federal government's legal conclusions "even when such interests are at stake." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010); *see also* U.S. Resp. at 45 (citing cases). Whether the Act conflicts with or otherwise is preempted by U.S. foreign policy is a legal question for this Court to resolve, and Act 122 does not collide with any binding rule of federal law in the foreign policy arena.

## V. Act 122 does not violate the dormant Commerce Clause.

### A. Act 122 does not violate the dormant Interstate Commerce Clause.

The United States' interstate commerce claim rests on the faulty theory that Act 122 directly regulates wholly out-of-state conduct. As discussed elsewhere, the Act does not regulate any conduct. But even if it did, the Act would not run afoul of any existing dormant Commerce

Clause prohibition. Accordingly, if the Court does not dismiss the United States' interstate commerce claim, the Court should grant the State's cross-motion for summary judgment.[17]

*First,* though the United States nominally claims "discrimination," it only supports that claim through reliance on its flawed extraterritoriality arguments. *See* U.S. Resp. at 52. Again, the actual test for discrimination requires a plaintiff to show that a statute "discriminat[es] against interstate commerce on its face . . . harbor[s] a discriminatory purpose . . . or discriminat[es] in its effect." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 48 (2d Cir. 2007). And the Act does not discriminate facially, in purpose, or in effect. Vt. MTD at 57-58 ; Vt. MTD/SJ Mem. at 39. The Act cannot be facially discriminatory because it does not distinguish between in-state and out-of-state fossil fuel producers. *See* Vt. MTD at 57; Vt. MTD/SJ Mem. at 39; *contrast with, e.g., Granholm v. Heald,* 544 U.S. 460, 473-74, 476 (2005) (holding that state laws allowing in-state but not out-of-state wineries to ship directly to customers, or imposing additional hurdles on out-of-state wineries, were facially discriminatory).

Additionally, to the extent the United States suggests the Act has a discriminatory purpose or effect because fossil fuel companies did not engage in extraction or refining in Vermont from 1995-2024, *see* U.S. Resp. at 52, this is not the test. *See Nat'l Shooting Sports*, 144 F.4th at 115 ("[T]he mere fact that [the law] may, in practice, apply only to gun industry members engaged in interstate commerce because there exist no wholly intrastate gun industry members is not sufficient to establish discrimination."). The question is whether the Act burdens out-of-state competitors to the advantage of in-state counterparts. *See, e.g., Granholm,* 544 U.S.

_____

[17] No party has moved for summary judgment on the Chamber's and West Virginia's Commerce Clause claims. The Court should dismiss those claims. Vt. MTD at 55-61. Also, the United States appears to have dropped its *Pike* argument; the State should prevail on *Pike. Compare* Vt. MTD/SJ Mem. at 39-40 *with* U.S. Resp. at 51-52.

at 472 ("States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses."); *Town of Southold,* 477 F.3d at 49 (holding no discriminatory effect where law "does not confer a competitive advantage upon local business vis-a-vis out-of-state competitors"). Act 122 does not. *See* Vt. MTD at 57-58; *contrast with, e.g.*, *Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 350-52 (1977) (holding North Carolina law had discriminatory effect against Washington apple producers because, though law applied same grading/labeling requirement to in-state and out-of-state apples, it removed competitive advantage Washington enjoyed through Washington's own grading/labeling). The United States has provided no response to this crucial distinction.

Moreover, the dormant Commerce Clause does not foreclose Vermont from passing laws to benefit itself. U.S. Resp. at 52 (complaining that Act raises funds for in-state projects). Again, the question is not whether economic legislation benefits the State (of course it would), but whether doing so amounts to economic protectionism—"that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273 (1988).

Further, even if Act 122 were discriminatory and subject to "strict scrutiny," *see* U.S. Compl. ¶ 77, the purpose with which the United States takes issue (raising revenue for climate adaptation) is legitimate. *See* Vt. MTD at 44. And there would be no "reasonable nondiscriminatory alternative" to Act 122 (again, even if it were discriminatory, which it is not) because the point is to recover costs from the entities whose products gave rise to those costs versus, for instance, regulating goods or services. *See, e.g., Nat'l Elec. Mfrs. Ass'n v. Sorrell,* 272 F.3d 104, 108-13 (2d Cir. 2001) (light bulbs); *Town of Southold,* 477 F.3d at 47-49 (ferry service); *Hunt,* 432 U.S. at 348-54 (apples).

*Second,* Act 122 does not offend the dormant Commerce Clause as extraterritorial. The United States acknowledges there is no *per se* rule against extraterritoriality, but continues to suggest that Act 122 is nonetheless invalid under *Pork Producers.* U.S. Resp. at 51-52. This is incorrect. *Pork Producers* emphasized that the Court's prior "extraterritorial" cases were concerned with economic protectionism. *See Pork Producers,* 598 U.S. at 371-74. It explained that the laws at issue in those cases "had a *specific* impermissible 'extraterritorial effect'—they deliberately prevented out-of-state firms from undertaking competitive pricing or deprived businesses and consumers in other States of whatever competitive advantages they may possess." *Id.* at 374 (citation modified) (emphasis in *Pork Producers*). For instance, a New York law that prohibited out-of-state dairy farmers from selling their milk in New York for less than New York's dairy farmers (thus ensuring out-of-state farmers did not have that competitive advantage over in-state farmers). *Id.* at 371-72 (citing *Baldwin v. G.A.F. Seeling, Inc*., 294 U.S. 511 (1935)). Or price-affirmation statutes that "tied 'the price of . . . in-state products to out-of-state prices'" for those products. *Id.* at 374 (citation omitted). Unlike those statutes, Act 122 does not offer competitive advantages to in-state producers over out-of-state producers. *See* Vt. MTD at 57-58.

Further, whatever may be left of extraterritoriality after *Pork Producers,* it is concerned with "acts committed 'outside [the first State's] jurisdiction' that are not 'intended to produce [or that do not] produc[e] detrimental effects within it,'" *Pork Producers*, 598 U.S. at 375-76 (citation omitted); or, possibly, laws that "*directly* regulat[e] out-of-state transactions by those with *no* connection to the State," *id.* at 376 n.1 (discussing plurality in *Edgar v. MITE Corp.,* 457 U.S. 624 (1982)) (emphasis in original). This is not Act 122. Act 122 does not directly regulate any transactions at all. And Act 122 will not apply to anyone with "no connection" to the State— both because the definition of "responsible party" requires a sufficient connection with the State

and because Act 122's cost recovery is based on acts that led to detrimental effects within Vermont. *See* Act 122 Sec. 2, Act 47 Sec. 22-24 (Vt. Stat. Ann. tit. 10, §§ 596(22), 597(1), 598(a)(1), (b), 599c). Under the Act's careful framework, payments are assigned to a responsible party based on greenhouse gas emissions attributable to that party and for the amount of Vermont's climate change adaptation costs proportional to those emissions. Vt. MTD at 46; Vt. MTD/SJ Mem. at 43 & n.24.[18] The United States' attempt to create a new test out of whole cloth—one that would require the State to trace "specific molecules to a specific company's production in a specific location" and even then would not be good enough, U.S. Resp. at 40—cannot be squared with *Pork Producers*.

Vermont is not an island, and any notion that fossil fuel extraction and refining have nothing to do with Vermont is not a serious one. Fossil fuel companies have gas stations all over Vermont where Vermonters and others work and buy gasoline; emissions from use of those companies' products in Vermont and elsewhere have contributed significantly to anthropogenic climate change; climate change is causing significant on-the-ground impacts in Vermont along with the rest of the world; and the fossil fuel industry has known for decades this would happen. As we said before, States are not powerless to hold polluters responsible for in-state environmental harms just because the harm they set in motion began somewhere else, or because that harm is so broad and severe that it is also felt in other places. Act 122 is not unconstitutionally extraterritorial under the dormant Commerce Clause.

---

[18] Contrary to West Virginia's and the Chamber's assertions, W. Va. Resp. at 30-31, Chamber Resp. at 46-47, the State's position that the Act is not a regulation of emissions is entirely consistent with its position that cost recovery demands under the Act are connected to the extraction and refining activities of responsible parties. Obviously the Act concerns emissions—not to "address" emissions as West Virginia claims, W. Va. Resp. at 31—but to recover costs based on the past extraction and refining activities leading to those emissions.

### C. Act 122 does not violate the dormant Foreign Commerce Clause.

As to the Foreign Commerce Clause, the United States repeats its conclusory assertion that Act 122 impairs the federal government's ability to "speak with one voice," *see* U.S. Resp. at 52-53, but ignores what this means: it must identify "specific indications of congressional intent to bar the state action here challenged," *Barclays Bank PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 324 (1994) (internal quotation marks omitted). *See also id.* at 331 ("we leave it to Congress—whose voice, in this area, is the Nation's—to evaluate [how] the national interest is best served"). It has not done so.

*Japan Line, Limited v. Los Angeles County* does not say otherwise.[19] In that case, the federal "voice" was evidenced by a ratified treaty. 441 U.S. 434, 452-53 (1979). The treaty provided that temporarily imported cargo shipping containers would not be subject to any importation taxes, but California localities had imposed taxes on shipping containers docked in their waters, which was a problem under the foreign commerce clause. *Id.* at 436-37, 452-53. Here, there is no treaty or any other "specific indication[] of congressional intent" that comes close to exempting fossil fuel companies from liability for a portion of a state's climate change response costs. No matter how many times Plaintiffs say it, there is no "one voice" that creates any problems for Act 122 under the foreign commerce clause.[20]

---

[19] The Supreme Court did not address the foreign commerce clause in the other case cited by the United States, *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000).

[20] The United States has not supported its claim that Act 122 discriminates against foreign commerce other than to reference its arguments about interstate commerce, U.S. Resp. at 52, 60. Act 122 is not discriminatory, *see supra* at 25-26, but the United States also has not demonstrated that the foreign commerce clause test includes discrimination. *Barclays Bank* addressed discrimination against foreign commerce in the context of the four-factor test for determining whether state taxes offend interstate commerce, but did not expressly adopt it as a foreign commerce clause test. *See* 512 U.S. at 310-14, 316-17, 320.

\* \* \*

Plaintiffs' request for permanent injunctive relief should be denied because they have not demonstrated Act 122 is unconstitutional or unlawful. If the Court were to conclude that some part of the Act were unlawful—it should not—the Court should leave in place all parts of the Act that can lawfully function. *See* Vt. MTD/SJ Mem. at 37 n.20; Vt. Stat. Ann. tit. 1, § 215.

## CONCLUSION

For the foregoing reasons, and for the reasons discussed in the State's prior briefing, the State respectfully requests that if the Court does not grant the State's Motion to Dismiss on the claims raised in its cross motion for summary judgment, the Court should grant summary judgment to the State on those claims.

DATED January 16, 2026

Respectfully submitted,

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By: */s/ Jonathan T. Rose*
JONATHAN T. ROSE
*Solicitor General*
LAURA B. MURPHY
*Director, Environmental Protection Unit*
HANNAH W. YINDRA
SAMUEL B. STRATTON
PATRICK T. GAUDET
*Assistant Attorneys General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
jonathan.rose@vermont.gov
laura.murphy@vermont.gov
hannah.yindra@vermont.gov
sam.stratton@vermont.gov
patrick.gaudet@vermont.gov