## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br>　　　　　　　　　Plaintiffs,<br>　　　and<br><br>STATE OF WEST VIRGINIA et al.,<br>　　　　　　　　　Intervenor-Plaintiffs,<br>　　　v.<br><br>JULIE MOORE et al.<br>　　　　　　　　　Defendants,<br>　　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　　Intervenor-Defendants. | Case No. 2:24-cv-01513 |
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br>　　　　　　　　　Plaintiffs,<br>　　　v.<br><br>STATE OF VERMONT et al.,<br>　　　　　　　　　Defendants,<br>　　　and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br>　　　　　　　　　Intervenor-Defendants. | Case No. 2:25-cv-00463 |

## REPLY DECLARATION OF DON FULLERTON, Ph.D.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.　　　I submit this declaration in further support of Defendants' opposition to Plaintiffs' motions for summary judgment in the above-captioned cases.

**REPLY TO ZYCHER DECLARATION**

2.     I have reviewed the declaration of Benjamin Zycher submitted by the West Virginia Plaintiffs. Dr. Zycher opines that the Vermont Climate Superfund Act (the "Act") will lead to a reduction in future fossil fuel investment, which will reduce production of fossil fuels, and as a result, lead to an increase in the price of fossil fuels for consumers of between 1.6 and 3.2 percent. Declaration of Benjamin Zycher in Support of Intervenor States' Reply in Support of their Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment ("Zycher Decl."), ECF Nos. 121-1, 124-1, ¶¶ 5, 52.

3.     In sum, Dr. Zycher's opinion is flawed for several reasons. First, he assumes without evidence that investors will believe that the State of Vermont will repeat and expand the Act to apply to future fossil fuel company activities and therefore investors will view the Act as a tax on future behavior. But the Act is not a tax on future behavior. It is an assessment on fossil fuel companies based on past conduct, so it is a fixed cost that would not affect the market price of fossil fuels. Second, even if the Act were to be extended and could be treated as a tax on future behavior, Dr. Zycher's analysis makes two key additional erroneous assumptions: (1) he treats the Act as a tax directly on the investment in fossil fuel supply within the United States, even though the Act's assessments are based on production, not investment; and (2) he fails to recognize that fossil fuel companies that do not receive an assessment under the Act, or new entrants to the fossil fuel market, will make any promising investment that assessed companies do not make. Those other companies would thus expand their future investment and fossil fuel supply to offset any decrease in production by assessed companies.

4.     Dr. Zycher's analysis starts with the assumption that investors will believe that the State of Vermont will extend the Act to apply in the future and then, based on that assumption,

treat the Act as a tax on current and future investment. His assumption is based on a theory of political economy that the "spending requirements specified in the [Act] will create and/or expand constituencies with strong interests in long run preservation or expansion of the spending programs." Zycher Decl. ¶ 12; *see also id.* ¶¶ 33-39. But the Act does not include spending "requirements"; rather, it identifies permissible uses for the revenue from the one-time assessment of the Act. Moreover, Dr. Zycher does not provide any evidence to support the application of that theory to the climate change adaptation projects that will be funded by the Act or to support his assertion that based on that theory, investors must believe that the State of Vermont will extend the Act to apply in the future.

5.      In contrast, and as explained in my November 17, 2025 declaration, the 2015 Clean Power Plan, if implemented, would have been a tax on emissions from future fossil fuel production. It would have raised the marginal cost of production, which means it would raise the market price of fossil fuels. Unlike the Clean Power Plan (CPP), Vermont's Act is not a tax on future fossil fuel supply. It is an assessment based on past fossil fuel extraction and refinement. It would impose a fixed cost that would not affect the market price of fossil fuels.

6.      Based on his incorrect assumption that the Act is a tax on future behavior, Dr. Zycher then calculates the impact of the supposed tax, making eight flawed and unsupported additional assumptions (as described in the following eight paragraphs).

7.      First, he assumes that the Act's total assessment will be spent over 9 years and will amount to $1 billion a year, that Vermont will continue to spend $1 billion a year for every subsequent year after those 9 years, and that Vermont will enact a similar new law to pay for that spending. Zycher Decl. ¶¶ 43-46. He provides no basis for his assumption that Vermont will

spend $1 billion a year, or that the spending would necessarily be paid for in the future through a similar assessment.

8.      Second, Dr. Zycher then incorrectly treats the assumed $1 billion annual spending as a tax on U.S. companies' fossil fuel investments. Zycher Decl. ¶¶ 45-46. But the Act imposes an assessment that is based on the greenhouse gas emissions attributable to the fossil fuels produced by the assessed companies, not an assessment that is based directly on those companies' investment. Even if the Act were to be repeated in the future and could be treated as a future tax, Dr. Zycher provides no basis to treat it as a tax on investment. Rather, the appropriate assessment under the Act – and thus if it were repeated – is based on the fossil fuel extraction and refining that led to those greenhouse gas emissions.[1]

9.      Third, in order to calculate the supposed tax rate, Dr. Zycher divides the assumed $1 billion annual spending by $206 billion, citing an International Energy Agency (IEA) finding about 2024 U.S. investment in fossil fuel supply, to conclude that the Act will impose a 0.49 percent tax on investment. Zycher Decl. ¶¶ 42-47. But Dr. Zycher offers no justification for considering the $206 billion figure, nor does he explain what exactly is meant by "U.S. capital investment in fossil fuel supply," nor why it would be appropriate to use "U.S. capital investment in fossil fuel supply" as the denominator in his calculation. For example, U.S. fossil fuel companies make substantial investments in fossil fuel supply around the world. Indeed, the source cited by Dr. Zycher indicates that worldwide investment in fossil fuel supply in 2025 will

---

[1] As with the CPP discussed above in ¶ 5, any hypothetical tax on future fossil fuel production would have some effect on all future fossil fuel activities, including employment, output, and investment. Dr. Zycher's error is assuming his entire hypothetical tax would directly apply only to investment.

likely exceed $1 trillion.[2] Either measure could be the appropriate measure to calculate Dr. Zycher's supposed tax rate, depending on the justification, but no justification is provided. However, Dr. Zycher's use of worldwide investment rather than U.S. investment multiplies his speculated investment tax by a factor of five (from 0.1% to 0.49%), because he divides the $1 billion "tax" by $206 billion instead of $1 trillion (though his speculated $1 billion burden is the same in either case). This example is not meant to suggest that either calculation is correct (or that the calculation itself is even relevant). Instead, it is meant to illustrate the omissions and uncertainty in Dr. Zycher's reasoning.

10. Fourth, Dr. Zycher opines that this speculative continuing stream of penalties over time would guarantee higher prices for fossil energy "even if increased foreign production compensates fully for the decline in U.S. production" because: "(a) the production shift overseas would increase transportation and such other costs as exchange rate risk; (b) the production shift overseas would increase production costs, because the shift, driven by public policies, would be toward higher cost producers; and (c) there would be an increase in refining costs because the U.S. refining capital stock is optimized for a particular mix of crude oil types." Zycher Decl. ¶ 56. Each of these reasons is incorrect or misleading, however, because (a) Dr. Zycher assumes without justification that any added transportation cost or exchange risk will be borne by the buyer and not by the seller; (b) the increase in production costs overseas would be only a short run problem, as new investment brings costs back down over the long term; (c) also in the long run, capital stocks can be optimized for any particular mix of crude oil types; and (d) in any case,

[2] International Energy Agency (2025). Executive summary – World Energy Investment 2025. IEA Publications. https://www.iea.org/reports/world-energy-investment-2025/executive-summary.

he ignores the fact that increased production by unassessed U.S. companies will also compensate for the decline in U.S. production from assessed companies.

11.     Fifth, Dr. Zycher assumes a 10 percent long-run rate of return to investment in fossil fuels and finds that the Act represents a decline in profitability of 0.49 percentage points of that 10 percent return, which is a 4.9 percent reduction in the rate of return. Zycher Decl. ¶ 50. He then assumes a value of 0.33 for the elasticity of investment with respect to the rate of return (so investment falls by 0.33 percent for each one percent fall in the net rate of return). He thus finds that the 4.9 percent reduction in the rate of return will lead to a 1.6 percent reduction in capital investment in fossil fuel production. Zycher Decl. ¶ 51. In doing so, Dr. Zycher implicitly assumes that the tax on investment applies to all existing companies and all potential entrants to the industry. Instead, it would only apply to fossil fuel companies that receive assessments under the Act. If those assessed companies reduced their investment in future fossil fuel supply, then other existing firms or new firms would make those same investments instead and expand their future fossil fuel supply. Those other firms would be unaffected by the Act, so total investment would be unaffected (see ¶ 34 in my November 17 declaration).

12.     Sixth, based on his assumption that investment will be reduced by 1.6 percent, Dr. Zycher assumes that output would also fall by 1.6 percent, because "reduction in capital investment results directly in a decline in production capacity." Zycher Decl. ¶ 51. But production does not bear a fixed relationship to the capital infrastructure. Standard economic models instead assume that companies have flexibility to substitute among inputs to production such as capital, labor, and other inputs. Even assuming reduced investment in capital infrastructure such as drilling or mining equipment, fossil fuel companies have some flexibility to use more workers to run the same equipment for more hours with better maintenance and

more efficiency in production. Thus, a reduction in investment will not equate to the same percent reduction in production.

13.     Seventh, Dr. Zycher assumes a demand elasticity between 0.5 and 1.0 to infer that the 1.6 percent reduction in output would raise prices by 1.6 to 3.2 percent.[3] He also assumes that the price increase would affect all producers, including those not assessed, because a single market cannot have more than one price. Zycher Decl. ¶ 52. He is correct that a single market cannot have more than one price, but he incorrectly assumes that the assessed companies could set a higher single market price. If only a subset of companies faces an assessment on fossil fuel extraction or refining, even if it were on future extraction or refining every year forever, then other companies remain unassessed and can proceed to produce and sell fossil fuels at their unchanged marginal cost. That lower unchanged marginal cost of production would determine the single market price, which would also therefore be unchanged.

14.     Eighth, Dr. Zycher also states that, "[i]f future prices are expected to rise above current prices at a rate greater than the market rate of interest, producers have incentives to produce less now and more later in the hope of receiving returns higher than those available by investing current sales revenues" and that this "incentive increases prices during the current time period." Zycher Decl. ¶¶ 59, 60. This logic is wrong. An increase in future price could create a *profit* opportunity for a firm to "produce less now and more later in the hope of receiving higher returns," an action that would raise the current market price. But in this case, Dr. Zycher speculates about a future tax that raises the future price, which does *not* create a profit

---

[3] A demand elasticity of 1.0 means that a one percent decline in quantity is associated with a one percent rise in price (so the 1.6 percent decline in output leads to a 1.6 percent increase in price). A demand elasticity of 0.5 means that a half percent decline in quantity is associated with a one percent rise in price (so the 1.6 percent decline in output leads to a 3.2 percent rise in price).

opportunity for a firm that holds oil off the market to sell later. If anything, a future tax could create incentives to produce less later and more now, reducing the current price. In other words, nothing about Dr. Zycher's speculative future tax would provide an incentive that "increases prices during the current time period."

15.     Dr. Zycher's conclusion that a law passed by a single small state within the United States could be the cause of a 1.6 to 3.2 percent increase in the worldwide market price of fossil fuels is implausible on its face. Even assuming for the sake of argument his assumption of a $1 billion per year assessment is correct, the IEA reports that worldwide annual revenues of the oil and gas industry have averaged close to $3.5 trillion (in U.S. dollars).[4] The IEA does not report the annual value of all fossil fuels worldwide, but their numbers can be used to calculate that the value of worldwide coal production is approximately $1 trillion USD.[5] The sum of these values for annual oil and gas production ($3.5 trillion) plus coal production ($1 trillion) is $4.5 trillion. Thus, even if the $1 *billion* annual assessment were extended, it would not have any noticeable effect on this $4.5 *trillion* market.

16.     But as discussed above, the Act does not impose a tax on future behavior. The only assessment that is appropriate to analyze is the assessment actually enacted by the State of Vermont, namely, a one-time assessment that is based on emissions attributable to past fossil fuel extraction and crude oil refining. That assessment represents a fixed cost on fossil fuel

---

[4] International Energy Agency (2023). The Oil and Gas Industry in New Zero Transitions. IEA Publications. https://www.iea.org/reports/the-oil-and-gas-industry-in-net-zero-transitions. Page 13 says "Since 2018, the annual revenues generated by the oil and gas industry have averaged close to USD 3.5 trillion."

[5] International Energy Agency (2024). Coal 2024: Analysis and Forecast to 2027. https://www.iea.org/reports/coal-2024. Page 7 reports that estimated global coal production in 2024 is 8.77 billion tonnes. Coal does not have a single worldwide price, but page 10 reports that "the price of imported thermal coal in Europe was around USD 120 per tonne." This price multiplied by 8.77 billion tonnes is barely over $1 trillion in USD.

companies and is not a tax on any current investment or future production of any fossil fuel company.

## REPLY TO FROEB DECLARATION

17.     I have also reviewed the Rebuttal Declaration of Luke Froeb, Ph.D. ("Froeb Decl."), submitted by the United States, ECF No. 65-2.

18.     Dr. Froeb's Declaration contends that I have "(1) fail[ed] to account for capital markets and (2) overlook[ed] the risk that Vermont might expand its covered period and that other jurisdictions might enact legislation similar to the Vermont Act." Froeb Decl. ¶ 15. Each of these claims is incorrect.

## CAPITAL MARKETS

19.     To explain his first point about the cost of capital, Dr. Froeb says: "The impending liability and uncertainty surrounding the magnitude of these potential liabilities increases firms' exposure to financial risk. That increased risk, in turn, could reduce firms' willingness to undertake costly, long-lived investments in future energy production. It also could reduce the willingness of debt providers and equity financers to supply capital, except on more expensive terms." Froeb Decl. ¶ 19. Therefore, he concludes that "the Vermont Act could affect price, production, and investment by *increasing the responsible parties' costs* of equity and debt financing (collectively, their 'cost of capital'), thereby reducing *their* willingness to undertake costly capital expenditures." Froeb Decl. ¶ 13 (emphases added). The rest of this section describes three primary issues with this analysis.

20.     First, this claim is inaccurate. My declaration does "account for capital markets." *See, e.g.,* Declaration of Don Fullerton, Ph.D. ("Fullerton Decl."), ¶ 33, ECF No. 53-2 ("even if assessments leave a fossil fuel company with too little cash and no outside source of finance to

make promising investments in future production, the Act still has no effect on marginal cost of production, market price, or total investment in fossil fuel production, because the same investment and any other investments in future production that are sufficiently promising will be undertaken by some other company").

21.     To show that any company worldwide could make these investments in future production, I first explain competition in this market. While Dr. Froeb was the Director of the Bureau of Economics of the Federal Trade Commission (FTC) in 2004, his office published a 253-page report about competition in petroleum markets.[6] The Report points out that crude oil is traded throughout the world, with large flows from countries with surplus production to industrial countries. Report at 130. Within the broad market defined as "all crude oils produced worldwide," Report at 131, the Report then finds that the world crude oil market is competitive.[7] In other words, any firm around the world can sell crude oil at nearly the same worldwide price.

22.     A major implication of this worldwide competition is that all firms worldwide have the same incentive to make new investments that could allow them to produce and sell

---

[6] U.S. Federal Trade Commission (2004). The Petroleum Industry: Mergers, Structural Change, and Antitrust Enforcement ("Report"). Available at https://www.ftc.gov/reports/petroleum-industry-mergers-structural-change-antitrust-enforcement-report-staff-federal-trade. The Report's primary measure of competitiveness is the "measure of concentration known as the Herfindahl Hirschman Index ('HHI'), which equals the sum of the squared market shares of all market participants." Report at 26. As the FTC Report further explains, the most competitive markets have low market concentration, with HHI under 1,000, while the least competitive markets have high market concentration, with HHI over 1,800. *Id.*

[7] The Report finds that the "concentration of world production fell from an HHI of 527 in 1990 to 276 in 2002." Report at 135. These numbers are well below the competitive "low market concentration" limit of HHI less than 1,000. To further explain how that HHI is so low, and that the world crude oil market is competitive, the Report's Table 5-3 shows market shares. Report at 145. To list some of the firms best known in the U.S, Exxon Mobil has a market share of 3.3% in 2002, Shell has a share of 3.2%, BP has a share of 2.7%, and ChevronTexaco has a share of 2.5%. Table 5-3 lists over fifty firms that all compete with each other in the sale of crude oil around the world.

future crude oil. Thus, worldwide competition reinforces the idea that any unassessed firm can make any investment that is prevented by an assessed firm's raised cost of capital.

23.     My declaration explained that "temporary disruptions may affect market price until other firms expand their investments and production – driving market price back down toward the marginal cost of production. That is, any increase in market price would be temporary." Fullerton Decl. ¶ 22. Thus, at least in the long run, the Act does not affect the market price of oil.

24.     Second, while Dr. Froeb says that empirical research has shown that increases in liability risk have raised the cost of capital in the oil and gas industry (Froeb Decl. ¶ 20), none of his evidence shows that any assessment has decreased total investment or increased the market price of oil. He cites a published study finding that "adverse lawsuit outcomes—particularly large settlements and judgments—further increase financing costs." Froeb Decl. ¶ 21. British Petroleum's (BP's) Deepwater Horizon oil spill is a major example. As of 2022, BP has paid over $60 billion to settle criminal, civil, and other fines,[8] so it would not be surprising if the spill increased BP's borrowing costs by 1.75 percentage points (as claimed by Dr. Froeb in ¶ 20). This evidence shows that a large assessment can raise borrowing costs.

25.     However, Dr. Froeb has not provided any evidence tying an increase in borrowing costs (for the subset of companies subject to assessments under the Vermont Act) to an increase in market price.[9] Indeed, consider Dr. Froeb's Deepwater Horizon example: even though BP's

---

[8] See McGuire W, Holtmaat EA, and Prakash A (2022). Penalties for industrial accidents: The impact of the Deepwater Horizon accident on BP's reputation and stock market returns. PLoS ONE 17(6): e0268743, at 2. https://doi.org/10.1371/journal.pone.0268743.

[9] McGuire *et al.* even find "no evidence that the Deepwater Horizon spill diminished BP's stock market returns in the mid (1–2 years) or the long term (2–7 years), despite a drastic drop in BP's stock price immediately after the spill. Moreover, we find no evidence that other firms in the oil

borrowing costs increased, the overall price of West Texas Intermediate crude oil actually declined substantially, from $81.52/barrel on April 19, 2010, the day before the Deepwater Horizon spill, to $64.78/barrel a month after the spill.[10] This evidence that the price did not rise in the first month was not surprising, because other firms without such assessments have no change in their cost of capital and can make whatever investments the assessed firm wanted to make. Also, no evidence has shown that the spill raised price in the long run either.

26.     My third response is about the size of any assessment relative to the IEA estimate cited in my ¶ 9 above that worldwide investment in fossil fuel supply in 2025 will likely exceed $1 trillion per year. BP's $60 billion cost of the spill had an effect on the company's profits but was too small to provide a measurable impact on $1 trillion of worldwide investment, or on market price. The amounts of assessments under the Act are not yet known, and they may also have temporary disruptive effect on some profits of some companies. But the relative size of the BP cost and its lack of effect on market price makes it arbitrary to assume that Vermont's Act would have any noticeable effect on total worldwide fossil fuels investment – as would be necessary to have a noticeable effect on the global price of oil.

27.     In other words, any disruption of capital markets for assessed firms will be small, and temporary, and will not affect other firms that can make the same investments the assessed firms would have made, thus ensuring no long-run effect on production of fossil fuels.

---

and gas industry suffered declines in their stock market returns." *Supra* note 8, at 3.  In other words, as stated in my November 17 declaration at ¶ 11(b): "This fixed cost will be absorbed by the firm and its shareholders and cannot be passed on to customers through an increase in price."

[10] Curry L. Hagerty and Jonathan L. Ramseur (2010). Deepwater Horizon Oil Spill: Selected Issues for Congress. Congressional Research Service. https://www.everycrsreport.com/reports/R41262.html.

## POSSIBLE FUTURE LAWS

28.     Dr. Froeb's second claim is that I have "overlook[ed] the risk that Vermont might expand its covered period and that other jurisdictions might enact legislation similar to the Vermont Act." Froeb Decl. ¶ 15. However, my opinion took this into account. The next five paragraphs respond to this point.

29.     First, several of Dr. Froeb's statements about my declaration are incorrect. For example, Dr. Froeb states that "Dr. Fullerton assumes a static world in which Vermont never amends its Act and other jurisdictions do not implement similar laws or otherwise take similar actions against energy producers." Froeb Decl. ¶¶ 14, 23. However, my declaration assumes neither explicitly nor implicitly anything about a static world with no expectations about future laws, nor does it assume that Vermont will never amend its Act. In fact, Vermont has a large number of options it could undertake. Dr. Froeb also states that "Dr. Fullerton's declaration does not recognize or address these spillover effects and instead concludes, without analysis, that the Vermont Act will have no such effects." Froeb Decl. ¶ 28. However, my declaration has no statement saying or implying that the "Act will have no such effects." Rather, my declaration says "[t]he Act has no definitive indirect effect on prices through changes in the expectations of fossil fuel companies about future liability." The reason is that "economists have no generally accepted theory about how firms and individuals form expectations." Fullerton Decl. ¶ 25.

30.     Second, other speculations about market expectations are equally plausible. If further funds are needed to pay for climate change adaptation, some observers could speculate that Vermont might use any number of possible sources of revenue. Vermont or any state might pay for adaptation using income taxes, sales taxes, or other sources of funds. Nothing in Dr. Froeb's declaration proves that Vermont will amend its Act to cover future years or that other

states will "implement similar laws or otherwise take similar actions against energy producers." Froeb Decl. ¶ 14. Moreover, Dr. Froeb's declaration does not prove that investors or other market participants will expect Vermont to extend the Act or take similar actions against energy producers.

31.     Third, regardless of the Act or any future Vermont action, as noted in my previous declaration (¶ 26), other jurisdictions within the U.S. and around the world are actively trying to reduce emissions using cap-and-trade permit systems, carbon taxes, and other restrictions. The European Union in 2005 implemented a revenue-raising Emissions Trading System (ETS) to limit carbon emissions (raising about $42 billion in U.S. dollars in 2024); the state of California in 2012 implemented a revenue-raising Cap-and-Trade Program to limit carbon emissions (raising $5.13 billion in 2024); and the state of Washington in 2023 implemented a revenue-raising Cap-and-Invest Program to limit carbon emissions (raising $1.1 billion in 2024).[11] In a global map, the World Bank shows locations of 73 carbon taxes or ETS programs in operation worldwide, and notes that "revenues from carbon taxes and ETSs grew by over 10% in 2022, reaching almost USD $95 billion globally."[12] In addition, the Intergovernmental Panel on Climate Change says "global warming will continue to increase in the near term (2021–2040) mainly due to increased cumulative CO2 emissions in nearly all considered scenarios and

---

[11] For the EU, see https://icapcarbonaction.com/en/ets/eu-emissions-trading-system-eu-ets. For California, see https://icapcarbonaction.com/en/ets/usa-california-cap-and-trade-program. For Washington state, see https://icapcarbonaction.com/en/ets/usa-washington-cap-and-invest-program.

[12] The Word Bank (2023). State and Trends of Carbon Pricing 2023, at 23, 26. Available at: https://openknowledge.worldbank.org/bitstreams/bdd449bb-c298-4eb7-a794-c80bfe209f4a/download.

modelled pathways."[13] Thus, with or without Vermont's Act, market participants already are aware of existing legislation and expect future legislation related to climate change, either to limit emissions or to help pay for costs, legislation such as carbon taxes or permit pricing, which are policies that can both limit emissions and help pay for damages. No such expectations can be reliably attributed specifically to Vermont's Act.

32.     Fourth, Dr. Froeb speculates that "other jurisdictions might enact legislation similar to the Vermont Act." Froeb Decl. ¶ 15. Maybe so. Indeed, 11 states have introduced their own climate Superfund bills.[14] On the other hand, suppose states are not allowed to use legislation similar to the Vermont Act that imposes a fixed cost on fossil fuel companies, which standard economic models predict will *not* raise market prices of fossil fuel products and impose burdens on consumers. In that case, those other states may be likely to use carbon pricing laws that place an added price on each future barrel of oil or ton of coal produced (as in the California and Washington laws just described). These other laws clearly *do* raise marginal costs of production and the market price of fossil fuel products. It is speculation, of course, that other states would react to disallowing Vermont's Act by instead using carbon pricing to raise the necessary revenue, but it is likewise speculation that allowing Vermont's Act would induce other states to enact laws similar to Vermont's Act.

33.     Fifth, rather than assuming "a static world," or assuming anything about what laws might be enacted in the future, my prior declaration merely undertakes the task of analyzing

---

[13] IPCC (2023). Summary for Policymakers. In: Climate Change 2023: Synthesis Report. Contribution of Working Groups I, II and III to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, at 12. Available at: https://www.ipcc.ch/report/sixth-assessment-report-cycle/.

[14] See, e.g., *Grist*, "Despite Backlash, More States Are Considering Laws To Make Big Oil Pay For Climate Change," May 19, 2025, at https://perma.cc/9BD7-L2QB.

only Vermont's Climate Superfund Act. As in my final response to Dr. Zycher in ¶ 16 above: "The only assessment that is appropriate to analyze is the assessment actually enacted by the State of Vermont, namely, a one-time assessment that is based on emissions attributable to past fossil fuel extraction … [which] represents a fixed cost on fossil fuel companies and is not a tax on any current investment or future production of any fossil fuel company."

34. In summary, while economic outcomes can sometime depend upon market participants' expectations, economists cannot reliably predict what market participants will expect in the future.

Dated: January 16, 2026

_____
Don Fullerton, Ph.D.